# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SOUTHERN FOODS GROUP, LLC, *et al.*, | ) | Case No. 19-36313 |
|  | ) |  |
| Debtors.[1] | ) | (Joint Administration Requested) |
|  | ) |  |
|  | ) |  |

**EMERGENCY MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING (I) DEBTORS TO (A) PAY PREPETITION EMPLOYEE OBLIGATIONS AND (B) MAINTAIN EMPLOYEE BENEFITS PROGRAMS AND PAY RELATED ADMINISTRATIVE OBLIGATIONS, (II) CURRENT AND FORMER EMPLOYEES TO PROCEED WITH OUTSTANDING WORKERS' COMPENSATION CLAIMS, AND (III) FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS**

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: Southern Foods Group, LLC (1364); Dean Foods Company (9681); Alta-Dena Certified Dairy, LLC (1347); Berkeley Farms, LLC (8965); Cascade Equity Realty, LLC (3940); Country Fresh, LLC (6303); Dairy Information Systems Holdings, LLC (9144); Dairy Information Systems, LLC (0009); Dean Dairy Holdings, LLC (9188); Dean East II, LLC (9192); Dean East, LLC (8751); Dean Foods North Central, LLC (7858); Dean Foods of Wisconsin, LLC (2504); Dean Holding Company (8390); Dean Intellectual Property Services II, Inc. (3512); Dean International Holding Company (9785); Dean Management, LLC (7782); Dean Puerto Rico Holdings, LLC (6832); Dean Services, LLC (2168); Dean Transportation, Inc. (8896); Dean West II, LLC (9190); Dean West, LLC (8753); DFC Aviation Services, LLC (1600); DFC Energy Partners, LLC (3889); DFC Ventures, LLC (4213); DGI Ventures, Inc. (6766); DIPS Limited Partner II (7167); Franklin Holdings, Inc. (8114); Fresh Dairy Delivery, LLC (2314); Friendly's Ice Cream Holdings Corp. (7609); Friendly's Manufacturing and Retail, LLC (9828); Garelick Farms, LLC (3221); Mayfield Dairy Farms, LLC (3008); Midwest Ice Cream Company, LLC (0130); Model Dairy, LLC (7981); Reiter Dairy, LLC (3675); Sampson Ventures, LLC (7714); Shenandoah's Pride, LLC (2858); Steve's Ice Cream, LLC (6807); Suiza Dairy Group, LLC (2039); Tuscan/Lehigh Dairies, Inc. (6774); Uncle Matt's Organic, Inc. (0079); and Verifine Dairy Products of Sheboygan, LLC (7200). The debtors' mailing address is 2711 North Haskell Avenue, Suite 3400, Dallas, TX 75204.

**EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON NOVEMBER 13, 2019 AT 2:30 PM IN COURTROOM 400, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**RELIEF IS REQUESTED NOT LATER THAN NOVEMBER 13, 2019.**

Southern Foods Group, LLC, Dean Foods Company, and certain of their affiliates (collectively, the "**Debtors**"), each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby file this *Emergency Motion of Debtors for Entry of an Order Authorizing (I) Debtors To (A) Pay Prepetition Employee Obligations and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Current and Former Employees To Proceed With Outstanding Workers' Compensation Claims, and (III) Financial Institutions To Honor and Process Related Checks and Transfers* (this "**Motion**"). This Motion is supported by the *Declaration of Gary Rahlfs in Support of Debtors' Chapter 11 Proceedings and First Day Pleadings* (the "**Rahlfs Declaration**") filed contemporaneously herewith. In further support of this Motion, the Debtors respectfully state as follows:

<u>**Relief Requested**</u>

1.      By this Motion, and pursuant to sections 105(a), 362(d), 363(b), 363(c), 507(a)(4), 507(a)(5), and 541 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtors seek entry of an order (the "**Proposed Order**" and, if entered, the "**Order**") (a) authorizing, but not requiring, the Debtors to (i) pay or cause to be paid, in their sole discretion, all or a portion of the amounts owing (and associated costs) under or related to Wages, the Withholding Obligations, the Reimbursement Obligations, the Relocation Obligations, the Health and Welfare Plan

Obligations, the COBRA Obligations, the PTO Obligations, the Disability Obligations, the Retirement Obligations, the Workers' Compensation Obligations, the Contingent Workers Obligations, the Non-Insider Severance Obligations, the Non-Insider Retention Obligations, the Non-Insider STIP Obligation, and the Miscellaneous Obligations (each as individually defined below and, collectively, the "**Prepetition Employee Obligations**") and (ii) unless otherwise set forth herein, continue, in their sole discretion, their plans, practices, programs, and policies for their current and former Employees (as defined below) (collectively, the "**Employee Programs**"), as applicable, as those Employee Programs were in effect as of the Petition Date and as may be modified, terminated, amended, or supplemented from time to time by the Debtors, and to make payments pursuant to the Employee Programs in the ordinary course of business, as well as to pay related administrative obligations, (b) permitting current and former Employees holding claims under the Workers' Compensation Program (as defined below) to proceed with such claims in the appropriate judicial or administrative fora, and (c) authorizing the Debtors' financial institutions to receive, process, honor, and pay all checks or wire transfers used by Debtors to pay the foregoing.

2.      By seeking the authorization requested herein, it should not be presumed that the Debtors have determined, as of this time, which of the Prepetition Employee Obligations they will pay or honor, nor should any party rely on this Motion as to any specific claim or benefit.  Without limiting the foregoing, the Debtors intend to pay all Employees and, where applicable, former Employees, with respect to validly earned Prepetition Employee Obligations that the Debtors would be required to pay in the ordinary course of business.

**Jurisdiction, Venue, and Authority**

3.      The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over this Application pursuant to 28 U.S.C. § 1334 and the *Amended*

*Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012.

4.       This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  In addition, the Debtors confirm their consent, pursuant to Bankruptcy Rule 7008 and Rule 7008-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Local Rules**"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue of the Chapter 11 Cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

5.       On the date hereof, (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have continued in possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner, and no official committee has been appointed in the Chapter 11 Cases.

