## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SOUTHERN FOODS GROUP, LLC, *et al.*, | ) | Case No. 19-36313 |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |
| | ) | |

## EMERGENCY MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING (I) DEBTORS TO PAY PREPETITION CRITICAL VENDOR CLAIMS AND 503(B)(9) CLAIMS IN THE ORDINARY COURSE OF BUSINESS, (II) DEBTORS TO RETURN GOODS, AND (III) FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS

> **EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON NOVEMBER 13 AT 2:30 PM IN COURTROOM 400, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**
>
> **RELIEF IS REQUESTED NOT LATER THAN NOVEMBER 13, 2019.**

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: Southern Foods Group, LLC (1364); Dean Foods Company (9681); Alta-Dena Certified Dairy, LLC (1347); Berkeley Farms, LLC (8965); Cascade Equity Realty, LLC (3940); Country Fresh, LLC (6303); Dairy Information Systems Holdings, LLC (9144); Dairy Information Systems, LLC (0009); Dean Dairy Holdings, LLC (9188); Dean East II, LLC (9192); Dean East, LLC (8751); Dean Foods North Central, LLC (7858); Dean Foods of Wisconsin, LLC (2504); Dean Holding Company (8390); Dean Intellectual Property Services II, Inc. (3512); Dean International Holding Company (9785); Dean Management, LLC (7782); Dean Puerto Rico Holdings, LLC (6832); Dean Services, LLC (2168); Dean Transportation, Inc. (8896); Dean West II, LLC (9190); Dean West, LLC (8753); DFC Aviation Services, LLC (1600); DFC Energy Partners, LLC (3889); DFC Ventures, LLC (4213); DGI Ventures, LLC (6766); DIPS Limited Partner II (7167); Franklin Holdings, Inc. (8114); Fresh Dairy Delivery, LLC (2314); Friendly's Ice Cream Holdings Corp. (7609); Friendly's Manufacturing and Retail, LLC (9828); Garelick Farms, LLC (3221); Mayfield Dairy Farms, LLC (3008); Midwest Ice Cream Company, LLC (0130); Model Dairy, LLC (7981); Reiter Dairy, LLC (3675); Sampson Ventures, LLC (7714); Shenandoah's Pride, LLC (2858); Steve's Ice Cream, LLC (6807); Suiza Dairy Group, LLC (2039); Tuscan/Lehigh Dairies, Inc. (6774); Uncle Matt's Organic, Inc. (0079); and Verifine Dairy Products of Sheboygan, LLC (7200). The debtors' mailing address is 2711 North Haskell Avenue, Suite 3400, Dallas, TX 75204.

Southern Foods Group, LLC, Dean Foods Company, and certain of their affiliates (collectively, the "**Debtors**"), each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby file this *Emergency Motion of Debtors for Entry of Interim and Final Orders Authorizing (i) Debtors To Pay Prepetition Critical Vendor Claims and 503(b)(9) Claims in the Ordinary Course of Business, (ii) Debtors to Return Goods, and (iii) Financial Institutions To Honor and Process Related Checks and Transfers* (this "**Motion**").   This Motion is supported by the *Declaration of Gary Rahlfs in Support of Debtors' Chapter 11 Proceedings and First Day Pleadings* (the "**Rahlfs Declaration**") and the *Declaration of Robert Bruce Matson in Support of Debtors' Motion for Authorization to Pay Critical Vendors* (the "**Matson Declaration**"), both filed contemporaneously herewith.   In further support of this Motion, the Debtors respectfully state as follows:

## Relief Requested

1.     By this Motion, and pursuant to sections 105(a), 363, 503(b), and 507(a)(2) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtors seek entry of interim and final orders (the "**Proposed Orders**" and, if entered, the "**Orders**") (a) establishing procedures pursuant to which the Debtors may engage in discussions with counterparties that may qualify as Critical Vendors (as defined below) regarding the validity and amount of their respective claims and to determine whether any such counterparties are Critical Vendors, (b) authorizing, but not directing, the Debtors to pay, in their sole discretion, prepetition obligations related to Critical Vendors (as defined below) and valid claims of vendors under section 503(b)(9) of the Bankruptcy Code in the ordinary course of business, (c) authorizing the Debtors, in their sole discretion, under section 546(h) of the Bankruptcy Code, to return Goods

purchased from Vendors by the Debtors prior to the Petition Date for credit against such Vendors' prepetition claims, and (d) authorizing the Debtors' financial institutions to receive, process, honor, and pay checks or wire transfers used by the Debtors to pay the foregoing.

## Jurisdiction, Venue, and Authority

2.     The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334 and the *Order of Reference to Bankruptcy Judges*, General Order 2012-6 (S.D. Tex. May 24, 2012) (Hinojosa, C.J.).

3.     This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  In addition, the Debtors confirm their consent, pursuant to Bankruptcy Rule 7008 and Rule 7008-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Local Rules**"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue of the Chapter 11 Cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

4.     On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have continued in possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner, and no official committee has been appointed in the Chapter 11 Cases.

