# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SOUTHERN FOODS GROUP, LLC, *et al.*, | ) | Case No. 19-36313 (DRJ) |
|  | ) |  |
| Debtors.[1] | ) | (Jointly Administered) |
|  | ) |  |
|  | ) |  |

**EMERGENCY MOTION OF DEBTORS FOR
ENTRY OF INTERIM AND FINAL ORDERS,
PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, 507 AND 552
(I) AUTHORIZING THE DEBTORS TO (A) OBTAIN SENIOR
SECURED SUPERPRIORITY POST-PETITION FINANCING,
AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND
SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) PROVIDING
ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (IV)
<u>SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF</u>**

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows:  Southern Foods Group, LLC (1364); Dean Foods Company (9681); Alta-Dena Certified Dairy, LLC (1347); Berkeley Farms, LLC (8965); Cascade Equity Realty, LLC (3940); Country Fresh, LLC (6303); Dairy Information Systems Holdings, LLC (9144); Dairy Information Systems, LLC (0009); Dean Dairy Holdings, LLC (9188); Dean East II, LLC (9192); Dean East, LLC (8751); Dean Foods North Central, LLC (7858); Dean Foods of Wisconsin, LLC (2504); Dean Holding Company (8390); Dean Intellectual Property Services II, Inc. (3512); Dean International Holding Company (9785); Dean Management, LLC (7782); Dean Puerto Rico Holdings, LLC (6832); Dean Services, LLC (2168); Dean Transportation, Inc. (8896); Dean West II, LLC (9190); Dean West, LLC (8753); DFC Aviation Services, LLC (1600); DFC Energy Partners, LLC (3889); DFC Ventures, LLC (4213); DGI Ventures, Inc. (6766); DIPS Limited Partner II (7167); Franklin Holdings, Inc. (8114); Fresh Dairy Delivery, LLC (2314); Friendly's Ice Cream Holdings Corp. (7609); Friendly's Manufacturing and Retail, LLC (9828); Garelick Farms, LLC (3221); Mayfield Dairy Farms, LLC (3008); Midwest Ice Cream Company, LLC (0130); Model Dairy, LLC (7981); Reiter Dairy, LLC (3675); Sampson Ventures, LLC (7714); Shenandoah's Pride, LLC (2858); Steve's Ice Cream, LLC (6807); Suiza Dairy Group, LLC (2039); Tuscan/Lehigh Dairies, Inc. (6774); Uncle Matt's Organic, Inc. (0079); and Verifine Dairy Products of Sheboygan, LLC (7200). The debtors' mailing address is 2711 North Haskell Avenue, Suite 3400, Dallas, TX 75204.

> **EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON NOVEMBER 13, 2019 AT 2:30 PM IN COURTROOM 400, 515 RUSK STREET, HOUSTON, TEXAS 77002. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**
>
> **RELIEF IS REQUESTED NOT LATER THAN NOVEMBER 13, 2019.**
>
> **REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

The above-captioned debtors and debtors-in-possession, and their debtor affiliates (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") file this *Motion of Debtors for Entry of Interim and Final Orders, (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Post-Petition Financing, and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Providing Adequate Protection to Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (this "Motion")[2]. In support of this Motion, the Debtors rely on (a) the *Declaration of Bo S. Yi* attached hereto as **Exhibit B** (the "**Yi Declaration**") and (b) the *Declaration of Gary Rahlfs in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**"), both filed contemporaneously herewith. In further support of this Motion, the Debtors respectfully state as follows:

### Jurisdiction and Venue

1.     The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Credit Agreement (as defined below) or the Interim Order (as defined below) as applicable.

and the Order of Reference to Bankruptcy Judges, General Order 2012-6 (S.D. Tex. May 24, 2012) (Hinojosa, C.J.).

2.       This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  In addition, the Debtors confirm their consent, pursuant to Bankruptcy Rule 7008 and Rule 7008-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Local Rules**"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue of the Chapter 11 Cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.       By this Motion, and pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c) and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rule 9013-1(b), the Debtors seek entry of interim and final orders (the "**Proposed Orders**") authorizing the relief detailed below.

## Introduction

4.       By this Motion, the Debtors seek approval to obtain superpriority, priming lien DIP Facility (as defined below) in the aggregate principal amount of $425 million, to be funded by certain of the Debtors' prepetition secured lenders.  The DIP Facility consists of a committed (a) $236,200,000 million new money revolving loan facility, available for the incurrence of new money revolving loans or the issuance of up to $25 million of letters of credit and (b) upon entry of the Final Order (as defined below), roll-

up term loan facility in an aggregate principal amount of $188,800,000 million to refinance all loans outstanding under the Debtors' prepetition secured revolving credit facility and accrued and unpaid interest thereon[3].  The DIP Facility is backstopped by Rabobank (as defined below) and is part of a comprehensive financing package that includes an amended and restated $425 million Securitization Facility, to be provided by certain of the DIP Lenders (as defined below).

5.      The proposed financing was obtained following a competitive marketing process by Evercore Group L.L.C. ("**Evercore**"), in which the Debtors solicited and obtained third-party financing proposals and ultimately concluded that the DIP Facility provided by certain existing secured lenders presented the most favorable pricing and terms and afforded the Debtors with the greatest certainty of execution available to the Debtors under the circumstances, especially when considered in combination with the amended Securitization Facility.

6.      The DIP Facility is critical to enabling the Debtors to fund their operations during the course of the Chapter 11 Cases as they pursue restructuring alternatives and preserve and maximize the value of their estates for the benefit of all parties in interest. Importantly, the DIP Facility provides the Debtors with the runway and flexibility to pursue either a sale of substantially all assets or a standalone reorganization. For these reasons, and for the reasons set forth below and in the Yi Declaration and the First Day Declaration, the Debtors believe that entering into the DIP Credit Agreement is a sound

---

[3] The Commitment Letter is attached hereto as **Exhibit C-1.** The Debtors propose to file the Commitment Letter under seal pursuant to the *Debtors' Emergency Motion for Entry of an Order Authorizing the Debtors to File Under Seal the Fee Letters and Commitment Letter,* filed contemporaneously herewith (the "**Sealing Motion**").

exercise of the Debtors' business judgment.   Accordingly, the Debtors respectfully request that the Court enter the Proposed Orders.

**Relief Requested**

7.     By this Motion, the Debtors seek entry of an interim order (the "**Interim Order**"), substantially in the form attached hereto as **Exhibit A**, and a final order (the "**Final Order**") granting the following relief:

(a)     authorizing Dean Foods Company (the "**DIP Borrower**") to obtain, and certain of the DIP Borrower's Debtor subsidiaries (collectively, in their capacity as such, the "**Guarantors**" and, together with the DIP Borrower, the "**DIP Loan Parties**") to guaranty, debtor-in-possession financing (the "**DIP Facility**") consisting of:

(A)     a new money revolving loan facility (the "**DIP Revolving Facility**") in an aggregate principal amount of $236,200,000 that may be made available for the incurrence of new money revolving loans ("**DIP Revolving Loans**") or, up to a sub-limit of $25 million (the "**L/C Sub-Limit**"), the issuance of letters of credit ("**DIP Letters of Credit**"), provided that issuance of DIP Letters of Credit under the L/C Sub-Limit shall only be available if, and to the extent that, there is no remaining capacity for the issuance of letters of credit under the Receivables Financing; and

(B)     upon and after entry of the Final Order (as defined below), term loans (the "**DIP Roll-Up Loans**", and together with the DIP Revolving Loans, the "**DIP Loans**"; and the DIP Loans collectively with the DIP Letters of Credit, the "**DIP Extensions of Credit**") in an aggregate principal amount equal to, as of the Petition Date, the aggregate outstanding principal amount of all loans (the "**Prepetition Revolving Loans**") under that certain Credit Agreement, dated as of February 22, 2019 (as amended, amended and restated, supplemented or otherwise modified from the Petition Date, the "**Prepetition Credit Agreement**" and, such facility, the "**Prepetition Revolving Credit Facility**"), among the Dean Foods Company, each lender party thereto from time to time (the "**Prepetition Revolving Lenders**"), and Coöperatieve Rabobank U.A., New York Branch ("**Rabobank**"), as administrative agent (in such capacity,

5

the "**Prepetition Revolving Agent**" and, together with the Prepetition Revolving Lenders, the Issuing Bank and the other Holders of Secured Obligations (each as defined therein), the "**Prepetition Revolving Secured Parties**"), which Prepetition Revolving Loans will be refinanced as (and deemed paid by) the DIP Roll-Up Loans ("**Revolver Refinancing**");

(b)     authorizing the Debtors, subject to satisfaction (or waiver) of all applicable conditions precedent under the DIP Loan Documents (as defined below) in accordance therewith:

(A)     during the period (the "**Interim Period**") from the date hereof through and including the earlier to occur of (x) the date of entry of the Final Order by this Court and (y) the Termination Date, (1) to incur DIP Revolving Loans and (2) to the extent of any availability under the DIP L/C Sub-Limit, issue DIP Letters of Credit, in an aggregate principal amount (with respect to DIP Revolving Loans and any DIP Letters of Credit) not to exceed $50 million (the "**Interim Availability**");

(B)     upon entry of the Final Order and thereafter until the Termination Date, (1)(A) to incur DIP Revolving Loans and (B) to the extent of any availability under the DIP L/C Sub-Limit, issue DIP Letters of Credit (with respect to the foregoing clauses (A) and (B), in an aggregate principal amount not to exceed $236,200,000 (including the aggregate amount borrowed under the DIP Facility during the Interim Period)), and (2) (x) to incur DIP Roll-Up Loans in an aggregate amount not to exceed $188,800,000 and consummate the Revolver Refinancing and (y) immediately pay in cash all accrued and unpaid interest and fees outstanding in respect of the Prepetition Revolving Loans as of the date the DIP Roll-Up Loans are incurred; ; provided that borrowings or DIP Revolving Loans will be limited to the greater of the aggregate amount of commitments available to be drawn at the time and a borrowing base calculated pursuant to the terms of the DIP Credit Agreement;

(c)     authorizing the DIP Loan Parties, to (A) enter into, execute and deliver the documentation governing the DIP Facility, the Superpriority Secured Debtor-in-Possession Credit Agreement, by and among the DIP Borrower, the lenders party thereto (the "**DIP Lenders**"), and Rabobank, as arranger, Rabobank, as administrative and collateral agent (in such capacities, collectively,

the "**DIP Agent**") and as the Issuing Bank (as defined therein) (in such capacity, the "**DIP Issuing Bank**" and, together with the DIP Agent DIP Lenders, the "**DIP Secured Parties**"), substantially in the form attached hereto as **Exhibit 1** to **Exhibit A** (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "**DIP Credit Agreement**" and, collectively with the DIP Budget, the Interim Order, the Final Order, and all other Loan Documents (as defined in the DIP Credit Agreement), including, without limitation, all commitment and fee letters and agreements entered into in connection therewith, in each case, as hereafter amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, collectively, the "**DIP Loan Documents**"), in each case, to which they are a party, and (B) to perform such other and further acts as may be necessary or appropriate in connection therewith, or otherwise required under the DIP Loan Documents;

(d)     authorizing the Debtors to use the proceeds of the DIP Facility subject to the 13-week cash flow forecast prepared by the DIP Borrower and attached as **Exhibit 2** to **Exhibit A** (as updated from time to time) (the "**DIP Budget**") subject to any Permitted Variance and as otherwise provided in the DIP Loan Documents;

(e)     Granting to the DIP Agent (for the benefit of the DIP Lenders) in respect of the DIP Obligations, a superpriority administrative expense claim pursuant to Section 364(c)(1) of the Bankruptcy Code and first priority priming liens on and security interests in substantially all assets and property of the DIP Loan Parties (now owned or hereafter acquired), pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code, in each case, as and to the extent, and subject to the priorities, set forth more fully below and in the DIP Loan Documents, and subject to the Carve-Out (as defined below) and the liens permitted under Section 6.02 of the DIP Credit Agreement;

(f)     authorizing the Debtors to use cash collateral as such term is defined in Section 363 of the Bankruptcy Code (the "**Cash Collateral**") in which the Prepetition Secured Parties (as defined in the Order) have an interest and all other Prepetition Collateral (as defined in the Order);

(g)     the granting of the Adequate Protection Superiority Claim (as defined below) and Adequate Protection Liens (as defined below), to the extent of and as compensation for any Diminution of Value (as defined below), and the payment of fees and expenses to the Prepetition Agent (as defined in the Order) for the benefit of the

Prepetition Secured Parties, in each case, as set forth more fully below and subject to the Carve-Out;

(h)    approving certain stipulations by the Debtors with respect to the Prepetition Financing Documents and the Prepetition Collateral as set forth herein;

(i)    modifying the automatic stay as set forth herein and the DIP Loan Documents, to the extent necessary, to implement and effectuate the terms of the DIP Facility, the Interim Order, and the other DIP Loan Documents;

(j)    scheduling a final hearing (the "**Final Hearing**") to consider entry of an order granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing and the transactions contemplated herein; and

(k)    the waiver by the Court of any applicable stay (including under Bankruptcy Rule 6004) and provision for the immediate effectiveness of both the Interim Order and the Final Order.

