## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| SOUTHERN FOODS GROUP, LLC, *et al.*, | ) | Case No. 19-36313 (DRJ) |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |
| | ) | |
| | ) | |

**DECLARATION OF BO S. YI IN SUPPORT OF THE DEBTORS' (A) MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED SUPERPRIORITY POST-PETITION FINANCING, AUTHORIZING THE USE OF CASH COLLATERAL, AND GRANTING RELATED RELIEF AND (B) MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING CERTAIN DEBTORS TO CONTINUE SELLING RECEIVABLES AND RELATED RIGHTS PURSUANT TO A SECURITIZATION FACILITY, MODIFYING THE AUTOMATIC STAY, AND GRANTING RELATED RELIEF**

I, Bo S. Yi, make this declaration pursuant to 28 U.S.C. § 1746:

1.     I am authorized to make this declaration (this "**Declaration**") on behalf of

Evercore Group L.L.C. ("**Evercore**") proposed investment banker to the Debtors (as defined

herein).  I submit this Declaration in support of (a) the Debtors' motion seeking approval

---

[1] The debtors and debtors in possession in these Chapter 11 Cases, along with the last four digits of their respective Employer Identification Numbers, are as follows:  Southern Foods Group, LLC (1364); Dean Foods Company (9681); Alta-Dena Certified Dairy, LLC (1347); Berkeley Farms, LLC (8965); Cascade Equity Realty, LLC (3940); Country Fresh, LLC (6303); Dairy Information Systems Holdings, LLC (9144); Dairy Information Systems, LLC (0009); Dean Dairy Holdings, LLC (9188); Dean East II, LLC (9192); Dean East, LLC (8751); Dean Foods North Central, LLC (7858); Dean Foods of Wisconsin, LLC (2504); Dean Holding Company (8390); Dean Intellectual Property Services II, Inc. (3512); Dean International Holding Company (9785); Dean Management, LLC (7782); Dean Puerto Rico Holdings, LLC (6832); Dean Services, LLC (2168); Dean Transportation, Inc. (8896); Dean West II, LLC (9190); Dean West, LLC (8753); DFC Aviation Services, LLC (1600); DFC Energy Partners, LLC (3889); DFC Ventures, LLC (4213); DGI Ventures, Inc. (6766); DIPS Limited Partner II (7167); Franklin Holdings, Inc. (8114); Fresh Dairy Delivery, LLC (2314); Friendly's Ice Cream Holdings Corp. (7609); Friendly's Manufacturing and Retail, LLC (9828); Garelick Farms, LLC (3221); Mayfield Dairy Farms, LLC (3008); Midwest Ice Cream Company, LLC (0130); Model Dairy, LLC (7981); Reiter Dairy, LLC (3675); Sampson Ventures, LLC (7714); Shenandoah's Pride, LLC (2858); Steve's Ice Cream, LLC (6807); Suiza Dairy Group, LLC (2039); Tuscan/Lehigh Dairies, Inc. (6774); Uncle Matt's Organic, Inc. (0079); and Verifine Dairy Products of Sheboygan, LLC (7200). The debtors' mailing address is 2711 North Haskell Avenue, Suite 3400, Dallas, TX 75204.

of post-petition financing (the "**DIP Facility**") and authority to use cash collateral (the "**DIP Motion**"), and (b) the Debtors' motion to continue selling receivables and related rights pursuant to a securitization facility (the "**Securitization Facility**" and, together with the DIP Facility, the "**Post-Petition Financing Facilities**") . . . (the "**Securitization Motion**" and, together with the DIP Motion, the "**Post-Petition Financing Motions**")[2] filed by Southern Foods Group, LLC and its debtor affiliates (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").

2.      In particular, I submit this declaration in support of my view that the Post-Petition Financing Facilities (a) are the product of arm's-length, good faith negotiations, (b) are the best available post-petition financing options for the Debtors, and (c) contain reasonable terms and conditions under the circumstances.

3.      The statements in this declaration are, except where specifically noted, based on my personal knowledge or opinion, on information that I have received from the Debtors' employees or advisors, or professionals of Evercore working directly with me or under my supervision, direction, or control, or from the Debtors' books and records maintained in the ordinary course of their businesses.

