## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| SOUTHERN FOODS GROUP, LLC, *et al.*, | ) | Case No. 19-36313 (DRJ) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |
| | ) | |

**EMERGENCY MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING CERTAIN DEBTORS TO CONTINUE SELLING RECEIVABLES AND RELATED RIGHTS PURSUANT TO A SECURITIZATION FACILITY, (II) MODIFYING THE AUTOMATIC STAY, AND (III) GRANTING RELATED RELIEF**

**EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON NOVEMBER 13, 2019 AT 2:30 PM IN COURTROOM 404, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**RELIEF IS REQUESTED NOT LATER THAN NOVEMBER 13, 2019.**

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows:  Southern Foods Group, LLC (1364); Dean Foods Company (9681); Alta-Dena Certified Dairy, LLC (1347); Berkeley Farms, LLC (8965); Cascade Equity Realty, LLC (3940); Country Fresh, LLC (6303); Dairy Information Systems Holdings, LLC (9144); Dairy Information Systems, LLC (0009); Dean Dairy Holdings, LLC (9188); Dean East II, LLC (9192); Dean East, LLC (8751); Dean Foods North Central, LLC (7858); Dean Foods of Wisconsin, LLC (2504); Dean Holding Company (8390); Dean Intellectual Property Services II, Inc. (3512); Dean International Holding Company (9785); Dean Management, LLC (7782); Dean Puerto Rico Holdings, LLC (6832); Dean Services, LLC (2168); Dean Transportation, Inc. (8896); Dean West II, LLC (9190); Dean West, LLC (8753); DFC Aviation Services, LLC (1600); DFC Energy Partners, LLC (3889); DFC Ventures, LLC (4213); DGI Ventures, Inc. (6766); DIPS Limited Partner II (7167); Franklin Holdings, Inc. (8114); Fresh Dairy Delivery, LLC (2314); Friendly's Ice Cream Holdings Corp. (7609); Friendly's Manufacturing and Retail, LLC (9828); Garelick Farms, LLC (3221); Mayfield Dairy Farms, LLC (3008); Midwest Ice Cream Company, LLC (0130); Model Dairy, LLC (7981); Reiter Dairy, LLC (3675); Sampson Ventures, LLC (7714); Shenandoah's Pride, LLC (2858); Steve's Ice Cream, LLC (6807); Suiza Dairy Group, LLC (2039); Tuscan/Lehigh Dairies, Inc. (6774); Uncle Matt's Organic, Inc. (0079); and Verifine Dairy Products of Sheboygan, LLC (7200). The debtors' mailing address is 2711 North Haskell Avenue, Suite 3400, Dallas, TX 75204.

Southern Foods Group, LLC, Dean Foods Company, and certain of their affiliates (collectively, the "**Debtors**" or "**Dean Foods**"), each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby file this *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Certain Debtors to Continue Selling Receivables and Related Rights Pursuant to a Securitization Facility, (II) Modifying the Automatic Stay, and (III) Granting Related Relief* (the "**Motion**").  In support of this Motion, the Debtors rely on (a) the *Declaration of Bo Yi in Support of Motion of Debtors for Entry of Interim and Final Orders, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, and 507, (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Post-Petition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling Final Hearing, and (VII) Granting Related Relief* (the "**Yi Declaration**") and (b) the *Declaration of Gary Rahlfs in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (the "**Rahlfs Declaration**"), both filed contemporaneously herewith. In further support of the Motion, the Debtors respectfully state as follows:

<u>**Preliminary Statement**</u>

1.    Prior to the Petition Date, Dean Foods relied on its $450,000,000 receivables securitization facility (the "**Securitization Facility**") as a key source of liquidity and working capital.  The Securitization Facility has been critical to the Debtors' businesses, not least because it is the primary means by which the Debtors obtain the issuance of letters of credit to third parties as required by their operations.  The Securitization Facility is maintained through the sale of Receivables and other Pool Assets to two of Dean Foods's wholly-owned indirect subsidiaries, non-Debtors Dairy Group Receivables, L.P. ("**Dairy Group**") and Dairy Group Receivables II, L.P. ("**Dairy Group II**" and, together with Dairy Group, "**Dairy Receivables**"),

both of which are bankruptcy remote, special-purpose entities. These Receivables[2] and Pool Assets are available, on a first-priority secured basis, to satisfy the claims of their creditors (*i.e.*, the Purchasers, the LC Bank, the LC Participants, and the Agent).

2.    The Securitization Facility is governed by the Receivables Agreements, consisting of the RSAs[3] and the RPA.   First, pursuant to the RSAs, certain originating Debtors (the "**Originators**")[4] sell the Receivables to Dairy Receivables.   The Originators manufacture, market, and distribute a wide variety of branded and private label dairy and dairy case products, including fluid milk, ice cream, cultured dairy products, creamers, ice cream mix, and other dairy products to retailers, distributors, foodservice outlets, educational institutions, and governmental entities across the United States.

---

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the RPA.

[3] The "**Dean RSA**" means that certain Amended and Restated Dairy Receivables Sale Agreement, dated as of June 12, 2014 (as amended and restated pursuant to that certain Second Amended and Restated Receivables Sale Agreement, dated as of the Closing Date and as further amended, restated supplemented or otherwise modified from time to time) by and among Alta-Dena Certified Dairy, Inc., Berkeley Farms, Inc., Dean Dairy Holdings, LLC, Dean East II, LLC, Dean Foods North Central, Inc., Dean West II, LLC, Mayfield Dairy Farms, Inc., Midwest Ice Cream Company, LLC, Reiter Dairy, Inc., Verifine Dairy Products Corporation of Sheboygan, LLC. and Dairy Group II. The "**Suiza RSA**" means and (b) that certain Second Amended and Restated Receivables Sale Agreement, dated as of June 12, 2014 (as amended and restated pursuant to that certain Third Amended and Restated Receivables Sale Agreement, and as may be further amended, restated, supplemented or otherwise modified from time to time) among Country Fresh, LLC, Dean East, LLC, Dean West, LLC, Garelick Farms, LLC, Model Dairy, LLC, Shenandoah's Pride, LLC, Southern Foods Group, LLC, Suiza Dairy Group, LLC, Tuscan/Lehigh Dairies, LLC and Dairy Group. Together, the Dean RSA and the Suiza RSAs are referred to as the "**RSAs**". The "**RPA**" is that certain Receivables Purchase Agreement dated as of February 22, 2019 among Dairy Group Receivables, L.P. and Dairy Group Receivables II, L.P., as Sellers, the Servicers, the Purchasers, PNC Bank, National Association, as LC Bank and Co-Agent, and Coöperatieve Rabobank U.A., New York Branch, as Agent.

[4] The Originators are: Alta-Dena Certified Dairy, LLC, Berkeley Farms, LLC, Country Fresh, LLC, Dean Dairy Holdings, LLC, Dean East, LLC, Dean East II, LLC, Dean Foods North Central, LLC, Dean Foods of Wisconsin, LLC, Dean West, LLC, Dean West II, LLC, Friendly's Ice Cream Holdings Corp., Friendly's Manufacturing and Retail, LLC, Garelick Farms, LLC, Mayfield Dairy Farms, LLC, Midwest Ice Cream Company, LLC, Model Dairy, LLC, Reiter Dairy, LLC, Shenandoah's Pride, LLC, Southern Foods Group, LLC, Suiza Dairy Group, LLC, Tuscan/Lehigh Dairies, Inc., and Verifine Dairy Products of Sheboygan, LLC.

3.    Second, pursuant to the RPA, the Servicers[5] collect and administer the Receivables from the Originators on behalf of Dairy Receivables for a nominal servicing fee, and following the sale of Receivables to Dairy Receivables, Dairy Receivables sell interests in a receivables pool to the Purchasers, which were Coöperatieve Rabobank U.A. ("**Rabobank**"), PNC Bank, National Association ("**PNC Bank**"), and certain of their affiliates.  Additionally, PNC Bank, as an issuer of letters of credit under the Securitization Facility, issued letters of credit on behalf of Dairy Receivables and the Originators and their affiliates.[6]  The letters of credit issued under the Securitization Facility are without recourse to the Debtors other than with respect to certain indemnification and other obligations described below.  There is approximately $375,209,771 currently outstanding under the Securitization Facility, of which letters of credit total approximately $195,209,771.

4.    The Securitization Facility is a critical and necessary component of the Debtors' capital structure, providing essential letters of credit and access to liquidity.  Termination of the Securitization Facility would result in immediate and adverse consequences to the Debtors.  Upon termination, the proceeds of outstanding Receivables generated by the Originators and sold through the Securitization Facility would cease to be remitted to the Debtors upon collection.  Instead, they would be trapped at Dairy Receivables and used to cash collateralize outstanding letters of credit and pay certain related fees and expenses.  Moreover, termination of the Securitization Facility could cause the LC Bank to deliver non-renewal notices with respect to such letters of credit, which could entitle the beneficiaries of outstanding letters of credit to

---

[5] The Servicers are the same group of entities as the Originators.

