

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
12/23/2019

|  |  |
|---|---|
| In re: | Chapter 11 |
| SOUTHERN FOODS GROUPS, LLC, *et al.*, | Case No. 19-36313 (DRJ) |
| Debtors.[1] | (Jointly Administered) |

**FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
506, 507, AND 552 AND RULES 2002, 4001, 6003, 6004, AND 9014 OF
THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (I) AUTHORIZING THE
DEBTORS TO (A) OBTAIN SENIOR SECURED SUPERPRIORITY POST-PETITION
FINANCING, AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND
SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) PROVIDING
ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, AND
(IV) GRANTING RELATED RELIEF**

Upon the motion, dated November 12, 2019 (the "<u>Motion</u>"),[2] of Dean Foods Company

("<u>Dean Foods</u>" or "<u>DIP Borrower</u>") and certain of its affiliates, the debtors and debtors-in-

possession (collectively, the "<u>Debtors</u>") in the above-captioned chapter 11 cases (the "<u>Cases</u>"),

seeking the entry of the Interim Order (as defined below) and a final order (this "<u>Final Order</u>")

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows:  Southern Foods Group, LLC (1364); Dean Foods Company (9681); Alta-Dena Certified Dairy, LLC (1347); Berkeley Farms, LLC (8965); Cascade Equity Realty, LLC (3940); Country Fresh, LLC (6303); Dairy Information Systems Holdings, LLC (9144); Dairy Information Systems, LLC (0009); Dean Dairy Holdings, LLC (9188); Dean East II, LLC (9192); Dean East, LLC (8751); Dean Foods North Central, LLC (7858); Dean Foods of Wisconsin, LLC (2504); Dean Holding Company (8390); Dean Intellectual Property Services II, Inc. (3512); Dean International Holding Company (9785); Dean Management, LLC (7782); Dean Puerto Rico Holdings, LLC (6832); Dean Services, LLC (2168); Dean Transportation, Inc. (8896); Dean West II, LLC (9190); Dean West, LLC (8753); DFC Aviation Services, LLC (1600); DFC Energy Partners, LLC (3889); DFC Ventures, LLC (4213); DGI Ventures, Inc. (6766); DIPS Limited Partner II (7167); Franklin Holdings, Inc. (8114); Fresh Dairy Delivery, LLC (2314); Friendly's Ice Cream Holdings Corp. (7609); Friendly's Manufacturing and Retail, LLC (9828); Garelick Farms, LLC (3221); Mayfield Dairy Farms, LLC (3008); Midwest Ice Cream Company, LLC (0130); Model Dairy, LLC (7981); Reiter Dairy, LLC (3675); Sampson Ventures, LLC (7714); Shenandoah's Pride, LLC (2858); Steve's Ice Cream, LLC (6807); Suiza Dairy Group, LLC (2039); Tuscan/Lehigh Dairies, Inc. (6774); Uncle Matt's Organic, Inc. (0079); and Verifine Dairy Products of Sheboygan, LLC (7200). The debtors' mailing address is 2711 North Haskell Avenue, Suite 3400, Dallas, TX 75204.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion or the DIP Credit Agreement (as defined below), as applicable.

pursuant to Sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "<u>Bankruptcy Rules</u>"), the Local Bankruptcy Rules for the Southern District of Texas (the "<u>Local Rules</u>"), and the Procedures for Complex Chapter 11 Bankruptcy Cases (the "<u>Complex Case Rules</u>") promulgated by the United States Bankruptcy Court for the Southern District of Texas (I) authorizing the Debtors to (A) obtain senior secured superpriority post-petition financing, and (B) use cash collateral, (II) granting liens and superpriority administrative expense claims, (III) providing adequate protection to the Prepetition Secured Parties (as defined below), (IV) scheduling a final hearing, and (V) granting related relief, the Debtors sought, among other things, the following relief:

(i)      the Court's authorization for the DIP Borrower to obtain, and for each subsidiary of the DIP Borrower that is a Debtor in these Cases (collectively, the "<u>DIP Guarantors</u>" and, together with the DIP Borrower, the "<u>DIP Loan Parties</u>") to guarantee (unconditionally and on a joint and several basis) senior, secured, superpriority, priming, debtor-in-possession financing in an aggregate principal amount of $425,000,000 (the "<u>DIP Facility</u>"), participation in which has been offered to each of the Prepetition Revolving Lenders (as defined below) on a *pro rata* basis, consisting of: (A) a new money revolving credit facility in the aggregate principal amount of up to $236,200,000 (the "<u>DIP Revolving Facility</u>"), which shall be available for the incurrence of new money revolving loans (the "<u>DIP Revolving Loans</u>"), including, up to a $25,000,000 sub-limit (the "<u>DIP L/C Sub-Limit</u>"), and subject to certain conditions thereon, the issuance of letters of credit (the "<u>DIP Letters of Credit</u>"); and (B) term loans (the "<u>DIP Roll-Up</u>

Loans" and, together with the DIP Revolving Loans, the "<u>DIP Loans</u>"; and the DIP Loans, collectively, with the DIP Letters of Credit and with any other financial accommodations provided for, under, or in respect of the DIP Facility, the "<u>DIP Extensions of Credit</u>") in an aggregate principal amount not to exceed the aggregate principal amount of all Prepetition Revolving Loans outstanding as of the Petition Date (as defined below), which Prepetition Revolving Loans shall be, on a dollar-for-dollar basis, refinanced as (and deemed repaid by) the DIP Roll-Up Loans (the "<u>Revolver Refinancing</u>");

(ii)     the Court's authorization for the Debtors, subject to satisfaction (or waiver) of all applicable conditions precedent under the DIP Loan Documents (as defined below) in accordance therewith:

(a)     during the period from the date of entry of the Interim Order through and including the date of entry of this Final Order (the "<u>Interim Period</u>") in accordance with the terms of the DIP Credit Agreement (as defined below), to (1) incur DIP Revolving Loans and (2) subject to, and to the extent of any availability under, the DIP L/C Sub-Limit, obtain issuance of DIP Letters of Credit, in an aggregate principal amount (with respect to DIP Revolving Loans and any DIP Letters of Credit) not to exceed $50,000,000;

(b)     from the entry of this Final Order until the Termination Date, in accordance with the terms of the DIP Credit Agreement, to continue to incur DIP Revolving Loans and subject to, and to the extent of any availability under, the DIP L/C Sub-Limit, obtain issuance of DIP Letters of Credit, in an aggregate

principal amount not to exceed $236,200,000 (including the aggregate amount borrowed under the DIP Facility during the Interim Period); and

(c)      immediately upon the entry of this Final Order, to incur DIP Roll-Up Loans in an aggregate principal amount not to exceed $188,800,000 and consummate the Revolver Refinancing;

(iii)      the Court's authorization for the Debtors to enter into, execute and deliver documentation evidencing the DIP Facility, including, without limitation, the Senior Secured Superpriority Debtor-in-Possession Credit Agreement, by and among, the DIP Borrower, Coöperatieve Rabobank U.A., New York Branch ("Rabobank"), as arranger, Rabobank, as administrative agent and as collateral agent (in such capacities, collectively, the "DIP Agent"), and as the Issuing Bank (in such capacity, the "DIP Issuing Bank"), the financial institutions from time to time party thereto as lenders (the "DIP Lenders" and, together with the DIP Agent, the DIP Issuing Bank, and each other Holder of Secured Obligations under and as defined in the DIP Credit Agreement, the "DIP Secured Parties"), in substantially the form attached as Exhibit 1 to the Interim Order (the "DIP Credit Agreement" and, collectively with this Final Order, the Interim Order (as applicable), and all other Loan Documents (as defined in the DIP Credit Agreement), including, without limitation, all fee letters and agreements entered into in connection therewith, in each case, as thereafter amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, collectively, the "DIP Loan Documents"), in each case, to which they are a party, and to perform such other and further acts as may be necessary or appropriate in connection therewith, or otherwise required under the DIP Loan Documents;

(iv)     the Court's authorization for the Debtors to use the proceeds of the DIP Facility in accordance with the 13-week cash flow forecast prepared by the Debtors and annexed as <u>Exhibit 2</u> to the Interim Order (as updated from time to time pursuant to the DIP Loan Documents and subject to the prior approval of the Required Lenders, the "<u>DIP Budget</u>" (and upon two (2) Business Days' prior notice (to the extent reasonably practicable under the circumstances) having been given to Committee Counsel (as defined below), <u>provided</u> that failure to give notice shall not affect the validity of the updated DIP Budget and that such notice shall not be deemed to create any Committee approval rights))[3], subject to any permitted variances (as and to the extent provided in the DIP Credit Agreement, the "<u>Permitted Variances</u>"), and as otherwise provided herein and in the other DIP Loan Documents;

(v)     the granting by the Court, as of the Petition Date (as defined below), to the DIP Agent (for the benefit of the DIP Secured Parties) in respect of the DIP Obligations (as defined below), of a superpriority administrative expense claim pursuant to Section 364(c)(1) of the Bankruptcy Code and first priority priming liens on and security interests in substantially all assets and property of the Debtors (now owned or hereafter acquired), pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code, in each case, as and to the extent, and subject to the priorities, set forth more fully below and in the DIP Loan Documents, and subject to the Carve-Out (as defined below);

---

[3]  For the avoidance of doubt, any waiver or consent to a budget variance entered into by the Debtors and the DIP Agent (with the consent of the requisite DIP Secured Parties as provided in and consistent with their respective rights under the DIP Loan Documents, and upon prior notice (to the extent reasonably practicable under the circumstances) of any such consent being given to Committee Counsel (<u>provided,</u> that failure to give notice shall not affect the validity of any DIP Budget or any consent given to any budget variance, and that such notice shall not be deemed to create any Committee approval rights)) pursuant to the DIP Credit Agreement shall be deemed a waiver or consent with respect to any provision in this Final Order requiring compliance with, or providing authorization subject to, the DIP Budget as it pertains to the applicable budget variance.

(vi)     the Court's authorization for the Debtors to use "cash collateral" as such term is defined in Section 363 of the Bankruptcy Code (the "Cash Collateral") in which the Prepetition Secured Parties have an interest;

(vii)    the granting by the Court, as of the Petition Date, of the Adequate Protection Superpriority Claim and Adequate Protection Liens (each as defined below), to the extent of and as compensation for any Diminution in Value (as defined below), and the payment of fees and expenses to the Prepetition Agent (as defined below) for the benefit of the Prepetition Secured Parties, in each case, as set forth more fully below and subject to paragraph I hereof and to the Carve-Out; and

(viii)   modification by the Court of the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility, this Final Order and the other DIP Loan Documents;

(ix)     the scheduling by the Court of a Final Hearing (as defined below) to consider entry of this Final Order granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing and the transactions contemplated by the Motion; and

(x)      the waiver by the Court of any applicable stay (including under Bankruptcy Rule 6004) and provision for the immediate effectiveness of this Final Order; and

the Court having jurisdiction to consider the matters raised in the Motion pursuant to U.S.C. § 1334; and the Court having authority to hear the matters raised in the Motion pursuant to 28 U.S.C. § 157; and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and consideration of the Motion and the requested relief being a core proceeding that the Court

can determine pursuant to 28 U.S.C. § 157(b)(2); and due and proper notice of the Motion and opportunity for a hearing on the Motion having been given to the parties listed therein, and it appearing that no other or further notice need be provided; and the Court having reviewed and considered the Motion, the *Declaration of Gary Ralhfs in Support of the First Day Motions and Pursuant to Local Bankruptcy Rule 1007-2* (the "<u>First Day Declaration</u>"), and *the Declaration of Bo S. Yi in Support of the Motion* (the "<u>DIP Declaration</u>," and together with the First Day Declaration, the "<u>DIP Declarations</u>"); and the Court having held a hearing on November 13, 2019 to consider entry of the Interim Order (the "<u>Interim Hearing</u>"); and the Court having held a hearing on December [20], 2019 to consider entry of this Final Order (the "<u>Final Hearing</u>"); and the Court having entered on November 14, 2019 the *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,506, 507, and 552 and Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Post-Petition Financing, and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Providing Adequate Protection to Prepetition Secured Parties, (IV) Scheduling Final Hearing, and (V) Granting Related Relief* [Docket No. 133] (the "<u>Interim Order</u>"); and the Court having determined that the legal and factual bases set forth in the Motion and in the Declarations, and at the Interim Hearing and Final Hearing establish just cause for the relief granted herein; and the Court having found the relief requested in the Motion to be fair, reasonable, and in the best interests of the Debtors, their creditors, their estates, and all other parties in interest; and the Court having determined that the relief requested in the Motion is essential for the continued operation of the Debtors' businesses; and all objections, if any, to the entry of this Final Order having been withdrawn, resolved or

overruled by the Court; and upon all of the proceedings had before the Court; after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[4]**

A.     **Petition Date.**   On November 12, 2019 (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "<u>Court</u>") commencing these Cases.   The Debtors have continued in the management and operation of their businesses and properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.   No trustee or examiner has been appointed in the Cases.

B.     **Jurisdiction and Venue.**   The Court has jurisdiction over these proceedings, pursuant to 28 U.S.C. § 1334.   Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).   Venue for the Cases and the proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.   Pursuant to Bankruptcy Rule 7008 and Local Rule 7008-1, the Debtors consent to the entry of a final order by the Court in connection with the Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

C.     **Committee Formation.**   On November 22, 2019, the United States Trustee for the Southern District of Texas (the "<u>U.S. Trustee</u>") appointed an official committee of unsecured creditors in the Cases (the "<u>Committee</u>").

---

[4] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.   To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.   To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

D.    **Notice**.  Notice of the Final Hearing and the relief requested in the Motion has been provided by telecopy, email, overnight courier and/or hand delivery, to (i) the U.S. Trustee, (ii) those creditors holding the 30 largest unsecured claims against the Debtors' estates (on a consolidated basis), (iii) White & Case LLP, as counsel to Coöperatieve Rabobank U.A., New York Branch, the administrative agent under Debtors' prepetition receivables purchase agreement and administrative agent under Debtors' prepetition secured revolving credit facility, (iv) the indenture trustee under the Debtors' prepetition unsecured bond indenture, (v) Mayer Brown LLP, as counsel to PNC Bank, National Association, the predecessor co-agent, purchaser, and letter of credit issuer under the Receivables Financing Agreement (as defined below), (vi) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to an ad hoc group of prepetition unsecured noteholders, (vii) Akin Gump Strauss Hauer & Feld LLP, as counsel to the Committee ("Committee Counsel"), (viii) the Securities and Exchange Commission, (ix) the Internal Revenue Service, (x) the United States Attorney's Office for the Southern District of Texas, (xi) the state attorneys general for states in which the Debtors conduct business, (xii) all other parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors, and (xiii) any party that has requested notice pursuant to Bankruptcy Rule 2002 (the "Notice Parties").  Such notice of the Final Hearing and the relief requested in the Motion constitutes due, sufficient and appropriate notice and complies with Section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(b) and (c) and 9014, the Local Rules and the Complex Case Rules.

