### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SOUTHERN FOODS GROUPS, LLC, *et al.*, | ) | Case No. 19-36313 (DRJ) |
|  | ) |  |
| Debtors.[1] | ) | Jointly Administered |
|  | ) |  |

**MOTION OF DEBTORS FOR ENTRY OF ORDERS (I)(A) APPROVING BIDDING PROCEDURES FOR SALE OF DEBTORS' ASSETS, (B) APPROVING THE DESIGNATION OF DAIRY FARMERS OF AMERICA, INC. AS THE STALKING HORSE BIDDER FOR SUBSTANTIALLY ALL OF DEBTORS' ASSETS, (C) AUTHORIZING AND APPROVING ENTRY INTO THE STALKING HORSE ASSET PURCHASE AGREEMENT, (D) APPROVING BID PROTECTIONS, (E) SCHEDULING AUCTION FOR, AND HEARING TO APPROVE, SALE OF DEBTORS' ASSETS, (F) APPROVING FORM AND MANNER OF NOTICES OF SALE, AUCTION, AND SALE HEARING, (G) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (H) GRANTING RELATED RELIEF AND (II)(A) APPROVING SALE OF DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF**

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows:  Southern Foods Group, LLC (1364); Dean Foods Company (9681); Alta-Dena Certified Dairy, LLC (1347); Berkeley Farms, LLC (8965); Cascade Equity Realty, LLC (3940); Country Fresh, LLC (6303); Dairy Information Systems Holdings, LLC (9144); Dairy Information Systems, LLC (0009); Dean Dairy Holdings, LLC (9188); Dean East II, LLC (9192); Dean East, LLC (8751); Dean Foods North Central, LLC (7858); Dean Foods of Wisconsin, LLC (2504); Dean Holding Company (8390); Dean Intellectual Property Services II, Inc. (3512); Dean International Holding Company (9785); Dean Management, LLC (7782); Dean Puerto Rico Holdings, LLC (6832); Dean Services, LLC (2168); Dean Transportation, Inc. (8896); Dean West II, LLC (9190); Dean West, LLC (8753); DFC Aviation Services, LLC (1600); DFC Energy Partners, LLC (3889); DFC Ventures, LLC (4213); DGI Ventures, Inc. (6766); DIPS Limited Partner II (7167); Franklin Holdings, Inc. (8114); Fresh Dairy Delivery, LLC (2314); Friendly's Ice Cream Holdings Corp. (7609); Friendly's Manufacturing and Retail, LLC (9828); Garelick Farms, LLC (3221); Mayfield Dairy Farms, LLC (3008); Midwest Ice Cream Company, LLC (0130); Model Dairy, LLC (7981); Reiter Dairy, LLC (3675); Sampson Ventures, LLC (7714); Shenandoah's Pride, LLC (2858); Steve's Ice Cream, LLC (6807); Suiza Dairy Group, LLC (2039); Tuscan/Lehigh Dairies, Inc. (6774); Uncle Matt's Organic, Inc. (0079); and Verifine Dairy Products of Sheboygan, LLC (7200). The debtors' mailing address is 2711 North Haskell Avenue, Suite 3400, Dallas, TX 75204.

> **A HEARING WILL BE CONDUCTED ON THIS MATTER ON <u>MARCH 12, 2020 AT 2:00 P.M. (CT)</u> IN COURTROOM 400, 515 RUSK STREET, HOUSTON, TEXAS 77002, BEFORE THE HONORABLE DAVID R. JONES.  IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING, SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING.  UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN 21 DAYS FROM THE DATE YOU WERE SERVED WITH THIS PLEADING.  YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

Southern Foods Group, LLC, Dean Foods Company, and certain of their debtor affiliates (collectively, the "**Debtors**"), each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby file this *Motion of Debtors for Entry of Orders (I)(a) Approving Bidding Procedures for Sale of Debtors' Assets, (b) Approving the Designation of Dairy Farmers of America, Inc. as the Stalking Horse Bidder for Substantially All of Debtors' Assets, (c) Authorizing and Approving Entry into the Stalking Horse Asset Purchase Agreement, (d) Approving Bid Protections, (e) Scheduling Auction for, and Hearing To Approve, Sale of Debtors' Assets, (f) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, (g) Approving Assumption and Assignment Procedures, and (h) Granting Related Relief and (II)(a) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (b) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (c) Granting Related Relief* (this "**Motion**"). This Motion is supported by (i) the *Declaration of Anthony Magro in Support of the Motion of Debtors for Entry of Orders (I)(a) Approving Bidding Procedures for Sale of Debtors' Assets, (b) Approving the Designation of Dairy Farmers of America, Inc. as the Stalking Horse Bidder for Substantially All of Debtors' Assets, (c) Authorizing and Approving Entry into the Stalking Horse Asset Purchase Agreement, (d) Approving Bid Protections, (e) Scheduling Auction for, and Hearing To Approve, Sale of Debtors' Assets, (f) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, (g) Approving Assumption and Assignment Procedures, and*

*(h) Granting Related Relief and (II)(a) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (b) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (c) Granting Related Relief* (the "**Magro Declaration**"), which is attached hereto and incorporated by reference herein, and (ii) the entire record of the Chapter 11 Cases.  In further support of this Motion, the Debtors respectfully state as follows:

<u>**Relief Requested**</u>

1.    By this Motion, pursuant to sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtors request entry of the following:

a.    an order, substantially in the form attached hereto (the "**Bidding Procedures Order**"),

i.    authorizing and approving the bidding procedures, substantially in the form attached to the Bidding Procedures Order (the "**Bidding Procedures**"), in connection with the sale of the Bid Assets (as defined herein)[2] (the "**Sale Transaction**"[3]);

ii.    authorizing and approving the Debtors' entry into the Stalking Horse Agreement (as defined herein) with Dairy Farmers of America, Inc., a copy of which is attached hereto;

iii.    approving certain Bid Protections in favor of the Stalking Horse Bidder (as defined below) in connection with the Stalking Horse Agreement and in accordance with the terms and conditions set forth in the Bidding Procedures;

---

[2] Notwithstanding the Debtors' request for authorization and approval of the Bidding Procedures, the Debtors reserve the right to seek by separate motion, in the exercise of their sound business judgment and fiduciary duties (in consultation with the Consultation Parties (as defined herein)), the authority to sell assets of the Debtors' estates (that do not constitute all or substantially all of the Debtors' assets) pursuant to section 363 of the Bankruptcy Code.

[3] As described below, the Bidding Procedures provide that there may be one or several Sale Transactions. To the extent that this Motion refers to the Sale Transaction, or terms related thereto, in the singular it shall include the plural, and vice versa.

iv.       scheduling an auction of the Bid Assets (the "**Auction**") to be held on April 20, 2020 at 10:00 a.m. (prevailing Eastern Time);

v.       scheduling a hearing (the "**Sale Hearing**") to consider approval of the proposed Sale Transaction to be held on April [27], 2020 at [·]:00 [·].m. (prevailing Central Time)[4];

vi.       authorizing and approving the (A) notice of the sale of the Bid Assets, the Potential Bidder Deadline, the Bid Deadline, and the Auction and Sale Hearing (each as defined herein), substantially in the form attached to the Bidding Procedures Order (the "**Sale Notice**"), (B) notice to each relevant non-Debtor counterparty (each, a "**Counterparty**") to an executory contract or unexpired lease listed on the Potential Assumed Contracts Schedule (as defined below) (collectively, the "**Contracts and Leases**" and each an "**Assumed Contract**" or "**Assumed Lease**") regarding the Debtors' potential assumption and assignment of such Counterparty's Assumed Contracts or Assumed Leases (collectively, the "**Potential Assumed Contracts**") and the amount necessary to cure any defaults thereunder (the "**Cure Costs**"), substantially in the form attached to the Bidding Procedures Order (the "**Potential Assumption and Assignment Notice**"), and (C) notice to each Counterparty listed on the Proposed Assumed Contracts Schedule (as defined herein), substantially in the form attached to the Bidding Procedures Order (the "**Proposed Assumption and Assignment Notice**");

vii.       authorizing and approving procedures for the assumption and assignment of the Contracts and Leases and the determination of Cure Costs with respect thereto (collectively, the "**Assumption and Assignment Procedures**"); and

viii.       granting related relief.

b.       an order (the "**Sale Order**") authorizing and approving the following:

i.       the sale of the Bid Assets free and clear of all liens, claims, interests, and encumbrances, except certain permitted encumbrances as determined by the Debtors and any purchaser of the Bid Assets;

ii.       the assumption and assignment of the proposed Assumed Contracts and Assumed Leases (collectively, the "**Proposed Assumed Contracts**") in connection with the proposed Sale Transaction; and

---

[4] This date remains subject to Court approval.

iii.      granting related relief.

**Jurisdiction, Venue, and Authority**

2.      The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334 and the *Order of Reference to Bankruptcy Judges*, General Order 2012-6 (S.D. Tex. May 24, 2012) (Hinojosa, C.J.).

3.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  In addition, the Debtors confirm their consent, pursuant to Bankruptcy Rule 7008 and Rule 7008-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Local Rules**"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue of the Chapter 11 Cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

**Background**

4.      On November 12, 2019 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have continued in possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On November 22, 2019, the Office of the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") appointed an Official Committee of Unsecured Creditors (the "**Committee**").  *See Notice of Appointment of Committee of Unsecured Creditors* [D.I. 288].

6.     No request has been made for the appointment of a trustee or examiner in the Chapter 11 Cases.

7.     Additional information about the Debtors' businesses and affairs, capital structure, and prepetition indebtedness, and the events leading up to the Petition Date, can be found in the *Declaration of Gary Rahlfs in Support of Debtors' Chapter 11 Proceedings and First Day Pleadings* [D.I. 46] (the "**Rahlfs Declaration**"), which is incorporated herein by reference.

8.     The Chapter 11 Cases are being jointly administered pursuant to Bankruptcy Rule 1015(b) and the *Order Directing Joint Administration of Chapter 11 Cases* [D.I. 9] entered by the Court on November 12, 2019 in each of the Chapter 11 Cases.

## The Bid Assets[5]

9.     The Debtors are a leading public food and beverage company and the largest processor and direct-to-store distributor of fresh fluid milk and other dairy and dairy case products in the United States.  The Debtors manufacture, market, and distribute a wide variety of branded and private label dairy and dairy case products, including fluid milk, ice cream, cultured dairy products, creamers, ice cream mix, and other dairy products to retailers, distributors, foodservice outlets, educational institutions, and governmental entities across the United States.

10.    As described more fully in the Rahlfs Declaration, the Debtors sell their products under national, regional, or local proprietary or licensed brands.  Products not sold under these brands are sold under a variety of private labels.  The Debtors' brands include *DairyPure*®, the country's largest fresh, white milk national brand, and *TruMoo*®, the leading national flavored milk brand.  As of December 31, 2019, the Debtors' national, local, and regional proprietary and licensed brands included the following:

---

[5] The assets and operations described in this section are referred to collectively as the "**Bid Assets**" herein.

| | | |
|---|---|---|
| Alta Dena® | Jilbert™ | Pog® (licensed brand) |
| Arctic Splash® | Knudsen® (licensed brand) | Price's™ |
| Barber's Dairy® | Land O Lakes® (licensed brand) | Purity™ |
| Berkeley Farms® | Land-O-Sun & design® | ReadyLeaf® |
| Broughton™ | Lehigh Valley Dairy Farms® | Reiter™ |
| Brown Cow® | Louis Trauth Dairy Inc.® | Robinson™ |
| Brown's Dairy® | Mayfield® | Schepps® |
| Chug® | McArthur® | Sonora™ |
| Country Fresh™ | Meadow Brook® | Steve's® |
| Country Love® | Meadow Gold® | Stroh's® |
| Creamland™ | Model Dairy® | Swiss Dairy™ |
| DairyPure® | Morning Glory® | Swiss Premium™ |
| Dean's® | Nature's Pride® | TruMoo® |
| Fieldcrest® | Nurture® | T.G. Lee® |
| Friendly's® | Nutty Buddy® | Turtle Tracks® |
| Fruit Rush® | Oak Farms® | Tuscan® |
| Gandy's™ | Orchard Pure® | Uncle Matt's Organic® |
| Garelick Farms® | Organic Valley® (licensed by joint venture) | Viva® |
| Good Karma® | Over the Moon® | |
| Hygeia® | PET® (licensed brand) | |

11.     The Debtors currently operate 57 manufacturing facilities (each a "**Facility**") in 29 states located largely based on customer needs and other market factors, with distribution capabilities across all 50 states.  Due to the perishable nature of the Debtors' products, they deliver the majority of their products directly to their customers' locations in a fleet of approximately 5,000 refrigerated trucks or trailers that they own or lease.  This form of delivery is called a "direct-to-store delivery" or "DSD" system.  The Debtors have one of the most extensive refrigerated DSD systems in the United States.

