IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

----------------------------------------------------------- x
In re:                                                      :   Chapter 11
                                                            :
SOUTHERN FOODS GROUP, LLC *et al.*                          :   Case No. 19-36313 (DRJ)
                                                            :
        Debtors.[1]                                         :   (Jointly Administered)
----------------------------------------------------------- x

**MDVA'S OBJECTION TO THE DEBTORS' MOTION FOR ENTRY OF ORDERS (I)(A) APPROVING BIDDING PROCEDURES FOR SALE OF DEBTORS' ASSETS, (B) APPROVING THE DESIGNATION OF DAIRY FARMERS OF AMERICA, INC. AS THE STALKING HORSE BIDDER FOR SUBSTANTIALLY ALL OF DEBTORS' ASSETS, (C) AUTHORIZING AND APPROVING ENTRY INTO THE STALKING HORSE ASSET PURCHASE AGREEMENT, (D) APPROVING BID PROTECTIONS, (E) SCHEDULING AUCTION FOR, AND HEARING TO APPROVE, SALE OF DEBTORS' ASSETS, (F) APPROVING FORM AND MANNER OF NOTICES OF SALE, AUCTION, AND SALE HEARING, (G) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (H) GRANTING RELATED RELIEF AND (II)(A) APPROVING SALE OF DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF**

[Relates to D.I. 925]

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: Southern Foods Group, LLC (1364); Dean Foods Company (9681); Alta-Dena Certified Dairy, LLC (1347); Berkeley Farms, LLC (8965); Cascade Equity Realty, LLC (3940); Country Fresh, LLC (6303); Dairy Information Systems Holdings, LLC (9144); Dairy Information Systems, LLC (0009); Dean Dairy Holdings, LLC (9188); Dean East II, LLC (9192); Dean East, LLC (8751); Dean Foods North Central, LLC (7858); Dean Foods of Wisconsin, LLC (2504); Dean Holding Company (8390); Dean Intellectual Property Services II, Inc. (3512); Dean International Holding Company (9785); Dean Management, LLC (7782); Dean Puerto Rico Holdings, LLC (6832); Dean Services, LLC (2168); Dean Transportation, Inc. (8896); Dean West II, LLC (9190); Dean West, LLC (8753); DFC Aviation Services, LLC (1600); DFC Energy Partners, LLC (3889); DFC Ventures, LLC (4213); DGI Ventures, Inc. (6766); DIPS Limited Partner II (7167); Franklin Holdings, Inc. (8114); Fresh Dairy Delivery, LLC (2314); Friendly's Ice Cream Holdings Corp. (7609); Friendly's Manufacturing and Retail, LLC (9828); Garelick Farms, LLC (3221); Mayfield Dairy Farms, LLC (3008); Midwest Ice Cream Company, LLC (0130); Model Dairy, LLC (7981); Reiter Dairy, LLC (3675); Sampson Ventures, LLC (7714); Shenandoah's Pride, LLC (2858); Steve's Ice Cream, LLC (6807); Suiza Dairy Group, LLC (2039); Tuscan/Lehigh Dairies, Inc. (6774); Uncle Matt's Organic, Inc. (0079); and Verifine Dairy Products of Sheboygan, LLC (7200). The debtors' mailing address is 2711 North Haskell Avenue, Suite 3400, Dallas, TX 75204.

41625228v9

Maryland and Virginia Milk Producers Cooperative Association, Inc. ("MDVA"), a supplier of raw milk and other dairy and drink products and creditor in the above-captioned cases, by counsel, and pursuant to Fed. R. Bankr. P. 6004(b) and 9014, and BLR 9013-1(g), files this objection (the "Objection") to the *Motion of Debtors for Entry of Orders (I)(a) Approving Bidding Procedures for Sale of Debtors' Assets, (b) Approving the Designation of Dairy Farmers of America, Inc. as the Stalking Horse Bidder for Substantially All of Debtors' Assets, (c) Authorizing and Approving Entry into the Stalking Horse Asset Purchase Agreement, (d) Approving Bid Protections, (e) Scheduling Auction for, and Hearing To Approve, Sale of Debtors' Assets, (f) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, (g) Approving Assumption and Assignment Procedures, and (h) Granting Related Relief and (II)(a) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (b) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (c) Granting Related Relief* (the "Bidding Procedures Motion") [D.I. 925].[2] In support of the Objection, MDVA respectfully states as follows:

## PRELIMINARY STATEMENT

The Debtors seek approval of a sale process that is fundamentally flawed. Without significant revisions to the Proposed Bidding Procedures and further support for the relief requested in the Bidding Procedures Motion, the sale process should cease.

