IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| | § | Case No. 19-36313 (DRJ) |
| SOUTHERN FOODS GROUP, LLC, *et al.*,[1] | § § | (Jointly Administered) |
| | § | |
| Debtors. | § § § | |

OBJECTION OF THE AD HOC GROUP OF
BONDHOLDERS TO DEBTORS' BIDDING PROCEDURES MOTION

(Related Docket No. 925)

---

[1]     The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: Southern Foods Group, LLC (1364); Dean Foods Company (9681); Alta-Dena Certified Dairy, LLC (1347); Berkeley Farms, LLC (8965); Cascade Equity Realty, LLC (3940); Country Fresh, LLC (6303); Dairy Information Systems Holdings, LLC (9144); Dairy Information Systems, LLC (0009); Dean Dairy Holdings, LLC (9188); Dean East II, LLC (9192); Dean East, LLC (8751); Dean Foods North Central, LLC (7858); Dean Foods of Wisconsin, LLC (2504); Dean Holding Company (8390); Dean Intellectual Property Services II, Inc. (3512); Dean International Holding Company (9785); Dean Management, LLC (7782); Dean Puerto Rico Holdings, LLC (6832); Dean Services, LLC (2168); Dean Transportation, Inc. (8896); Dean West II, LLC (9190); Dean West, LLC (8753); DFC Aviation Services, LLC (1600); DFC Energy Partners, LLC (3889); DFC Ventures, LLC (4213); DGI Ventures, Inc. (6766); DIPS Limited Partner II (7167); Franklin Holdings, Inc. (8114); Fresh Dairy Delivery, LLC (2314); Friendly's Ice Cream Holdings Corp. (7609); Friendly's Manufacturing and Retail, LLC (9828); Garelick Farms, LLC (3221); Mayfield Dairy Farms, LLC (3008); Midwest Ice Cream Company, LLC (0130); Model Dairy, LLC (7981); Reiter Dairy, LLC (3675); Sampson Ventures, LLC (7714); Shenandoah's Pride, LLC (2858); Steve's Ice Cream, LLC (6807); Suiza Dairy Group, LLC (2039); Tuscan/Lehigh Dairies, Inc. (6774); Uncle Matt's Organic, Inc. (0079); and Verifine Dairy Products of Sheboygan, LLC (7200). The debtors' mailing address is 2711 North Haskell Avenue, Suite 3400, Dallas, TX 75204.

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ................................................................................................................ 6

    A.    General Case Background.................................................................................. 6

    B.    The Debtors' Preparation for the DFA Sale ........................................... 6

    C.    The Ad Hoc Group's Diligence Process............................................................ 10

    D.    DFA.................................................................................................................... 12

    E.    The Bidding Procedures Motion ....................................................................... 19

    F.    Stalking Horse Agreement ................................................................................ 22

    G.    The Ad Hoc Group Investigation....................................................................... 25

OBJECTION....................................................................................................................... 25

    I.    The Bid Protections should not be approved because they are unnecessary, will chill bidding, and do not represent a sound exercise of the Debtors' business judgment ................................................................................................ 26

    II.    The Bidding Procedures and Stalking Horse Bid should be subject to heightened scrutiny because DFA may be an insider of the Debtors .................. 32

    III.    The Bidding Procedures timeline should be maintained to afford the Ad Hoc Group enough time to formulate its potential bid and complete its ongoing investigation................................................................................................ 34

    IV.    The Bidding Procedures and the Stalking Horse Agreement require additional important modifications ..................................................................... 35

CONCLUSION................................................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Acis Capital Mgmt., L.P.*,
   604 B.R. 484 (N.D. Tex. 2019)......................................................................28, 29

*In re Alta Mesa Res., Inc.*,
   Case No. 19-35133 (Bankr. S.D. Tex. 2019)..........................................................32

*In re Am. W. Airlines, Inc.*,
   166 B.R. 908 (Bankr. D. Ariz. 1994)....................................................................29

*In re ASARCO L.L.C.*,
   441 B.R. 813 (S.D. Tex. 2010) ...........................................................................29

*In re ASARCO, L.L.C.*,
   650 F.3d 593 (5th Cir. 2011) ........................................................................28, 29

*In re Auto Style Plastics, Inc.*,
   269 F.3d 726 (6th Cir. 2001) ..............................................................................35

*In re Beth Israel Hosp. Ass'n of Passaic*,
   2007 WL 2049881 (Bankr. D.N.J. July 12, 2007).................................................29

*Brewer v. Erwin & Erwin, P.C.*,
   942 F.2d 1462 (9th Cir. 1991) ............................................................................35

*In re Cobalt International Energy Inc.*
   Case No. 17-36709 (Bankr. S.D. Tex. 2018).........................................................32

*In re EMAS CHIYODA Subsea Ltd.*
   Case No. 17-31146 (Bankr. S.D. Tex. 2017).........................................................32

*Fabricators Inc. v. Technical Fabricators, Inc.*,
   926 F.2d 1458 (5th Cir. 1991) ............................................................................35

*In re Francis Drilling Fluids, Ltd.*,
   Case No. 18-35441 (Bankr. S.D. Tex. 2018).........................................................32

*In re Geokinetics Inc.*,
   Case No. 18-33410 (Bankr. S.D. Tex. 2018).........................................................32

*In re Harford Sands Inc.*,
   372 F.3d 637 (4th Cir. 1991) ..............................................................................35

*Matter of Holloway*,
   955 F.2d 1008 (5th Cir. 1992) ............................................................................34

ii

*In re Innkeepers USA Tr.*,
   442 B.R. 227 (Bankr. S.D.N.Y. 2010) ...................................................................36

*In re Jones*,
   2019 WL 1167812 (Bankr. N.D. Tex. Mar. 11, 2019) ............................................35

*Matter of Lifschultz Fast Freight*,
   132 F.3d 339 (7th Cir. 1997) .................................................................................35

*In re Mid-Town Produce Terminal, Inc.*,
   599 F.2d 389 (10th Cir. 1979) ...............................................................................35

*In re O'Brien Envtl. Energy, Inc.*,
   181 F.3d 527 (3d Cir. 1999)...................................................................................29

*Pepper v. Litton*,
   308 U.S. 295 (1939) ........................................................................................35, 36

*In re Reliant Energy Channelview LP*,
   594 F.3d 200 (3d Cir. 2010)...................................................................................29

*Sitts v. Dairy Farmers of Am.*,
   Case No. 16-287, 2019 WL 439533 (D. Vt. Sept. 27, 2019)..............................13, 14, 20, 31

*In re Tridimension Energy L.P.*,
   No. 10-33565-SGJ, 2010 WL 5209233 (Bankr. N.D. Tex. Oct. 29, 2010)...........................29

*In re Vanguard Natural Resources, LLC*,
   Case No. 17-30560 (Bankr. S.D. Tex. 2017)........................................................32

*In re Winstar Commc'ns, Inc.*,
   554 F.3d 382 (3d Cir. 2009)..............................................................................34, 35

**OTHER AUTHORITIES**

Alan I. Green & John S. Rhee, *Price Fixing and Enforcement of the Antitrust
   Laws in the Dairy Industry*, BLOOMBERG L. REP.—ANTI TRUST & TRADE, Vol.
   4, No. 4 (2011)
   https://www.hinshawlaw.com/media/news/23_AGreene_PriceFixingandEnfor
   cementoftheAntitrustLawsintheDairyIndustry_022111.pdf .....................................15

*Buy Largest U.S. Milk Producer*, CONSUMER AFFAIRS ( February 18, 2020)
   https://www.consumeraffairs.com/news/dairy-farmers-of-america-agrees-to-
   buy-largest-us-milk-producer-021820.html............................................................30

Chris Mather, *USDA and DOJ hold Historic Workshop on Competitiveness in Dairy Sector, Hear from Nation's Dairy Farmers*, USDA (March 7, 2017), https://www.usda.gov/media/blog/2010/06/25/usda-and-doj-hold-historic-workshop-competitiveness-dairy-sector-hear-nations ............................................................ 15

DAIRY FARMERS OF AMERICA, *DFA Reports 2018 Financial Results* (March 20, 2019), https://www.dfamilk.com/newsroom/press-center/dfa-reports-2018-financial-results ................................................................................................................ 13

David Yaffe-Bellany, *Talk of Milk Industry Merger Draws Justice Dept. Scrutiny*, THE NEW YORK TIMES (Jan. 20, 2020) ........................................................................ 13

*Dean Foods Company Initiates Voluntary Reorganization with New Financial Support from Existing Lenders*, DEAN FOODS (Nov. 12, 2019), available at https://deanfoodsrestructuring.com/wp-content/uploads/2019/11/Dean-Foods-Company-Initiates-Voluntary-Reorganization-with-New-Financial-Support-from-Existing-Lenders-1.pdf ....................................................................................... 8