6.       Contemporaneously herewith, the Debtors have filed a motion requesting the joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.

7.       Additional information about the Debtors' businesses and affairs, capital structure, and prepetition indebtedness, and the events leading up to the Petition Date, can be found in the Rahlfs Declaration, which is incorporated herein by reference.

**Prepetition Employee Obligations**

8.      The Debtors are a leading public food and beverage company and the largest processor and direct-to-store distributor of fresh fluid milk and other dairy and dairy case products in the United States.  The Debtors manufacture, market, and distribute a wide variety of branded and private label dairy and dairy case products, including fluid milk, ice cream, cultured dairy products, creamers, ice cream mix, and other dairy products to retailers, distributors, foodservice outlets, educational institutions, and governmental entities across the United States.

9.      Crucial to their businesses, the Debtors employ a talented and dedicated workforce that has enabled the Debtors to continue to achieve their high standards of quality, safety, and sustainability for their products and the processes.

<u>Wages, Salaries, and Other Compensation</u>

10.      As of the Petition Date, the Debtors employ approximately 15,000 people in active status working in both full-time and part-time positions, including those related to milk and dairy products production, operations and logistics, sales, accounting and finance, legal, administration, human resources, and information technology (collectively, with current members of the Debtors' Boards of Directors[2] or similar governing bodies, "**Employees**").  Approximately 40% of the Employees participate in at least one of a multitude of collective bargaining agreements with the Debtors of varying duration and terms (the "**CBAs**").  The Debtors maintain headquarters in Dallas, Texas, where a majority of their corporate and administrative employees reside, but they also have employees located across all 50 states.

---

[2] The Debtors pay Wages (as defined herein) to their Board of Directors in the form of annual cash retainers (paid in quarterly installments in advance), chairman fees, and meeting fees (for meeting in excess of eight per year).

11.     The Debtors pay their Employees' wages and salaries (collectively, the "**Wages**")[3] under a number of different pay cycles:[4]

- Semi-monthly.  Approximately 2,200 Employees are paid on the 15th and 31st of each month, and are considered to be current as of each pay date.  For each semi-monthly payroll period, the Debtors pay on average approximately $11,100,000 (in gross amounts).  The Debtors estimate that, as of the Petition Date, they owe approximately $100,000 on account of such Wages.

- Bi-weekly.  Approximately 6,600 Employees are paid every other Friday, one week in arrears (with an exception that 300 employees are paid two weeks in arrears).  Of these Employees, approximately 3,400 are paid on the first and third Friday of each month (*i.e.*, bi-weekly odd) and approximately 3,200 are paid on the second and fourth Friday of each month (*i.e.*, bi-weekly even).  For each bi-weekly odd payroll period, the Debtors pay on average approximately $8,900,000 (in gross amounts) and, for each bi-weekly even payroll period, the Debtors pay on average approximately $9,100,000 (in gross amounts).  The Debtors estimate that, as of the Petition Date, they owe approximately $7,100,000 in Wages to bi-weekly odd Employees and $4,800,000 to bi-weekly even Employees.

---

[3] Certain Wages have been prepaid to Employees for work performed and expected to be performed through November 15, 2019.

[4] ADP, LLC ("**ADP**") serves as the Debtors' payroll administrator, for which the Debtors pay ADP approximately $200,000 per month for processing payroll, tax withholdings, and other human resources information systems.  ADP impounds Wages for Employees two days prior to their pay dates and impounds taxes and garnishments one day prior to their pay dates.

- <u>Weekly</u>.  Approximately 6,200 Employees are paid every Friday, one week in arrears.   For each weekly payroll period, the Debtors pay on average approximately $8,300,000 (in gross amounts).  The Debtors estimate that, as of the Petition Date, they owe approximately $6,200,000 in Wages to weekly Employees.

12.     The Debtors believe that, as of the Petition Date, no Employee is owed Wages in excess of the $13,650 statutory cap under section 507(a)(4) of the Bankruptcy Code.[5]

Withholding Obligations

13.     The Debtors withhold from Employees' Wages certain amounts that the Debtors are required to transmit to third parties for such purposes as Social Security, Medicare, federal, and state income taxes, the medical and dental plans, the vision plan, retirement plans, contributions and payroll deduction payment programs for various insurance programs, health savings accounts, flexible savings accounts, garnishments, and other similar mandatory withholdings (collectively, the "**Withholding Obligations**").

14.     The Debtors' average Withholdings Obligations are summarized below:

| Withholding Obligation | Estimated Amount Per Payroll Period | Estimated Amount Accrued & Unpaid as of the Petition Date |
|---|---|---|
| Employee Taxes[6] | $3,600,000 | $3,800,000 |
| Medical and Dental | $400,000 | $400,000 |
| Vision | $100,000 | $100,000 |
| 401(k) | $900,000 | $3,100,000 |
| Insurance | $100,000 | $100,000 |

---

[5] As noted below, PTO Obligations associated with certain select Employees have accrued over several years of such Employees' service due to some states' laws that do not permit "use or lose" PTO policies.  The Debtors do not intend to make any immediate cash payments for these amounts; rather, the Debtors intend to satisfy such PTO Obligations over time through time off and limited cash payments.

[6] Excludes Employer Taxes, estimated at $1,400,000 per payroll period and $1,500,000 accrued and unpaid as of the Petition Date.

| Withholding Obligation | Estimated Amount Per Payroll Period | Estimated Amount Accrued & Unpaid as of the Petition Date |
|---|---|---|
| Health Savings Accounts & Flexible Savings Accounts | $200,000 | $200,000 |
| Garnishments | $200,000 | $200,000 |
| Other Withholdings | $200,000 | $200,000 |
| **Total** | **$5,700,000** | **$8,100,000** |

15.     The Debtors believe that the Withholding Obligations, to the extent that they were in the Debtors' possession as of the Petition Date and/or remain in the Debtors' possession, are not property of the Debtors' bankruptcy estates under section 541 of the Bankruptcy Code.