5.     Contemporaneously herewith, the Debtors have filed a motion requesting the joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.

6.     Additional information about the Debtors' businesses and affairs, capital structure, and prepetition indebtedness, and the events leading up to the Petition Date, can be found in the Rahlfs Declaration and Matson Declaration, which information is incorporated herein by reference.

## The Critical Vendors

7.     The Debtors are a leading public food and beverage company and the largest processor and direct-to-store distributor of fresh fluid milk and other dairy and dairy case products in the United States.  The Debtors manufacture, market, and distribute a wide variety of branded and private label dairy and dairy case products, including fluid milk, ice cream, cultured dairy products, creamers, ice cream mix, and other dairy products to retailers, distributors, foodservice outlets, educational institutions, and governmental entities across the United States.

8.     In connection with the normal operation of their businesses, the Debtors purchase or contract for, among other things, raw milk, cream, sugar, resin, packaging, other ingredient materials, inventory, supplies, equipment, and related goods necessary for the Debtors' regular operations (collectively, the "**Goods**")[2] and various services from vendors and independent contractors that are unaffiliated with the Debtors and are, by and large, the sole source or limited source for unique materials or services, or services needed for compliance with certain laws and regulations, and provide material economic or operational advantages when compared to other

---

[2] In many instances, the Debtors receive invoices from Vendors covering Goods and related services, such as when a Vendor both sells a Good and installs it one of the Debtors' locations.  To the extent that the Debtors in good faith are unable to ascertain the portion of such invoices that is on account of Goods and the portion that is on account of services, the Debtors hereby request authority to pay the full amount of such invoices.

available vendors; without them, the Debtors could not operate (collectively, the "**Critical Vendors**"). Many of these vendors hold a virtual monopoly over the goods and services they provide. As discussed in further detail below, the Critical Vendors are so essential to the Debtors' businesses that the lack of any of their particular Goods or services, even for a short duration, could significantly disrupt the Debtors' operations and cause irreparable harm to the Debtors' businesses, goodwill, market share, and estates.

9. While the Debtors hope and expect to ensure a continuing post-petition supply of goods and services by consensual negotiation with their vendors, the Debtors recognize that their fiduciary duties require them to consider and plan for the vendors that may refuse to provide future goods or services unless their prepetition claims are paid. Replacement vendors, even where available, would likely result in substantially higher costs for the Debtors and severe operational disruption. Moreover, replacement vendors may lack knowledge of the Debtors' operations or fail to match the Debtors' high performance standards, thereby placing the safety of the Debtors' employees and the reputation of the Debtors' businesses and products at risk.

10. The Goods are generally shipped on an as-needed basis directly to the Debtors' operations, all as directed by the Debtors. As a consequence of the commencement of the Chapter 11 Cases, the Debtors believe that many of the Critical Vendors may be particularly concerned that they will not be paid for the delivery or shipment of Goods after the Petition Date if such delivery or shipment was based on a Prepetition Order, or that their claims arising from the Prepetition Orders will be treated as general unsecured claims. Accordingly, the Critical Vendors may refuse to provide Goods or services to the Debtors (or may recall shipments) unless the Debtors obtain an order of the Court authorizing the Debtors, in their sole discretion, to satisfy those obligations in the ordinary course of their businesses.

11.     If the Debtors can pay Critical Vendors their prepetition claims (such claims, collectively, the "**Critical Vendor Claims**"), and thereby (a) maintain lower costs of Goods and services purchased during the post-petition period, (b) ensure delivery of Goods ordered prepetition but not yet delivered, (c) ensure the provision of critical services, and (d) avoid the severe disruption and safety risks to their employees that might result from the cessation of such essential Goods and services, it is prudent for the Debtors to do so.  Failure to pay the Critical Vendors, and the consequent discontinuity of the Goods and services rendered by such Critical Vendors, may disrupt the Debtors' businesses.  This would cause significant and irreparable harm to the Debtors and to the recoveries of all of the Debtors' creditors that would far outweigh the cost of payment of the Critical Vendor Claims.

12.     The Debtors' Critical Vendors include the following:

(a)     <u>Milk Vendors</u>.  The Debtors purchase raw milk from a number of independent family dairy farms ("**family farms**") and dairy farmers' cooperatives ("**farmers' cooperatives**" and, collectively with the family farms, the "**Milk Vendors**").  A more detailed explanation of the Debtors' purchasing relationships with the Milk Vendors is provided in the Matson Declaration.  *See generally* Matson Declaration ¶¶ 5–22.  Because Dean Foods is the only purchaser of milk from the 600 family farms, and the single largest purchaser for certain of the farmers' cooperatives, *id.* ¶ 11, the Milk Vendors depend upon reliable income streams from the Debtors to pay their business (and personal) expenses, *id.* ¶¶ 17–18.  Thus, if the Milk Vendors are not paid, they will be forced to quickly seek alternate buyers, which in turn will cause a cascading effect whereby *other* Milk Vendors also stop supplying Dean Foods in search of more reliable partners.  *See id.* ¶¶ 11–12.  Attempting to find replacement sources of