### **Concise Summary of Terms of DIP Facility**

8.    Under the disclosure requirements of Bankruptcy Rules 4001(b), (c), and (d) and the United States Bankruptcy Court for the Southern District of Texas Procedures for Complex Chapter 11 Cases (the "**Complex Case Procedures**"), the following table concisely summarizes the significant terms of the DIP Facility and the Interim Order:[4]

| Summary of Relevant Provisions | |
| --- | --- |
| **Bankruptcy Code/Local Rule** | **Summary of Material Terms** |
| **Borrower** <br> Bankruptcy Rule 4001(c)(1)(B) | Dean Foods Company <br> *See* DIP Credit Agreement, Introductory Preamble |
| **Guarantors** <br> Bankruptcy Rule 4001(c)(1)(B) | Each Subsidiary of the DIP Borrower other than the Unrestricted Subsidiaries <br> *See* DIP Credit Agreement § 1.01 (Definitions of "Subsidiary Guarantor" and "Unrestricted Subsidiary") |

---

[4] This summary, including the defined terms it uses (whether or not defined within the summary), is qualified in its entirety by the provisions of the DIP Loan Documents and the Interim Order, as applicable. To the extent that there are any conflicts between this summary, on the one hand, and any DIP Loan Document or the Interim Order, as applicable, on the other, the terms of such DIP Loan Document or the Interim Order, as applicable, shall govern.

| | |
|---|---|
| **DIP Lenders**<br>Bankruptcy Rule<br>4001(c)(1)(B) | The Persons listed on Schedule 1.01(a) of the DIP Credit Agreement and their permitted assignees<br><br>*See* DIP Credit Agreement, § 1.01 (Definitions of "Lenders") |
| **DIP Agent**<br>Bankruptcy Rule<br>4001(c)(1)(B) | Coöperatieve Rabobank U.A., New York Branch<br><br>*See* DIP Credit Agreement, § 1.01 (Definition of "Administrative Agent") |
| **Amount and Facility**<br>Bankruptcy Rule<br>4001(c)(1)(B) | A senior secured superpriority debtor-in-possession financing in an aggregate principal amount of up to $425 million, consisting of:<br><br>(a)   a new money revolving loan facility in an aggregate principal amount of up to $236,200,000 that may be made available for the incurrence of new money revolving loans or, up to a sub-limit of $25 million, in the issuance of letters of credit; provided that the issuance of DIP Letters of Credit under the L/C Sub-Limit shall only be available if, and to the extent that, there is no remaining capacity for the issuance of letters of credit under the Receivables Financing (as defined below); provided, further, that borrowings under the revolving loan facility will be limited to the greater of the aggregate amount of commitments available to be drawn at the time and a borrowing base calculated pursuant to the terms of the DIP Credit Agreement; and<br><br>(b)   upon and after entry of the Final Order, term loans in an aggregate principal amount equal to, as of the date the Chapter 11 Cases are commenced, the aggregate outstanding principal amount of all loans under that certain Credit Agreement, dated as of February 22, 2019 (as amended, amended and restated, supplemented or otherwise modified from time to time), among the Dean Foods Company, each lender party thereto from time to time, and Coöperatieve Rabobank U.A., New York Branch, as administrative agent , which Prepetition Revolving Loans will be refinanced as (and deemed paid by) the DIP Roll-Up Loans.<br><br>*See* DIP Credit Agreement § 1.01 (Definition of "Aggregate Revolving Commitment," "DIP Term Loan Commitment" and "LC Commitment") and §§2.01, 2.07 |
| **Funding Use of Proceeds**<br>Bankruptcy Rule<br>4001(c)(1)(B) | All proceeds of the Prepetition Collateral and the DIP Collateral, including proceeds realized from a sale or disposition thereof, or from payment thereon, and all proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses payable under the Interim Order or the Final Order) may be used and/or applied in accordance with the terms and conditions of the Interim Order and the DIP Loan Documents, for the types of expenditures set forth in the DIP Budget (subject to Permitted Variances), including:<br><br>(i) to pay fees, interest, payments and expenses associated with the DIP Credit Agreement and the other DIP Loan Documents;<br><br>(ii) to fund the cost of administrating the Chapter 11 Cases (including, without limitation, adequate protection payments and professional fees and expenses);<br><br>(iii) to finance other pre-petition and pre-filing expenses that are approved by the Bankruptcy Court and permitted by the DIP Budget (subject to Permitted Variances);<br><br>(iv) for working capital and general corporate purposes; and<br><br>(v) for the Prepetition Debt Financing.<br><br>*See* DIP Credit Agreement § 5.08 (Use of Proceeds), and Interim Order ¶ I |

| | |
|---|---|
| **Interest Rate**<br>Bankruptcy Rule<br>4001(c)(1)(B) | DIP Revolving Loans and DIP Roll-Up Loans will bear interest, payable in cash, at the following rates:<br><br>(b)      with respect to LIBOR Loans, the Adjusted LIBO Rate (with a zero floor) plus 7.00% per annum, and<br><br>(c)      with respect to ABR Loans, the Alternative Base Rate (with a zero floor) plus 6.00% per annum.<br><br>*See* DIP Credit Agreement §1.01 (Definition of "Applicable Rate") and §2.13 (Interest) |
| **Default Interest**<br>Bankruptcy Rule<br>4001(c)(1)(B) | DIP Loans will bear default interest at the rate of 2.00% per annum plus (i) in the case of any Loan, the rate otherwise applicable to such Loan and (ii) in the case of any other amount, the rate applicable to the ABR Loans.<br>*See* DIP Credit Agreement § 2.13 (Interest) |
| **Termination**<br>Bankruptcy Rule<br>4001(c)(1)(B) | The earliest to occur of:<br>(a)      the effective date of a plan of reorganization filed in the Bankruptcy Cases that is confirmed pursuant to an order of the Bankruptcy Court;<br>(b)      the date of consummation of a sale, pursuant to section 363 of the Bankruptcy Code or otherwise, of all or substantially all of the Debtors' assets;<br>(c)      the date that is forty-five (45) days after the Petition Date if a Final Order has not been entered by the Bankruptcy Court by such date;<br>(d)      the Interim Order or the Final Order, as applicable, ceasing to be in full force and effect for any reason;<br>(e)      the acceleration of the Obligations or termination by the Revolving Lenders of the Revolving Commitments; and<br>(f)      the Scheduled Maturity Date.<br>*See* DIP Credit Agreement § 1.01 (Definition of "Maturity Date") |
| **Fees**<br>Bankruptcy Rule<br>4001(c)(1)(B) | <u>Unused Commitment Fee</u>: Applicable Rate on the average daily amount of the Available Revolving Commitment of such Revolving Lender during the period from and including the Effective Date to but excluding the date on which Commitment terminates.<br><br><u>Letter of Credit Fee</u>: Applicable Rate used to determine the interest applicable to Libor Revolving Loans.<br><br><u>Letter of Credit Fronting Fees</u>: 0.125% on the average daily amount of the LC Exposure.<br><br><u>Exit Fee</u>:  1.25% of the aggregate principal amount of DIP Term Loans prepaid, refinanced, or replaced or the amount of Revolving Commitments permanently refinanced, replaced, cancelled or reduced.<br><br><u>Fee Letters:</u> The arrangement, backstop, upfront and administrative agency fees payable pursuant to the Agent Fee Letter attached hereto as **Exhibit C-2** and the Farm Credit Fee Letter attached hereto as **Exhibit C-2**. Additional terms of the DIP Facility are included in the Commitment Letter attached hereto as **Exhibit C-1**. [5]<br><br>*See* DIP Credit Agreement § 2.12 (Fees), Fee Letter |

---

[5] The Debtors propose to file the Fee Letters pursuant to the Sealing Motion

| | |
|---|---|
| **Optional Prepayments**<br>Bankruptcy Rule 4001(c)(1)(B) | DIP Loans may be voluntarily prepaid, in whole or in part, without premium or penalty subject to customary breakage costs and the exit fee described above. Once repaid, DIP Roll-Up Loans may not be reborrowed.<br><br>*See* DIP Credit Agreement § 2.11(a) (Prepayment of Loans) |
| **Mandatory Prepayments**<br>Bankruptcy Rule 4001(c)(1)(B) | (a)  Within three (3) Business Days following the receipt of Net Cash Proceeds in connection with any Asset Sale or series of Asset Sales in excess of $5 million, the DIP Borrower will be require to repay the Obligations in an amount equal to such Net Cash Proceeds.<br><br>(b)  The DIP Borrower must repay Obligations with the proceeds received in connection with any Recovery Event in excess of $5 million unless applied to repaid, replace or relocate damaged property within 30 days of receipt.<br><br>(c)  The DIP Borrower must repay Revolving Loans and/or Cash Collateralize LC Exposure in an amount equal to the amount by which the aggregate principal amount of Revolving Exposures exceed the Maximum Available Amount.<br><br>(d)  If Unrestricted Cash, less the sum of the budged operating disbursements for the immediately succeeding week and the amount of the Carve-Out exceeds $30 million for five (5) consecutive Business Days, the DIP Borrower will be required to repay the Revolving Loans in the amount of such excess.<br><br>*See* DIP Credit Agreement §§ 2.11(b), 2.11 (c) (Prepayment of Loans) |
| **Security and Priority**<br>Bankruptcy Rule 4001(c)(1)(B)(i) | The DIP Agent and other DIP Secured Parties in order to secure the DIP Obligations are hereby granted the following security interests and liens, which shall immediately be valid, binding, perfected, continuing, enforceable and non-avoidable all liens and security interests granted to the DIP Agent and each of the DIP Secured Parties (x) during the Interim Period, in respect of the DIP Obligations under the DIP Revolving Facility (including, subject to any conditions or limitation specified in the DIP Loan Documents, any DIP Letters of Credit issued under the DIP L/C Sublimit) and (y) upon entry of the Final Order, in respect of the remaining DIP Revolving Loans (including, subject to any conditions or limitation specified in the DIP Loan Documents, any DIP Letters of Credit issued under the DIP L/C Sublimit) and the DIP Roll-Up Loans (pursuant to the Interim Order, any Final Order and the other DIP Loan Documents, the "<u>DIP Liens</u>"):<br><br>(a)  pursuant to Section 364(c)(2) of the Bankruptcy Code, valid, enforceable, perfected and non-avoidable first priority liens on and security interests in all DIP Collateral that was not encumbered by valid, enforceable, perfected and non-avoidable liens as of the Petition Date; and<br><br>(b)  pursuant to Section 364(c)(3) and Section 364(d) of the Bankruptcy Code, valid, enforceable, perfected and non-avoidable first priority priming liens on and security interests in all other DIP Collateral, which liens and security interests shall, in each case, be (x) junior only to any pre-existing liens as of the Petition Date of a third party, *i.e.,* not any Prepetition Secured Parties (each a "**Third Party Lienholder**") on the DIP Collateral, but solely to the extent that such liens and security interests of any Third Party Lienholders were, in each case, as of the Petition Date, valid enforceable, perfected and non-avoidable liens, or were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (i) senior to the Prepetition Liens or (ii) attached to property of the Debtors that did not constitute Prepetition Collateral (such liens in the preceding clauses (i) and (ii), the "**Permitted Third Party Liens**"), and (y) senior to all other liens on, and security interests in the DIP Collateral, including without limitation, the Prepetition Liens, the Adequate Protection Liens, and the liens of any Third Party Lienholders which are *pari passu* with or junior to the Prepetition |