4.      I am not being specifically compensated for this testimony other than through payments received by Evercore as a professional retained by the Debtors.  I am over the age of 18 years and authorized to submit this declaration on behalf of the Debtors.  If I were called upon to testify, I could and would competently testify to the facts set forth herein.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the applicable Post-Petition Financing Motion.

### Background and Qualifications

5.      I joined Evercore in 2007 and have over 17 years of experience in advisory, corporate finance, and restructuring. Prior to joining Evercore, I held positions at Level 3 Communications and Lehman Brothers. I have a B.S. in Business Administration and a B.A. in Economics from the University of Colorado at Boulder (1999) and an M.B.A. from Columbia Business School (2007).

6.      As a Managing Director at Evercore, I specialize in advising both debtors and creditors in financial restructurings, distressed mergers and acquisitions, and raising debt and equity capital in both out-of-court and in bankruptcy proceedings. Moreover, I have advised numerous companies in complex restructurings, including in connection with obtaining post-petition financing (including DIP financing and exit financing), helping them find sources of financing, and negotiating, on their behalf, the terms of such financing.

7.      Evercore is a leading independent investment banking advisory and investment management firm established in 1996.  Evercore's investment banking business includes its advisory business, which provides a range of investment banking services to multinational corporations on mergers and acquisitions, divestitures, special committee assignments, recapitalizations, restructurings, and other strategic transactions.

8.      Evercore has been involved in many large and complex restructuring cases in this and other districts around the United States, including *In re EP Energy Corporation*, Case No. 19-35654 (Bankr. S.D. Tex. Oct. 4, 2019); *In re Jones Energy, Inc.,* Case No. 19-32112 (Bankr. S.D. Tex. Apr. 14, 2019); *In re Sheridan Holding Company II, LLC*, Case No. 19-35198 (Bankr. S.D. Tex. Sept. 15, 2019); *In re Southcross Energy Partners, L.P.*, Case No. 19-10702 (Bankr. D. Del. Apr. 2, 2019); *In*

*re David's Bridal, Inc.*, Case No. 18-12635 (Bankr. D. Del. Nov. 19, 2018); *In re New MACH Gen, LLC*, Case No. 18-11369 (Bankr. D. Del. Jun. 11, 2018); *In re Enduro Resource Partners LLC*, Case No. 18-11174 (Bankr. D. Del. May 15, 2018); *In re Tops Holding II Corp.*, Case No. 18-22279 (Bankr. S.D.N.Y. Mar. 22, 2018); *In re Fieldwood Energy LLC*, Case No. 18-30648 (Bankr. S.D. Tex. Mar. 8, 2018); *In re Pac. Drilling S.A.*, Case No. 17-131393 (Bankr. S.D.N.Y. Jan. 26, 2018); *In re Orchard Acquisition Co., LLC (J.G. Wentworth)*, Case No. 17-12914 (Bankr. D. Del. Jan. 5, 2018); *In re Castex Energy Partners, L.P.*, Case No. 17-35835 (Bankr. S.D. Tex. Dec. 4, 2017); *In re GulfMark Offshore, Inc.*, Case No. 17-11125 (Bankr. D. Del. June 15, 2017); *In re Vanguard Nat. Res., LLC*, Case No. 17-30560 (Bankr. S.D. Tex. Mar. 20, 2017); *In re Azure Midstream Partners, LP*, Case No. 17-30461 (Bankr. S.D. Tex. Mar. 10, 2017); *In re Chaparral Energy, Inc.,* Case No. 16-11144 (Bankr. D. Del. May 9, 2016); *In re Midstates Petroleum Company, Inc.,* Case No. 16-32237 (Bankr. S.D. Tex. May 1, 2016); *In re Energy & Exp. Partners, Inc.*, Case No. 15-44931 (Bankr. N.D. Tex. Feb. 8, 2016); *In re Parallel Energy LP,* Case No. 15-12263 (Bankr. D. Del. Dec. 16, 2015); *In re The Great Atl. & Pac. Tea Co., Inc.,* Case No. 15-23007 (Bankr. S.D.N.Y. Aug. 11, 2015); *In re Altegrity, Inc.*, Case No. 15-10226 (Bankr. D. Del. March 16, 2015); *In re Mineral Park, Inc.,* Case No. 14-11996 (Bankr. D. Del. Sept. 23, 2014 & Oct. 2, 2014); and *In re Energy Future Holdings Corp.*, Case No. 14-10979 (Bankr. D. Del. Sept. 16, 2014).