[6] Under the RPA (as amended and restated pursuant to the ninth amendment and restatement thereto, dated as of the Closing Date, and as further amended, restated, supplemented or otherwise modified from time to time), in substantially the form attached hereto as Exhibit E, PNC Bank will cease to be a Purchaser or LC Bank and Rabobank will become the successor LC Bank.

draw on such letters of credit unless the Debtors were able to timely secure replacements.  Once the cash is in the hands of a letter-of-credit beneficiary, the beneficiary may seek to hold onto the cash until it determines that all of the obligations supported by the letters of credit are satisfied.

5.      Given the critical importance of the Securitization Facility to the Debtors, in advance of commencing the Chapter 11 Cases, in conjunction with negotiating the Debtors' post-petition revolving credit facility (the "**DIP Facility**") and as part of a comprehensive financing to provide the Debtors with sufficient liquidity to fund the Chapter 11 Cases, the Debtors and Rabobank negotiated certain amendments to the Receivables Agreements and certain other instruments and agreements relating to the Securitization Facility, including the Transaction Documents (as defined in the RPA) (collectively with the Receivables Agreements, as amended and restated, the "**Amended Transaction Documents**") to govern the Securitization Facility.  Pursuant to the Amended Transaction Documents, the parties to the Securitization Facility have agreed to allow the Securitization Facility to continue postpetition, subject to certain modifications, including the Debtors' agreement to increase certain pricing elements of the Securitization Facility.

6.      Together with the DIP Facility, the Securitization Facility provides essential liquidity and access to crucial letters of credit.  Concurrently with this Motion, the Debtors are seeking approval to enter into the DIP Facility, secured by substantially all assets of the Debtors (but excluding the Receivables and the other Pool Assets).[7]  The DIP Facility, however, was priced and structured based on the understanding that the Securitization Facility would continue

---

[7] Dairy Group and Dairy Group II are not Debtors in the Chapter 11 Cases, will not be guarantors under the DIP Facility, and will not pledge the Receivables or any of their other assets to secure the DIP Facility. The proposed lenders under the DIP Facility will, however, be granted a first-priority lien on the equity interests of Dairy Group and Dairy Group II.

postpetition.   During the course of the Debtors' prepetition search for potential debtor-in-possession financing, the Debtors, in consultation with their proposed investment banker, Evercore Group L.L.C., provided potential third-party debtor-in-possession financing providers the option to refinance the Securitization Facility and to provide letters of credit as part of a proposed debtor-in-possession financing facility.  None of the potential providers of a debtor-in-possession financing contacted by the Debtors prepetition were willing to facilitate the issuance of letters of credit on terms that were more favorable than those provided by Rabobank under the Securitization Facility (as amended), particularly when considered together with the DIP Facility as a comprehensive financing package.  If the Securitization Facility is not permitted to continue, the Debtors would likely face more onerous terms in replacing the necessary letters of credit and would likely be required to partially or fully cash-collateralize their outstanding letters of credit, which would negatively impact the Debtors' liquidity and would impede the Debtors' ability to operate their businesses in the ordinary course.  Accordingly, the Debtors are seeking the relief requested herein.

### Relief Requested

7.     By this Motion, and pursuant to sections  105, 362, 363, 364, 365, 503(b), and 507(b) of the United States Code (the "**Bankruptcy Code**"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 9013-1(b) of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Local Rules**"), the Debtors seek entry of interim and final orders (the "**Proposed Orders**" and, if entered, the "**Orders**"):

    i.     authorizing certain of the Debtors to enter into certain amendments to the Receivables Agreements and continue selling and/or servicing the Receivables in accordance with the terms of the Amended Transaction Documents and perform their other obligations thereunder;

ii.     authorizing the Debtors to cause the non-Debtor Dairy Receivables to perform or continue to perform under the Amended Transaction Documents to which Dairy Receivables are parties;

iii.    authorizing certain of the Debtors to assume, and approving the assumption of, pursuant to section 365 of the Bankruptcy Code, the Amended Transaction Documents and the Collection Account Agreements to which such Debtors are a party;

iv.     authorizing certain of the Debtors to enter into the Amended Transaction Documents to which they will be a party and perform their obligations thereunder;

v.      pursuant to section 364(c)(1) of the Bankruptcy Code, granting Dairy Receivables, the Agent, and the Purchasers the Superpriority Claims (as defined below), which shall provide priority in payment with respect to the obligations of Dairy Receivables and the Originators under the Amended Transaction Documents over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code, other than with respect to (i) superpriority claims granted in connection with the DIP Facility (such claims, the "**DIP Superpriority Claims**"), which shall rank *pari passu* with the Superpriority Claims, and (ii) the Carve-Out (as defined below), which shall rank senior to the Superpriority Claims and the DIP Superpriority Claims;

vi.     pursuant to section 364(c)(2) of the Bankruptcy Code, granting the Securitization Liens (as defined below);

vii.    modifying the automatic stay imposed pursuant to section 362 of the Bankruptcy Code to allow for the effective setoff of the Repayment Amounts (as defined below) to Dairy Receivables and the Originators and the enforcement of remedies under the Amended Transaction Documents; and

viii.   granting certain other related relief, as set forth in the Proposed Orders.

### Jurisdiction, Venue, and Authority

8.      The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334 and the *Order of Reference to Bankruptcy Judges*, General Order 2012-6 (S.D. Tex. May 24, 2012) (Hinojosa, C.J.).

9.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  In addition, the Debtors confirm their consent, pursuant to Bankruptcy Rule 7008 and Local Rule

7008-1, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue of the Chapter 11 Cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

### General Background

10.     On the date hereof, (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have continued in possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner, and no official committee has been appointed in the Chapter 11 Cases.

11.     Contemporaneously  herewith, the Debtors have filed a motion requesting the joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.

12.     Additional information about the Debtors' businesses and affairs, capital structure, and prepetition indebtedness, and the events leading up to the Petition Date, can be found in the Rahlfs Declaration, which is incorporated herein by reference.

### The Securitization Facility

**A.     Purchase and Sale of Receivables.**

15.     Under the RSAs, certain Debtors that generate Receivables from the sale of milk, dairy products or other goods or services (*i.e.*, the Originators) sell those Receivables to Dairy Receivables at a customary discount, taking into account the time value of money based on the anticipated date of collection of such Receivables and the risk of nonpayment by the account

debtors, which are special-purpose entities that are not Debtors.  Such sales of Receivables occur immediately and automatically upon the creation of the Receivables without any further action by the Originators or Dairy Receivables.  Under the terms of the Receivables Agreements and the Amended Transaction Documents, the transfers from the Originators to Dairy Receivables are intended to be "true sales" and absolute assignments of the Receivables.  Each Originator has also granted to the Agent, for the benefit of the Purchasers, a precautionary, back-up security interest in its transferred Receivables and its rights related thereto under the Securitization Facility, which security interest has been perfected by the filing of UCC-1 financing statements.  Such security interest is provided in the event that, against the intent of the parties, the transfer of Receivables were to be recharacterized as a loan or extension of credit rather than a true sale.

16.     Under the RPA, Dairy Receivables sell interests in a Receivables pool to the Purchasers, and the Servicers administer and collect Receivables from the Originators on behalf of Dairy Receivables.  The Securitization Facility allows for Dairy Receivables to receive either cash or letters of credit for the account of the Originators or certain of their affiliates.

**B.     Use of the Facility.**

17.     As of the Petition Date, the total size of the Securitization Facility was $450,000,000, which shall, upon the Closing Date, be reduced to $425,000,000. Availability under the Securitization Facility at any time is limited by the outstanding balance of the eligible Receivables, the size of the total reserves (similar in concept to an "equity cushion"), and other factors.

**C.     Collection of Receivables, Application of Proceeds, Collection Accounts.**

18.     The Originators maintain accounts (collectively, the "**Collection Accounts**") at Bank of America, N.A. ("**BofA**"), BMO Harris Bank National Association ("**BMO**"), JP Morgan

Chase Bank, N.A. ("**Chase**"), Wells Fargo Bank, N.A. ("**Wells Fargo**"), and various regional banks (the "**Regional Banks**"), which collect receipts on account of Receivables associated with their sales.[8]  Deposits in the Collection Accounts are then swept into an account located at and controlled by Rabobank (the "**Rabobank Account**").[9]  The Rabobank Account was established shortly before the Petition Date in connection with the contemplated amendments to the Securitization Facility.  Then, after daily borrowing bases are submitted, the Rabobank Account releases funds to a concentration account located at Wells Fargo.  Funds in the concentration account at Wells Fargo are held as cash collateral for the benefit of the Purchasers to the extent the outstanding amount of letters of credit exceed borrowing base at a given time.  This cash flow process will continue on a postpetition basis under the Amended Transaction Documents.