E.    **Prepetition Obligations.**  Without limiting the rights of the Committee or any other party in interest, in each case, with standing and requisite authority, as and to the extent set

forth in paragraph 6 hereof, the Debtors permanently, immediately, and irrevocably acknowledge, represent, stipulate and agree:

    (i)    <u>Prepetition Revolving Credit Facility</u>

    (a)    Dean Foods, as borrower, each lender party thereto from time to time (the "<u>Prepetition Revolving Lenders</u>"), and Rabobank, as administrative agent and collateral agent (in such capacities, the "<u>Prepetition Agent</u>," and together with the Prepetition Revolving Lenders, and the Issuing Bank and each other Holder of Secured Obligations under (and in each case as defined in) the Prepetition Revolving Credit Agreement (as defined below), the "<u>Prepetition Secured Parties</u>"), are parties to that certain Credit Agreement, dated as of February 22, 2019 (as amended, amended and restated, waived, supplemented and/or modified from time to time, the "<u>Prepetition Revolving Credit Agreement</u>" and, together with the Prepetition Security Agreement and the Prepetition Guaranty (each as defined below), and the other Loan Documents (as defined in the Prepetition Revolving Credit Agreement), in each case, as amended, amended and restated, waived, supplemented and/or modified from time to time, the "<u>Prepetition Loan Documents</u>"), which provided for a revolving borrowing base credit facility in the aggregate principal amount of up to $265,000,000 (which amount was increased by $85,000,000 to an aggregate principal amount of up to $350,000,000 as of August 27, 2019, pursuant to certain supplements to the Prepetition Revolving Credit Agreement), including a letter of credit sub-limit of up to $25,000,000 and swingline availability in an aggregate principal amount of up to $10,000,000 (the "<u>Prepetition Revolving Credit Facility</u>").

(b)     Pursuant to that certain Guaranty, dated as of February 22, 2019 (as amended, amended and restated, waived, supplemented and/or modified from time to time, the "Prepetition Guaranty"), each of the subsidiaries of Dean Foods party thereto from time to time (together with Dean Foods, as borrower, the "Prepetition Loan Parties") unconditionally guaranteed on a joint and several basis the Prepetition Obligations (as defined below), which guaranty is secured by the Prepetition Collateral (as defined below).

(c)     Pursuant to that certain Pledge and Security Agreement, dated as of February 22, 2019 (as amended, amended and restated, waived, supplemented and/or modified from time to time, the "Prepetition Security Agreement") and the other Prepetition Loan Documents, the Prepetition Obligations owed to the Prepetition Secured Parties are secured by first priority Liens (as defined in the Prepetition Revolving Credit Agreement, the "Prepetition Liens") on, and security interests in, all of the Collateral (as defined in the Prepetition Revolving Credit Agreement), collectively, the "Prepetition Collateral").

(ii)     Receivables Financing

(a)     Dairy Group Receivables, L.P. ("Dairy Group") and Dairy Group Receivables II, L.P. (together with Dairy Group, the "Receivables Sellers"), as sellers, certain subsidiaries of Dean Foods who originated the receivables sold to the Receivables Sellers, as Servicers (as defined in the Receivables Financing Agreement (as defined below), the "Receivables Financing Servicers"), the Purchasers (as defined in the Receivables Financing Agreement, the "Receivables Purchasers"), Rabobank, as agent for the Receivables Purchasers (in such

capacity, the "Receivables Financing Agent"), and as issuer of letters of credit (in such capacity, the "Receivables LC Issuer"), are parties to that certain Eighth Amended and Restated Receivables Purchase Agreement, dated as of February 22, 2019 (as amended by the Ninth Amended and Restated Receivables Purchase Agreement, dated on or before the Effective Date under and as defined in the DIP Credit Agreement, and as may be further amended and restated, waived, supplemented and/or modified from time to time, the "Receivables Financing Agreement" and, together with the other Transaction Documents (as defined in the Receivables Financing Agreement), the "Receivables Financing Documents"), which provided for a receivables securitization facility in the aggregate principal amount of up to $450,000,000, which was reduced to $425,000,000 upon entry by the Court of the *Interim Order Pursuant to 11 U.S.C. §§ 105, 362, 363, 364, 503(b), 507(b) and Rules 4001, 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Certain Debtors to Continue Selling Receivables and Related Rights Pursuant to a Securitization Facility, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* [Docket No. 110] (the "Interim Securitization Order," and together with the final order approving the continuation and amendment of the Receivables Purchase Agreement on a final basis, in each case, as applicable the "Securitization Order"), including the ability to issue letters of credit up to an aggregate face amount of $450,000,000, which was also reduced to $425,000,000 upon entry of the Interim Securitization Order (collectively, the "Receivables Financing"), pursuant to which the Receivables Sellers sold certain accounts

- 12 -

receivables belonging to certain subsidiaries of Dean Foods to the Receivables Purchasers.

(b)     Notwithstanding that transfers of the Transferred Receivables pursuant to (and as defined in) the Receivables Financing Agreement are intended to be true sales, the Obligations under (and as defined in) the Receivables Financing Agreement owed by Receivables Sellers and the Receivables Financing Servicers to the Receivables Purchasers are secured by first priority protective liens on, and security interests in, the  Transferred Receivables and other Pool Assets (as defined in the Receivables Financing Agreement, and collectively with the Transferred Receivables, the "Receivables Financing Collateral").

(c)     Pursuant to (i) that certain Fifth Amended and Restated Performance Undertaking, dated February 22, 2019 (as amended pursuant to that certain Sixth Amended and Restated Performance Undertaking, dated as of the Closing Date, and as may be further amended, restated, supplemented, or otherwise modified from time to time) and (ii) that certain Fourth Amended and Restated Performance Undertaking, dated as of February 22, 2019 (as amended pursuant to that certain Fifth Amended and Restated Performance Undertaking, dated on or before the Effective Date under and as defined in the DIP Credit Agreement, and as may be further amended, restated, supplemented or otherwise modified from time to time), the DIP Borrower has provided to the Receivables Financing Agent, for itself and for the benefit of the Receivables Purchasers and the applicable Receivables Sellers, an absolute, unconditional and continuing guaranty of the full and punctual performance by each of the Receivables

Financing Originators of certain obligations under the Receivables Financing Documents.

(iii)     <u>Prepetition Unsecured Notes</u>.  Pursuant to that certain Indenture, dated as of February 25, 2015 (as amended, amended and restated, waived, supplemented and/or modified from time to time, the "<u>Prepetition Indenture</u>"), among Dean Foods, as issuer, The Bank of New York Mellon Trust Company, N.A., as trustee, and the Guarantors (as defined in the Prepetition Indenture), Dean Foods issued 6.50% Senior Notes due March 15, 2023 in an aggregate principal amount of $700,000,000.

(iv)     <u>Intercreditor Agreement</u>.  The respective rights of the Prepetition Secured Parties, on the one hand, and the Receivables Purchasers and Receivables  Sellers, on the other hand, to, and the priority of their respective rights to and security interests in, the Lender Collateral and the Securitization Assets (each as defined therein), are set forth in that certain Intercreditor Agreement, dated as of February 22, 2019, among certain of the Debtors, the Prepetition Agent and the Receivables Financing Agent (as amended, amended and restated, waived, supplemented and/or modified from time to time, the "<u>Intercreditor Agreement</u>").

F.     **<u>Stipulations as to Prepetition Obligations</u>**.  Without limiting the rights of the Committee or any other party in interest, in each case, with standing and requisite authority, as and to the extent set forth in paragraph 6 hereof, the Debtors permanently, immediately, and irrevocably acknowledge, represent, stipulate and agree:

(i)     <u>Prepetition Obligations</u>.

(a)     As of the Petition Date, the Prepetition Loan Parties were justly and lawfully indebted and liable to the Prepetition Secured Parties under the

Prepetition Loan Documents, without objection, defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $188,800,000  on account of outstanding Loans under (and as defined in) the Prepetition Revolving Credit Agreement (the "Prepetition Revolving Loans"), plus all accrued and unpaid interest thereon, and any fees, expenses, indemnification obligations, guarantee obligations, reimbursement obligations, including, without limitation, any attorneys', accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable to or reimbursable by the Prepetition Loan Parties, and all other Secured Obligations under (and as defined in) the Prepetition Revolving Credit Agreement (collectively, the "Prepetition Obligations").

(b)     **Enforceability of the Prepetition Obligations.**     (i) The Prepetition Obligations constitute legal, valid, binding, non-avoidable obligations of the Prepetition Loan Parties enforceable in accordance with the terms of the applicable Prepetition Loan Documents, and (ii) no offsets, recoupments, challenges, contests, attacks, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or the Prepetition Obligations exist, and no portion of the Prepetition Liens or the Prepetition Obligations is subject to any challenge, cause of action, or defense, including avoidance, disallowance, disgorgement, subordination (equitable or otherwise), re-characterization, or other challenge of any kind or nature under the Bankruptcy Code, applicable non-bankruptcy law or otherwise.

(c)     **Enforceability of Prepetition Liens.**     The Prepetition Liens granted by the Prepetition Loan Parties, to or for the benefit of the Prepetition

- 15 -

Agent and the other Prepetition Secured Parties, as security for the Prepetition Obligations, encumber the Prepetition Collateral, as the same existed on or at any time prior to the Petition Date. The Prepetition Liens have been properly recorded and perfected under applicable non-bankruptcy law, and are legal, valid, enforceable, non-avoidable, and not subject to contest, avoidance, attack, offset, re-characterization, subordination or other challenge of any kind or nature under the Bankruptcy Code, applicable non-bankruptcy law or otherwise. As of the Petition Date, and without giving effect to the Interim Order or this Final Order, the Debtors are not aware of any liens or security interests over the Prepetition Collateral of the Prepetition Secured Parties having priority over the Prepetition Liens, except certain Permitted Liens (as defined in the Prepetition Revolving Credit Agreement). The Prepetition Liens were granted to or for the benefit of the Prepetition Agent and the other Prepetition Secured Parties for fair consideration and reasonably equivalent value, and were granted contemporaneously with, or covenanted to be provided as inducement for, the making of the loans and/or commitments and other financial accommodations secured thereby.

(ii)      **Indemnity.** The Prepetition Secured Parties and the DIP Secured Parties have acted in good faith, and without negligence, misconduct or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting or obtaining requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens (as defined below) and any Adequate Protection Liens, any challenges or objections to the DIP Facility or the use of Cash Collateral, the DIP Loan Documents,

and all other documents related to and all transactions contemplated by the foregoing. Accordingly, without limitation to any other right to indemnification (including any and all rights of the Prepetition Secured Parties to indemnification under the Prepetition Loan Documents), the DIP Secured Parties shall be and hereby are indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related thereto in accordance with the terms of the DIP Loan Documents. No exception or defense in contract, law or equity existed as of the date of the Interim Order or exists as of the date of this Final Order to any obligation set forth, as the case may be, in this paragraph F(ii), in the DIP Loan Documents, or in the Prepetition Loan Documents to indemnify and/or hold harmless the DIP Agent, any other DIP Secured Party, or any Prepetition Secured Party, as the case may be, and any such defenses are hereby waived.

(iii)    **No Control.**  None of the DIP Secured Parties or the Prepetition Secured Parties are control persons or insiders of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the DIP Facility, the Prepetition Obligations, the DIP Loan Documents and/or the Prepetition Loan Documents.

(iv)    **No Claims or Causes of Action.**  As of the date hereof, there exist no claims or causes of action against any of the DIP Agent, the other DIP Secured Parties, or the Prepetition Secured Parties with respect to, in connection with, related to, or arising from the DIP Loan Documents, the Prepetition Loan Documents, the DIP Facility, the DIP Obligations and/or the Prepetition Obligations that may be asserted by the DIP Loan

Parties, the Prepetition Loan Parties or, to the Debtors' knowledge, any other person or entity.

(v) **Release.** The Debtors, on behalf of themselves and their respective estates, forever and irrevocably release, discharge, and acquit all former, current and future DIP Secured Parties and any Prepetition Secured Parties, all holders of participation interests under the DIP Credit Agreement or the Prepetition Revolving Credit Agreement, all Affiliates of the DIP Secured Parties and of the Prepetition Secured Parties, and each of the former, current and future officers, employees, directors, agents, representatives, owners, members, partners, financial and other advisors and consultants, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors and successors in interest of each DIP Secured Party and each Prepetition Secured Party and of each of their respective Affiliates, in each case in its capacity as such (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the DIP Obligations, the DIP Loan Documents, the Prepetition Obligations and the other Prepetition Loan Documents and/or the transactions contemplated hereunder or thereunder including, without limitation, (x) any so-called "lender liability" or equitable

subordination claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the DIP Agent, the other DIP Secured Parties, and/or the Prepetition Secured Parties. The Debtors further waive and release any defense, right of counterclaim, right of setoff or deduction of the payment of the Prepetition Obligations and the DIP Obligations that the Debtors now have or may claim to have against the Releasees arising out of, connected with, or relating to any and all acts, omissions or events occurring prior to the entry of this Final Order.

G.     **Immediate Need for Postpetition Financing and Use of Cash Collateral.** Good cause has been shown for entry of this Final Order. An immediate need exists for the Debtors to continue to obtain funds and liquidity to, as the case may be, continue operations, pay the costs and expenses of administering the Cases, and administer and preserve the value of their businesses and estates. The ability of the Debtors to finance their operations, to preserve and maintain the value of the Debtors' assets and to maximize the return for all creditors requires the continued availability of the DIP Facility and use of Cash Collateral. In the absence of the continued availability of such funds and liquidity in accordance with the terms hereof, the continued operation of the Debtors' businesses would not be possible, and immediate and irreparable harm to the Debtors and their estates and creditors would occur. Further, the possibility for a successful restructuring would be jeopardized in the absence of the availability of funds in accordance with the terms of this Final Order. Thus, the ability of the Debtors to preserve and maintain the value of their assets and maximize the return for creditors requires the availability of working capital from the DIP Facility and the use of Cash Collateral.

H.    **No Credit Available on More Favorable Terms.**  The Debtors have been unable to obtain on more favorable terms and conditions than those provided in this Final Order and the Interim Order, (i) adequate unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense, (ii) credit for money borrowed with priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code, (iii) credit for money borrowed secured by a lien on property of the estate that is not otherwise subject to a lien, or (iv) credit for money borrowed secured by a junior lien on property of the estate that is subject to a lien.  The Debtors are unable to obtain credit for borrowed money without granting the DIP Liens and the DIP Superpriority Claim (as defined below) to (or for the benefit of) the DIP Secured Parties, or without granting the adequate protection (including authorization for the Revolver Refinancing) as and to the extent set forth herein and in the Interim Order.

I.    **Adequate Protection for Secured Parties.**  The Prepetition Agent and the other Prepetition Secured Parties have negotiated in good faith regarding the Debtors' use of Prepetition Collateral (including Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses, in accordance with the terms hereof and the DIP Budget (subject to any Permitted Variances).  The Prepetition Secured Parties agreed to permit the Debtors to use the Prepetition Collateral, including the Cash Collateral, in accordance with the terms hereof, including the DIP Budget (subject to any Permitted Variances), subject to the terms and conditions set forth in this Final Order and in the other DIP Loan Documents, including the protections afforded parties acting in "good faith" under Section 363(m) of the Bankruptcy Code.  The Prepetition Secured Parties are entitled to the adequate protection as and to the extent set forth herein pursuant to Sections 361, 362, and 363 of the Bankruptcy Code.