## Marketing and Sale Process

12.     Evercore Group L.L.C. ("**Evercore**") has been engaged as investment banker to the Debtors since February 2019.  The Debtors initially retained Evercore to assist with a broad evaluation of potential strategic alternatives, including a sale of the enterprise, strategic business combinations, the disposition of certain assets, the formation of new joint ventures, and

other options to re-energize the Debtors' stand-alone business.  It was ultimately determined that these options could not be pursued for a variety of reasons, including the existence of potential contingent liabilities that the Debtors faced related to the underfunded status of certain multi-employer pension plans in which the Debtors participated.  Such potential liabilities significantly impaired the Debtors' ability to pursue any strategic transactions with third parties outside of a bankruptcy proceeding.

13.     By early October 2019, the Debtors saw a sharp decline in their third quarter 2019 results and realized that they faced a financial outlook that was deteriorating more rapidly than prior forecasts.  Evercore explored a variety of potential out-of-court financing transactions, which led to discussions with a number of potential lenders, including certain holders of the Debtors' prepetition senior unsecured notes.  Ultimately, however, the Debtors concluded, in consultation with Evercore and other advisors, that such an out-of-court transaction was not actionable under the circumstances.  Accordingly, the Debtors commenced the Chapter 11 Cases in order to manage liquidity, prevent potentially ruinous customer and vendor fights, and pursue the consummation of one or more sale transactions or a plan of reorganization through a court-supervised process.

14.     To finance the Debtors' businesses as they pursue such transactions, the Debtors sought and obtained senior secured superpriority post-petition financing in the amount of $425 million and an amendment and restatement of the receivables securitization facility in the amount of $425 million.  After considering a wide-range of potential strategic alternatives and negotiating with all relevant stakeholders and counterparties, Evercore and the Debtors ultimately determined that a sale of all or substantially all of the Debtors' assets would be a potential path to maximize and preserve value for the benefit of the Debtors' stakeholders.

15.     To that end, in October 2019, Evercore and the Debtors engaged in negotiations and discussions with Dairy Farmers of America, Inc. ("**DFA**").  As the Debtors' long-time commercial partner and raw milk vendor, DFA was considered likely to be able to contribute significant value to the Debtors' businesses and negotiate and reach a sale agreement with the Debtors prior to the Petition Date.  Although the Debtors and DFA did not enter into a stalking horse agreement by the Petition Date, the discussions were significantly advanced such that the Debtors were able to publicly announce on November 12, 2019 that they were engaged in advanced discussions with DFA with regard to its role as a potential stalking horse bidder for the purchase of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code.

16.     After the Petition Date, Evercore considerably expanded the marketing process for the Bid Assets.  Evercore began communicating with additional potential strategic and financial buyers while it continued to engage with DFA to explore a sale of the Bid Assets through the Chapter 11 Cases.

17.     Over the course of approximately three months, Evercore contacted and/or received inbound interests from nearly 100 entities, including 55 potential strategic buyers (among which were 18 regional dairy companies) and 44 potential financial buyers.  Based on discussions with these entities, Evercore provided approximately 38 parties with confidential information regarding the Debtors' businesses after such parties executed non-disclosure agreements with the Debtors.  Several of these parties, including the Stalking Horse Bidder (as defined below), expressed interest in considering a transaction with the Debtors and were granted access to a data room containing additional confidential information regarding the Bid Assets. Evercore provided additional details to these parties, including access to confidential diligence

materials.  At the same time, the Debtors and their advisors have been working extensively with the ad hoc group of noteholders and their advisors regarding a possible plan or reorganization.

18.     Following a competitive process and arm's length negotiations, the Debtors secured a bid (the "**Stalking Horse Bid**") from DFA, pursuant to which DFA will serve as the stalking horse bidder (hereinafter, the "**Stalking Horse Bidder**") in a transaction to purchase substantially all of the Bid Assets for an aggregate purchase price (subject to certain adjustments) of $425 million along with the assumption of certain liabilities (such group of Bid Assets, the "**Stalking Horse Assets**") on the terms and conditions set forth in the Asset Purchase Agreement, dated as of February 16, 2020, by and among the Debtors and the Stalking Horse Bidder (the "**Stalking Horse Agreement**").  The Stalking Horse Assets consist of (a) 44 of the Debtors' 57 manufacturing facilities, including real estate, inventory, equipment and all other assets necessary to operate such facilities, (b) all fluid and frozen assets associated with such facilities, (c) certain real estate and equipment relating to one previously closed manufacturing facility, (d) certain intangible assets, and (e) ownership interest in certain joint ventures, each, as further specified in the Stalking Horse Agreement.

19.     The Stalking Horse Agreement is the product of the extensive marketing efforts of the Debtors and their advisors, in consultation with the Committee[6] and the Agents (as defined below), which efforts are more fully described above and in the Magro Declaration.  Given the exigencies of the Debtors' financial condition, and specifically, the Debtors' distressed liquidity situation, the Debtors believe that the timely sale of the Stalking Horse Assets in accordance with the sale process outlined in this Motion is the best way to maximize value for the benefit of their

---

[6] Although the Debtors consulted with the Agents and the Committee prior to filing this Motion, the Agents and the Committee are still analyzing the transaction contemplated by the Stalking Horse Agreement, this Motion, and the Bidding Procedures, and reserve all rights in connection therewith.

estates and stakeholders.

20.     To ensure that the Stalking Horse Bid is in fact the highest or otherwise best offer for the purchase of the Stalking Horse Assets, and to provide for the potential sale of additional Bid Assets that are not included in the Stalking Horse Assets, the Debtors have developed Bidding Procedures to govern the sale of the Stalking Horse Assets and all other Bid Assets.  The Bidding Procedures allow interested parties to submit bids for (a) all of the Bid Assets or (b) particular lots of individual Bid Assets or combinations thereof as specified in the Bidding Procedures, in each case, subject to the terms and provisions of the Bidding Procedures.  The Stalking Horse Agreement, therefore, sets a floor for the sale of the Stalking Horse Assets in a competitive bidding process, which will benefit all of the Debtors' stakeholders by helping to ensure the highest or otherwise best offer for the Stalking Horse Assets.

21.     The Debtors have carefully evaluated a number of qualitative and quantitative factors in designing a process that they believe will maximize the value of their estates and produce maximum recoveries.   This process includes both entry into the Stalking Horse Agreement and approval of the Bidding Procedures, which are designed to (a) promote active bidding from interested parties and (b) to elicit the highest or otherwise best offers available for the Stalking Horse Assets and all other Bid Assets for the benefit of stakeholders.  Moreover, the Bidding Procedures provide the Debtors with the flexibility to consider bids in the form of chapter 11 plans of reorganization.

22.     The Debtors, in consultation with the Debtors' advisors, believe that the process and time periods set forth in the Bidding Procedures are reasonable and will provide parties with sufficient time and information necessary to formulate bids to purchase the Bid Assets.   In formulating the Bidding Procedures and time periods contained therein, the Debtors balanced the

need to provide adequate and appropriate notice to parties in interest and to potential purchasers with the need to efficiently sell the Bid Assets to maximize realizable value, all the while preventing the disclosure of confidential information to competitors that could be damaging to the business going forward.  As described above and more fully in the Magro Declaration, the Bid Assets have been extensively marketed by Evercore over approximately three months to a broad group of strategic and financial buyers, who have been provided with substantial information regarding the Bid Assets.  Moreover, speed is critical in light of the Debtors' obligations under the Senior Secured Superpriority Debtor-In-Possession Credit Agreement, dated as of November 14, 2019 (as may be amended, supplemented, or otherwise modified form time to time, the "**DIP Credit Agreement**"), and the need to ensure the Debtors maximize and preserve value for all stakeholders.[7]

23.     Completion of the sale process in a timely manner will maximize the value of the Bid Assets.  The time periods set forth in the Bidding Procedures are prudent and consistent with the case milestones set forth in the DIP Credit Agreement (which were negotiated and agreed to among the advisors to the Debtors, the DIP Lenders[8], and the Committee), and failure to adhere to such time periods could jeopardize the closing of a Sale Transaction.  Thus, the Debtors have determined that pursuing a Sale Transaction in the manner and within the time periods prescribed

---

[7] The DIP Credit Agreement contains a milestone obligating the Debtors to file this Motion within 90 days after the Petition Date, or February 10, 2020.  *See* DIP Credit Agreement ¶ 5.14(d).  The February 10, 2020 milestone has been extended to February 24, 2020.

[8] The "**DIP Lenders**" shall have the meaning ascribed to such term in the *Emergency Motion of Debtors for Entry of Interim and Final Orders, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, 507 and 552 (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Post-Petition Financing, and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Claims, (III) Providing Adequate Protection to Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [D.I. 72] (the "**DIP Motion**").

in the Bidding Procedures is in the best interest of the Debtors' estates and will provide interested parties with sufficient opportunity to participate.

24.     Accordingly, the Debtors believe that the Bidding Procedures, entry into the Stalking Horse Agreement, and the related relief requested in this Motion will allow the Debtors to efficiently accomplish a restructuring that is in the best interests of the Debtors' estates and their stakeholders.  Therefore, the Debtors respectfully request that the Court grant the relief requested herein.

**The Proposed Sale and Bidding Procedures**

**A.     Summary of Key Terms of the Stalking Horse Bid**

25.     The Stalking Horse Agreement represents a binding bid to purchase the Stalking Horse Assets.  By this Motion, the Debtors request authority to provide the Stalking Horse Bidder with standard stalking horse protections, in particular (a) the payment of a break-up fee in an amount equal to $15,000,000.00 (the "**Break-up Fee**") and (b) reimbursement of up to $8,000,000.00 for reasonable and documented costs and expenses incurred by the Stalking Horse bidder in connection with the negotiation and execution of, and the carrying out of its obligations under, the Stalking Horse Agreement (other than such costs or expenses that the Stalking Horse Bidder has agreed to pay thereunder) (the "**Expense Reimbursement**" and, together with the Break-up Fee, the "**Bid Protections**").

26.     The Stalking Horse Agreement includes various customary representations, warranties, and covenants by and from the Debtors and the Stalking Horse Bidder.  In addition, the Stalking Horse Agreement includes certain conditions to closing the contemplated Sale Transaction and rights of termination related to the Chapter 11 Cases.