The Debtors seek to designate Dairy Farmers of America, Inc. ("DFA") as the Stalking Horse Bidder for a sale of substantially all their assets. Yet, as the Debtors and most parties in interest are aware, a sale to DFA will raise significant red flags for antitrust regulators: DFA is by far the largest dairy coop in the United States and it also owns dairy production facilities

---

[2] Capitalized terms used but not otherwise defined in this Objection shall have the meanings given to them in the Bidding Procedures Motion.

throughout the United States, while Debtor Dean Foods Company, DFA's largest customer, is the largest dairy processing company in the United States. So the government, coops like MDVA, which compete with DFA to provide raw milk to milk processors and fluid milk to retailers, retailers, and other consumers of fluid milk have legitimate antitrust concerns, which the Debtors have done nothing to assuage. In support of the Bidding Procedures Motion, the Debtors articulate no reason to believe that regulators will approve a sale with DFA. And having failed to take the time necessary to adequately market their assets and find a stalking horse that would be able to consummate a sale, the Debtors have decided to remain steadfast in their pursuit of a sale with DFA — regardless of the cost to their estates and the effect on competition in the dairy market. The Debtors' actions in this regard are commercially unreasonable and will, if permitted to proceed, more likely than not lead to challenges on antitrust grounds.

Procedural aspects of the sale process favor DFA and raise doubts about the Debtors' ability to compare and evaluate offers from other bidders. For example, the Debtors have not adequately explained the need for the exceptionally tight deadline for submission of Qualified Bids, which will stifle bidding and deny Potential Bidders a full and fair opportunity to participate in the auction. "The need for expedition . . . is not a justification for abandoning proper standards." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 450 (1968). "[A]bandoning proper standards" under the name of expedition is what the Debtors are doing here. Partial Bidders, in addition, are uniquely prejudiced because the Stalking Horse Agreement does not allocate the Purchase Price among the Bid Assets. This robs Partial Bidders of the ability to calculate and propose competitive bids. Should Partial Bids be submitted without allocation the Debtors and the Court will have no way to meaningfully compare them to the Stalking Horse Agreement or to other bids.

3

Because the Debtors have not satisfied their burden to establish (1) a sound business reason for a sale for which DFA is the Stalking Horse Bidder, and (2) bidding procedures that create a fair and competitive sale process, their Bidding Procedures Motion must be denied.

## JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this Objection pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested in this Objection are sections 105, 363, and 365 of the Bankruptcy Code.

## BACKGROUND

4. MDVA is a vertically integrated dairy cooperative owned and operated by 1,000 dairy families from Pennsylvania to Georgia. Similar to other vertically integrated dairy cooperatives, including DFA, MDVA operates two businesses. First it markets (sells) the raw milk produced by the members' dairy farms. That is the core business of any cooperative. And in so doing it tries to negotiate the best prices for its members. When a coop also owns plants it has a separate business of selling the products that come from processing the raw milk. MDVA has two balancing plants that produce self-stable products like milk powder and butter but also tanker loads of cream and condense. These products make up MDVA's Ingredient Division, meaning the products are used as ingredients in making other dairy products. MDVA also has two fluid bottling plants that make products for its Consumer Products Division. These include bottled fluid milk, cream, half & half, and similar products.