Jacob Bunge, *Regulators Probe Potential Dean Foods Merger*, THE WSJ (Jan. 27, 2020, 5:38 PM), https://www.wsj.com/articles/regulators-probe-potential-dean-foods-merger-11580147236 ........................................................ 5, 15, 30, 31

*Our Cooperative,* DAIRY FARMERS OF AMERICA, https://www.dfamilk.com/who-we-are/our-cooperative (last visited March 6, 2020) ............................................. 13

Rob Blaufuss, LINKEDIN, https://www.linkedin.com/in/rob-blaufuss-50a98247/ (last visited March 9, 2020) ...................................................................................... 4

The ad hoc group (the "**Ad Hoc Group**") of certain holders of the Debtors' 6.500% Senior Notes due 2023 (the "**Senior Notes**") submits this objection (the "**Objection**") to the Debtors' motion seeking approval of their proposed bidding procedures and other related relief (the "**Bidding Procedures Motion**").[1]  In further support of this Objection, the Ad Hoc Group submits the *Declaration of J. Soren Reynertson* (the "**Reynertson Declaration**"), the *Declaration of Lisa Donahue* (the "**Donahue Declaration**"), and the *Declaration of Sally Keefe* (the "**Keefe Declaration**"), attached to this Objection as **Exhibit A,** **Exhibit B**, and **Exhibit C** respectively, and states as follows:

## PRELIMINARY STATEMENT

1.      The Ad Hoc Group's goals in this case are straightforward and critical:  to ensure that the Debtors have adequate time to consider a standalone restructuring of their business that could maximize value for all stakeholders and to avoid a liquidation of the Debtors' assets that will leave their estates administratively insolvent all for the sole benefit of Dairy Farmers of America, Inc. ("**DFA**").

2.      The Debtors seek approval of Bidding Procedures that will frustrate those goals and that are inappropriate under the facts and circumstances of these cases.  Among other things, the Bidding Procedures include certain stalking horse protections in the form of a $15 million Break-up Fee, an Expense Reimbursement of up to $8 million, and an incremental

---

[1]      *See Motion of Debtors for Entry of Orders for Entry of Orders (I)(a) Approving Bidding Procedures for Sale of Debtors' assets, (b) Approving the Designation of Dairy Farmers of America, Inc. as the Stalking Horse Bidder for Substantially All of Debtors' Assets, (c) Authorizing and Approving Entry into the Stalking Horse Asset Purchase Agreement, (d) Approving Bid Protections, (e) Scheduling Auction for, and Hearing to Approve, Sale of Debtors' Assets, (f) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, (g) Approving Assumption and Assignment procedures, and (h) Granting Related Relief and (II)(a) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (b) Authorizing Assumption and Assignment of Executory Contracts and Unexpired leases, and (c) Granting related relief* [Docket No. 925].  Capitalized terms used but not defined in this Objection have the meanings used in the Bidding Procedures Motion.

$5 million minimum overbid requirement (together, the "**Bid Protections**").[2]  The Bid Protections will make it significantly more difficult, perhaps impossible, for the Ad Hoc Group to propose a competing and committed restructuring transaction that would present a materially better result for these estates and present far less closing risk than the proposed DFA bid and for other interested parties to submit value-maximizing alternatives to the DFA bid.  Allowing DFA, in particular, to chill competition in these cases is inappropriate for reasons discussed at length herein.

3.     As the Debtors are well aware, the Ad Hoc Group is actively working to develop and finalize restructuring alternatives that would maximize value for the Debtors' stakeholders compared to the DFA bid, while minimizing execution (particularly antitrust) risk and preserving estate claims for the benefit of creditors.  These efforts began in earnest well before the Debtors commenced these cases.  But at every turn the Debtors have maintained a myopic focus on selling their assets to DFA and rebuffed or hindered the Ad Hoc Group's efforts to prepare a plan-based restructuring alternative to the DFA sale.

4.     Prepetition, the Debtors largely ignored the Ad Hoc Group's efforts to engage in discussions for rescue financing and failed to meaningfully engage on the group's proposal for DIP financing, which was free of onerous case controls and intended to avoid the exact scenario now unfolding in these cases—a value-minimizing liquidation sale to DFA.  Postpetition, the Debtors failed to timely provide basic diligence to the Ad Hoc Group that is essential to its ongoing efforts to finalize its restructuring proposal.  The Debtors began responding to the most important of these requests only last week after the Ad Hoc Group informed them that it would seek the Court's intervention if they refused to produce basic and pre-existing

---

[2]     *Id.* ¶¶ 25, 29.

diligence materials that provide information regarding the price that the Debtors pay for raw milk (and that therefore implicate the Debtors' relationship with DFA).[3]

5.     Based on the diligence received to date, the Ad Hoc Group now has serious and credible concerns ████████████████████████████████████████████████ ████████.[4]   This limited information █████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████.   Specifically, based largely on information and diligence that was withheld from the Ad Hoc Group until recently, ███████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████:

- ██████████████████████████████████████████
  ██████████████████████████████████████████
  ██████████████████████████████████████████
  ██████████████████████████████████████████
  ████████████████████████████████████████,[6]

- ██████████████████████████████████████████
  ██████████████████████████████████████████
  ██████████████████████████████████████████
  ███████████████████████████████████████[8]

---

[3]     It appears the Debtors began uploading more of this critical diligence information just hours before the objection deadline.

[4]     The Ad Hoc Group received access to its diligence information pursuant to certain non-disclosure agreements with the Debtors.   Accordingly, although the Ad Hoc Group has no objection to publicly filing this information, they have redacted the relevant portions of this Objection and the supporting declarations out of an abundance of caution and filed a related motion to seal.

[5]     ████████████████████████████████████████.

[6]     *See infra* ¶¶ 32-37.

[7]     ████████████████████████████████████████████████   *See* Keefe Declaration at Exhibit 2, DFA Contract § 1.A.

[8]     *See infra* ¶¶ 37-39.   The Ad Hoc Group's own diligence suggests that the Debtors' director of dairy procurement and risk management ████████████████ left to join DFA ███████████ ██████████████.   *See* Rob Blaufuss, LINKEDIN, https://www.linkedin.com/in/rob-

-  [9] and

- [10]

6.     The Ad Hoc Group understands the Official Committee of Unsecured Creditors (the "**Committee**") also has concerns regarding the Debtors' relationship with DFA, and both the Committee and, contemporaneously herewith, the Ad Hoc Group have commenced separate investigations of the Debtors and DFA concerning (among other things) that longstanding relationship and the proposed sale to DFA.  The Bidding Procedures must allow sufficient time for these investigations to run their course and the Bid Protections should not be approved until they conclude.

7.     In addition, the Bid Protections should not be approved because they are unnecessary and inappropriate in the context of these cases.  DFA does not need any special inducement or protections to pursue its bid in these cases.  DFA works for its members, and its members need the Debtors to buy their milk.  DFA's own public statements make this clear: "When the largest processor of raw milk in the world files for bankruptcy, *we have an obligation to do what we can to secure those markets and work to minimize disruption to our members and*

---

blaufuss-50a98247/ (last visited March 9, 2020).  The Ad Hoc Group intends to investigate this and any other connections between the officers and directors of the Debtors and DFA through its ongoing investigation.

[9]     *See infra* ¶ 38.

[10]    *See infra* ¶ 39.

*other farmers.*"[11]  Bid Protections are unnecessary and provide no special inducement where DFA admits it has an obligation to its members to preserve the Debtors' business.  Rather, they simply chill competitive proposals.

8.     The Bid Protections are also unwarranted because the Stalking Horse Agreement includes many closing conditions outside the Debtors' control that introduce material execution risk to the closing of the DFA transaction.  Most importantly, the Stalking Horse Agreement allows DFA to walk from the transaction if the Debtors fail to obtain the requisite antitrust approvals by a specified outside date, which only DFA may extend in its sole discretion. Given this transaction has already drawn the attention of antitrust regulators at the state and federal level, and DFA is subject to litigation in other jurisdictions for alleged anticompetitive practices, the Debtors very well may be providing $28 million of Bid Protections to lock in a bid they cannot close.

9.     For all these reasons, the Court should deny the Bid Protections and ensure the Bidding Procedures adhere to the timeline set forth in the Bidding Procedures Motion (which reflects a negotiated outcome with the Ad Hoc Group) to allow the Ad Hoc Group time to finalize and propose a standalone plan of reorganization and, with the Committee, to complete their initial investigations.[12]  At a minimum, if the Court determines to approve some or all of the Bid Protections, they should be subject to the ongoing investigations and DFA should be required to disgorge or waive these fees if it is subsequently determined that there are estate claims against

---

[11]     *See* Jacob Bunge, *Regulators Probe Potential Dean Foods Merger*, THE WSJ (Jan. 27, 2020, 5:38 PM), https://www.wsj.com/articles/regulators-probe-potential-dean-foods-merger-11580147236      (*emphasis added*).