### Business Expense Reimbursement

16.     In accordance with their corporate policies, the Debtors reimburse Employees who incur business expenses in the ordinary course of performing their business duties on behalf of the Debtors.  These reimbursement obligations include, among other things, travel (*e.g.*, airfare, hotel, car rental, car mileage, gas, cab, and business parking), business meals and entertainment, and office expenses (collectively, the "**Reimbursement Obligations**").

17.     Reimbursement is made directly to the Employee for business expenses paid by such Employee.  In the first nine months of 2019, the Reimbursement Obligations averaged approximately $600,000 per month.  Although it is difficult for the Debtors to determine the exact amount of the Reimbursement Obligations outstanding at any particular time because of the generally unpredictable and irregular nature of Employees seeking payment pursuant to the Reimbursement Obligations, the Debtors estimate that they owe approximately $900,000 related to Reimbursement Obligations as of the Petition Date.

### Relocation Benefits

18.     In the ordinary course of business, the Debtors pay or reimburse Employees for relocation expenses incurred at the Debtors' request or for the Debtors' benefit on a case-by-case

basis at the Debtors' discretion (collectively, the "**Relocation Obligations**").  The Relocation Obligations generally include amounts incurred for property rental assistance, temporary lodging and housing, moving expenses, travel expenses for housing services and visits, storage, lease termination, and sales and marketing assistance.  As of the Petition Date, the Debtors believe that $400,000 in Relocation Obligations remain outstanding.

Health and Welfare Benefits

19.    The Debtors offer several health and welfare benefit plans (collectively, the "**Health and Welfare Plans**") to Employees, including, among other things, coverage for medical, medical plan support vendors, prescription drugs and specialty prescriptions, dental, vision, health savings accounts and flexible spending accounts, critical illness and accidental death and dismemberment insurance, short-term disability and long-term disability insurance, workers' compensation, and COBRA (as defined herein) (collectively, the "**Health and Welfare Plan Obligations**").

20.    The Debtors' medical and dental plans (collectively, the "**Medical and Dental Plans**") require the Debtors to pay for the costs arising under such plans, including claim payments and associated administrative costs.  Administrative costs in respect of the Medical and Dental Plans total approximately $2,900,000 over the first nine months of 2019.  As of January 1, 2019, the Medical and Dental Plans were insured by and administered through a variety of companies, including UMR Inc., Delta Dental, Blue Care Network, ValueOption, United Healthcare, Livongo Health Inc., CVS CareMark, Vivio Health Inc., Vision Service Plan, and Wage Works.

21.    In the first nine months of 2019, payments on account of Health and Welfare Plans totaled approximately $99,400,000, comprised of (a) $76,300,000 for payments under the Medical and Dental Plans, (b) $11,500,000 for prescription and specialty drugs, (c) $6,500,000 for contributions to health savings accounts and flexible savings accounts, (d) $0 for payments under

the vision plans (which are fully funded by Employees), (e) $3,500,000 for payments under the short-term disability benefits plan, (f) $400,000 for payments under the critical illness and accidental death and dismemberment insurance plans, (g) $1,000,000 for payments under the employee assistance plan (*i.e.*, counseling service for employees), and (h) $200,000 for other post-employment benefits.

22.     The Debtors also incurred $3,500,000 in the first nine months of 2019 in connection with a third party administrator's management, reporting, and processing of certain obligations to former Employees under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("**COBRA**").  All Employees have the right under COBRA to elect to receive COBRA coverage, which extends medical, dental, and vision benefits to which an Employee was entitled immediately prior to termination for a specified post-termination period of 18 months (collectively, the "**COBRA Obligations**").  Employees who elect to receive COBRA coverage are required to pay 102% of the elected premiums.  As of the Petition Date, approximately 200 former Employees have elected to receive COBRA coverage.

23.     All other Health and Welfare Plans (besides the Medical and Dental Plans) are insured by and administered through a variety of companies, including Benefit Choice, Beacon Health Option, Coordinated Care Program, Sedgwick, Life Insurance Co. of North American ("**CIGNA**"), Aflac Group Insurance, and Total Administrative Services Corporation.

24.     Because of the manner in which expenses are incurred and claims are processed under the Health and Welfare Plans, it is difficult for the Debtors to determine the extent of their obligations under the Health and Welfare Plans outstanding at any particular time.  Based on historical experience and expected future trends, the Debtors estimate that the cost of the Health and Welfare Plan Obligations (including payments to administrators) is approximately

$11,500,000 per month.  As of the Petition Date, the Debtors estimate that they owe approximately $15,200,000 on account of the Health and Welfare Plan Obligations (including payments to administrators).

Paid Time Off

25.     Pursuant to the Debtors' general paid time off policies ("**PTO**"),[7] Employees earn PTO days based on length of service, and they are earned over the course of a calendar year:

| Length of Service | PTO days |
|---|---|
| Less than 2 years | 10 |
| 2 to 6 years | 15 |
| 7 to 14 years | 20 |
| 15 to 24 years | 25 |
| 25 years and up | 30 |

Unless specifically approved by the Debtors, unused PTO days are not permitted to be carried over into the next calendar year.  Certain Employees are eligible to sell back their earned but unused PTO days to the Debtors, and the Debtors estimate that, as of the Petition Date, such sell back obligations total approximately $3,000,000.  Additionally, if an Employee's employment is terminated, that Employee is entitled to receive pay for earned but unused PTO days, regardless of the Employee's length of service or the reason for termination.  In addition to PTO days, certain Employees are eligible for holiday pay.  The Debtors intend to honor prepetition accrued PTO and holiday pay obligations for their Employees (collectively, the "**PTO Obligations**"), in the ordinary course of business.[8]

---

[7] PTO for new Employees is negotiated prior to the commencement of their employment and may vary from the general policies described herein.

[8] A select number of Employees—less than 50—reside in states that do not permit "use or lose" PTO policies. As such, PTO Obligations associated with these Employees have accrued over several years of the Employees' service. The Debtors do not intend to make immediate cash payment for these amounts; rather, the Debtors intend to satisfy such PTO Obligations over time through time off and limited cash payment.