raw milk would result in significant additional expenses, and such replacement sources may very well not be available in the substantial volumes that the Debtors require.  *See generally id.*  Even a modest disruption of the Debtors' supply of milk would cause a drop in the Debtors' order fulfillment rate, resulting in Dean Foods' customers—which include Wal-Mart, Starbucks, and public and private schools, along with many others— immediately shifting their orders to competing suppliers.  *See id.* ¶ 13.  Because it will likely lead first to loss of Debtors' milk supply, and then to loss of the Debtors' customers, failing to pay the Milk Vendors will have a catastrophic effect on the Debtors' business.  *See id.*  Thus, the benefits of paying the Milk Vendors substantially outweigh any associated costs.  As of the Petition Date, the Debtors estimate that they owe the Milk Vendors approximately $272,000,000 on account of prepetition claims, of which the Debtors believe that $110,000,000 is critical.

(b)     Specialty Material Vendors.  The Debtors also purchase from third party vendors (collectively, the "**Specialty Material Vendors**") various specialty materials required for the operation of their dairy processing plants.  These materials include, among other things, cream, sugar, resin, packaging, and other ingredient materials.  Attempting to find replacement sources of these materials would result in significant additional expenses, and such replacement sources may very well not be available in the volumes required.  Thus, the benefits of paying these vendors substantially outweigh any associated costs given the crucial roles that these materials play in the ongoing viability of the Debtors' businesses.  As of the Petition Date, the Debtors estimate that they owe the Specialty Material Vendors approximately $115,000,000 on account of prepetition claims.

(c)     <u>Safety and Regulatory Compliance Vendors</u>.  The Debtors employ various skilled third party vendors (collectively, the "**Safety and Regulatory Compliance Vendors**") to ensure that the Debtors' operations fully comply with the foregoing safety and regulatory requirements, to provide the Debtors' employees with a safe work environment, and to ensure products meet all food safety and regulatory standards for sale.  Specifically, the Safety and Regulatory Compliance Vendors provide services that include, among other things, emergency spill management, waste water treatment and management, underground storage tank removal, environmental site assessments, environmental remediation activities, and food safety regulatory compliance.  Failure to comply with such regulations could result in injuries, fines, and potential interruption of operations.  Accordingly, the benefits of paying the Safety and Regulatory Compliance Vendors significantly outweigh any associated costs given the critical roles that the Safety and Regulatory Compliance Vendors play in the safety of the Debtors' employees and the ongoing viability of the Debtors' businesses.  As of the Petition Date, the Debtors estimate that they owe Safety and Regulatory Compliance Vendors approximately $5,000,000 on account of prepetition claims.

(d)     <u>Service Providers</u>.  The Debtors employ various skilled third party vendors (collectively, the "**Service Providers**") to ensure that the Debtors' operations run as efficiently as possible.  These services are vital to ensuring continuing operations of plant and administrative operations utilized by the Debtors on a daily basis.  The services largely consist of non-executory temporary plant manufacturing labor and outsourced information technology services and administrative support provided by internationally based companies, including daily transaction coding and processing functions.  As of the

Petition Date, the Debtors estimate that they owe Service Providers approximately $10,000,000 on account of prepetition claims.

        (e)      <u>Logistical Support Providers</u>.  The Debtors employ various skilled third party vendors (the "**Logistical Support Providers**") to ensure that the Debtors' delivery fleet continues operations.  These Logistical Support Providers services include, among other things, truck repair and maintenance providers, fuel providers, and third party providers of driver training and certification programs.  The Debtors would not be able to maintain their fleet of delivery trucks without the services provided by these Logistical Service Providers.  As of the Petition Date, the Debtors estimate that they owe Logistical Support Providers approximately $17,000,000 on account of prepetition claims.

13.    The Debtors also believe that a significant portion of their outstanding accounts payables as of the Petition Date, some of which relate to Critical Vendors, would be entitled to administrative expense status under section 503(b)(9) of the Bankruptcy Code because such claims are on account of goods received by the Debtors in the ordinary course of their businesses during the 20-day period prior to the Petition Date (the "**503(b)(9) Claims**").  As of the Petition Date, the Debtors estimate that approximately $189,200,000 of the $555,700,000 of total outstanding accounts payables would be entitled to administrative expense status as 503(b)(9) Claims.  As they are administrative claims incurred in the ordinary course of the Debtors' businesses, the Debtors believe that they are authorized to pay the 503(b)(9) Claims pursuant to section 363(c)(1) of the Bankruptcy Code.

14.    The Debtors estimate that the maximum amount needed to pay the prepetition claims of Critical Vendors during the first 30 days of the Chapter 11 Cases is approximately

$43,700,000 (the "**Interim Period Critical Vendor Claims Cap**").   Similarly, the Debtors

estimate that the maximum amount of claims that the Debtors believe would be entitled to

administrative expense status as 503(b)(9) Claims during the first 30 days of the Chapter 11

Cases, all of which relate to Milk Vendors, totals approximately $90,400,000.