| | |
|---|---|
| | Liens. |
| | *See* Interim Order ¶2(e) |
| **DIP Budget and Related Covenants** Bankruptcy Rule 4001(c)(1)(B) | The use of proceeds of the DIP Facility is subject to a customary budget, including any permitted variances. <br><br> *See* DIP Credit Agreement §1.01 (Definition of "Agreed Budget"), § 5.12 and Interim Order ¶ (iv) |
| **Reporting** Bankruptcy Rule 4001(c)(1)(B) | Loan Parties will be required to deliver a customary budget and will be subject to a variance covenant as more fully set forth in the DIP Credit Agreement. <br><br> *See* DIP Credit Agreement § 5.01 (Financial Statements and Other Information) |
| **Borrowing Conditions** Bankruptcy Rule 4001(c)(1)(B) | In addition to other customary conditions precedent (collectively, the "**Conditions Precedent**"): <br><br> (a) Delivery of the Agreed Budget; <br><br> (b) Entry of the Interim Order and the Final Order, as applicable, and such orders are in full force and effect; <br><br> (c) Execution of definitive documentation by the Loan Parties and the other parties thereto that are required to be executed; <br><br> (d) Accuracy of representations and warranties; <br><br> (e) All fees, costs and expenses required to have been paid or reimbursed, as set forth in the DIP Credit Agreement have been paid or reimbursed; <br><br> (f) Amendment of the Prepetition Receivables Financing Agreement; <br><br> (g) Entry of Cash Management Orders and all other "first day orders;" <br><br> (h) Revolving Exposures not exceeding Maximum Available Commitment; <br><br> (i) In respect of Letters of Credit, there shall be no remaining capacity (either at all or for the size of the letter of credit request) under any Permitted Receivables Financing; and <br><br> (j) Unrestricted cash, less the sum of the budgeted operating disbursements for the immediately succeeding week and the amount of the Carve-Out, must not exceed $30 million after giving effect to such borrowing. <br><br> *See* DIP Credit Agreement §§ 4.01, 4.02 (Conditions) |
| **Stipulations as to Prepetition Claims and Liens** Bankruptcy Rule 4001(c)(1)(B)(iii) | In the Interim Order, the Debtors stipulate to certain facts, including, among other things, that: <br><br> (a) As of the Petition Date, the Prepetition Loan Parties were justly and lawfully indebted and liable to the Prepetition Secured Parties under the Prepetition Loan Documents, without objection, defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $188,800,000 on account of outstanding Loans under (and as defined in) the Prepetition Revolving Credit Agreement (the "**Prepetition Revolving Loans**"), plus all accrued and unpaid interest thereon, and any fees, expenses, indemnification obligations, guarantee obligations, reimbursement obligations, including, without limitation, any attorneys', accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable to or reimbursable by the Prepetition Loan Parties, and all other Obligations under (and as defined in) the Prepetition Revolving Credit Agreement. <br><br> (b) (i) The Prepetition Revolving Loans constitute legal, valid, binding, non-avoidable obligations of the Prepetition Loan Parties enforceable in accordance with the terms of the applicable Prepetition Loan Documents, |

and (ii) no offsets, recoupments, challenges, contests, attacks, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or the Prepetition Revolving Loans exist, and no portion of the Prepetition Liens or the Prepetition Revolving Loans is subject to any challenge, cause of action, or defense, including avoidance, disallowance, disgorgement, subordination (equitable or otherwise), re-characterization, or other challenge of any kind or nature under the Bankruptcy Code, applicable non-bankruptcy law or otherwise.

(c)   The Prepetition Liens granted by the Prepetition Secured Parties, to or for the benefit of the Prepetition Agent and the other Prepetition Secured Parties, as security for the Prepetition Obligation, encumber the Prepetition Collateral, as the same existed on or at any time prior to the Petition Date.  The Prepetition Liens have been properly recorded and perfected under applicable non-bankruptcy law, and are legal, valid, enforceable, non-avoidable, and not subject to contest, avoidance, attack, offset, re-characterization, subordination or other challenge of any kind or nature under the Bankruptcy Code, applicable non-bankruptcy law or otherwise.  As of the Petition Date, and without giving effect to the Interim Order, the Debtors are not aware of any liens or security interests over the Prepetition Collateral of the Prepetition Loan Parties having priority over the Prepetition Liens, except certain Permitted Liens (as defined in the Prepetition Revolving Credit Agreement).  The Prepetition Liens were granted to or for the benefit of the Prepetition Agent and the other Prepetition Secured Parties for fair consideration and reasonably equivalent value, and were granted contemporaneously with, or covenanted to be provided as inducement for, the making of the loans and/or commitments and other financial accommodations secured thereby.

(d)   The DIP Secured Parties have acted in good faith, and without negligence, misconduct or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting or obtaining requisite approvals of the DIP Facility and the use of Cash Collateral.

(e)   None of the DIP Secured Parties or the Prepetition Secured Parties are control persons or insiders of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the DIP Facility, the Prepetition Revolving Loans, the DIP Loan Documents and/or the Prepetition Loan Documents.

(f)   As of the date hereof, there exist no claims or causes of action against any of the DIP Agent, the other DIP Secured Parties, or the Prepetition Secured Parties with respect to, in connection with, related to, or arising from the DIP Loan Documents, the Prepetition Loan Documents, the DIP Facility and/or the Prepetition Revolving Obligations that may be asserted by the DIP Loan Parties or, to the Debtors' knowledge, any other person or entity.

*See* Interim Order ¶ F

| | |
|---|---|
| **Release of Claims against the DIP Secured Parties and Prepetition Secured** | In the Interim Order, the Debtors provide the following release of claims:

The Debtors, on behalf of themselves and their respective estates, forever and irrevocably release, discharge, and acquit all former, current and future DIP |

| | |
|---|---|
| **Parties** | Secured Parties and any Prepetition Secured Parties that become DIP Lenders, all holders of participation interests under the DIP Credit Agreement or the Prepetition Revolving Credit Agreement, all Affiliates of the DIP Secured Parties and of the Prepetition Secured Parties, and each of the former, current and future officers, employees, directors, agents, representatives, owners, members, partners, financial and other advisors and consultants, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors and successors in interest of each DIP Secured Party and each Prepetition Secured Party and of each of their respective Affiliates, in each case in its capacity as such, (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the DIP Facility, the DIP Loan Documents, the Prepetition Revolving Credit Facility and the other Prepetition Loan Documents and/or the transactions contemplated hereunder or thereunder including, without limitation, (x) any so-called "lender liability" or equitable subordination claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the DIP Agent, the other DIP Secured Parties, and/or the Prepetition Secured Parties. The Debtors further waive and release any defenses, right of counterclaim, right of setoff or deduction of the payment of the Prepetition Revolving Loans and the DIP Obligations that the Debtors now have or may claim to have against the Releasees arising out of, connected with, or relating to any and all acts, omissions or events occurring prior to the entry of the Interim Order. <br><br> *See* Interim Order ¶ F(v) |
| **Effect of Stipulations** <br> Bankruptcy Rule 4001(c)(1)(B)(iii) | The Debtors' stipulations, admissions, agreements, releases, and waivers contained in the Interim Order, including the stipulations set forth in Paragraph F of the Interim Order (the "**Stipulations**"), are and shall be binding upon the Debtors and any and all of the Debtors' successors-in-interest and assigns (including, without limitation, any chapter 7 or chapter 11 trustee, responsible person, examiner with expanded powers, or other estate representative). The Stipulations, and all other admissions, agreements, releases and waivers set forth in the Interim Order also are and shall be binding upon all other parties-in-interest and each of their respective successors-in-interest and assigns, unless, and solely to the extent that (i) parties-in-interest, in each case with standing and requisite authority to do so have timely filed the proper pleadings, and timely commenced the appropriate proceedings under the Bankruptcy Code and Bankruptcy Rules, (a) objecting to or challenging any of the Stipulations or (b) otherwise asserting or prosecuting any action against the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees in connection with matters covered by the Stipulations (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "**Challenge**"), by no later than (x) with respect to the official committee of unsecured creditors (if one is appointed), the date that is sixty (60) days from the date such committee is appointed and (y) with respect to all other parties in interest, the date that is seventy-five (75) days from the entry of the Interim Order (the period described in the immediately preceding clauses (x) and (y) shall be referred to as the "**Challenge Period**," and the date that is the next calendar day after the termination of the Challenge Period shall be referred to as the |

| | |
|---|---|
| | "**Challenge Period Termination Date**"), as such date may be extended as to any such party-in-interest by the Prepetition Agent (with the consent of the Required Lenders (as defined in the Prepetition Revolving Credit Agreement) and each applicable individual Prepetition Secured Party that is the subject of a Challenge or by any such later date as has been ordered by the Court for cause upon a motion filed and served within the Challenge Period (before giving effect to such extension) and (ii) the Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding, and any such judgment has become final and is not subject to any further review or appeal.<br><br>*See* Interim Order ¶ 6 |
| **Adequate Protection**<br>Bankruptcy Rule 4001(c)(1)(B)(ii) | Until the indefeasible discharge of the Prepetition Term Facility and Prepetition Revolving Credit Facility, and pursuant to sections 361, 363(e), and 364(d)(1) of the Bankruptcy Code, the Prepetition Secured Parties will be authorized to receive as adequate protection:<br><br>(a)  Until the Revolver Refinancing occurs (and, on a contingent basis, until expiration of the Challenge Period) to the extent of diminution in value of their collateral, replacement or, if applicable, new liens on the DIP Collateral to secure adequate protection claims, subject and subordinate only to the Carve-Out, the DIP Liens, and the Prepetition Liens;<br><br>(b)  Until the Revolver Refinancing occurs (and, on a contingent basis, until expiration of the Challenge Period), superpriority claims as provided for in section 507(b) of the Bankruptcy Code that are junior to the DIP Superpriority Claims;<br><br>(c)  Current cash payments on a monthly basis (x) from and after the entry of the Interim Order, of all accrued and unpaid interest and fees owing, whether incurred or accrued prior to or on or after the Petition Date, under the Prepetition Revolving Credit Agreement at the applicable rate of defaults and on the payment dates provided therein and (y) immediately upon the entry of the Final Order, all remaining accrued and unpaid interest fees owing by the Debtors under the Prepetition Revolving Credit Agreement as of the date the DIP Roll-Up Loans are incurred, at the applicable default rates provided for in the Prepetition Credit Agreement;<br><br>(d)  Until the Revolver Refinancing has occurred, current cash reimbursement of the reasonable and documented fees and expenses (including reasonable and documented professional fees) incurred by the DIP Agent;<br><br>(e)  Subject to the entry of the Final Order, use of the DIP Roll-Up Loans to consummate the Revolver Refinancing;<br><br>(f)  Until the Revolver Refinancing has occurred, the delivery of all monthly financial reporting given to the U.S. Trustee, and all of the financial reporting and notices as, and when, required to be provided to the DIP Agent.<br><br>*See* Interim Order ¶ 4 |
| **Covenants**<br>Bankruptcy Rule 4001(c)(1)(B) | <u>Affirmative Covenants</u>:  Customary and appropriate for financings of this type, including, (i) financial reporting and other information, (ii) notices of material events, (iii) conduct of business, (iv) payment of obligations, (v) maintenance of properties, (vi) inspection rights on books and records, (vii) compliance with laws, |