## **Evercore's Retention**

9.      Evercore has been engaged as investment banker to the Debtors since February 2019.  Since its engagement, Evercore has worked closely with the Debtors' management team and other professionals and advisors in exploring various strategic and financial alternatives.  In addition, Evercore, among other financial advisory services,

has: (a) analyzed the Debtors' current liquidity and projected cash flows; (b) evaluated potential in and out of court financing alternatives; (c) assisted the Debtors in a potential sale of the business; (d) helped the Debtors prepare for the Chapter 11 Cases; and (e) as a part of Chapter 11 preparation, conducted a comprehensive process to secure debtor-in-possession financing for the Debtors on the most competitive terms and conditions available to the Debtors.  Through its engagement, Evercore has become well-acquainted with the Debtors' capital structure, liquidity needs, and business operations.

## Background

**A.     The Debtors' Immediate Liquidity Needs.**

10.     The Debtors need an immediate capital infusion to operate their business post-petition and to fund these Chapter 11 Cases.  As of the Petition Date, the Debtors lack sufficient funds to operate their enterprise and continue paying their debts as they come due, and they do not have readily available sources of additional financing.  The Debtors forecast that they will be unable to generate sufficient levels of operating cash flows in the ordinary course of business to cover either their operating costs going forward or the projected restructuring costs of the Chapter 11 Cases without the Post-Petition Financing Facilities.

**B.     The Debtors' Restructuring Efforts.**

11.     The Debtors commenced the Chapter 11 Cases to preserve and maximize their enterprise value for the benefit of their stakeholders in the face of significant industry headwinds and an impending liquidity crisis.  A multi-year trend of shrinking margins and increasing competition was exacerbated by (i) loss of significant volume from two major customers, and (ii) a series of well-intentioned cost-savings and strategic initiatives throughout 2018 and 2019 that fell short of the anticipated benefits and drove

increased customer loss and margin compression.  In early 2018, Walmart Inc., the Debtors' largest single customer, opened a large dairy manufacturing plant in Indiana that resulted in a loss to Dean Foods of approximately 100 million gallons of fluid milk in annualized sales volume.  Dean Foods lost an additional nearly 40 million gallons of annualized fluid milk sales from another major customer further exacerbating the effects of volume deleverage.

12.     In turn, Dean Foods initiated certain cost savings and strategic initiatives, and attempted to manage the lost volumes by consolidating 7 plants in just 8 weeks. Resulting higher than expected transitory costs including freight, labor, and product loss, offset anticipated productivity gains for the year from the plant consolidation and related initiatives.

13.     In February 2019, the Debtors refinanced its then outstanding secured revolving facility and amended and restated its securitization facility to remove certain financial covenants it could no longer meet.  This reduced the available revolving borrowing base from $450 million to $175 million.  Accessibility in both cases was subject to compliance with financial covenants.

14.     As noted above, it was also in February 2019 that the Debtors retained Evercore to assist with a broad evaluation of potential strategic alternatives, including the disposition of certain assets, the formation of new joint ventures, strategic business combinations, sale of the enterprise, or other options to re-energize the Debtors' stand-alone business.  It was ultimately determined that these options could not be pursued for a variety of reasons, including potential contingent liabilities that Dean Foods faces related to the underfunded status of certain multi-employer pension plans in which is

participates.  In particular and by far the most significant, Dean Foods faces an estimated potential, contingent liability of over $700 million in the event it withdraws from Central States Southeast & Southwest Areas Pension.  Such potential liabilities significantly impaired Dean Foods' ability to pursue any strategic transactions with third parties outside of a bankruptcy proceeding.