19.     Additionally, the RPA provides that the Agent exercises dominion and control over each of the Collection Accounts and all funds on deposit therein, and may take any or all other actions permitted under an applicable Collection Accounts Agreement (as defined in the RPA) governing such accounts.  This cash flow process will continue on a postpetition basis under the Amended Transaction Documents and the Collection Accounts Agreements.

**D.     Security Interests.**

20.     To secure its obligations under the Amended Transaction Documents, Dairy Receivables granted to the Agent (for the benefit of the Purchasers) a security interest in all of its property, including all Receivables, the other Pool Assets, and all proceeds of the foregoing.

---

[8] For additional discussion of the Debtors' cash management program, see the *Emergency Motion of Debtors for Entry of Interim and Final Orders Authorizing (i) Debtors To Continue To Maintain Existing Cash Management System, Bank Accounts, and Business Forms and (ii) Financial Institutions To Honor and Process Related Checks and Transfers* filed contemporaneously herewith.

[9] All of the Collection Accounts located at BofA, BMO, Chase, and Wells Fargo are zero-balance accounts, such that receipts deposited in these accounts are automatically swept daily to the Rabobank Account.  Funds in the Collection Accounts located at Regional Banks, on the other hand, are manually wired the Rabobank Account approximately monthly.

21.     Similarly, pursuant to the Amended Transaction Documents, the Originators grant precautionary, back-up security interests.  The Amended Transaction Documents expressly state that the transfers of Receivables from the Originators to Dairy Receivables are intended to be true sales and absolute assignments of the Receivables.  However, if, against the intent of the parties (and notwithstanding entry of the interim Order and the final Order, which provide that the transfers of the Receivables constitute true sales), any such transfer is recharacterized as a loan or extension of credit, each Originator has granted a first-priority prepetition security interest in the Receivables and certain related collateral, pursuant to the Amended Transaction Documents, for the ultimate benefit of the Agent on behalf of the Purchasers and the LC Bank (the "**Prepetition Liens**").  The Originators have agreed, in connection with continuing the Securitization Facility pursuant to the Amended Transaction Documents, pursuant to section 364(c)(2) of the Bankruptcy Code, to extend such Prepetition Liens, and the Agent (for the benefit of the Purchasers), will be granted valid, binding, continuing, enforceable, unavoidable and fully perfected continuing first-priority security interests in Receivables and other Pool Assets originated and purported to be sold through the Securitization Facility on or after the Petition Date, whether existing on the Petition Date or thereafter arising or acquired (the "**Securitization Liens**").

**E.      Certain Obligations of the Originators.**

22.     The Originators do not guarantee the collection of Receivables that are transferred to Dairy Receivables.  However, the Originators and Dairy Receivables are obligated to indemnify the Purchasers, the Agent, the LC Bank, and each LC Participant, as applicable, from any claims arising, directly or indirectly, from the issuance of any letter of credit and the servicer provided by the Servicers under the RPA, with certain narrow exceptions (such obligations, the "**Repayment Amounts**").

23.     In connection with the continuation of the Securitization Facility pursuant to the Amended Transaction Documents, the Debtors seek approval of superpriority claims against each Originator and in favor of Dairy Receivables, the Agent, and the Purchasers in respect of each Originator's obligations under the Amended Transaction Documents, including the Repayment Amounts and certain other limited indemnification obligations of the Servicers and the Originators under the Amended Transaction Documents (such claims, the "**Superpriority Claims**"), which Superpriority Claims shall be subject and subordinate to the Carve-Out and rank *pari passu* with the DIP Superpriority Claims.

**F.     Documentation.**

24.     The Amended Transaction Documents include the following agreements and instruments, among others:

- the Suiza RSA in substantially the form attached hereto as <u>Exhibit B</u>;

- the Dean RSA in substantially the form attached hereto as <u>Exhibit C</u>;

- the RPA in substantially the form attached hereto as <u>Exhibit D</u>;

- that certain Seventh Amended and Restated Master Fee Letter dated as of February 22, 2019 (as amended pursuant to that certain Eighth Amended and Restated Master Fee Letter, dated as of the Closing Date, and as may be further amended, restated, supplemented or otherwise modified from time to time), among the Agent, Nieuw Amsterdam Receivables Corporation B.V., as a Company, PNC Bank, as LC Bank, as a Financial Institution, as LC Participant, and as a Company, Dairy Group, and Dairy Group II (the "**Master Fee Letter**"), in substantially the form attached hereto as <u>Exhibit E</u>;[10]

- that certain fee letter by and between the Agent and Dairy Group and Dairy Group II regarding certain fees in connection with the Securitization Facility (the "**Dairy Receivables Fee Letter**"), in substantially the form attached hereto as <u>Exhibit F</u>;[11]

---

[10] The Master Fee Letter will be filed under seal pursuant to the *Debtor's Emergency Motion for Entry of an Order Authorizing the Debtors to File Under Seal the Fee Letters* filed concurrently herewith (the "**Seal Motion**").

[11] The Dairy Receivables Fee Letter will be filed under seal pursuant to the Seal Motion.

- that certain fee letter by and between the Agent and Dean Foods Company regarding certain fees in connection with the Securitization Facility, in substantially the form attached hereto as <u>Exhibit G</u> (the "**Dean Foods Fee Letter**" and, collectively with the Master Fee Letter and the Dairy Receivables Fee Letter, the "**Fee Letter**");[12]

- that certain Fourth Amended and Restated Performance Undertaking, dated as of February 22, 2019 (as amended pursuant to that certain Fifth Amended and Restated Performance Undertaking, dated as of the Closing Date, and as may be further amended, restated, supplemented or otherwise modified from time to time, the "**Dean Performance Guarantee**"), by Dean Foods in favor of Dairy Receivables II, as Seller, and the Agent, for itself and for the benefit of the Purchasers, in substantially the form attached hereto as <u>Exhibit H</u>;

- that certain Fifth Amended and Restated Performance Undertaking, dated as of February 22, 2019 (as amended pursuant to that certain Sixth Amended and Restated Performance Undertaking, dated as of the Closing Date, and as may be further amended, restated, supplemented or otherwise modified from time to time, the "**Suiza Performance Guarantee**" and, together with the Dean Performance Guarantee, the "Performance Guarantees"), by Dean Foods in favor of Dairy Group Receivables I, as Seller, and the Agent, for itself and Agent for the benefit of the Purchasers, in substantially the form attached hereto as <u>Exhibit I</u>;

- that certain Intercreditor Agreement, dated as of February 22, 2019 (as amended and restated pursuant to that certain Amended and Restated Intercreditor Agreement, dated as of the Closing Date, and as may be further amended, restated, supplemented or otherwise modified from time to time as amended, restated, supplemented or otherwise modified from time to time, the "**Intercreditor Agreement**") between Rabobank, as agent under the DIP Facility, and the Agent, in substantially the form attached hereto as <u>Exhibit J</u>; and

- any other Amended Transaction Documents, as each may be amended, restated, supplemented or otherwise modified from time to time.

## G.     Bankruptcy-Related Termination Events.

25.     In addition to the terms described above, the Amended Transaction Documents also provide for the termination of the Securitization Facility upon the occurrence of certain events (each a "**Termination Event**"), including but not limited to:

---

[12] The Dean Foods Fee Letter will be filed under seal pursuant to the Seal Motion.

- The entry of an order with respect to (i) any of the Chapter 11 Cases entered by the Bankruptcy Court (or any member of the Provider Group[13] shall file an application or motion or pleading for entry of or in support of an order) (i) dismissing or converting to a case under section 1112 of the Bankruptcy Code or otherwise to a case under chapter 7 of the Bankruptcy Code or (ii) appointing a trustee under chapter 7 or chapter 11 of the Bankruptcy Code, a responsible officer under section 1104 of the Bankruptcy Code, or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business under section 1106(b) of the Bankruptcy Code.

- Entry of an order of the Bankruptcy Court in any of the Chapter 11 Cases (i) staying, reversing, vacating, amending, supplementing or otherwise modifying any of the Financing Orders[14] or any member of the Provider Group shall apply for authority to do so or (ii) permitting any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to any member of the Provider Group, equal to or superior to the priority of the Superpriority Claims granted to the Agent or any other Secured Party other than the "Carve Out" (as defined in the Financing Orders) and the *pari passu* administrative expense claim granted to the DIP Agent (as defined in the Financing Orders) pursuant to the DIP Order (as defined in the Financing Orders) in connection with the DIP Facility, in each case, without the prior written consent of the Agent.

- Any member of the Provider Group's opposition of, or support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court) of any other Person's opposition of, any motion made in the Bankruptcy Court by the Agent or any other Secured Party seeking confirmation of the validity, priority or extent of the liens or other interests of the Agent granted pursuant to the Amended Transaction Documents.