Based on the Motion and on the record presented to the Court at the Interim Hearing and the Final Hearing, the terms of the proposed adequate protection arrangements and of the use of Prepetition Collateral (including Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the Prepetition Agent and Prepetition Secured Parties' consent thereto; provided, that nothing in this Final Order, the Interim Order, or the other DIP Loan Documents shall (i) be construed as a consent by any Prepetition Secured Party that it would be adequately protected in the event any debtor-in-possession financing is provided by a third party (i.e., other than the DIP Lenders), or a consent to the terms of any financing or use of Cash Collateral, including the consent to any lien encumbering the Prepetition Collateral (whether senior or junior) pursuant to any financing or use of Cash Collateral, in each case, except under the terms hereof, or (ii) prejudice, limit or otherwise impair the rights of the Prepetition Agent (for the benefit of the Prepetition Secured Parties) to seek new, different or additional adequate protection under any circumstances after the date hereof.  For the avoidance of doubt, the adequate protection granted by this Final Order applies in respect of (1) solely until the date of consummation of the Revolver Refinancing, the Prepetition Revolving Loans that are converted to or deemed refinanced by the DIP Roll-Up Loans hereunder, (2) all other Prepetition Obligations that are not converted to or deemed refinanced by the DIP Roll-Up Loans (including any indemnification obligations), and (3) any DIP Roll-Up Loans that, whether as a result of a successful Challenge or otherwise, are unwound or converted back into Prepetition Obligations.

J.      **Section 552.**  In light of, as applicable, the subordination of the Prepetition Liens (and any Adequate Protection Liens) to the DIP Liens and the Carve-Out, and the granting of the DIP Liens on the Prepetition Collateral, the Prepetition Secured Parties are each entitled to all of

the rights and benefits of Section 552(b) of the Bankruptcy Code, and the "equities of the case" exception shall not apply.

K.  **Extension of Financing.**  The DIP Secured Parties committed to provide financing to the Debtors in accordance with the DIP Credit Agreement and the other DIP Loan Documents (including the DIP Budget, subject to any Permitted Variances), and subject to (i) the entry of the Interim Order, the entry of this Final Order, and approval of each provision of the DIP Loan Documents, and (ii) findings by this Court that such financing is essential to the Debtors' estates (and the continued operation of the DIP Loan Parties), that the DIP Secured Parties are good faith financiers, and that the DIP Secured Parties' claims, superpriority claims, security interests and liens and other protections granted pursuant to and in connection with the Interim Order, this Final Order and the DIP Loan Documents (including the DIP Superpriority Claim and the DIP Liens), will not be affected by any subsequent reversal, modification, vacatur, stay or amendment of, as the case may be, this Final Order, the Interim Order, or any other order, as provided in Section 364(e) of the Bankruptcy Code.  The Prepetition Secured Parties have consented to the use of the Prepetition Collateral and the Cash Collateral, solely in respect of the DIP Facility provided by the DIP Agent and the DIP Lenders, and not in respect of any other postpetition financing or cash collateral facility.

L.  **Business Judgment and Good Faith Pursuant to Section 364(e).**

(i)  The terms and conditions of the DIP Facility, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.

(ii)     All obligations incurred, payments made, and transfers or grants of security set forth in this Final Order, the Interim Order, and the other DIP Loan Documents by any DIP Loan Party are (and were) granted to or for the benefit of the DIP Secured Parties for fair consideration and reasonably equivalent value, and are (and were) granted contemporaneously with the making of the loans and/or commitments and other financial accommodations secured thereby.

(iii)     The DIP Facility and the DIP Loan Documents were negotiated in good faith and at arm's length among the Debtors, the DIP Agent, the other DIP Secured Parties, and the Prepetition Secured Parties.

(iv)     The use of the proceeds to be extended under the DIP Facility and the DIP Loan Documents will be so extended in good faith and for valid business purposes and uses, as a consequence of which the DIP Secured Parties are entitled to the protection and benefits of Section 364(e) of the Bankruptcy Code.

M.     **Relief Essential; Best Interest.**  The relief requested in the Motion (and provided in this Final Order), is necessary, essential and appropriate for the continued operation of the Debtors' businesses and the management and preservation of the Debtors' assets and property, and satisfies the requirements of Bankruptcy Rule 6003.  It is in the best interest of the Debtors' estates, and consistent with the Debtors' exercise of their fiduciary duties, that the Debtors be allowed to enter into the DIP Facility, incur the DIP Obligations, grant the liens and claims contemplated herein and under the DIP Loan Documents to the DIP Secured Parties and the Prepetition Secured Parties, and use Prepetition Collateral, including Cash Collateral, as contemplated herein.

**NOW, THEREFORE,** on the Motion of the Debtors and the record before this Court with respect to the Motion, including the record made during the Interim Hearing and the record made during the Final Hearing, and with the consent of the Debtors, the Prepetition Secured Parties and the DIP Secured Parties, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1.     **Motion Granted.**   The Motion is granted in accordance with the terms and conditions set forth in this Final Order.  Any objections to the Motion with respect to entry of this Final Order to the extent not withdrawn, waived or otherwise resolved, and all reservation of rights included therein, are hereby denied and overruled.

2.     **DIP Facility.**

(a)     **DIP Obligations, etc.**   The Debtors are expressly and immediately authorized and empowered, on a final basis, to enter into the DIP Facility and to continue to incur and to perform all obligations under the DIP Facility (including the DIP Obligations) in accordance with and subject to this Final Order and the other DIP Loan Documents, to enter into, execute and/or deliver (to the extent not previously entered into, executed or delivered) all DIP Loan Documents and all other instruments, certificates, agreements and documents, and to take all actions, which may be reasonably required or otherwise necessary for the performance by the DIP Loan Parties under the DIP Facility, including the creation and perfection of the DIP Liens described and provided for herein.  The Debtors are hereby authorized and directed to (i) pay (to the extent not previously paid pursuant to the Interim Order) all principal, interest, fees and expenses, indemnities under the DIP Loan Documents, and other amounts described herein and in the other DIP Loan Documents as such shall accrue and become due hereunder or thereunder, including, without limitation, (A) the non-refundable payment to the Arranger, the DIP Agent or

the DIP Lenders (as the case may be) of any arrangement, backstop, upfront or administrative fee in any letter agreement between the Debtors, on the one hand, and the DIP Agent, Arranger and/or the DIP Lenders, on the other hand; and (B) the reasonable fees and expenses of White & Case LLP (as counsel to the Prepetition Agent and DIP Agent and as counsel to the Receivables Financing Agent), FTI Consulting (as financial advisors), and any other attorneys and financial and other advisors and consultants of the DIP Agent and the DIP Lenders (including any local counsel and any additional counsel to the Receivables Financing Agent) as may be reasonably required (the "DIP Lender Professionals"), in each case, as and to the extent provided for herein and in accordance with the other DIP Loan Documents (collectively, all loans, advances, extensions of credit, financial accommodations, fees, expenses and other liabilities, and all other Secured Obligations (including indemnities and similar obligations) in respect of DIP Extensions of Credit, the DIP Facility and the DIP Loan Documents, the "DIP Obligations"), and (ii) subject to paragraphs 4(i), 6 and 7 hereof, to (x) incur the DIP Roll-Up Loans, which shall be deemed to refinance (and repay), on a dollar-for-dollar basis, all outstanding Prepetition Revolving Loans, in accordance with the terms and conditions of this Final Order and the other DIP Loan Documents and (y) and immediately pay in cash all accrued and unpaid interest and fees outstanding in respect of the Prepetition Revolving Loans, as provided herein and in accordance with the Prepetition Loan Documents.  The DIP Obligations shall not otherwise be subject to further approval of this Court.  The DIP Loan Documents and all DIP Obligations shall represent, constitute and evidence, as the case may be, valid and binding obligations of the Debtors, enforceable against the Debtors, their estates and any successors thereto in accordance with their terms.  All obligations incurred, payments made, and transfers or grants of security set forth in this Final Order, in the Interim Order, and in the other DIP Loan Documents by any DIP

Loan Party are, and were, granted to or for the benefit of the DIP Secured Parties for fair consideration and reasonably equivalent value, and are, and were, granted contemporaneously with the making of the loans and/or commitments and other financial accommodations secured thereby (subject, in the case of the DIP Roll-Up Loans, to paragraphs 4(i), 6 and 7 hereof). Subject, solely in the case of the DIP Roll-Up Loans, to paragraphs 4(i), 6 and 7 hereof, no obligation incurred, payment made, transfer or grant of security set forth in the DIP Loan Documents by any DIP Loan Party as approved under the Interim Order or this Final Order shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.  The term of the DIP Facility commenced following the entry of the Interim Order on the Effective Date and shall end on the Termination Date, subject to the terms and conditions set forth herein and in the other DIP Loan Documents, including the protections afforded a party acting in good faith under Section 364(e) of the Bankruptcy Code.

(b)      **Authorization to Borrow, etc.**  In order to enable them to continue to operate their businesses, subject to the terms and conditions of this Final Order and the other DIP Loan Documents, (i) the DIP Borrower is hereby authorized under the DIP Facility to continue to borrow (and the DIP Guarantors are authorized to continue to guarantee repayment of) DIP Revolving Loans and, subject to any conditions or limitations set forth in the DIP Loan Documents, to issue DIP Letters of Credit, in an aggregate principal amount not to exceed $236,200,000 (including any amounts borrowed during the Interim Period, and with respect to any DIP Letters of Credit, subject to the DIP L/C Sublimit) under the DIP Facility and (ii) the DIP Borrower is hereby authorized under the DIP Facility to incur (and, subject to paragraph 2(d), the DIP Guarantors are authorized to guarantee repayment of) DIP Roll-Up Loans in an

aggregate principal amount not to exceed $188,800,000 and consummate the Revolver Refinancing.

(c)    **Conditions Precedent.**   The DIP Lenders shall have no obligation to make any DIP Extension of Credit or any other financial accommodation hereunder or under or in respect of the other DIP Loan Documents unless all conditions precedent to making DIP Extensions of Credit under the DIP Loan Documents have been satisfied or waived in accordance with the terms of the DIP Loan Documents.

(d)    **DIP Collateral.**   As used herein, "DIP Collateral" shall mean, all now owned or hereafter acquired assets and property, whether real or personal, of the Debtors including, without limitation, all Prepetition Collateral, all assets and property pledged under the DIP Loan Documents, and all cash, any investment of such cash, inventory, accounts receivable, including intercompany accounts (and all rights associated therewith), other rights to payment whether arising before or after the Petition Date, contracts, contract rights, chattel paper, goods, investment property, inventory, deposit accounts, "core concentration accounts," "cash collateral accounts", any bank accounts, and in each case all amounts on deposit therein (or credited thereto) from time to time, equity interests (including all the equity interests of any Debtor in any foreign subsidiary), securities accounts, securities entitlements, securities, commercial tort claims, books, records, plants, equipment, farm products, general intangibles, documents, instruments, interests in leases and leaseholds, interests in real property (whether or not such real property constituted Prepetition Collateral under the Prepetition Loan Documents), fixtures, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, letter of credit rights, supporting obligations, machinery and equipment, patents, copyrights, trademarks, tradenames, other intellectual property, all licenses therefor, interests of any Debtor in any

foreign subsidiary, and all proceeds, rents, profits, products and substitutions, if any, of any of the foregoing and including, the proceeds of all of the Debtors' claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, and any other avoidance or similar action under the Bankruptcy Code or similar state law (collectively, the "Avoidance Actions"), whether received by judgment, settlement or otherwise.  Notwithstanding the foregoing, the DIP Collateral shall not include any Excluded Property (as defined in the DIP Credit Agreement); provided, however, that DIP Collateral shall include proceeds and products of such Excluded Property (except to the extent such proceeds or products also constitute Excluded Property).[5]  Notwithstanding anything in this Final Order or the DIP Loan Documents to the contrary, the collateral securing the DIP Roll-Up Loans shall not include the assets of any Debtors that were not obligated on the Prepetition Obligations, and the Debtors obligated on the DIP Roll-Up Loans shall not include any Debtors that were not obligated on the Prepetition Obligations.[6]

(e)    **DIP Liens.**  Effective immediately upon entry of (i) the Interim Order, with regard to all DIP Obligations incurred during the Interim Period and (ii) this Final Order, with regard to all DIP Obligations, including, without limitation, the DIP Roll-Up Loans, in each case subject to the Carve-Out, and as set forth more fully in this Final Order and the other DIP Loan Documents, the DIP Agent and each of the other DIP Secured Parties, in order to secure

---

[5] For the avoidance of doubt, the capitalized term "Collateral" in the DIP Credit Agreement shall mean the DIP Collateral as defined in this Final Order and the "Collateral" (or any equivalent term) as defined in each other Collateral Document (as defined in the DIP Credit Agreement), as applicable, and, in any event, shall exclude the Excluded Property (as defined in the DIP Credit Agreement).

[6] For the avoidance of doubt, all references in this Final Order to the Debtors who were not obligated on the Prepetition Obligations are limited solely to the following entities (i) Cascade Equity Realty, LLC, (ii) Dairy Information Systems Holdings, LLC, (iii) Dairy Information Systems, LLC, (iv) Dean International Holding Company, (v) Dean Puerto Rico Holdings, LLC, (vi) DFC Aviation Services, LLC, (vii) DFC Energy Partners, LLC, and (viii) Franklin Holdings, Inc.

the DIP Obligations, were (and continue to be) granted or are hereby granted, as applicable, the following security interests and liens, which (subject, solely in the case of the DIP Roll-Up Loans, to paragraphs 4(i), 6 and 7 hereof) are immediately valid, binding, perfected, continuing, enforceable and non-avoidable (all liens and security interests granted to the DIP Agent and the DIP Secured Parties pursuant to the Interim Order, this Final Order and the other DIP Loan Documents, the "DIP Liens"):

        (I)        pursuant to Section 364(c)(2) of the Bankruptcy Code, valid, enforceable, perfected and non-avoidable first priority liens on and security interests in all DIP Collateral that was not encumbered by valid, enforceable, perfected and non-avoidable liens as of the Petition Date; and

        (II)        pursuant to Section 364(c)(3) and Section 364(d) of the Bankruptcy Code, valid, enforceable, perfected and non-avoidable first priority priming liens on and security interests in all other DIP Collateral, which liens and security interests shall, in each case, be (x) junior only to any pre-existing liens as of the Petition Date of a third party, *i.e.,* not any Prepetition Secured Parties (each a "Third Party Lienholder") on the DIP Collateral, but solely to the extent that such liens and security interests of any Third Party Lienholders were, in each case, as of the Petition Date, valid enforceable, perfected and non-avoidable liens, or were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, and (i) senior to the Prepetition Liens or (ii) attached to property of the Debtors that did not constitute Prepetition Collateral (such liens in the preceding clauses (i) and (ii), the "Permitted Third Party

Liens"), and (y) senior to all other liens on, and security interests in the DIP Collateral, including without limitation, the Prepetition Liens, any Adequate Protection Liens, and the liens of any Third Party Lienholders which are *pari passu* with or junior to the Prepetition Liens.[7]

Notwithstanding anything to the contrary contained in this Final Order, the Interim Order, or any other DIP Loan Documents, but subject to paragraph 2(d) hereof, (i) the DIP Liens securing the DIP Roll-Up Loans shall be *pari passu* with the DIP Liens securing all other DIP Obligations, including in respect of the DIP Revolving Facility and any DIP Letters of Credit and (ii) no DIP Liens granted in respect of the DIP Roll-Up Loans shall extend to the assets of the Debtors who were not obligated on the Prepetition Obligations.