27.     The pertinent terms of the proposed Stalking Horse Bid are summarized in the following table.[9]

| Term | Summary Description |
|---|---|
| **Purchase Price** | The aggregate consideration for the Stalking Horse Assets shall be approximately $425 million, which shall consist of the following:<br>   i.   cash consideration in the amount of $322 million; and<br>   ii.   payment of cure costs associated with the Assumed DFA Milk Contracts in the amount of $103 million and pro rata reduction in Administrative Claims held by DFA up to $62.5 million.<br><br>Portions of the purchase price equal to (x) $35 million to secure Debtors' indemnification obligations with respect to certain customer claims and (y) $20 million to secure the parties' obligations in respect of a purchase price adjustment, if any, to the extent the Acquired Assets' target working capital deviates from its closing date working capital will, in each case, be held in escrow subject to release upon the terms and conditions set forth in the Stalking Horse Agreement. |
| **Acquired Assets; Transferred Employees** | The Acquired Assets shall include:<br>   i.   44 of the Debtors' 57 fluid and frozen facilities, including real estate, inventory, equipment, and all other assets necessary to operate such facilities and real estate, equipment and assets relating to one previously closed manufacturing facility (the "**DFA-Acquired Facilities**");<br>   ii.   certain intangible assets;<br>   iii.   those of Debtors' executory contracts that DFA elects to assume; and<br>   iv.   ownership interest in the Organic Valley joint venture and Mexican subsidiaries.<br><br>DFA agrees to make employment offers to all of the Debtors' employees whose primary work location is a DFA-Acquired Facility or who otherwise provide services primarily in support of the Acquired Assets. |
| **Excluded Assets** | The Excluded Assets shall include: |

---

[9] This summary is provided for the convenience of the Court and parties in interest. To the extent that there is any conflict between this summary and the Stalking Horse Agreement, the latter governs in all respects. Capitalized terms used but not otherwise defined in this summary shall have the meanings ascribed to such terms in the Stalking Horse Agreement.

| Term | Summary Description |
|------|---------------------|
| | i.   accounts receivable held in bankruptcy-remote entity;<br>ii.  13 manufacturing facilities and operations at four branch locations;<br>iii. all assets exclusively used by non-DFA-Acquired Facilities;<br>iv. all vendor accounts receivable/rebates, insurance claims, excess equipment (*e.g.*, leased equipment);<br>v.  all causes of action against any director or officer related to any pre-closing period;<br>vi. other non-core assets (as further specified in the Stalking Horse Agreement); and<br>vii. Uncle Matt's Business and ownership in Good Karma Foods, Inc. |
| **Assumed Liabilities** | The Assumed Liabilities shall include:<br>i.   select employee liabilities, including accrued payroll, employment benefits, and incentive compensation;<br>ii.  utility payables and customer rebates for the DFA-Acquired Facilities; and<br>iii. environmental costs for the DFA-Acquired Facilities to the extent required by law. |
| **Bid Protections** | The Bid Protections shall include:<br>i.   Break-up Fee in the amount of $15 million; and<br>ii.  Expense Reimbursement in the amount of $8 million. |

## B.    The Bidding Procedures

28.    The Bidding Procedures are designed to promote a competitive and efficient sale process to (a) confirm that the Stalking Horse Bid is, indeed, the highest or otherwise best offer for the Stalking Horse Assets or to identify one or more alternative bids (if any) that are collectively higher or otherwise better with respect to the sale of the Stalking Horse Assets, and (b) identify one or more additional bids (if any) for Bid Assets that are not included in the Stalking Horse Assets to maximize the value of such Bid Assets.  If approved, the Bidding Procedures will allow the Debtors, in consultation with the Consultation Parties, to solicit and identify bids from potential buyers that constitute the highest or otherwise best offer for the Bid

Assets on a schedule consistent with the deadlines under the Stalking Horse Agreement, the Bidding Procedures, the milestones in the DIP Credit Agreement, and the Debtors' strategy for maximizing value for their stakeholders.

29.    As the Bidding Procedures are attached to the Bidding Procedures Order, they are not herein restated in their entirety.  Certain of the key terms of the Bidding Procedures are highlighted in the chart below.[10]

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| **Consultation Rights** | Throughout the sale process, the Debtors and their advisors will regularly and timely consult with the following parties (collectively, the **"Consultation Parties"**): Coöperatieve Rabobank U.A., as agent, and its advisors (including White & Case LLP and FTI Consulting), and the Committee and its advisors, including Akin Gump Strauss Hauer & Feld LLP. |
| | For the avoidance of doubt, unless approved by the Court or otherwise provided in the Bidding Procedures, no amendment or other modification to the Bidding Procedures (including the extension of any deadlines set forth therein) shall be made by the Debtors without the consent of the Consultation Parties. |
| | The Debtors shall not consult with or provide copies of bids regarding any assets to any insider or affiliate of the Debtors pursuant to the terms of the Bidding Procedures if such party has a bid for the Bid Assets pending, or expressed any interest (written or verbal) in bidding for any of the Debtors' assets; *provided*, *however*, that if such insider or affiliate of the Debtors chooses not to submit any bid, then such party may receive copies of all bids following expiration of the latest possible Bid Deadline (as such Bid Deadline may be extended under the Bidding Procedures).  Notwithstanding the foregoing, if a member of the Committee submits a Qualified Bid (as defined in the Bidding Procedures), the Committee will maintain its consultation rights as a Consultation Party; provided that the Committee shall exclude such member from any discussions or deliberations regarding a transaction involving the applicable Bid Assets and shall not provide any confidential information regarding the Bid Assets or a transaction involving the Bid Assets to the bidding Committee member. |
| **Provisions Governing Qualification of Bidders and Qualified Bids** | **Parts 1 and 2 of the Bidding Procedures set forth the Qualified Bid and Qualified Bidder requirements.** |
| | A party may participate in the bidding process by submitting a bid for (a) all or substantially all of the Bid Assets and/or (b) one or more, or any combination of, Bid Assets as that party may desire. |
| | The Bidding Procedures also provide that the Debtors, in consultation with the |

---

[10] To the extent that there is any inconsistency between the terms of the Bidding Procedures and the summary of such terms in this Motion, the terms of the Bidding Procedures shall control.  Capitalized terms used but not otherwise defined in this summary shall have the meanings ascribed to such terms in the Bidding Procedures.

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
| --- |

Consultation Parties, may also consider competing bids in the form of a chapter 11 plan of reorganization, subject to the requirements set forth in the Bidding Procedures (a "**Chapter 11 Plan Bid**").

**A.   Indications of Interest.**

   1.  <u>Required Information</u>. Interested Parties must deliver the following items to Evercore so as to be received no later than 3:00 p.m. (prevailing Central Time) on March 31, 2020:

      a.  an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors, in consultation with the Consultation Parties;

      b.  a statement and other factual support demonstrating, to the Debtors' satisfaction, in consultation with the Consultation Parties, that the Interested Party has a *bona fide* interest in purchasing some or all of the Bid Assets;

      c.  a description of the nature and extent of any due diligence the Interested Party wishes to conduct and the date in advance of the Bid Deadline (as defined below) by which such due diligence will be completed; and

      d.  sufficient information, as defined by the Debtors, in consultation with the Consultation Parties, to allow the Debtors, in consultation with the Consultation Parties, to determine that the Interested Party has the financial wherewithal and any required internal corporate, legal, or other authorizations to close the sale transaction, including, but not limited to, current audited financial statements of the Interested Party (or such other form of financial disclosure acceptable to the Debtors in consultation with the Consultation Parties) or, if the Interested Party is an entity formed for the purpose of acquiring some or all of the Bid Assets, (i) current audited financial statements of the equity holder(s) (the "**Sponsor(s)**") of the Interested Party or such other form of financial disclosure acceptable to the Debtors in consultation with the Consultation Parties, (ii) a written commitment acceptable to the Debtors and their advisors, in consultation with the Consultation Parties, that the Sponsor(s) are responsible for the Interested Party's obligations in connection with the Bidding Process, and (iii) copies of any documents evidencing any financing commitments necessary to consummate the transaction.

If the Debtors determine, in consultation with the Consultation Parties, after receipt of the items identified above, that an Interested Party has (i) a *bona fide* interest in purchasing any or all of the Bid Assets, (ii) the financial wherewithal to execute such purchase, and (iii) reasonable due diligence requirements, such Interested Party will be deemed a "**Potential Bidder**" and the Debtors will deliver to such Potential Bidder (a) an electronic copy of the Stalking Horse Agreement and (b) access to the Debtors' confidential electronic data room concerning the Bid Assets (the "**Data Room**"), which shall include a form of Sale Order.

**B.   Due Diligence**.  In addition to Data Room access, Debtors may, in consultation with the Consultation Parties, grant additional due diligence access reasonably requested by Potential Bidders.  Unless otherwise determined by the Debtors, the availability of due diligence to a Potential Bidder will cease if the Potential Bidder does not become a Qualified Bidder or the Bidding Process is terminated in accordance with its terms**.**

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
|---|

**C. Bid Deadline** – April 13, 2020 at 3:00 p.m. (prevailing Central Time)

**D. Qualified Bid Requirements.**

1. <u>Required Bid Documents</u>. A Qualified Bid (other than the Stalking Horse Bid, with respect to which the deposit requirements will be governed by the Stalking Horse Agreement) must be accompanied by the following documents:

    a. a letter stating that the bidder's offer is irrevocable until consummation of a transaction involving the Bid Assets (or lot thereof) identified in such offer;

    b. other than for any Chapter 11 Plan Bid, a duly authorized and executed asset purchase agreement, which purchase agreement must be based on the form of the Stalking Horse Agreement, marked to show any revisions, including, among other things, the purchase price for the Bid Assets (or lot thereof, as applicable), together with all exhibits and schedules, in each case marked against the Stalking Horse Agreement and any proposed revisions to the proposed form of Sale Order;

    c. each Chapter 11 Plan Bid must be accompanied by an executed investment agreement, signed by an authorized representative of such bidder, pursuant to which the bidder proposes to effectuate a non-taxable recapitalization transaction effectuated pursuant to a chapter 11 plan of reorganization, and must provide for a fully-committed investment of capital in exchange for substantially all of the equity of the reorganized Debtors;

    d. written evidence acceptable to the Debtors in consultation with the Consultation Parties demonstrating financial wherewithal, operational ability, and corporate authorization to consummate the proposed transaction; and

    e. written evidence of a firm commitment for financing to consummate the proposed transaction, or other evidence of ability to consummate the proposed transaction without financing, that is satisfactory to the Debtors in consultation with the Consultation Parties.

2. <u>Identity of Purchaser</u>. Full disclosure of the legal identity of the purchaser and related parties participating in the Auction.

3. <u>Bid Assets; Consideration</u>.

    a. Other than for a Chapter 11 Plan Bid, identification of Bid Assets (or lot thereof) to be purchased and the Contracts and Leases to be assumed, and the consideration therefor (the "**Bid Consideration**").

    b. If the bid seeks to purchase all or substantially all of the Stalking Horse Assets (and not a lot thereof), such Bid provides for a purchase price payable in cash at Closing in an amount at least equal to $453 million, which is the sum of (i) $425 million (*i.e.* the purchase price under the Stalking Horse Agreement); *plus* (ii) the aggregate amount of the Bid Protections; *plus* (iii) $5 million (the "**Minimum Overbid**").

    c. Other than for a Chapter 11 Plan Bid, clearly states which liabilities of the Debtors or the Bid Assets will be assumed.

    d. Includes a statement of proposed terms for employees, including with respect to the Debtors' affected collective bargaining agreements and affected labor unions.

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
|---|

|  | e. Clearly allocates the Bid Consideration among the Bid Assets and Contracts and Leases to be assumed on a per Facility basis. |

4. <u>No Financing/Diligence Contingency</u>. No condition on the obtainment of financing or on the outcome of unperformed due diligence.

5. <u>Regulatory Approvals</u>. Includes a description of all governmental, licensing, regulatory, or other approvals or consents that are required to consummate the proposed transaction (including any antitrust approval related to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended), together with evidence satisfactory to the Debtors, in consultation with the Consultation Parties, of the ability to obtain such approvals or consents as soon as reasonably practicable, and in no event later than June 1, 2020, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such approvals or consents.