5. Before and after the Debtors filed for bankruptcy, MDVA has supplied the Debtor Dean Foods Company with raw milk and milk products. Indeed, MDVA was one of a number of

"critical vendors" for which the Debtors obtained approval to pay prepetition critical vendor claims early in these cases. *See Final Order Authorizing (I) Debtors to Pay Prepetition Critical Vendor Claims and 503(b)(9) Claims in the Ordinary Course of Business* ("Critical Vendor Order") [D.I. 121] filed November 13, 2019. In addition to being a creditor in these chapter 11 cases MDVA has also expressed its interest in purchasing one or more Bid Assets in order to, among other things, preserve competition for the processing and sale of raw milk in the Appalachian region. MDVA, therefore, has a strong interest in the outcome of the Bidding Procedures Motion.

*The Debtors commence their Chapter 11 Cases.*

6. On November 12, 2019 (the "Petition Date"), each of the Debtors filed voluntary petitions with this Court for relief under chapter 11 of the Bankruptcy Code. The Debtors' cases (the "Chapter 11 Cases") are being jointly administered for procedural purposes only under case number 19-36313 (DRJ). *See Order Directing Joint Administration of Chapter 11 Cases* [D.I. 9].

7. The Debtors remain in possession of their property and continue to manage their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

8. On November 22, 2019, the Office of the United States Trustee for the Southern District of Texas appointed an Official Committee of Unsecured Creditors. *See Notice of Appointment of Committee of Unsecured Creditors* [D.I. 288].

9. No trustee or examiner has been appointed in the Chapter 11 Cases.

*Three months later, the Debtors File the Bidding Procedures Motion.*

10. On February 17, 2020, the Debtors filed the Bidding Procedures Motion and, in support, attached the Proposed Bidding Procedures [D.I. 925-2] and the Margo Declaration [D.I. 925-1].

11. The same day, the Debtors filed the *Debtors' Notice of Filing of Stalking Horse Asset Purchase Agreement* [D.I. 935], which disclosed that the Debtors intend to designate DFA as the Stalking Horse Bidder. The Stalking Horse Agreement [D.I. 935-1] between the Debtors and DFA was attached as Exhibit A.

12. In the Bidding Procedures Motion, the Debtors describe the marketing process (in MDVA's view, an insufficient one) for the Bid Assets and the provisions of the Stalking Horse Agreement and Proposed Bidding Procedures that they deem relevant and material. The Bidding Procedures Motion, however, glosses over the regulatory issues that undoubtedly will arise if DFA is the Successful Bidder. It contains no adequate justification for the overly aggressive schedule for bidding and approval of a sale, and it proposes inadequate mechanics for Partial Bidding on Auction Lots.

13. MDVA addresses these deficiencies and others in more detail below.

## ARGUMENT

**I.   The Debtors have failed to exercise reasonable business judgment in selecting DFA as the Stalking Horse Bidder because a sale to DFA raises significant regulatory issues that are likely to prevent the sale from closing.**

14. A court may approve a sale of substantially all a debtor's assets if, among other things, there is evidence that the debtor's management exercised good business judgment, and the sale is in the best interests of the debtor's estate. Here, however, the selection of DFA as the Stalking Horse Bidder is not a prudent judgment. The offer of the Stalking Horse Bid cannot be the "highest and best" offer due to the significant risk that a sale of substantially all the Debtors' assets to DFA will not receive the necessary regulatory approval. Indeed, the closing of such a sale is so speculative that a potential bidder is likely to submit only the Minimum Overbid amount without further consideration because such a bidder will be confident that its bid is "better" than the Stalking Horse Bid regardless of price. And some potential bidders may be deterred from bidding at all so

they are not saddled with the obligation as "Alternate" bidders to purchase assets that may have depreciated or decreased in value over time should applicable government authorities refuse to approve the sale to DFA after a sale has been approved by this Court.

15. Pursuant to section 363 of the Bankruptcy Code, a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).[3] Motions to sell substantially all a debtor's assets "are subject to special scrutiny." *In re Gulf Coast Oil Corp.*, 404 B.R. 407, 422 (Bankr. S.D. Tex. 2009). To obtain the court's approval, the debtor "must (i) have business justification for the sale and sale process, and (ii) must have a valid business justification for the process occurring separate from the plan confirmation process and being consummated without satisfaction of the plan confirmation procedures and requirements." *Id.* at 423; *see Institutional Creditors of Continental Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.),* 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("The rule adopted by the Fifth Circuit requires that a Judge determining a § 363(b) application expressly find from the evidence presented at hearing a good business reason to grant the application.").