[12]     Based on all of its conversations with parties in interest in the case, including the Debtors, the Ad Hoc Group believes that there is a material risk that the Debtors will seek approval of the DFA bid on an expedited timeline, despite having sufficient liquidity to honor the timeline set forth in the Bidding Procedures Motion.

DFA or that DFA engaged in bad faith conduct in connection with its bid or its relationship with the Debtors generally.

## BACKGROUND

### A.  General Case Background

10.     On November 12, 2019 (the "**Petition Date**"), each of the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

11.     On November 22, 2019, the Office of the United States Trustee appointed the Committee.  *See Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 288].

### B.  The Debtors' Preparation for the DFA Sale

12.     Prior to the Petition Date, the Debtors' almost exclusive focus was on consummating a sale to DFA.[13]  The Ad Hoc Group first engaged with the Debtors in April 2019. These conversations became more substantive in October 2019 when the Ad Hoc Group attempted to negotiate an out-of-court exchange that could have maximized value for all of the Debtors' stakeholders and provided the Debtors with time to consider a comprehensive restructuring.[14] After executing nondisclosure agreements with the Debtors on November 3, 2019, the Ad Hoc Group offered to provide the Debtors with up to $215 million in new money financing to address

---

[13]     Reynertson Declaration, ¶ 11.

[14]     *Id.* at ¶ 7.

their immediate liquidity needs (the "**Restructuring Proposal**") and avoid an immediate bankruptcy filing.[15]

13.     Unfortunately, the Debtors did not provide a specific counteroffer to the Restructuring Proposal and expressed no real interest in an out-of-court restructuring.[16]   On November 8, 2019, fearing that the Debtors were contemplating a sale of substantially all of their assets on an expedited timeline and following repeated attempts to engage with the Debtors regarding their financing needs, the Ad Hoc Group submitted an unsolicited proposal to provide the Debtors with up to $240 million in postpetition financing (the "**DIP Proposal**") that would provide the Debtors with sufficient liquidity and minimal case controls to facilitate a restructuring that could maximize value for all stakeholders and avoid a liquidation sale.[17]

14.     The Debtors rejected the DIP Proposal.[18]   Instead, they opted to pursue postpetition financing under a facility (the "**DIP Facility**") led by its existing prepetition secured lenders, including Cooperatieve Rabobank U.A., New York Branch ("**Rabobank**").   The DIP Facility provided for unnecessarily tight milestones, including a requirement that the Debtors provide Rabobank a draft motion to sell all or substantially all of their assets no later than December 12, 2019 and, if the Debtors elected to pursue a sale process, to file that motion no later than February 10, 2020 (the "**Sale Milestone**").[19]

15.     Even this restrictive Sale Milestone was the product of hard-fought prepetition negotiations by the Ad Hoc Group.   Initially, the Debtors were willing to accept

---

[15]     *Id.* at ¶ 9.

[16]     Reynertson Declaration at ¶ 9.

[17]     *Id.* at ¶ 10.

[18]     *Id.*

[19]     *Id.* at ¶ 10.

milestones that required them to elect to pursue a sale process by December 12, 2019 and to file a sale motion no later than January 13, 2020.  It was only after the Ad Hoc Group indicated it was ready and willing to oppose the motion to approve the DIP Facilities and to seek the appointment of a chief restructuring officer that the Debtors relented and obtained the additional time from Rabobank to permit the Ad Hoc Group to formulate an alternative restructuring proposal.

16.     In the days leading up to the Petition Date, it became clear that the Debtors were focused on consummating a sale of their assets to DFA.[20]  On the Petition Date, the Debtors issued a press release indicating that they were in "advanced discussions with DFA regarding a potential sale of substantially all assets of the Company."[21]  On the day before the Petition Date, the Ad Hoc Group repeatedly asked the Debtors to indicate in their press release that numerous restructuring strategies were under consideration and that a sale to DFA was not the only option being pursued, but the Debtors refused to include a reference to any alternative transactions until the last minute, when they added "[t]he Company also intends to . . . work with its creditors to explore a potential stand-alone plan of reorganization".[22]  At the "first day" hearing before this court on November 13, 2019, counsel for the Debtors stated that they "have begun the proceedings, having held advance discussions with the Dairy Farmers of America, or DFA, about its role as a potential stalking horse bidder . . . ."[23]

17.     When the Debtors filed their 10-Q on the Petition Date, they disclosed that on November 6, 2019, just days before filing for bankruptcy, the Debtors provided $350,000 total

---

[20]     Reynertson Declaration at ¶ 11.

[21]     *Dean Foods Company Initiates Voluntary Reorganization with New Financial Support from Existing Lenders*, DEAN FOODS (Nov. 12, 2019), available at https://deanfoodsrestructuring.com/wp-content/uploads/2019/11/Dean-Foods-Company-Initiates-Voluntary-Reorganization-with-New-Financial-Support-from-Existing-Lenders-1.pdf.

[22]     *Id.*

[23]     First Day Hr'g Tr. at 19:21–24, Nov. 13, 2020.

in salary increases to two of their executive officers and paid $6,007,500 total in short term bonuses to three of their executive officers as set forth below.[24]

| Name | Title | New Salary | Salary Increase | Bonus |
|---|---|---|---|---|
| Eric Beringause | President & CEO | $1,050,000 | $250,000 | $4,675,000 |
| Gary W. Rahlfs | Senior Vice President & CFO | $600,000 | $100,000 | $790,000 |
| David Bernard | Senior Vice President & CIO | $350,000 | $0 | $542,500 |
| **Total** | | **$2,000,000** | **$350,000** | **$6,007,500** |

18.     The management team's windfall is an insider KERP subject to clawback if a recipient resigns without good reason or is terminated for cause "before the earliest of November 8, 2020, *the consummation of a sale of all or substantially all of the Company's assets* and the effective date of the Company's emergence from bankruptcy."[25]  A postpetition sale to DFA on an expedited timeline would of course cause these payments to vest.

19.     Finally, on



---

[24]     Dean Foods Co., Quarterly Report (Form 10-Q) (Nov. 12, 2019), at 50-51 (hereinafter the "**10-Q**").

[25]     *Id.* at 51 (emphasis added).

[26]     Reynertson Declaration, ¶ 13.

[27]     *Id.*

[28]     Reynertson Declaration, ¶ 13.

### C.  **The Ad Hoc Group's Diligence Process**

20.     Realizing that time was of the essence and that it only had about three months to propose a restructuring of a billion dollar business with minimal cooperation from management or the Debtors' advisors, the Ad Hoc Group retained AlixPartners LLP ("**AlixPartners**") to review the Debtors' business and, because the Debtors had no real business plan of their own, to draft an independent business plan for the reorganized Debtors.[29]  The Ad Hoc Group retained AlixPartners on November 18, 2019 to assist the Ad Hoc Group in developing a standalone business plan for the Debtors that would maximize value for the Debtors and their stakeholders.[30]  To develop this business plan, AlixPartners had to carefully examine the Debtors' revenues, costs, and profitability, and other detailed information about the Debtors' business.[31]

21.     AlixPartners began its work by requesting from the Debtors information essential to understanding the Debtors' business and finances.[32]  A critical component of the requested information focused on the Debtors' procurement of milk—the raw material that is the key ingredient for most of the products the Debtors sell and whose cost constitutes a substantial part of the Debtors' expenses.[33]  This information included data on milk pricing and details on the Debtors' suppliers, particularly with respect to its principal supplier DFA.[34]

22.     Unfortunately, despite numerous requests over several months, basic information necessary to developing a comprehensive business plan was not provided in a timely manner, including information related to the Debtors' milk procurement, and some of it still has

---

[29]     Donahue Decl., at ¶ 6.

[30]     *Id.*

[31]     *Id.*

[32]     *Id.* ¶ 8

[33]     *Id.*

[34]     *Id.*

not been provided.[35]  When AlixPartners did receive information, it was often incomplete or did not provide the necessary level of detail.[36]  As a result, AlixPartners' ability to complete its work in a reasonable period of time and with sufficient accuracy was significantly undermined.[37]

23.     It was only in mid-January, when the Ad Hoc Group retained several experts from the dairy industry who identified by their precise "dairy-industry names" the supplier-level milk procurement and pricing documents AlixPartners had previously requested—documents that addressed AlixPartners' requests and the Debtors previously told AlixPartners they did not have or would be too difficult to obtain—that the Debtors began to produce them.[38]  These documents included the Debtors' Federal Milk Marketing Order Reports ("**FMMO Reports**"), Producer Settlement Fund Handler Statements ("**PSF Handler Statements**"), and 2019 invoices for the Debtors' raw materials and fluid purchases (the "**2019 Invoices**").[39]  The AlixPartners team was very surprised to learn from the Ad Hoc Group's dairy experts that these documents are regularly produced and exchanged among the Debtors and their regulators, given they contained the exact data AlixPartners had requested numerous times from the Debtors, but had been told did not exist or would be too difficult to produce.[40]

24.     Although the Debtors produced an initial batch of these documents on January 28-29, 2020 and additional documents between February 20 and February 24, 2020, it was

---

[35]     *Id.* ¶ 9.