Disability Benefits

26.     The Debtors also offer disability benefits to their Employees, consisting of short-term and long-term disability benefits.  In the event that an Employee becomes eligible for disability benefits, the benefits are provided for up to 26 weeks, after which period certain eligible Employees may receive additional long-term disability benefits.  The short-term disability benefits are administered and insured by Sedgwick, and the long-term disability benefits are administered and insured by Life Insurance Co.  In the first nine months of 2019, the Debtors' incurred expenses of approximately $3,500,000 on account of the obligations related to the benefits described in this paragraph (collectively, the "**Disability Obligations**").  The Debtors believe that, as of the Petition Date, $2,300,000 in Disability Obligations remain outstanding.

Pensions

27.     The Debtors currently are contributing employers to 15 multiemployer pension plans ("**MEPPs**"), each of which is sponsored by a specific labor union.[9]  The Debtors are required to make annual contributions to the MEPPs under each relevant CBA that the Debtors have entered into with each labor union (collectively, the "**MEPPs Obligations**").  In 2019, the Debtors contributed $29,800,000 to the 15 MEPPs.

28.     In addition, the Debtors sponsor various single employer pension plans ("**SEPPs**" and the obligations thereunder, the "**SEPPs Obligations**" and, together with the MEPPs

---

[9] These MEPPs include the following plans: Automotive Industries Pension Plan; Central Pennsylvania Teamsters Defined Benefit Plan; Central Pension Fund of IUOE & Participating Employers; Central States Southeast & Southwest Area Pension Plan; Dairy Industry – Union Pension Plan for Philadelphia and Vicinity; Employer-Teamsters Locals Nos. 175 & 505 Pension Trust Fund; IAM National Pension Fund; IUOE Statutory Engineers Local 39 Pension Plan; Local 584 Pension Trust Fund; Milk Wagon Drivers' Union 753 and Milk Dealers' Pension Trust Pension Plan; New England Teamsters & Trucking Industry Pension; Retail Wholesale & Department Store International Union and Industry Pension Fund; Rockford Area Dairy Industry Local 754 IBT Retirement Pension Plan; Western Conference of Teamsters Pension Plan; and Western States Office and Professional Employees Pension Fund.

Obligations, the "**Pension Obligations**") in addition to the union-sponsored MEPPs. Only the Debtors' Employees and former Employees may participate in the SEPPs. In 2019, the Debtors contributed $0 to the SEPPs.[10]

Non-Pension Retirement Plans

29.     The Debtors maintain various non-pension retirement plans. The Debtors' obligations under such non-pension retirement plans, as described below, are referred to collectively herein as the "**Non-Pension Retirement Obligations**" (and, together with the Pension Obligations, the "**Retirement Obligations**"):

- Dean Foods SmartChoice Savings Plan. This is a 401(k) plan for which certain non-union Employees that meet age and service criteria are eligible.

- Dean Union 401(k) Plan. This is a 401(k) plan for Employees that (a) are covered by a CBA that authorizes the offering of this 401(k) plan and (b) meet age and service criteria.

- Dean Foods Supplemental Executive Retirement Plan. This is a 401(k) restoration plan that permits the Debtors to match contributions made by Employees whose contributions are cut off by the 401(k) wage limits.

30.     The Debtors make contributions related to the Non-Pension Retirement Obligations on a weekly basis following payroll, and such contributions total, on average, approximately $500,000. The Debtors estimate that they have made contributions related to the Non-Pension Retirement Obligations in an amount equal to $17,300,000 on a year-to-date basis. As of the

---

[10] The Debtors prefunded certain accounts that fund benefits due under the SEPPs, but have not contributed any money to the SEPPs in 2019.

Petition Date, the Debtors believe that they have approximately $1,100,000 in aggregate Non-Pension Retirement Obligations outstanding.

Workers' Compensation Program

31.     Under applicable law, the Debtors are required to maintain a workers' compensation insurance program to cover Employees' workers' compensation claims arising from or related to their employment with the Debtors (the "**Workers' Compensation Program**") and to satisfy the Debtors' obligations arising under or related to the Workers' Compensation Program (collectively, the "**Workers' Compensation Obligations**").    The Workers' Compensation Obligations are backed by secured letters of credit, and if the Debtors were to fail to make payments owed under the Workers' Compensation Program such secured letters of credit would be drawn.

32.     For each claim under the Workers' Compensation Program, the Debtors file an injury report with a third party claims administrator.  As of October 1, 2018, the Debtors' current third party administrator is Sedgewick; however, there are also legacy third party claims administrators handling active Workers' Compensation claims, including Helmsman, Gallagher-Bassett, and Crawford.  The third party administrators perform an independent investigation of whether the claim is eligible for coverage.  Once a claim is deemed eligible, the third party claims administrators administer and pay out such claims.

33.     As of the Petition Date, the Debtors have $85,400,000 in outstanding Workers' Compensation Obligations.

Contingent Workers

34.     From time to time, the Debtors use the personal services of individuals employed by, and provided through, staffing agencies and of individuals providing personal services directly as independent contractors (collectively, the "**Contingent Workers**").     Such services are

-14-

necessary to the operation of the Debtors' businesses. The Contingent Workers include, but are not limited to, short-term production staff, maintenance staff, clerical staff, and other short-term service providers as needed on an *ad hoc* basis. Payments to the Contingent Workers (collectively, the "**Contingent Workers Obligations**") vary according to the terms of the Contingent Workers' individual contracts with the Debtors or according to the terms of the Debtors' contracts with the appropriate staffing agencies. It is difficult for the Debtors to determine total accrued and unpaid prepetition obligations to the Contingent Workers because of the generally unpredictable and irregular nature of such obligations.