15.     Finally, the Debtors estimate that the amount needed to pay the prepetition claims

of Critical Vendors after the first 30 days of the Chapter 11 Cases is approximately $24,100,000.

The Debtors also estimate that the amount of claims entitled to administrative expense status as

503(b)(9) Claims after the first 30 days of the Chapter 11 Cases is approximately $98,800,000.[3]

16.     A summary of the relief that the Debtors are seeking related to Critical Vendors

and valid 503(b)(9) claims, on both and interim and final basis, is as follows:

| Category | Total AP | Critical Vendor | 503(b)(9) |
|---|---|---|---|
| Interim Milk | | $     19,600,000 | $     90,400,000 |
| Interim Trade A/P | | 24,100,000 | - |
| Interim Relief | | $     43,700,000 | $     90,400,000 |
| Final Trade A/P | | 24,100,000 | 98,800,000 |
| **Grand Total** | **$  555,700,000** | **$     67,800,000** | **$    189,200,000** |
| *% of Total AP* | | *12.2%* | *34.0%* |

17.     The Debtors are not seeking to pay these amounts immediately or in one lump

sum.  Rather, the Debtors intend to pay these amounts, in their sole discretion, as they become

due and payable in the ordinary course of business operations.  The Debtors' cash on hand, the

cash generated by the Debtors' business, and the proceeds of the post-petition credit facilities

will provide ample liquidity for payment of the Critical Vendor Claims, the 503(b)(9) claims,

---

[3] Neither the Interim Period Critical Vendor Claims Cap nor the amounts requested to be authorized thereafter include any prepetition claims that the Debtors seek to pay pursuant to other orders requested to be entered by this Court in the Chapter 11 Cases.

and the ongoing obligations of its continued operations in the ordinary course during the pendency of the Chapter 11 Cases.

### Conditions to Payment of Critical Vendor Claims

18.     The Debtors seek the authority to pay Critical Vendor Claims in the ordinary course of business.  The Debtors propose that they may, in their sole discretion, condition payment of any such Critical Vendor Claims upon an agreement to continue to supply Goods or services to the Debtors on such creditor's "**Customary Trade Terms**"[4] for the one-year period prior to the Petition Date and on other such terms and conditions as are acceptable to the Debtors.  However, in certain circumstances, a Critical Vendor may refuse to provide Goods or services to the Debtors on the creditor's Customary Trade Terms even after payment of its claim. To accommodate these circumstances, the Debtors seek approval to enter into other agreements, in the Debtors' sole discretion, with each such Critical Vendor on a case-by-case basis.

19.     To ensure that Critical Vendors  transact business with the Debtors on Customary Trade Terms, the Debtors propose the following procedures, to be implemented in the Debtors' sole discretion, as a condition to paying any Critical Vendors: (a) a letter or contract including provisions substantially in the form of the letter attached hereto (the "**Vendor Agreement**") be delivered to, and executed by, the creditor along with a copy of the order granting the relief sought herein and (b) payment of the creditor's Critical Vendor Claim include a communication of the following statement:

---

[4] As used herein, "**Customary Trade Terms**" means, with respect to a Critical Vendor, (a) the normal and customary trade terms, practices, and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix and availability, and other applicable terms and programs), that were most favorable to the Debtors and in effect between such creditor and the Debtors in the one-year period prior to the Petition Date or (b) such other trade terms as agreed by the Debtors and such creditor.

By accepting this payment, the payee agrees to the terms of the Order of the United States Bankruptcy Court for the Southern District of Texas, dated _____, 2019 in the jointly administered chapter 11 cases of Southern Foods Group, LLC, *et al.* (Case No. 19-36313), entitled "*[Interim] [Final] Order Authorizing (i) Debtors To Pay Prepetition Critical Vendor Claims and 503(b)(9) Claims in the Ordinary Course of Business, (ii) Debtors to Return Goods, and (iii) Financial Institutions To Honor and Process Related Checks and Transfers*" and submits to the jurisdiction of that Court for enforcement thereof.

20.     As a further condition of receiving payment on a Critical Vendor Claim, the Debtors also request authority to require, in their sole discretion, that a Critical Vendor agree to take whatever action is necessary, at such Critical Vendor's sole cost and expense, and waive any right to assert a lien on account of the paid claim of such Critical Vendor.

21.     The Debtors further propose that if a Critical Vendor accepts payment for a Critical Vendor Claim and, thereafter, refuses to continue to supply Goods or services to the Debtors on the Customary Trade Terms for the applicable period, or on such terms as were individually agreed to between the Debtors and such creditor, then the Debtors may, in their sole discretion, and without further order of the Court (a) declare that the payment of such Critical Vendor Claim is a voidable post-petition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover from such Critical Vendor in cash or in goods (including by setoff against post-petition obligations), and (b) demand that the creditor immediately return such payments in respect of its Critical Vendor Claim to the extent that the aggregate amount of such payments exceeds the post-petition obligations then outstanding without giving effect to alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever.  Upon recovery of such payment by the Debtors, such creditor's Critical Vendor Claim shall be reinstated in such an amount as to restore the Debtors and the applicable Critical Vendor to their original positions, as if the agreement had never been entered into and the payment of the

creditor's Critical Vendor Claim had not been made.  In sum, the Debtors will return the parties

to their positions immediately prior to the entry of the order approving the relief sought herein.