| | |
|---|---|
| | (viii) use of proceeds, (ix) insurance, (x) subsidiary guarantors, pledges, collateral, and further assurances, (xi) mortgaged property, (xii) agreed budget, (xiii) capital expenditures, (xiv) agreement to deliver collateral documents, (xv) permitted variances, (xvi) milestones, (xvii) periodic calls, and (xviii) post-closing obligations. <br><br>*See* DIP Credit Agreement Article V (Affirmative Covenants) <br><br><u>Negative Covenants</u>:  Customary and appropriate for financings of this type, including restrictions on (i) indebtedness, (ii) liens, (iii) fundamental changes, (iv) investments, loans, advance and acquisitions, (v) asset sales, (vi) sale and leaseback transactions, (vii) restricted payments, (viii) prepayment of other indebtedness, (ix) transactions with affiliates, (x) restrictive agreements, (xi) amendments to other indebtedness, (xii) intentionally omitted, (xiii) sanctions, (xiv) anti-corruption laws, (xv) chapter 11 claims, and (xvi) revision of orders and application to Bankruptcy Court. <br><br>*See* DIP Credit Agreement Article VI (Negative Covenants) |
| **Events of Default** <br> Bankruptcy Rule 4001(c)(1)(B) | Customary and appropriate for financings of this type, including (a) failure to perform payment obligations, (b) breach of representations and warranties, (c) failure to comply with covenants, (d) payment and cross-default with respect to any Permitted Receivables Financing and material Indebtedness, (e) entry of judgments not stayed, (f) certain ERISA Events, (g) invalidity of loan documents, (h) orders appointing a trustee or examiner and order dismissing or converting the cases to chapter 7, (i) non-compliance with the interim or final orders, (j) termination of exclusivity, (k) entry of unapproved order or filing of an unapproved plan, (l) orders granting relief to certain claimholders from the automatic stay, (m) termination of orders granting use of prepetition collateral, (n) unenforceability of interim and final order, (o) support of motions against secured parties, and (p) prohibited debt payments. <br><br>*See* DIP Credit Agreement § 7.01 (Events of Default) |
| **Carve-Out** <br> Bankruptcy Rule 4001(c)(1)(B) | As used in the Interim Order, the "**Carve-Out**" shall mean a carve-out from the DIP Superpriority Claims, the DIP Liens, claims pursuant to section 507(b) of the Bankruptcy Code, and the Adequate Protection Liens and the Prepetition Liens, in an amount equal to the sum of (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the Carve-Out Trigger Notice (as defined herein)); (ii) all reasonable and documented fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code, in an aggregate amount not to exceed $75,000 (without regard to the Carve-Out Trigger Notice); (iii) to the extent allowed by the Court at any time, whether by interim order, procedural order or otherwise, all unpaid fees and expenses, other than any Transaction Fees (as defined below) (the "**Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code or by a Committee, if any, pursuant to section 328 and 1103 of the Bankruptcy Code (collectively, the "**Professional Persons**"), at any time on or before the first business day following the (a) delivery by the DIP Agent of a Carve-Out Trigger Notice and (b) the Termination Date (including as a result of the occurrence of an Event of Default) (such day, the "**Carve-Out Trigger Date**"), whether allowed by the Court prior to or after the Carve-Out Trigger Date; and (iv) Professional Fees incurred after the Carve-Out Trigger Date in an amount not to exceed $8,000,000 (the "**Post-Carve-Out Trigger Notice Cap**"), in each case subject to the limits imposed by the Interim Order and the Final Order. For purposes of the foregoing, "**Carve-Out Trigger Notice**" shall mean a written notice delivered by email by the DIP Agent to the Debtors' lead restructuring |

counsel, the U.S. Trustee, and counsel to any Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default under the DIP Loan Documents stating that the Post-Carve-Out Trigger Notice Cap has been invoked.  For the avoidance of doubt, the incurrence or payment of any amounts subject to the Carve-Out shall not be restricted by the DIP Budget.

The Carve-Out shall not include any restructuring, completion, sale, success, divestiture or other transaction fees of any investment bankers or financial advisors of the Debtors or a Committee, if any (such fees, "**Transaction Fees**"), provided, however, that a Transaction Fee which is earned and payable by the Debtors, upon consummation of an applicable transaction, pursuant to an engagement letter between the Debtors and the Debtors' investment banker, Evercore, which is acceptable to the DIP Agent (with the consent of the requisite DIP Secured Parties as provided in and consistent with their respective rights under the DIP Loan Documents) and is approved by the Court, shall be payable prior to any distribution to, the DIP Secured Parties or the Prepetition Secured Parties, solely from any proceeds received by the Debtors resulting from such transaction.

Prior to the occurrence of the Carve-Out Trigger Date, the Debtors are authorized (subject to the DIP Budget) to pay Professional Fees that are authorized to be paid in accordance with the provisions of the Bankruptcy Code and any order entered by the Court establishing procedures for the payment of compensation to Professional Persons in these Cases, as the same may be due and payable, and such payments shall not reduce the Carve-Out.   Upon the occurrence of the Carve-Out Trigger Date, the Post-Carve-Out Trigger Notice Cap shall be reduced, dollar-for-dollar, by the amount of any Professional Fees incurred and accruing by the Debtors or any Committee, and paid to the applicable Professional Persons, following delivery of the Carve-Out Trigger Notice to the Debtors.

Immediately upon the Carve-Out Trigger Date, and prior to the payment of any DIP Secured Party or Prepetition Secured Party on account of adequate protection, the Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve (the "**Carve-Out Reserve**") in an amount equal to the sum of the amounts set forth in paragraphs 8(a)(i) through 8(a)(iv) above.

The Carve-Out Reserve shall be held in a segregated non-interest bearing account in trust at the DIP Agent to pay allowed Professional Fees benefiting from the Carve-Out as provided herein, and the Carve-Out Reserve shall be available only to satisfy such allowed Professional Fees benefiting from the Carve-Out until such Professional Fees are paid in full.

To the extent the Carve-Out Reserve has not been reduced to zero after the payment in full of such obligations, it shall be used to pay the DIP Agent for the benefit of the DIP Secured Parties until the DIP Obligations have been indefeasibly paid in full in cash and all commitments under the DIP Facility have been terminated.  Notwithstanding anything to the contrary herein, the Prepetition Agent and the DIP Agent, each on behalf of itself and the relevant secured parties, (y) shall not sweep or foreclose on the Carve-Out Reserve prior to satisfaction in full of all obligations benefitting from the Carve-Out as provided herein, and (z) shall have a security interest upon any residual interest in the Carve-Out Reserve, available following satisfaction in cash in full of all obligations benefitting from the Carve-Out as provided herein, and the priority of such liens on the residual interest shall be consistent with the Interim Order.  Further, notwithstanding anything to the contrary herein, (A) the failure of the Carve-Out Reserve to satisfy in full the Professional Fees shall not affect the priority of the

<table>
<tr>
<td></td>
<td>Carve-Out and (B) in no way shall the Carve-Out, the Post-Trigger Date Carve-Out Amount, the Carve-Out Reserve, or any of the foregoing be construed as a cap or limitation on the amount of the Professional Fees due and payable by the Debtors.

Notwithstanding anything to the contrary herein or in the DIP Loan Documents, the Carve-Out shall be senior to the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the Adequate Protection Obligations, the 507(b) Claims, the Adequate Protection Liens, the Prepetition Liens, and all other liens and claims granted under the Interim Order, the DIP Loan Documents, or otherwise securing or in respect of the DIP Obligations or the Adequate Protection Obligations.

The DIP Secured Parties and the Prepetition Secured Parties reserve the right to review and object to any fee statement, interim application or monthly application issued or filed by the Professionals Persons.   Notwithstanding anything to the contrary herein or in the DIP Loan Documents, the payment of any allowed Professional Fees pursuant to the Carve-Out shall not, and shall not be deemed, to (i) reduce any Debtor's obligations owed to the DIP Agent, the other DIP Secured Parties, the Prepetition Agent or the other Prepetition Secured Parties (whether under the Interim Order or otherwise) or (ii) other than as necessary to permit the payment of such allowed Professional Fees (in each case, subject to the terms of and as expressly provided in the Interim Order with respect to the Carve-Out), modify, alter or otherwise affect any of the liens and security interests of such parties (whether granted under the Interim Order or otherwise) in the Prepetition Collateral or the DIP Collateral (or their claims against the Debtors).  The DIP Agent, the other DIP Secured Parties, the Prepetition Agent and the other Prepetition Secured Parties shall not be responsible for the direct payment or reimbursement of any Professional Fees, or any fees or expenses of the U.S. Trustee or Clerk of the Court (or of any other entity) incurred in connection with the Cases or any Successor Case, and nothing in the Interim Order or otherwise shall be construed to obligate such parties in any way to pay such compensation or to reimburse such expenses.

*See* Interim Order ¶ 8</td>
</tr>
<tr>
<td>**Milestones**
Bankruptcy Rule 4001(c)(1)(B)(v) and (vi)</td>
<td>In addition to such other milestones as may be agreed to between the Debtors and the DIP Lenders:

(a)  on or before the date falling thirty (30) days after the Petition Date, the Debtors shall have delivered to the Administrative Agent a draft Sale Motion;

(b)   within forty-five (45) days after the Petition Date, the Final Order shall have been entered by the Bankruptcy Court;

(c)  on or before the date falling ninety (90) days after the Petition Date, the Debtors shall have delivered to the Administrative Agent an election of whether it intends to pursue a Sale Process, a Plan Process or a combination of both;

(d)  if a Sale Process is elected, on or before the date falling ninety (90) days after the Petition Date, the Debtors shall have filed a Sale Motion;

(e)  if a Plan Process is elected, on or before the date falling ninety (90) days after the Petition Date, the Debtors shall have filed an Acceptable Plan and related disclosure statement (in each case, in form and substance acceptable to the Required Lenders) with respect to any Plan Process;

(f)  if a Sale Process is elected, on or before the date falling one hundred twenty (120) days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Sale Motion;</td>
</tr>
</table>

|  | (g) if a Sale Process is elected, on or before the date falling one hundred sixty (160) days after the Petition Date, the Bankruptcy Court shall have entered an order approving each sale contemplated by any relevant Sale Process following completion of the process contemplated by the bid procedures described in the Sale Motion; |
|  | (h) if a Plan Process is elected, on or before the date falling one hundred sixty (160) days after the Petition Date, the Bankruptcy Court shall have entered an order confirming an Acceptable Plan; and |
|  | (i) if a Sale Process is elected, on or before the date falling two hundred forty (240) days after the Petition Date, the Bankruptcy Code shall have entered an order confirming an Acceptable Plan. |
|  | *See* DIP Credit Agreement §5.14 (Milestone) |
| **Limitations on Use of Cash Collateral** Bankruptcy Rule 4001(c)(1)(B) | No proceeds of the DIP Facility, DIP Collateral, Prepetition Collateral (including Cash Collateral) or the Carve-Out may be used for: |
|  | (a) incurring indebtedness other than as expressly provided in the Interim Order or the DIP Budget, |
|  | (b) preventing, hindering, impeding, or delaying any of the Prepetition Agent's or any other Prepetition Secured Party's enforcement or realization upon, or exercise of rights in respect of, any of the Prepetition Collateral or DIP Collateral other than to seek a determination that an Event of Default has not occurred or is not continuing or in connection with a remedies hearing, |
|  | (c) seeking to amend or modify any of the rights or interests granted to the Prepetition Agent or any other Prepetition Secured Party under the Interim Order or Prepetition Loan Documents, including seeking to use Cash Collateral on a contested basis, |
|  | (d) asserting, commencing, or prosecuting any claims or causes of action, including, without limitation, any Challenge or any other actions under chapter 5 of the Bankruptcy Code (or any similar law), against the Prepetition Agent or any other Prepetition Secured Party, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees, or |
|  | (e) asserting, joining, commencing, supporting, investigating, or prosecuting any Challenge, or any other action for any claim, counterclaim, action, cause of action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the material interests of the Prepetition Secured Parties, arising out of, in connection with, or relating to the Prepetition Loan Documents, or the transactions contemplated thereunder, including, without limitation, |
|  | a. any action arising under the Bankruptcy Code, |
|  | b. any so-called "lender liability" claims and causes of action, |
|  | c. any action with respect to the validity and extent of the Prepetition Revolving Loans or the validity, extent, perfection and priority of the Prepetition Liens, |
|  | d. any action seeking to invalidate, set aside, avoid, reduce, set off, offset, recharacterize, subordinate (whether equitable, contractual, or otherwise), recoup against, disallow, impair, raise any defenses, cross-claims, or counterclaims, or raise any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation against, or with respect to, |