15.    Liquidity remained tight, and on June 28, 2019, Dean Foods returned to it Prepetition Revolving Lenders and elected to appraise additional real estate for inclusion in the borrowing base under the Prepetition Revolving Credit Agreement in order to increase the borrowing base from $175 million to the facility maximum of $265 million.

16.    On August 27, 2019, Dean Foods entered into further supplements to the Credit Agreement pursuant to which Dean Foods elected to exercise its rights to increase the aggregate principal amount of the commitments under the Credit Agreement by $85 million to an aggregate principal amount of $350 million.

17.    In August 2019, as Dean Foods reported its second quarter results it reduced its internal full year adjusted operating income forcast and reported that it would be a net user of cash for the full year 2019.  Eric Beringause, the current president and chief executive officer joined Dean Foods on July 29, 2019, and engaged in a renewed effort to evaluate Dean Foods' business plan and strategy.

18.    By early October 2019, the Debtors saw a sharp decline in preliminary third quarter 2019 results and realized they faced a financial outlook that was deteriorating significantly more rapidly than prior forecasts, and with the assistance of their various advisors, determined that it would be necessary to seek Chapter 11 relief to manage liquidity and prevent potentially ruinous customer flight.

19.     As discussed in more detail in the First Day Declaration, the Debtors provide a critical daily staple product.  Any shortfalls in the Debtors' fulfillment means that school lunch rooms, coffee shops, and grocery stores across America could face weeks without cartons for their lunch trays, milk for their coffee, or gallons for their refrigerators.  The Debtors believe their customers would not accept such risk of instability in their supply, and would likely rapidly seek a replacement vendor.

20.     The Debtors and their advisors concluded that seeking the protections of Chapter 11 was the most likely option for obtaining the necessary funding to sustain operations and preventing any disruption with their vendors and customers. The Debtors and their advisors engaged in the exploration of options for debtor-in-possession ("**DIP**") financing.

21.     The DIP Financing enables the Debtors to explore a standalone plan or a potential strategic transaction, including with the Debtors' long-time commercial partner and largest single raw milk vendor, Dairy Farmers of America ("**DFA**").  The Debtors have engaged in advanced discussions with DFA with regard to its role as a potential stalking horse bidder for the purchase of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code.  The Debtors intend to continue and expand the 363 sale marketing process they began prior to the Petition Date.

**C.     The DIP Sizing Process**

22.     Starting in mid-October, the Debtors retained Alvarez & Marsal North America, LLC ("**A&M**"), to assist in the analysis of their general liquidity needs, including particularly in the event that the Debtors needed to file for chapter 11 protection.  This analysis accounted for the potential payment of certain prepetition claims of trade vendors to avoid irreparable harm as a result of a chapter 11 filing, as well

as financing fees for any DIP facilities, professional fees, and other anticipated administrative expenses.

23.     Evercore reviewed the DIP sizing analysis prepared by the Debtors and A&M and relied on this information in its conversations with potential financing providers.

**D.     The Post-Petition Financing Facilities**

24.     In order to ensure their continued operations during the Chapter 11 Cases and to assure stakeholders of their ability to consummate a restructuring plan of reorganization within the proposed time frame, the Debtors are seeking immediate approval of the Post-Petition Financing Facilities. The liquidity to be provided by the Post-Petition Financing Facilities, together with the use of Cash Collateral, will enable the Debtors to fund their operations during the course of the Chapter 11 Cases as they pursue restructuring alternatives and to preserve and maximize the value of their estates for the benefit of all parties in interest.