- The filing by any member of the Provider Group of any motion or proceeding to approve a debtor-in-possession financing facility or provide for any other relief that grants a lien on (i) the membership interests of any Seller (other than the Eligible DIP Subordinated Interest) or (ii) any Pool Assets, in each case without the prior written consent of the Agent;

- The entry of an order authorizing recovery by any person from the Pool Assets for any costs of preservation or disposition thereof under section 506(c) of the

---

[13] As defined in the RPA, the "**Provider Group**" comprises Dean Foods Company, Dairy Receivables, and Dairy Receivables' direct and indirect subsidiaries that are Originators.

[14] As defined in the RPA, "**Financing Orders**" means the interim and final orders of the Bankruptcy Code providing for, among other, things, (i) assumption of the Receivables Sale Agreements and continued sale and contribution of Receivables to the Buyer pursuant thereto and (ii) superpriority administrative status for all claims of the Seller and the Secured Parties against each member of the Provider Group (excluding each Seller) under the Transaction Documents.

Bankruptcy Code or the filing by any member of the Provider Group of a motion seeking such an order;

- The filing by any member of the Provider Group of a motion or proceeding that could reasonably be expected to result in material impairment of the Agent's or any Secured Party's rights under the Amended Transaction Documents, or a final determination by the Bankruptcy Court (or any other court of competent jurisdiction) with respect to any motion or proceeding brought by any other party that results in a material impairment of the Agent's or any Secured Party's rights under the Amended Transaction Documents, unless such suit or other proceeding is in connection with the enforcement of the Amended Transaction Documents against the Agent.

- The entry of one or more orders granting relief from the automatic stay with respect to any proceeding involving any member of the Provider Group (excluding each Seller), so as to allow any third party to proceed against (i) the assets of any member of the Provider Group (excluding each Seller) constituting Pool Assets, which have a value in excess of $5,000,000 in the aggregate or (ii) the equity of any Seller.

- The existence of any Adverse Claim on any Pool Assets.

- The making of any payment by any member of the Provider Group on any Indebtedness of any member of the Provider Group arising before the Filing Date, other than as permitted by order of the Bankruptcy Court or as otherwise agreed to by the Agent.

- Failure of the Debtors to obtain entry by the Court of a final Order within 45 days following the Petition Date (or such later date as consented to in writing by the Agent in its sole and absolute discretion); or from and after the date of entry thereof, the final Order shall cease to be in full force and effect (or shall have been vacated, stayed, reversed, modified or amended), in each case without the prior written consent of the Agent and each Purchaser.

- Dean Foods Company's or any of its affiliates' failure to comply in any material respect with the interim Order or final Order.

- The filing of a plan or a motion seeking approval of a sale of all or substantially all of the Purchaser Group's assets that, in either case, does not provide for indefeasible payment in full in cash of all obligations owed by any member of the Provider Group (excluding each Seller) to the Purchasers (other than Contingent Obligations not yet due and payable as of the effective date of such plan) upon effectiveness.

- The entry of an order, in any of the Chapter 11 Cases, after the entry of an order approving the Amended Transaction Documents, approving a debtor-in-possession financing facility that is not an Eligible DIP Facility or (ii) any member of the Provider Group (excluding each Seller) enters into a debtor-in-possession financing facility that is not an Eligible DIP Facility.

- The entry of an order denying or terminating the Provider Group's use of prepetition cash collateral, and the Provider Group has not obtained the use of cash collateral (consensually or non-consensually).

- If any Seller or any member of the Provider Group is enjoined, restrained or in any way prevented by an order of a court of competent jurisdiction (other than an order of the Bankruptcy Court approved by the Agent) from continuing to conduct all or any material part of its business or affairs.

- If any Seller is determined by the Bankruptcy Court (or other court of competent jurisdiction) to be substantively consolidated with any other member of the Provider Group.

- The inability of either Dairy Group or Dairy Group II to pay its debts (or an admission by Dairy Group or Dairy Group II of the foregoing) or any proceeding, or corporate action by Dairy Group or Dairy Group II in support of any proceeding, adjudicating Dairy Group or Dairy Group II to be bankrupt or insolvent, seeking its liquidation or reorganization, restructuring its debts or seeking appointment of a receiver, trustee or custodian for Dairy Group or Dairy Group II or any substantial part of its property.

- Dean Foods Company fails to own, free and clear of any Adverse Claims, (except any Adverse Claim in favor of the Collateral Agent in accordance with the Dean Credit Agreement), in the aggregate, either directly or indirectly, 100% of the limited partnership interests of Dairy Group and 99.9% of the partnership interests of Dairy Group, or Dairy Group Receivables GP, LLC (f/k/a Suiza Receivables GP, LLC) fails to own, free and clear of any Adverse Claims (except any Adverse Claim in favor of the Collateral Agent in accordance with the Dean Credit Agreement), 100% of the general partnership interests of Dairy Group and 0.1% of the partnership interests of Dairy Group, or Dean Foods Company and Suiza Dairy Group, LLC fail to own, free and clear of any Adverse Claims (except any Adverse Claim in favor of the Collateral Agent in accordance with the Dean Credit Agreement), in the aggregate, either directly or indirectly, 100% of the membership interests of Dairy Group Receivables GP, LLC.

- Dean Foods Company fails to own, free and clear of any Adverse Claims, (except any Adverse Claim in favor of the Collateral Agent in accordance with the Dean Credit Agreement), in the aggregate, either directly or indirectly, 100% of the limited partnership interests of Dairy Group II and 99.9% of the partnership interests of Dairy Group II, or Dairy Group Receivables GP II, LLC faild to own, free and clear of any Adverse Claims (except any Adverse Claim in favor of the Collateral Agent in accordance with the Dean Credit Agreement), 100% of the general partnership interests of Dairy Group II and 0.1% of the partnership interests of Dairy Group II, or Dean Foods Company and Dean Dairy Holdings, LLC fail to own, free and clear of any Adverse Claims (except any Adverse Claim in favor of the Collateral Agent in accordance with the Dean Credit Agreement), in the aggregate, either directly or indirectly, 100% of the membership interests of Dairy Group Receivables GP II, LLC.

- A Change of Control occurs.

**H.    Pricing, Fees and Expenses.**

26.    In connection with the Amended Transaction Documents, the Debtors have agreed to a revised schedule of fees and other amounts payable by Dairy Receivables to the Agent and the Purchasers on the terms set forth in the RPA and the Fee Letter.  The payments set forth in the RPA and the Fee Letter, which effectively represent the pricing of the Securitization Facility, include the following:

- Yield payable monthly in arrears with respect to the Purchaser Interests funded on balance sheet, for each day in an amount equal to the product of the sum of LIBO or Alternate Base Rate and a spread of 3.50% multiplied by the Capital of such Purchaser Interest for each day elapsed during the applicable period, annualized on a 360 day basis.

- Payment of the aggregate discount or yield accrued with respect to the Purchaser Interests funded through the issuance of commercial paper, as set forth in the RPA.

- Certain fees set forth in the Fee Letter, including a monthly unused fee of 0.50% on the average daily unused commitments under the RPA, a monthly used fee of 3.50% on the average daily balance of Capital outstanding, a letter of credit fronting fee, and a monthly letter of credit participation fee on each LC Participant's average daily LC Participation Amount.

27.    In addition to the foregoing terms, the Fee Letter agreed to in connection with the Securitization Facility contemplates certain additional fees, the terms of which are commercially sensitive and proprietary in nature.  The fees are described in the fee letters attached hereto as Exhibits E, F, and G, which the Debtors propose to file under seal pursuant to the Seal Motion.[15] The Debtors have also agreed to pay the fees, costs and disbursements of the Agent's counsel in connection with the Amended Transaction Documents.  The Debtors submit that the fees and

---

[15] *See* the *Debtors' Emergency Motion for Entry of an Order Authorizing the Debtors to File Under Seal the Fee Letters*, filed contemporaneously herewith.

other payment terms under the Amended Transaction Documents are fair, reasonable, and customary for financings of this type.