(f)     **DIP Liens Senior to Other Liens.**  Effective immediately upon entry of (i) the Interim Order, with regard to all DIP Obligations incurred during the Interim Period and (ii) this Final Order, with regard to all DIP Obligations, including, without limitation, the DIP Roll-Up Loans, in each case subject to the Carve-Out, and as set forth more fully in this Final Order and the other DIP Loan Documents, the DIP Liens shall (or, as applicable, shall continue to) secure all of the DIP Obligations and, subject, solely in the case of the DIP Roll-Up Loans, to paragraphs 4(i), 6 and 7 hereof, shall not, without the consent of the DIP Agent, be made subject or subordinate to, or *pari passu* with, (1) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Section 551 of the Bankruptcy Code, (2) any lien or security interest arising on or after the Petition Date (but shall be subject to the Carve-Out), or (3) any other lien or security interest under Section 363 or 364 of the

---

[7] Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Third Party Lien is valid, senior, enforceable, prior, perfected, or non-avoidable.  Moreover, nothing herein shall prejudice the rights of any party-in-interest, including, but not limited to, the Debtors, the DIP Agent, the DIP Secured Parties, the Prepetition Secured Parties, or the Committee, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Third Party Lien and/or security interests.

Bankruptcy Code or otherwise, other than to the Carve-Out or to the extent expressly provided herein, by any court order heretofore or hereafter entered in the Cases, provided that no DIP Liens granted in respect of the DIP Roll-Up Loans shall extend to the assets of the Debtors who were not obligated on the Prepetition Obligations.  The DIP Liens and any Adequate Protection Liens shall be valid and enforceable against any trustee appointed in the Cases, upon the conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (such cases or proceedings, "Successor Cases"), and/or upon the dismissal of any of the Cases.  It is understood and agreed, and hereby ordered, that, notwithstanding the immediately preceding sentence or anything else to the contrary set forth in this Final Order, in the Interim Order, in any other DIP Loan Document, or in any other order of this Court entered in the Cases, any amounts advanced or expended by the Prepetition Secured Parties or the DIP Secured Parties, in their sole and absolute discretion and without requiring the consent or approval of any other party, after the occurrence and during the continuation of an Event of Default, directly or indirectly, to protect, preserve, maintain, market, sell or liquidate the Prepetition Collateral or DIP Collateral, including to fund the Debtors' operations during a sale process pursuant to Section 363 of the Bankruptcy Code, and any reasonable professional or advisory fees and expenses of White & Case LLP (as counsel to the Prepetition Agent and DIP Agent and as counsel to the Receivables Financing Agent), FTI Consulting, any local counsel, any additional counsel to the Receivables Financing Agent, and any other advisors, appraisers and/or liquidators retained by the DIP Agent in accordance with the DIP Loan Documents to assist or advise it in such capacities and for such purposes, shall be added to the DIP Obligations for all purposes hereunder and under the other DIP Loan Documents.  The DIP Liens and the Adequate Protection Liens shall not be subject to Sections

510, 549, 550 or 551 of the Bankruptcy Code, the "equities of the case" exception of Section 552 of the Bankruptcy Code, or Section 506(c) of the Bankruptcy Code.

        (g)    **Superpriority Administrative Claim.**  Effective immediately upon entry of (i) the Interim Order, with regard to all DIP Obligations incurred during the Interim Period and (ii) this Final Order, with regard to all DIP Obligations, including, without limitation, the DIP Roll-Up Loans, in each case subject to the Carve-Out and, solely in the case of the DIP Roll-Up Loans, paragraphs 4(i), 6 and 7 hereof, and as set forth more fully in this Final Order and the other DIP Loan Documents, pursuant to Section 364(c)(1) of the Bankruptcy Code, and subject in each case to the Carve-Out, the DIP Agent and the other DIP Secured Parties were granted (and continue to be granted) or are hereby granted, as applicable, an allowed superpriority claim in the amount of the DIP Obligations owed to them and outstanding from time to time (all such claims granted to the DIP Agent and the DIP Secured Parties pursuant to the Interim Order and this Final Order, the "DIP Superpriority Claim"), which shall be payable from and have recourse to all assets and properties of the Debtors, and which shall be against each of the Debtors who are DIP Loan Parties (jointly and severally), with priority over any and all other administrative expenses, adequate protection claims, diminution in value claims, and all other claims asserted against the Debtors now existing or hereafter arising of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under any other provisions of the Bankruptcy Code, including Sections 105, 326, 327, 328, 330, 331, 363, 364, 365, 503, 506(b), 506(c), 507(a) (other than 507(a)(1)), 546, 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, subject only to the Carve-Out,

and *pari passu* solely with respect to any superpriority administrative expense claim granted (or continued to be granted) to the Receivables Financing Agent or the Receivables Purchasers pursuant to the Securitization Order (the "Receivables Superpriority Claim"), which DIP Superpriority Claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under Section 503(b) of the Bankruptcy Code and shall be payable from and have recourse to all pre- and post-petition assets and property, whether existing on the Petition Date or thereafter acquired, of the Debtors and all proceeds thereof (excluding Avoidance Actions, but including proceeds of Avoidance Actions). Other than with respect to the Carve-Out and as expressly provided herein, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under Sections 328, 330 and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings or in any Successor Cases, and no priority claims are, or will be, senior to, prior to or *pari passu* with the DIP Liens, the DIP Superpriority Claim, any of the DIP Obligations, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, the Prepetition Liens, or any other claims of the DIP Secured Parties arising hereunder or under the other DIP Loan Documents, or otherwise, in connection with the DIP Facility, provided that, notwithstanding anything contained in this Final Order to the contrary, any DIP Superpriority Claim granted on account of the DIP Roll-Up Loans shall have recourse solely to the Debtors who were Prepetition Loan Parties.

     3.    **Authorization and Approval to Use Cash Collateral and Proceeds of DIP Facility.** Subject to the terms and conditions of this Final Order, the other DIP Loan Documents, and the DIP Budget (subject to any Permitted Variances), and to any adequate protection granted to or for the benefit of the Prepetition Secured Parties as hereinafter set forth, each Debtor is

authorized to (a) use the Cash Collateral and (b)(i) DIP Loans, including the proceeds thereof, (ii) issue DIP Letters of Credit under the DIP Facility, and (iii) to incur DIP Roll-Up Loans and consummate the Revolver Refinancing.  Notwithstanding anything herein to the contrary, the Debtors' right to use proceeds of the DIP Facility or to use Cash Collateral shall terminate on the Termination Date, including upon written notice being provided by the DIP Agent to the Debtors and Committee Counsel that an Event of Default has occurred and is continuing; provided that, solely as and to the extent provided in paragraph 14 below, during the Default Notice Period (as defined below), the DIP Loan Parties shall be permitted to continue to use Cash Collateral and proceeds of the DIP Facility in the ordinary course of business and in accordance with the DIP Budget (subject to Permitted Variances), and may request an expedited hearing before the Court to address such issues as may be heard pursuant to paragraph 14 below.  Nothing in this Final Order shall authorize the disposition of any assets of the Debtors or their estates or other proceeds resulting therefrom outside the ordinary course of business, except as permitted herein and in the DIP Loan Documents (subject to any required Court approval).

4. **Revolver Refinancing; Adequate Protection for Prepetition Secured Parties**.

(i) **Revolver Refinancing**.

(a) The Debtors are authorized and directed to immediately consummate the Revolver Refinancing, including, subject to paragraphs 6 and  7 hereof, to (1) incur the DIP Roll-Up Loans, which shall be deemed to refinance (and repay), on a dollar-for-dollar basis, all outstanding Prepetition Revolving Loans, in accordance with the terms and conditions of this Final Order and the other DIP Loan Documents and (2) pay to the Prepetition Secured Parties, in cash, all remaining accrued and unpaid interest and fees owing by the Debtors under the

Prepetition Revolving Credit Agreement, at the applicable default rates provided for in the Prepetition Revolving Credit Agreement, including all accrued and unpaid letter of credit participation fees, unused commitment fees, and fronting fees owing to the Issuing Bank under (and as defined in) the Prepetition Revolving Credit Agreement, and/or the other Prepetition Secured Parties under the Prepetition Loan Documents, and any professional and advisory fees of the Prepetition Secured Parties required to be paid pursuant to the Prepetition Loan Documents.

(b)     Notwithstanding the foregoing, in the event that there is a timely and successful Challenge by the Committee or any party in interest with the requisite authority and standing in accordance with paragraph 6 hereof, as set forth in a final, non-appealable order of a court of competent jurisdiction, this Court may, pursuant to further order (entered after notice and a hearing), fashion an appropriate remedy with respect to the DIP Roll-Up Loans, which may include reversing the deemed repayment and treatment of the Prepetition Revolving Loans as DIP Roll-Up Loans, in whole or in part, or recharacterization or disgorgement of any repayment of the DIP Roll-Up Loans, in each case to the extent that (i) the DIP Roll-Up Loans resulted in the conversion of any Prepetition Obligations consisting of an unsecured claim or other claim or amount not allowable under section 502 of the Bankruptcy Code into a DIP Roll-Up Loan and (ii) such conversion unduly advantaged the applicable Prepetition Secured Party. Notwithstanding anything to the contrary herein, but subject to the preceding sentence, a successful Challenge shall not in any way affect the validity,

enforceability or priority of the DIP Obligations or the DIP Liens, and no obligation, payment, transfer or grant of security under the DIP Credit Agreement, the other DIP Loan Documents, the Interim Order, or this Final Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code), or be subject to any defense, reduction, setoff, recoupment or counterclaim.

(c)     Notwithstanding anything to the contrary in this Final Order, the DIP Credit Agreement, or the other DIP Loan Documents, until the Challenge Termination Date, no repayment or prepayment of the DIP Roll-Up Loans shall be permitted prior to the occurrence of the Termination Date and, after the occurrence of the Termination Date, any such repayment shall be subject to the provisions of clause 4(i)(b) of this Final Order.

(ii)     **Adequate Protection for Prepetition Secured Parties.**  As adequate protection for any interests of the Prepetition Secured Parties in the Prepetition Collateral (including Cash Collateral), the Prepetition Agent for the benefit of the Prepetition Secured Parties shall receive adequate protection as follows:

(a)     **Adequate Protection Liens.**  To the extent of, and in an aggregate amount equal to, the aggregate diminution in value of such interests, from and after the Petition Date, calculated in accordance with Section 506(a) of the Bankruptcy Code, resulting from the use, sale or lease by the Debtors of the Prepetition Collateral (including from the use of Cash Collateral), the granting of the DIP Liens, and the subordination of the Prepetition Liens thereto and to the

Carve-Out, and the imposition or enforcement of the automatic stay of Section 362(a) of the Bankruptcy Code (collectively, "Diminution in Value"), pursuant to Sections 361, 363(e) and 364(d) of the Bankruptcy Code, the Prepetition Agent and each of the other Prepetition Secured Parties, shall have replacement security interests in and liens upon (the "Adequate Protection Liens") all of the DIP Collateral of the Debtors (other than of the Debtors who were not obligated on the Prepetition Obligations), which Adequate Protection Liens shall be (i) subject to the Carve-Out, (ii) junior and subject to the DIP Liens and any Permitted Third Party Liens and (iii) senior and prior to all other liens thereon.  The Adequate Protection Liens shall in all cases be subject to the Carve-Out.

(b)     **Adequate Protection Superpriority Claims.**  To the extent of the aggregate Diminution in Value, the Prepetition Agent and each of the other Prepetition Secured Parties shall have, subject to the payment of the Carve-Out, an allowed superpriority administrative expense claim (the "Adequate Protection Superpriority Claim") as provided for in Section 507(b) of the Bankruptcy Code against each Debtor (other than the Debtors who were not obligated on the Prepetition Obligations), immediately junior and subject to the DIP Superpriority Claim and any Receivables Superpriority Claim, and payable from and having recourse to all DIP Collateral (other than DIP Collateral owned by Debtors who were not obligated on the Prepetition Obligations); provided, that the Prepetition Secured Parties shall not receive or retain any payments, property, distribution or other amounts in respect of the Adequate Protection Superpriority Claim unless

and until the DIP Obligations and (without duplication) the DIP Superpriority Claim have indefeasibly been paid in full in cash.

(c)     **Adequate Protection Payments**.  Notwithstanding anything to the contrary in this paragraph 4 or in the Interim Order, in the event of a timely and successful Challenge, in accordance with paragraph 6 hereof, as set forth in a final, non-appealable order of a court of competent jurisdiction, any or all payments of accrued and unpaid interest and fees (other than any payment of professional and advisory fees) made to the Prepetition Secured Parties pursuant to clause (2) of paragraph 4(i)(a) or pursuant to the Interim Order as adequate protection, may be subject to disgorgement or recharacterization as payments of principal if so ordered by the Court.

(iii)     **Continuing Effect**.  For the avoidance of doubt, any surviving obligations as set forth in any DIP Loan Documents, Prepetition Loan Documents, or any document related to the Revolver Refinancing, including, without limitation, any reimbursement or indemnification obligations, shall continue and survive any discharge of the Revolver Refinancing.

5.     **DIP Lien and Adequate Protection Replacement Lien Perfection.**  This Final Order (and the Interim Order) shall be sufficient and conclusive evidence of the validity, perfection and priority of the DIP Liens and any Adequate Protection Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Liens and any Adequate Protection Liens or to entitle the DIP Liens and any Adequate Protection Liens to the priorities granted herein and in the

Interim Order.  Notwithstanding the foregoing, the DIP Agent (and, if applicable, the Prepetition Agent) may each, in their respective sole discretion, file such financing statements, mortgages, security agreements, notices of liens and other similar documents, and are hereby granted relief from the automatic stay of Section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices and other agreements or documents shall be deemed to have been filed or recorded at the time and on the Petition Date.  It shall constitute a Default if, as and to the extent required under the DIP Loan Documents, the Debtors shall not execute and deliver to the DIP Agent (and, if applicable, the Prepetition Agent) all such financing statements, mortgages, security agreements, notices and other documents as the DIP Agent (and, if applicable, the Prepetition Agent) may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of, the DIP Liens and any Adequate Protection Liens.  The DIP Agent (and, if applicable, the Prepetition Agent), in their respective discretion, may file a certified copy of this Final Order (and the Interim Order, if applicable) as a financing statement or a notice with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property and, in such event, the subject filing or recording officer shall be authorized to file or record such copy of the Interim Order and/or this Final Order.  To the extent that the Prepetition Agent is the secured party under any account control agreements, listed as loss payee under any of the Debtors' insurance policies or is the secured party under any Prepetition Loan Document, the DIP Agent is also deemed to be the secured party under such account control agreements, loss payee under the Debtors' insurance policies or is the secured party under any loan document, financing statement, deed of trust, mortgage or other instrument or document which may otherwise be required under the law of any jurisdiction to validate,

attach, perfect or prioritize liens (any such instrument or document, a "Security Document"), the DIP Agent is also deemed to be the secured party under each such account control agreement, loss payee under the Debtors' insurance policies, and the secured party under each such Security Document, and shall have all rights and powers attendant to that position (including, without limitation, rights of enforcement) and shall act in that capacity and distribute any proceeds recovered or received in accordance with the terms of this Final Order (or the Interim Order, as applicable) and the other DIP Loan Documents. The Prepetition Agent shall serve as agent for the DIP Agent for purposes of perfecting their respective security interests and liens on all DIP Collateral comprised of Prepetition Collateral that is of a type such that perfection of a security interest therein may be accomplished only by possession or control by a secured party.