6. <u>Alternate Bidder</u>. Must expressly state that the bidder agrees to serve as an Alternate Bidder if such bidder's Qualified Bid is selected as the next highest or next best bid after the Successful Bid (as hereinafter defined) with respect to the applicable Bid Assets.

7. <u>Good Faith Deposit</u>. Except with respect to the Stalking Horse Bidder (whose deposit shall be governed by the Stalking Horse Agreement), delivery of a cash deposit by wire transfer to a Deposit Agent in an amount equal to ten percent of the proposed purchase price.

8. <u>Authorized Representatives</u>. A list setting forth the representatives authorized to appear and act for the bidder in connection with the proposed transaction.

9. <u>No Bid Protections</u>. Statement that the bidder will not seek any transaction or break-up fee, expense reimbursement, or similar type of payment.

10. <u>Adequate Assurance</u>. Evidence supporting the bidder's ability to comply with section 365 of the Bankruptcy Code (to the extent applicable), including the provision of adequate assurance of such bidder's ability to perform under any Contracts and Leases to be assumed by the bidder in connection with the proposed transaction.

**E. Designation of Qualified Bids; Cure of Non-Qualifying Bids.** The Debtors, in consultation with the Consultation Parties, shall have the right to deem a bid a Qualified Bid. If the Debtors receive a bid prior to the Bid Deadline that is not a Qualified Bid, the Debtors may provide the bidder with the opportunity to remedy any deficiencies following the Bid Deadline. If any bid is determined by the Debtors, in consultation with the Consultation Parties, not to be a Qualified Bid, and the applicable bidder fails to remedy such bid in accordance with the Bidding Procedures, the Debtors shall promptly instruct the Deposit Agent to return such bidder's Good Faith Deposit. Within one day of the Debtors' receipt of any bid for any or all of the Stalking Horse Assets, the Debtors shall provide such bid to the Stalking Horse Bidder and the Consultation Parties; *provided* that such bid may be withheld from members of the Committee or redacted to the extent that the Debtors determine, in their reasonable business judgment and in consultation with the advisors to the Committee, that sharing such bid would be likely to have a negative impact on potential bidding or otherwise be contrary to goal of maximizing value for the Debtors' estates from the sale process.

**F. Deemed Acknowledgments and Representations.** Each Qualified Bidder shall be

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | deemed to acknowledge and represent that such bidder: <br><br> 1.  had an opportunity to conduct any and all due diligence regarding the Bid Assets that are the subject of the Auction prior to making any such bid; <br><br> 2.  relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the assets in making its bid; and <br><br> 3.  did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Bid Assets (or lot thereof), or the completeness of any information provided in connection therewith, except as expressly stated in the Bidding Procedures or, as to the Stalking Horse Bidder, the Stalking Horse Agreement, or, as to any other Successful Bidder(s) (as defined below), the purchase agreement(s) with such Successful Bidder(s). |
| **Provisions Providing Bid Protections to Stalking Horse Bidder** | **Part 3 of the Bidding Procedures outlines the terms of the Bid Protections being provided to the Stalking Horse Bidder** <br><br> If the Stalking Horse Bidder is not the Successful Bidder, or if the Debtors withdraw the motion prior to the entry of a Sale Order approving the Sale Transaction relating to the Stalking Horse Assets, the Debtors will, in certain circumstances, pay to the Stalking Horse Bidder a Break-Up Fee and the Expense Reimbursement. The payment of the Break-Up Fee and the Expense Reimbursement will be governed by the provisions of the Stalking Horse Agreement and the Bidding Procedures Order. The Break-Up Fee is $15,000,000.00 and the Expense Reimbursement shall not exceed $8,000,000.00. |
| **Provisions Governing Credit Bidding** | **Part 4 of the Bidding Procedures sets forth the provisions governing Credit Bidding[11]** <br><br> Subject to the terms and conditions set forth in the DIP Order, the DIP Agent, with the consent of the Required Lenders, shall have the right (on behalf of the DIP Lenders) to credit bid the amounts of the DIP Obligations (other than, prior to the Challenge Period Termination Date, the DIP Roll-Up Loans) in connection with any sale of all or substantially all of the Debtors' assets and property. <br><br> If the DIP Agent submits a credit bid in accordance with the foregoing, and such bid is received by the Bid Deadline, such bidder shall be deemed to be a Qualified Bidder and any such credit bid shall be deemed to be a Qualified Bid. |
| **Provisions Governing the Auction and Permitting the Modification of Bidding and** | **Part 5 of the Bidding Procedures sets forth the procedures governing the Auction.** <br><br> **A.  Date, Time, and Location.** The Auction shall be conducted at the offices of Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017 on April 20, 2020 at 10:00 a.m. (prevailing Eastern Time) or such later time on such day or such other place as the Debtors shall notify all Qualified Bidders (including |

---

[11] Capitalized terms used in this subsection but not otherwise defined shall have the meanings ascribed to them in the *Final Order Pursuant to Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, 507, and 522 and Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Post-Petition Financing, and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Providing Adequate Protection to Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [D.I. 133] (the "**DIP Order**").

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| **Auction Procedures** | the Stalking Horse Bidder). |

**B. Participants and Attendees.**

1. Attendance will be limited to the representatives or agents (including legal and financial advisors) of (a) the Debtors, (b) any Qualified Bidder that has submitted a Qualified Bid, (c) the Agents, and (d) the Committee.

2. Each Qualified Bidder must confirm on record that it (a) has not engaged in any collusion with respect to the bidding or the sale of any of the Bid Assets, (b) has reviewed, understands, and accepts the Bidding Procedures, (c) has consented to the jurisdiction of the Court, and (d) intends to consummate its Qualified Bid if it is selected as the Successful Bid.

**C. Auction Procedures.**

1. Notice of Qualification.  Prior to the Auction, the Debtors will (a) notify each Qualified Bidder that has timely submitted a Qualified Bid that its bid is a Qualified Bid and (b) provide all Qualified Bidders with (i) copies of the Qualified Bid or combination of Qualified Bids that the Debtors, in consultation with the Consultation Parties, believe is the highest or otherwise best offer (the "**Starting Bid**"), (ii) an explanation of how the Debtors value the Starting Bid, and (iii) a list identifying all of the Qualified Bidders and their respective Qualified Bids.

2. Starting Bid.  The first round of bidding at the Auction shall commence at the Starting Bid.  For the avoidance of doubt, the Starting Bid may be comprised of multiple Qualified Bids if the aggregate consideration in such Qualified Bids is higher and better than the Stalking Horse Bid.

3. Subsequent Bids. Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding in the presence of all parties at the Auction, so long as during each round at least one subsequent bid (a "**Subsequent Bid**") is submitted by a Qualified Bidder that (a) improves upon such Qualified Bidder's immediately prior Qualified Bid and (b) the Debtors determine in consultation with the Consultation Parties that such Subsequent Bid is (i) with respect to the first round, a higher or otherwise better offer than the Starting Bid and (ii) with respect to subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below), in each case taking into account other Qualified Bids for other Bid Assets; *provided*, *however*, that with respect to each round of bidding with respect to all or substantially all of the Stalking Horse Assets, any Qualified Bid or Subsequent Bid must provide consideration at least equal to the Minimum Overbid. The Debtors reserve the right, in consultation with the Consultation Parties, to announce reductions or increases in the Minimum Overbid (or in valuing such bids) at any time during the Auction.  For the avoidance of doubt, in any subsequent round of bidding with respect to all or substantially all of the Stalking Horse Assets, the Stalking Horse Bidder will be entitled to a "credit" in the amount of the Bid Protections to be counted toward its bid in such round.  In each subsequent round after the first round, the Debtors, in consultation with the Consultation Parties, may determine appropriate minimum bid increments or requirements for each round of bidding.

4. Minimum Bid Increments. In each subsequent round after the first round, the Debtors, in consultation with the Consultation Parties, may determine appropriate minimum bid increments or requirements for each round of bidding.

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
|---|

5. <u>Highest or Best Offer</u>. After the first round of bidding and between each subsequent round of bidding, as applicable, the Debtors will determine in their discretion, in consultation with the Consultation Parties, and announce the bid or bids that they believe to be the highest or otherwise best offer or combination of offers (the "**Leading Bid**"). Additional consideration in excess of the amount set forth in the Starting Bid may include cash and/or non-cash consideration; *provided, however*, that the value for such non-cash consideration shall be determined by the Debtors in consultation with the Consultation Parties.

6. <u>Partial Bids</u>. If any of the Qualified Bids submitted by the Bid Deadline are structured as a purchase of less than all or substantially all of the Bid Assets (each such bid, a "**Partial Bid**"), the Debtors may conduct separate auctions at the Auction for each lot of assets (each, an "**Auction Lot**") subject to a Partial Bid.  The Debtors may, in consultation with the Consultation Parties, combine Partial Bids into an Auction Lot to compete against the Stalking Horse Bid. The Debtors may designate each Auction Lot at any time prior to the Auction.

7. <u>Recording</u>.  The bidding at the Auction will be transcribed or videotaped.

8. <u>Modification of Bidding and Auction Procedures</u>:  The Debtors, in consultation with the Consultation Parties, may employ and announce at the Auction additional procedural rules for conducting the Auction (*e.g.*, the amount of time allotted to submit Subsequent Bids), *provided, however,* that such rules shall (a) not be inconsistent with the Bankruptcy Code, the Bidding Procedures Order, or any other order of the Court entered in connection herewith and (b) be disclosed to all Qualified Bidders.

**Part 6 of the Bidding Procedures sets forth procedures by which the Debtors shall select the Successful Bid(s) and Alternate Bid(s).**

A. **Selection of Successful Bids.**  Prior to the conclusion of the Auction, the Debtors shall, in consultation with the Consultation Parties, (i) review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale transaction, (ii) determine and identify the highest or otherwise best offer or collection of offers (the "**Successful Bid(s)**"), (iii) determine and identify the next highest or otherwise best offer or collection of offers (the "**Alternate Bid(s)**"), and (iv) notify all Qualified Bidders participating in the Auction, prior to its adjournment, of (A) the identity of the party or parties that submitted the Successful Bid(s) (the "**Successful Bidder(s)**"), (B) the amount and other material terms of the Successful Bid(s), (C) the identity of the party or parties that submitted the Alternate Bid(s) (the "**Alternate Bidder(s)**"), and (D) the amount and other material terms of the Alternate Bid(s).

Each Qualified Bidder shall agree and be deemed to agree to be the Alternate Bidder if so designated.  Notwithstanding the foregoing sentence or anything in the Bidding Procedures to the contrary, any Qualified Bid submitted by the Stalking Horse Bidder or the DIP Agent (as defined in the DIP Order) shall not be required to serve as an Alternate Bid absent consent of the Stalking Horse Bidder or DIP Agent, respectively.