16. The debtor, as a fiduciary of the estate, has the burden to demonstrate that the sale and sale process is justified. *In re Flour City Bagels, LLC*, 557 B.R. 53, 77 (Bankr. W.D.N.Y. 2016). "When evaluating whether the debtor-in-possession's proposed sale is consistent with a reasonable business justification, courts 'should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike.'" *In re Particle Drilling Techs., Inc.,* No. 09-33744, 2009 WL 2382030, at *2 (Bankr. S.D. Tex. July

---

[3] It is undisputed that the sale of substantially all the Debtors' assets is outside the ordinary course of the Debtors' business.

7

29, 2009) (quoting *In re Cont'l Air Lines, Inc.* 780 F.2d at 1226).[4] Generally, "the debtor must demonstrate that the purchase price is not merely the highest dollar amount — but the highest *and best* offer." *In re Flour City Bagels,* 557 B.R. at 78 (explaining that, in addition to price, the debtor "should weigh other factors, 'such as contingencies, conditions, timing, or other uncertainties in an offer that may render it less appealing.'" (citation omitted)); *see also In re Tresha-Mob, LLC,* No. 18-52420-RBK, 2019 WL 1785431, at *2 (Bankr. W.D. Tex. Apr. 3, 2019) (rejecting "one-track value-maximization argument that ignore[d] mountains of precedent in which trustees, debtors-in-possession, and courts have rejected the highest bid when it was not the 'best bid'").

17. There are well-documented antitrust issues plaguing a sale to DFA.[5] Yet the Debtors seek this Court's approval of DFA as the Stalking Horse Bidder. Under the circumstances the Debtors' request is not reasonable.

18. First, the Debtors have not submitted any evidence that DFA will be able to obtain the approval of regulators necessary to close a sale — and can do so without significant delay or

---

[4] The Fifth Circuit Court of Appeals has enumerated examples of some of the factors that may be assessed to determine whether the debtor satisfied the business judgment standard. Those factors include the following:

1. The proportionate value of the asset to the estate as a whole;
2. The amount of elapsed time since the filing;
3. The likelihood that a reorganization plan would be proposed and confirmed in the near future;
4. The effect of the proposed disposition on future plans of reorganization;
5. The proceeds to be obtained from the disposition vis-a-vis any appraisals of the property;
6. Whether the disposition is by sale, use, or lease; and finally and, perhaps, most important,
7. Whether the asset is increasing or decreasing in value.

*In re Crutcher Res. Corp.*, 72 B.R. at 631 (quoting *Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)) (quotation marks omitted). That list, however, "is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge." *In re Cont'l Air Lines, Inc.,* 780 F.2d at 1226 (quoting *In re Lionel Corp.*, 722 F.2d at 1071) (internal quotation marks omitted). Because the Debtors have failed to make sufficient disclosures in the Bidding Procedures Motion, it is unclear how application of those factors would impact this Court's analysis.

[5] *See, e.g.,* David Yaffee-Bellany, *America's Dairy Farmers Are Hurting. A Giant Merger Could Make Things Worse.*, N.Y. TIMES (Dec. 11, 2019), https://www.nytimes.com/2019/12/11/business/dean-foods-dairy-farmers-antitrust.html.