[36]     *Id.* ¶ 9.

[37]     *Id.*

[38]     *Id.* at ¶ 14.

[39]     *Id.*

[40]     *Id.* The Debtors are required to prepare FMMO Reports on a monthly basis for 42 of the Debtors' 57 facilities and submit them to their milk administrators with the United States Department of Agriculture each month. The PSF Statements are reports that the milk administrators return to the Debtors in response to the FMMO Reports.  These documents should have been readily available and accessible to the Debtors for prompt provision to the Ad Hoc Group.  Keefe Decl., at ¶ 6.

not until March of 2020 that the Debtors began producing a substantial amount of this information.[41]   The information in these documents would have provided AlixPartners with a clearer picture of the Debtors' milk procurement costs, including location-specific comparisons of milk suppliers, which would have been incorporated into its analysis of the Debtors' business and any proposed restructuring.[42]

25.    By failing to provide the Ad Hoc Group with timely diligence, including important information about the Debtors' milk suppliers, the Debtors have not only hampered the Ad Hoc Group's efforts to seek financing for an alternative restructuring plan,[43] but also created a significant and unfair advantage for DFA, which will crystallize upon the approval of the Bid Protections or any expedited sale timeline.

**D.  DFA**

26.    The nature and scope of DFA's operations, and its relationship to the Debtors, are critical to the Court's analysis of the relief requested in the Bidding Procedures Motion and this Objection.

27.    DFA is the country's largest dairy cooperative headquartered in Kansas City, Missouri.[44]   DFA is member-owned and managed by a 49-member Board of Directors that allegedly operates the cooperative on behalf of and for the benefit of its members.[45]   DFA's

---

[41]     *Id.* at ¶ 16.

[42]     *Id.* at ¶ 17.

[43]     Donahue Decl., at ¶ 17.

[44]     *See Our Cooperative,* DAIRY FARMERS OF AMERICA, https://www.dfamilk.com/who-we-are/our-cooperative (last visited March 6, 2020); *see also* David Yaffe-Bellany, *Talk of Milk Industry Merger Draws Justice Dept. Scrutiny*, THE NEW YORK TIMES (Jan. 20, 2020), https://www.nytimes.com/2020/01/29/business/dean-foods-dairy-merger-investigation.html.

[45]     *See Our Cooperative, supra* note 39.

members, all of which are producers of raw milk, include both individual dairy farmers and other member-owned milk marketing cooperatives.[46]

28.    In 2018, DFA directed the marketing of 64.5 billion pounds of raw milk for its members and others through DFA's consolidated businesses, which represents approximately 30% of total raw milk production in the United States.[47]   DFA's 2018 net sales totaled $13.6 billion, with a corresponding net income of $108.5 million.[48]   As of September 2019, it also owned forty-two manufacturing facilities with over 6,000 employees.[49]   Put simply, DFA is among the largest raw milk suppliers in the country with enormous influence in the U.S. dairy industry.

29.    DFA is also "a long-time commercial counterparty [of the Debtors], providing roughly 60% of Dean Foods milk supply (Dean Foods in turn accounts for approximately 20% of DFA's milk sales)."[50]   In addition, DFA owned a 33.8% interest in the Debtors' operations until December 2001, at which time the Debtors purchased DFA's interest and issued a contingent, subordinated promissory note to DFA (the "**DFA Note**").[51]   The DFA Note had an original principal amount of $40 million, a 20-year term, and an interest rate based on the consumer price index, which is paid in kind on an annual basis until the note reaches a

---

[46]    *See Sitts v. Dairy Farmers of Am.*, Case No. 16-287, 2019 WL 439533 at *2 (D. Vt. Sept. 27, 2019) ("*Sitts*") (denying DFA's and its co-defendants' motion for summary judgment in part on the ground that plaintiffs established genuine issues of material fact regarding, among other things, whether DFA and its co-defendants had a monopsony power or whether there is a dangerous possibility they would achieve it, and whether that monopsony power is derived from legitimate or predatory means.).

[47]    *See* DAIRY FARMERS OF AMERICA, *DFA Reports 2018 Financial Results* (March 20, 2019), https://www.dfamilk.com/newsroom/press-center/dfa-reports-2018-financial-results (hereinafter the "**2018 DFA Report**").

[48]    *Id.*

[49]    *Sitts* at *2.

[50]    *Declaration of Gary Rahlfs in Support of Debtors' Chapter 11 Proceedings and First Day Pleadings*, ¶ 60 (hereinafter "**First Day Declaration**").

[51]    10-Q, *supra* note 18, at 29.

maximum principal amount of $96 million.[52]   The DFA Note is payable only if the Debtors materially breach or terminate their milk supply agreement with DFA without renewal or replacement, otherwise it would have expired in 2021 without any obligation to pay any portion of principal or interest.[53]

30.     Due to DFA's size and market position, the Stalking Horse Bid has already attracted regulators' scrutiny.  The U.S. dairy industry is heavily regulated.[54]  Federal agencies set prices for milk and monitor the industry to ensure stable market relationships among milk producers and milk handlers.[55]   Accordingly, antitrust litigation and regulatory oversight, particularly of large processors and producers, is common in the U.S. dairy industry.[56]

31.     Here, the U.S. Department of Justice's Antitrust Division has announced that it is "investigating Dairy Farmers of America's potential acquisition of Dean Foods and the potential loss of competition for selling raw milk."[57]  In addition, other groups in the dairy industry have started to raise concerns.[58]  For example, the Wisconsin Farmers Union has met with antitrust

---

[52]   *Id.*

[53]   *Id.* Although the DFA Note is disclosed in the Debtors' public securities filings, it is not disclosed in the First Day Declaration or the Bidding Procedures Motion.

[54]   Keefe Decl., at ¶¶ 6, 10.

[55]   *Id.* at ¶ 10.

[56]   *See generally*, Chris Mather, *USDA and DOJ hold Historic Workshop on Competitiveness in Dairy Sector, Hear from Nation's Dairy Farmers*, USDA (March 7, 2017), https://www.usda.gov/media/blog/2010/06/25/usda-and-doj-hold-historic-workshop-competitiveness-dairy-sector-hear-nations (discussing the "unprecedented collaboration" between federal agencies concerning antitrust and regulatory enforcement in the dairy industry); Alan I. Green & John S. Rhee, *Price Fixing and Enforcement of the Antitrust Laws in the Dairy Industry*, BLOOMBERG L. REP.—ANTI TRUST & TRADE, Vol. 4, No. 4 (2011) https://www.hinshawlaw.com/media/news/23_AGreene_PriceFixingandEnforcementoftheAntitrustLawsintheDairyIndustry_022111.pdf (discussing price fixing and enforcement of antitrust laws in the dairy industry, including factors that "have created an environment expected to lead to increased federal enforcement efforts").

[57]   *See* Bunge, *supra* note 4.

[58]   *Id.*

officials from the Wisconsin Department of Justice to raise concerns about the DFA sale.[59]  DFA

is also subject to litigation in other jurisdictions alleging anticompetitive behavior over the years,

such as colluding with other dairy cooperatives and processors by sharing price information to

suppress payments to farmers.[60]

32.     Finally, certain diligence the Ad Hoc Group has received to date (and

particularly the FMMO Reports that were withheld from the Ad Hoc Group until last week)



34.     Based on a preliminary analysis of the hundreds of FMMO Reports and PSF

Handler Statements only received last week from the Debtors,

---

59      *Id.*

60      *See* Yaffe-Bellany, *supra* note 39; *Sitts* at *5.

61      Keefe Decl., at ¶ 14.

62      *Id.*

63      *Id.*

64      *Id.*



35.    As set forth in <u>Exhibit 3</u> to the Keefe Declaration, ███████████████

36.    ████████████████████

---

65    *Id.* ¶ 15.
66    *Id.* ¶ 16; Exhibit 3.███████████████████████

███████████████████████. Keefe Declaration, at ¶ 23.
67    Keefe Decl., at ¶ 19.
68    *Id.*



37. ████████████████████████████████████

38.    For example, ████████████████████████

---

[69]    *Id.* at ¶ 20.

[70]    *Id.*

[71]    *Id.* at 21.

[72]    *Id.*

[73]    *Id.*

[74]    *Id.* at 22.

[75]    *Id.*



[76]

39. ████████████████████████████████

.[78]

---

[76]    *Id.*

[77]    Keefe Decl., at Exhibit 2, ████.

[78]    *Id.* at 24.