Severance Program

35. The Debtors have certain obligations (collectively, the "**Severance Obligations**") arising out of a severance plan maintained by the Debtors for the benefit of all of their Employees (as may be amended, restated, supplemented, or modified from time to time, the "**Severance Program**"), some of whom may be considered insiders of the Debtors (as that term is defined in section 101(31) of the Bankruptcy Code) (collectively, "**Insiders**").[11] The Severance Program, as amended and restated by the Debtors on May 8, 2019, provides terminated Employees with cash payments, depending on title and basis for termination, in accordance with the terms thereof and as summarized below:

**Qualifying Reduction in Force Termination Severance Benefits**

| Title | Calculation | Minimum Payment | COBRA-Related Benefit |
|---|---|---|---|
| **Grade 18 & Above** Senior Executives and all levels of VPs | Weekly Wages (Annual Wages / 52 weeks) x Weeks of Severance x 2x | $14,100,000 | Employer Coverage for Earned Weeks of Severance |

---

[11] For union Employees covered by CBAs that do not contain severance clauses, the Debtors generally pay severance amounts consistent with the Severance Program applicable to non-union Employees.

| | (Severance multiplier) | | |
|---|---|---|---|
| **Grade 15-17** Directors and Senior Managers | Weekly Pay (Annual Pay / 52 weeks) x Weeks of Severance x 2x (Severance multiplier) | $35,400,000 | Employer Coverage for Earned Weeks of Severance |
| **Grade 10-14** Supervisors, Managers, and Exempt Employees | Weekly Pay (Annual Pay / 52 weeks) x Weeks of Severance x 1x (Severance multiplier) | $63,500,000 | Employer Coverage for Earned Weeks of Severance |
| **Below Grade 10** Non-union front-line workers, hourly associates, and non-exempt office staff | Weekly Pay (Annual Pay / 52 weeks) x Weeks of Severance x 1x (Severance multiplier) | $203,900,000 | Employer Coverage for Earned Weeks of Severance |

36.     In the first nine months of 2019, the Debtors paid approximately $6,900,000 on account of Severance Obligations.  The Debtors believe that, as of the Petition Date, approximately $12,600,000 owed under the Severance Program is outstanding.  For the avoidance of doubt, the Debtors are not seeking authority to continue the Severance Program with respect to Employees who were or are Insiders, but only with respect to all other Employees who are not Insiders and are eligible to receive payments pursuant to the Severance Program (collectively, the "**Eligible Non-Insider Employees**"). [12]   The Debtors believe that having the authority, in their sole discretion, to maintain the Severance Program for Eligible Non-Insider Employees (the "**Non-Insider Severance Obligations**") is essential to their businesses in order to retain, and provide security to, Eligible Non-Insider Employees.  Although it is difficult for the Debtors to estimate

---

[12] The Debtors reserve the right to seek, through another motion, approval of a severance program with respect to Insiders that is consistent with section 503(c) of the Bankruptcy Code.  Furthermore, the Debtors reserve all of their rights to contest any claim by an Eligible Non-Insider Employee to payment under the Severance Program.

-16-

the average monthly cost of the Non-Insider Severance Obligations given the generally unpredictable and irregular nature of such obligations, the Debtors believe that the monthly cost of maintaining the Non-Insider Severance Program for Eligible Non-Insider Employees is negligible in the context of the Debtors' aggregate compensation and benefit obligations.

<u>Retention Obligations</u>

37.    The Debtors have certain retention obligations arising out of *ad hoc* agreements that the Debtors entered into in the normal course of business with key Employees. As of the Petition Date, the Debtors have accrued approximately $1,800,000 in retention obligations owed to non-Insiders (collectively, the "**Non-Insider Retention Obligations**"). By this Motion, the Debtors are seeking authority to pay Non-Insider Retention Obligations of approximately $180,000 related to calendar year 2019 and Non-Insider Retention Obligations of approximately $540,000 related to calendar year 2020. None of the foregoing Employees are covered by any other of the Debtors' retention programs. The Debtors believe that having the authority, in their sole discretion, to pay the Non-Insider Retention Obligations to non-Insider Employees is essential to their businesses in order to retain, and provide security to, eligible non-Insider Employees.

<u>Non-Insider Incentive Plans</u>

38.    The Debtors maintain incentive plans for the Employees. The incentive plans are carefully calibrated to ensure that eligible Employees are rewarded for their efforts toward the Debtors' financial performance and productivity, as well as their contributions to the Debtors' achievement of maximum quality, workplace safety, and environmental compliance. Pursuant to this Motion, the Debtors seek authority to continue certain of these incentive plans with respect to Employees who are not Insiders, as detailed below. This Motion does not seek to continue any incentive plans with respect to Insiders, which may be addressed in a subsequent motion to be filed with the Court.

39.     In the ordinary course of business, the Debtors offer awards under a short-term incentive plan (the "**STIP**") to certain Employees for the purpose of providing Employees with a direct financial incentive in meeting certain financial goals and other departmental objectives identified by the Debtors. Each Employee's STIP opportunity is based on his or her role and position within the Debtors' businesses and is earned at the company-wide and individual employee levels.  Indeed, certain minimum performance thresholds must be achieved prior to the payment of any compensation under the STIP.

40.     The STIP is earned over the course of a calendar year and paid on March 15 of the following calendar year.  The calendar year 2018 STIP that was paid on March 15, 2019 totaled approximately $10,000,000.  The Debtors seek authority in this Motion to make payments under the STIP to non-Insider Employees (collectively, the "**Non-Insider STIP Obligations**") for employee performance during the calendar year 2019.  The Debtors estimate that the Non-Insider STIP Obligations accrued thus far for the calendar year 2019 due to be paid on March 15, 2020 will total approximately $9,400,000.

41.     The Debtors also maintained, in the ordinary course of business, a Long-Term Incentive Performance Plan (the "**LTIP**").  The LTIP was available to approximately 320 Employees (including all Insiders) and provided for a variety of cash- and stock-based incentive awards (collectively, "**Awards**") to individual Employees at the discretion of the Debtors' Board of Directors.  Under the LTIP, the Debtors paid approximately $4,000,000 in Awards in 2019.

Miscellaneous Programs

42.     Finally, the Debtors maintain a number of miscellaneous programs aimed at boosting Employee morale.  Such programs are *de minimis* in amount and include, among other things, the following: year of service awards; special performance awards; gift card programs;

retirement awards; employee appreciation rewards; plant closure incentives; holiday parties; and other bonuses related to attendance, quality assurance, and safety.  The Debtors estimate that obligations relating to these programs (the "**Miscellaneous Obligations**") total approximately $2,300,000 annually.  As of the Petition Date, the Debtors estimate that they have approximately $500,000 of Miscellaneous Obligations outstanding.