22.     To the extent that an agreement relating to a Critical Vendor Claim is deemed an

executory contract within the meaning of section 365 of the Bankruptcy Code, the Debtors do

not, at this time, seek to assume such contract.  Accordingly, if the Court authorizes the

payments described above, such payments should not be deemed to constitute post-petition

assumption, reaffirmation, or adoption of the programs, policies, or agreements as executory

contracts pursuant to section 365 of the Bankruptcy Code, and the Debtors reserve all of their

rights under the Bankruptcy Code in connection therewith.  In addition, nothing in this Motion

shall be an admission as to any lien or interest, including any possessory lien.

### Basis for Relief

Payment of Critical Vendor Claims Is Appropriate Under
Sections 363(b)(1), 363(c), and 105(a) of the Bankruptcy Code

23.     Section 363(b)(1) of the Bankruptcy Code empowers the Court to allow a debtor

to "use, sell, or lease, other than in the ordinary course of business, property of the estate."

11 U.S.C. § 363(b)(1).  Debtors' decisions to use, sell, or lease assets outside the ordinary course

of business must be based upon the sound business judgment of the debtor.  *See, e.g.*, *Inst'l*

*Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780

F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary

duty to the debtor, creditors and equity holders, there must be some articulated business

justification for using, selling, or leasing the property outside the ordinary course of business.");

*In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has

considerable discretion in approving a § 363(b) sale of property of the estate other than in the

ordinary course of business, but the movant must articulate some business justification for the sale . . . .").

24.     Courts emphasize that the business judgment rule is not an onerous standard and that it "is flexible and encourages discretion." *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011). "Great judicial deference is given to the [debtor's] exercise of business judgment." *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 254 (N.D. Tex. 2005). As long as a transaction "appears to enhance a debtor's estate, court approval of a debtor in possession's decision to [enter into the transaction] should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the Bankruptcy Code." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (citation and internal quotation marks omitted).

25.     Moreover, section 363(c) of the Bankruptcy Code authorizes a debtor in possession operating its business pursuant to section 1108 of the Bankruptcy Code to "enter into transactions . . . in the ordinary course of business without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). One purpose of section 363(c) of the Bankruptcy Code is to provide a debtor with the flexibility to engage in the ordinary course transactions required to operate its business without undue supervision by its creditors or the court. *See, e.g.*, *In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992) (citations omitted) ("Section 363 is designed to strike [a] balance, allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets."). Included within the purview of section 363(c) of the Bankruptcy Code is a debtor's ability to continue "routine transactions" necessitated by a debtor's business practices. *See, e.g.*, *Amdura*

*Nat. Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996) (citations omitted) ("A debtor in possession under Chapter 11 is generally authorized to continue operating its business."); *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 796 (Bankr. D. Del. 2007) (citations omitted) (noting that courts have shown a reluctance to interfere in a debtor's making of routine, day-to-day business decisions).

26.     The Bankruptcy Code does not define "ordinary course of business."   In determining whether a transaction qualifies as "ordinary course," the courts use the "horizontal" dimension test (*i.e.*, "the way businesses operate within a given industry") and the "vertical" dimension test (*i.e.*, whether the transaction is consistent with the reasonable "expectations of creditors").   *See Denton Cty. Elec. Coop., Inc. v. Eldorado Ranch, Ltd. (In re Denton Cty. Elec. Coop., Inc.)*, 281 B.R. 876, 882 & n.12 (Bankr. N.D. Tex. 2002) (collecting cases).   "In general, under the vertical test, courts look at whether the transaction subjects a hypothetical creditor to a different economic risk than existed when the creditor originally extended credit.   Under the horizontal test, in general courts look at whether the transaction was of the sort commonly undertaken by companies in the industry.   The primary focus is on the debtor's pre-petition business practices and conduct."   *In re Patriot Place, Ltd.*, 486 B.R. 773, 793 (Bankr. W.D. Tex. 2013).

27.     The Debtors submit that the relief requested in this Motion represents a sound exercise of the Debtors' business judgment, is within the Debtors' ordinary course of business, is necessary to avoid immediate and irreparable harm, and is justified under section 363 of the Bankruptcy Code.   Indeed, the relief sought herein is amply justified by the need for the continued receipt of the Goods and services that the Critical Vendors provide, including those that will be received and accepted by the Debtors post-petition in the ordinary course of business.

The relief will also help ensure a continuous supply of materials that underpin the Debtors' operations.  Delivery of the Goods and services by the Critical Vendors is crucial for orderly and efficient operation of the Debtors' businesses.  Unless the Debtors have the authority to pay for these essential Goods and services, their businesses will suffer immediate and irreparable harm. The authorization sought in this Motion will not prejudice the Debtors' ability to contest the validity of any invoices.