|  | the Prepetition Liens, in whole or in part or |
|---|---|
|  | e.  appeal or otherwise challenge the Interim Order or the Final Order; <u>provided</u> that no more than $75,000 in the aggregate of the proceeds of the DIP Facility, the DIP Collateral, Prepetition Collateral, the Cash Collateral, and the Carve-Out may be used by any Committee to investigate (but not prosecute or Challenge, or initiate the prosecution of, including the preparation of any complaint or motion on account of) the Stipulations. |
|  | *See* Interim Order ¶ 7 |
| **506(c) Waiver**<br>Bankruptcy Rule 4001(c)(1)(B)(x) | Subject to the entry of the Final Order, the Debtors shall be deemed to have waived any rights, benefits or causes of action under Section 506(c) of the Bankruptcy Code as they may relate to or be asserted against the DIP Secured Parties, the DIP Liens, the DIP Collateral, the Prepetition Secured Parties, the Prepetition Liens or the Prepetition Collateral.<br><br>*See* Interim Order ¶ 9 |
| **Liens on Avoidance Actions**<br>Bankruptcy Rule 4001(c)(1)(B)(xi) | Subject to entry of the Final Order, the DIP Liens shall attach to the proceeds of claims and causes of action under Chapter 5 of the Bankruptcy Code.<br><br>*See* Interim Order ¶ 2(d) |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Loan Documents provide for customary indemnification of the DIP Agent and DIP Lenders.<br><br>*See* DIP Credit Agreement § 2.17(d) (Indemnification by the Loan Parties), Interim Order ¶ 2 |
| **Automatic Stay Waiver/Modification**<br>Bankruptcy Rule 4001(c)(1)(B)(iii) | Pursuant to the Interim Order, the automatic stay imposed by section 362 of the Bankruptcy Code shall be modified as necessary to permit the DIP Agent and DIP Lenders to enforce all their rights under the DIP Loan Documents.<br><br>*See* Interim Order ¶ viii |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens**<br>Bankruptcy Rule 4001(c)(1)(B)(vii) | The Interim Order shall be sufficient and conclusive evidence of the validity, perfection and priority of the DIP Liens and the Adequate Protection Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Liens and the Adequate Protection Liens or to entitle the DIP Liens and the Adequate Protection Liens to the priorities granted herein.<br><br>*See* Interim Order ¶ 5 |

<u>Statement Regarding Significant Provisions</u>

9.      The Interim Order contains the following provisions (the "**Significant Provisions**") identified in the Complex Case Procedures:[6]

---

[6] Pursuant to the Complex Case Procedures, ¶ 21, effective June 21, 2019, Debtor(s)'s counsel should highlight provisions of proposed orders issued under 11 U.S.C. §§ 363 or 364 that contain the following: a. Sale or plan confirmation milestones; b. Cross-collateralization; c. Roll ups; d. Liens on avoidance actions or proceeds of avoidance actions; e. Default provisions and remedies; f. Releases of claim against lender or

(a)     **Sale or Plan Confirmation Milestones**. The DIP Credit Agreement includes milestones of 120 days and 160 days after the petition date, respectively, for the entry of orders, in the alternative, approving each sale contemplated by any relevant Sale Process, or confirming an Acceptable Plan with respect to any Plan Process (each as defined in the DIP Credit Agreement). *See* DIP Credit Agreement § [5.14].

(b)     **Cross-Collateralization or Adequate Protection**. The Interim Order does not provide for cross-collateralization of any prepetition credit facility. The Interim Order provides for adequate protection in the form of adequate protection liens and superpriority claims against the Debtors, but limited to the extent of for any diminution in the value of respective interests in the value of the Prepetition Collateral. *See* Interim Order ¶ [4].

(c)     **Roll Ups**. The DIP Facility will be used to refinance and pay down all outstanding Prepetition Revolving Loans. *See* Interim Order ¶ (i).

(d)     **Liens on Avoidance Actions or Proceeds of Avoidance Actions**. The Interim Order does not provide for liens on Avoidance actions, but does provide for liens and superpriority claims on the proceeds of Avoidance Actions upon entry of the Final Order. *See* Order, ¶ 2(g).

(e)     **Default Provisions and Remedies**. The DIP Loan Documents contain customary Events of Default provisions and will allow for remedies by the DIP Agent upon direction by the Required DIP Lenders following the occurrence of an Event of Default and subject to the Default Notice Period upon the Termination Date. *See* DIP Credit Agreement § [7], Interim Order ¶ 14.

(f)     **Release of Claim Against Lender or Others**. [The Interim Order provides for the unconditional release and discharge of each of the DIP Secured Parties, Prepetition Secured Parties and all Affiliates from any and all obligations and liabilities to the DIP Loan Parties. *See* Interim Order, ¶ [F(v)].

(g)     **Limitations on Fees for Advisors to Official Committees**. The Interim Order does not provide for any limitations on fees owed to advisors to any official committee.

---

others; g. Limitations on fees for advisors to official committees; h. Priming liens; i. Any other provision that limits the ability of estate fiduciaries to fulfill their duties under the Bankruptcy Code and applicable law.

(h)     **Priming Liens**. The Interim Order does not provide for any non-consensual priming liens. The Interim Order, which has been consented to by a majority of the lenders under the Prepetition Revolving Credit Facility, provides the DIP Agent for its own benefit and the benefit of the DIP Lenders first priority senior priming security interests in and liens upon the Prepetition Collateral. *See* Interim Order, ¶ 2(e); DIP Credit Agreement § [6.02].

10.     The inclusion of the foregoing Significant Provisions are necessary (such explanation being required by Complex Case Procedures ¶¶ 21(a)–(i), which is made applicable by Bankruptcy Local Rule 1075-1) to obtain (a) the DIP Lenders' agreement to provide the DIP Facility on the terms and conditions reflected in the DIP Credit Agreement, (b) the Prepetition Secured Parties' consent to the Debtors' use of Cash Collateral during these Chapter 11 cases, and (c) the Prepetition Secured Parties' consent to the priming of the Prepetition Revolving Loans, which the Debtors believe (for the reasons set forth herein) will benefit all parties in interest over the remainder of the Debtors' Chapter 11 cases.  As set forth herein, the DIP Facility is critical to the Debtors' successful reorganization efforts and granting the relief requested pursuant to the Proposed Orders is critical to the continued operation of the Debtors' businesses and will maximize the value of the Debtors' estates for all parties in interest.

11.     In light of the foregoing, the Debtors submit that the Significant Provisions are appropriate under the facts and circumstances of these Chapter 11 cases. Accordingly, the Significant Provisions in the Proposed Orders should be approved.

## Background

12.     The Debtors are a leading public food and beverage company and the largest processor and direct-to-store distributor of fresh fluid milk and other dairy and dairy case products in the United States. The Debtors manufacture, market, and distribute

22

a wide variety of branded and private label dairy and dairy case products, including fluid milk, ice cream, cultured dairy products, creamers, ice cream mix, and other dairy products to retailers, distributors, foodservice outlets, educational institutions, and governmental entities across the United States.

13.     On the date hereof (the "**Petition Date**"), each of the Debtors commenced the above-captioned Chapter 11 Cases by filing with the Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

14.     The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   As of the date of this Motion, no trustee, examiner or statutory committee has been appointed in these Chapter 11 Cases.

15.     Additional information regarding the circumstances leading to the commencement of these Chapter 11 Cases and information regarding the Debtors' business and capital structure is set forth in detail in the First Day Declaration and the Yi Declaration, both filed contemporaneously herewith and incorporated by reference.

**A.  The Debtors' Prepetition Capital Structure**

16.     The Debtors' have approximately $189 in secured indebtedness under the Prepetition Revolving Credit Facility.  Certain of the Debtors are party to a $450 million prepetition receivables facility (the "**Securitization Facility**"), pursuant to which the Debtors sell trade receivables to two non-Debtor wholly owned, bankruptcy remote special purpose vehicle subsidiaries (the "**Sellers**"), which are a significant source of liquidity for the Debtors.  Additionally the Debtors have approximately $700 in aggregate principal amount of senior unsecured notes as described in paragraph 47 below (the

"**2023 Notes**").   These and other amounts are summarized in the following table and detailed below.[7]

| Obligation | Priority Against Debtors | Loans Outstanding[8] | Letters of Credit Outstanding |
|---|---|---|---|
| Prepetition Revolving Credit Facility | Secured | $188.8 million | $0.0 |
| Securitization Facility | Secured / True Sale | $180 million | $195.2 million |
| 2023 Notes | Senior Unsecured | $700 million | N/A |

<u>Prepetition Revolving Credit Facility</u>

17.     On February 22, 2019, the DIP Borrower, as borrower, and certain of the other Debtors, as guarantors, entered the Prepetition Credit Agreement with Rabobank, as administrative agent and collateral agent, and the Prepetition Lenders, pursuant to which the Prepetition Lenders provided a senior secured revolving borrowing base credit facility with a maximum facility amount of up to $265 million.  On August 27, 2019 Dean Foods exercised its right to increase the aggregate principal amount of the commitments under the Prepetition Credit Agreement to $350 million.  A portion of the Prepetition Revolving Credit Facility is available for the issuance of up to $25 million of standby letters of credit, although no letters of credit were outstanding as of the Petition Date.   Loans outstanding under the Prepetition Revolving Credit Facility bear interest, at borrowers' option, at either: (i) the Base Rate (as defined in the RFC Credit Agreement) or (ii) the Adjusted Eurodollar Rate (as defined in the RFC Credit Agreement), plus a margin ranging between 1.25% and 1.75% (in the case of Base Rate loans) or 2.25% and 2.75% (in the

---

[7] The table is for illustration and summary purposes only. The Debtors do not admit to the validity, priority and/or allowance of any claim, lien or interest in property and reserve rights in relation to such issues.

[8] The amounts tabulated above reflect the outstanding principal amounts owed, and do not include accrued and unpaid interest, fees, premiums or other related claims.

case of Eurodollar Rate loans), in each case based on Dean Foods' total net leverage ratio at such time.

18. Availability under the Credit Facility is subject to a borrowing base equal to 65% of the appraised value of certain of our real property and equipment. The Prepetition Revolving Credit Facility has a stated maturity of February 22, 2024. As of November 8, 2019, Dean Foods had $188.8 million outstanding borrowings under the Prepetition Revolving Credit Facility.

19. The Prepetition Revolving Credit Facility can also be used to secure designated hedges entered into with any lenders. As of November 11, 2019, the Debtors aggregate notional amount of all such hedges was $33.6 million.

**B. Securitization Facility**

20. Dean Foods' Securitization Facility is a $450 million receivables securitization facility pursuant to which certain subsidiaries sell their accounts receivable to the Sellers, two wholly owned, bankruptcy-remote entities. The entities then transfer the receivables to third-party asset-backed commercial paper conduits sponsored by major financial institutions.

21. As of November 8, 2019, Dean Foods had the ability to borrow up to $5.4 million of the total commitment amount under the Securitization Facility. In addition, as of November 8, 2019, an aggregate of $180 million in loans and $195.2 in undrawn letters of credit were outstanding, and the remaining available borrowing capacity was $5.4 million. The receivables securitization facility bears interest at a variable rate based upon commercial paper and one-month LIBO rates plus an applicable margin based on our total net leverage ratio, which rate was 3.72% as of close of business on November 8, 2019.