<u>The DIP Facility</u>

25.     As described more fully in the DIP Motion, the Debtors are seeking approval to obtain superpriority, priming lien debtor-in-possession financing in the aggregate principal amount of $425 million to be funded by certain of the Prepetition Secured Parties (in their capacity as lenders under the DIP Facilities, the "**DIP Lenders**"), consisting of (a) a new money revolving loan facility (the "**DIP Revolving Facility**") in the aggregate principal amount of approximately $236 million which shall be available for the incurrence of new money revolving loans (the "**DIP Revolving Loans**") or, up to a $25 million sub-limit, the issuance of letters of credit (the "**DIP Letters of Credit**"), and (b) upon and after entry of the Final Order, term loans (the "**DIP Roll-Up Loans**"

and, together with the DIP Revolving Loans, the "**DIP Loans**") in an aggregate principal amount not to exceed the aggregate principal amount of all Obligations outstanding under the Prepetition Revolving Credit Facility as of the Petition Date, which Prepetition Obligations shall be, on a dollar-for-dollar basis, refinanced as (and deemed paid by) the DIP Roll-Up Loans.

<u>Reinstatement of the Securitization Facility</u>

26.     As more fully described in the Securitization Motion, the Debtors are seeking authority to continue selling and servicing certain eligible accounts receivable pursuant to the Prepetition Securitization Facility, which is being reduced in total facility size from $450 million to $425 million, and to enter into other related documentation.  As described in further detail in the Securitization Motion, I understand that under various purchase agreements, two wholly-owned indirect non-Debtor subsidiaries, both of which are bankruptcy remote, special-purpose entities, purchase trade receivables generated by certain Dean Foods subsidiaries and then transfers undivided interests in those receivables to Coöperatieve Rabobank U.A., New York Branch ("**Rabobank**") for cash which is then used to secure the incurrence of borrowings and the issuance of letters of credit. To secure its obligations under the Prepetition Securitization Facility, the special purpose entities have granted to Rabobank, as agent (for the benefit of the other purchaser parties), a security interest in all of its property, including all eligible receivables.  The Prepetition Securitization Facility has historically been used to provide the Debtors access to additional liquidity, and to provide the Debtors with letters of credit to collateralize surety bonds required by various vendors, and state and federal agencies for the Debtors' business operations.

## The Debtors' Efforts to Obtain Financing

### A.    The Marketing Process.

27.    Evercore commenced a marketing process for possible DIP financing alternatives on October 21, 2019 with a target of a potential chapter 11 filing on November 12, 2019.  Evercore solicited DIP financing proposals that could provide $250 million to $300 million of new money, assuming the Securitization Facility would remain available post-petition.  Evercore indicated openness to a variety of structures, including senior lien facilities that would prime the Prepetition Revolving Credit Facility and financing that would refinance and replace the Prepetition Revolving Credit Facility and/or the Securitization Facility.

28.    As part of these efforts, Evercore contacted 22 potential third-party lenders, consisting of banks and alternative lenders.  Evercore separately solicited DIP financing proposals from the existing secured lenders, certain large noteholders through their advisors, and DFA.  Of the potential third-party lenders, 15 executed non-disclosure agreements and 14 received access to non-public information, including DIP marketing materials and access to a virtual dataroom with additional financial information.  Evercore and the Debtors had follow-up diligence calls with these potential lenders as requested.

29.    In total, three non-binding DIP financing proposals were received from potential third-party lenders.  Although Evercore explored options for new money financing on an unsecured, junior-lien, or *pari passu* basis, none of these third-party financing sources indicated a willingness to provide such financing to the Debtors.

(i) The first proposal was not actionable because it provided a commitment for only $75 million of new money.

(ii)  The second proposal provided for a $615 million borrowing base facility that would prime the existing Prepetition Revolving Credit Facility and refinance the Securitization Facility.   However, after deducting the $425 million of potential availability under the Securitization Facility, this DIP financing proposal would only provide approximately $190 million of new money capital—less than the amount of new money the Debtors were requesting.  This proposal was more expensive than the DIP financing proposal from Rabobank.  In addition, the potential DIP lender required that the Prepetition Secured Lenders consent to priming, which they refused to do.