**Certain Disclosures**

29.    Out of an abundance of caution,[16] the Debtors provide the following potentially applicable summary of material provisions of the proposed interim Order and the Amended Transaction Documents with respect to the Securitization Liens to be granted in connection with this Motion (which, for the avoidance of doubt, are only granted to the extent the transfer of Receivables are recharacterized as a loan or extension of credit rather than a true sale):

i.      ***Cross-Collateralization.***   The relief sought herein does not contemplate cross-collateralization of any prepetition secured obligations.  However, in the unlikely event that, and contrary to the intent of the parties to the Securitization Facility, the transfers of Receivables under the Securitization Facility are not respected as true and absolute sales, and instead are recharacterized as loans secured by the Receivables, the Originators have granted the Securitization Liens on Receivables to secure repayment of the recharacterized loans.  In the unlikely event of such an occurrence, the Agent may have a right of setoff of prepetition indemnity obligations (if such obligations become liquidated) against Securitization Liens on Receivables during the postpetition period.

ii.     ***Validity, Perfection, and Amount of Prepetition Liens.***  Pursuant to Paragraph F of the interim Order, the Debtors have stipulated to, among other things, the amount of letters of credit outstanding as of the Petition Date.  These stipulations will bind all parties in interest, including the Debtors.  Parties in interest have (1) 75 days after entry of the interim Order, or (2) solely with respect to a Committee appointed in the Chapter 11 Cases, if any, 60 days after the appointment of the Committee, to investigate the stipulations set forth in Paragraph F of the Interim Order.

iii.    ***506(c) Waiver.***  Pursuant to Paragraph 14 of the final Order, the Debtors are seeking a waiver of the Debtors' estates rights under section 506(c) of the Bankruptcy Code.  Such relief is subject to the entry of the final Order.

---

[16] The following summary of the terms of the interim Order and the Amended Transaction Documents is subject entirely to the respective terms thereof. If there are any inconsistencies between the following summary and the interim Order and/or the Amended Transaction Documents, then the interim Order and/or the Amended Transaction Documents, as applicable, shall control. Unless otherwise indicated, capitalized terms used in the following summary shall have the meanings ascribed to them in the interim Order and/or the Amended Transaction Documents, as applicable.

iv.   ***Liens on Avoidance Actions.***   The Debtors are not granting liens on avoidance actions in connection with the relief sought herein.

v.   ***Provisions Deeming Prepetition Debt to be Postpetition Debt.***   The Debtors are not seeking to deem prepetition secured debt to be postpetition secured debt or to use postpetition loans from a prepetition secured creditor to pay all of that secured creditor's prepetition debt in connection with the relief sought herein.

vi.   ***Disparate Treatment of Professionals Retained by the Committee***.   The interim Order and final Order do not provide disparate treatment for professionals retained by the Committee from those professionals retained by the Debtors in respect of the Carve-Out.

vii.   ***Non-Consensual Priming.***   The relief sought herein does not contemplate the priming of any secured liens without the consent of an applicable lienor.

viii.   ***Provisions Affecting the Court's Power to Consider the Equities of the Case.***   The relief sought herein seeks to affect the Court's power to consider the equities of the case under 11 U.S.C. § 552(b)(1) as it pertains solely to the relief requested herein, subject to the final Order.

## BASIS FOR RELIEF

A.   **The Debtors Should be Authorized to Enter into the Amended Transaction Documents, Continue Selling Receivables Pursuant to the Securitization Facility, and Pay Fees in Connection Therewith.**

30.   The Debtors' decision to continue the Securitization Facility pursuant to the Amended Transaction Documents, and pay the associated fees and expenses, is an appropriate exercise of the Debtors' business judgment and should be approved by this Court under sections 105(a) and 363 of the Bankruptcy Code.

31.   Section 363(b)(1) of the Bankruptcy Code empowers the Court to allow a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). Debtors' decisions to use, sell, or lease assets outside the ordinary course of business must be based upon the sound business judgment of the debtor. *See, e.g.*, *Inst'l Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary

19

duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale . . . .").

32.     Courts emphasize that the business judgment rule is not an onerous standard and that it "is flexible and encourages discretion."  *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011).  "Great judicial deference is given to the [debtor's] exercise of business judgment." *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 254 (N.D. Tex. 2005).  As long as a transaction "appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision to [enter into the transaction] should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the Bankruptcy Code."  *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (citation and internal quotation marks omitted).

33.     Moreover, section 363(c) of the Bankruptcy Code authorizes a debtor in possession operating its business pursuant to section 1108 of the Bankruptcy Code to "enter into transactions . . . in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business, without notice or a hearing." 11 U.S.C. § 363(c)(1).  One purpose of section 363(c) of the Bankruptcy Code is to provide a debtor with the flexibility to engage in the ordinary course transactions required to operate its business without undue supervision by its creditors or the court.  *See, e.g.*, *In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992) (citations omitted) ("Section 363 is designed to strike [a]

balance, allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets."). Included within the purview of section 363(c) of the Bankruptcy Code is a debtor's ability to continue "routine transactions" necessitated by a debtor's business practices.  *See, e.g.*, *Amdura Nat. Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996) (citations omitted) ("A debtor in possession under Chapter 11 is generally authorized to continue operating its business."); *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 796 (Bankr. D. Del. 2007) (citations omitted) (noting that courts have shown a reluctance to interfere in a debtor's making of routine, day-to-day business decisions).

34.     The Bankruptcy Code does not define "ordinary course of business."   In determining whether a transaction qualifies as "ordinary course," the courts use the "horizontal" dimension test (*i.e.*, "the way businesses operate within a given industry") and the "vertical" dimension test (*i.e.*, whether the transaction is consistent with the reasonable "expectations of creditors").  *See See Denton Co. Elec. Coop., Inc. v. Eldorado Ranch, Ltd. (In re Denton Cty. Elec. Coop., Inc.)*, 281 B.R. 876, 882 & n.12 (Bankr. N.D. Tex. 2002) (collecting cases).   "In general, under the vertical test, courts look at whether the transaction subjects a hypothetical creditor to a different economic risk than existed when the creditor originally extended credit. Under the horizontal test, in general courts look at whether the transaction was of the sort commonly undertaken by companies in the industry.  The primary focus is on the debtor's pre-petition business practices and conduct."  *In re Patriot Place, Ltd.*, 486 B.R. 773, 793 (Bankr. W.D. Tex. 2013).

35.     The Debtors submit that, to the extent that the use of property of the estate is implicated here, the relief requested in this Motion represents a sound exercise of the Debtors'

business judgment, is necessary to avoid immediate and irreparable harm, and is justified under section 363 of the Bankruptcy Code.   Failure to reinstate the Securitization Facility would immediately and irreparably harm the Debtors businesses, as they would not have access to direly needed liquidity and letters of credit.   If the Securitization Facility were discontinued, it would likely be difficult for the Debtors to timely find replacement letters of credit on comparable economic terms as those offered by the LC Bank.   Further, termination of the Securitization Facility would result in the Debtors' loss of access to the funds deposited into the Depository Accounts from collections of outstanding Receivables.   Such funds would instead be used to fully pay the Purchasers' outstanding investments and accrued interest thereon, cash collateralize undrawn letters of credit, and pay other liabilities arising under the Securitization Facility.   Consequently, all of the Debtors' creditors will benefit if the requested relief is granted.

36.      The Debtors further submit that continuation of the Securitization Facility postpetition is necessary and appropriate and is authorized under section 105(a) of the Bankruptcy Code pursuant to what is referred to interchangeably as the "doctrine of necessity" or "necessity of payment rule".   The doctrine of necessity functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code.   *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (recognizing the "doctrine of necessity"); *In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2003) (same and citing *In re CoServ*); *see also In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to debtor's continued operation); *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section

105(a) of the Bankruptcy Code "provides a statutory basis for payment of pre-petition claims" under the doctrine of necessity).

37.     The Court's power to utilize the "doctrine of necessity" in the Chapter 11 Cases derives from the Court's inherent equity powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). "[T]he debtor-in-possession's role as the equivalent of a trustee under § 1107(a) and its duty to protect the going-concern value of an operating business in a Chapter 11 provide[s] the 'bridge that makes application to the Doctrine of Necessity 'necessary or appropriate to carry out the provisions of' the Bankruptcy Code.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 56 (Bankr. N.D. Tex. 2004) (citing *In re CoServ*, 273 B.R. at 497). Accordingly, the Court has expansive equitable powers to fashion any order or decree that is in the interest of preserving or protecting the value of the Debtors' assets. *See In re Young*, 416 F. App'x 392, 398 (5th Cir. 2011) (recognizing that "[s]ection 105(a) of Title 11 permits the bankruptcy court to exercise broad authority"); *In re Nixon*, 404 F. App'x 575, 578 (3d Cir. 2010) (citation omitted) ("It is well settled that the court's power under § 105(a) is broad."); *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004) (citation omitted) (noting that section 105 of the Bankruptcy Code "has been construed to give a bankruptcy court 'broad authority' to provide equitable relief appropriate to assure the orderly conduct of reorganization proceedings"); *In re Trevino*, 599 B.R. 526, 542-43 (Bankr. S.D. Tex. 2019) (noting that the bankruptcy court has "broad authority" under section 105(a) of the Bankruptcy Code); *In re Padilla*, 379 B.R. 643, 667 (Bankr. S.D. Tex. 2007) (citations omitted) ("Section 105(a) gives bankruptcy courts broad authority to take actions necessary and appropriate for administering and enforcing the Bankruptcy Code and . . . authorizes a bankruptcy court to fashion such orders as are necessary

23

to further the purposes of the substantive provisions of the Bankruptcy Code."); *see also Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) (citation omitted) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code.").