6. **Reservation of Certain Third Party Rights and Bar of Challenges and Claims.** The Debtors' stipulations, admissions, agreements, releases, and waivers contained in this Final Order, including the stipulations set forth in Paragraphs E and F of this Final Order (the "Stipulations"), are and shall be binding upon the Debtors and any and all of the Debtors' successors-in-interest and assigns (including, without limitation, any chapter 7 or chapter 11 trustee, responsible person, examiner with expanded powers, or other estate representative). The Stipulations, and all other admissions, agreements, releases and waivers set forth in this Final Order also are and shall be binding upon all other parties-in-interest (including the Committee) and each of their respective successors-in-interest and assigns, unless, and solely to the extent that (i) such parties-in-interest, in each case with standing and requisite authority to do so (subject in all respects to any agreement or applicable law which may limit or affect such entity's right or ability to do so) have timely filed the proper pleadings, and timely commenced the appropriate proceedings under the Bankruptcy Code and Bankruptcy Rules, including, without

limitation, as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in paragraph 7 below), (a) objecting to or challenging any of the Stipulations or (b) otherwise asserting or prosecuting any action against the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees in connection with matters covered by the Stipulations (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "Challenge"), by no later than, with respect to all issues including valuation of the Prepetition Collateral, (x) with respect to the Committee, one hundred and five (105) days from the appointment of the Committee on November 22, 2019; provided, however, that the Committee shall provide the Prepetition Revolving Lenders with a status report with respect to the Committee's investigation by no later than the date that is sixty (60) days from the appointment of the Committee on November 22, 2019 and (y) with respect to all other parties in interest, the date that is seventy-five (75) days from the entry of the Interim Order (the period described in the immediately preceding clauses (x) and (y) shall be referred to as the "Challenge Period," and the date that is the next calendar day after the termination of the Challenge Period shall be referred to as the "Challenge Period Termination Date") , as such date may be extended as to any such party-in-interest by the Prepetition Agent (with the consent of the Required Lenders (as defined in the Prepetition Revolving Credit Agreement)) and each applicable individual Prepetition Secured Party that is the subject of a Challenge or by any such later date as has been ordered by the Court for cause upon a motion filed and served within the Challenge Period (before giving effect to such extension) and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding, and any such judgment has become final and is not subject to any further review or appeal; provided that in the event that the Committee

files a motion seeking standing or authority to pursue a Challenge against any Prepetition Secured Party with respect to any causes of action belonging to the Debtors or their estates, which motion for standing filed in, or in connection with, any Challenge shall set forth with specificity the basis for such challenge or claim and include a substantially final complaint setting forth the proposed causes of action for which such party seeks standing (a "Standing Motion") by no later than on or before one hundred and five (105)  days after the appointment of the Committee on November 22, 2019, the Challenge Period shall be extended, solely with respect to the Challenge(s) for which the Committee seeks standing pursuant to the Standing Motion, to the date that is the earlier of the entry of a final nonappealable order (i) denying any Standing Motion or (ii) in connection with any Challenge; provided, further, that (x) the hearing with respect to the Standing Motion shall not be adjourned without the written consent of the Prepetition Revolving Lenders unless otherwise ordered by the Court and (y) the Committee agrees to request an expedited hearing on the Standing Motion from the Court and to take all commercially reasonable steps to have the Standing Motion heard as soon as practicable.  Any Challenge not asserted by the timely and proper filing of a pleading by a party-in-interest with the requisite standing and authority as contemplated herein prior to the Challenge Period Termination Date shall be deemed forever waived, released, and barred with respect to such party-in-interest.  To the extent a party-in-interest with requisite standing and authority timely and properly commences a Challenge prior to the Challenge Period Termination Date, all claims, causes of action and other matters not specifically set forth in such Challenge shall be deemed forever waived, released, and barred with respect to such party-in-interest.  To the extent the Stipulations (or any of them) are (x) not subject to a Challenge timely and properly commenced prior to the Challenge Period Termination Date or (y) subject to a Challenge timely and properly

commenced prior to the Challenge Period Termination Date, to the extent any such Challenge does not result in a final and non-appealable judgment or order of the Court that is inconsistent with such Stipulations, then, in each case, without further notice, motion or application to, or order of, or hearing before, this Court and without the need or requirement to file any proof of claim: (a) any and all such Challenges by the Committee, and any other party in interest shall be deemed to be forever waived, released, and barred (including in any Successor Case); and (b) the Prepetition Obligations shall be deemed to be an allowed secured claim within the meaning of Sections 502 and 506 of the Bankruptcy Code for all purposes in connection with the Cases (or, after the occurrence of the Revolver Refinancing, an allowed secured claim under the DIP Facility), and all of the Stipulations and all other waivers, releases and affirmations set forth in this Final Order (or any not properly and timely challenged) shall be in full force and effect and shall be binding, conclusive and final on any person, entity or party-in-interest, including the Committee (in each case, and their successors-in-interest and assigns), in the Cases and in any Successor Case for all purposes, without any further order of the Court, and shall not be subject to challenge or objection by the Committee or any other party-in-interest, including, without limitation, any trustee, responsible individual, examiner with expanded powers or other representative of the Debtors' estates.  If any Challenge is timely and properly filed during the Challenge Period, the Stipulations and all other waivers, releases and affirmations contained in this Final Order shall nonetheless remain binding, and preclusive as provided in this paragraph 6, on all other parties in interest (including the Committee), and on any other person or entity, except for the plaintiff or movant timely and successfully asserting such Challenge, as set forth in a final, non-appealable order of a court of competent jurisdiction.  Notwithstanding anything to the contrary herein, the right to commence any Challenge under this Final Order is only

preserved as against any particular Prepetition Obligation (including any Prepetition Revolving Loan that has been converted to or deemed refinanced by the DIP Roll-Up Loans) or Prepetition Collateral, or against any Prepetition Secured Party (including any DIP Lender whose Prepetition Revolving Loan has been converted to or deemed refinanced by the DIP Roll-Up Loans) to the extent such Challenge is commenced timely and properly, prior to the Challenge Period Termination Date, and in respect of such Prepetition Obligation, Prepetition Collateral, or Prepetition Secured Party, and is otherwise waived as set forth in this paragraph 6.  All remedies or defenses of any party with respect to any Challenge are hereby preserved.  Nothing in this Final Order vests or confers on any person (as defined in the Bankruptcy Code), including the Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any Challenges with respect to the Prepetition Obligation, and an order of the Court (or any other court of competent jurisdiction) conferring such standing on the Committee or other party in interest shall be a prerequisite for the prosecution of a Challenge by the Committee or such other party in interest (other than any Challenge for which the Committee or such other party in interest already has standing as a matter of law).

7.      **Limitations on Use of Cash Collateral**.  Notwithstanding anything herein to the contrary, no portion of the proceeds of the DIP Facility, the DIP Collateral, Prepetition Collateral, including Cash Collateral, or the Carve-Out, and no disbursements set forth in the DIP Budget, may be used for the payment of professional fees, disbursements, costs, or expenses incurred by any person in connection with (a) incurring indebtedness other than as expressly provided in this Final Order, the Interim Order or the DIP Budget, (b) preventing, hindering, impeding, or delaying any of the DIP Agent's or any other DIP Secured Party's enforcement or realization upon, or exercise of rights in respect of, any of the Prepetition Collateral or DIP

Collateral, other than to seek a determination that an Event of Default has not occurred or is not continuing or in connection with a remedies hearing, (c) seeking to amend or modify any of the rights or interests granted to the DIP Agent, any other DIP Secured Party, the Prepetition Agent or any other Prepetition Secured Party under this Final Order or Prepetition Loan Documents, including seeking to use Cash Collateral on a contested basis, (d) asserting, commencing, or prosecuting any claims or causes of action, including, without limitation, any Challenge or any other actions under chapter 5 of the Bankruptcy Code (or any similar law), against the DIP Agent, any other DIP Secured Party, the Prepetition Agent, or any other Prepetition Secured Party, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees, (or any Releasees under and as defined in the Securitization Order) or (e) asserting, joining, commencing, supporting, investigating, or prosecuting any Challenge, or any other action for any claim, counterclaim, action, cause of action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the material interests of the DIP Secured Parties, the Prepetition Secured Parties, or any Releasees under and as defined in the Securitization Order, or arising out of, in connection with, or relating to the DIP Documents, Prepetition Loan Documents, the Amended Transaction Documents (as defined in the Securitization Order) or the transactions contemplated thereunder, including, without limitation, (i) any action arising under the Bankruptcy Code, (ii) any so-called "lender liability" claims and causes of action, (iii) any action with respect to the validity and extent of the DIP Obligations, the Prepetition Obligations, or the Facility Obligations (as defined in the Securitization Order) or the validity, extent, perfection and priority of the DIP Liens, the Prepetition Liens, or the Securitization Liens (as defined in the Securitization Order), (iv) any action seeking to

invalidate, set aside, avoid, reduce, set off, offset, recharacterize, subordinate (whether equitable, contractual, or otherwise), recoup against, disallow, impair, raise any defenses, cross-claims, or counterclaims, or raise any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation against, or with respect to, the DIP Liens, the Prepetition Liens, or the Securitization Liens (as defined in the Securitization Order), in whole or in part, or (v) appeal or otherwise challenge this Final Order (or the Interim Order) or the Securitization Order; provided that no more than $200,000 in the aggregate (the "Investigation Budget") of the proceeds of the DIP Facility, the DIP Collateral, Prepetition Collateral, the Cash Collateral, and the Carve-Out may be used by the Committee to investigate (but not prosecute or Challenge, or initiate the prosecution of, including the preparation of any complaint or motion on account of) the Stipulations; provided that any fees and expenses in excess of the Investigation Budget incurred in connection with the foregoing or any prosecution or Challenge relating thereto and allowed by the Bankruptcy Court under Bankruptcy Code sections 328, 330, 331 and/or 503(b) may be permitted to be paid in accordance with applicable orders of this Court, including any interim compensation orders, provided that the administrative expenses in respect thereof shall be subordinate in all respects to the Carve-Out, the DIP Superpriority Claim, and any Receivables Superiority Claim (and, for the avoidance of doubt, may not be paid from any proceeds of the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, or the Carve-Out (including any Carve-Out Reserve) until the indefeasible repayment and Full Satisfaction (as defined in the DIP Credit Agreement) of all DIP Obligations and any Prepetition Obligations in accordance with the DIP Loan Documents and the Prepetition Loan Documents, as the case may be); and provided that, subject to the Challenge Period as provided in paragraph

6 and subject to this paragraph 7, nothing contained in this Final Order or the DIP Loan Documents shall restrict the Committee's ability to contest issues related to valuation.

8.      **Carve-Out.**

(a)      As used in this Final Order, the "Carve-Out" shall mean a carve-out from the DIP Superpriority Claims, the DIP Liens, claims pursuant to section 507(b) of the Bankruptcy Code, any Adequate Protection Liens and the Prepetition Liens, in an amount equal to the sum of (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the Carve-Out Trigger Notice (as defined herein)); (ii) all reasonable and documented fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code, in an aggregate amount not to exceed $75,000 (without regard to the Carve-Out Trigger Notice); (iii) all reasonable, documented, ordinary course out-of-pocket expenses of individual members of the Committee solely in their capacity as such (but expressly excluding any and all fees and expenses of professional persons employed by such Committee members individually); (iv) to the extent allowed by the Court at any time, whether by interim order, procedural order or otherwise (unless subsequently disallowed), all paid and unpaid fees and expenses, other than any Transaction Fees (as defined below) (the "Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code or by the Committee, pursuant to section 328 and 1103 of the Bankruptcy Code (collectively, the "Professional Persons"), at any time on or before the first business day following the (a) delivery by the DIP Agent of a Carve-Out Trigger Notice and (b) the Termination Date (including as a result of the occurrence of an Event of Default) (such day, the "Carve-Out Trigger Date"), whether allowed by the Court prior to or after the Carve-Out Trigger Date; and

(v) Professional Fees incurred after the Carve-Out Trigger Date in an amount not to exceed $8,000,000 (the "Post-Carve-Out Trigger Notice Cap"), in each case subject to the limits imposed by this Final Order.  For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by email by the DIP Agent to the Debtors' lead restructuring counsel, the U.S. Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default under the DIP Loan Documents stating that the Post-Carve-Out Trigger Notice Cap has been invoked.  For the avoidance of doubt, the incurrence or payment of any amounts subject to the Carve-Out shall not be restricted by the DIP Budget.

(b)     The Carve-Out shall not include any restructuring, completion, sale, success, divestiture or other transaction fees of any investment bankers or financial advisors of the Debtors or the Committee, provided, however, that a (i) Sale Fee or a Restructuring Fee, as defined in, and which is earned and payable by the Debtors upon consummation of an applicable transaction pursuant to, an engagement letter between the Debtors and the Debtors' investment banker, Evercore, which is acceptable to the DIP Agent (with the consent of the requisite DIP Secured Parties as provided in and consistent with their respective rights under the DIP Loan Documents) and is approved by the Court and (ii) a sale or restructuring fee, upon consummation of an applicable transaction pursuant to, an engagement letter between the Committee and the Committee's investment banker, Miller Buckfire, which is acceptable to the DIP Agent (with the consent of the requisite DIP Secured Parties) and is approved by the Court, shall be payable prior to any distribution to, the DIP Secured Parties or the Prepetition Secured Parties, solely from any proceeds received by the Debtors resulting from such transaction.

(c)     Prior to the occurrence of the Carve-Out Trigger Date, the Debtors are authorized to pay Professional Fees that are authorized to be paid in accordance with the provisions of the Bankruptcy Code and any order entered by the Court establishing procedures for the payment of compensation to Professional Persons in these Cases, as the same may be due and payable.   Upon the occurrence of the Carve-Out Trigger Date, the Post-Carve-Out Trigger Notice Cap shall be reduced, dollar-for-dollar, by the amount of any Professional Fees incurred and accruing by the Debtors or the Committee, and paid to the applicable Professional Persons, following delivery of the Carve-Out Trigger Notice to the Debtors.

(d)     Immediately upon the Carve-Out Trigger Date, and prior to the payment of any DIP Secured Party or Prepetition Secured Party on account of adequate protection, the Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve (the "Carve-Out Reserve") in an amount equal to the sum of the amounts set forth in paragraphs 8(a)(i) through 8(a)(v) above (but, for the avoidance of doubt, not including any amounts referenced in paragraph 8(a)(iv) that have been previously paid).

(e)     The Carve-Out Reserve shall be held in a segregated non-interest bearing account in trust at the DIP Agent to pay allowed Professional Fees benefiting from the Carve-Out as provided herein, and the Carve-Out Reserve shall be available only to satisfy such allowed Professional Fees benefiting from the Carve-Out until such Professional Fees are paid in full.

(f)     To the extent the Carve-Out Reserve has not been reduced to zero after the payment in full of such obligations, it shall be used to pay the DIP Agent for the benefit of the DIP Secured Parties until the DIP Obligations have been indefeasibly paid in full in cash and all

commitments under the DIP Facility have been terminated.  Notwithstanding anything to the contrary herein, the Prepetition Agent and the DIP Agent, each on behalf of itself and the relevant secured parties, (y) shall not sweep or foreclose on the Carve-Out Reserve prior to satisfaction in full of all obligations benefitting from the Carve-Out as provided herein, and (z) shall have a security interest upon any residual interest in the Carve-Out Reserve, available following satisfaction in cash in full of all obligations benefitting from the Carve-Out as provided herein, and the priority of such liens on the residual interest shall be consistent with this Final Order.  Further, notwithstanding anything to the contrary herein, (A) the failure of the Carve-Out Reserve to satisfy in full the Professional Fees shall not affect the priority of the Carve-Out and (B) in no way shall the Carve-Out, the Post-Trigger Date Carve-Out Amount, the Carve-Out Reserve, or any of the foregoing be construed as a cap or limitation on the amount of the Professional Fees due and payable by the Debtors.