B. **Execution of Definitive Documentation.**  As soon as reasonably practicable after the completion of the Auction, the Successful Bidder(s) and the applicable Debtors shall complete and execute all agreements, instruments, and other documents necessary to consummate the applicable sale or other transaction(s) contemplated by the applicable Successful Bid(s). Promptly following the selection of the Successful

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | Bid(s) and Alternate Bid(s), the Debtors shall file a notice of the Successful Bid(s) and Alternate Bid(s) with the Court, together with a proposed Sale Order. |
| **Provisions Regarding Sale Hearing and Closing with Successful Bidders and Alternative Bidders** | **Part 7 of the Bidding Procedures sets forth procedures regarding closing with Successful Bidder(s) or Alternative Bidder(s).**<br><br>The Sale Hearing will be held on April [27], 2020 at: [·]:00 [·].m. (prevailing Central time)[12] before the Honorable Judge David R. Jones, in the United States Bankruptcy Court for the Southern District of Texas, 515 Rusk St., Houston, Texas 77002.  The Sale Hearing may be adjourned by the Debtors, in consultation with the Consultation Parties, by an announcement of the adjourned date at a hearing before the Bankruptcy Court or by filing a notice on the Bankruptcy Court's docket.  At the Sale Hearing, the Debtors will seek the Bankruptcy Court's approval of the Successful Bid(s) and, at the Debtors' election, the Alternate Bid(s).<br><br>The Debtors' presentation to the Court of the Successful Bid(s) and Alternate Bid(s) will not constitute the Debtors' acceptance of such bid(s), which acceptance will only occur upon approval of such bid(s) by the Court.  Following the Court's entry of the Sale Order, the Debtors and the Successful Bidder(s) shall proceed to consummate the transaction(s) contemplated by the Successful Bid(s).  If the Debtors and the Successful Bidder(s) fail to consummate the proposed transaction(s), then the Debtors shall file a notice with the Court advising of such failure.  Upon the filing of such notice with the Court, the Alternate Bid(s) will be deemed to be the Successful Bid(s) and the Debtors will be authorized, but not directed, to effectuate the transaction(s) with the Alternate Bidder(s) subject to the terms of the Alternate Bid(s) of such Alternate Bidder(s) without further order of the Court. |

## C.    Key Dates and Deadlines

30.    Consistent with the Debtors' need to consummate a sale of the Bid Assets as efficiently as practicable, the Debtors propose the following key dates and deadlines for the sale process, certain of which dates and deadlines may be subject to extension in accordance with the Bidding Procedures:

| | |
|---|---|
| **March 12, 2020 at 2:00 p.m. (prevailing Central Time)** | Hearing to consider approval of the Bidding Procedures and entry of the Bidding Procedures Order |
| **March 16, 2020** | Target date for the Debtors to file Potential Assumed Contracts Schedule |
| **March 31, 2020 at 3:00 p.m. (prevailing Central Time)** | Potential Bidder deadline |
| **April 6, 2020 at 4:00 p.m.** | Cure Objection Deadline |

---

[12] This date remains subject to Court approval.

| (prevailing Central Time) | |
|---|---|
| **April 13, 2020 at 3:00 p.m. (prevailing Central Time)** | Bid Deadline |
| **April 20, 2020 at 10:00 a.m. (prevailing Eastern Time)** | Auction (if any) to be held at the offices of Davis Polk & Wardwell LLP |
| **April 21, 2020** | Target date for the Debtors to file with the Court the Notice of Auction Results |
| **April 22, 2020 at 4:00 p.m. (prevailing Central Time)** | Deadline to object to the Sale Transaction to the Successful Bidder; and the Assumption and Assignment Objection Deadline |
| **April [27], 2020 at [·]:00 [·].m. (prevailing Central Time)[13]** | Hearing to consider approval of the Sale Transaction(s) and entry of the Sale Order(s) |

## D.      Noticing Procedures

31.      The Debtors propose the following "**Noticing Procedures**":

a.      <u>**Sale Notice and Publication.**</u> As soon as reasonably practicable after entry of the Bidding Procedures Order, but not later than three business days after entry of the Bidding Procedures Order, the Debtors shall serve the Sale Notice, the Bidding Procedures Order (including the Bidding Procedures attached to the Bidding Procedures Order) by first class or overnight mail upon the following:  (i) the U.S. Trustee; (ii) Akin Gump Strauss Hauer & Feld LLP, as counsel to the Committee; (iii) White & Case LLP, as counsel to Coöperatieve Rabobank U.A., New York Branch, the administrative agent under Debtors' prepetition receivables purchase agreement, administrative agent under the Debtors' prepetition secured revolving credit facility, administrative agent under the Debtors' securitization facility, and administrative agent under the Debtors' post-petition financing facility (collectively, the "**Agents**"); (iv) indenture trustee under the Debtors' prepetition unsecured bond indenture; (v) Counterparties to Contracts and Leases; (vi) the Securities and Exchange Commission; (vii) the Internal Revenue Service; (viii) the U.S. Environmental Protection Agency; (ix) the United States Attorney's Office for the Southern District of Texas; (x) the United States Attorney General/Antitrust Division of the Department of Justice; (xi) the state attorneys general for states in which the Debtors conduct business; (xii) all other parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors; (xiii) all potential buyers previously identified or solicited by the Debtors or their advisors and any additional parties who have previously expressed an interest to the Debtors or their advisors in potentially acquiring the Debtors' assets; (xiv) all other known parties with any interest in the Bid Assets; (xv) all known creditors of the Debtors; and (xvi) any party that has requested notice pursuant to

---

[13] This date remains subject to Court approval.

Bankruptcy Rule 2002 (collectively, the "**Sale Notice Parties**").   The Debtors will publish the Sale Notice once in *USA Today* national edition as soon as practicable following entry of the Bidding Procedures Order. This publication notice will provide notice of the sale to any other interested parties whose identities are unknown to the Debtors.

b.   **Notice of Determination of Qualified Bids**. The Debtors, in consultation with the Consultation Parties, will make a determination regarding which bids qualify as a Qualified Bid.  Prior to the Auction, the Debtors will (i) notify each Qualified Bidder that has timely submitted a Qualified Bid that its bid is a Qualified Bid and (ii) provide all Qualified Bidders with (A) a copy of the Starting Bid, (B) an explanation of how the Debtors value the Starting Bid, and (C) a list identifying all of the Qualified Bidders and their respective Qualified Bids.

c.   **Notice of Hearing if Auction Not Held**. If (a) no Qualified Bids for the Stalking Horse Assets are submitted by the Bid Deadline other than the Stalking Horse Bid or (b) only one or more Partial Bids are submitted by the Bid Deadline for non-overlapping lots of the Bid Assets, the Debtors may, in their discretion, in consultation with the Consultation Parties, elect to cancel the Auction, seek approval of the transactions contemplated in the Stalking Horse Bid, the Qualified Bid which is not the Stalking Horse Bid, or the transactions in respect of such Partial Bids, at the Sale Hearing. If no Auction is to be conducted, the Debtors will file with the Court, serve on the Sale Notice Parties, and cause to be published on the Debtors' case information website located at *https://dm.epiq11.com/SouthernFoods* (the "**Case Information Website**") a notice (x) indicating that the Auction for the Bid Assets has been canceled, (y) indicating that the Stalking Horse Bid, or Partial Bid(s) (as applicable) is or are the Successful Bid with respect to the Bid Assets, and (z) setting forth the date and time of the Sale Hearing.

In no event shall the Consultation Parties have fewer than five days before the Sale Hearing to object to the Partial Bid or Successful Bid, or to the Stalking Horse Bid, absent consent of the Consultation Parties.

d.   **Notice of Auction Results**.  Promptly following the selection of the Successful Bid(s) and Alternate Bid(s), the Debtors shall file a notice of the Successful Bid(s) and Alternate Bid(s) (the "**Notice of Auction Results**") with the Court and cause the Notice of Auction Results to be published on the Case Information Website.

32.   The Noticing Procedures constitute adequate and reasonable notice of the key dates and deadlines for the sale process, including, among other things, the objection deadline, the Bid Deadline, and the times and locations of the Auction and Sale Hearing.  Accordingly, the

Debtors request that the Court find that the Noticing Procedures are adequate and appropriate under the circumstances and comply with the requirements of Bankruptcy Rule 2002 and Local Rule 6004(a).

**Assumption and Assignment Procedures**

33.     In connection with the Sale Transaction, the Debtors anticipate that they will assume and assign to the Successful Bidder (or its designated assignee(s)) all or certain of the Assumed Contracts and Assumed Leases pursuant to section 365(b) of the Bankruptcy Code. Accordingly, the Debtors hereby also seek approval of the proposed Assumption and Assignment Procedures set forth herein, which are designed to, among other things, (a) outline the process by which the Debtors will serve notice to all Counterparties regarding the potential assumption and assignment, related Cure Costs, if any, and information regarding the Successful Bidder's adequate assurance of future performance and (b) establish objection and other relevant deadlines and the manner for resolving disputes relating to assumption and assignment of the Assumed Contracts and Assumed Leases.   Specifically, the Assumption and Assignment Procedures are as follows:

a.     **Potential Assumed Contracts Schedule**.   As soon as reasonably practicable following entry of the Bidding Procedures Order, the Debtors shall file with the Court, and cause to be published on the Case Information Website, the Potential Assumption and Assignment Notice and a list of the Potential Assumed Contracts (the "**Potential Assumed Contracts Schedule**") that specifies (i) each of the Contracts and Leases that potentially could be assumed and assigned in connection with the sale of the Bid Assets, including the name of each Counterparty and (ii) the proposed Cure Cost with respect to each Potential Assumed Contract.

b.     **Potential Assumption and Assignment Notice**.   The Debtors shall, as soon as reasonably practicable after entry of the Bidding Procedures Order (but in any event, so as to provide sufficient notice such that any required responses from any Counterparties are due prior to the scheduled date of the Auction as specified in the Bidding Procedures), serve on each relevant Counterparty the Potential Assumption and Assignment Notice, which shall (i) identify the Potential Assumed Contracts, (ii) list the Debtors'

good faith calculation of the Cure Costs with respect to the Potential Assumed Contracts identified on the Potential Assumption and Assignment Notice, (iii) expressly state that assumption or assignment of an Assumed Contract or Assumed Lease is not guaranteed and is subject to Court approval, (iv) prominently display the deadline to file an Assumption and Assignment Objection (as defined herein), and (v) prominently display the date, time, and location of the Sale Hearing. The Debtors shall serve on all parties requesting notice pursuant to Bankruptcy Rule 2002, via first class mail, a modified version of the Potential Assumption and Assignment Notice, without the Potential Assumed Contracts Schedule, which will include instructions regarding how to view the Potential Assumed Contracts Schedule on the Case Information Website.

c.    **Proposed Assumption and Assignment Notice**. The Debtors shall, in conjunction with the filing of the Notice of Auction Results, file and serve on each relevant Counterparty the Proposed Assumption and Assignment Notice, which shall (i) identify the Proposed Assumed Contracts, (ii) expressly state that assumption or assignment of an Assumed Contract or Assumed Lease is not guaranteed and is subject to Court approval, (iii) prominently display the deadline to file an Assumption and Assignment Objection, and (iv) prominently display the date, time, and location of the Sale Hearing.  The Debtors shall serve on all parties requesting notice pursuant to Bankruptcy Rule 2002, via first class mail, a modified version of the Proposed Assumption and Assignment Notice, without the schedule of Proposed Assumed Contracts (the "**Proposed Assumed Contracts Schedule**"), which will include instructions regarding how to view the Proposed Assumed Contracts Schedule on the Case Information Website.

d.    **Assumption and Assignment Objections**.

i.    Objection Deadlines. Any Counterparty may object to the potential or proposed assumption or assignment of its Assumed Contract or Assumed Lease, the Debtors' proposed Cure Costs, if any, or the ability of a Successful Bidder to provide adequate assurance of future performance (an "**Assumption and Assignment Objection**").  All Assumption and Assignment Objections must (A) be in writing, (B) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules, (C) state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Costs the Counterparty believes is required to cure defaults under the relevant Assumed Contract or Assumed Lease, (D) (1) for objections relating to proposed Cure Costs, be filed no later than **April 6, 2020 at 4:00 p.m. (prevailing Central Time)** (the "**Cure Objection Deadline**") and (2) for all other objections, **April 22, 2020 at 4:00 p.m. (prevailing Central Time)** (the "**Assumption**