costs to the Debtors' estates. The antitrust closing risk is not speculative. The fluid milk marketplace is already concentrated. And declining milk production over recent years has only increased industry consolidation. Prior acquisitions by DFA and Debtors have been closely scrutinized by the U.S. Department of Justice ("DOJ"), including Debtors' 2001 merger with Suiza Foods Corp. ("Suiza"), which resulted in the divestiture of less desirable dairy plants now part of the Borden Dairy Co. bankruptcy. Over the past decade, raw milk suppliers and customers have filed a number of antitrust lawsuits challenging coordinated behavior by DFA and Debtors regarding milk processing, including in *In re Southeastern Milk Antitrust Litigation*, Master File No. 2:08-MD-01000 (E.D. Tenn.), covering the Appalachia / Southeast region where MDVA operates. DFA and Debtors settled that litigation for nearly $300 million. *See Dairy Farmer Plaintiffs' Motion for Final Approval of Class Action Settlement with Defendants Dairy Farmers of America, Inc., Dairy Marketing Services, LLC, Mid-Am Capital LLC, National Dairy Holdings, LP, and Gary Hanman,* Doc. No. 1933, Master File No. 2:08-MD-01000 (E.D. Tenn. March 27, 2013). Here, significant antitrust issues such as a combined DFA/Debtors' ability to foreclose access to raw milk sales and processing of raw milk products have been discussed in various public forums, including news articles and analyst reports scrutinizing the hurdles to close.[6] The DOJ is already scrutinizing the proposed transaction, and as publicly acknowledged by DFA and the Debtors, "the proposed transaction with DFA is subject to various closing conditions, including antitrust clearance."[7] Serious antitrust risks necessarily translate to serious closing risks. In light

---

[6] *See, e.g.,* Jacob Bunge, *Regulators Probe Potential Dean Foods Merger*, WALL ST. J. (Jan. 27, 2020), https://www.wsj.com/articles/regulators-probe-potential-dean-foods-merger-11580147236?mod=searchresults&page=1&pos=2.

[7] *See* Dean Foods, *Dean Foods Enters Into Asset Purchase Agreement with Dairy Farmers of America* (Feb. 17, 2020), https://deanfoodsrestructuring.com/wp-content/uploads/2020/02/Dean-Foods-Enters-Into-Asset-Purchse-Agreement-with-Dairy-Farmers-of-Ame....pdf, in which the Debtors acknowledge that "there can be no assurances that the sale of assets to DFA will receive regulatory approval or that the sale will be successfully consummated."

of these risks, the Debtors cannot reasonably submit that DFA's Stalking Horse Bid is the best offer, regardless of the bids received at auction. Selecting DFA to serve as the Stalking Horse Bidder is a waste of the Debtors' resources and is not a sound exercise of the Debtors' business judgment.

19. Section 7.04(b) of the Stalking Horse Agreement acknowledges the serious regulatory hurdles. That section allows DFA to divest one or two milk processing plants (of its choice) to attempt to satisfy regulators (the "Divestiture Procedure"). The Divestiture Procedure, however, does not truly remedy DFA's antitrust problems because the procedure is limited to no more than two (2) fluid milk processing plants not exceeding 43-million pounds of raw milk intake per month in specified geographic areas. Such a limited divestiture is unlikely to resolve antitrust concerns about concentrating so much market power over the dairy market in specific regions of the country. Moreover, the Stalking Horse Agreement gives DFA almost unilateral authority to seek the required Governmental Authorization and to make corresponding decisions regarding divestiture of assets. The Divestiture Procedure, as such, is unfair because it excludes all parties in interest other than DFA from participating or providing comments.

20. The Debtors further demonstrate lack of sound business judgment by requiring DFA or any potential sale counterparty to obtain necessary government approvals by an extremely aggressive date, June 1, 2020. *See* Stalking Horse Agmt. 7.04(b); *see also* Proposed Bidding Procedures § 2(a) (stating that Potential Bidders must provide evidence of their ability to obtain all necessary government approvals by June 1, 2020).

21. Second, by selecting DFA as the Stalking Horse Bidder (and structuring the sale procedures to favor DFA, *see infra* Arguments II & III) the auction will be anticompetitive. Potential or Qualified Bidders who are aware of the substantial risks inherent in closing a sale with

DFA will be incentivized to bid the lowest amount possible to beat the Stalking Horse Bid. And the pool of bidders will be smaller than it would be if DFA was not the Stalking Horse Bidder. Pursuant to the Proposed Bidding Procedures, "[e]ach Qualified Bidder shall agree and be deemed to agree to be the Alternate Bidder if so designated." *See* Proposed Bidding Procedures § 6. An interested party may not want to submit a bid because, if DFA is selected as the Successful Bidder yet regulators ultimately deny approval of a sale to DFA, then the Alternate Bidder will be bound to purchase the assets — which likely will have depreciated during the interim.[8] Therefore, designating DFA as the Stalking Horse Bidder fails to maximize value for the estate.