███████████████████████████████████████████████

████.[79]  In the interim, DFA should not benefit from stalking horse protections if the outcome

of that investigation shows any bad faith conduct on its part.[80]

### E.  The Bidding Procedures Motion

40.     On February 17, 2020, the Debtors filed the Bidding Procedures Motion,

which seeks, among other things, an order (i) authorizing and approving the Bidding Procedures

in connection with the Sale Transaction; (ii) authorizing and approving the Debtors' entry into the

Stalking Horse Agreement with DFA; (iii) approving certain Bid Protections in connection with

the Stalking Horse Agreement and in accordance with the terms and conditions set forth in the

Bidding Procedures; (iv) scheduling certain dates for the Auction and Sale Hearing; (v) authorizing

and approving certain notice procedures; and (vi) authorizing and approving certain Assumption

and Assignment Procedures.[81]

41.     The Stalking Horse Bid contemplates DFA's purchase of substantially all

of the Debtors' assets for an aggregate purchase price (subject to significant adjustments) of

$425 million along with the assumption of certain liabilities on the terms and conditions set forth

in the Stalking Horse Agreement.[82]   Notably, the $425 million aggregate purchase price only

includes $322 million of cash.  DFA makes up the difference by paying itself $103 million on

---

[79]     *Id.*

[80]     Notably, it appears the Debtors' engaged McKinsey & Company in 2009 to evaluate their milk supply options and received an estimate that it could save $100 million annually by direct sourcing milk rather than purchasing it through Dairy Marketing Services, LLC (an affiliate of DFA).  *See Sitts* at *10.

[81]     *Bidding Procedures Motion, supra* note 2, at ¶ 1(a).

[82]     *Id.* at ¶ 18.

account of its alleged cure claims, ███████████████████████████████

███ .[83]

42.    The Bidding Procedures also include certain Bid Protections in the form of a $15 million Break-up Fee and an Expense Reimbursement of up to $8 million.[84]  In addition, the Bidding Procedures provide for an initial "minimum bid increment" of $5 million for any bid to constitute a Qualified Bid in the Auction.[85]  The net result is that any potential bidder (or plan proponent) must exceed the Debtors' purported $425 million purchase price by at least $28 million (6.5% of the aggregate purchase price, and 8.7% of the cash purchase price).[86]

43.    Finally, the Bidding Procedures also establish the following timeline for the proposed Sale:[87]

| Date | Milestone |
|------|-----------|
| March 16, 2020 | Target date for Debtors to file Potential Assumed Contracts Schedule |
| March 31, 2020 | Potential Bidder deadline |
| April 13, 2020 | Bid Deadline |
| April 20, 2020 | Auction (if Qualified Bids are received) |
| April 22, 2020 | Sale objection deadline |
| April [27], 2020 | Proposed Sale hearing |

44.    This timeline represents a negotiated outcome among the Debtors and the Ad Hoc Group.  When the Debtors amended the DIP Facilities on February 10, 2020, the Ad Hoc Group requested that the Debtors extend the milestone to file the Bidding Procedures Motion from February 10, 2020 to March 11, 2020, and the milestone for entry of the Bidding Procedures Order

---

[83]    *Id.*; Reynertson Decl., *supra* note 5, at ¶ 17.

[84]    *Bidding Procedures Motion, supra* note 2, at ¶ 25.

[85]    *Bidding Procedures Motion, supra* note 2, at ¶ 29.

[86]    Pursuant to the Stalking Horse Agreement, any plan of reorganization submitted by the Ad Hoc Group and entered into by the Debtors would constitute a "Superior Proposal," which would trigger the Bid Protections. *See Stalking Horse Agreement*, §§ 1.01; 12.01(b)(iv); 14.07.

[87]    *Bidding Procedures Motion, supra* note 2, at ¶ 30.

from March 11, 2020 to April 10, 2020.  As a compromise, the Ad Hoc Group accepted milestones of February 24, 2020 for the filing of the Bidding Procedures Motion and March 27, 2020 for the entry of the Bidding Procedures Order.  The Debtors filed the Bidding Procedures Motion on February 17, 2020, one week earlier than required and three weeks prior to the Ad Hoc Group's request.  The Debtors are also seeking entry of the Bidding Procedures Order on March 12, 2020, two weeks prior to the agreed outside date and almost a month prior to the Ad Hoc Group's requested date.  The table below summarizes the various bid-asks on the timeline and the final results of those negotiations:

| Milestone | Final DIP Order Milestones | Ad Hoc Group Request | DIP Amendment Milestones | Bidding Procedures Motion |
|---|---|---|---|---|
| File Sale Motion | 2/10/2020 | 3/11/2020 | 2/24/2020 | 2/17/2020 |
| Bidding Procedures Order | 3/11/2020 | 4/10/2020 | 3/27/2020 | 3/12/2020 |
| Sale Order | 5/20/2020 | 5/20/2020 | 5/20/2020 | 4/27/2020 |

45.     The Debtors have the flexibility and liquidity under the DIP Credit Agreement to accommodate the timeline set forth in the Bidding Procedures Motion.  Indeed, ███

████████████████████████████████████████████████████,[88] and the DIP Milestones do not require entry of an order approving the Sale Transaction until May 20, 2020—almost a month after the proposed Sale Hearing.[89]

46.     The Ad Hoc Group recently requested that the Debtors extend the hearing on the Bidding Procedures for 30 days.  This additional time would allow the Ad Hoc Group and

---

[88]     Reynertson Decl. at ¶ 22.

[89]     *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, 507, and 552 and Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (i) Authorizing the Debtors to (a) Obtain Senior Secured Superpriority Post-petition Financing, and (b) Use Cash Collateral, (ii) Granting Liens and Superpriority Administrative Expense Claims, (iii) Providing Adequate Protection to Prepetition Secured Parties, and (iv) Granting Related Relief*, Annex A [Docket No. 568].

the Committee time to complete their respective investigations, and for the Ad Hoc Group to continue its efforts to propose a value-maximizing restructuring alternative to the DFA sale.

### F. Stalking Horse Agreement

47.    The specific terms of the Stalking Horse Bid are set forth in the Stalking Horse Agreement, certain of which are of particular relevance to this Objection.[90]

48.    Sections 2.01(a) and 2.01(b) provide that DFA will acquire, among other Assets: (a) all the Debtors' claims and causes of action against all Persons related to the Assets or the Acquired Business subject to certain limited exceptions[91] and (b) Avoidance Actions related to payments for goods or services delivered or provided to any of the acquired Facilities (collectively, the "**Transferred Estate Claims**").

49.    In addition, Section 14.17(b) (the "**DFA Release**") provides that, effective as of the Closing, each Debtor irrevocably and unconditionally releases DFA, each of its Subsidiaries, their respective Affiliates, and all of their respective "past, present and/or future officers, directors (and Persons in similar positions), employees, agents, general or limited partners, managers, management companies, members, advisors, stockholders, equity holders, controlling Persons, other Representatives or Affiliates" from any and call estate claims and causes of action that the Debtors have now or in the future, in respect of "any cause, matter or thing relating to [DFA], the Assets, or the Business occurring or arising prior to the Closing Date."

50.    Despite agreeing to sell the Transferred Estate Claims and grant the DFA Release, to date the Debtors have not provided any analysis or valuation of these estate claims.

---

[90]    All section references herein refer to the applicable provisions of the Stalking Horse Agreement and all capitalized terms have the meanings used therein unless otherwise defined.

[91]    For example, estate claims against the Debtors' officers and directors arising or related to the pre-Closing period are not included in the Transferred Estate Claims.

Moreover, it does not appear that the Debtors have performed any investigation into potential claims against DFA arising under their supply contracts with the Debtors or otherwise, or of any other estate claims.  If the Bid Protections or an accelerated timeline are authorized, it appears likely that these releases will be granted notwithstanding the lack of any investigation, valuation, or any other evidence to support a finding of the proper exercise of business judgment in agreeing to them, particularly in light of concerns regarding the Dean-DFA relationship identified by the Ad Hoc Group through its diligence process.

51.     The Stalking Horse Agreement also includes multiple closing conditions that excuse DFA from its obligation to close the proposed sale, many of which are not within the Debtors' control and introduce substantial execution risk even if the Stalking Horse Bid is deemed the winning bidder at the Auction, including:

- all antitrust waiting periods applicable to the transaction have not expired or early termination is not granted by certain dates that only DFA may extend (§ 10.03);

- the Court fails to enter orders approving (a) the rejection of each of the Debtors' Collective Bargaining Agreements or (b) the modification of each Collective Bargaining Agreement in a manner acceptable to DFA and pursuant to section 1113 of the Bankruptcy Code (§ 9.05); and

- the Court fails to enter the Sale Order that provides, among other things, that DFA is entitled to the protections of section 363(m) of the Bankruptcy Code and has not engaged in conduct subject to section 363(n) of the Bankruptcy Code (Art. I; § 10.02).