### Basis for Relief

Cause Exists To Authorize the Debtors To Pay Prepetition Employee Obligations, Maintain
Employee Programs, and Pay Related Administrative Obligations

43.      Pursuant to sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, an individual's claims for "wages, salaries, or commissions, including vacation, severance, and sick leave pay" earned within 180 days before the Petition Date, and claims against the Debtors for contributions to employee benefit plans arising from services rendered within 180 days before the Petition Date, are each afforded unsecured priority status for amounts up to $13,650 per employee. 11 U.S.C. §§ 507(a)(4), (5).  Furthermore, section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(1).  Section 105(a) of the Bankruptcy Code further provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

44.      The Debtors believe that many of their Prepetition Employee Obligations constitute priority claims under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.  To the extent such Prepetition Employee Obligations constitute priority claims, the Debtors will be required to pay such claims in full to confirm a chapter 11 plan.  *See* 11 U.S.C. § 1129(a)(9)(B).  Thus, granting

the relief sought herein would only cause such Employee claims to be paid in the initial stages of the Chapter 11 Cases, rather than at the plan confirmation stage.

45.     Section 363(b)(1) of the Bankruptcy Code empowers the Court to allow a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(1).   Debtors' decisions to use, sell, or lease assets outside the ordinary course of business must be based upon the sound business judgment of the debtor.  *See, e.g.*, *Inst'l Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale . . . .").

46.     Courts emphasize that the business judgment rule is not an onerous standard and that it "is flexible and encourages discretion."  *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011).   "Great judicial deference is given to the [debtor's] exercise of business judgment."  *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 254 (N.D. Tex. 2005).   As long as a transaction "appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision to [enter into the transaction] should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the Bankruptcy Code."  *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (citation and internal quotation marks omitted).

47.     Moreover, section 363(c) of the Bankruptcy Code authorizes a debtor in possession operating its business pursuant to section 1108 of the Bankruptcy Code to "enter into transactions . . . in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business, without notice or a hearing."  11 U.S.C. § 363(c)(1).  One purpose of section 363(c) of the Bankruptcy Code is to provide a debtor with the flexibility to engage in the ordinary course transactions required to operate its business without undue supervision by its creditors or the court.  *See, e.g.*, *In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992) (citations omitted) ("Section 363 is designed to strike [a] balance, allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets.").  Included within the purview of section 363(c) of the Bankruptcy Code is a debtor's ability to continue "routine transactions" necessitated by a debtor's business practices.  *See, e.g.*, *Amdura Nat. Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996) (citations omitted) ("A debtor in possession under Chapter 11 is generally authorized to continue operating its business."); *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 796 (Bankr. D. Del. 2007) (citations omitted) (noting that courts have shown a reluctance to interfere in a debtor's making of routine, day-to-day business decisions).

48.     The Bankruptcy Code does not define "ordinary course of business."  In determining whether a transaction qualifies as "ordinary course," the courts use the "horizontal" dimension test (*i.e.*, "the way businesses operate within a given industry") and the "vertical" dimension test (*i.e.*, whether the transaction is consistent with the reasonable "expectations of creditors").  *See See Denton Co. Elec. Coop., Inc. v. Eldorado Ranch, Ltd. (In re Denton Cty. Elec. Coop., Inc.)*, 281 B.R. 876, 882 & n.12 (Bankr. N.D. Tex. 2002) (collecting cases).  "In general,

under the vertical test, courts look at whether the transaction subjects a hypothetical creditor to a different economic risk than existed when the creditor originally extended credit.  Under the horizontal test, in general courts look at whether the transaction was of the sort commonly undertaken by companies in the industry.  The primary focus is on the debtor's pre-petition business practices and conduct." *In re Patriot Place, Ltd.*, 486 B.R. 773, 793 (Bankr. W.D. Tex. 2013).

49.     The Debtors submit that, to the extent that the use of property of the estate is implicated here, the relief requested in this Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm, and is justified under section 363 of the Bankruptcy Code.  Any delay in paying the Prepetition Employee Obligations or failure to maintain the Employee Programs and pay related administrative obligations will adversely impact the Debtors' relationships with their Employees and could irreparably impair Employees' morale, dedication, confidence, and cooperation.  The Debtors' businesses hinge on their relationships with their customers and the ability to deliver superior products and services is vital.  The Employees' support for the Debtors' restructuring efforts in the Chapter 11 Cases is critical to the success of those efforts.  At this early stage, the Debtors simply cannot risk the substantial damage to their businesses that would inevitably attend any decline in their Employees' morale attributable to the Debtors' failure to pay the Prepetition Employee Obligations.

50.     Absent an order granting the relief requested in this Motion, many Employees would undoubtedly suffer hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable certain Employees to meet their own personal financial obligations.  Without the requested relief, the stability of the Debtors would be undermined, perhaps irreparably, by the possibility that otherwise loyal Employees will seek other employment

alternatives.  Consequently, all of the Debtors' creditors will benefit if the requested relief is granted.

51.     In fact, numerous courts in this jurisdiction have granted relief similar to that requested herein.  *See*, *e.g.*, *In re Alta Mesa Resources, Inc.*, No. 19-35133 (MI) (Bankr. S.D. Tex. Oct. 7, 2019); *In re Bristow Group Inc.*, No. 19-32713 (DRJ) (Bankr. S.D. Tex. May 14, 2019); *In re Vanguard Natural Resources, Inc.*, No. 19-31786 (DRJ) (Bankr. S.D. Tex. Apr. 2, 2019); *In re Parker Drilling Co.*, No. 18-36958 (MI) (Bankr. S.D. Tex. Dec. 13, 2018); *In re Westmoreland Coal Co.*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. Oct. 30, 2018); *In re iHeartMedia, Inc.*, No. 18-31274 (MI) (Bankr. S.D. Tex. Apr. 12, 2018).  The Debtors submit that the circumstances described herein warrant similar relief.