28.     In fact, numerous courts in this jurisdiction have granted relief similar to that requested herein.  *See*, *e.g.*, *In re Shale Support Global Holdings, LLC*, No. 19-33884 (DRJ) (Bankr. S.D. Tex. July 12, 2019); *In re Bristow Group Inc.*, No. 19-32713 (DRJ) (Bankr. S.D. Tex. June 27, 2019); *In re Parker Drilling Co.,* No. 18-36958 (MI) (Bankr. S.D. Tex. Jan. 3, 2019); *In re Westmoreland Coal Co.*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. Nov. 15, 2018); *In re Gastar Expl., Inc.*, No. 18-36057 (MI) (Bankr. S.D. Tex. Nov. 2, 2018); *In re EXCO Res., Inc.*, No. 18-30155 (MI) (Bankr. S.D. Tex. Jan. 18, 2018); *In re Linn Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. June 27, 2016).  The Debtors submit that the circumstances described herein warrant similar relief.

29.     Finally, the Debtors submit that payment of the Critical Vendor Claims is necessary and appropriate and is authorized under section 105(a) of the Bankruptcy Code pursuant to what is referred to interchangeably as the "doctrine of necessity" or "necessity of payment rule".  The doctrine of necessity functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code.  *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (recognizing the "doctrine of necessity"); *In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2003) (same and citing *In re CoServ*); *see*

*also In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to debtor's continued operation); *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code "provides a statutory basis for payment of pre-petition claims" under the doctrine of necessity).

30.     The Court's power to utilize the "doctrine of necessity" in the Chapter 11 Cases derives from the Court's inherent equity powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). "[T]he debtor-in-possession's role as the equivalent of a trustee under § 1107(a) and its duty to protect the going-concern value of an operating business in a Chapter 11 provide[s] the 'bridge that makes application to the Doctrine of Necessity 'necessary or appropriate to carry out the provisions of' the Bankruptcy Code.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 56 (Bankr. N.D. Tex. 2004) (citing *In re CoServ*, 273 B.R. at 497). Accordingly, the Court has expansive equitable powers to fashion any order or decree that is in the interest of preserving or protecting the value of the Debtors' assets. *See In re Young*, 416 F. App'x 392, 398 (5th Cir. 2011) (recognizing that "[s]ection 105(a) of Title 11 permits the bankruptcy court to exercise broad authority"); *In re Nixon*, 404 F. App'x 575, 578 (3d Cir. 2010) (citation omitted) ("It is well settled that the court's power under § 105(a) is broad."); *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004) (citation omitted) (noting that section 105 of the Bankruptcy Code "has been construed to give a bankruptcy court 'broad authority' to provide equitable relief appropriate to assure the orderly conduct of reorganization proceedings"); *In re Trevino*, 599 B.R. 526, 542–43 (Bankr. S.D. Tex. 2019) (noting that the bankruptcy court has "broad authority" under section 105(a) of the Bankruptcy Code); *In re Padilla*, 379 B.R. 643,

667 (Bankr. S.D. Tex. 2007) (citations omitted) ("Section 105(a) gives bankruptcy courts broad authority to take actions necessary and appropriate for administering and enforcing the Bankruptcy Code and . . . 'authorizes a bankruptcy court to fashion such orders as are necessary to further the purposes of the substantive provisions of the Bankruptcy Code.'"); *see also Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) (citation omitted) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code.").

31.     The United States Supreme Court first articulated the doctrine of necessity more than a century ago, in *Miltenberger v. Logansport Ry. Co.*, 106 U.S. 286 (1882), in affirming the authorization by the lower court of the use of receivership funds to pay pre-receivership debts owed to employees, vendors, and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership.  *See id.* at 309.  This doctrine has become an accepted component of modern bankruptcy jurisprudence, and courts' application of it largely adheres to the Supreme Court's reasoning in *Miltenberger.  See, e.g.*, *In re Lehigh & New Eng. Ry.*, 657 F.2d at 581-82 ("[I]n order to justify payment under the 'necessity of payment' rule, a real and immediate threat must exist that failure to pay will place the continued operation of the [debtor] in serious jeopardy."); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369 (Bankr. S.D. Tex. 2000) (noting that "courts in this district" have applied this doctrine "primarily out of common sense and the presence of a legal or factual inevitability of payment"); *In re Mirant*, 296 B.R. at 429 (applying the rule where the "Debtors' businesses [would be] seriously damaged by the delay required to satisfy the court that a particular creditor should be paid its prepetition claim outside of a confirmed plan"); *In re Ionosphere Clubs, Inc.*, 98 B.R. 145, 175 (Bankr. S.D.N.Y. 1989) (holding that the "ability of a Bankruptcy Court to

authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept"); *In re Just for Feet, Inc.*, 242 B.R. at 826 (stating that where the debtor "cannot survive" absent payment of certain prepetition claims, the doctrine of necessity should be invoked to permit payment).