22.     The Debtors are currently seeking to amend and continue the Securitization Facility post-petition, as described in greater detail in the Securitization Motion.  Absent the relief requested in the Securitization Motion, the Securitization Facility would automatically terminate and begin to wind down.

### C.  Prepetition Senior Unsecured Notes

23.     On February 25, 2015, Dean Foods issued the 2023 Notes, $700 million in aggregate principal amount of 6.50% senior notes due 2023 at an issue price of 100% of the principal amount of the 2023 Notes in a private placement for resale to "qualified institutional buyers" as defined in Rule 144A under the Securities Act of 1933, as amended (the "**Securities Act**"), and in offshore transactions pursuant to Regulation S under the Securities Act.  The 2023 Notes are senior unsecured obligations.  The 2023 Notes are fully and unconditionally guaranteed on a senior unsecured basis, jointly and severally, by the same subsidiaries that guarantee Dean Foods' obligations under the Prepetition Credit Facility.  The 2023 Notes mature on March 15, 2023 and bear interest at an annual rate of 6.50%, which is payable semi-annually in arrears in March and September of each year.  The carrying value under the 2023 Notes at December 31, 2018 was $695.4 million, net of unamortized debt issuance costs of $4.6 million.

### D.  The Debtors' Immediate Liquidity Needs

24.     Dean Foods commenced the Chapter 11 Cases to preserve and maximize its enterprise value for the benefit of its stakeholders in the face of significant industry headwinds and an impending liquidity crisis that had built over the preceding year.  In February 2019, the Debtors retained Evercore to assist with a broad evaluation of potential strategic alternatives, including the disposition of certain assets, the formation of new joint ventures, a strategic business combination, a sale of the enterprise, or other

26

options to re-energize the Debtors' stand-alone business.  While Evercore and other advisors spent months exploring these options, a series of industry, operational, and financial factors, all explained in greater detail in the First Day Declaration, aggregated to prevent such efforts from sufficiently altering the Debtors' financial outlook.

25.     The Debtors need an immediate capital infusion to operate their business post-petition and to fund these Chapter 11 Cases.  As of the Petition Date, the Debtors lack sufficient funds to operate their enterprise and continue paying their debts as they come due, and they do not have readily available sources of additional financing.  The Debtors' forecast that they will be unable to generate sufficient levels of operating cash flows in the ordinary course of business to cover either their operating costs going forward or the projected restructuring costs of the Chapter 11 Cases without the DIP Facility and amended Securitization Facility.

### E.  The Debtors' Restructuring Efforts

26.     The Debtors commenced the Chapter 11 Cases to preserve and maximize their enterprise value for the benefit of their stakeholders in the face of significant industry headwinds and an impending liquidity crisis.  A multi-year trend of shrinking margins and increasing competition was exacerbated by (i) loss of significant volume from two major customers, and (ii) a series of well-intentioned cost-savings and strategic initiatives throughout 2018 and 2019 that fell short of the anticipated benefits and drove increased customer loss and margin compression.

27.     In February 2019, the Debtors refinanced their then outstanding secured revolving facility and amended and restated its securitization facility to remove certain financial covenants it could no longer meet.  This reduced the available revolving

borrower base from $450 million to $175 million. Accessibility in both cases was subject to compliance with financial covenants.

28.     As noted above, it was also in February 2019 that the Debtors retained Evercore to assist with a broad evaluation of potential strategic alternatives, including the disposition of certain assets, the formation of new joint ventures, strategic business combinations, sale of the enterprise, or other options to re-energize the Debtors' stand-alone business.  It was ultimately determined that these options could not be pursued for a variety of reasons, including potential contingent liabilities that Dean Foods faces related to the underfunded status of certain multi-employer pension plans in which is participates. In particular and by far the most significant, Dean Foods faces an estimated potential, contingent liability of over $700 million in the event it withdraws from Central States Southeast & Southwest Areas Pension.  Such potential liabilities significantly impaired Dean Foods' ability to pursue any strategic transactions with third parties outside of a bankruptcy proceeding.

29.     Liquidity remained tight, and on June 28, 2019, Dean Foods returned to it Prepetition Revolving Lenders and elected to appraise additional real estate for inclusion in the borrowing base under the Prepetition Revolving Credit Agreement in order to increase the borrowing base from $175 million to the facility maximum of $265 million.

30.     On August 27, 2019, Dean Foods entered into further supplements to the Credit Agreement pursuant to which the Dean Foods elected to exercise its rights to increase the aggregate principal amount of the commitments under the Credit Agreement by $85 million to an aggregate principal amount of $350 million.

31.     In August 2019, as Dean Foods reported its second quarter results it reduced its internal full year adjusted operating income forecast and reported that it would be a net user of cash for the full year 2019.  Eric Beringause, the current president and chief executive officer joined Dean Foods on July 29, 2019, and engaged in a renewed effort to evaluate Dean Foods' business plan and strategy.

32.     By early October 2019, the Debtors saw a sharp decline in preliminary third quarter 2019 results and realized they faced a financial outlook that was deteriorating significantly more rapidly than prior forecasts, and with the assistance of their various advisors, determined that it would be necessary to seek Chapter 11 relief to manage liquidity and prevent potentially ruinous customer flight.

33.     As discussed in more detail in the First Day Declaration, the Debtors provide a critical daily staple product.  Any shortfalls in the Debtors' fulfillment means that school lunch rooms, coffee shops, and grocery stores across America could face weeks without cartons for their lunch trays, milk for their coffee, or gallons for their refrigerators.  The Debtors believe their customers would not accept such risk of instability in their supply, and would likely rapidly seek a replacement vendor. Accordingly, the Debtors and their advisors concluded that seeking the protections of Chapter 11 was the most likely option for obtaining the necessary funding to sustain operations and preventing any disruption with their vendors and customers.

34.     The Debtors and their advisors engaged in the exploration of options for debtor-in-possession financing with a proposed DIP facility from certain of its prepetition secured lenders.

29

35.     The debtor-in-possession financing enables the Debtors to explore a plan or a potential strategic transaction including with the Debtors' long-time commercial partner and largest single raw milk vendor, Dairy Farmers of America ("**DFA**").  The Debtors have engaged in advanced discussions with DFA with regard to its role as a potential stalking horse bidder for the purchase of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code.  The Debtors intend to continue and expand the 363 sale marketing process they began prior to the Petition Date.

### F.  The Debtors Efforts to Obtain Financing

#### a.  The Marketing Process

36.     Evercore commenced a marketing process for possible DIP financing alternatives on October 21, 2019 with a target of a potential chapter 11 filing on November 12, 2019.  Evercore solicited debtor-in-possession financing proposals that could provide $250 million to $300 million of new money, assuming the Securitization Facility would remain available post-petition.  Evercore indicated openness to a variety of structures, including senior lien facilities that would prime the Prepetition Revolving Credit Facility and financing that would refinance and replace the Prepetition Revolving Credit Facility and/or the Securitization Facility.

37.     As part of these efforts, Evercore contacted 22 potential third-party lenders, consisting of banks and alternative lenders.  Evercore separately solicited debtor-in-possession financing proposals from the existing secured lenders, certain large noteholders through their advisors, and DFA.  Of the potential third-party lenders, 15 executed non-disclosure agreements and 14 received access to non-public information, including DIP marketing materials and access to a virtual dataroom with additional

30

financial information.  Evercore and the Debtors had follow-up diligence calls with these potential lenders as requested.

38.     In total, three non-binding debtor-in-possession financing proposals were received from potential third-party lenders.  Although Evercore explored options for new money financing on an unsecured, junior-lien, or *pari passu* basis, none of these third-party financing sources indicated a willingness to provide such financing to the Debtors.

39.     In general, as described in more detail in the Yi Declaration, each of the third-party proposals had significant shortcomings and was subject to significant execution risk given the requirement for further due diligence, especially in light of the tight timetable.  Accordingly, the Debtors focused their efforts on negotiating financing with certain of their Prepetition Revolving Lenders and Securitization Facility providers.

40.     On November 1, 2019, the Debtors received a DIP facility proposal from Rabobank, a lender and administrative agent under each of the Prepetition Revolving Credit Facility and the Prepetition Securitization Facility.  The Rabobank proposal was a comprehensive financing proposal to address both the need for incremental liquidity and the automatic termination of the Securitization Facility upon commencement of chapter 11 proceedings, and provided for (a) a new money financing in the form of a revolving facility and (b) the continuation of the Securitization Facility.

41.     The Debtors determined that, as compared to the third-party proposals and the PNC proposal, the Rabobank proposal had the advantage of offering a comprehensive financing package upon terms and at an all-in cost that compared favorably to the other proposals.  Importantly, Rabobank's proposed securitization facility terms were no less favorable in terms of pricing and structure than the PNC proposal.  And none of the third-

party debtor-in-possession financing proposals combined with the PNC proposal to make up a more attractive package than the Rabobank proposal. Accordingly, the Debtors focused their efforts primarily on negotiating the financing proposed by Rabobank, which ultimately took the form of the DIP Facility and the amended Securitization Facility.

## Basis for Relief

### A. The Debtors Should Be Authorized to Obtain Post-Petition Financing on a Senior Secured and Superpriority Basis

> i. *The Debtors Exercised Sound and Reasonable Business Judgment in Deciding to Enter into the DIP Facility*

42.     Provided that an agreement to obtain post-petition credit is consistent with the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in exercising its sound business judgment in obtaining such credit. *See, e.g.*, *In re Exco Resources, Inc.* No. 18-30155 (D.I. 97) (Bankr. S.D. Tex. Jan. 18, 2019) (order approving postpetition financing as exercise of debtors' business judgment); *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing as exercise of debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

43.     To determine whether a debtor has met the business judgment standard, a court need only "examine whether a reasonable business person would make a similar

decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

44.     Moreover, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender to determine whether the terms of a postpetition financing arrangement are fair and reasonable. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Tr. Co. (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into a "hard" bargain to acquire funds for its reorganization).

45.     Courts emphasize that the business judgment rule is not an onerous standard and may be satisfied "as long as the proposed action *appears* to enhance the debtor's estate." *Crystalin, LLC v. Selma Props., Inc. (In re Crystalin, LLC)*, 293 B.R. 455, 463–64  (B.A.P. 8th Cir. 2003) (quoting *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.*), 107 F.3d 558, 566 n.16 (8th Cir. 1997) (emphasis in original, internal alterations, and quotations omitted)).  Courts require only that the debtors "show that a sound business purpose justifies such actions."  *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (citations omitted); *see also In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987).

46.     Further, in determining whether the Debtors have exercised sound business judgment in deciding to enter into the DIP Loan Documents, the Court may appropriately take into consideration non-economic benefits to the Debtors offered by a proposed post-petition facility. For example, in *In re ION Media Networks, Inc.*, No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009), the Bankruptcy Court for the Southern District of New York observed that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps to foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict. *Id.*

47.     The DIP Facility is critical to the Debtors' ability to fund operations and pay the administrative costs of these Chapter 11 Cases, and also provides the Debtors with sufficient liquidity (in combination with the amended Securitization Facility) to operate their business without creating a value-destructive "priming" or valuation dispute at the outset of these Chapter 11 Cases or presenting significant execution or funding risk. *See,* Yi Decl. ¶ 43.  In addition to providing the Debtors with incremental liquidity, the DIP Facility will provide the Debtors with access to the use of cash collateral on a consensual basis, and will allow the Debtors to fund their business in the ordinary course, which will ensure continued, uninterrupted operations, preserving the value of the estate

for the benefit of all stakeholders. *Id*. Accordingly, the Court should authorize the Debtors' entry into the DIP Loan Documents as it is a reasonable exercise of the Debtors' business judgment.

       ii.     *The Debtors Meet the Conditions Necessary Under Section 364(c) and (d) to Obtain Post-Petition Financing on a Senior Secured and Superpriority Basis*

48.    The Debtors propose to obtain financing under the DIP Facility by providing the DIP Secured Parties superpriority claims and liens pursuant to section 364(c) and (d)(1) of the Bankruptcy Code.  Specifically, the Debtors propose to provide to the DIP Secured Parties first priority liens on substantially all of the Debtors' assets and administrative expense claims in the Chapter 11 Cases with priority over all other claims (subject in each case only to the Permitted Prior Liens and the Carve-Out).