(iii)  The third proposal provided for $300 million of new money capital through a priming, revolving DIP facility.   Despite the high headline amount of incremental new money, this proposal had a number of deficiencies. First, the full commitment amount would not be immediately and fully accessible to the Debtors.  The potential lender indicated that access to the DIP facility would be subject to tight funding milestones, among other conditions.   Second, the DIP financing proposal was also significantly more expensive than all the other proposals received by the Debtors.  Third, the potential DIP lender had significant execution risk, because the DIP lender would only provide a binding commitment after satisfactory due diligence, which would need to be completed under an extremely expedited timeline.   Finally, the proposed DIP financing would require a risky "priming" fight or valuation dispute with the Debtors' prepetition secured lenders at the very outset of these Chapter 11 Cases, which would have been costly, very well might not have resulted in an approved financing, and could have untenably imperiled the Debtors' businesses, given that the Debtors would not be certain to persuade a court that the Prepetition Secured Parties would be adequately

protected.  Moreover, if the priming facility was not approved, there was no assurance that the Prepetition Secured Parties providing the Post-Petition Financing Facilities would have remained willing to fund on the same conditions.

30.     In general, each of the third-party proposals was subject to significant execution risk given the requirement for further due diligence, especially in light of the tight timetable.  Given the significant shortcomings of the third-party financing proposals, the Debtors focused their efforts on negotiating financing with certain of their Prepetition Revolving Lenders and Securitization Facility providers.

31.     On October 31, 2019, the Debtors received a proposal from PNC Bank, N.A. ("**PNC**"), a lender under each of the Prepetition Revolving Credit Facility and the Securitization Facility, that provided solely for the post-petition continuation of the Securitization Facility, and required the Debtors to obtain incremental liquidity in the form of separate post-petition financing satisfactory to PNC.

32.     On November 1, 2019, the Debtors received a DIP facility proposal from Rabobank, a lender and administrative agent under each of the Prepetition Revolving Credit Facility and the Prepetition Securitization Facility.  The Rabobank proposal was a comprehensive financing proposal to address both the need for incremental liquidity and the automatic termination of the Prepetition Securitization Facility upon commencement of chapter 11 proceedings.  The initial Rabobank proposal provided for (a) a new money financing in the form of a revolving facility and (b) the continuation of the Prepetition Securitization Facility.  As proposed, the new money facility would initially prime the prepetition liens securing Prepetition Revolving Credit Facility on a consensual basis, and

upon entry of the interim order the Prepetition Revolving Credit Facility would be refinanced in full with roll-up loans.

33.     The Debtors determined that, as compared to the third-party proposals and the PNC proposal, the Rabobank proposal had the advantage of offering a comprehensive financing package upon terms and at an all-in cost that compared favorably to the other proposals.  Importantly, Rabobank's proposed Securitization Facility terms were no less favorable in terms of pricing and structure than the PNC proposal.  And none of the third-party DIP financing proposals combined with the PNC proposal to make up a more attractive package than the Rabobank proposal.  Two of the three third-party DIP financing proposals were not actionable for the reasons described above. The third proposal was significantly less favorable than Rabobank's proposal because the commitment amount might never be fully accessible to the Debtors, the significantly higher cost as compared to the other proposals received by the Debtors, and the execution risk posed by the due diligence requirement. Moreover, because the third proposal would require a risky "priming" fight with the Debtors' prepetition secured lenders at the very outset of these Chapter 11 Cases, which would have been costly and untenably imperiled the Debtors' businesses.  Perhaps most critically, Rabobank as the administrative agent and a lender under the Debtors' Prepetition Revolving Credit Facility offered the least execution risk, with the fewest due diligence requirements and the greatest ability to close and fund immediately. Accordingly, the Debtors focused their efforts primarily on negotiating the financing proposed by Rabobank, which ultimately took the form of the Post-Petition Financing Facilities.

34.     In addition, on November 4, 2019, the Debtors received a short-form proposal for an out-of-court loan from an ad hoc group of holders of the Debtors senior unsecured notes due 2023 (the "**Ad Hoc Group**").  The proposal provided for $150 million to $215 million in new money financing and a dollar-for-dollar exchange of unsecured debt into new junior lien debt, and did not specify key economic terms such as fees and interest rate.  The Debtors determined that the Ad Hoc Group proposal did not offer sufficient incremental liquidity to avert a chapter 11 filing in the near-term.  More significantly, the Debtors, in consultation with Evercore and their other advisors, determined that any attempt to continue operations without immediate chapter 11 relief would entail untenable enterprise risk as customers and vendors lost faith in the Debtors' stability and sought alternative commercial partners.