38.     The United States Supreme Court first articulated the doctrine of necessity more than a century ago, in *Miltenberger v. Logansport Ry. Co.*, 106 U.S. 286 (1882), in affirming the authorization by the lower court of the use of receivership funds to pay pre-receivership debts owed to employees, vendors, and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership. *See id.* at 309.  This doctrine has become an accepted component of modern bankruptcy jurisprudence, and courts' application of it largely adheres to the Supreme Court's reasoning in *Miltenberger.  See, e.g.*, *In re Lehigh & New Eng. Ry.*, 657 F.2d at 581-82 ("[I]n order to justify payment under the 'necessity of payment' rule, a real and immediate threat must exist that failure to pay will place the continued operation of the [debtor] in serious jeopardy."); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369 (Bankr. S.D. Tex. 2000) (noting that "courts in this district" have applied this doctrine "primarily out of common sense and the presence of a legal or factual inevitability of payment"); *In re Mirant*, 296 B.R. at 429 (applying the rule where the "Debtors' businesses [would be] seriously damaged by the delay required to satisfy the court that a particular creditor should be paid its prepetition claim outside of a confirmed plan"); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (holding that the "ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept"); *In re Just for Feet, Inc.*, 242 B.R. at 826

(stating that where the debtor "cannot survive" absent payment of certain prepetition claims, the doctrine of necessity should be invoked to permit payment).

39.     The Debtors negotiated extensively to obtain the ability to continue the Securitization Facility pursuant to the Amended Transaction Documents.   Although the Amended Transaction Documents contain certain restrictive provisions and increase certain pricing elements of the Securitization Facility, the Agent and the Purchasers have required these modifications as a condition to continuation of the Securitization Facility.   Allowing the Securitization Facility to continue gives the Debtors the ability to provide and maintain crucial letters of credit on the best terms available.   Based upon the foregoing, the Debtors submit that the relief requested herein is essential, appropriate, and in the best interests of the Debtors' estates and stakeholders.   Absent this relief, the value of the Debtors' estates will suffer, possibly precipitously.   Consequently, the Debtors' stakeholders will benefit if the requested relief is granted.

**B.    The Debtors Should be Authorized to Assume the Amended Transaction Documents and the Collateral Accounts Agreements.**

35.     As outlined above and expressly stated in the Amended Transaction Documents, the sale of the Receivables under the Amended Transaction Documents is a true sale.   Further, the Collateral Accounts Agreements contain ongoing obligations on the part of all parties thereto. Accordingly, the Amended Transaction Documents and the Collateral Accounts Agreements constitute executory contracts, with material obligations of all parties remaining such that the Debtors may assume the Amended Transaction Documents and the Collateral Accounts Agreements under section 365(a) of the Bankruptcy Code.

36.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease

of the debtor." 11 U.S.C. § 365(a).  "It is well established that the question [of] whether a lease should be rejected . . . is one of business judgment."  *Richmond Leasing Co.*, 762 F.2d at 1309 (citation and internal quotation marks omitted).  "As long as assumption of a lease appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision to assume the lease should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code."  *Id.* (citation and internal quotation marks omitted).

37.    The Debtors' decision to continue the Securitization Facility pursuant to the Amended Transaction Documents and the Collection Account Agreements is a sound exercise of the Debtors' business judgment.  As with the Debtors' other business decisions related to continuation of the Securitization Facility, the Debtors' decision to assume the Amended Transaction Documents and the Collection Account Agreements satisfies the business judgment test because it is in the Debtors' best interests to continue performing under the Amended Transaction Documents and the Collection Account Agreements post-petition.  Accordingly, the Court should authorize the Debtors to assume the Amended Transaction Documents and the Collection Account Agreements under section 365 of the Bankruptcy Code.

**C.    The Receivables Purchases Under the Securitization Facility Are Good Faith Purchases and Satisfy Section 363(m) of the Bankruptcy Code.**

40.    Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) of the Bankruptcy Code states the following:

> The reversal or modification on appeal of an authorization under [section 363(b) of the Bankruptcy Code] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

26

11 U.S.C. § 363(m).  "The purpose of § 363(m)'s stay requirement is in furtherance of the policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely."  *In re TMT Procurement Corp.*, 764 F.3d 512, 521 (5th Cir. 2014) (citation and internal quotation marks omitted). "Section 363(m) patently protects, from later modifications on appeal, an authorized sale where the purchaser acted in good faith and the sale was not stayed pending appeal."  *Matter of Gilchrist*, 891 F.2d 559, 560 (5th Cir. 1990).

39.     Although the Bankruptcy Code does not define "good faith," the Fifth Circuit has defined the term  in two ways in the context of section 363(m) of the Bankruptcy Code.  First, it has "defined a 'good faith purchaser' as 'one who purchases the assets for value, in good faith, and without notice of adverse claims.'"  *TMT Procurement Corp.*, 764 F.3d at 521 (citations omitted).  Second, the Fifth Circuit has "noted that 'the misconduct that would destroy a purchaser's good faith status . . . involves fraud, collusion between the purchaser and other bidders of the trustee, or an attempt to take grossly unfair advantage of other bidders.'"  *Id.* (citations omitted).

40.     Here, the requirements of section 363(m) have been satisfied, as the Servicers, the Originators, Dairy Receivables, the Agent, and the Purchasers all acted in good faith in negotiating the Amended Transaction Documents and the terms of the proposed interim Order and final Order.  The negotiations surrounding the terms of these documents were good-faith, arm's-length negotiations in which the principals and advisors of the Servicers and the Originators participated significantly.  The Debtors believe that the Servicers, the Originators, Dairy Receivables, the Agents, and the Purchasers will continue to act in good faith as Receivables are sold under the Securitization Facility in the ordinary course of business.

Accordingly, the Court should issue a finding that these parties are entitled to the protections of section 363(m) of the Bankruptcy Code.

**D.      Section 363(f) of the Bankruptcy Code, if Applicable, Allows for the Sale of the Receivables Free and Clear.**

41.    Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances of an entity other than the estate if any one of the following conditions is satisfied:

  a.    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

  b.    such entity consents;

  c.    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

  d.    such interest is in bona fide dispute; or

  e.    such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Patriot Place, Ltd.*, 486 B.R. 773, 814 (Bankr. W.D. Tex. 2013) ("Section 363(f) of the Bankruptcy Code sets forth five alternative conditions that must be satisfied by the Court to authorize a debtor . . . to sell its property . . . free and clear of interests of a third party.")

42.    Section 363(f) of the Bankruptcy Code is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of claims] is within the court's equitable powers when necessary to carry out the provisions of [the Bankruptcy Code].").

43.     As an initial matter, the Debtors submit that section 363(f) does not apply to the sale of the Receivables by the Originators.  The liens granted under the Debtors' prepetition indebtedness and the DIP Facility expressly do not include liens on the Receivables and proceeds and products thereof.  As a result, the only liens securing the Receivables are those held by Dairy Receivables and assigned to Rabobank, as Agent on behalf of the Purchasers and as LC Bank, which liens were put in place for the purpose of complying with UCC requirements for sales of accounts, as well as protecting such parties in the event that such sales and absolute assignments occurring under the Securitization Facility are recharacterized as loans.  Accordingly, the Debtors are not aware of any lien from which the Receivables could be released.  Under these circumstances, the Debtors do not need to satisfy the requirements of section 363(f) of the Bankruptcy Code.  *See, e.g.*, *Mich. Empl. Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.23 (6th Cir. 1991) ("General unsecured claimants . . . have no specific interest in a debtor's property.  Therefore, section 363 is inapplicable for sales free and clear of such claims.") (quoting *In re White Motor Credit Corp.*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987)); *Rubinstein v. Alaska Pac. Consortium (In re New England Fish Co.)*, 19 B.R. 323, 326 (Bankr. W.D. Wash. 1982) (finding that general unsecured creditors do not have an interest in the property of the estate contemplated by section 363(f) of the Bankruptcy Code).

44.     Nevertheless, the Debtors satisfy the provisions of section 363(f) of the Bankruptcy Code.  Satisfaction of any of the five requirements enumerated in section 363(f) suffices to authorize a debtor's sale of assets free and clear of all interests (*i.e.,* all liens, claims, rights, interests, charges, or encumbrances).  *See In re Kellstrom Indus., Inc.,* 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *In re C-Power Prods., Inc.*, 230 B.R. 800, 803

(Bankr. N.D. Tex. 1998) (same).   The Debtors' satisfy section 363(f) because the Debtors' prepetition financing agreements and the DIP Facility documents permit the sale of the Receivables, and other parties holding security interests in the Receivables, if any, could be compelled to accept a money satisfaction of such interests.  *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 290 (3d Cir. 2003) (section 363(f)(5) is satisfied where the interest in property being sold is subject to monetary valuation); *GBL Holdings Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005) (same). Because the Receivables can be reduced to a monetary amount, sale of the Receivables is authorized under section 363(f)(5).   Accordingly, the Debtors request that the Court approve the ongoing sales of Receivables from the Originators to Dairy Receivables free and clear of all liens, claims, encumbrances, or interests within the meaning of section 363(f) of the Bankruptcy Code.