(g)      Notwithstanding anything to the contrary herein or in the DIP Loan Documents, the Carve-Out shall be senior to the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, any adequate protection liens and claims, the Prepetition Liens, and all other liens and claims granted under this Final Order, the Interim Order, the DIP Loan Documents, or otherwise securing or in respect of the DIP Obligations or any adequate protection obligations.

(h)      The DIP Secured Parties and the Prepetition Secured Parties reserve the right to review and object to any fee statement, interim application or monthly application issued or filed by the Professional Persons.   Notwithstanding anything to the contrary herein or in the DIP Loan Documents, the payment of any allowed Professional Fees pursuant to the Carve-Out shall not, and shall not be deemed, to (i) reduce any Debtor's obligations owed to the DIP Agent, the other DIP Secured Parties, the Prepetition Agent or the other Prepetition Secured Parties

(whether under this Final Order or otherwise) or (ii) other than as necessary to permit the payment of such allowed Professional Fees (in each case, subject to the terms of and as expressly provided in this Final Order with respect to the Carve-Out), modify, alter or otherwise affect any of the liens and security interests of such parties (whether granted under the Interim Order or this Final Order or otherwise) in the Prepetition Collateral or the DIP Collateral (or their claims against the Debtors).  Notwithstanding anything to the contrary herein or in the other DIP Loan Documents, none of the DIP Agent, the other DIP Secured Parties, the Prepetition Agent or the other Prepetition Secured Parties shall be responsible for the direct payment or reimbursement of any Professional Fees, or any fees or expenses of the U.S. Trustee or Clerk of the Court (or of any other entity) incurred in connection with the Cases or any Successor Case, and nothing in this Final Order, the Interim Order, or otherwise shall be construed to obligate such parties in any way to pay such compensation or to reimburse such expenses.

9.      **Section 506(c) Claims.**  As a further condition of the DIP Facility and the DIP Extensions of Credit under the DIP Credit Agreement and the other DIP Loan Documents, any obligation of the DIP Secured Parties to make DIP Extensions of Credit, and the Debtors' authorization to use the Cash Collateral, the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in the Cases or any Successor Case) shall be deemed to have waived any rights, benefits or causes of action under Section 506(c) of the Bankruptcy Code as they may relate to or be asserted against the DIP Secured Parties, the DIP Liens, the DIP Collateral, the Prepetition Secured Parties, the Prepetition Liens or the Prepetition Collateral.  Except for the Carve-Out, nothing contained in the Interim Order, in this Final Order or in the other DIP Loan Documents shall be deemed a consent by the Prepetition Secured Parties or the DIP Secured Parties to any charge, lien, assessment or claim against, or in

respect of, the DIP Collateral or the Prepetition Collateral under Section 506(c) of the Bankruptcy Code or otherwise.

10. **Collateral Rights; Limitations in Respect of Subsequent Court Orders.** Unless the DIP Agent (at the direction of the Required Lenders) and the Prepetition Agent (at the direction of the requisite lenders under the Prepetition Loan Documents) have provided their prior written consent, or all DIP Obligations and Prepetition Obligations have been (or with the proceeds thereof shall be) indefeasibly paid and Fully Satisfied (as defined under the DIP Credit Agreement and the Prepetition Revolving Credit Agreement, as applicable), in accordance with the DIP Loan Documents and the Prepetition Loan Documents, as the case may be, and discharged (subject to paragraphs 4(i), 6 and 7 solely with respect to the DIP Roll-Up Loans and the Prepetition Obligations), it shall constitute an Event of Default if the Debtors shall seek in these Cases, or in any Successor Case, or there shall be entered in these Cases or in any Successor Case (or in each case any proceeding ancillary thereto), any order which authorizes any of the following: (i) except as and to the extent expressly permitted by the DIP Credit Agreement, the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral and/or entitled to priority administrative status which is superior to or *pari passu* with those granted pursuant to this Final Order or the Interim Order (other than any Receivables Superpriority Claim) to or for the benefit of the DIP Secured Parties or the Prepetition Secured Parties, or (ii) the use of proceeds of the DIP Facility or Cash Collateral for any purpose other than as permitted under the DIP Credit Agreement and in accordance with the DIP Budget (subject to any Permitted Variances).

11. **Proceeds of Subsequent Financing.** Without limiting the provisions and protections of paragraph 10 above, if at any time prior to the indefeasible repayment and Full Satisfaction (as defined in the DIP Credit Agreement) of all DIP Obligations in accordance with the DIP Loan Documents and this Final Order, as the case may be, and the termination of the DIP Secured Parties' obligations to make DIP Extensions of Credit, including subsequent to the confirmation of any Chapter 11 plan or plans with respect to the Debtors, the Debtors, the Debtors' estates, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed, shall obtain credit or incur debt in violation of this Final Order or the other DIP Loan Documents, then all of the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent for application in accordance with the DIP Loan Documents, the relevant Prepetition Loan Documents, and under applicable law (and solely with respect to payment of any Prepetition Obligations, subject to paragraphs 4(i), 6 and 7 hereof,).

12. **Cash Management.** It shall constitute a Default if the Debtors' cash management system shall not at all times be maintained in accordance with the terms of the DIP Loan Documents and the order of this Court approving the maintenance of the Debtors' cash management system. Other than the Collections Accounts (as defined in the Securitization Order), the DIP Agent shall be deemed to have "control" over all bank accounts for all purposes of perfection under the Uniform Commercial Code pursuant to this Final Order and, if required, pursuant to control agreements reasonably acceptable to the DIP Agent.

13. **Disposition of DIP Collateral.** It shall constitute an Event of Default if the Debtors shall sell (including, without limitation, any sale and leaseback transaction), transfer (including any assignment of rights), lease, encumber or otherwise dispose of any portion of the DIP Collateral, except as permitted by the DIP Credit Agreement (including with respect to the

Receivables Financing, in accordance with the Securitization Order and the Receivables Financing Documents).

14.     **Events of Default; Rights and Remedies Upon Event of Default.**

(a)     Any automatic stay otherwise applicable to the DIP Secured Parties is hereby modified so that, upon and after the occurrence of the Termination Date, the DIP Agent (or the other DIP Secured Parties, to the extent expressly permitted under the DIP Loan Documents) shall, subject to subparagraphs (b) and (c) of this paragraph 14 (including the Default Notice Period to the extent provided therein) and, solely in the case of a Termination Date resulting from an Event of Default, following (i) the delivery of a written notice to counsel to the Debtors, counsel for the Committee, and the U.S. Trustee (such notice, a "Default Notice") and (ii) the filing of an emergency motion on the Court's docket, during which period the Court shall hold an expedited hearing (at which hearing the burden shall be on any party opposing the exercise of remedies, and the DIP Secured Parties shall not be required to satisfy the applicable standard for relief from the automatic stay), be entitled to exercise all of their rights and remedies in respect of the DIP Collateral, in accordance with this Final Order and the other DIP Loan Documents.  The term "Termination Date" shall mean (a) the Scheduled Maturity Date, (b) the effective date of any Chapter 11 plan with respect to the Debtors confirmed by the Court; (c) the date on which all or substantially all of the assets of the Debtors are sold in a sale under any Chapter 11 plan or pursuant to Section 363 of the Bankruptcy Code; (d) the occurrence of an Event of Default under and as defined in the DIP Credit Agreement, (e) the acceleration of the DIP Obligations and/or termination of the commitments under the DIP Revolving Facility, in accordance with the terms of the DIP Loan Documents, and (f) this Final Order ceasing to be in full force and effect for any reason, provided that, prior to the Challenge Termination Date, the

Challenge Period shall survive the occurrence of the Termination Date, and any funds repaid upon the acceleration of the DIP Roll-Up Loans may be subject to disgorgement based on a successful Challenge by the Committee or any party in interest with the requisite authority and standing in accordance with paragraph 6 hereof.

(b)     Upon the delivery by the DIP Agent of a Default Notice: (i)    all commitments of the DIP Lenders to provide any DIP Extensions of Credit shall immediately be suspended; (ii) the Debtors shall have no right to request any DIP Extensions of Credit, to use proceeds of any DIP Extensions of Credit or DIP Collateral, or to use Cash Collateral, other than to use such Cash Collateral and proceeds of DIP Extensions of Credit towards the satisfaction of the DIP Obligations and funding of the Carve-Out Reserve, as provided herein; provided, that, during the Default Notice Period (as defined below) the Debtors may, subject to the limitations set forth herein and in the other DIP Loan Documents, continue to use Cash Collateral and proceeds of DIP Extensions of Credit previously drawn or issued (and any other cash on hand or on deposit in any deposit account or other bank account of a Debtor) in the ordinary course of business, and in accordance with the DIP Budget, to pay for payroll or other expenditures incurred prior to the Termination Date which are critical to the Debtors' operations and the preservation of the DIP Collateral; and (iii) subject to the provisions of this paragraph 14 (and with respect to the DIP Roll-Up Loans, paragraph 4(i) hereof if applicable), the DIP Agent shall be permitted to apply such proceeds in accordance with the terms of this Final Order.  The Debtors and the Committee shall be entitled to an emergency hearing before this Court within five (5) Business Days after the giving of written notice by the DIP Agent of the occurrence of an Event of Default (the "Default Notice Period").  If the Debtors or the Committee do not contest the occurrence of the Event of Default or the DIP Secured Parties' proposed exercise of

remedies within the Default Notice Period, or if the Debtors or the Committee do timely contest the occurrence of an Event of Default and the Court after notice and a hearing declines (or otherwise within the Default Notice Period fails) to stay the enforcement thereof, the Termination Date shall be deemed to have occurred for all purposes, and the automatic stay shall terminate as to the DIP Agent in all respects, as provided in this paragraph 14.  Nothing herein shall preclude the DIP Agent from seeking an order from the Court upon written notice (electronically in a manner that generates a receipt for delivery, or via overnight mail) to the U.S. Trustee, counsel to the Debtors and counsel to the Committee, authorizing the DIP Agent to exercise any enforcement rights or remedies with respect to the DIP Collateral on less than five (5) Business Days' notice, or the Debtors' or the Committee's right to contest such relief.

(c)     Upon the occurrence of the Termination Date (but subject, only in the case of the occurrence of the Termination Date resulting from an Event of Default, following the expedited hearing to be held in accordance with paragraph 14(a) hereof), the DIP Agent is authorized to exercise all remedies and proceed under or pursuant to the applicable DIP Loan Documents and the Prepetition Loan Documents, including, without limitation, to require the DIP Borrower to cash collateralize any DIP Letters of Credit in accordance with the DIP Loan Documents.  All proceeds realized in connection with the exercise of the rights and remedies of the DIP Secured Parties, or the Prepetition Secured Parties (subject to obtaining the requisite relief from the automatic stay), shall be turned over and applied in accordance with the terms of this Final Order, the other DIP Loan Documents and the Prepetition Loan Documents.

(d)     The automatic stay imposed under Section 362(a) of the Bankruptcy Code is hereby modified pursuant to the terms of the DIP Loan Documents as necessary to (i) permit the Debtors to grant any Adequate Protection Liens and the DIP Liens, to consummate the

Revolver Refinancing, and to incur all DIP Obligations and all liabilities and obligations to the DIP Secured Parties and the Prepetition Secured Parties hereunder and under the other DIP Loan Documents, as the case may be, and (ii) authorize the DIP Agent, the other DIP Secured Parties to retain and apply payments, and otherwise enforce their respective rights and remedies hereunder.

(e)    Nothing included herein shall prejudice, impair, or otherwise affect the Prepetition Agent's or the DIP Agent's rights to seek (on behalf of the Prepetition Secured Parties and the DIP Secured Parties, respectively), subject to their relative rights and priorities herein, any other or supplemental relief in respect of the Debtors (including, as the case may be, other or additional adequate protection) nor the DIP Agent's or Prepetition Agent's rights to suspend or terminate the making of DIP Extensions of Credit or use of Cash Collateral in accordance with this Final Order and the other DIP Loan Documents, or the rights of the Debtors to oppose such relief.  The delay or failure to exercise rights and remedies under this Final Order or any other DIP Loan Document or Prepetition Loan Document, as applicable, shall not constitute a waiver of the DIP Agent's, the DIP Secured Parties', the Prepetition Agent's or the Prepetition Secured Parties' respective rights hereunder, thereunder or otherwise, as applicable. The occurrence of an Event of Default or the Termination Date shall not affect the validity, priority or enforceability of any and all rights, remedies, benefits and protections provided (or that continue to be provided) to the DIP Agent, the DIP Secured Parties, the Prepetition Agent or the Prepetition Secured Parties under this Final Order, which rights, remedies, benefits and protections shall survive the Termination Date, as provided herein.

(f)    Notwithstanding anything in this Final Order to the contrary, neither the Prepetition Agent (on behalf of itself or the other Prepetition Secured Parties) or the other

Prepetition Secured Parties shall be permitted to exercise any rights or remedies unless and until the DIP Obligations are indefeasibly paid and Fully Satisfied (as defined in the DIP Credit Agreement) in accordance with the DIP Loan Documents, and discharged.

15.     **Applications of Proceeds of Collateral, Payments and Collections.** As a condition to the DIP Extensions of Credit and the authorization to use Cash Collateral, each Debtor has agreed that all Cash Collateral, all proceeds of any DIP Collateral or Prepetition Collateral (including proceeds realized from a sale or disposition thereof), any amounts held on account of the DIP Collateral or Prepetition Collateral, all payments and collections received by the Debtors with respect to all DIP Collateral and Prepetition Collateral, and all other amounts remitted by any non-Debtor affiliates to any Debtors in respect of, among other things, asset sales and certain other transactions in accordance with the DIP Credit Agreement shall only be used and applied in accordance with this Final Order, the DIP Credit Agreement, and the other DIP Loan Documents (including repayment and reduction of the DIP Obligations), and in accordance with the DIP Budget (subject to any Permitted Variances).

16.     **Proofs of Claim, etc.**  None of the DIP Secured Parties or the Prepetition Secured Parties shall be required to file proofs of claim in any of the Cases or any Successor Cases for any claim allowed herein, and the Debtors' Stipulations shall be deemed to constitute a timely filed proof of claim against each of the applicable Debtors in the Cases.  Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Cases or any Successor Cases to the contrary, the DIP Agent, on behalf of itself and the DIP Secured Parties, and the Prepetition Agent, on behalf of itself and the Prepetition Secured Parties, respectively, are hereby authorized and entitled, in each of their sole and absolute discretion, but not required, to file (and amend and/or supplement, as it sees fit) a master proof of claim and/or aggregate

proofs of claim in each of the Cases or any Successor Cases for any claim allowed herein; for avoidance of doubt, any such proof of claim may (but is not required to) be filed as one consolidated proof of claim against all of the Debtors, rather than as separate proofs of claim against each Debtor.  Any proof of claim filed by the DIP Agent or the Prepetition Agent shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the respective DIP Secured Parties or Prepetition Secured Parties.  Any order entered by the Court in relation to the establishment of a bar date for any claim (including, without limitation, administrative claims) in any of the Cases or any Successor Cases shall not apply to the DIP Agent, the other DIP Secured Parties, the Prepetition Agent or the other Prepetition Secured Parties.