**and Assignment Objection Deadline**"), and (E) be served on (1) counsel to the Debtors, (y) Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn: Brian M. Resnick, Steven Z. Szanzer, Nate Sokol, and Daniel E. Meyer and (z) Norton Rose Fulbright US LLP, 1301 McKinney Street, Suite 5100, Houston, Texas 77010, Attn: William Greendyke, Jason L. Boland, Robert B. Bruner, and Julie Harrison, (2) (y) counsel to the Agents, White & Case LLP, 1221 Avenue of the Americas, New York, NY 10020, Attn: Scott Greissman, Philip Abelson, and Elizabeth Feld and (z) Gray Reed, 1300 Post Oak Blvd, Suite 2000, Houston, TX 77056, Attn: Jason S. Brookner, (3) counsel to the Committee, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attn: Philip Dublin and Meredith Lahaie, and (4) the U.S. Trustee (collectively, the "**Assumption and Assignment Objection Notice Parties**").

ii.  <u>Resolution of Assumption and Assignment Objections</u>.  If a Counterparty files a timely Assumption and Assignment Objection, such objection shall be heard at the Sale Hearing or such later date that the Debtors, in consultation with the Successful Bidder, shall determine in their discretion (in consultation with the Consultation Parties and subject to the Court's calendar).  If such objection has not been resolved prior to the closing of the Sale Transaction (whether by an order of the Court or by agreement with the Counterparty), the Successful Bidder(s) may elect, in their sole and absolute discretion, one of the following options:  (A) treat such Counterparty's contract or lease as property excluded from the Bid Assets (an "**Excluded Contract**" or "**Excluded Lease**", respectively); or (B) temporarily treat the Proposed Assumed Contract as an Excluded Contract or Excluded Lease, as applicable (a "**Designated Agreement**"), proceed to the closing of the Sale Transaction with respect to all other Bid Assets, and determine whether to treat the Designated Agreement as an Assumed Contract or Assumed Lease, as applicable, or an Excluded Contract or Excluded Lease, as applicable, within ten business days after resolution of such objection (whether by the Court's order or by agreement of the Counterparty, the Debtors, and the Successful Bidder).

iii.  <u>Failure To File Timely Assumption and Assignment Objection</u>. If a Counterparty fails to file with the Court and serve on the Assumption and Assignment Objection Notice Parties a timely Assumption and Assignment Objection, the Counterparty shall be forever barred from asserting any such objection with regard to the assumption or assignment of its Assumed Contract or Assumed Lease.  Notwithstanding anything to the contrary in the Assumed Contract or Assumed Lease, or any other document, the Cure Costs

set forth in the Potential Assumption and Assignment Notice or the Supplemental Assumption and Assignment Notice (as defined herein) shall be controlling and will be the only amount necessary to cure outstanding defaults under the applicable Assumed Contract or Assumed Lease under section 365(b) of the Bankruptcy Code arising out of or related to any events occurring prior to the closing of the Sale Transaction or other applicable date upon which such assumption and assignment will become effective, whether known or unknown, due or to become due, accrued, absolute, contingent, or otherwise, and the Counterparty shall be forever barred from asserting any additional cure or other amounts with respect to such Assumed Contract or Assumed Lease against the Debtors, the Successful Bidder, or the property of any of them.

e. **Modification of Potential Assumed Contracts Schedule or Proposed Assumed Contracts Schedule**.

    i. In addition to the rights of the Successful Bidder described above with respect to an Assumption and Assignment Objection at or prior to the closing of the Sale Transaction, the Successful Bidder (including the Stalking Horse Bidder) may elect, in its sole and absolute discretion, to (A) exclude any contract or lease on the Potential Assumed Contracts Schedule as an Assumed Contract or Assumed Lease, as applicable (in which case it shall become an Excluded Contract or Excluded Lease, as applicable), or (B) include on the Proposed Assumed Contracts Schedule any contract or lease listed on the Potential Assumed Contracts Schedule, by providing to the Debtors written notice of its election to exclude or include such contract or lease, as applicable.

    ii. If the Debtors or the Successful Bidder identify during the pendency of the Chapter 11 Cases (before or after the closing of the Sale Transaction) any contract or lease that is not listed on the Proposed Assumed Contracts Schedule, and such contract or lease has not been rejected by the Debtors, the Successful Bidder may, in its sole and absolute discretion, elect by written notice to the Debtors to treat such contract or lease as an Assumed Contract or Assumed Lease, as applicable, and the Debtors shall seek to assume and assign such Assumed Contract or Assumed Lease in accordance with the Assumption and Assignment Procedures.

    iii. Following the conclusion of the Auction, if any, and the selection of the Successful Bidder(s), the Debtors reserve the right, at any time before the closing of the Sale Transaction, to modify the previously-stated Cure Costs associated with any Proposed

Assumed Contract, subject to notice requirements in the Assumption and Assignment Procedures.

iv. In the event that any contract or lease is added to the Potential Assumed Contracts Schedule or Proposed Assumed Contracts Schedule or previously-stated Cure Costs are modified, in accordance with the Stalking Horse Agreement or the procedures set forth in this Motion, the Debtors will promptly serve a supplemental assumption and assignment notice, by first class mail, on the applicable Counterparty (each, a "**Supplemental Assumption and Assignment Notice**"). Each Supplemental Assumption and Assignment Notice will include the same information with respect to the applicable Assumed Contract or Assumed Lease as is required to be included in the Potential Assumption and Assignment Notice.

v. Any Counterparty listed on a Supplemental Assumption and Assignment Notice whose contract or lease is proposed to be assumed and assigned may object to the proposed assumption or assignment of its Assumed Contract or Assumed Lease, the Debtors' proposed Cure Costs (to the extent modified from the previously-stated amount), or the ability of the Successful Bidder to provide adequate assurance of future performance (a "**Supplemental Assumption and Assignment Objection**"). All Supplemental Assumption and Assignment Objections must (A) be in writing, (B) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules, (C) state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Costs the Counterparty believes is required to cure defaults under the relevant Assumed Contract or Assumed Lease, and (D) **no later than 14 days from the date of service of such Supplemental Assumption and Assignment Notice**, (1) be filed with the Court and (2) be served on the Assumption and Assignment Objection Notice Parties. Each Supplemental Assumption and Assignment Objection, if any, shall be resolved in the same manner as an Assumption and Assignment Objection.

f. **Reservation of Rights**. The inclusion of an Assumed Contract, Assumed Lease, or Cure Costs with respect thereto on a Potential Assumption and Assignment Notice, a Proposed Assumption and Assignment Notice, the Potential Assumed Contracts Schedule, the Proposed Assumed Contracts Schedule, or a Supplemental Assumption and Assignment Notice shall not constitute or be deemed a determination or admission by the Debtors, the Successful Bidder(s) (including the Stalking Horse Bidder), or any other party in interest that such contract or lease is an executory contract or unexpired lease within the meaning of the Bankruptcy Code. The Debtors reserve all of their rights, claims, and causes of action with respect to each

Assumed Contract and Assumed Lease listed on a Potential Assumption and Assignment Notice, Proposed Assumption and Assignment Notice, Supplemental Assumption and Assignment Notice, the Potential Assumed Contracts Schedule, and the Proposed Assumed Contracts Schedule. The Debtors' inclusion of any Assumed Contract or Assumed Lease on the Potential Assumption and Assignment Notice, Proposed Assumption and Assignment Notice, Supplemental Assumption and Assignment Notice, the Potential Assumed Contracts Schedule, and/or the Proposed Assumed Contracts Schedule shall not be a guarantee that such Assumed Contract or Assumed Lease ultimately will be assumed or assumed and assigned.

**Approval of the Relief Requested is Warranted
and in the Best Interests of the Debtors and Their Stakeholders**

**A.     The Bidding Procedures are Fair and Appropriate and Should Be Approved**

34.     The Bidding Procedures are specifically designed to promote what courts have deemed to be the paramount goal of any proposed sale of property of a debtor's estate: maximizing the value of sale proceeds received by the estate.  *See In re Johnson*, 433 B.R. 626, 638 (Bankr. S.D. Tex. 2010) (citing *Cheng v. K&S Diversified Invs. (In re Cheng)*, 308 B.R. 448, 455 (B.A.P. 9th Cir. 2004)) ("The debtor in possession performing the duties of the trustee is the representative of the estate and is saddled with the same fiduciary duty as a trustee to maximize the value of the estate available to pay creditors."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (recognizing that main goal of any proposed sale of property of a debtor's estate is to maximize value).  Courts uniformly recognize that procedures established to enhance competitive bidding are consistent with the fundamental goal of maximizing value of a debtor's estate.  *See In re ASARCO, L.L.C.*, 650 F.3d 593, 603 (5th Cir. 2011) (affirming bankruptcy court's approval of bid procedures designed to maximize the value of the debtor's estate); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing that sale procedures "encourage bidding and . . . maximize the value of the debtor's assets").

35.     The Bidding Procedures provide for an orderly, uniform, and appropriately competitive process through which interested parties may submit offers to purchase the Bid Assets.  Given the time constraints, the Debtors, with the assistance of their advisors, have structured the Bidding Procedures to promote active bidding by interested parties and to confirm the highest or otherwise best offer reasonably available for the Bid Assets.  Additionally, the Bidding Procedures will allow the Debtors to conduct the Auction in a fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to consummate a timely Sale Transaction.

36.     Courts in this district have approved procedures similar to the proposed Bidding Procedures in connection with chapter 11 asset sales.  *See, e.g.*, *In re Alta Mesa Res., Inc.*, Case No. 19-35133 (Bankr. S.D. Tex. 2019) [D.I. 317]; *In re Geokinetics Inc.*, Case No. 18-33410 (Bankr. S.D. Tex. 2018) [D.I. 110 & 154]; *In re Francis Drilling Fluids, Ltd.*, Case No. 18-35441 (Bankr. S.D. Tex. 2018) [D.I. 236]; *In re Cobalt Int'l Energy, Inc.*, [D.I. 299]; *In re EMAS CHIYODA Subsea Ltd.*, Case No. 17-31146 (Bankr. S.D. Tex. 2017) [D.I. 317]; *In re Vanguard Nat. Res., LLC*, Case No. 17-30560 (Bankr. S.D. Tex. 2017) [D.I. 583].  Accordingly, the Bidding Procedures should be approved because, under the circumstances, they are reasonable, appropriate, and in the best interests of the Debtors, their estates, and all parties in interest.

**B.     The Selection of the Stalking Horse Bidder and the Bid Protections Have Sound Business Purposes and Should Be Approved**

37.     As noted above, the Stalking Horse Agreement provides for a Break-Up Fee in an amount equal to $15,000,000.00 to be paid to the Stalking Horse Bidder upon entry of an order approving, or the consummation of, an Alternative Transaction.  In addition, the Stalking Horse Agreement provides for an Expense Reimbursement of up to $8,000,000.00 to be paid upon the occurrence of certain events typical and customary for transactions of this kind.  The Debtors

believe that the Bid Protections are necessary for the Stalking Horse Bidder to enter into the Stalking Horse Agreement. In addition, the Debtors believe that the presence of a stalking horse bidder will set a floor for the value of the Stalking Horse Assets and attract other potential buyers to bid for such assets, thereby maximizing the realizable value of the Stalking Horse Assets for the benefit of the Debtors' estates, their creditors, and all other parties in interest.[14]

38.     Approval of the Bid Protections is governed by standards for determining the appropriateness of bid protections in the bankruptcy context. The Fifth Circuit has held that bid protections should be approved in chapter 11 cases so long as (a) there was no "self-dealing or manipulation among the parties who negotiated" the bid protections, (b) the bid protections "facilitated, not hindered, the auction process," and (c) the bid protections are "reasonable in comparison to the size of" the transaction. *In re ASARCO LLC*, 650 F.3d at 603.