**II.     The accelerated timetable for submission of Qualified Bids will chill rather than stimulate competitive bidding, and the expedited sale process that the Debtors have proposed fails to respect creditors' due process rights.**

22.     While MDVA appreciates the Debtors' desire for an expeditious sale process, MDVA respectfully submits that the Debtors have not furnished evidence demonstrating the need for such an aggressive schedule. As Judge Steen cautioned in *Gulf Coast Oil*, "[t]he Court must be concerned about a slippery slope. Not every sale is an emergency. . . ." 404 B.R. at 423. Indeed, "[a]t a minimum, if section 363(b)(1) is the means for effecting a debtor's disposition, the creditors should have the luxury of enough time for their representatives to assess fully the proposed transaction." *In re Bombay Co., Inc.*, No. 07-44061-DML-11, 2007 WL 2826071, at *3 (Bankr. N.D. Tex. Sept. 26, 2007); *see also In re Gulf Coast Oil Corp.,* 404 B.R. at 423–24 ("Proposals for quick sales, understood only by a few parties who would benefit from the sale, are inherently suspect.").

---

[8] The regulators' review period may be extended, and they may commence proceedings to challenge a sale to DFA. Therefore, a significant amount of time may pass before the Alternate Bidder is called upon to consummate a transaction with the Debtors. At that point the Debtors' assets may have decreased in value significantly.

23. When evaluating proposed bid procedures, courts consider, *inter alia*, whether the assets have been "aggressively marketed" and whether parties in interest have received or will receive proper notice. *In re Gulf Coast Oil Corp.,* 404 B.R. at 423–24; *accord In re Angel Fire Water Co., LLC*, No. 13-10868 TA11, 2015 WL 251570, at *2 (Bankr. D.N.M. Jan. 20, 2015) ("The sale terms, including any modifications, must have been subject to adequate notice."). It is widely accepted that the purpose of orders authorizing bid procedures is "to facilitate an open and fair public sale designed to maximize value for the estate." *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998). As such, "[s]tructured bid procedures should provide a vehicle to enhance the bid process and should not be a mechanism to chill prospective bidders' interests." *In re President Casinos, Inc.*, 314 B.R. 784, 786 (Bankr. E.D. Mo. 2004).

24. Here, the overly ambitious deadline for submitting Qualified Bids will chill bidding, and, as a result, the Proposed Bidding Procedures intrinsically and overwhelmingly favor DFA. The hearing to consider approval of the Bidding Procedures is set for March 12, 2020, the Potential Bidder Deadline is March 31, 2020, and the Bid Deadline is April 13, 2020. *See* Proposed Bidding Procedures § 12. Under that schedule, there is virtually no time to adequately market the assets,[9] and interested parties will have, at most, 13 days to conduct due diligence, prepare their bids and other Required Bid Documents, and obtain financing commitments. The burden on Partial Bidders will be particularly onerous because their changes to the Stalking Horse Agreement will be substantial. The Debtors are seeking approval of procedures that fundamentally discourage interested parties from submitting higher and better offers.

---

[9] According to Evercore, the Debtors' investment banker, the Debtors were already in advanced negotiations with DFA for a sale of substantially all the Debtors' assets by the Petition Date. *See* Margo Declr. ¶ 11. Only at that point did Evercore begin marketing the assets more widely, and Evercore did so only for three months (which MDVA submits is not adequate) before the Stalking Horse Agreement with DFA was finalized. *See id.* ¶¶ 13–14. So in effect, DFA was selected as the Stalking Horse Bidder before any marketing of the assets occurred.