52.     As noted above, regulators have already expressed concerns about DFA, the largest dairy co-op in the country, purchasing the Debtors' assets.  It is apparent that there is material regulatory risk to the closing of the proposed DFA transaction.  That risk is borne entirely by the Debtors' estates, which may be forced to liquidate if the DFA sale is approved and subsequently cannot close.  Approval of the Bid Protections will chill the Ad Hoc Group's ability



to propose an Alternative Transaction, likely crystallizing this risk to the Debtors' estates and all of their stakeholders.

53.     In addition, the Stalking Horse Bid is likely to leave the Debtors' estates administratively insolvent.[92]  As set forth in the below summary and in greater length in the DFA Stalking Horse Bid Analysis attached as <u>Exhibit 4</u> to the Reynertson Declaration, ███████

████████████████████████████████████████████████████████████████████

██████████████████████████



54.     Based on GLC's[97] calculations of the proceeds of the remaining assets in the Debtors' estates after the proposed Sale closes, including cash, facilities, ███████████

---

[92]     *Id.* at ¶ 19.

[93]     This analysis assumes that no holders of administrative claims agree to reduce the amount of their administrative claims and, therefore, there is no corresponding $62.5 million reduction of DFA's administrative claims.

[94]     Assumes (a) $322 million in cash and (b) $103 million in payment of DFA's 503(b)(9) claims and cure costs related to DFA milk contracts.

[95]     Includes liquidation costs, chapter 11 professional fees, KERP bonuses and STI bonus.

[96]     Includes 503(b)(9) payables and cure costs associated with DFA Milk Contracts.

[97]     GLC Advisors & Co, LLC ("GLC"), an investment banking advisory firm engaged by the Ad Hoc Group.

██████████████████████████████████████████████████

████████████████    ████████████████████████████████

████████████████████████████████████████████████.[99]  In

all these scenarios, the Debtors will lack sufficient proceeds to pay administrative claims in full,

let alone provide any recovery to the Debtors' other stakeholders.  And, with the release of

substantially all estate claims, there will be few estate assets remaining that could otherwise

generate a meaningful (though contingent) return.  A bid that is premised on the release of

potentially valuable and uninvestigated claims, is subject to significant closing risk, and leaves the

estates administratively insolvent is not one that should be permitted to chill the efforts of

competing parties in interest with significant Bid Protections.

### G.  The Ad Hoc Group Investigation

55.    Contemporaneously herewith, the Ad Hoc Group is serving document

requests and deposition notices on the Debtors and DFA seeking information concerning, among

other things, their long-standing commercial relationship and the facts and circumstances

surrounding the development and pursuit of the Stalking Horse Bid.  The Ad Hoc Group intends

to pursue this investigation on a dual-track with the development of its restructuring proposal.

### OBJECTION

56.    The Bidding Procedures and Stalking Horse Agreement contain numerous

provisions that will chill bidding, otherwise limit or eliminate participation by prospective bidders,

including the Ad Hoc Group, and ultimately result in a sale to DFA that will leave the estates

administratively insolvent.  But that does not have to be the result.  The Ad Hoc Group's objective

---

[98]    *Reynertson Declaration*, *supra* note 5, Exhibit 4 at ¶ 19.

[99]    *Id.* at Exhibit 4.

is to ensure the Bidding Procedures lay a foundation for a process that enables the highest-value alternative to the Stalking Horse Bid.  The Ad Hoc Group's Objection is therefore limited to the modifications necessary to achieve that goal and provide the Ad Hoc Group and the Committee with the diligence and information necessary to move these cases forward to an optimal restructuring outcome for all stakeholders under the circumstances.

I.    **The Bid Protections should not be approved because they are unnecessary, will chill bidding, and do not represent a sound exercise of the Debtors' business judgment**

57.    The Bid Protections consist of the following amounts, which taken together represent approximately 6.58% of the $425 million "headline purchase price" under the Stalking Horse Agreement:

| Bid Protection | Amount | % Total Purchase Price ($425 million) | % Cash Purchase Price ($322 million)[100] |
|---|---|---|---|
| Break-Up Fee | $15 million | 3.53% | 4.66% |
| Expense Reimbursement | $8 million[101] | 1.88% | 2.48% |
| Minimum Incremental Bid Amount[102] | $5 million | 1.1% | 1.5% |
| **Total** | **$28 million** | **6.58%** | **8.69%** |

---

[100]    The "Cash Purchase Price" excludes $103 million of "cure." DFA is effectively paying itself under the Stalking Horse Agreement, even though other cure costs are paid by the Debtor and its cure claims may be subject to setoff or impairment as discussed below.

[101]    The Expense Reimbursement provides "up to" $8 million "for reasonable and documented costs and expenses incurred by [DFA] in connection with the negotiation and execution of, and the carrying out of its obligations under, the Stalking Horse Agreement."  *Bidding Procedures Motion*, *supra* note 2, at ¶ 25.

[102]    Although the $5 million minimum incremental bid amount is not an express "Bid Protection" under the Stalking Horse Agreement, it functions as a de facto Bid Protection and is treated as such in this Objection.

58.     The Stalking Horse Agreement provides that the Break-Up Fee and Expense Reimbursement "will be treated as an administrative expense" entitled to superpriority status under section 364(c)(1) of Bankruptcy Code.[103]

59.     In the Fifth Circuit, the Break-Up Fee must satisfy the requirements of section 503(b) of the Bankruptcy Code, which provides that the fee may only be approved if it is an actual and necessary cost of preserving the estate.[104]  This generally requires, at a minimum, that the estate receive a "discernible benefit" from the Break-Up Fee.[105]  Courts also consider the following factors when assessing bid protections generally:   (i) the size and nature of the transaction contemplated and comparable transactions, (ii) the efforts to be expended by the potential buyer, (iii) the benefits the potential buyer has provided the bankruptcy estate, and (iv) the necessity of inducing the potential buyer to serve as a "stalking horse" bidder.[106]  Courts will deny bid protections that fail to meet this standard.[107]

60.     Section 363(b) applies to the Expense Reimbursement and requires "some articulated business justification" for the reimbursement.[108]  This generally requires consideration

---

[103]    *Stalking Horse Agreement*, Art. 1.

[104]    *See, e.g., In re ASARCO, L.L.C.*, 650 F.3d 593, 602 (5th Cir. 2011) (stating that section 503(b) is the proper channel for requesting payment of a break-up fee); *In re Acis Capital Mgmt., L.P.*, 604 B.R. 484, 517 n.28 (N.D. Tex. 2019) ("The parties do not dispute that § 503 applies to the bankruptcy court's decision to approve a break-up fee."); *In re Tridimension Energy L.P.*, No. 10-33565-SGJ, 2010 WL 5209233, at *2 (Bankr. N.D. Tex. Oct. 29, 2010) ("The Break–Up Fee is [] an actual and necessary cost of preserving the Debtors' estates within the meaning of Section 503(b)").

[105]    *In re ASARCO L.L.C.*, 441 B.R. 813, 824 (S.D. Tex. 2010); *Acis Capital Mgmt.*, 604 B.R. at 517.

[106]    *Tridimension Energy*, 2010 WL 5209233, at *2.

[107]    *See, e.g., In re Reliant Energy Channelview LP*, 594 F.3d 200, 208 (3d Cir. 2010) (break-up fee denied where court found the bidder would not abandon the bid absent the break-up fee); *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999) (denying break-up fee where the original bid did not incentivize more competitive bidding); *In re Beth Israel Hosp. Ass'n of Passaic,* 2007 WL 2049881, at *13 (Bankr. D.N.J. July 12, 2007) (denying break-up fee where stalking horse bid not found *to* incentivize the competing, successful bid); *In re Am. W. Airlines, Inc.*, 166 B.R. 908, 913 (Bankr. D. Ariz. 1994) (denying break-up fee where due a thorough marketing process the break-up fee was found to chill bidding and deplete estate assets).

[108]    *ASARCO*, 650 F.3d at 601.

of all important factors pertaining to the sale, with a focus on the interests of the debtors and their stakeholders.[109]  As a general matter, expense reimbursements may be approved where (i) there is no evidence of self-dealing; (ii) the reimbursement facilitates the auction process; and (iii) the reimbursement is reasonable in comparison to the value of the asset(s) being sold.[110]

61.     Regardless of the applicable standard, the Bid Protections fail to satisfy these requirements for at least five reasons.

62.     *First*, the Bid Protections are not necessary to preserve the value of the Debtors' estates.  The Debtors, as the largest milk processing and distribution company in the United States,[111] represent 20% of DFA's milk sales.  Unlike non-insider, third-party bidders with no pre-existing relationship with the Debtors, DFA's fiduciary obligations to its members are intrinsically linked to the survival of the Debtors' business as a going concern regardless of who ultimately owns the Debtors.  DFA markets a product that quickly spoils and needs to be processed and sold to market expeditiously.  DFA must do whatever it can to keep the Debtors in business.  Accordingly, DFA does not need special inducement to enter into a defensive Stalking Horse Bid and the Bid Protections provide no benefit to the Debtors' estates.[112]

63.     As noted above, DFA is member-owned and those members need Dean to buy their milk.  DFA's own public statements make this clear: "When the largest processor of raw milk in the world files for bankruptcy, ***we have an obligation to do what we can to secure those***

---

[109]     *Id.*

[110]     *Id. at* 603.