52.     Finally, the Debtors submit that payment of the Prepetition Employee Obligations, maintaining the Employee Programs and paying related administrative expenses is necessary and appropriate and is authorized under section 105(a) of the Bankruptcy Code pursuant to what is referred to interchangeably as the "doctrine of necessity" or "necessity of payment rule".  The doctrine of necessity functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code.  *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (recognizing the "doctrine of necessity"); *In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2003) (same and citing *In re CoServ*); *see also In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to debtor's continued operation); *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code "provides a statutory basis for payment of pre-petition claims" under the doctrine of necessity).

-23-

53.     The Court's power to utilize the "doctrine of necessity" in the Chapter 11 Cases derives from the Court's inherent equity powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  "[T]he debtor-in-possession's role as the equivalent of a trustee under § 1107(a) and its duty to protect the going-concern value of an operating business in a Chapter 11 provide[s] the 'bridge that makes application to the Doctrine of Necessity 'necessary or appropriate to carry out the provisions of' the Bankruptcy Code.'"  *In re CEI Roofing, Inc.*, 315 B.R. 50, 56 (Bankr. N.D. Tex. 2004) (citing *In re CoServ*, 273 B.R. at 497).  Accordingly, the Court has expansive equitable powers to fashion any order or decree that is in the interest of preserving or protecting the value of the Debtors' assets.  *See In re Young*, 416 F. App'x 392, 398 (5th Cir. 2011) (recognizing that "[s]ection 105(a) of Title 11 permits the bankruptcy court to exercise broad authority"); *In re Nixon*, 404 F. App'x 575, 578 (3d Cir. 2010) (citation omitted) ("It is well settled that the court's power under § 105(a) is broad."); *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004) (citation omitted) (noting that section 105 of the Bankruptcy Code "has been construed to give a bankruptcy court 'broad authority' to provide equitable relief appropriate to assure the orderly conduct of reorganization proceedings"); *In re Trevino*, 599 B.R. 526, 542-43 (Bankr. S.D. Tex. 2019) (noting that the bankruptcy court has "broad authority" under section 105(a) of the Bankruptcy Code); *In re Padilla*, 379 B.R. 643, 667 (Bankr. S.D. Tex. 2007) (citations omitted) ("Section 105(a) gives bankruptcy courts broad authority to take actions necessary and appropriate for administering and enforcing the Bankruptcy Code and . . . authorizes a bankruptcy court to fashion such orders as are necessary to further the purposes of the substantive provisions of the Bankruptcy Code."); *see also Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) (citation omitted) ("Section 105 sets out the power of the

-24-

bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code.").

54.     The United States Supreme Court first articulated the doctrine of necessity more than a century ago, in *Miltenberger v. Logansport Ry. Co.*, 106 U.S. 286 (1882), in affirming the authorization by the lower court of the use of receivership funds to pay pre-receivership debts owed to employees, vendors, and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership. *See id.* at 309. This doctrine has become an accepted component of modern bankruptcy jurisprudence, and courts' application of it largely adheres to the Supreme Court's reasoning in *Miltenberger*. *See, e.g.*, *In re Lehigh & New Eng. Ry.*, 657 F.2d at 581-82 ("[I]n order to justify payment under the 'necessity of payment' rule, a real and immediate threat must exist that failure to pay will place the continued operation of the [debtor] in serious jeopardy."); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369 (Bankr. S.D. Tex. 2000) (noting that "courts in this district" have applied this doctrine "primarily out of common sense and the presence of a legal or factual inevitability of payment"); *In re Mirant*, 296 B.R. at 429 (applying the rule where the "Debtors' businesses [would be] seriously damaged by the delay required to satisfy the court that a particular creditor should be paid its prepetition claim outside of a confirmed plan"); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (holding that the "ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept"); *In re Just for Feet, Inc.*, 242 B.R. at 826 (stating that where the debtor "cannot survive" absent payment of certain prepetition claims, the doctrine of necessity should be invoked to permit payment).

55.     The doctrine of necessity is frequently invoked early in a reorganization, particularly in connection with those chapter 11 sections that relate to payment of prepetition claims.  For instance, the court in *In re StructureLite Plastics Corp.* indicated its accord with "the principle that a bankruptcy court may exercise its equity powers under § 105(a) to authorize payment of prepetition claims where such payment is necessary to 'permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately.'" *In re StructureLite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988) (citations omitted).  The court stated that a "*per se* rule proscribing the payment of prepetition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code." *Id.* at 932. Accordingly, pursuant to section 105(a) of the Bankruptcy Code, the Court is empowered to grant the relief requested herein.

56.     Based upon the foregoing, the Debtors submit that the relief requested herein is essential, appropriate, and in the best interests of the Debtors' estates and stakeholders.  Absent this relief, the value of the Debtors' estates will suffer, possibly precipitously.  Consequently, the Debtors' stakeholders will benefit if the requested relief is granted.

**Cause Exists To Authorize the Debtors To Continue to Pay and/or Honor Any and All Workers'
Compensation Obligations and To Authorize Current and Former Employees To Proceed with
<u>Outstanding Workers' Compensation Claims</u>**

57.     It is imperative that the Debtors be permitted to continue to pay and/or honor any and all Workers' Compensation Obligations, including all prepetition premiums, claims (including claim settlements), losses, and expenses in connection with the Workers' Compensation Obligations, and to pay all costs and expenses associated with the Workers' Compensation Program, including such costs and expenses related to administration, servicing, processing, adjusting, paying, and settling claims and losses under these programs.

58.     It is crucial for Employee morale and for the Debtors' operations that the Debtors be able to continue to (a) pay workers' compensation benefits and (b) honor the Workers' Compensation Obligations under the Workers' Compensation Program described herein.

59.     Section 362(a) of the Bankruptcy Code operates to stay, among other things:

> the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title.