32.     The doctrine of necessity is frequently invoked early in a reorganization, particularly in connection with those chapter 11 sections that relate to payment of prepetition claims.  For instance, the court in *In re StructureLite Plastics Corp.* indicated its accord with "the principle that a bankruptcy court may exercise its equity powers under § 105(a) to authorize payment of prepetition claims where such payment is necessary to 'permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately.'" *In re StructureLite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988) (citations omitted).  The court stated that a "*per se* rule proscribing the payment of prepetition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code." *Id.* at 932. Accordingly, pursuant to section 105(a) of the Bankruptcy Code, the Court is empowered to grant the relief requested herein.

33.     Based upon the foregoing, the Debtors submit that the relief requested herein is essential, appropriate, and in the best interests of the Debtors' estates and stakeholders.  The Debtors believe that payment of Critical Vendor Claims owed to Critical Vendors will be necessary to preserve operations, dramatically reduce the financial burden on the Debtors' estates, maintain goodwill and positive relationships with all Critical Vendors, and maximize the value of the Debtors' assets for the benefit of all stakeholders.  The need for the flexibility to pay such claims is particularly acute in the period immediately following the Petition Date.  During this period, the Debtors, their attorneys and financial advisors, and other professionals will be

focusing on stabilizing operations in chapter 11. At the same time, while the Debtors are distracted with stabilizing their businesses and strategic planning, Critical Vendors may attempt to assert their considerable leverage and deny provision of Goods and services going forward, suddenly and without notice, in an effort to cripple operations and coerce payment. Furthermore, if the relief sought herein is not granted, Critical Vendors will have no incentive to continue to supply Goods or services to the Debtors on Customary Trade Terms.

34. The Debtors strongly believe that the uninterrupted supply of Goods and services, on Customary Trade Terms, and the continuing support of their customers are imperative to the ongoing operations and viability of the Debtors. The continued availability of trade credit, in amounts and on terms consistent with those the Debtors have worked hard to obtain over the years, is clearly advantageous to the Debtors. It allows the Debtors to maintain and enhance necessary liquidity and to focus on returning to profitability. The Debtors believe that preserving working capital through the retention and reinstatement of their normally advantageous trade credit terms will enable the Debtors to stabilize business operations at this critical time, to maintain their competitiveness, and to maximize the value of their businesses for the benefit of all interested parties. Conversely, any deterioration of trade credit, or disruption or cancellation of deliveries of goods or provision of essential services, could spell disaster for the Debtors' restructuring efforts.

35. After carefully vetting all Critical Vendors, the Debtors designed the Interim Period Critical Vendor Claims Cap as an estimate of how much must be paid in the first 30 days of the Chapter 11 Cases (excluding 503(b)(9) Claims) to such creditors to continue the supply of critical Goods and services. The Debtors hope to pay significantly less than the requested amount.

## The Debtors Are Authorized To Return Goods Under
## Section 546(h) of the Bankruptcy Code

36.     The Debtors also occasionally receive various Goods that may be defective, not up to standards, or otherwise not suitable or necessary for their operations.  In some cases, the Debtors return such Goods to vendors (critical or otherwise).  Notwithstanding the filing of the Chapter 11 Cases and the distinction between prepetition and post-petition claims, the Debtors request that they be authorized, in their sole discretion, to return Goods that were delivered after the Petition Date based on Prepetition Orders for credit against such Prepetition Orders if the Debtors determine that such Goods are of little or no value to the Debtors' estates.

37.     Section 546(h) of the Bankruptcy Code permits a debtor, with the consent of a creditor and subject to the prior rights of holders of security interests in such goods or the proceeds of such goods, to return goods shipped to the debtor by the creditor before the commencement of the case for credit against the creditor's prepetition claim, provided that the Court determines (on a motion made no later than 120 days after the order for relief and after notice and a hearing) that such return is in the best interests of the estate.

38.     The Debtors submit that an order approving returns of Goods to vendors for credit against their prepetition claims, subject to the prior rights of holders of security interests in such Goods or the proceeds of such Goods, to the extent of such interests, is in the best interests of the Debtors' estates.  Such relief will enable the Debtors to (a) obtain proper credit for otherwise unusable Goods, cost-effectively and without undue financial risk and (b) effectively manage inventory and enhance the Debtors' financial performance and the value of the assets of their estates.

39.     Through this Motion, the Debtors seek only the relief that is contemplated by section 546(h) of the Bankruptcy Code.  Accordingly, the Debtors should be permitted to return Goods, in their discretion, as permitted by the Bankruptcy Code and as set forth herein.

**Applicable Financial Institutions Should Be**
**Authorized To Honor and Process Related Checks and Transfers**

40.     The Debtors also request that all applicable financial institutions be authorized to (a) receive, process, honor, and pay all checks presented for payment of, and to honor all fund transfer requests made by the Debtors related to, the claims that the Debtors request authority to pay in this Motion, regardless of whether the checks were presented or fund transfer requests were submitted before, on, or after the Petition Date and (b) rely on the Debtors' designation of any particular check as approved by the Proposed Orders.