49.    The Debtors meet the requirements for relief under section 364(c) of the Bankruptcy Code, which permits a debtor, with Court authorization, to obtain post-petition financing and, in return, to grant superpriority administrative status and liens on its property.  Specifically, section 364(c) of the Bankruptcy Code provides as follows:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
> (a)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (b)    secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (c)    secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).  In evaluating proposed post-petition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and consider whether

(a) unencumbered credit or alternative financing without superpriority status is available to the debtor, (b) the credit transactions are necessary to preserve assets of the estate, and (c) the terms of the credit agreement are fair, reasonable, and adequate. *See*, *e.g.*, *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011); *In re Aqua Assoc.*, 123 B.R. 192, 195–99 (Bankr. E.D. Pa. 1991); *In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *In re Crouse Group, Inc.*, 71 B.R. 544, 549–51 (Bankr. E.D. Pa. 1987); *see also Bland v. Farmworker Creditors*, 308 B.R. 109, 113–14 (S.D. Ga. 2003); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990).

50. Further, the Debtors meet the requirements for relief under section 364(d) of the Bankruptcy Code, which permits a debtor, with Court authorization, to obtain post-petition financing secured by liens that are senior to prepetition liens. Specifically, section 364(d) of the Bankruptcy Code provides as follows:

> (a) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:
>
>> (i) the trustee is unable to obtain such credit otherwise; and
>>
>> (ii) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
>
> (b) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. § 364(d). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Secured Parties have consented or (b) the Prepetition Secured Parties' interests in collateral are adequately protected.

36

51.     Here, the Debtors have amply satisfied the necessary conditions under section 364(c) and (d) of the Bankruptcy Code for authority to enter into the DIP Loan Documents.   Given the circumstances, the Debtors could not obtain credit on an unsecured, junior secured, or administrative expense basis.   For all the reasons discussed further below, the Debtors respectfully submit that the Court should grant the Debtors' request to enter into the DIP Facility pursuant to section 364(c) and (d) of the Bankruptcy Code.

      a.   <u>The Debtors Are Unable to Obtain Financing on More Favorable Terms Than the DIP Facility</u>

52.     In order to satisfy this test, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by section 364(c) or 364(d) of the Bankruptcy Code.  *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *Pearl-Phil GMT (Far E.) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40 (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c), to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  This is especially true where time is of the essence.  *See In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987).

53.     Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor on an unsecured or administrative priority basis, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).  *See also In re Snowshoe Co.*, 789 F.2d at 1088  (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that the requirements of section 364 of the Bankruptcy Code were met); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b) of the Bankruptcy Code).

54.     As described more fully above and in the Yi Declaration, the Debtors sought financing from multiple market sources and engaged in extensive and good faith negotiations with the DIP Lenders to obtain the best financing terms available.  *See* Yi Decl. ¶ 36.  However, due to the uncertainties related to the Chapter 11 process, no lenders were willing to provide post-petition financing to meet the Debtors' immediate cash needs in the timing required on an unsecured, junior secured, or administrative priority basis, or otherwise on terms better than those under the DIP Loan Documents. Accordingly, the Debtors submit that they have met the standard for obtaining the proposed DIP Facility.

      b.   <u>The DIP Facility Is Necessary to Preserve the Value of the Debtors'</u>
           <u>Estates</u>

55.     The Debtors, as debtors in possession, have a fiduciary duty to protect and maximize their estates' assets. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004). The Debtors' immediate access to post-petition financing is essential to their ability to effectively carry out that duty. The Debtors currently have $48.8 million of unrestricted cash on hand. *See* Yi Decl. ¶ 10. The Debtors need an immediate capital infusion to operate their business post-petition and to fund these Chapter 11 Cases. As of the Petition Date, the Debtors lack sufficient funds to operate their enterprise and continue paying their debts as they come due, and they do not have readily available sources of additional financing. The Debtors' forecast that they will be unable to generate sufficient levels of operating cash flows in the ordinary course of business to cover either their operating costs going forward or the projected restructuring costs of the Chapter 11 Cases without the DIP Facility and amended Securitization Facility. *Id.* The liquidity to be provided by the DIP Facility and amended Securitization Facility, together with the use of Cash Collateral, will enable the Debtors to fund their operations during the course of the Chapter 11 Cases as they pursue restructuring alternatives and to preserve and maximize the value of their estates for the benefit of all parties in interest. *See* Yi Decl. ¶ 23.

          <u>The Terms of the DIP Facility and the Proposed Adequate Protection Are Fair,</u>
          <u>Reasonable, and Adequate Under the Circumstances</u>

56.     In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First*

*Nat'l Bank & Trust Co.* (*In re Ellingsen MacLean Oil Co.*), 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).  The appropriateness of a proposed financing facility should also be considered in light of current market conditions.  *See Transcript of Record* at 740:4–6, *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [debtor-in-possession financing] pricing terms are, I find the provisions [of the financing] reasonable here and now.").

57.     As set forth in the Yi Declaration, the Debtors believe that the fees to be paid under the DIP Facility are appropriate, particularly in light of the circumstances of the Chapter 11 Cases.  *See* Yi Decl. ¶ 38.  All of the terms of the DIP Facility were extensively negotiated by the Debtors and their advisors to ensure that the terms were as favorable to the Debtors as possible under the circumstances, and the Debtors believe that such terms represent fair consideration for the critical financing being provided by the DIP Lenders.  *Id.*  Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Loan Documents in connection with the DIP Facility.

58.     Although the Bankruptcy Code does not define "adequate protection," section 361 of the Bankruptcy Code delineates a non-exhaustive list of the available types of adequate protection, which include periodic cash payments, additional liens, replacement liens, and the "indubitable equivalent of such entity's interest in such property."  11 U.S.C. § 361.  The focus of the requirement is to protect a secured creditor from the diminution in the value of its interest in the particular collateral during the period of use.  *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor

receives the value for which he bargained prebankruptcy.") (internal citations omitted). When priming of liens is sought under section 364(d) of the Bankruptcy Code, the courts also examine whether the prepetition secured creditors are being provided adequate protection for the value of their liens. *See In re Utah 7000, LLC*, No. 08-21869, 2008 WL 2654919, at *3 (Bankr. D. Utah July 3, 2008); *In re Beker Indus. Corp.*, 58 B.R. 725, 737 (Bankr. S.D.N.Y. 1986).

59.     As described more fully above, the Debtors propose to provide a variety of forms of adequate protection to protect the interests of the Prepetition Secured Parties in the Debtors' property from any diminution in value of the Prepetition Collateral (including Cash Collateral) resulting from the use of the Cash Collateral by the Debtors and the imposition of the automatic stay, subject, in each case, to the liens and claims of the DIP Lenders, the Permitted Prior Liens, and the Carve-Out.   Importantly, the Prepetition Secured Parties have consented to be primed by the DIP Loans and to the adequate protection being provided.

60.     As a result of these financing and marketing efforts, the Debtors have initiated these proceedings with a proposed DIP facility from certain of its prepetition secured lenders and negotiations with DFA for sale of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code. *See* Yi Decl. ¶ 20  Courts have held enhancement of collateral is a critical component of adequate protection and have considered "whether the value of the debtor's property will increase as a result of the" use of the collateral. *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626 (Bankr. S.D.N.Y. 1992) (finding that improvements to collateral financed by post-petition financing proceeds would improve collateral value in excess of loans and, therefore, provided

adequate protection); *see In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996) (approving post-petition financing to be used, in part, to fund cleanup costs of encumbered property anticipated to improve the value of the collateral, thereby serving the goal of adequate protection).  The Debtors, therefore, further submit that the adequate protection as described herein is fair and reasonable, and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

     iii.    *The Refinancing of a Portion of the Prepetition Secured Debt Is Appropriate*

61.    The negotiations with the DIP Lenders regarding the DIP Facilities were vigorous and were conducted in good faith and at arms' length. *See*, Yi Decl. ¶ 37.  The roll-up of the Prepetition Revolving Credit Facility with the DIP Roll-Up Loans is appropriate for a number of reasons.  *See*, Yi Decl. ¶ 41.  The DIP Lenders specifically negotiated for the roll-up in the context of their commitment to provide the DIP Facility and amended Securitization Facility on the terms described herein.  *Id.*  In light of the continued existence of the challenge rights, the likely requirements to provide adequate protection to the Prepetition Revolving Credit Facility and the lack of meaningful alternatives, the roll-up of the Prepetition Revolving Credit Facility is appropriate under the circumstances. *Id*.

62.    Roll-ups and repayments of prepetition debt, such as the Prepetition Debt Refinancing—which remain subject to the challenge rights—are a common feature of debtor-in-possession financings and have been approved in a variety of cases.  *See, In re Bristow Grp., Inc.,* No. 19-32713 (D.I. 582) (Bankr. S.D. Tex. August 21, 2019) (approving repayment of prepetition secured notes under debtor-in-possession financing facility); *In re Legacy Reserves, Inc.,* No. 19-33395 (D.I. 86) (Bankr. S.D. Tex. June 20,

2019) (approving of a cashless "roll-up" for the benefit of lenders under debtor-in-possession financing facility); *In re Exco Res, Inc.* No. 18-30155 (D.I. 97) (Bankr. Jan. 18, 2019) (approving the "roll-up" of prepetition loans under debtor-in-possession financing facility); *In re BCBG Max Azria Global Holdings, LLC*, Case No. 17-10466 (SCC) (Bankr. S.D.N.Y. Mar. 2, 2017) (approving roll-up of $35 million outstanding revolving obligations); *See e.g.*, *In re Vanguard Nat. Res., Inc.* Case No. 19-31786 (DRJ) (Bankr. S.D. Tex. Apr. 30, 2019) (authorizing $130 million DIP that included $65 million roll up of prepetition debt); *In re Westmoreland Coal Co.* Case No. 18-35672 (DRJ) (Bankr. S.D. Tex. Nov. 15, 2018) (authorizing $110 million DIP that included $90 million to refinance prepetition debt); *In re Gastar Expl., Inc.*, No. 18-36057 (MI) (Bankr. S.D. Tex. Nov. 26, 2018) (authorizing approximately $383 million DIP that included repayment of approximately $283 million of prepetition debt); *In re Shoreline Energy LLC*, No. 16-35571 (DRJ) (Bankr. S.D. Tex. Dec. 16, 2016) (authorizing approximately $50 million DIP that included refinancing of $32 million in prepetition debt); *In re Black Elk Energy Offshore Operations, LLC*, No. 15-34287 (MI) (Bankr. S.D. Tex. Mar. 18, 2016) (authorizing approximately $15 million DIP that included refinancing of approximately $7.5 million in prepetition debt); *In re ATP Oil & Gas Corp.*, No. 12-36187 (MI) (Bankr. S.D. Tex. Sept. 20, 2012) (authorizing approximately $618 million DIP that included refinancing of approximately $368 million in prepetition debt).

### B.  The Debtors Should Be Authorized to Use Cash Collateral

63.    The Debtors should be permitted to use Cash Collateral pursuant to section 363(c)(2) of the Bankruptcy Code, which provides, in relevant part, that a debtor "may not use, sell, or lease cash collateral . . . unless: (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes

such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Section 363(e) of the Bankruptcy Code further provides that "on request of an entity that has an interest in property . . . to be used, sole, or leased, by the trustee, the court . . . shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." § 362(e).

64. The Adequate Protection Obligations, described above, are intended to protect the Prepetition Secured Parties from any diminution in the value of their interests in the Prepetition Collateral resulting from the Debtors' use thereof during the pendency of the Chapter 11 Cases.