35.     On Friday, November 8, 2019, the Debtors received an additional offer from the Ad Hoc Group for a DIP financing proposal on a *pari passu* basis with the existing revolving credit facility.  This proposal remains deficient in comparison to the proposed Post-Petition Financing Facilities as it does not provide a comprehensive funding package accounting for the Securitization Facility.  This proposal also would have required consent of the Prepetition Secured Parties that was not granted, and involve significant additional due diligence and execution risk.

<u>**Negotiation of the Post-Petition Financing Facilities**</u>

36.     In order to ensure their continued operations during the Chapter 11 Cases and to assure stakeholders of their ability to consummate a restructuring plan of reorganization within the proposed time frame, the Debtors are seeking immediate approval of the Post-Petition Financing Facilities. The liquidity to be provided by the

Post-Petition Financing Facilities, together with the use of Cash Collateral, will enable the Debtors to fund their operations during the course of the Chapter 11 Cases as they pursue restructuring alternatives and to preserve and maximize the value of their estates for the benefit of all parties in interest.  The Post-Petition Financing Facilities represent the only viable comprehensive funding solution that solves both the Debtors' immediate liquidity needs and provides the funding that can support the full term of these Chapter 11 Cases.

A.    **The Debtors, the Prepetition Secured Parties and the DIP Lenders Negotiated the Terms of the DIP Financing and the Adequate Protection in Good Faith and at Arms' Length**

37.    The negotiations with the DIP Lenders and the Securitization Facility Purchasers regarding Post-Petition Financing Facilities were vigorous and were conducted in good faith and at arms' length.  Following initial conversations among advisors to the Debtors and Rabobank, draft term sheets were exchanged in late October of 2019, followed by numerous telephonic negotiation sessions aided by the exchange of business term grids.  These negotiations involved a series of back and forth discussions with the DIP Lenders which resulted in significant improvement from the initial proposal.  Most significantly, the total commitment on the DIP Facility was increased from $350 million to $425 million, the fees and rates were meaningfully reduced, the milestones were extended and the effectiveness of the roll-up was deferred until entry of the Final Order.  Finally, although the Debtors repeatedly requested that the DIP Roll-Up Loans be removed from the proposal or reduced in size, the DIP Lenders insisted that their inclusion was a condition of the commitment.

38.    Once key terms were reasonably settled, draft definitive documents were exchanged, and negotiations over the pricing, structure and other terms of the Post-

16

Petition Financing Facilities continued into the days leading up to the Petition Date. The Debtors' management team was actively involved throughout this process, and the Debtors' board of directors (the "**Board**") was kept well-informed. Through these negotiations, the economic and other terms of the Post-Petition Financing Facilities improved to the benefit of the Debtors compared to the initial proposal.

**B.     The Terms of the Post-Petition Financing Facilities are Reasonable and Appropriate Under the Circumstances.**

39.     The Post-Petition Financing Facilities include various fees that were expressly required by the DIP Lenders and Securitization Facility Purchasers as a condition to provide the Post-Petition Financing Facilities and are an integral component of the financing package. Given the financial and operating condition of the Debtors, the timing, cost, and risk of administering these Chapter 11 Cases, and the Debtors' liability profile, I believe these fees are appropriate under the circumstances.

40.     The DIP Facility is secured by senior liens on substantially all assets of the Debtors, junior only to the Senior Third Party Liens. Critically, the DIP Lenders include Prepetition Secured Parties holding a majority of the loans under the Prepetition Revolving Credit Facility, who have consented to the incurrence of the DIP Liens on a priming basis until such time as the Prepetition Revolving Credit Facility is refinanced by the DIP Roll-Up Loans (as discussed below). The obligations under the DIP Facility constitute superpriority, administrative expense claims. As discussed above, based on conversations with potential financing parties and the financing proposals received, I do not believe the Debtors could have obtained post-petition financing on an unsecured or junior lien basis or without offering superpriority claims.