**E.**      **Modification of the Automatic Stay is Warranted with Respect to the Securitization Facility.**

45.      In connection with the continuation of the Securitization Facility, the Debtors request that this Court modify the automatic stay to permit certain transactions contemplated by the Amended Transaction Documents.   Specifically, pursuant to the Amended Transaction Documents, the Purchasers may deduct Repayment Amounts in respect of prior Receivables from the purchase prices they pay to Dairy Receivables, and the Servicers may deduct these amounts from distributions and deferred payments for existing Receivables and distributions and payments for new Receivables.  The Repayment Amounts effectively operate as setoffs and are either (a) netted from the total purchase price due to the Originators upon the sale of Originators' Receivables to Dairy Receivables or (b) withheld from amounts of proceeds transferred by Dairy Receivables to be distributed through the Debtors' cash management system.  The Repayment

Amounts are conceptually similar to ordinary course bank fees for overdrafts and returned checks.

46.     Pursuant to section 362(d)(l) of the Bankruptcy Code, the Court shall grant relief from the automatic stay imposed thereby "for cause." 11 U.S.C. § 362(d)(1).  "'Cause" is not defined in title 11,  which behooves courts to determine courts to determine whether cause exists in a case-by-case approach." *In re JCP Props. Ltd.*, 540 B.R. 596, 613 (Bankr. S.D. Tex. 2015) (citing *In re Reitnauer*, 152 F.3d 341, 343 n.4 (5th  Cir. 1998)).

47.     The Debtors submit that "cause" exists here to modify the automatic stay to permit the setoff and netting of the Repayment Amounts.  Such modification is limited in scope and is necessary to allow the Securitization Facility to function as it was designed.  Accordingly, the Court should modify the automatic stay, pursuant to section 362(d)(1) of the Bankruptcy Code, to the extent necessary to permit the setoff and netting of the Repayment Amounts.

**F.      The Purchasers Should Be Granted Superpriority Claims Pursuant to Section 364(c)(1) of the Bankruptcy Code.**

48.     In addition, when Dairy Receivables pay the Originators the full purchase price for Receivables that are subsequently reduced by the Repayment Amounts, Dairy Receivables are, in essence, extending the Originators credit to the extent of the Repayment Amounts. Similarly, amounts owing from the Originators to Dairy Receivables, the Agent, or the Purchasers on account of indemnities and other obligations under the Amended Transaction Documents are also, in essence, extensions of credit to the Originators until they are paid.

49.     As a condition to the continuation of the Securitization Facility pursuant to the Amended Transaction Documents, the Agent and the Purchasers have required that they and Dairy Receivables be granted the Superpriority Claims, pursuant to section 364(c) of the Bankruptcy Code, for obligations of the Servicer and the Originators arising under the Amended

31

Transaction Documents.  As agreed among the parties to the Securitization Facility, the Superpriority Claims will be *pari passu* the DIP Superpriority Claims and subject and subordinate to the Carve-Out.

50.     Pursuant to section 364(c) of the Bankruptcy Code, the Court may authorize the grant of a superpriority claim, after notice and a hearing, upon a finding that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(l)" of the Bankruptcy Code. 11 U.S.C. § 364(c).  To satisfy the requirements of section 364(c) of the Bankruptcy Code, courts consider whether (a) the debtor made reasonable effort, but failed, to obtain unsecured credit under sections 364(a) and 364(b) of the Bankruptcy Code, (b) the credit transaction benefits the debtor as necessary to preserve estate assets, and (c) the terms of the credit transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender.  *See In re Republic Airways Holdings Inc.*, 2016 WL 2616717, at *11; *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312–13; *In re Aqua Assoc.*, 123 B.R. 192, 195–99 (Bankr. E.D. Pa. 1991).

51.     However, section 364 imposes no duty to seek credit from every possible lender. *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) (citation omitted).  A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code*.  In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *In re Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving

financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c), to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). This is especially true where time is of the essence.  *See In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987).

52.     Whether a debtor has made sufficient efforts to obtain credit on an unsecured basis is determined on a case by case basis, and debtors are granted particular flexibility when time is of the essence.  *In re Reading Tube Indus.*, 72 B.R. at 332.  In circumstances where only a few lenders likely can or will extend the necessary credit to a debtor on an unsecured or administrative priority basis, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).  *See also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that the requirements of section 364 of the Bankruptcy Code were met); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37–39 (Bankr. S.D.N.Y. 1990) (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b) of the Bankruptcy Code).  Finally, in analyzing whether section 364(c) relief is appropriate, courts "permit debtors-in-possession to exercise

their basic business judgment consistent with their fiduciary duties." *See In re Ames Dep't Stores, Inc.*, 115 B.R. at 37.

53.     The Superpriority Claims meet the standard imposed under section 364(c) and should be approved thereunder.  Although the Superpriority Claims are among the concessions that the Debtors were required to make to continue the Securitization Facility, as previously noted, continuation of the Securitization Facility is necessary to preserve the value of the Debtors' estates.  *See In re W. Pac. Airlines, Inc.*, 223 B.R. 567, 572 (Bankr. D. Colo. 1997) (approving postpetition financing agreement under section 364(c) and (d), even after noting that "the terms of the financing are onerous, costly, and tough," because of benefit that the financing would provide to the debtors' estates).  Moreover, in connection with the marketing process for debtor-in-possession financing, none of the potential lenders were willing to facilitate the issuance of letters of credit on terms that were equal to or more favorable than those provided by Rabobank under the Securitization Facility.  Additionally, the terms of the Securitization Facility are favorable to the Debtors and thus meet the "fair, reasonable, and adequate" requirement under section 364(c).  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 885-86 (Bankr. W.D. Mo. 2003) (finding that amendments to DIP facility were "fair, reasonable, and adequate" even though they represented a "hard bargain" because "[c]hapter 11 post-petition financing is fraught with dangers for creditors," and so "debtors may have to enter into hard bargains to acquire (or continue to receive) the funds needed for reorganization") (internal quotation marks omitted). Further, the obligations of the Originators that give rise to the Superpriority Claims are limited in nature and, therefore, unlikely to accumulate in a significant amount.  Based on the foregoing, the Superpriority Claims meet the requirements of section 364(c) and should be granted by the Court.

**G.      The Court Should Authorize the Securitization Liens Pursuant to Section 364(c)(2) of the Bankruptcy Code.**

54.      As documented in the Amended Transaction Documents, the intent of the parties to the Securitization Facility is that the transfer of the Receivables under those agreements be characterized as true and absolute sales.  Nevertheless, in the event that those transfers are not respected as true sales, and instead recharacterized as loans secured by the Receivables, the Originators have granted the Prepetition Liens to secure repayment of the recharacterized loans. To allow the Securitization Facility to continue to operate as it was designed, the Originators have agreed, pursuant to the Amended Transaction Documents, to grant the Securitization Liens, which cover Receivables and other Pool Assets generated on or after the Petition Date.  In this manner, the Originators effectively seek to extend the Securitization Liens on the Receivables and the other Pool Assets into the postpetition period.

55.      The Servicers' and the Originators' decision to grant the Securitization Liens is a crucial component of the parties' larger agreement to continue the Securitization Facility pursuant to the Amended Transaction Documents.  The Debtors thus submit that the granting of the Securitization Liens, pursuant to section 364(c)(2) of the Bankruptcy Code, is in the best interests of their estates.

56.      The Securitization Liens are limited in nature and serve only to provide the Purchasers with the benefit of the agreed bargain.  The Securitization Liens become relevant only if the postpetition[17] purchases of Receivables under the Amended Transaction Documents are, against the intent of the parties and the provisions of the interim Order and final Order, recharacterized as secured loans.  In such circumstances, the Receivables would be property of

---

[17] As noted above, the Securitization Liens would apply only to those Receivables entering the Securitization Facility on or after the Petition Date.

the relevant Originator's estate, and the Securitization Liens on those Receivables would simply provide the Agent and the Purchasers with the benefit of their respective bargains under the Amended Transaction Documents.