17.     **<u>Other Rights and Obligations</u>.**

(a)     **<u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Final Order</u>.**  Based on the findings set forth in this Final Order (and the Interim Order) and in accordance with Section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility as approved by this Final Order (and the Interim Order), in the event any or all of the provisions of this Final Order are hereafter modified, amended or vacated by a subsequent order of this Court or any other court, the DIP Secured Parties are entitled to the protections provided in Section 364(e) of the Bankruptcy Code, and no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of any advances made hereunder or the liens or priority authorized or created hereby (subject, solely in the case of the DIP Roll-Up Loans, to paragraphs 4(i), 6 and 7).  Notwithstanding any such modification, amendment or vacatur, any claim granted to the DIP Secured Parties hereunder arising prior to the effective date of such modification, amendment, vacatur or stay of any DIP Liens or of the

DIP Superpriority Claim granted to or for the benefit of the DIP Secured Parties shall be governed in all respects by the original provisions of this Final Order (and the Interim Order, as applicable), and the DIP Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits, including the DIP Liens and the DIP Superpriority Claim granted herein (and in the Interim Order), with respect to any such claim.  Because the DIP Extensions of Credit are (and were) made in reliance on this Final Order, the Interim Order, and the other DIP Loan Documents, the DIP Obligations incurred by the Debtors or owed to the DIP Secured Parties prior to the effective date of any stay, modification or vacatur of this Final Order (subject, solely in the case of the DIP Roll-Up Loans, to paragraphs 4(i), 6 and 7) shall not, as a result of any subsequent order in the Cases or in any Successor Cases, be subordinated, lose their lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the DIP Secured Parties under this Final Order (and the Interim Order).

(b)     **Expenses.**  To the fullest extent provided in this Final Order and in the other DIP Loan Documents, the Debtors will pay all prepetition and post-petition fees and expenses incurred by the DIP Secured Parties (including, without limitation, the reasonable fees and disbursements of the DIP Lender Professionals, and any other local counsel or additional securitization counsel that any DIP Secured Party shall retain and any internal or third-party appraisers, consultants, financial, restructuring or other advisors and auditors advising any such counsel), including in connection with (i) the negotiation, preparation, execution, delivery, funding and administration of the DIP Loan Documents, including, without limitation, all due diligence fees and expenses incurred or sustained in connection with the DIP Loan Documents, (ii) the Cases or any Successor Cases, or (iii) enforcement of any rights or remedies under the

DIP Loan Documents.  Payment of all such fees and expenses, and the fees and expenses of the Prepetition Secured Parties that are paid as adequate protection hereunder (or that were paid as adequate protection under the Interim Order), shall not be subject to allowance by the Court, and the Prepetition Secured Parties, the Prepetition Lender Professionals (as defined in the Interim Order), the DIP Secured Parties, and the DIP Lender Professionals (and any other professionals for the DIP Secured Parties), shall not be required to file an application seeking compensation for services or reimbursement of expenses with the Court or comply with the U.S. Trustee fee guidelines, but shall provide its fee and expense statements or invoices, in summary form, which shall not be required to contain time entries but shall include the number of hours billed by the applicable professional (except for financial advisors compensated on other than an hourly basis) and a summary statement of services provided and the expenses incurred and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client or other privilege, any information constituting attorney work product, or any other confidential or otherwise sensitive information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine) to the Debtors, with copies to be provided to the Office of the U.S. Trustee and counsel for the Committee contemporaneously with the delivery of such fee and expense statements or invoices to the Debtors.  The Debtors shall pay in cash all such fees and expenses of any DIP Lender Professional, within ten (10) days of presentment of such statements or invoices, if no written objections to the reasonableness of the fees and expenses charged in any such statement or invoice (or portion thereof) is made.  Any objection raised by the Debtors, the U.S. Trustee or the Committee with respect to such fee and expense statements or invoices (with notice of such objection provided to the DIP Agent and to the respective DIP Lender

Professional) may be made only on the basis of "reasonableness," and shall specify in writing the amount of the contested fees and expenses and the detailed basis for such objection.  To the extent an objection only contests a portion of an invoice, the undisputed portion thereof shall be promptly paid.  If any such objection to payment of an invoice (or any portion thereof) is not otherwise resolved between the Debtors, the Committee or the U.S. Trustee and the issuer of the invoice, either party may submit such dispute to the Court for a determination as to the reasonableness of the relevant disputed fees and expenses set forth in the invoice.  This Court shall retain the jurisdiction to resolve any dispute as to the reasonableness of any fees and expenses.  Such fees and expenses shall not be subject to the DIP Budget and shall not be subject to any offset, defense, claim, counterclaim or diminution of any type, kind or nature whatsoever. For the avoidance of doubt, and without limiting any of the forgoing or any other provision of this Final Order (or the Interim Order, as applicable), each of the fees specified in Section 2.12 of the DIP Credit Agreement (including, any commitment fees, upfront fees, administrative agent fees, arranger fees, exit fees, letter of credit participation fees, letter of credit fronting fees, and unused line fees), were, in each case, upon entry of the Interim Order, and continue to be, upon entry of this Final Order, and irrespective of any subsequent order approving or denying the DIP Facility or any other financing pursuant to Section 364 of the Bankruptcy Code, fully entitled to all protections of Section 364(e) of the Bankruptcy Code and are deemed fully earned, non-refundable, irrevocable, and non-avoidable as of the date of entry of the Interim Order.

(c)    **Credit Bid.**  The DIP Agent, with the consent of the Required Lenders shall have the right (on behalf of the DIP Lenders) to credit-bid the amount of the DIP Obligations (other than, prior to the Challenge Period Termination Date, the DIP Roll-Up Loans) in connection with any sale of all or substantially all of the Debtors' assets and property,

including, without limitation, any sale occurring pursuant to Section 363 of the Bankruptcy Code or included as part of any Chapter 11 plan subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

(d)     **Binding Effect.**  The provisions of this Final Order shall be binding upon and inure to the benefit of the DIP Secured Parties and the Prepetition Secured Parties, the Debtors, and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors) whether in the Cases, in any Successor Cases, or upon dismissal of any such Chapter 11 or Chapter 7 cases.

(e)     **No Waiver.**  The failure of the DIP Secured Parties or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under the Interim Order, this Final Order, the other DIP Loan Documents or the Prepetition Loan Documents or otherwise, as applicable, shall not constitute a waiver of any of the DIP Secured Parties' or Prepetition Secured Parties' rights hereunder, thereunder, or otherwise.   Notwithstanding anything herein, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair any of the rights, claims, privileges, objections, defenses or remedies of the DIP Secured Parties or the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law against any other person or entity in any court, including without limitation, the rights of the DIP Agent and the Prepetition Agent (i) to request conversion of the Cases to cases under Chapter 7, dismissal of the Cases, or the appointment of a trustee in the Cases, (ii) to propose, subject to the provisions of Section 1121 of the Bankruptcy Code, any Chapter 11 plan, or (iii) to exercise any of the rights, claims or

privileges (whether legal, equitable or otherwise) on behalf of the DIP Secured Parties or the Prepetition Secured Parties, as applicable.

(f)     **No Third Party Rights.**   Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, third party or incidental beneficiary.

(g)     **Intercreditor Matters.**   Nothing in this Final Order shall be construed to convey on any individual DIP Lender or Prepetition Revolving Lender any consent, voting or other rights beyond those (if any) set forth in the DIP Loan Documents and Prepetition Loan Documents, as applicable.   Nothing in this Final Order shall be construed to impair, modify or otherwise affect (i) the Intercreditor Agreement or (ii) any other intercreditor, subordination or similar agreement or arrangement in respect of the Prepetition Obligations and the obligations under the Receivables Financing Documents, which in each case are enforceable to the fullest extent provided by section 510(a) of the Bankruptcy Code and applicable law.

(h)     **No Marshaling.**   Neither the DIP Secured Parties nor the Prepetition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as applicable; *provided*, *however*, that the DIP Secured Parties and Prepetition Secured Parties, as applicable, shall use commercially reasonable efforts to first use all DIP Collateral other than any proceeds of Avoidance Actions to repay the DIP Superpriority Claim and any Adequate Protection Superpriority Claim, as applicable.

(i)     **Section 552(b).**   The DIP Secured Parties and the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under Section 552(b) of the Bankruptcy Code

shall not apply to the DIP Secured Parties or the Prepetition Secured Parties with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or the DIP Collateral.

(j)     **Limitation of Liability**.   In determining to make any loan or other extension of credit under the DIP Credit Agreement, to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Final Order, the Interim Order, the DIP Loan Documents or the Prepetition Loan Documents, the DIP Secured Parties (and the Prepetition Secured Parties in respect of the use of Cash Collateral) shall not (a) be deemed to be in "control" of the operations of the Debtors, (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates, or (c) be deemed to be acting as a "Responsible Person," "Owner," or "Operator" with respect to the operation or management of the Debtors, so long as the DIP Secured Parties' actions do not constitute, within the meaning of 42 U.S.C. § 9601(20)(F), actual participation in the management or operational affairs of a vessel or facility owned or operated by a Debtor, or otherwise cause liability to arise to the federal or state government or the status of "responsible person" or "managing agent" to exist under applicable law (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, as amended, or any similar federal or state statute).  Furthermore, nothing in this Final Order, the Interim Order, the other DIP Loan Documents, or the Prepetition Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the DIP Loan Parties.

(k)     **Amendment.**  The Debtors and the DIP Agent (with the written consent of the requisite DIP Secured Parties as provided in and consistent with their respective rights

under the DIP Loan Documents) may amend, modify, supplement or waive any provision of the DIP Loan Documents without further notice to or approval of the Court (but upon two (2) business days' prior notice (to the extent reasonably practicable under the circumstances) having been given to Committee Counsel of any amendment or modification (provided, that such notice shall not be deemed to create any Committee approval rights)), unless such amendment, modification, supplement or waiver (x) increases the interest rate (other than as a result of the imposition of the default rate or changes to any base rate, LIBOR or similar component thereof) or fees (other than consent fees in connection with such amendment, modification, supplement or waiver) charged in connection with the DIP Facility, (y) increases the commitments of the DIP Lenders to make DIP Extensions of Credit under the DIP Loan Documents, or (z) changes the Termination Date to an earlier date.   Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by, or on behalf of, all the Debtors and the DIP Agent (after having obtained the approval of the requisite DIP Secured Parties as provided in the DIP Loan Documents) and approved by the Court after notice to parties in interest.

(l)      **Priority of Terms**.   To the extent of any conflict between or among (a) the express terms or provisions of any of the other DIP Loan Documents, the Motion, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Final Order, on the other hand, unless such term or provision herein is phrased in terms of "defined in" or "as set forth in" the DIP Credit Agreement, the terms and provisions of this Final Order shall govern.

(m)      **Survival of Final Order.**   The provisions of this Final Order and any actions taken pursuant hereto shall survive, and shall not be modified, impaired or discharged by,

any order which may be entered (i) confirming any Chapter 11 plan in the Cases, (ii) converting any of the Cases to a case under Chapter 7 of the Bankruptcy Code, (iii) dismissing any of the Cases, (iv) terminating the joint administration of these Cases, (v) withdrawing of the reference of any of the Cases from this Court or (vi) providing for abstention from handling or retaining of jurisdiction of any of the Cases in this Court.  The terms and provisions of this Final Order (subject to paragraphs 4(i), 6 and 7, as and to the extent applicable), including the DIP Liens and DIP Superpriority Claim granted pursuant to this Final Order or the Interim Order, and any protections granted to or for the benefit of the Prepetition Secured Parties (including any adequate protection, if applicable), shall continue in full force and effect notwithstanding the entry of such order, or in the event any or all of the provisions of this Final Order are hereafter modified, amended or vacated by a subsequent order of this Court or any other court, and such DIP Liens and DIP Superpriority Claim and protections for the Prepetition Secured Parties (including any adequate protection, if applicable) shall maintain their priorities as provided by this Final Order, the other DIP Loan Documents and the Prepetition Loan Documents (as the case may be), including the Intercreditor Agreement and any other intercreditor arrangement or agreements in respect thereof, until all of the DIP Obligations (and any Prepetition Obligations) have been indefeasibly paid and Fully Satisfied (as defined in the DIP Credit Agreement and the Prepetition Revolving Credit Agreement, as applicable) in accordance with the DIP Loan Documents and the Prepetition Loan Documents, as the case may be, and discharged.  The Court shall retain jurisdiction, notwithstanding any such dismissal, for the purpose of enforcing the claims, liens and security interests referred to in this paragraph 17(m).

(n)     **Enforceability.**   This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.

(o)     **Waiver of any Applicable Stay.**   Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Final Order and this Final Order shall be immediately effective and enforceable upon its entry.

18.     **Modification of DIP Credit Agreement**.  Upon and following entry of this Final Order, section 5.14 of the DIP Credit Agreement shall be deemed amended so that it reads as set forth in Annex A to this Final Order.

19.     **No Impact on Compliance with Laws**.   Notwithstanding any provision to the contrary in this Final Order or any other DIP Loan Document, nothing in this Final Order or any other DIP Loan Document shall: (1) relieve the Debtors of any obligations under federal, state or local police or regulatory laws or under 28 U.S.C. § 959(b), provided that nothing herein shall limit or impair the Debtors' rights to assert defenses under applicable law and nothing herein shall create new defenses to obligations under police or regulatory laws or 28 U.S.C. § 959(b); or (2) impair or adversely affect the United States of America's rights, claims and defenses of set-off and recoupment, and all such rights, claims, and defenses shall be preserved in their entirety.

20.     **Minnesota Statutory Trusts**.    Notwithstanding anything to the contrary contained herein, nothing in this Final Order nor the DIP Loan Documents shall impair or impact any valid trust formed under Minn. Stat. § 27.138 or the rights of sellers (as defined in Minn. Stat. Ch. 27) in the assets in any such valid trust, in each case except to the extent that the Bankruptcy Code renders such trust ineffective, unenforceable, and/or invalid, and such claims may be paid by the Debtors in the ordinary course of business to the extent permissible pursuant

to applicable law, including as has been authorized pursuant to the *Final Order Authorizing the Debtors to Pay Prepetition Critical Vendor Claims in the Ordinary Course of Business* [ECF No. 121]; <u>provided</u> that all parties' rights are reserved with respect to any argument as to whether any such trust is impacted by the Bankruptcy Code.

21.     **Texas Taxing Authorities**.  Notwithstanding any other provisions included in the Interim Order or this Final Order, or any agreements approved hereby, any statutory liens (collectively, the "<u>Tax Liens</u>") of the Texas taxing authorities requested by Linebarger, Goggan, Blair & Sampson, LLP, McCreary, Veselka, Bragg & Allen, P.C., and Perdue, Brandon, Fielder, Collins & Mott, LLP, (the "<u>Texas Taxing Authorities</u>") shall not be primed by nor made subordinate to any liens granted pursuant to the Interim Order, this Final Order or the other DIP Loan Documents to the extent such Tax Liens are valid, perfected, enforceable, non-avoidable and senior to the Prepetition Liens.  For the avoidance of doubt, all parties' rights to object to the priority, validity, amount, and extent of the claims and liens asserted by the Texas Taxing Authorities are fully preserved.