---

[14] For the avoidance of doubt, notwithstanding entry of the Bidding Procedures Order, the Bid Protections shall (a) remain subject to the terms and conditions of the Stalking Horse Agreement and (b) will not be binding on the Debtors until entry of the Sale Order.

39.     Here, the Bid Protections squarely satisfy the *ASARCO* factors.   First, as demonstrated by the Magro Declaration, the Bid Protections are the product of good faith, arm's length negotiations between the Debtors and the Stalking Horse Bidder.  *See* Magro Decl. ¶ 15. Further, the Stalking Horse Agreement provisions relating to the Bid Protections (along with other provisions of the Stalking Horse Agreement) were (a) scrutinized by the Debtors' professionals, (b) reviewed with outside advisors, including the advisors of the Consultation Parties,[15] through the marketing process, and (c) approved by the Debtors' board of directors. *See* Magro Decl. ¶ 19.

40.     Second, the Debtors believe, based on their business judgment, that the Break-Up Fee and the Expense Reimbursement will allow them to maximize the realizable value of the Stalking Horse Assets without chilling bidding.  The Bid Protections were a material inducement for, and a condition of, the Stalking Horse Bidder's agreement to enter into the Stalking Horse Agreement.[16]  Indeed, the Debtors believe that their ability to offer the Bid Protections to the Stalking Horse Bidder is necessary to help ensure an adequate floor for the value of the Stalking Horse Assets and to insist that competing bids be materially higher or otherwise better than the Stalking Horse Bid, thereby providing the upside opportunity that the Debtors could potentially realize a higher or otherwise better offer at any auction for the Stalking Horse Assets which, absent such a bid floor, might otherwise never have been realized—a clear benefit to the Debtors' estates.  *See In re ASARCO LLC*, 650 F.3d at 602 n.9 (5th Cir. 2011) (citation, quotation marks, and internal modifications omitted) ("In the context of bankruptcy auction sales, break-up fees are sometimes authorized because they provide an incentive for an initial

---

[15] *See supra* note 6.

[16] Moreover, the Stalking Horse Bidder would not have agreed to act as a stalking horse without the Bid Protections.  *See* Magro Decl. ¶¶ 16–17.

bidder to serve as a so-called 'stalking horse,' whose initial research, due diligence, and subsequent bid may encourage later bidders."); s*ee also In re Demay Int'l LLC*, 471 B.R. 510, 517 n.10 (S.D. Tex. 2012) ("In an effort to maximize recovery of value from an asset sale in bankruptcy, before the court-supervised auction the debtor chooses a buyer, the 'stalking horse,' from a pool of bidders to make a first bid that establishes a framework for competitive bidding, a floor, so that other bidders cannot low-ball the purchase price.").  Without the Court authorizing the Debtors to offer the Bid Protections, the Debtors might lose the opportunity to obtain the highest or otherwise best offer for the Stalking Horse Assets and would certainly lose the downside protection that could be afforded by the existence of a Stalking Horse Bidder.  Furthermore, without the benefit of the Stalking Horse Bidder, the bids received at the Auction for the Stalking Horse Assets could be substantially lower than the one offered by the Stalking Horse Bidder.

41.     Third, and finally, the Break-Up Fee and Expense Reimbursement are reasonable and appropriate in light of the size, nature, and complexity of the transaction and the efforts that will necessarily have been expended by the Stalking Horse Bidder.  Moreover, the Break-up Fee and the Expense Reimbursement are actually necessary to preserve the value of the Debtors' estates.  As set forth in the Magro Declaration, the Break-Up Fee represents only 3.5% of the Purchase Price to be paid by the Stalking Horse Bidder.  *See* Magro Decl. ¶ 18.  Additionally, both the Break-Up Fee and the Expense Reimbursement were negotiated in good faith, and both were necessary to secure the Stalking Horse Bidder's commitment under the Stalking Horse Agreement.  In sum, the Debtors' ability to offer the Bid Protections enables them to ensure the sale of the Stalking Horse Assets at a price they believe to be fair, while, at the same time,

providing the Debtors with the potential of achieving an even greater benefit to the Debtors' estates in the form of a higher or otherwise better offer for the Stalking Horse Assets.

42.     Courts in this District have approved protections similar to the proposed Break-Up Fee and Expense Reimbursement as reasonable, and consistent with the type and range of bidding protections typically approved, and also have granted administrative expense status to break-up fees that become due under the terms of a stalking horse purchase agreement.  *See, e.g.*, *In re Alta Mesa Res., Inc.*, Case No. 19-35133 (Bankr. S.D. Tex. 2019) [D.I. 317]; *In re Geokinetics Inc.*, Case No. 18-33410 (Bankr. S.D. Tex. 2018) [D.I. 110 & 154]; *In re Francis Drilling Fluids, Ltd.*, Case No. 18-35441 (Bankr. S.D. Tex. 2018) [D.I. 236]; *In re Cobalt Int'l Energy, Inc.,* [D.I. 299]; *In re EMAS CHIYODA Subsea Ltd.,* Case No. 17-31146 (Bankr. S.D. Tex. 2017) [D.I. 317]; *In re Vanguard Nat. Res., LLC*, Case No. 17-30560 (Bankr. S.D. Tex. 2017) [D.I. 583].

43.     Accordingly, the Debtors submit that the Bid Protections reflect a sound business purpose, are fair and appropriate under the circumstances, and should be approved.  *See* Magro Decl. ¶¶ 18–19.

**C.      The Proposed Sale Transactions Satisfy the Requirements of Section 363 of the Bankruptcy Code**

44.     Section 363(b)(1) of the Bankruptcy Code empowers the Court to allow a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  A debtor's decision to use, sell, or lease assets outside the ordinary course of business must be based upon the sound business judgment of the debtor.  *See, e.g.*, *Inst'l Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business

justification for using, selling, or leasing the property outside the ordinary course of business.");
*In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale . . . ."); *In re Cowin*, No. 13-30984, 2014 WL 1168714, at *38 (Bankr. S.D. Tex. Mar. 21, 2014); *In re St. Marie Clinic PA*, No. 10-70802, 2013 WL 5221055, at *9 (Bankr. S.D. Tex. Sept. 17, 2013); *In re Particle Drilling Techs., Inc.*, No. 09-33744, 2009 WL 2382030, at *2 (Bankr. S.D. Tex. July 29, 2009); *In re San Jacinto Glass Indus., Inc.*, 93 B.R. 934, 944 (Bankr. S.D. Tex. 1988).

45.     Courts emphasize that the business judgment rule is not an onerous standard and that it "is flexible and encourages discretion."  *In re ASARCO, L.L.C.*, 650 F.3d at 601.  "Great judicial deference is given to the [debtor's] exercise of business judgment."  *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 254 (N.D. Tex. 2005).  A sound business justification for the sale of a debtor's assets outside the ordinary course of business exists where such sale is necessary to preserve the value of the estate for the benefit of creditors and interest holders.  *See, e.g., In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 566 n.16 (8th Cir. 1997) (recognizing the paramount goal of any proposed sale of property of estate is to maximize value).  As long as a transaction "appears to enhance a debtor's estate, court approval of a debtor in possession's decision to [enter into the transaction] should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the Bankruptcy Code."  *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (citation and internal quotation marks omitted).

46.     Moreover, section 105(a) of the Bankruptcy Code confers a bankruptcy court with broad equitable powers to confer relief in alignment with bankruptcy policies.  *See U.S. v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986) (holding that section 105(a) of the Bankruptcy Code authorizes bankruptcy courts to fashion equitable remedies "in a manner consistent with the provisions of the Bankruptcy Code"); *see also In re Young*, 416 F. App'x 392, 398 (5th Cir. 2011) (recognizing that "[s]ection 105(a) of Title 11 permits the bankruptcy court to exercise broad authority"); *In re Trevino*, 599 B.R. 526, 542–43 (Bankr. S.D. Tex. 2019) (noting that the bankruptcy court has "broad authority" under section 105(a) of the Bankruptcy Code); *In re Padilla*, 379 B.R. 643, 667 (Bankr. S.D. Tex. 2007) (citations omitted) ("Section 105(a) gives bankruptcy courts broad authority to take actions necessary and appropriate for administering and enforcing the Bankruptcy Code and . . . 'authorizes a bankruptcy court to fashion such orders as are necessary to further the purposes of the substantive provisions of the Bankruptcy Code.'").

1.     ***The Debtors Have Demonstrated a Sound Business Justification for the Potential Sale Transaction***

47.     As set forth above and in the Magro Declaration, a strong business justification exists for the sale of the Bid Assets as described herein.  An orderly but expeditious sale of the Bid Assets is critical to maximizing the value of the Debtors' estates and recoveries for the Debtors' economic stakeholders.  Additionally, the Debtors believe that a consummated Sale Transaction will produce fair and reasonable purchase prices for the Bid Assets.  The Stalking Horse Bid is an offer to purchase the Stalking Horse Assets for a price that the Debtors, with the advice of their advisors, already have determined to be fair and reasonable.

48.     In addition, the Bidding Procedures were carefully designed to facilitate a flexible, robust, and competitive bidding process.  The Debtors are poised to capitalize on the progress made during the prepetition and post-petition phases of their sale process (*e.g.*, the

communication by Evercore with nearly 100 strategic and financial parties and the dissemination of confidential diligence information to 38 of those parties) to maximize the value of the Bid Assets sold at the Auction.  The Bidding Procedures provide an appropriate framework for the Debtors to review, analyze, and compare all bids received to determine which bids are in the best interests of the Debtors' estates and their economic stakeholders.  Sale Transactions governed by the Bidding Procedures undoubtedly will serve the important objectives of obtaining not only a fair and reasonable purchase price for the Bid Assets, but also the highest or otherwise best value for the Bid Assets, which will inure to the benefit of all parties in interest in the Chapter 11 Cases.

49.     Finally, nothing in the Bidding Procedures require the Debtors' board of directors to take any action, or to refrain from taking any action, with respect to the Bidding Procedures, to the extent that the Debtors' board of directors determines, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary duties under applicable law, thereby allowing the Debtors to pivot to an alternative transaction, including a plan of reorganization.

50.     For the foregoing reasons, the Debtors submit that a strong business justification exists for approving the Sale Transactions and related relief requested herein.

**2.     *The Noticing Procedures Are Reasonable and Appropriate***

51.     "[A] sale of assets under § 363 requires notice and a hearing and is subject to court approval."  *In re Moore*, 608 F.3d 253, 262 (5th Cir. 2010).  The Noticing Procedures described above are reasonably calculated to provide all of the Debtors' known creditors and all other parties in interest with adequate, timely notice of, among other things, the proposed Sale Transaction, Bidding Procedures, Auction, and Sale Hearing.

**D.      The Successful Bidder Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code**

52.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) of the Bankruptcy Code states the following:

> The reversal or modification on appeal of an authorization under [section 363(b) of the Bankruptcy Code] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).  "The purpose of § 363(m)'s stay requirement is in furtherance of the policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely."  *In re TMT Procurement Corp.*, 764 F.3d 512, 521 (5th Cir. 2014) (citation and internal quotation marks omitted).  "Section 363(m) patently protects, from later modifications on appeal, an authorized sale where the purchaser acted in good faith and the sale was not stayed pending appeal."  *Matter of Gilchrist*, 891 F.2d 559, 560 (5th Cir. 1990).

53.     Although the Bankruptcy Code does not define "good faith," the Fifth Circuit has defined the term in two ways in the context of section 363(m) of the Bankruptcy Code.  First, it has "defined a 'good faith purchaser' as 'one who purchases the assets for value, in good faith, and without notice of adverse claims.'"  *TMT Procurement Corp.*, 764 F.3d at 521 (citations omitted).  Second, the Fifth Circuit has "noted that 'the misconduct that would destroy a purchaser's good faith status . . . involves fraud, collusion between the purchaser and other bidders of the trustee, or an attempt to take grossly unfair advantage of other bidders.'"  *Id.* (citations omitted).