25.     The Debtors have proposed an auction and sale approval process that will proceed with even greater haste if authorized by this Court. Under the Proposed Bidding Procedures, the auction is set for April 20, 2020, the deadline for objecting to the sale transaction and Successful Bidder is April 22, 2020, and the hearing to consider approval of the sale is tentatively set for April 27, 2020. Two days, however, is not enough time to review the proposed transaction with the Successful Bidder and file an objection if necessary. To the extent that the Debtors attempt to meaningfully consider a hypothetically robust selection of Partial Bids (though MDVA doubts that can happen, *see* Arg. III, *infra*) and Chapter 11 Bids,[10] the asset purchase agreement with the Successful Bidder may be very different from the Stalking Horse Agreement previously filed. Given the lack of reasonable notice to parties in interest of the terms of the sale and Successful Bidder, due process is not assured.[11]

26.     The chilling effect of the accelerated timetable in the proposed bidding procedures is made worse by the disparate treatment of potential third-party bidders and DFA. The due diligence to be afforded to potential third-party bidders (*see* Proposed Bidding Procedures § 1(b)) is much less robust and constrained than that afforded to DFA by the Stalking Horse Contract (*compare* Proposed Bidding Procedures § 1(b), *with* Stalking Horse Agmt. §§ 7.01, 7.09).

27.     The Proposed Bidding Procedures, therefore, should not be approved unless the Debtors (with the DIP lenders' input) or the Court extends the sale-related deadlines to facilitate competitive bidding and protect due process rights.

---

[10] The Debtors seem to contemplate consideration of "competing bids in the form of a chapter 11 plan of reorganization," *i.e.*, a Chapter 11 Plan Bid. The Debtors, however, provide almost no details about how Chapter 11 Plan Bids will be compared to the Stalking Horse Bid and other bids. More than that, the Debtors fail to explain how they will satisfy sections 1125, 1126, 1129(a)(7), and 1129(b)(2) of the Bankruptcy Code if a Chapter 11 Plan Bid is the Successful Bid, *see, e.g., In re Cont'l Air Lines, Inc.,* 780 F.2d at 1226, especially when the announcement of the Successful Bidder will occur a mere two days before the sale objection deadline.

[11] The expedited sale schedule and lack of reasonable notice also requires denial of the Debtors' request for the Court to waive the 14-day stay of a sale order under Rule 6006(h) of the Bankruptcy Code.

**III.   The Proposed Bidding Procedures discriminate against Partial Bids. When read with the Stalking Horse Agreement, they show that the Debtors cannot meaningfully consider Partial Bids.**

28.    According to the Proposed Bidding Procedures, the Debtors will entertain offers "for one or more, or any combination of, Bid Assets." *See* Proposed Bidding Procedures (introduction). Yet the Proposed Bidding Procedures fail to describe how the Debtors will evaluate Partial Bids against the Stalking Horse Bid to determine which is the highest and best offer. Exacerbating the problem is the Debtors' failure to require DFA to allocate the Purchase Price among the Bid Assets until after closing — and then, seemingly for tax purposes only. *See* Stalking Horse Agmt. § 8.04. This prejudices Partial Bidders because, unallocated, the Stalking Horse Bid will not serve as a meaningful reference for preparing Partial Bids.

29.    It is also unclear how auctions of fewer than all the Bid Assets will be conducted. As currently drafted, the procedures concerning "Auction Lots" are too vague. *See* Bidding Procedures § 5. Interested parties and the Court are entitled to understand the process for mini auctions alluded to within the context of the overall auction. Relatedly, the Proposed Bidding Procedures and Stalking Horse Agreement do not address how the bid protections for DFA will be handled if some but not all of the Bid Assets are sold to parties other than DFA, but DFA elects to purchase the remaining assets. *See* Bidding Procedures § 3; Stalking Horse Agmt. § 14.07.

30.    In addition, the Proposed Bidding Procedures reserve to the Debtors (in consultation with the Consulting Parties) the right to cancel the auction and to proceed with the proposed Stalking Horse Agreement under circumstances that are insufficiently explained. *See* Proposed Bidding Procedures Order ¶ 8. The Proposed Bidding Procedures, also, fail to require the Debtors to disclose all Qualified Bids received to the bankruptcy court and to creditors and interested parties for review. Instead, they call for requiring the submission of only the Successful Bid(s) and the Alternate Bid(s).

31.     In sum, these defects in the Proposed Bidding Procedures prevent meaningful participation by Partial Bidders because they are not sufficiently detailed or transparent and tend to show that the Debtors' inclusion of Partial Bids in the auction is perfunctory. Therefore, the Debtors must go back to the drawing board and supply the missing details before the sale process can move forward.