[111]     *First Day Declaration*, *supra* note 43, at ¶ 8.

[112]     The Debtors admit that is one of the main reasons they focused on negotiations with DFA to the exclusion of other viable alternatives in the first place.  *See First Day Declaration*, at ¶ 60 ("The Debtors and their advisors focused initially on discussions for [a strategic sale transaction] with DFA as a potential counterparty for several reasons, including that . . . DFA is a long-time commercial counterparty, providing roughly 60% of Dean Foods' milk supply (Dean Foods in turn accounts for approximately 20% of DFA's milk sales)").

***markets and work to minimize disruption to our members and other farmers.***"[113]   Indeed, DFA

claims "no one has a greater interest in preserving and expanding milk markets than DFA."[114] DFA

has publicly acknowledged that it has pursued the Stalking Horse Bid on account of its independent

obligation to protect its customers and their markets, it does not need $28 million of aggregate Bid

Protections to induce its participation in the sales process.

        64.    *Second*, the Bid Protections are inappropriate where the terms of the

Stalking Horse Bid give DFA termination rights based on contingencies that present material

obstacles outside of the Debtors' control.  For example, neither party has an obligation to close

until they obtain the requisite antitrust approvals.  Obtaining these approvals is not simply a *pro*

*forma* exercise for DFA.  The U.S. DOJ's Antitrust Division has already publicly announced that

it is "investigating [DFA]'s potential acquisition of Dean Foods and the potential loss of

competition for selling raw milk" and that it is "concerned with [DFA] acquiring another big

processor."[115]   Other third-parties are also raising concern with state regulators, including the

Wisconsin Department of Justice.[116]  DFA is also subject to pending suits in other jurisdictions

alleging anticompetitive practices involving the Debtors (among many other non-defendant

cooperative and processor co-conspirators), including using outsourcing and supply agreements

with processors. ███████████████████████████████████████████████████,

to further their anticompetitive practices.[117]

---

[113]    *See* Bunge, *supra* note 4.

[114]    *See* Christopher Maynard, *Dairy Farmers of America Agrees to Buy Largest U.S. Milk Producer*, Consumer Affairs ( February 18, 2020) https://www.consumeraffairs.com/news/dairy-farmers-of-america-agrees-to-buy-largest-us-milk-producer-021820.html,

[115]    *See* Bunge, *supra* note 4.

[116]    *See* Bunge, *supra* note 4.

[117]    *See* Yaffe-Bellany, *supra* note 39; *Sitts* at *5, *12 (noting that, according to the plaintiffs, DFA's arrangement with the Debtors was used a "template" for other processors and citing a November 2004 presentation in

65.    DFA also has no obligation to close unless the Debtors successfully reject or otherwise modify their Collective Bargaining Agreements in a manner acceptable to DFA and subject to section 1113 of the Bankruptcy Code.   The Debtors do not control whether such rejections or modifications will both pass muster under section 1113 and satisfy DFA, and the Ad Hoc Group anticipates that the applicable unions will vigorously assert their rights and protect their interests in a manner adverse to DFA.

66.    The inherent uncertainty baked into the Stalking Horse Agreement militates against approval of all the Bid Protections.   The Bid Protections will serve to chill bids and preclude otherwise Qualified Bids and Alternative Transactions, while the Stalking Horse Agreement sticks the Debtors with the risk that the transaction cannot be consummated.   If DFA wants to shift the antitrust and other closing risk to the Debtors' estates, it should not also be entitled to use the Bid Protections to chill other parties in interest from submitting bids or other Alternative Transactions that do not include such substantial closing risk.

67.    *Third*, the Bid Protections are unreasonably high, which will further chill bids and other Alternative Transactions.   Assuming the Debtors' headline purchase price of $425 million is the appropriate benchmark for comparison—which it is not—the Break-Up Fee alone constitutes 3.53% of the aggregate purchase price.   That arguably falls just above the high-end of a "market" range for break-up fees in a true arm's length transaction.[118]   However, even that is

---

which "DFA announced that the 'Dean outsourcing agreement served as a predicate for subsequent outsourcing projects'" with other processors.).

[118]   The Debtors cite six cases where "similar" Bidding Procedures were approved in connection with chapter 11 asset sales (*see Bidding Procedures Motion, supra* note 2, at ¶ 36), and only one had a break-up fee higher than 3% and none had a break-up fee higher than 5%.  *See In re Alta Mesa Res., Inc.*, Case No. 19-35133, (Bankr. S.D. Tex. 2019) [Docket 701] (3% break-up fee); *In re Francis Drilling Fluids, Ltd.*, Case No. 18-35441 (Bankr. S.D. Tex. 2018) [Docket 285] (3% break-up fee); *In re Cobalt International Energy Inc.* Case No. 17-36709 (Bankr. S.D. Tex. 2018) [Docket 299] (3% break-up fee); *In re EMAS CHIYODA Subsea Ltd.* Case No. 17-31146, (Bankr. S.D. Tex. 2017) [Docket 317] (2% break-up fee); *In re Vanguard Natural Resources, LLC,* Case No. 17-30560 (Bankr. S.D. Tex. 2017) [Docket 583] (3% break-up fee); *In re*

misleading as DFA's headline purchase price of $425 million is not the appropriate benchmark. Of that amount, DFA is paying itself $103 million in alleged cure amounts based on claims that cannot be verified until the Ad Hoc Group and the Committee complete their ongoing investigations.[119]  DFA is effectively credit bidding its cure claim, ██████████████████ ██████████████████████████████████████.[120]  This is particularly problematic where, unlike many 363 asset purchase agreements, the Stalking Horse Agreement saddles the Debtors with the obligation to satisfy all other Cure Costs arising from the agreements DFA elects to assume (further reducing cash proceeds available for distribution to other administrative creditors).[121]  In addition, given the potential estate claims against DFA discussed above—which the Ad Hoc Group and Committee are still investigating—DFA's alleged cure claims may be subject to setoff or impairment.  The Bid Protections thus become more egregious when measured against the Stalking Horse Bid's $322 million of cash consideration, representing 8.69% of the nominal cash purchase price.

68.     *Fourth*, any value ascribed to DFA's agreement to reduce its alleged administrative claims by up to $62.5 million is illusory.  Under the Stalking Horse Agreement, DFA's agreement to reduce its claims is subject to other holders of Administrative Claims agreeing to a commensurate reduction—DFA is effectively inflating its bid off the back of the Debtors' other administrative trade creditors.  No value should be ascribed to such amounts for the purposes of determining the reasonableness of the Bid Protections.

---

*Geokinetics Inc.,* Case No. 18-33410 (Bankr. S.D. Tex. 2018) [Docket 110] (5% break-up fee).  *See also* Reynertson Decl. at ¶ 20.

[119]    The Stalking Horse Agreement also contains certain escrows and purchase price adjustments that render it virtually impossible to determine the exact purchase price and therefore accurately benchmark the proposed Bid Protections.

[120]    *Reynertson Declaration*, *supra* note 5, at ¶ 17.

[121]    *Stalking Horse Agreement*, § 8.12.

69.  *Fifth*, even if they are approved, the Break-Up Fee—and all other Bid Protections—should be expressly subject to the Ad Hoc Group's and the Committee's ongoing investigations.  As described above, the Ad Hoc Group believes that the MFN provisions of the DFA Contract have been repeatedly breached by DFA (and have not been enforced by the Debtors) to the material detriment of the Debtors' estates and all other parties in interest.  Other anomalies in the DFA Contract raise concerns regarding a pattern of decision-making routinely benefiting DFA and harming the Debtors.  Pending the outcome of these investigations, DFA should not be permitted to reap the rewards of any potential misconduct by securing Bid Protections that will secure its presumptive position as the purchaser of the Debtors' assets.

## II.    The Bidding Procedures and Stalking Horse Bid should be subject to heightened scrutiny because DFA may be an insider of the Debtors

70.  Although there is no controlling definition of non-statutory insider in the Fifth Circuit, that court has stated a non-statutory insider is an entity with (a) a sufficiently close relationship with the debtor and (b) a high degree of control or influence over the debtor that negates any arm's length dealings between the parties.[122]  Many other courts have applied this two-step analysis to determine whether a party is a non-statutory insider,[123] including the United States

---

[122]  *See Matter of Holloway*, 955 F.2d 1008, 1010 (5th Cir. 1992).  *Holloway*, while instructive, was deciding a claim for relief under Tex. Bus. Comm. Code Ann. § 24.006(b).  The Fifth Circuit looked to the Bankruptcy Code based on a finding that the Uniform Fraudulent Transfer Act's definition of "insider" is very similar to the definition found in Bankruptcy Code section 101(31).  *See Matter of Holloway*, 955 F.2d at 1010; *see also In re Winstar Commc'ns, Inc.,* 554 F.3d 382, 396-97 (3d Cir. 2009) (holding that "it is not necessary that a non-statutory insider have actual control; rather, the question is whether there is a close relationship [between debtor and creditor] and . . . anything other than closeness to suggest that any transactions were not conducted at arm's length.") (internal citations and quotations omitted).