11 U.S.C. § 362(a).  Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." 11 U.S.C. § 362(d)(1).

60.     To the extent that any current or former Employees hold claims pursuant to the Workers' Compensation Program, the Debtors seek authorization under section 362(d) of the Bankruptcy Code to permit such current or former Employees, in the Debtors' sole discretion, to proceed with such claims in the appropriate judicial or administrative fora.  The Debtors believe that cause exists to grant them authority to modify the automatic stay, where the Debtors deem it appropriate to do so, because staying such claims could have a detrimental effect on the financial and medical well-being and morale of their Employees and lead to the departure of certain Employees.  Such departures could cause a severe disruption in the Debtors' businesses, to the detriment of all parties in interest.  To this end, the Debtors seek an order granting (a) relief from the automatic stay as it relates to current and former Employee claims under the Workers' Compensation Program and (b) waiver of the corresponding notice requirements under Bankruptcy Rule 4001(d).

61.     Pursuant to this Motion, the Debtors do not seek a waiver, termination or modification of the automatic stay with respect to any other claims.

**Applicable Financial Institutions Should Be**
**Authorized To Honor and Process Related Checks and Transfers**

62.     The Debtors also request that all applicable financial institutions be authorized to (a) receive, process, honor, and pay all checks presented for payment of, and to honor all fund transfer requests made by the Debtors related to, the claims that the Debtors request authority to pay in this Motion, regardless of whether the checks were presented or fund transfer requests were submitted before, on, or after the Petition Date and (b) rely on the Debtors' designation of any particular check as approved by the Proposed Order.

**Debtors' Reservation of Rights**

63.     Nothing contained herein is intended or should be construed as, or deemed to constitute, an agreement or admission as to the validity of any claim against the Debtors on any grounds, a waiver or impairment of the Debtors' rights to dispute any claim on any grounds, or an assumption or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code.  The Debtors expressly reserve their rights to contest any claims related to the Prepetition Employee Obligations under applicable bankruptcy and non-bankruptcy law.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended, and should not be construed, as an admission as to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

**Emergency Consideration**

64.     Pursuant to Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this Motion under Bankruptcy Rule 6003(b).  Bankruptcy Rule 6003 provides that, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the

-28-

court shall not, within 21 days after the filing of the petition, issue an order granting . . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition . . . ." Fed. R. Bankr. P. 6003.  As set forth in this Motion and the Rahlfs Declaration, the Debtors believe that an orderly transition into chapter 11 is critical to the viability of the Debtors' businesses, operations, and estates and that any delay in granting the emergency relief requested herein could cause immediate and irreparable harm.  If the Debtors are not permitted to continue their ordinary business operations by continuing to pay the Prepetition Employee Obligations as they come due, and to reassure their Employees that authority has been granted to honor all such claims, the Debtors could suffer immediate and irreparable harm.  Accordingly, the emergency relief requested herein is consistent with Bankruptcy Rule 6003.

**Compliance with Bankruptcy Rule 6004(a) and Waiver of Bankruptcy Rule 6004(h)**

65.     To implement successfully the relief sought herein, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances.  The Debtors also request that, to the extent applicable to the relief requested in this Motion, the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their businesses without interruption and to preserve value for their estates. Accordingly, the Debtors respectfully submit that ample cause exists to justify the (a) finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied (b) waiving the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

**Notice**

66.     Notice of the Interim Hearing and the relief requested in the Motion has been provided by telecopy, email, overnight courier, and/or hand delivery, to (a) the United States Trustee for the Southern District of Texas, (b) those creditors holding the 30 largest unsecured claims against the Debtors' estates (on a consolidated basis), (c) White & Case LLP, as counsel to Coöperatieve Rabobank U.A., New York Branch, the administrative agent under Debtors' prepetition receivables purchase agreement, the administrative agent under Debtors' prepetition secured revolving credit facility, and the administrative agent under the Debtors' proposed post-petition financing facility, (d) indenture trustee under the Debtors' prepetition unsecured bond indenture, (e) Mayer Brown LLP, as counsel to PNC Bank, National Association, the co-agent under Debtors' prepetition receivables purchase agreement, (f) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to an ad hoc group of prepetition unsecured noteholders, (g) the Securities and Exchange Commission, (h) the Internal Revenue Service, (i) the United States Attorney's Office for the Southern District of Texas, (j) the state attorneys general for states in which the Debtors conduct business, (k) all other parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors, and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002 (the "**Notice Parties**").  A copy of this Motion and any order approving it will also be made available on the Debtors' case information website located at *https://dm.epiq11.com/SouthernFoods*.   Under the circumstances, such notice of the Interim Hearing and the relief requested in the Motion constitutes due, sufficient, and appropriate notice and complies with Section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(b) and (c) and 9014, the Local Rules, and the Complex Case Rules.

## **No Prior Request**

67.     The Debtors have not previously sought the relief requested herein from the Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order substantially in the forms attached to this Motion, granting the relief requested herein and such other and further relief as the Court deems just and proper.

Dated:   November 12, 2019
          Houston, Texas

Respectfully submitted,

**NORTON ROSE FULBRIGHT US LLP**

*/s/ William R. Greendyke*
William R. Greendyke (SBT 08390450)
Jason L. Boland (SBT 24040542)
Robert B. Bruner (SBT 24062637)
Julie Goodrich Harrison (SBT 24092434)
1301 McKinney Street, Suite 5100
Houston, Texas 77010-3095
Tel.:  (713) 651-5151
Fax:  (713) 651-5246
william.greendyke@nortonrosefulbright.com
jason.boland@nortonrosefulbright.com
bob.bruner@nortonrosefulbright.com
julie.harrison@nortonrosefulbright.com

*-and-*

**DAVIS POLK & WARDWELL LLP**

Brian M. Resnick (*pro hac vice* pending)
Steven Z. Szanzer (*pro hac vice* pending)
Nate Sokol (*pro hac vice* pending)
450 Lexington Avenue
New York, New York 10017
Tel.: (212) 450-4000
Fax: (212) 701-5800
brian.resnick@davispolk.com
steven.szanzer@davispolk.com
nathaniel.sokol@davispolk.com


*Proposed Counsel to the Debtors and Debtors in Possession*

## **Certificate of Accuracy**

      I certify that the facts and circumstances described in the above pleading giving rise to the emergency request for relief are true and correct to the best of my knowledge, information, and belief.

*/s/ William R. Greendyke* _____

William R. Greendyke