**Debtors' Reservation of Rights**

41.     Nothing contained herein is intended or should be construed as, or deemed to constitute, an agreement or admission as to the validity of any claim against the Debtors on any grounds, a waiver or impairment of the Debtors' rights to dispute any claim on any grounds, or an assumption or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code.  The Debtors expressly reserve their rights to contest any claims related to the Critical Vendors under applicable bankruptcy and non-bankruptcy law.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended, and should not be construed, as an admission as to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

**Emergency Consideration**

42.     Pursuant to Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this Motion under Bankruptcy Rule 6003(b).  Bankruptcy Rule 6003 provides

that, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, issue an order granting . . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition . . . ." Fed. R. Bankr. P. 6003.  As set forth in this Motion, the Rahlfs Declaration, and the Matson Declaration, the Debtors believe that an orderly transition into chapter 11 is critical to the viability of their businesses, operations, and estate and that any delay in granting the emergency relief requested herein could cause immediate and irreparable harm by damaging the Debtors' ability to sustain their day-to-day operations and meet their various obligations, likely resulting in the substantial loss of business. If the Debtors are not permitted to continue their ordinary business operations by continuing to pay the Critical Vendor Claims as they come due, and to reassure the Critical Vendors that authority has been granted to honor all such claims, the Debtors could suffer immediate and irreparable harm.  Accordingly, the relief requested herein is consistent with Bankruptcy Rule 6003.

### Compliance with Bankruptcy Rule 6004(a) and Waiver of Bankruptcy Rule 6004(h)

43.     To implement successfully the relief sought herein, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances.  The Debtors also request that, to the extent applicable to the relief requested in this Motion, the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their businesses without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully submit that ample cause exists to justify

the (a) finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and (b) waiving of the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## Notice

44.     Notice of the Interim Hearing and the relief requested in the Motion has been provided by telecopy, email, overnight courier, and/or hand delivery to (a) the United States Trustee for the Southern District of Texas, (b) those creditors holding the 30 largest unsecured claims against the Debtors' estates (on a consolidated basis), (c) White & Case LLP, as counsel to Coöperatieve Rabobank U.A., New York Branch, the administrative agent under the Debtors' prepetition receivables purchase agreement, the administrative agent under the Debtors' prepetition secured revolving credit facility, and the administrative agent under the Debtors' proposed post-petition financing facility, (d) indenture trustee under the Debtors' prepetition unsecured bond indenture, (e) Mayer Brown LLP, as counsel to PNC Bank, National Association, the co-agent under Debtors' prepetition receivables purchase agreement, (f) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to an ad hoc group of prepetition unsecured noteholders, (g) the Securities and Exchange Commission, (h) the Internal Revenue Service, (i) the United States Attorney's Office for the Southern District of Texas, (j) the state attorneys general for states in which the Debtors conduct business, (k) all other parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors, and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002 (the "**Notice Parties**").  A copy of this Motion and any order approving it will also be made available on the Debtors' case information website located at *https://dm.epiq11.com/SouthernFoods*.  Under the circumstances, such notice of the Interim Hearing and the relief requested in the Motion constitutes due, sufficient, and appropriate notice and complies with section 102(1) of the

Bankruptcy Code, Bankruptcy Rules 2002, 4001(b) and (c) and 9014, the Local Rules, and the Complex Case Rules.

**No Prior Request**

45.     The Debtors have not previously sought the relief requested herein from the Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Orders, substantially in the forms attached to the Motion, granting the relief requested herein and such other and further relief as the Court deems just and proper.

Dated:   November 12, 2019
        Houston, Texas

Respectfully submitted,

**NORTON ROSE FULBRIGHT US LLP**

*/s/ William R. Greendyke*
William R. Greendyke (SBT 08390450)
Jason L. Boland (SBT 24040542)
Robert B. Bruner (SBT 24062637)
Julie Goodrich Harrison (SBT 24092434)
1301 McKinney Street, Suite 5100
Houston, Texas 77010-3095
Tel.:  (713) 651-5151
Fax:  (713) 651-5246
william.greendyke@nortonrosefulbright.com
jason.boland@nortonrosefulbright.com
bob.bruner@nortonrosefulbright.com
julie.harrison@nortonrosefulbright.com

*-and-*

**DAVIS POLK & WARDWELL LLP**

Brian M. Resnick (*pro hac vice* pending)
Steven Z. Szanzer (*pro hac vice* pending)
Nate Sokol (*pro hac vice* pending)
Dan Meyer (*pro hac vice* pending)
450 Lexington Avenue
New York, New York 10017
Tel.: (212) 450-4000
Fax: (212) 701-5800
brian.resnick@davispolk.com
steven.szanzer@davispolk.com
nathaniel.sokol@davispolk.com
daniel.meyer@davispolk.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## **Certificate of Accuracy**

I certify that the facts and circumstances described in the above pleading giving rise to the emergency request for relief are true and correct to the best of my knowledge, information, and belief.

*/s/ William R. Greendyke*
William R. Greendyke