65. While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes adequate protection on a case-by-case basis. *See, e.g., In re Swedeland Dev. Grp., Inc.*, 16 F.3d at 564 ("[A] determination of whether there is adequate protection is made on a case by case basis."); *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985) ("[S]uch matters are [to be] left to case-by-case interpretation and development." (brackets in original) (quotations omitted)). The adequate protection offered here is traditional and routinely granted, including in this district. *See, e.g., In re Bristow Grp., Inc.,* No. 19-32713 (DRJ) (Bankr. S.D. Tex. Aug. 21, 2019) (D.I. 582); *In re Offshore Grp. Inv. Ltd.*, No. 15-12422 (BLS) (Bankr. D. Del. Jan. 8, 2016) (E.I. 158) (granting prepetition secured parties adequate protection liens, superpriority claims subject to a carve out, fees and expenses, and requiring that the debtors deliver certain financial reports and budget compliance documents); *Interim Order* at 11-21, *In re Samson Res. Corp.*, No. 15-11934 (CSS) (Bankr. D. Del. Sep. 25, 2015) (E.I. 111-2)

44

(granting certain prepetition secured parties adequate protection liens, superpriority administrative claims, fees and expenses, and adequate protection payments, and requiring the debtors to provide monthly rolling 13-week cash flow forecasts and other financial reports); *In re EXCO Res., Inc.*, No. 18-30155 (MI) (Bankr. S.D. Tex. Feb. 21, 2018) (granting adequate protection replacement liens, adequate protection payments, and fees and expenses); *In re LINN Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. May 13, 2016) (same); *In re Energy XXI LTD.*, No. 16-31928 (DRJ) (Bankr. S.D. Tex. Apr. 15, 2016) (same); *In re Goodrich Petrol. Corp.*, No. 16-31975 (MI) (Bankr. S.D. Tex. Apr. 18, 2016) (same); *In re Midstates Petrol. Co.*, No. 16-32237 (DRJ) (Bankr. S.D. Tex. May 2, 2016) (same); *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Mar. 29, 2016) (same).

66.     In light of the foregoing, the Debtors further submit that the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition Secured Parties are fair and appropriate under the circumstances to ensure that the Debtors are able to continue using the Cash Collateral, subject to the terms and conditions set forth in the Interim Order, for the benefit of all parties in interest and the Debtors estates.

**C.  The DIP Agent and the DIP Lenders Should Be Afforded Good Faith Protection Under Section 364(e) of the Bankruptcy Code**

67.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  11 U.S.C. § 364(e).  Section 364(e) of the Bankruptcy Code provides as follows:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain

45

credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

*Id.*

68.     The DIP Facility is the result of (a) the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain vital post-petition financing and (b) extensive arm's length, good faith negotiations between the Debtors and the DIP Lenders.  *See* Yi Decl. ¶ 30.  The Debtors submit that the terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to the DIP Agent, the DIP Lenders, or any other party to the DIP Loan Documents other than as described herein.  Accordingly, the Court should find that the obligations arising under the DIP Facility and other financial accommodations made to the Debtors have been extended by the DIP Agent and the DIP Lenders in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and, therefore, the DIP Agent and the DIP Lenders are entitled to all of the protections afforded thereby.

**D.  The Automatic Stay Should Be Modified on a Limited Basis**

69.     The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to permit (a) the Debtors to grant the liens and claims provided for under the DIP Facility, (b) the Debtors to incur the liabilities and obligations contemplated in the DIP Loan Documents, (c) the Debtors to pay all amounts required in accordance with the DIP Loan Documents, (d) the DIP

Secured Parties, subject to certain limitations, to exercise remedies upon the occurrence and during the continuation of an event of default under the DIP Loan Documents, and (e) the DIP Secured Parties to implement all of the terms, rights, benefits, privileges, remedies, and provisions of the Interim Order and the DIP Loan Documents, including allowing the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim Order.

70.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of the chapter 11 cases.  *See, e.g.*, *In re Bristow Grp., Inc.,* No. 19-32713 (D.I. 582) (Bankr. S.D. Tex. August 21, 2019) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Vanguard Nat. Res., Inc.* Case No. 19-31786 (DRJ) (Bankr. S.D. Tex. Apr. 30, 2019) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Westmoreland Coal Co.* Case No. 18-35672 (DRJ) (Bankr. S.D. Tex. Nov. 15, 2018) (same); *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Autoseis, Inc.*, No. 14-20130 (RSS) (Bankr. S.D. Tex. Mar. 27, 2014) (same); *In re ATP Oil & Gas Corp.*, No. 12-36187 (MI) (Bankr. S.D. Tex. Aug. 17, 2012) (same); *In re MPF Holdings US LLC*, No. 08-36084 (JB) (Bankr. S.D. Tex. Feb. 18, 2009) (same); *see also In re TMP Directional Mktg.*, LLC, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (same). The Debtors therefore submit that the modification of the automatic stay as set forth in the Order should be approved.

47

### E.  The Scope of the Carve-Out Is Appropriate

71.    The DIP Facility and the Interim Order subject the security interests and administrative expense claims under the DIP Facility and Adequate Protection Obligations to the Carve-Out.  Such carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any official committee appointed can reimburse their professionals in certain circumstances during an event of default under the terms of the debtor's post-petition financing.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. at 38 ("Absent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  Additionally, the Carve-Out protects against administrative insolvency during the course of these Chapter 11 Cases by ensuring that, notwithstanding the grant of superpriority claims and liens under the DIP Facility and Adequate Protection Obligations, assets remain for the payment of the fees of the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee") and professional fees of the Debtors and any official committee.

72.    Courts in this district and others routinely approve carve-out provisions agreed to by the debtors and their post-petition lenders.  *See, e.g.*, *In re Legacy Reserves Inc.*, Case No. 19-33395 (MI) (Bankr. S.D. Tex. June 20, 2019); *In re Sanchez Energy Corporation*, Case No. 19-34508 (MI) (Bankr. S.D. Tex. Aug. 15, 2019); *In re Parker Drilling Co.*, Case No. 18-36958 (MI) (Bankr S.D. Tex. Dec. 13, 2018); *In re PetroQuest Energy*, Case No. 18-36322 (DRJ) (Bankr. S.D. Tex. Dec. 3, 2018); *In re Westmoreland Coal Co.*, Case No. 18-35672 (MI) (Bankr. S.D. Tex. Oct. 10, 2018); *In re Linn Energy, LLC*, Case No. 16-60040 (DRJ) (Bankr. S.D. Tex. May 13, 2016).

48

### F.  Failure to Obtain Immediate Interim Access to the DIP Facility Would Cause Immediate and Irreparable Harm

73.      Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

74.      The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, to immediately withdraw and borrow funds under the DIP Facility.  The Debtors are at risk of suffering immediate and irreparable harm if the Interim Order approving the DIP Facility is not entered sooner than 14 days after service of the DIP Motion and if the Debtors are not permitted to interim access to the DIP Revolving Loans.  The Debtors require access to the DIP Term Loans prior to the Final Hearing and entry of the Final Order in order to continue operating, to pay their administrative expenses and to implement the relief requested in the Debtors' other "first day" motions.  This relief is necessary for the Debtors to preserve and maximize value and, therefore, to avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest.

### Request for Final Hearing

75.      Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## Debtors' Reservation of Rights

76.     Nothing contained herein is intended or should be construed as, or deemed to constitute, an agreement or admission as to the validity of any claim against the Debtors on any grounds, a waiver or impairment of the Debtors' rights to dispute any claim on any grounds, or an assumption or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code.  The Debtors expressly reserve their rights to contest any claims related to the DIP Facility under applicable bankruptcy and non-bankruptcy law.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended, and should not be construed, as an admission as to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## Emergency Consideration

77.     Pursuant to Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this Motion under Bankruptcy Rule 6003(b).  Bankruptcy Rule 6003 provides that, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, issue an order granting . . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition . . . ."  Fed. R. Bankr. P. 6003.  As set forth in this Motion, the First Day Declaration, and the Yi Declaration, the Debtors believe that an orderly transition into chapter 11 is critical to the viability of the Debtors' businesses, operations, and estates and that any delay in granting the emergency relief requested herein could cause immediate and irreparable harm.  Accordingly, the emergency relief requested herein is consistent with Bankruptcy Rule 6003.

### Compliance with Bankruptcy Rule 6004(a) and Waiver of Stay Under
### Bankruptcy Rule 6004(h)

78.     To implement successfully the relief sought herein, the Debtors request

that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a)

under the circumstances.  The Debtors also request that, to the extent applicable to the

relief requested in this Motion, the Court waive the stay imposed by Bankruptcy Rule

6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property

other than cash collateral is stayed until the expiration of 14 days after entry of the order,

unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As described above, the

relief that the Debtors seek in this Motion is necessary for the Debtors to operate their

businesses without interruption and to preserve value for their estates.  Accordingly, the

Debtors respectfully submit that ample cause exists to justify the finding that the notice

requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of

the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief

sought herein justifies immediate relief.

### Notice

79.     Notice of the relief requested in the Motion has been provided by

telecopy, email, overnight courier, and/or hand delivery, to (a) the United States Trustee

for the Southern District of Texas, (b) those creditors holding the 30 largest unsecured

claims against the Debtors' estates (on a consolidated basis), (c) White & Case LLP, as

counsel to Coöperatieve Rabobank U.A., New York Branch, the administrative agent

under Debtors' prepetition receivables purchase agreement and administrative agent

under Debtors' prepetition secured revolving credit facility, and administrative agent

under Debtors' proposed post-petition financing facility, (d) indenture trustee under the

Debtors' prepetition unsecured bond indenture, (e) Mayer Brown LLP, as counsel to PNC Bank, National Association, the co-agent under Debtors' prepetition receivables purchase agreement, (f) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to an ad hoc group of prepetition unsecured noteholders, (g) the Securities and Exchange Commission, (h) the Internal Revenue Service, (i) the United States Attorney's Office for the Southern District of Texas, (j) the state attorneys general for states in which the Debtors conduct business, (k) all other parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors, and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002 (the "**Notice Parties**").  A copy of this Motion and any order approving it will also be made available on the Debtors' case information website located at https://dm.epiq11.com/SouthernFoods.  Under the circumstances, such notice of the relief requested in the Motion constitutes due, sufficient and appropriate notice and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(b) and (c) and 9014, the Local Rules, and the Complex Case Rules.

## No Prior Request

80.    The Debtors have not previously sought the relief requested herein from the Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the proposed forms of order, substantially in the forms attached hereto, granting the relief requested herein and such other and further relief as the Court deems just and proper.

Dated: November 12, 2019
Houston, Texas

Respectfully submitted,

**NORTON ROSE FULBRIGHT US LLP**

*/s/ William R. Greendyke*
William R. Greendyke (SBT 08390450)
Jason L. Boland (SBT 24040542)
Robert B. Bruner (SBT 24062637)
Julie Goodrich Harrison (SBT 24092434)
1301 McKinney Street, Suite 5100
Houston, Texas 77010-3095
Tel.:  (713) 651-5151
Fax:  (713) 651-5246
william.greendyke@nortonrosefulbright.com
jason.boland@nortonrosefulbright.com
bob.bruner@nortonrosefulbright.com
julie.harrison@nortonrosefulbright.com

*-and-*

**DAVIS POLK & WARDWELL LLP**

Brian M. Resnick (*pro hac vice* pending)
Steven Z. Szanzer (*pro hac vice* pending)
Aryeh E. Falk (*pro hac vice* pending)
Nate Sokol (*pro hac vice* pending)
450 Lexington Avenue
New York, New York 10017
Tel.: (212) 450-4000
Fax: (212) 701-5800
brian.resnick@davispolk.com
steven.szanzer@davispolk.com
aryeh.falk@davispolk.com
nathaniel.sokol@davispolk.com

*Proposed Counsel to the Debtors and Debtors in Possession*