41.     The DIP Facility is also expressly linked to certain case milestones. These milestones are consistent with the timeline for the Debtors' anticipated chapter 11 process, which will benefit all stakeholders by continuing to drive parties towards a global and comprehensive solution for the Debtors' liabilities.  The milestones were negotiated by the DIP Lenders as a condition to providing the Post-Petition Financing Facilities and were a critical inducement for the DIP Lenders in providing the Debtors with the cash necessary to operate their business and fund these cases.

42.     In addition to approximately $236 million of new money loans, the DIP Facility includes approximately $189 million of Roll-Up Loans that will be used to refinance in full the Prepetition Revolving Credit Facility, subject to the challenge rights of any creditors' committee or other party-in-interest.  Such a roll-up of prepetition debt, subject to a challenge period, is a common feature of debtor-in-possession financings.  I believe that the roll-up of the Prepetition Revolving Credit Facility with the Roll-Up Loans is appropriate for a number of reasons.  The DIP Lenders specifically negotiated for the roll-up in the context of their commitment to provide the Post-Petition Financing Facilities on the terms described herein. In light of the continued existence of the challenge rights, the likely requirements to provide adequate protection to the Prepetition Revolving Credit Facility and the lack of meaningful alternatives, I believe the roll-up of the Prepetition Revolving Credit Facility is appropriate under the circumstances.

43.     The terms of the Post-Petition Securitization Facility are likewise reasonable.  Other than changes in pricing and certain conforming changes to the terms that are customary for a post-petition receivables facility, the structure and terms of the Reinstated Securitization are not materially different than the Prepetition Securitization

Facility.   Moreover, the DIP Facility was priced and structured based on the understanding that the Prepetition Securitization would be reinstated and continued post-petition.   Based on my experience in negotiating financings for distressed companies, I believe that the fees and other payment terms under the Reinstated Securitization, as amended by the proposed amendments described in the Securitization Motion, are reasonable under these circumstances, and should be approved in all respects.   If the Debtors are not permitted to reinstate the Securitization Facility, the Debtors would face a critical liquidity crisis, would likely be unable to renew the letters of credit issued pursuant to the Securitization Facility when they expire, would likely face more onerous terms in replacing the necessary letters of credit, and would likely be required to partially or fully cash collateralize the letters of credit, all of which would threaten to hobble the Debtors' restructuring.

**C.      Entering Into the Post-Petition Financing Facilities is a Reasonable Exercise of the Debtors' business judgment.**

44.      The Post-Petition Financing Facilities are critical to the Debtors' ability to fund operations and pay the administrative costs of these Chapter 11 Cases, and also provides the Debtors with sufficient liquidity to operate their business without creating a value-destructive "priming" or valuation dispute at the outset of these Chapter 11 Cases or presenting significant execution or funding risk.   In addition to providing the Debtors with incremental liquidity, the Post-Petition Financing Facilities will provide the Debtors with access to the use of cash collateral on a consensual basis, and will allow the Debtors to fund their business in the ordinary course, which will ensure continued, uninterrupted operations, preserving the value of the estate for the benefit of all stakeholders.   The Debtors did not have any other actionable financing proposals.

45.     Given the financial and operating condition of the Debtors and the expected range of value of the Debtors, I believe the Post-Petition Financing Facilities, including the milestones, fees, and liens included therein, are appropriate under the circumstances, and are the best terms available to the Debtors.  Moreover, I believe that the incurrence of the Post-Petition Financing Facilities is an essential component to funding the Debtors and providing a path to emergence and is critical to reassure customers and vendors, protect operations, and maximize value for all stakeholders.

46.     In sum, it is my professional opinion that the terms of the Post-Petition Financing Facilities are reasonable under the circumstances and were the product of good faith, arm's length negotiations.

[*Signature Page Follows*]

I, the undersigned Managing Director of Evercore Group L.L.C., declare under penalty of

perjury that the foregoing is true and correct.

Dated: November 12, 2019

/s/ Bo S. Yi
_____
Bo S. Yi
Managing Director
Evercore Group L.L.C.