57.     The Court may authorize a debtor to incur postpetition secured debt, pursuant to section 364(c)(2), upon finding that (a) the debtor is unable to obtain unsecured credit with priority under section 503(b)(1); (b) the credit transaction is necessary to preserve the assets of the estate; and (c) the terms of the transaction are fair, reasonable, and adequate.  *See In re St. Mary Hosp.*, 86 B.R. 393, 402 (Bankr. E.D. Pa. 1988) (authorizing the debtor to obtain credit pursuant to section 364(c)(2) of the Bankruptcy Code, after notice and a hearing, upon showing that unsecured credit could not be obtained).  Courts "permit debtors-in-possession to exercise their basic business judgment" in analyzing whether section 364(c) relief should be granted.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. at 37-38.

58.     The Agent and the Purchasers will not continue the Securitization Facility unless the Servicers and the Originators are authorized to grant the Securitization Liens.  As discussed above, the Securitization Facility is the most cost-effective way for the Debtors to obtain and renew the letters of credit issued thereunder, and the DIP Facility does not provide any capacity to issue letters of credit.  As a result, without the Securitization Facility, the Debtors would likely only be able to obtain such letters of credit on more onerous terms, such as fully cash collateralizing such letters of credit.  Moreover, termination of the Securitization Facility would disrupt the Debtors' operations and could immediately impact the Debtors' liquidity.  The Debtors do not believe that any alternative funding source is available to fill the void that would be left by termination of the Securitization Facility in the near term, and such financing would not be available on an unsecured basis.

59.     In the context of their efforts to reorganize or consummate asset sales, the Debtors have determined that continuation of the Securitization Facility, along with entering into the DIP Facility, are essential to preserving their liquidity and continuing their operations during the chapter 11 process.  For these reasons, the Debtors respectfully request that the Court authorize the Servicer and the Originators to grant the Securitization Liens under section 364(c)(2) of the Bankruptcy Code in the event that the transfer of Receivables pursuant to the Securitization Facility is recharacterized as an extension of credit or pledge rather than an absolute sale.

**H.     The Court Should Grant Good Faith Protections Pursuant to Section 364(e) of the Bankruptcy Code.**

60.     Section 364(e) of the Bankruptcy Code protects the validity of a good faith lender's rights under a section 364 postpetition financing agreement even if the order authorizing the debtor to enter into such financing agreement is reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

61.     The Servicers, the Originators, Dairy Receivables, the Agent and the Purchasers have acted in good faith in their prepetition conduct under the Securitization Facility and in negotiating the Amended Transaction Documents.  The Servicers and the Originators expect that such good faith conduct will continue in the parties' postpetition conduct under the Securitization Facility.  Accordingly, to the extent that the Securitization Facility contemplates an extension of credit or the grant of security interests, the Debtors request a finding of fact that

Dairy Receivables, the Agent, and the Purchasers have acted, and continue to act, as good faith lenders, and as such are entitled to the protections of section 364(e) of the Bankruptcy Code.

## I.       Bankruptcy Courts Have Granted the Relief Requested In This Motion.

62.       Given the widespread usage of receivables-purchase programs and the essential role of such programs in preserving liquidity, courts in this and other districts have previously permitted debtors in possession to continue operating comparable receivables purchase facilities and have granted relief similar to that requested in this Motion.  *See, e.g.*, *In re Cloud Peak Energy Inc., et al.*, No. 19-11047 (KG) (Bankr. D. Del. May 5, 2019) (authorizing debtors to enter into amendments to and continuation of accounts receivable securitization facility postpetition, and granting superpriority claims in favor of securitization purchasers pursuant to section 364(c)(1) of the Bankruptcy Code); *accord In re Peabody Energy Corp., et al*., No. 16-42529 (Bankr. E.D. Mo. May 18, 2016); *In re Arch Coal, Inc.*, No. 16-40120 (Bankr. E.D. Mo. Feb. 25, 2016); *In re Residential Capital, LLC*, No. 12-12020 (Bankr. S.D.N.Y. June 25, 2012); *In re AbitibiBowater, Inc.*, No. 09-11296 (Bankr. D. Del. July 1, 2009); *In re Tribune Media Co.*, No. 08-13141 (Bankr. D. Del. Jan. 15, 2009); *In re DJK Residential LLC*, No. 08-10375 (Bankr. S.D.N.Y. Feb. 5, 2008); *In re J.L. French Auto. Castings, Inc.*, No. 06-10119 (Bankr. D. Del. Mar. 3, 2006).

### Debtors' Reservation of Rights

63.       Nothing contained herein is intended or should be construed as, or deemed to constitute, an agreement or admission as to the validity of any claim against the Debtors on any grounds, or a waiver or impairment of the Debtors' rights to dispute any claim on any grounds. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended, and should not be construed, as an admission as to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## Emergency Consideration

64.     Pursuant to Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this Motion under Bankruptcy Rule 6003(b).  Bankruptcy Rule 6003 provides that, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, issue an order granting . . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition . . . ." Fed. R. Bankr. P. 6003.  In addition, Bankruptcy Rule 4001(c) provides that, when presented with a motion for authority to obtain credit, the "court may conduct a hearing before [14 days after service of the motion], but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(c)(2).  For the reasons discussed herein and in the Yi Declaration, authorizing the Debtors to enter into the Amended Transaction Documents, to continue to perform under the Securitization Facility postpetition, and grant the Superpriority Claims, as well as granting the other relief requested herein, is critical to enabling the Debtors to effectively transition to operating as chapter 11 debtors.  Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations and significantly impact the Debtors' ability to reorganize swiftly and efficiently.  As such, the relief requested is necessary in order for the Debtors to operate their businesses in the ordinary course and preserve the ongoing value of the Debtors' operations and maximize the value of their estates for the benefit of all stakeholders.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rules 4001(c) and 6003 to support granting the emergency relief requested herein.

**Compliance with Bankruptcy Rule 6004(a) and Waiver of Bankruptcy Rule 6004(h)**

65.     To implement successfully the relief sought herein, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances.  The Debtors also request that, to the extent applicable to the relief requested in this Motion, the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their businesses without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully submit that ample cause exists to justify the (a) finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and (b) waiving the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

**Notice**

66.     Notice of the Interim Hearing and the relief requested in the Motion has been provided by telecopy, email, overnight courier and/or hand delivery, to (i) the United States Trustee for the Southern District of Texas, (ii) those creditors holding the 30 largest unsecured claims against the Debtors' estates (on a consolidated basis), (iii) White & Case LLP, as counsel to Coöperatieve Rabobank U.A., New York Branch, the administrative agent under Debtors' prepetition receivables purchase agreement and administrative agent under Debtors' prepetition secured revolving credit facility, (iv) indenture trustee under the Debtors' prepetition unsecured bond indenture, (v) Mayer Brown LLP, as counsel to PNC Bank, National Association, the co-agent under Debtors' prepetition receivables purchase agreement, (vi) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to an ad hoc group of prepetition unsecured noteholders,

(vii) the Securities and Exchange Commission, (viii) the Internal Revenue Service, (ix) the United States Attorney's Office for the Southern District of Texas, (x) the state attorneys general for states in which the Debtors conduct business, (xi) all other parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors, and (xii) any party that has requested notice pursuant to Bankruptcy Rule 2002 (the "**Notice Parties**").   A copy of this Motion and any order approving it will also be made available on the Debtors' case information website located at *https://dm.epiq11.com/SouthernFoods*.   Under the circumstances, such notice of the Interim Hearing and the relief requested in the Motion constitutes due, sufficient and appropriate notice and complies with Section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(b) and (c) and 9014, the Local Rules and the Complex Case Rules.

## No Prior Request

67.   The Debtors have not previously sought the relief requested herein from the Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order substantially in the form attached hereto as Exhibit A, granting the relief requested herein and such other and further relief as the Court deems just and proper.

Dated: November 12, 2019
Houston, Texas

Respectfully submitted,

**NORTON ROSE FULBRIGHT US LLP**

*/s/  William R. Greendyke*
William R. Greendyke (SBT 08390450)
Jason L. Boland (SBT 24040542)
Robert B. Bruner (SBT 24062637)
Julie Goodrich Harrison (SBT 24092434)
1301 McKinney Street, Suite 5100
Houston, Texas 77010-3095
Tel.:  (713) 651-5151
Fax:  (713) 651-5246
william.greendyke@nortonrosefulbright.com
jason.boland@nortonrosefulbright.com
bob.bruner@nortonrosefulbright.com
julie.harrison@nortonrosefulbright.com

*-and-*

**DAVIS POLK & WARDWELL LLP**

Brian M. Resnick (*pro hac vice* pending)
Steven Z. Szanzer (*pro hac vice* pending)
Aryeh E. Falk (*pro hac vice* pending)
Nate Sokol (*pro hac vice* pending)
450 Lexington Avenue
New York, New York 10017
Tel.: (212) 450-4000
Fax: (212) 701-5800
brian.resnick@davispolk.com
steven.szanzer@davispolk.com
aryeh.falk@davispolk.com
nathaniel.sokol@davispolk.com

*Proposed Counsel to the Debtors and Debtors in Possession*