22.     **Lineage Logistics**.  Notwithstanding anything to the contrary in this Final Order, any warehousemen's liens of Lineage Logistics on new inventory of the Debtors that is delivered to Lineage Logistics following the Petition Date shall be Permitted Third Party Liens to the extent that such liens would be Permitted Third Party Liens with respect to inventory stored with Lineage Logistic as of the Petition Date irrespective of whether such liens constitute Permitted Encumbrances; <u>provided</u> that the foregoing is not intended to, and does not, modify any obligations of the Debtors, or any rights or remedies of the DIP Secured Parties, under the DIP Loan Documents, and does not constitute a waiver or modification of any Default or Event of Default under and as defined in the DIP Credit Agreement.

23.     **Vehicle Lease Agreements.**

(a)     Notwithstanding anything to the contrary in this Final Order or in the DIP Loan Documents, in respect of any leased motor vehicles (or other leased assets, the attachment or perfection of a lien on which is subject to a certificate of title) and all products and proceeds thereof and all accessions, substitutions and replacements of all of the foregoing, that are subject to or covered by any of the Third Party Leases (collectively, the "Lease Property") which would otherwise constitute DIP Collateral pursuant to the terms of this Final Order (without operation of this paragraph 23 and the other DIP Loan Documents, the DIP Liens and any Adequate Protection Liens shall only attach to such property to the extent it is property of the Debtors' estates within the scope of 11 U.S.C. § 541. Accordingly, with respect to Lease Property subject to a valid lease agreement, the DIP Liens and any Adequate Protection Liens shall only attach to the Debtors' interest in the applicable lease agreement (to the extent such interest constitutes DIP Collateral pursuant to the terms of this Final Order (without operation of this paragraph 23) and the other DIP Loan Documents) and not to the Lease Property itself. To the extent any Third Party Lease is determined by a court of competent jurisdiction to be a financing arrangement rather than a true lease (and the Lease Property is therefore considered secured financing collateral rather than leased property) the DIP Liens and any Adequate Protection Liens shall attach to the Debtors' interest in such property (to the extent such interest constitutes DIP Collateral pursuant to the terms of this Final Order (without operation of this paragraph 23) and the other DIP Loan Documents), but shall be junior to the liens of the Lessors in respect of such Lease Property to the extent that such liens are valid, enforceable, perfected and non-avoidable liens under applicable state law. Additionally, in respect of any other leased assets and all products and proceeds thereof and all accessions, substitutions and replacements of all of the

foregoing not constituting Lease Property that are subject to a valid lease agreement (collectively, "Other Lease Property") which would otherwise constitute DIP Collateral pursuant to the terms of this Final Order (without operation of this paragraph 23) and the other DIP Loan Documents, the DIP Liens and the Adequate Protection Liens (x) shall only attach to such property to the extent it is property of the Debtors' estates within the scope of 11 U.S.C. § 541 and (y) shall otherwise only attach to the Debtors' interest in the applicable lease agreement with respect to such Other Lease Property (but not the Other Lease Property itself).

(b)    The "BofA Lease" means that certain Master Vehicle Lease Agreement dated November 5, 2013, by and between Banc of America Leasing & Capital, LLC and Dean Transportation, Inc., and all schedules, addenda and ancillary agreements thereto, and all existing and future modifications, amendments, renewals and extensions thereof.

(c)    The "DTF Lease" means that certain Master Vehicle Lease Agreement dated April 3, 2007, by and between DaimlerChrysler Financial Services Americas LLC, a Michigan limited liability corporation (predecessor in interest to Mercedes-Benz Financial Services USA LLC dba Daimler Truck Financial) and Dean Transportation, Inc., and all schedules, addenda and ancillary agreements thereto, and all existing and future modifications, amendments, renewals and extensions thereof.

(d)    The "Wells Fargo Leases" means the Master Vehicle Lease Agreement no. XX9162, dated as of June 30, 2005, and Master Vehicle Lease Agreement dated September 16, 2005, each by and between Wells Fargo Equipment Finance, Inc. (or its predecessor in interest General Electric Capital Corporation) and Dean Transportation, Inc., and all schedules, addenda and ancillary agreements thereto, and all existing and future modifications, amendments, renewals and extensions thereof.

(e)      The "Citizens Leases" means: (i)  the Master Vehicle Lease Agreement Equipment Lease No. 1, dated as of October 30, 2003; (ii) the Master Vehicle Lease Agreement Equipment Lease No. 1, dated as of June 1, 2005; and (iii) the Master Vehicle Lease Agreement Equipment Lease No. 1, dated as of February 1, 2006 each by and between Citizens Asset Finance, Inc. f/k/a RBS Asset Finance, Inc. and Dean Transportation, Inc., and all schedules, addenda and ancillary agreements thereto, and all existing and future modifications, amendments, renewals and extensions thereof.

(f)      The "Signature Leases" means the Master Lease Agreement between Signature Financial LLC ("Signature") and Dean Transportation, Inc. dated August 14, 2014 (the "Master Lease"); all documents related thereto including, but not limited to, Schedule Nos. 001-017; and all similar lease and/or financing arrangements between Signature and any of the Debtors and/or their non-debtor affiliates.

(g)      The "Ascentium Leases" mean the two Lease Agreements, Agreement No. 2380054 and Agreement No. 2376342, between Ascentium Capital, LLC, and Dean Transportation, Inc.; all documents related thereto including, but not limited to, any appendices, schedules, commencement agreements; all similar lease and/or financing arrangements between Ascentium Capital, LLC and any of the Debtors and/or their non-debtor affiliates; all of the foregoing to include, but not limited to, lease agreements concerning the vehicles, trailers, and their related equipment set forth on the exhibits and title documents thereto.

(h)      The "Bridge Lease" means that certain Master Vehicle Lease Agreement dated September 14, 2015   between Bridge Funding Group f/k/a Bridge Capital Leasing as lessor and Dean Transportation, Inc., Lessee and all of the Schedules, as that term is defined in

the Master Vehicle Lease Agreement, as well as any addenda or ancillary agreements thereto and all existing and future modifications, amendments, renewals and extensions thereof.

(i)     The "<u>Regions Lease</u>" means that certain Master Vehicle Lease Agreement dated September 14, 2012, by and between Regions Equipment Finance Corporation, an Alabama corporation, and Dean Transportation, Inc., an Ohio corporation, and all schedules, addenda and ancillary agreements thereto, and all existing and future modifications, amendments, renewals and extensions thereof.

(j)     The "<u>TIAA Lease</u>" means that certain Master Vehicle Lease Agreement dated June 27, 2014, by and between TIAA Commercial Finance, Inc., as assignee of Fleet Advantage, LLC, and Dean Transportation, Inc., and all schedules, addenda and ancillary agreements thereto, and all existing and future modifications, amendments, renewals and extensions thereof.

(k)     The "<u>BB&T Equipment Leases</u>" means the Master Lease Agreement between BB&T Equipment Finance Corporation ("BB&T Equipment") and Dean Transportation, Inc. dated June 7, 2010, (the "Master Lease"); all documents related thereto including, but not limited to, Schedule Nos. 17-21; 27-49; all similar lease and/or financing arrangements between BB&T Equipment and any of the Debtors and/or their non-debtor affiliates; all of the foregoing include, but are not limited to, lease agreements concerning the vehicles and their related equipment set forth on the exhibits thereto.

(l)     The "<u>Fifth Third Leases</u>" means the Master Lease Agreements between Fifth Third Bank ("Fifth Third") and Dean Foods Company dated May 23, 2017; Dean Transportation, Inc., dated August 13, 2015; and Suiza Dairy Group, LLC, and Dean Dairy Holdings, LLC, dated May 3, 2018 (collectively, the "Master Leases"); all documents related

thereto including any and all schedules; any and all schedules which have been assigned to Farm Credit Mid-America, FLCA/PCA; all similar lease and/or financing arrangements between Fifth Third and any of the Debtors and/or their non-debtor affiliates; all of the foregoing include, but are not limited to, lease agreements concerning the vehicles and their related equipment set forth on the exhibits thereto.

(m)     The "EWB Master Lease" means that certain Master Vehicle Lease Agreement, Equipment Lease No. 34200040, between East West Bank ("EWB") and Dean Transportation, Inc., dated February 18, 2016; all documents related thereto including, but not limited to, all schedules thereto; all similar lease and/or financing arrangements between EWB and any of the Debtors and/or their non-debtor affiliates; all of the foregoing include, but are not limited to, lease agreements concerning vehicles and related equipment set forth on the exhibits thereto.

(n)     The "SFS Lease" means that certain Master Vehicle Lease Agreement dated as of July 21, 2011 by and between Siemens Financial Services, Inc. and Dean Transportation, Inc., and all schedules, addenda and ancillary agreements thereto, and all existing and future modifications, amendments, renewals and extensions thereof.

(o)     The "BMO Leases" means that certain: (i) Master Vehicle Lease Agreement, dated as of September 12, 2006, by and between General Electric Capital Corporation and Dean Transportation, Inc., and all schedules, addenda, or ancillary agreements thereto and any and all existing and future assignments, amendments, modifications, renewals and extensions thereof; (ii) Master Vehicle Lease Agreement, dated as of May 30, 2008, by and between AIG Commercial Equipment Finance, Inc. and Dean Transportation, Inc., and all schedules, addenda, or ancillary agreements thereto and any and all existing and future

assignments, amendments, modifications, renewals and extensions thereof; (iii) Master Vehicle Lease Agreement, dated as of June 7, 2010, by and between BB&T Equipment Finance Corp. and Dean Transportation, Inc., and all schedules, addenda, or ancillary agreements thereto and any and all existing and future assignments, amendments, modifications, renewals and extensions thereof; (iv) Master Vehicle Lease Agreement, dated as of August 4, 2014, by and between BMO Harris Equipment Finance Co. and Dean Transportation, Inc., and all schedules, addenda, or ancillary agreements thereto and any and all existing and future assignments, amendments, modifications, renewals and extensions thereof; (v) Master Vehicle Lease Agreement dated as of June 25, 2019, by and between BMO Harris Bank N.A. and Dean Transportation, Inc., and all schedules, addenda, or ancillary agreements thereto and any and all existing and future assignments, amendments, modifications, renewals and extensions thereof; and (vi) all similar lease and/or financing arrangements between BMO Harris Bank N.A., Bank of Montreal, and BMO Harris Equipment Finance Co. on the one hand and any of the Debtors and/or their non-debtor affiliates on the other hand concerning vehicles, trailers, and their related equipment and accessories.

(p)     The "STEFL Lease" means that certain Master Vehicle Lease Agreement (Equipment Lease No. 08819) dated November 6, 2012, by and between SunTrust Equipment Finance & Leasing Corp. and Dean Transportation, Inc., and all schedules, addenda and ancillary agreements thereto, and all existing and future modifications, amendments, renewals and extensions thereof.

(q)     The BofA Lease, the DTF Lease, the Wells Fargo Leases, the Signature Leases, the Citizens Leases. Ascentium Leases, the Bridge Lease, the Regions Lease, the TIAA Lease, the BB&T Equipment Leases, the Fifth Third Leases, the EWB Master Lease, the SFS

Lease, the BMO Leases, and the STEFL Lease are collectively referred to herein as the "Third Party Leases" and, the lessors thereunder, the "Lessors."

24.     **Chubb Reservation of Rights**. Notwithstanding anything in the DIP Credit Agreement, the Interim Order or this Final Order to the contrary, (i) to the extent ACE American Insurance Company, Federal Insurance Company, Westchester Fire Insurance Company, and/or any of their respective affiliates (collectively, and together with each of their successors, the "Chubb Companies") had valid and enforceable, perfected, and non-avoidable liens and/or security interests on property of the Debtors as of the Petition Date that were senior to the liens and/or security interests of the Prepetition Secured Parties on such property, such Chubb Company liens and or/security interests shall be senior to the liens on such property granted pursuant to the Interim Order and/or this Final Order; (ii) all rights of the Chubb Companies with respect to letters of credit securing obligations of the Debtors under any surety bonds, indemnity agreements, insurance policies and related agreements are not impaired under this Final Order and such letters of credit will remain in force in accordance with their stated terms; (iii) this Final Order does not grant the Debtors the right to use any property (or the proceeds thereof) held by the Chubb Companies as collateral to secure obligations under surety bonds, indemnity agreements, insurance policies and related agreements, provided that to the extent any such property reverts to the Debtors, such property shall be subject to the terms of this Final Order; (iv) the proceeds of any insurance policy issued by the Chubb Companies shall only be considered to be DIP Collateral to the extent such proceeds are payable to the Debtors (as opposed to a third party claimant) pursuant to the terms of any such applicable insurance policy; (v) except as expressly provided in paragraph 5 of the Interim Order and/or this Final Order regarding the DIP Agent as loss payee under the Debtors' insurance policies, nothing in the DIP

Credit Agreement, the Interim Order and/or this Final Order alters or modifies the terms and conditions of any insurance policies or related agreements issued by the Chubb Companies or rights or defenses of the Chubb Companies under any surety bonds issued for, or indemnity agreements executed by, any one or more of the Debtors.

25.    **Realty Income Reservation of Rights**.   Notwithstanding anything in this Final Order to the contrary, following the occurrence of the Termination Date resulting from an Event of Default, the DIP Secured Parties may enter upon leased premises only as provided by (i) any separate agreement by and between the applicable landlord and the DIP Secured Parties (the terms of which shall be reasonably acceptable to the parties thereto), (ii) applicable non-bankruptcy law, or (iii) an order from the Bankruptcy Court on no less than seven (7) days' notice to the applicable landlord.

26.    **Retention of Jurisdiction.**   The Court has and will retain jurisdiction to enforce this Final Order according to its terms.


      **Signed:  December 23, 2019.**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

Annex A to Final Order

Section 5.14    Milestones.  The Loan Parties shall ensure that each of the milestones set forth below (collectively, the "Milestones") is achieved in accordance with the applicable timing referred to below (or by such later time as approved in writing by the Administrative Agent and the Required Lenders):

(a)  on or before the date falling thirty (30) days after the Petition Date, the Debtors shall have delivered to the Administrative Agent a draft Sale Motion;

(b) within forty-five (45) days after the Petition Date, the Final Order shall have been entered by the Bankruptcy Court;

(c) on or before February 10, 2020, the Debtors shall have delivered to the Administrative Agent an election of whether it intends to pursue a Sale Process, a Plan Process or a combination of both;

(d) if a Sale Process is elected, on or before February 10, 2020, the Debtors shall have filed a Sale Motion;

(e) if a Plan Process is elected, on or before March 1, 2020, the Debtors shall have filed an Acceptable Plan and related disclosure statement (in each case, in form and substance acceptable to the Required Lenders) with respect to any Plan Process;

(f) if a Sale Process is elected, on or before March 11, 2019, the Bankruptcy Court shall have entered an order approving the Sale Motion;

(g) if a Sale Process is elected, on or before May 20, 2020, the Bankruptcy Court shall have entered an order approving each sale contemplated by any relevant Sale Process following completion of the process contemplated by the bid procedures described in the Sale Motion;

(h) if a Plan Process is elected, on or before May 20, 2020, the Bankruptcy Court shall have entered an order confirming an Acceptable Plan; and

 if a Sale Process is elected, on or before July 9, 2020, the Bankruptcy Code shall have entered an order confirming an Acceptable Plan.