40

54.     The Debtors submit that the Successful Bidder is or would be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code.  The Debtors and the Stalking Horse Bidder have entered into the Stalking Horse Agreement without collusion, in good faith, and through extensive arm's length negotiations.  *See* Magro Dec'l ¶¶ 14–17.  Indeed, the Stalking Horse Bidder and the Debtors have engaged separate counsel and other professional advisors to represent their respective interests in the negotiation of the Stalking Horse Agreement and with respect to the sale process generally.   To the best of the Debtors' knowledge, information, and belief, no party has engaged in any conduct that would cause or permit a Sale Transaction, including the Stalking Horse Agreement, to be set aside under section 363(m) of the Bankruptcy Code.

55.     Further, as set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process.  Each Qualified Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding or the sale of any of the Bid Assets.   *See* Bidding Procedures § 5.  Any asset purchase agreement with a Successful Bidder executed by the Debtors will be negotiated at arm's length and in good faith.  Accordingly, the Debtors seek a finding that any Successful Bidder under the Bidding Procedures is a good faith purchaser and is entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

56.     Based on the foregoing, the Debtors submit that the Debtors' entrance into a Sale Transaction pursuant to the Bidding Procedures is a sound exercise of the Debtors' business judgment and should be approved as a good faith transaction.

**E.     The Bid Assets Should Be Sold Free and Clear of Liens, Claims, Interests, and Encumbrances Under Section 363(f) of the Bankruptcy Code**

57.     In the interest of attracting the best offers, the Bid Assets should be sold free and clear of any and all liens, claims, interests, and other encumbrances, in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, interests, and encumbrances attaching to the proceeds of the applicable sale.   Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances of an entity other than the estate if any one of the following conditions is satisfied:

> a.     applicable non-bankruptcy law permits sale of such property free and clear of such interest;
>
> b.     such entity consents;
>
> c.     such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;
>
> d.     such interest is in bona fide dispute; or
>
> e.     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Patriot Place, Ltd.*, 486 B.R. 773, 814 (Bankr. W.D. Tex. 2013) ("Section 363(f) of the Bankruptcy Code sets forth five alternative conditions that must be satisfied by the Court to authorize a debtor . . . to sell its property . . . free and clear of interests of a third party.").

58.     Section 363(f) of the Bankruptcy Code is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free

and clear of claims] is within the court's equitable powers when necessary to carry out the provisions of [the Bankruptcy Code].").

59.     The Debtors submit that the sale of the Bid Assets free and clear of liens, claims, interests, and encumbrances will satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code.  For example, to the extent a party objects to the Sale Transaction on the basis that it holds a prepetition lien or encumbrance on the Bid Assets, the Debtors believe that any such party could be compelled to accept a monetary satisfaction of such claims, under section 363(f)(5) of the Bankruptcy Code, or that such lien is in bona fide dispute, under section 363(f)(4) of the Bankruptcy Code.

60.     Moreover, the Debtors have sent or will send the Sale Notice to any purported prepetition lienholders.  If such lienholders (other than the Prepetition Secured Parties) do not object to the proposed Sale Transaction, then their consent should be presumed.  Accordingly, the Debtors request that, unless a party asserting a prepetition lien, claim, interest, or encumbrance on any of the Bid Assets (other than with respect to any Assumed Liabilities and Permitted Encumbrances (as such terms are defined in the Stalking Horse Agreement)) timely objects to this Motion, such party shall be deemed to have consented to any Sale Transaction approved at the Sale Hearing.  *See Hargave v. Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to a sale motion, a creditor is deemed to consent to the relief requested therein).

61.     The purpose of a sale order purporting to authorize the transfer of assets free and clear of all claims, liens, interests, and encumbrances would be defeated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct.  Moreover, without such assurances, potential bidders may choose not to

participate in the Auction or the Stalking Horse Bidder would not have submitted the Stalking Horse Bid, to the detriment of the Debtors' economic stakeholders. Accordingly, the Debtors request that the Court authorize the sale of the Bid Assets free and clear of any liens, claims, interests, and encumbrances (with the exception of Permitted Encumbrances and Assumed Liabilities) in accordance with section 363(f) of the Bankruptcy Code, subject to such liens, claims, interests, and encumbrances (including, without limitation, all DIP Liens, DIP Superpriority Claims, Receivables Superpriority Claims, the Prepetition Obligations, and the Prepetition Liens (as each is defined in the DIP Order)) attaching to the proceeds thereof in the same order of relative priority and with the same validity, force, and effect as prior to such sale.

## F. The Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized

62.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The decision to assume or reject an unexpired lease is a matter within the "business judgment" of the debtor. *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.)*, 872 F.2d 36, 40 (3d Cir. 1989). "As long as assumption of a lease appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision to assume the lease should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code." *Richmond Leasing Co.*, 762 F.2d at 1309 (citation and internal quotation marks omitted).

63.     Any assumption of the Proposed Assumed Contracts is an exercise of the Debtors' sound business judgment because the transfer of such Contracts and Leases is necessary to the Debtors' ability to obtain the best value for their Bid Assets. The assumption and assignment of Proposed Assumed Contracts is a critical component of the Stalking Horse

Agreement and the value of the Bid Assets.  Given that consummation of the Sale Transaction is critical to the Debtors' efforts to maximize value for their estates and stakeholders, the Debtors' assumption of Proposed Assumed Contracts is an exercise of sound business judgment and, therefore, should be approved.

64.     The consummation of any Sale Transaction involving the assignment of a Proposed Assumed Contract will be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code.  Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Contracts and Leases to be assumed be cured and that the Debtors provide adequate assurance that such defaults will be promptly cured.  The Debtors' assumption and assignment of Proposed Assumed Contracts will be contingent upon payment of the Cure Costs and effective only upon the closing of an applicable Sale Transaction or any later applicable effective date.  As set forth above, the Debtors propose to file with the Court and serve on each Counterparty a Potential Assumption and Assignment Notice, which will set forth the Debtors' good faith calculations of Cure Costs with respect to each Contract and Lease listed on such Potential Assumption and Assignment Notice and Proposed Assumption and Assignment Notice.  As a result, Counterparties will have a meaningful opportunity to raise any objections to the proposed assumption of their respective Contracts and Leases in advance of the applicable Sale Hearing.

65.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract if "adequate assurance of future performance by the assignee of such contract or lease is provided."  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *In re Texas Health Enters., Inc.*, 246 B.R. 832, 834 (Bankr. E.D. Tex. 2000) (citation and

internal quotation marks omitted).  "Assurance of future performance is adequate if performance is likely (i.e. more probable than not) and the degree of assurance necessary to be deemed adequate falls considerably short of an absolute guaranty."  *In re PRK Enters., Inc.*, 235 B.R. 597, 603 (Bankr. E.D. Tex. 1999).  "Some helpful factors include 'whether the debtor's financial data indicated its ability to generate an income stream sufficient to meet its obligations, the general economic outlook in the debtor's industry, and the presence of a guarantee.'"  *In re Texas Health Enters. Inc.*, 72 Fed. App'x 122, 126 (5th Cir. 2003) (citation omitted).

66.     As set forth above and in the Bidding Procedures, for a bid to qualify as a Qualified Bid, a Potential Bidder must include with its bid information regarding its ability (and the ability of its designated assignee, if applicable) to perform under applicable Proposed Assumed Contracts.  Each affected Counterparty will have an opportunity to object to the ability of the Successful Bidder (including the Stalking Horse Bidder) to provide adequate assurance as provided in the Bidding Procedures Order.  In addition, the Stalking Horse Bidder submits that it is able to provide adequate assurance of its ability to perform under the applicable Proposed Assumed Contracts.  Further, the Debtors propose to file with the Court a Proposed Assumption and Assignment Notice, which will set forth a list of the Proposed Assumed Contracts, in advance of the Sale Hearing. To the extent necessary, the Debtors will present facts at the Sale Hearing to show the financial wherewithal, willingness, and ability of the Successful Bidder (including the Stalking Horse Bidder) to perform under the Proposed Assumed Contracts.

67.     In addition, to facilitate the assumption and assignment of Proposed Assumed Contracts, the Debtors further request that the Court find that all anti-assignment provisions contained therein, whether such provisions expressly prohibit or have the effect of restricting or

limiting assignment of such Assumed Contract or Assumed Lease, are unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code.[17]

### Waiver of Bankruptcy Rules 6004(a), 6004(h), and 6006(d)

68.     To implement successfully the relief sought herein, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances.  The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  The Debtors further request that the Court waive the stay imposed by Bankruptcy Rule 6006(d), which provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under section 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6006(d).

69.     The proposed Sale Transaction should be consummated as soon as practicable to allow the Debtors to maximize value for their estates and stakeholders.  Accordingly, the Debtors request that the Bidding Procedures Order, the Sale Order, and any order authorizing the assumption and assignment of a Proposed Assumed Contract in connection with a Sale Transaction be effective immediately upon entry and that the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) be waived.

---

[17] Section 365(f)(1) of the Bankruptcy Code provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . . ."  11 U.S.C. § 365(f)(1).  Section 365(f)(3) of the Bankruptcy Code further provides that, "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3)

## **Notice**

70.     Notice of this Motion has been provided by telecopy, email, overnight courier, and/or hand delivery to (a) the U.S. Trustee, (b) Akin Gump Strauss Hauer & Feld LLP, as counsel to the Committee, (c) White & Case LLP, as counsel to the Agents, (d) indenture trustee under the Debtors' prepetition unsecured bond indenture, (e) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to an ad hoc group of prepetition unsecured noteholders, (f) the Securities and Exchange Commission, (g) the Internal Revenue Service, (h) the United States Attorney's Office for the Southern District of Texas, (i) the state attorneys general for states in which the Debtors conduct business, (j) all other parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors, and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002.   A copy of this Motion and any Order approving it will also be made available on the Debtors' case information website located at https://dm.epiq11.com/SouthernFoods.   The Debtors submit that, under the circumstances, the forgoing notice constitutes due, sufficient, and appropriate notice and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rule 2002, 4001(b) and (c), 6004(a), and 9014, the Local Rules, and the Complex Case Rules and no other or further notice is required.

WHEREFORE the Debtors respectfully request that the Court enter the Bidding Procedures Order and, after the Sale Hearing, the Sale Order, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated:   February 17, 2020
         Houston, Texas

Respectfully submitted,

**NORTON ROSE FULBRIGHT US LLP**

*/s/ William R. Greendyke*
William R. Greendyke (SBT 08390450)
Jason L. Boland (SBT 24040542)
Robert B. Bruner (SBT 24062637)
Julie Goodrich Harrison (SBT 24092434)
1301 McKinney Street, Suite 5100
Houston, Texas 77010-3095
Tel.:  (713) 651-5151
Fax:  (713) 651-5246
william.greendyke@nortonrosefulbright.com
jason.boland@nortonrosefulbright.com
bob.bruner@nortonrosefulbright.com
julie.harrison@nortonrosefulbright.com

*-and-*

**DAVIS POLK & WARDWELL LLP**

Brian M. Resnick (admitted *pro hac vice*)
Steven Z. Szanzer (admitted *pro hac vice*)
Nate Sokol (admitted *pro hac vice*)
Daniel E. Meyer (admitted *pro hac vice*)
450 Lexington Avenue
New York, New York 10017
Tel.: (212) 450-4000
Fax: (212) 701-5800
brian.resnick@davispolk.com
steven.szanzer@davispolk.com
nathaniel.sokol@davispolk.com
daniel.meyer@davispolk.com

*Counsel to the Debtors and Debtors in Possession*