## RESERVATION OF RIGHTS

32.     MDVA reserves its rights to amend, modify, and/or supplement this Objection and to raise additional objections prior to or at the hearing on the Bidding Procedures Motion.[12] MDVA further reserves its rights to raise objections to, *inter alia*, the sale, sale order, and any asset purchase agreement submitted to the Court in these Chapter 11 Cases on any and all grounds, including but not limited to on the grounds that such a sale would violate applicable antitrust laws. In this regard MDVA urges the Court to explicitly include in any order approving bidding procedures and a stalking horse bid a statement that the Court is not determining whether any proposed sale would or would not violate applicable antitrust laws.

## ADMISSIONS AND DENIALS

33.     Attached as Exhibit "A" to this Objection are MDVA's admissions and denials to the allegations made in the Bidding Procedures Motion, which MDVA submits in accordance with BLR 9013-1(g)(1) and Rule 7008 of the Federal Rules of Bankruptcy Procedure.

## CONCLUSION

---

[12] When the Stalking Horse Agreement was filed, only the schedule identifying "Excluded Facilities" was attached. *See* Stalking Horse Agmt., Schedule 2.02(i). The deadline for providing final exhibits and schedules to the Stalking Horse Agreement was March 5, 2020. *See id.* § 14.18. As far as MDVA is aware, as of the date of this Objection, those final exhibits and schedules have not been publicly filed. Therefore, MDVA and other parties in interest could not review and evaluate them before objections to the Bidding Procedures Motion were due on March 9, 2020. MDVA objects to the Bidding Procedures Motion on this basis as well.

41625228v9

If the Debtors want this Court to approve the extremely expedited sale process that they have outlined in the Bidding Procedures Motion, they first must make significant improvements. The sale process that the Debtors have proposed is fundamentally flawed as it unfairly favors DFA over all other potential bidders and unreasonably invites challenge on antitrust grounds. At this stage, the Court should deny the Bidding Procedures Motion and require the Debtors to address the fundamental problems with the process they have proposed.

WHEREFORE, MDVA respectfully requests that this Court deny the Bidding Procedures Motion and grant MDVA such other and further relief as may be appropriate.

Dated: March 9, 2020
       Houston, Texas

Respectfully submitted,

**O'CONNORWECHSLER PLLC**

 /s/ Annie E. Catmull
Annie E. Catmull
State Bar No. 00794932
4400 Post Oak Parkway
Suite 2360
Houston, Texas 77027
Tel.: (281) 814-5977
aecatmull@o-w-law.com

-and-

**TROUTMAN SANDERS LLP**

Richard E. Hagerty (admitted *pro hac vice*)
VSB No. 47673
401 9th Street, N.W.,
Suite 1000
Washington, D.C. 20004
Tel.: (202) 274-2950
richard.hagerty@troutman.com

*Attorneys for MDVA*

41625228v9

## CERTIFICATE OF COMPLIANCE WITH BLR 9013-1(g)(1)

I HEREBY CERTIFY that on March 5, 2020, we attempted to confer with counsel for the Debtors in a good faith effort to resolve MDVA's objections to the proposed bidding procedures and Stalking Horse Contract, by way of a Richard Hagerty e-mail to debtor's counsel detailing our client's objections, and by inviting them to engage in a discussion about the MDVA's concerns. I further certify that on March 6, 2020 I called counsel for debtor, left a voicemail and received a return call from Nate Sokol, debtor's counsel, the same day, during which we engaged in good faith discussion in an attempt to address my client's concerns. The dispute remains unresolved.

                                    /s/ Annie E. Catmull
                                    Annie E. Catmull

41625228v9

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 9th day of March, 2020, I caused the foregoing *Objection* to be filed via the Court's CM/ECF system, which will cause notice of filing to be served on all registered users. I FURTHER CERTIFY that I caused true and correct copies to be served via e-mail or first-class mail, postage prepaid, on all other parties on the most recent *Master Service List* filed by the Debtors.

      /s/ Richard E. Hagerty
Richard E. Hagerty

      /s/ Annie E. Catmull__(as to ECF service only)
Annie E. Catmull