[123]  *Holloway*, 955 F.2d at 1011 (citing *In re Friedman*, 126 B.R. 63, 70 (9th Cir.B.A.P.1991) ("insider status may be based on a professional or business relationship with the debtor, in addition to the Code's per se classifications, where such relationship compels the conclusion that the individual or entity has a relationship with the debtor, close enough to gain advantage attributable simply to affinity rather than to the course of business dealings between the parties"); *In re* Schuman, 81 B.R. 583, 586 (9th Cir.B.A.P.1987) ("The tests developed by the courts in determining who is an insider focus on the closeness of the parties and the degree to which the transferee is able to exert control or influence over the debtor."); *In re Benson*, 57 B.R. 226, 229 (Bankr.N.D.Ohio 1986) (an insider may be anyone "whose close relationship with the debtor subjects transactions made between the two parties to careful scrutiny"); *Matter of Lemanski*, 56 B.R. 981, 983

---

Bankruptcy Court for the Northern District of Texas.[124]  Other factors indicating an entity's status as a non-statutory insider include, among other things: (i) exerting a high level of control over the debtor's decisions; (ii) treating the debtor as a "captive buyer" of the entity's goods; (iii) having the control and ability to coerce the debtors into transactions not in their best interests; and (iv) being a major creditor of and supplier of the debtor.[125]

71.     The Stalking Horse Bid contemplates the sale of substantially all of the Debtors' assets to DFA—the supplier of 60% of the Debtors' milk with a decades-long relationship with the Debtors.   Both the Ad Hoc Group and the Committee are still investigating this relationship, including the extent to which DFA exerts influence and control over the Debtors. However, as noted elsewhere in this objection, ████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

██████ .  The investigation may reveal further facts that establish that DFA has exercised undue influence over the Debtors and therefore is a non-statutory insider, which will render the Stalking Horse Bid (and the proposed sale) subject to heightened scrutiny.[126]  Other relevant facts indicating DFA's potential insider status include:  (i) the Debtors' unwarranted delay in providing readily available diligence relevant to their relationship with DFA, and (ii) ████████████████████████

---

(Bankr.W.D.Wis.1986) (a transferee "is an insider if, as a matter of fact, he exercises such control or influence over the debtor as to render their transaction not arms-length"); *Matter of Montanino*, 15 B.R. 307, 310 (Bankr.D.N.J.1981) (an insider "is one who has such a relationship with the debtor that their dealing with one another cannot be characterized as an arm's-length transaction")).

[124]     *See generally In re Jones*, 2019 WL 1167812 (Bankr. N.D. Tex. Mar. 11, 2019).

[125]     *See Winstar*, 554 F.3d at 397-399.

[126]     *See Pepper v. Litton*, 308 U.S. 295, 307-08 (1939); *Fabricators Inc. v. Technical Fabricators, Inc.*, 926 F.2d 1458, 1465 (5th Cir. 1991); *Matter of Lifschultz Fast Freight*, 132 F.3d 339, 344 (7th Cir. 1997) ("Insider's dealings with debtor-corporation are ordinarily subject to rigorous or strict scrutiny."); *In re Auto Style Plastics, Inc.*, 269 F.3d 726, 745 (6th Cir. 2001); *In re Harford Sands Inc.*, 372 F.3d 637, 641 (4th Cir. 1991); *Brewer v. Erwin & Erwin, P.C.*, 942 F.2d 1462, 1465 (9th Cir. 1991); *In re Mid-Town Produce Terminal, Inc.*, 599 F.2d 389, 393 (10th Cir. 1979).

███████████████████████████████████████████████████████

████████████████ .

72.     If heightened scrutiny applies, the Debtors and DFA must prove the "inherent fairness [of the proposed sale] from the viewpoint of the corporation and those interested therein."[127]  In such a heightened-scrutiny analysis, courts consider "whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain."[128]  In analyzing the integrity and entire fairness of a transaction, courts will "typically examin[e] whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration."[129]  This standard cannot be satisfied if DFA exercised undue influence over the Debtors in order to orchestrate a sale of the Debtors' estates to itself at a price that leaves the estates administratively insolvent, and stalking horse protections that insulate that potential result should not be condoned.

### III.    The Bidding Procedures timeline should be maintained to afford the Ad Hoc Group enough time to formulate its potential bid and complete its ongoing investigation

73.     As set forth above, the Bidding Procedures' current timeline represents a highly negotiated outcome.  This time is necessary for the Ad Hoc Group to attempt to finalize its plan proposal and for the Ad Hoc Group and the Committee to complete their investigations.  The Debtors have delayed the diligence process throughout these cases to DFA's benefit, frustrating the Ad Hoc Group's opportunity to finalize a fully financed plan proposal.  The Debtors and DFA should not be permitted to capitalize on this unfortunate course of conduct by cutting off the Ad Hoc Group's efforts to maximize value for the Debtors' stakeholders after having effectively

---

[127]     *Pepper*, 308 U.S. at 306.

[128]     *Id.* at 306–307.

[129]     *In re Innkeepers USA Tr.*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010).

frustrated those efforts to date—especially where they have the flexibility and liquidity to honor that timeline.

**IV.    The Bidding Procedures and the Stalking Horse Agreement require additional important modifications**

74.    In addition to the foregoing, the Bidding Procedures should be modified to reflect the following changes to ensure a level playing field and a robust, open sale/restructuring process that maximizes potential recoveries:

- **Consultation Rights** – the Debtors should clarify that notwithstanding anything to the contrary in the Bidding Procedures, DFA will not receive access to any bids or alternative transaction proposals submitted to the Debtors, including any Qualified Bids, prior to all other Qualified Bidders participating in the Auction.

- **Payment of Bid Protections** – if some or all of the Bid Protections are approved, the Stalking Horse Agreement should be amended to provide that any Bid Protections due to DFA should be payable only upon consummation of an alternative transaction, not within five Business Days after termination of the Stalking Horse Agreement and that such Bid Protections are subject to forfeiture upon a finding of bad faith conduct by DFA.

- **Alternate Bids** – the Stalking Horse Bidder should be required to serve as an Alternate Bidder like any other Qualified Bidder to preserve the Debtors' optionality during the sales process.

- **Estate Claims & Releases** – the DFA Release and the Transferred Estate Claims, taken together, transfer or waive estate claims and causes of action against DFA and a long list of other parties. The Ad Hoc Group believes these claims are potentially valuable. The Debtors have not identified, investigated, or valued these claims and causes of action, but have nonetheless agreed to transfer or release them under the Stalking Horse Agreement. Any such transfer or release should be prohibited at least until the Committee and the Ad Hoc Group's investigations are complete and the Debtors provide evidence that establishes why such transfer or releases constitute a sound exercise of their business judgment.

[*Remainder Of Page Intentionally Blank*]

## CONCLUSION

For all these reasons, the Court should deny approval of the Bidding Procedures unless the

Debtors make the modifications and clarifications set forth herein, including elimination of all Bid

Protections and confirmation that the sale timeline set forth in the Motion will be honored.[130]

Dated: March 9, 2020
        Houston, Texas

Respectfully submitted,
By: */s/ Hugh M. Ray, III*

**PILLSBURY WINTHROP SHAW
PITTMAN LLP**
Hugh M. Ray, III (State Bar No. 24004246)
Two Houston Center
909 Fannin, Suite 2000
Houston, TX 77010-1028
Telephone: (713) 276-7600
Email: hugh.ray@pillsburylaw.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Andrew N. Rosenberg (admitted *pro hac vice*)
Robert A. Britton (admitted *pro hac vice*)
Douglas Keeton (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019
Telephone: 212-373-3000
arosenberg@paulweiss.com
rbritton@paulweiss.com
dkeeton@paulweiss.com

*Counsel for the Ad Hoc Group of Bondholders*

---

[130]    A proposed form of Order denying the relief requested in the Bidding Procedures Motion is attached as **Exhibit D**.

## **CERTIFICATE OF SERVICE**

I hereby certify that, on March 9, 2020, a true and correct copy of the foregoing was served via email through the Bankruptcy Court's Electronic Case Filing System on the parties that have consented to such service.

*/s/ Hugh M Ray, III*
Hugh. M. Ray, III