EXHIBIT A
REYNERTSON DECLARATION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § § § | Chapter 11 |
|  | § | Case No. 19-36313 (DRJ) |
| SOUTHERN FOODS GROUP, LLC, *et al.*,[1] | § § § | (Jointly Administered) |
|  | § § | |
| Debtors. | § § | |

## DECLARATION OF J. SOREN REYNERTSON IN
## SUPPORT OF OBJECTION OF THE AD HOC GROUP OF
## BONDHOLDERS TO DEBTORS' BIDDING PROCEDURES MOTION

1.      I am a managing director and the co-founder of GLC Advisors & Co., LLC

("**GLC**"), an investment banking advisory firm.  Together with my team from GLC, I have served

as investment banker to the Ad Hoc Group.[2]  I submit this declaration ("**Declaration**") in support

of the Objection.

---

1       The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: Southern Foods Group, LLC (1364); Dean Foods Company (9681); Alta-Dena Certified Dairy, LLC (1347); Berkeley Farms, LLC (8965); Cascade Equity Realty, LLC (3940); Country Fresh, LLC (6303); Dairy Information Systems Holdings, LLC (9144); Dairy Information Systems, LLC (0009); Dean Dairy Holdings, LLC (9188); Dean East II, LLC (9192); Dean East, LLC (8751); Dean Foods North Central, LLC (7858); Dean Foods of Wisconsin, LLC (2504); Dean Holding Company (8390); Dean Intellectual Property Services II, Inc. (3512); Dean International Holding Company (9785); Dean Management, LLC (7782); Dean Puerto Rico Holdings, LLC (6832); Dean Services, LLC (2168); Dean Transportation, Inc. (8896); Dean West II, LLC (9190); Dean West, LLC (8753); DFC Aviation Services, LLC (1600); DFC Energy Partners, LLC (3889); DFC Ventures, LLC (4213); DGI Ventures, Inc. (6766); DIPS Limited Partner II (7167); Franklin Holdings, Inc. (8114); Fresh Dairy Delivery, LLC (2314); Friendly's Ice Cream Holdings Corp. (7609); Friendly's Manufacturing and Retail, LLC (9828); Garelick Farms, LLC (3221); Mayfield Dairy Farms, LLC (3008); Midwest Ice Cream Company, LLC (0130); Model Dairy, LLC (7981); Reiter Dairy, LLC (3675); Sampson Ventures, LLC (7714); Shenandoah's Pride, LLC (2858); Steve's Ice Cream, LLC (6807); Suiza Dairy Group, LLC (2039); Tuscan/Lehigh Dairies, Inc. (6774); Uncle Matt's Organic, Inc. (0079); and Verifine Dairy Products of Sheboygan, LLC (7200). The debtors' mailing address is 2711 North Haskell Avenue, Suite 3400, Dallas, TX 75204.

2       Capitalized terms used but not defined otherwise herein shall have the meanings ascribed to them in the Objection.

2.      All facts and opinions set forth in this Declaration are based upon: (a) my personal knowledge; (b) information learned from my review of relevant documents; (c) information supplied to me or verified by the Ad Hoc Group or its professionals or other members of my team at GLC; and/or (d) my experience and knowledge concerning financial restructurings and capital-raising activities.

3.      If called upon to testify, I would testify competently to the facts and opinions set forth herein.

### Qualifications

4.      I have a Bachelor of Arts in Economics from Emory University and a Master of Business Administration in Finance from Columbia Business School. I am a Managing Director at GLC Advisors, an investment banking boutique I co-founded in June 2009. Prior to GLC, I was a Managing Director in the Restructuring & Leveraged Finance Group at UBS Securities. In addition, I was previously the Managing Director and Head of the European Strategic Finance Group at Morgan Stanley International. Prior to that position, I held various roles, including as a Managing Director in the Restructuring Group at UBS, and as a restructuring advisor at Jay Alix & Associates (now AlixPartners). Prior to Jay Alix, I worked in the Dispute Analysis & Corporate Recovery Group at Price Waterhouse (now PriceWaterhouseCoopers). I have completed FINRA Administered Qualification Exams including Series 7, 24 and 63. I have also passed the U.K. Financial Services Authority securities exams including CF21 (Investment Adviser) and CF30 (Customer).

5.      GLC is a leading independent investment banking firm, with offices in New York, San Francisco, and Denver. GLC's professionals include those who have previously served as the heads of restructuring and leveraged finance teams at Credit Suisse First Boston LLC; Donaldson,

2

Lufkin & Jenrette Securities Corporation; Morgan Stanley & Co. International PLC; Smith Barney Inc.; and UBS Investment Bank.

6.      I have worked with financially-troubled companies and their stakeholders in a variety of industries in connection with complex financial restructurings, both out of court and in chapter 11 cases, including: iHeartMedia, FirstEnergy Solutions, Brookstone, City of Detroit, Caesars Entertainment, Jefferson County, Commonwealth of Puerto Rico, Colt Defense, Foxwoods Casino, Basic Energy, Radio Shack, Rivers Casino, Vantage Mobility, UCI International, Country Fresh, and Toys R Us.

### Prepetition Retention and Restructuring Efforts

7.      GLC was retained by the Ad Hoc Group on November 1, 2019 to provide investment banking services related to a potential restructuring of the Debtors.  Prior to that date, GLC had been working with members of the Ad Hoc Group on an informal basis beginning in April 2019, and therefore GLC had done extensive research on and was generally familiar with the Debtors' prepetition business and capital structure by the time it was retained.  On October 25, 2019, GLC executed a nondisclosure agreement with the Debtors to receive certain confidential information related to a potential restructuring transaction.  On October 27, 2019, GLC received materials from Evercore Group L.L.C. ("**Evercore**"), the Debtors' investment banker, indicating that the Debtors intended to file for bankruptcy in early November and were seeking a debtor-in-possession financing facility of approximately $250 million to $300 million.

8.      GLC and Paul, Weiss, Rifkind, Wharton & Garrison LLP ("**Paul Weiss**") negotiated nondisclosure agreements for the members of the Ad Hoc Group, which were executed on November 3, 2019.  Thereafter, the Ad Hoc Group immediately set to work on understanding

the Debtors' capital needs in order to attempt to provide the Debtors with the incremental liquidity needed to avoid a disorganized bankruptcy filing.

9.     On November 4, 2019, the Ad Hoc Group provided the Debtors with a term sheet containing a proposal for an out of court restructuring (the "**Restructuring Proposal**").  A copy of the Restructuring Proposal is attached hereto as **Exhibit 1**.  The Restructuring Proposal included an offer to provide the Debtors with up to $215 million in new money financing to address their immediate liquidity needs.  Unfortunately, the Debtors did not provide a specific counteroffer to the Restructuring Proposal and expressed no real interest in an out-of-court restructuring.  Understanding that the Debtors were determined to commence bankruptcy cases, the Ad Hoc Group then set to work to propose a financing facility that would provide the Debtors with sufficient liquidity and adequate milestones to effect a postpetition restructuring that maximized value for all stakeholders.

10.     On November 8, 2019, following repeated attempts to understand the Debtors' financing needs, the Ad Hoc Group submitted a copy of their initial postpetition financing proposal (the "**DIP Proposal**"), attached hereto as **Exhibit 2**, to the board of directors of Dean Foods Company.  The Ad Hoc Group submitted the DIP Proposal because it was concerned that the postpetition financing to be provided by the Debtors' existing prepetition secured lenders, led by Cooperatieve Rabobank U.A., New York Branch ("**Rabobank**"), would force the Debtors into a predetermined postpetition sale process to the detriment of all of the Debtors' unsecured creditors. The Debtors rejected the DIP Proposal.

11.     In the days leading up to the Petition Date, it became clear that the Debtors were focused on consummating a sale of their assets to DFA.  On the Petition Date, the Debtors issued a press release indicating that they were in "advanced discussions with DFA regarding a potential

sale of substantially all assets of the Company." A copy of the press release issued by the Debtors on the Petition Date is attached hereto as **Exhibit 3**.

**The Debtors' Postpetition Sale Process**

12.     The Debtors filed their petition on November 12, 2019.  Their postpetition financing required them to deliver to Rabobank a draft motion to sell all or substantially all of their assets no later than December 12, 2019, and, if the Debtors elected to pursue a sale process, to file that motion no later than February 10, 2020 and to obtain entry of the Bidding Procedures Order no later than March 11, 2020 and an order approving the sale no later than May 20, 2020 (the "**Sale Milestones**").

13.     On ███████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████

14.     On February 3, 2020, the Debtors began discussions with the Ad Hoc Group concerning the Debtors' efforts to extend the Sale Milestones, and the Ad Hoc Group agreed to the extension of the deadline for filing the Bidding Procedures Motion to February 24, 2020 and the deadline for entry of the Bidding Procedures Order to March 27, 2020.

15.     The Debtors filed the Bidding Procedures Motion on February 17, 2020, one week later than the original Sale Milestone of February 10, 2020, and one week before the amended Sale Milestone of February 24, 2020.  They are now seeking entry of the Bidding Procedures Order on

March 12, 2020, two weeks before the March 27, 2020 date required under the Sale Milestone that was negotiated by the Debtors and the Ad Hoc Group. This date is also almost a month before the date that the Ad Hoc Group initially requested.

### The Stalking Horse Bid

16.     DFA's Stalking Horse Bid provides for the purchase of 43 of the Debtors' facilities, including the related inventory, real estate, equipment and other assets at those facilities, as well as the real estate and equipment related to the Greeley facility, which the Debtors are in the process of closing; and excludes the Debtors' accounts receivable and certain accounts payable.

17.     DFA's bid of $425 million plus contingent value has three components:  (a) $322 million in cash, (b) $103 million in payments of certain cure costs for claims related to DFA's prepetition executory contracts with the Debtors ████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████ and (c) contingent value of up to $125 million from potential reductions in postpetition administrative claims.  In other words, of the $425 million "headline" purchase price, $103 million consists entirely of DFA paying its own prepetition claims, ████████████████████████████████████████████ DFA's Stalking Horse Bid also provides contingent value through a reduction of postpetition administrative claims of DFA on a dollar-for-dollar basis of up to $62.5 million to the extent other holders of postpetition administrative claims match DFA, for up to $125 million in the aggregate, but any recovery on these amounts is uncertain.

18.     Following the receipt of DFA's Stalking Horse Bid, GLC performed an analysis to determine what recovery general unsecured creditors could be expected to receive if the bid were approved (the "**DFA Stalking Horse Bid Analysis**").  A copy of the DFA Stalking Horse Bid

Analysis is attached hereto as **Exhibit 4**.  The DFA Stalking Horse Bid Analysis reviews the value of both the DFA Stalking Horse Bid and the Debtors' assets that are excluded from that transaction, and lays out three scenarios for the Debtors' sale, with a low, midpoint and high recovery for general unsecured creditors.

19.     Based on the DFA Stalking Horse Bid Analysis, I believe that the Debtors' estates are at risk of being administratively insolvent if the Debtors accept DFA's Stalking Horse Bid. DFA's Stalking Horse Bid has a value of $425 million excluding any potential contingent value realization.  Based on GLC's calculations, ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████.[3]  In all these scenarios, the Debtors will lack sufficient proceeds to pay administrative claims in full, let alone provide any recovery to the Debtors' other stakeholders.

20.     I also believe that the Bid Protections are unreasonably high, and will further chill bids and other Alternative Transactions.  Assuming the Debtors' headline purchase price of $425 million is the appropriate benchmark for comparison, the Break-Up Fee alone constitutes 3.53% of the aggregate purchase price.  That arguably falls just above the high end of a "market" range for break-up fees in an arm's-length transaction, but it is especially high given the Stalking

---

[3]     The foregoing amounts do not include any administrative claims asserted by any of the Debtors' multiemployer pension plans on account of any withdrawal liabilities.

Horse Bidder (as a major supplier to and competitor of the Debtors with fiduciary obligations to its members) has an independent inducement to bid and the Stalking Horse Bid, if approved, will likely leave the Debtors' estates administratively insolvent.

21.     The Stalking Horse Bid is not, however, the Debtors' only option.  The Ad Hoc Group remains interested in pursuing a restructuring transaction and is in active discussions with third-party financing sources as well as potential strategic partners to fund such a restructuring. Such a transaction could preserve more of the operations as a going concern and provide a greater distribution to stakeholders, including contingent value to unsecured claims.

22.     Further, I believe that the Debtors have the flexibility and liquidity under the DIP Facilities to continue negotiations with the Ad Hoc Group.  The Debtors' project their existing liquidity will be sufficient through the end of May.

23.     As set forth in greater detail in the Donahue Declaration and the Keefe Declaration, the Ad Hoc Group has also had substantial difficulty obtaining diligence from the Debtors.  This diligence has been necessary both to understand the Debtors' existing business and assets and to optimize a business plan for the reorganized Debtors, including projected revenues and asset divestitures.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on March 9, 2020 at New York, New York.

*/s/ J. Soren Reynertson*

EXHIBIT 1
RESTRUCTURING PROPOSAL

PRIVILEGED & CONFIDENTIAL
PREPARED AT DIRECTION OF COUNSEL
SUBJECT TO FRE 408 AND SIMILAR RULES

# Paul│Weiss

# Dean Foods

## Out-of-Court Financing Term Sheet

November 4, 2019





*A Financial Advisory Firm*
*Securities Offered Through GLCA Securities, LLC*
[www.glca.com](http://www.glca.com)
New York  |  Denver  |  San Francisco

Member FINRA | SIPC

PRIVILEGED & CONFIDENTIAL
PREPARED AT DIRECTION OF COUNSEL
SUBJECT TO FRE 408 AND SIMILAR RULES

# Disclaimer

This presentation has been prepared by GLC Advisors & Co., LLC ("GLC") for the exclusive use of the party to whom GLC delivers this presentation, using information provided by the company that is the subject of such presentation (together with its subsidiaries and affiliates, the "Company") and other publicly available information. GLC has not independently verified the information contained herein, nor does GLC make any representation or warranty, either express or implied, as to the accuracy, completeness or reliability of the information contained in this presentation. Any estimates or projections as to events that may occur in the future (including projections of revenue, expense, net income and stock performance) are based upon the best judgment of GLC from the information provided by the Company (including its advisors and representatives) and other publicly available information as of the date of this presentation. There is no guarantee that any of these estimates or projections will be achieved. Actual results will vary from the projections and such variations may be material. Nothing contained herein is, or shall be relied upon as, a promise or representation as to the past or future. GLC is not undertaking to provide any legal, regulatory, accounting, insurance, tax or other similar professional advice in this presentation. Nothing contained herein is, or shall be relied upon as, such advice. GLC and its affiliates expressly disclaim any and all liability relating or resulting from the use of this presentation.

This presentation has been prepared solely for informational purposes and is not to be construed as a solicitation or an offer to buy or sell any securities or related financial instruments. No investment, divestment or other financial decisions or actions should be based solely on the information in this presentation and GLC is not, by making this report available, providing investment, legal, tax, financial, accounting or other advice to you or any other party.

This Summary of Indicative Terms and Conditions (the "Summary") is an outline only and does not purport to summarize all of the conditions, terms, covenants, representations, warranties and other provisions which would be contained in definitive legal documentation for the transaction contemplated hereby.  This Summary is not intended to be a commitment from any entity to provide any service or accommodation or to enter into any transaction with the Issuer (defined below) or any of its affiliates, nor should it be construed as such.  Any financing commitment is subject to, among other conditions, satisfactory due diligence, the internal approvals required by each of the potential investors, as well as the negotiation, execution and delivery of definitive agreements acceptable to the Company and the investors.

This material must not be copied, reproduced, distributed or passed to others at any time without the prior written consent of GLC.

PRIVILEGED & CONFIDENTIAL
PREPARED AT DIRECTION OF COUNSEL
SUBJECT TO FRE 408 AND SIMILAR RULES

# Out-of-Court Financing Proposal

**Ad Hoc Group wants to support Dean Foods during this critical time and prevent unnecessary value destruction for all stakeholders**

- Ad Hoc Group ("Ad Hoc Group") of 6.5% Notes due 2023 ("Notes") is proposing a $[300-430]mm financing to provide liquidity and support comprehensive restructuring of Dean Foods ("Dean" or "Company")
  - $[150-215]mm of new money
  - $[150-215]mm to exchange for existing Notes at par

- Proposed financing would provide significant benefits to Dean
  - Incremental liquidity for working capital purposes including November 15th
  - Avoids disruption of a freefall bankruptcy filing
    - Financing provides comfort to vendors, employees, customers, and other stakeholders, as compared to bankruptcy filing
  - Provides company with critical financing bridge
    - Develop comprehensive business plan
    - Continued dialogue with existing strategic investor
    - Contact broader range of parties for M&A process and establish potential stalking horse bidder
    - Begin discussions with stakeholders such as pension plan/regulators
  - Avoids potential risk of near-term liquidation

PRIVILEGED & CONFIDENTIAL
PREPARED AT DIRECTION OF COUNSEL
SUBJECT TO FRE 408 AND SIMILAR RULES

# Summary Terms of Proposed Financing

| | |
|---|---|
| **Borrower** | • Dean Foods Company |
| **Guarantors** | • All Subsidiary Guarantors from Credit Agreement |
| **Amount** | • $[300-430]mm facility (expansion under the Credit Agreement)<br>  – $[150-215]mm new money<br>  – $[150-215]mm to exchange for existing notes at par |
| **Use of Proceeds** | • Working capital, general corporate purposes, and professional fees |
| **Debt-for-Debt Exchange** | • Debt-for-debt exchange of existing Notes for new loans under Credit Agreement<br>• Participation in debt-for-debt exchange contingent on lending commitment<br>• Conducted pursuant to section 4(2) of the Securities Act or another applicable securities law exemption |
| **Lenders** | • Members of the Ad Hoc Group |
| **Interest** | • Libor + [ ] payable monthly; Libor floor of [ ]<br>• Interest may include a PIK component |
| **Equity Consideration** | • [19.9]% of common equity |
| **Maturity** | • 2/22/2024 with same springing maturity as existing Credit Agreement debt |

PRIVILEGED & CONFIDENTIAL
PREPARED AT DIRECTION OF COUNSEL
SUBJECT TO FRE 408 AND SIMILAR RULES

# Summary Terms of Proposed Financing (cont.)

| | |
|---|---|
| **Security** | • 2nd Lien on all collateral securing only Credit Agreement debt (e.g. Inventory, PP&E, IP, etc.)<br>• 3rd Lien on all collateral securing both Credit Agreement and AR Facility debt<br>• Company will work with Ad Hoc Group to identify unencumbered assets or Guarantors with value and pledge in favor of Credit Agreement and the new loans created by this facility |
| Covenants | • Company must provide business plan satisfactory to lenders by [December 12, 2019]<br>• Minimum liquidity of $[ ]mm |
| Existing Secured Lender Required Consents | • Additional liens for AR (AR Facility lenders) and other collateral (RCF lenders)<br>• Option to acquire existing secured debt at par ("Yank a Bank")<br>• Notification period prior to exercise of collateral rights (RCF lenders)<br>• Other consents as may be required |
| Conditions to Funding | • Subject to satisfactory due diligence in all material respects<br>• Fulfilment of ongoing diligence information requests<br>• Management meeting<br>• Required consents from existing secured lenders<br>• Lead representative from A&M appointed as CRO |
| Funding Date | • On or before November 12, 2019 |

PRIVILEGED & CONFIDENTIAL
PREPARED AT DIRECTION OF COUNSEL
SUBJECT TO FRE 408 AND SIMILAR RULES

# Contact Information

**www.glca.com**

**New York**

600 Lexington Avenue

9th Floor

New York, NY 10022

212-542-4540

**San Francisco**

451 Jackson Street

2nd Floor

San Francisco, CA 94111

415-400-2320

**Denver**

1512 Larimer Street

9th Floor

Denver, CO 80202

303-479-3840

EXHIBIT 2
DIP PROPOSAL

PRIVILEGED & CONFIDENTIAL
PREPARED AT DIRECTION OF COUNSEL
SUBJECT TO FRE 408 AND SIMILAR RULES

**Paul | Weiss**

# Dean Foods

## Non-Binding Pari Passu DIP Financing Term Sheet

November 8, 2019





*A Financial Advisory Firm*
*Securities Offered Through GLCA Securities, LLC*
[www.glca.com](www.glca.com)
New York  |  Denver  |  San Francisco

Member FINRA | SIPC

PRIVILEGED & CONFIDENTIAL
PREPARED AT DIRECTION OF COUNSEL
SUBJECT TO FRE 408 AND SIMILAR RULES

# Disclaimer

This presentation has been prepared by GLC Advisors & Co., LLC ("GLC") for the exclusive use of the party to whom GLC delivers this presentation, using information provided by the company that is the subject of such presentation (together with its subsidiaries and affiliates, the "Company") and other publicly available information. GLC has not independently verified the information contained herein, nor does GLC make any representation or warranty, either express or implied, as to the accuracy, completeness or reliability of the information contained in this presentation. Any estimates or projections as to events that may occur in the future (including projections of revenue, expense, net income and stock performance) are based upon the best judgment of GLC from the information provided by the Company (including its advisors and representatives) and other publicly available information as of the date of this presentation. There is no guarantee that any of these estimates or projections will be achieved. Actual results will vary from the projections and such variations may be material. Nothing contained herein is, or shall be relied upon as, a promise or representation as to the past or future. GLC is not undertaking to provide any legal, regulatory, accounting, insurance, tax or other similar professional advice in this presentation. Nothing contained herein is, or shall be relied upon as, such advice. GLC and its affiliates expressly disclaim any and all liability relating or resulting from the use of this presentation.

This presentation has been prepared solely for informational purposes and is not to be construed as a solicitation or an offer to buy or sell any securities or related financial instruments. No investment, divestment or other financial decisions or actions should be based solely on the information in this presentation and GLC is not, by making this report available, providing investment, legal, tax, financial, accounting or other advice to you or any other party.

This Summary of Indicative Terms and Conditions (the "Summary") is an outline only and does not purport to summarize all of the conditions, terms, covenants, representations, warranties and other provisions which would be contained in definitive legal documentation for the transaction contemplated hereby.  This Summary is not intended to be a commitment from any entity to provide any service or accommodation or to enter into any transaction with the Issuer (defined below) or any of its affiliates, nor should it be construed as such.  Any financing commitment is subject to, among other conditions, satisfactory due diligence, the internal approvals required by each of the potential investors, as well as the negotiation, execution and delivery of definitive agreements acceptable to the Company and the investors.

This material must not be copied, reproduced, distributed or passed to others at any time without the prior written consent of GLC.

PRIVILEGED & CONFIDENTIAL
PREPARED AT DIRECTION OF COUNSEL
SUBJECT TO FRE 408 AND SIMILAR RULES

# Non-Binding Pari Passu DIP Term Sheet

| | |
|---|---|
| **Borrower** | • Dean Foods Company (the "Company") |
| **Guarantors** | • All other debtors and debtors-in-possession, including each guarantor of the Company's prepetition funded indebtedness |
| **Amount** | • $240mm<br>   – $[ ]mm term loan<br>   – $[ ]mm bond, pari passu and mirroring terms of the term loan<br>• Interim availability: $[75]mm<br>• Final availability: $240mm |
| **Facility** | • Delayed-draw super priority DIP term loan and bond |
| **Admin Agent/Trustee** | • TBD |
| **Use of Proceeds** | • Working capital, professional fees and general corporate purposes |
| **Repayment Waterfall** | • DIP lenders and DIP bondholders will be pari passu with existing RCF lenders |
| **DIP Lenders / DIP Bondholders** | • Ad Hoc Group of 6.500% Noteholders |
| **Interest** | • LIBOR + 800 subject to LIBOR floor of 1% |

PRIVILEGED & CONFIDENTIAL
PREPARED AT DIRECTION OF COUNSEL
SUBJECT TO FRE 408 AND SIMILAR RULES

# Non-Binding Pari Passu DIP Term Sheet

| | |
|---|---|
| **Fees** | • Commitment Fee: 1%<br>• Exit Fee: 1% |
| **Maturity** | • TBD |
| **Security** | • 1st Lien on all non-Receivables Facility collateral<br>• 2nd Lien on all Receivables Facility collateral<br>• Super priority administrative claims against each Debtor |
| **Intercreditor Agreement** | • TBD |
| **Representations & Warranties** | • Ordinary and customary representations and warranties for facilities of this type acceptable to DIP lenders and DIP bondholders |
| **Covenants** | • Financial Covenants:<br>  – Permitted variance to DIP budget TBD<br>  – Minimum liquidity TBD<br>  – Updated 13-week cash flow forecasts satisfactory to DIP lenders and DIP bondholders on monthly basis<br>• Case milestones, including milestones related to standalone business plan, sale process, DIP financing, plan approval and "second day" hearing, acceptable to DIP lenders and DIP bondholders<br>• Other ordinary and customary affirmative and negative covenants, including reporting covenants, for facilities of this type acceptable to DIP lenders and DIP bondholders |
| **Events of Default** | • Ordinary and customary events of default for this type of facility acceptable to DIP lenders and DIP bondholders |

PRIVILEGED & CONFIDENTIAL
PREPARED AT DIRECTION OF COUNSEL
SUBJECT TO FRE 408 AND SIMILAR RULES

# Non-Binding Pari Passu DIP Term Sheet

| | |
|---|---|
| **Other Key Terms** | • Receivables Facility remains in place<br>• CRO and associated restructuring management team acceptable to DIP lenders and DIP bondholders<br>• Ongoing access to management and diligence information to assist development of standalone reorganization plan<br>• Definitive documentation, including loan documents, DIP motion, DIP order, other "first day" papers, "second day" papers, sale documents, plan of reorganization documents and any other material documents to be filed with the bankruptcy court, acceptable to DIP lenders and DIP bondholders<br>• Payment of all fees and expenses of advisors to the DIP lenders and DIP bondholders, including GLC Advisors & Co., LLC and Paul, Weiss, Rifkind, Wharton & Garrison LLP and any local counsel, including acceptable retainers<br>• Bankruptcy court venue acceptable to DIP lenders and DIP bondholders<br>• Mandatory prepayments, call protections, conditions precedent to closing, conditions precedent to final DIP availability acceptable to DIP lenders and DIP bondholders |
| **Pension Obligations** | • Treatment of pension fund obligations and renegotiation of collective bargaining agreements acceptable to DIP lenders and DIP bondholders |
| **Governing Law** | • New York |

PRIVILEGED & CONFIDENTIAL
PREPARED AT DIRECTION OF COUNSEL
SUBJECT TO FRE 408 AND SIMILAR RULES

# Contact Information

**www.glca.com**

**New York**
600 Lexington Avenue
9th Floor
New York, NY 10022
212-542-4540

**San Francisco**
451 Jackson Street
2nd Floor
San Francisco, CA 94111
415-400-2320

**Denver**
1512 Larimer Street
9th Floor
Denver, CO 80202
303-479-3840

EXHIBIT 3
PRESS RELEASE



**Dean Foods Company Initiates Voluntary Reorganization with New Financial Support from Existing Lenders**

*Company Secures Commitments for $850 Million in DIP Financing to Support Operations*

*In Advanced Discussions with Dairy Farmers of America Regarding a Potential Sale*

*Business Continues Regular Operations; Customers Receiving Uninterrupted Supply of Dairy Products as Normal*

DALLAS, Nov. 12, 2019 --  Dean Foods Company (NYSE: DF) ("Dean Foods" or the "Company") today announced that it and substantially all of its subsidiaries have initiated voluntary Chapter 11 reorganization proceedings in the Southern District of Texas. The Company intends to use this process to protect and support its ongoing business operations and address debt and unfunded pension obligations while it works toward an orderly and efficient sale of the Company.

Dean Foods also announced that it is engaged in advanced discussions with Dairy Farmers of America, Inc. ("DFA") regarding a potential sale of substantially all assets of the Company. If the parties ultimately reach agreement on the terms of a sale, such transaction would be subject to regulatory approval and would be subject to higher or otherwise better offers in the bankruptcy.

Dean Foods is operating in the ordinary course of business and remains focused on providing its customers with wholesome, great-tasting dairy products and the highest levels of quality, service and value. The Company has received a commitment of approximately $850 million in debtor-in-possession ("DIP") financing from certain of its existing lenders, led by Rabobank. Following court approval, the Company expects to use the DIP financing, together with cash on hand and operating cash flows, to support its continued operation throughout this process, including payment of employee wages and benefits without interruption and payment to suppliers and vendors in full under normal terms for goods and services provided on or after the filing date.

"The actions we are announcing today are designed to enable us to continue serving our customers and operating as normal as we work toward the sale of our business," said Eric Beringause, who recently joined Dean Foods as President and Chief Executive Officer. "We have a strong operational footprint and distribution network, a robust portfolio of leading national brands and extensive private label capabilities, all supported by approximately 15,000 dedicated employees around the country. Despite our best efforts to make our business more agile and cost-efficient, we continue to be impacted by a challenging operating environment marked by continuing declines in consumer milk consumption. Importantly, we are continuing to provide customers with an uninterrupted supply of high-quality dairy products, as well as supporting our dairy suppliers and other partners."

Mr. Beringause continued, "Since joining the company just over three months ago, I've taken a hard look at our challenges, as well as our opportunities, and truly believe we are taking the best path forward. In recent months, we have put in place a new senior management team that not only has considerable experience in the dairy and consumer product industries, but also in executing major turnarounds. I am confident we have the right people in place to lead us through this process. I want to thank all Dean Foods employees for their continued commitment to our customers, our partners and our company. I also

want to thank our suppliers and other business partners for their cooperation and our customers for their continued support."

In conjunction with the court-supervised process, Dean Foods has filed a number of customary motions seeking court authorization to continue to support its business operations. The Company expects to receive court approval for all of these requests. The Company also intends to file bidding procedures with the court to conduct a sale in accordance with Section 363 of the U.S. Bankruptcy Code and work with its creditors to explore a potential stand-alone plan of reorganization.

Additional information is available on the restructuring page of the Company's website, www.DeanFoodsRestructuring.com. In addition, court filings and other information related to the proceedings are available on a separate website administered by the Company's claims agent, Epiq Corporate Restructuring, LLC, at https://dm.epiq11.com/SouthernFoods, or by calling Epiq representatives toll-free at 1-833-935-1362 or 1-503-597-7660 for calls originating outside of the U.S.

Davis Polk & Wardwell LLP and Norton Rose Fulbright are serving as legal advisors to the Company, Evercore is serving as its investment banker and Alvarez & Marsal is serving as its financial advisor.

In light of the bankruptcy filing, the Company has cancelled its quarterly earnings call, which was scheduled to take place today at 9:00 a.m. Eastern time.

**About Dean Foods**
Dean Foods is a leading food and beverage company and the largest processor and direct-to-store distributor of fresh fluid milk and other dairy and dairy case products in the United States. Headquartered in Dallas, Texas, the Dean Foods portfolio includes DairyPure®, the country's first and largest fresh, national white milk brand, and TruMoo®, the leading national flavored milk brand, along with well-known regional dairy brands such as Alta Dena®, Berkeley Farms®, Country Fresh®, Dean's®, Friendly's®, Garelick Farms®, LAND O LAKES®* milk and cultured products, Lehigh Valley Dairy Farms®, Mayfield®, McArthur®, Meadow Gold®, Oak Farms®, PET®**, T.G. Lee®, Tuscan® and more. Dean Foods also has a joint venture with Organic Valley®, distributing fresh organic products to local retailers. In all, Dean Foods has more than 50 national, regional and local dairy brands as well as private labels. Dean Foods also makes and distributes ice cream, cultured products, juices, teas, and bottled water. Approximately 15,000 employees across the country work every day to make Dean Foods the most admired and trusted provider of wholesome, great-tasting dairy products at every occasion. For more information about Dean Foods and its brands, visit www.deanfoods.com.

*The LAND O LAKES brand is owned by Land O'Lakes, Inc. and is used by license.
**PET is a trademark used by license.

**Forward-Looking Statements**
This press release includes "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. All statements, other than statements of historical facts, included in this release that address activities, events or developments that the Company expects, believes, targets or anticipates will or may occur in the future are forward-looking statements. The Company's actual results may differ materially from those anticipated in these forward-looking statements as a result of certain risks and other factors, which could include the following: risks and uncertainties relating to the Company's Chapter 11 cases (the "Chapter 11 Case"), including but not limited to, the Company's ability to obtain bankruptcy court approval with respect to motions in the Chapter 11 Case, the Company's ability to consummate the planned sale of the business pursuant to the Chapter 11 Case and, if consummated, to obtain an adequate price, the effects of the Chapter 11 Case on the Company and on the interests of various constituents, bankruptcy court rulings in the Chapter 11 Case and the outcome of the Chapter 11 Case in general, the length of time the Company will operate under the Chapter 11 Case, risks associated with third-party motions in the Chapter 11 Case, the potential adverse effects of the Chapter 11 Case on the Company's liquidity or results of operations and increased legal and other professional costs necessary to execute the Company's reorganization; the conditions to which the Company's debtor-

in-possession financing is subject and the risk that these conditions may not be satisfied for various reasons, including for reasons outside of the Company's control; the consequences of the acceleration of our debt obligations; as well as other risk factors set forth in the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q filed with the Securities and Exchange Commission. Additionally, there can be no assurances that Dean and DFA will ultimately reach agreement, that the sale will receive regulatory approval, or that the sale will be successfully consummated. The Company therefore cautions readers against relying on these forward-looking statements. All forward-looking statements attributable to the Company or persons acting on the Company's behalf are expressly qualified in their entirety by the foregoing cautionary statements. The Company expressly disclaims any obligation or undertaking to release publicly any updates or revisions to any such statements to reflect any change in its expectations with regard thereto or any changes in the events, conditions or circumstances on which any such statement is based except as required by law.

**Contacts**

Investor Relations
+1 214-303-3438

Media
+1 214-721-7766
media@deanfoods.com

Michael Freitag / Aura Reinhard / Viveca Tress
Joele Frank, Wilkinson Brimmer Katcher
+1 212-355-4449

EXHIBIT 4
(filed under seal)

EXHIBIT B
DONAHUE DECLARATION

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| | § | Case No. 19-36313 (DRJ) |
| SOUTHERN FOODS GROUP, LLC, *et al.*,[1] | § | |
| | § | (Jointly Administered) |
| | § | |
| Debtors. | § | |
| | § | |

**DECLARATION OF LISA DONAHUE**
**IN SUPPORT OF OBJECTION OF THE AD HOC GROUP OF**
**BONDHOLDERS TO DEBTORS' BIDDING PROCEDURES MOTION**

I, Lisa Donahue, declare as follows:

1.       I am a managing director and the Global Co-Lead of Turnaround and Restructuring Services at AlixPartners LLP ("**AlixPartners**"), a financial services firm.  Together with my team from AlixPartners, I have served as financial advisor to the Ad Hoc Group.  I submit this declaration ("**Declaration**") in support of the Objection.[2]

---

[1]       The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: Southern Foods Group, LLC (1364); Dean Foods Company (9681); Alta-Dena Certified Dairy, LLC (1347); Berkeley Farms, LLC (8965); Cascade Equity Realty, LLC (3940); Country Fresh, LLC (6303); Dairy Information Systems Holdings, LLC (9144); Dairy Information Systems, LLC (0009); Dean Dairy Holdings, LLC (9188); Dean East II, LLC (9192); Dean East, LLC (8751); Dean Foods North Central, LLC (7858); Dean Foods of Wisconsin, LLC (2504); Dean Holding Company (8390); Dean Intellectual Property Services II, Inc. (3512); Dean International Holding Company (9785); Dean Management, LLC (7782); Dean Puerto Rico Holdings, LLC (6832); Dean Services, LLC (2168); Dean Transportation, Inc. (8896); Dean West II, LLC (9190); Dean West, LLC (8753); DFC Aviation Services, LLC (1600); DFC Energy Partners, LLC (3889); DFC Ventures, LLC (4213); DGI Ventures, Inc. (6766); DIPS Limited Partner II (7167); Franklin Holdings, Inc. (8114); Fresh Dairy Delivery, LLC (2314); Friendly's Ice Cream Holdings Corp. (7609); Friendly's Manufacturing and Retail, LLC (9828); Garelick Farms, LLC (3221); Mayfield Dairy Farms, LLC (3008); Midwest Ice Cream Company, LLC (0130); Model Dairy, LLC (7981); Reiter Dairy, LLC (3675); Sampson Ventures, LLC (7714); Shenandoah's Pride, LLC (2858); Steve's Ice Cream, LLC (6807); Suiza Dairy Group, LLC (2039); Tuscan/Lehigh Dairies, Inc. (6774); Uncle Matt's Organic, Inc. (0079); and Verifine Dairy Products of Sheboygan, LLC (7200). The debtors' mailing address is 2711 North Haskell Avenue, Suite 3400, Dallas, TX 75204.

[2]       Capitalized terms used but not defined otherwise herein shall have the meanings ascribed to them in the Objection.

2.      All facts and opinions set forth in this Declaration are based upon: (a) my personal knowledge; (b) information learned from my review of relevant documents; (c) information supplied to me or verified by the Ad Hoc Group or its professionals or other members of my team at AlixPartners; and/or (d) my experience and knowledge concerning financial restructurings and providing financial advisory services.

3.      If called upon to testify, I would testify competently to the facts and opinions set forth herein.

## Qualifications

4.      I have worked in the restructuring industry since 1995.  I graduated from Florida State University in 1988, majoring in finance.   During my career, I have guided multiple underperforming companies through operational and financial turnarounds and restructurings.  In some cases I have acted in the role of an interim executive—as a chief restructuring officer, chief financial officer, or chief executive officer—and in others as a trusted advisor.  Most of these successful efforts involved developing a sustainable business plan for the company while simultaneously negotiating with creditor groups for companies whose indebtedness ran into the billions of dollars.  I was the Chief Development and Transition Officer at Westinghouse, and prior to that I was the Chief Restructuring Officer for the Puerto Rico Electric Power Authority.  I am also a fellow of the American College of Bankruptcy.  A copy of my *curriculum vitae* is attached as **Exhibit 1**.

5.      AlixPartners is an internationally recognized restructuring and turnaround firm that has a wealth of experience in providing financial advisory services and enjoys an excellent reputation for services it has rendered in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States.

2

**AlixPartners' Retention**

6.      The Ad Hoc Group retained AlixPartners on November 18, 2019 to assist the Ad Hoc Group in developing a standalone business plan for the Debtors that would maximize value for the Debtors and their stakeholders.  Six days earlier, the Debtors had filed petitions under chapter 11 of the Bankruptcy Code and announced they were in advanced negotiations to sell their assets to Dairy Farmers of America ("**DFA**").  The Ad Hoc Group sought AlixPartners' assistance in reviewing the Debtors' business and developing a business plan that could serve as the foundation for a competing proposal to the DFA sale.  To develop this business plan, AlixPartners had to carefully examine the Debtors' revenues, costs, profitability, and other detailed information about the Debtors' business.

7.      As a general matter, developing a business plan is a critical step in the development of a plan of reorganization.  The business plan serves as the foundation for various financial projections—such as future cash flows and funding needs—that must be understood to develop a sustainable capital structure for the reorganized company.  At the most basic level, the business plan is how a company knows how much cash it needs to fund the business and how much revenue it will generate.  Once those needs are assessed, and only then, can the company or its stakeholders develop a proposal for an appropriate capital structure and determine the amount of debt that it can service.  In addition, only by understanding how the business currently operates can opportunities to make those operations more efficient or effective be assessed.

**Initial Diligence Process**

8.      AlixPartners began its work by requesting from the Debtors information essential to understanding the Debtors' business and finances.  A critical component of the requested information focused on the Debtors' procurement of milk—the raw material that is the key

ingredient for most of the products the Debtors sell and whose cost constitutes a substantial part of the Debtors' expenses.  This information included data on milk pricing and details on the Debtors' suppliers, particularly with respect to its principal supplier DFA.  The Debtors' business is heavily dependent on predictable supplies of a highly perishable commodity, and evaluating its spend on this commodity was critical to assessing the Debtors' expenses and potential improvement opportunities.  Understanding in detail the Debtors' sources and cost of supply appeared particularly important in this case, not only because this cost represents a significant percentage of its cost structure, but also because the proposed DFA sale transaction entailed selling the Debtors' milk processing assets to its principal supplier.

9.      Unfortunately, despite numerous requests over several months, basic information necessary to developing a comprehensive business plan was not provided in a timely manner, including information related to the Debtors' milk procurement, and some of it still has not been provided.  Much of the most critical information related to milk procurement was only supplied beginning in March of 2020—months after it had been requested.  When we did receive information, it was often incomplete and therefore did not properly address the request.  As a result, our ability to complete our work in a reasonable period of time and with sufficient accuracy was significantly undermined.

10.     Most importantly, AlixPartners was unable to receive timely and complete diligence on the Debtors' milk suppliers, which, as explained above, is essential to understanding the costs of the Debtors' business and whether some of that cost could be reduced through optimization of the Debtors' milk supply chain.  On November 21, 2019, a member of our team sent an email to the Debtors' advisors at Alvarez & Marshal ("**A&M**") with an initial list of diligence questions involving the monthly pricing history of Grade A milk purchased from DFA

and other dairy cooperatives and producers over the past year.[3]   In multiple follow-up communications with the Debtors, we stressed the importance of this request, the required level of detail, and its role in the business plan we were developing.  However, the Debtors did not provide information with the specific details requested.  In particular, although the Debtors did ultimately share data on milk purchase costs for each of their facilities, this data was not further broken down by supplier.

11.    When a member of the AlixPartners team raised this issue to A&M, A&M acknowledged that the file that was provided did not provide the level of detail that we were looking for.  A&M told our team that the additional details were not readily available and would require substantial resources to track down.  As the diligence process continued, A&M repeatedly used their due diligence tracker to proclaim that this matter was resolved on the basis of their claim that it was the best they could provide.

12.    In addition to making written requests of the Debtors through A&M, we requested similar information from company personnel.  We spoke directly with Kristy Waterman, the Debtors' General Counsel, Bruce Matson, Vice President of Milk Procurement, and Eddie Tollison, Vice President FDD Controller.  The feedback received was that collecting this information was a manual process and the data was not easily accessible.

13.    Even though AlixPartners did not receive this critical information that we requested, we developed a high-level business plan of the Debtors' business for the Ad Hoc

---

[3]    The specific request given to the Debtors was: "Over Last twelve months, monthly pricing history of Grade A milk purchased from DFA, Other cooperatives, and directly from producer – By Dean's facility and month."  It also stated:  "(1) Please provide all costs in $/hundred weight or $/Lb; (2) Volume (cwt or other); (3) Please specify class of milk purchased; (4) Please specify facility that purchased the milk and the market order # it is located at; and (5) Please breakdown pricing of milk into (a) market order classified pricing and (b) over order premium: if available, please break premium into (i) freight charge, (ii) fuel surcharge, (iii) other accessorial transportation costs, (iv) other overhead/admin costs, (v) volume rebates, and (vi) other discounts."

Group.  The Ad Hoc Group used this high-level business plan for purposes of seeking out financing for an alternative restructuring proposal.  However, the Debtors' failure to timely respond to our diligence efforts—in particular, their failure to provide information going to the value to the Debtors of renegotiating their milk supply agreements—has hampered our efforts, including the Ad Hoc Group's ability to source financing for a restructuring proposal.  Moreover, we now know that the Debtors did in fact have the more detailed information that we requested and was not shared with us at the time.

<u>**Receipt of New Diligence Information**</u>

14.     In mid-January, the Ad Hoc Group retained several experts from the dairy industry. Only after these dairy experts identified by their precise "dairy-industry names" the supplier-level milk procurement and pricing documents we had previously requested—documents that addressed our requests and the Debtors previously told us they did not have or would be too difficult to obtain—did the Debtors begin to produce them.  These included the Debtors' Federal Milk Marketing Order Reports ("**FMMO Reports**"), Producer Settlement Fund Handler Statements ("**PSF Handler Statements**"), and 2019 invoices for the Debtors' raw materials and fluid purchases (the "**2019 Invoices**").  I was very surprised to learn from the Ad Hoc Group's dairy experts that these documents are regularly produced and exchanged among the Debtors and their regulators, given they contained the exact data AlixPartners had requested numerous times from A&M and the Debtors' officers, but had been told did not exist or would be too difficult to produce.  Upon learning of these documents, we promptly made a follow-up request to receive all of them.

15.     At that time, due to continued dissatisfaction with the Debtors' responsiveness and pace of diligence, AlixPartners and other Ad Hoc Group professionals established regular

diligence calls, attended by the Ad Hoc Group's counsel, to expedite diligence requests. Thereafter, an initial batch of these documents was received on January 28–29, 2020, when the Debtors provided approximately 140 FMMO Reports, 160 PSF Handler Statements, and 377 invoices.

16.     Notwithstanding the specificity of our follow-up request, the Debtors were very slow to produce the additional reports.  The Debtors produced additional documents between February 20 and February 24, 2020, but it was not until March of 2020 that the Debtors began producing a substantial amount of this information.  It is my understanding that on March 2, 2020, the Ad Hoc Group's counsel advised the Debtors that if they did not produce these reports, the Ad Hoc Group would schedule an emergency hearing before the Court to address the Debtors' failure to provide diligence.  Shortly thereafter, the Debtors produced approximately 480 FMMO Reports and 420 PSF Handler Statements over the span of three days.  It is also my understanding from Sally K. Keefe, one of the Ad Hoc Group's dairy experts, that the documents provided are still incomplete and must be supplemented.

17.     The information in these documents would have provided AlixPartners with a clearer picture of the Debtors' milk procurement costs including location-specific comparison of milk suppliers, which would have been incorporated into our analysis of the Debtors' business and any proposed restructuring.  Based on my experience in developing restructuring plans, the AlixPartners team's analysis of the Debtors' business, its resulting report, and the Ad Hoc Group's efforts to seek financing for an alternative restructuring plan were all hampered by the lack of information and diligence, including important information about the Debtors' milk suppliers—a subject about which the Ad Hoc Group and its professionals continue to request diligence.  With more complete information and time to analyze it, the Ad Hoc Group and its professionals will be

in a better position to propose a feasible, value-maximizing restructuring plan for the benefit of the Debtors and all stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on March 9, 2020 in New York, New York

*/s/ Lisa Donahue*

8

EXHIBIT 1
C.V. OF LISA DONAHUE



## Lisa Donahue

ldonahue@alixpartners.com
+1 212 297 6329
+1 917 743 4313
New York

Lisa offers more than two decades of successful outcomes in the area of corporate transformation. She guides underperforming companies through complex negotiations and operational restructurings whether in the role of an interim executive as chief restructuring officer (CRO), chief financial officer (CFO), or executive vice president (EVP) or as a trusted advisor.

Lisa has a degree in finance from Florida State University and is a fellow of the American College of Bankruptcy, a member of the Council on Foreign Relations, and a board member of both industry organizations and philanthropic ones. Lisa is also a regular speaker at forums and events around the world.

## Relevant experience

- As chief transition and development officer of Westinghouse Electric Company, Lisa is overseeing the operational and financial restructuring of the multinational organization.

- Served as CRO of the Puerto Rico Electric Power Authority; led a team that transformed the enterprise by generating cash and recurring savings of $525 million; negotiated a restructuring support agreement that consensually resolved $9 billion of debt.

- Led the transformation of a midstream oil & gas commodity-trading company; converted $7 billion in debt to equity.

- Served as CFO of a power and infrastructure company; integrated a large acquisition; strengthened the control environment.

- Served as EVP and CFO of Calpine Corp. to financially and operationally transform client's struggle with $18 billion in debt to savings of $500 million.

- Served as CFO and CRO for world's largest industrial and automotive battery manufacturer (Exide Technologies), generating savings of $600 million over two years.

- Served as CEO at a leading maker of branded dried pasta; generated savings of $100 million.

EXHIBIT C
KEEFE DECLARATION

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| | § | Case No. 19-36313 (DRJ) |
| | § | |
| SOUTHERN FOODS GROUP, LLC, | § | (Jointly Administered) |
| *et al.*,[1] | § | |
| | § | |
| | § | |
| Debtors. | § | |
| | § | |

**DECLARATION OF SALLY K. KEEFE
IN SUPPORT OF OBJECTION OF THE AD HOC GROUP OF
BONDHOLDERS TO DEBTORS' BIDDING PROCEDURES MOTION**

I, Sally K. Keefe, declare as follows:

1.      I am an independent consultant primarily serving clients in the dairy industry, and have served as an independent consultant to the Ad Hoc Group.  I submit this declaration (this "**Declaration**") in support of the Objection.[2]

---

[1]      The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: Southern Foods Group, LLC (1364); Dean Foods Company (9681); Alta-Dena Certified Dairy, LLC (1347); Berkeley Farms, LLC (8965); Cascade Equity Realty, LLC (3940); Country Fresh, LLC (6303); Dairy Information Systems Holdings, LLC (9144); Dairy Information Systems, LLC (0009); Dean Dairy Holdings, LLC (9188); Dean East II, LLC (9192); Dean East, LLC (8751); Dean Foods North Central, LLC (7858); Dean Foods of Wisconsin, LLC (2504); Dean Holding Company (8390); Dean Intellectual Property Services II, Inc. (3512); Dean International Holding Company (9785); Dean Management, LLC (7782); Dean Puerto Rico Holdings, LLC (6832); Dean Services, LLC (2168); Dean Transportation, Inc. (8896); Dean West II, LLC (9190); Dean West, LLC (8753); DFC Aviation Services, LLC (1600); DFC Energy Partners, LLC (3889); DFC Ventures, LLC (4213); DGI Ventures, Inc. (6766); DIPS Limited Partner II (7167); Franklin Holdings, Inc. (8114); Fresh Dairy Delivery, LLC (2314); Friendly's Ice Cream Holdings Corp. (7609); Friendly's Manufacturing and Retail, LLC (9828); Garelick Farms, LLC (3221); Mayfield Dairy Farms, LLC (3008); Midwest Ice Cream Company, LLC (0130); Model Dairy, LLC (7981); Reiter Dairy, LLC (3675); Sampson Ventures, LLC (7714); Shenandoah's Pride, LLC (2858); Steve's Ice Cream, LLC (6807); Suiza Dairy Group, LLC (2039); Tuscan/Lehigh Dairies, Inc. (6774); Uncle Matt's Organic, Inc. (0079); and Verifine Dairy Products of Sheboygan, LLC (7200). The debtors' mailing address is 2711 North Haskell Avenue, Suite 3400, Dallas, TX 75204.

[2]      Capitalized terms used but not defined otherwise herein shall have the meanings ascribed to them in the Objection.

2.      All facts and opinions set forth in this Declaration are based upon: (a) my personal knowledge; (b) information learned from my review of relevant documents; (c) information supplied to me or verified by the Ad Hoc Group or its professionals; and/or (d) my experience and knowledge concerning the dairy industry.

3.      If called upon to testify, I would testify competently to the facts and opinions set forth herein.

## Qualifications

4.      I have been involved in the dairy industry since 1996.  I graduated *cum laude* from Middlebury College in 1993, majoring in Economics, and completed my M.B.A. at the University of Colorado in 2003, with concentrations in Finance and Entrepreneurship.  After several years of post-college research and environmental policy work, in 1996 – 2001 I held a series of positions at Horizon Organic Dairy in Longmont, Colorado, where my responsibilities included management of the milk supply chain, from procurement through processing and distribution.  In 2003 – 2012, following completion of my M.B.A., I held a variety of positions at Aurora Organic Dairy in Boulder, Colorado, where my responsibilities included development and oversight of all aspects of the milk supply chain and compliance with all federal and state milk order regulatory requirements and reporting.  In 2013, I founded my independent agriculture and food management consulting business, skFigures, where my clients include, among others, dairy processors, to whom I provide advice about such matters as supply chain optimization, analysis of business opportunities, and milk order regulatory compliance matters.  A copy of my c.v. is attached as **Exhibit 1.**

2

5.     My years of experience in the dairy industry have given me a deep understanding of dairy markets and dairy market pricing.  I have provided testimony in Federal Milk Marketing Orders regulatory proceedings regarding milk pricing and marketing.

## The Diligence Process

6.     I was initially retained by the Ad Hoc Group on January 14, 2020, based upon my expertise and experience in the dairy industry, and was tasked with carrying out diligence of the Debtors' business in support of an alternative restructuring proposal by the Ad Hoc Group.  I requested that the Debtors provide the Ad Hoc Group with four categories of documents that I believed would be readily available and would provide me with an accurate picture of the Debtors' business.  These documents are:

   a.  Federal Milk Marketing Order Reports: Federal Milk Marketing Order Reports ("**FMMO Reports**") are reports that milk processors, such as the Debtors, submit on a monthly basis to the United States Department of Agriculture (the "**USDA**") so that the USDA can (i) monitor and audit the receipt of milk, payments for the milk, and utilization of milk and maintain stable marketing relationships among milk producers and milk handlers and (ii) ensure compliance with Federal Milk Marketing Order minimum price requirements, which are explained at a high level below.  Of the Debtors' 57 facilities, the 42 that are fully regulated FMMO pool plants submit these reports each month to the USDA.[3]  These reports are an essential source for understanding the Debtors' business because they show the sources of the Debtors' raw milk supply, how much milk they purchase and the

---

[3]     Some of the Debtors' plants are not fully regulated FMMO pool plants because they process frozen products (e.g., ice cream) rather than fluid milk, are outside of a federally regulated FMMO area, or for other reasons.

utilization of that milk, and how their milk is distributed.  Additionally, because these reports are prepared and submitted each month to the USDA, a milk processor such as the Debtors should have them readily available.

b. <u>Producer Settlement Fund Handler Statements</u>:  Producer Settlement Fund Handler Statements ("**PSF Statements**") are reports the Debtors receive each month from the USDA Agricultural Marketing Service Federal Milk Marketing Order Market Administrator Offices ("**AMS**") in response to their previously submitted FMMO Reports.  The PSF Statements detail the amounts that the Debtors owe to the AMS Producer Settlement Fund, which is a mechanism the AMS uses to equalize the prices received by farmers for their milk, regardless of the processor's use of the milk (e.g., for fluid milk, ice cream, or cheese), which varying uses may command different prices.  This Producer Settlement Fund cost is an integral part of the Debtors' total milk cost.  Importantly, the FMMO Reports and PSF Statements complement each other and must be reviewed together, and along with payments to milk suppliers, to understand the Debtors' milk cost.  The FMMO Reports are routinely audited by AMS.  Because they are verified by the relevant regulator, they provide the most reliable information about the Debtors' business.  Like the FMMO Reports, the PSF Statements are typically reviewed to understand a business such as the Debtors, and because these reports are regularly received from the USDA, a milk processor such as the Debtors should have them readily available.

c. <u>Financial Statements with Milk Ingredients and Packaging Details</u>:  These documents are financial statements of the Debtors ("**MIP Statements**") that contain information on the Debtors' cost of goods sold, excluding labor costs.  The

MIP Statements show the cost breakdown for the raw materials (including milk, other ingredients, and packaging) used in the Debtors' finished products, including actual costs, variances, and standard costing methodology. These documents should be easy to create from a dairy processor's accounting records.

d.  2019 Invoices for the Debtors' Raw Materials and Fluid Purchases:  These documents (the "**2019 Invoices**") include invoices for the Debtors' (1) raw materials, including but not limited to milk, cream, and condensed skim from cooperative and independent suppliers, (2) co-processed products, and (3) servicing and balancing direct milk programs. These invoices show which vendors the Debtors purchase raw materials from and how much they pay for those raw materials, including premiums and discounts.

7.  Based on my experience in the dairy industry and in consulting for businesses similar to the Debtors, it is typical and customary to receive the documents described above in any business combination process when analyzing a milk processing business like the Debtors'. This information is critical for understanding the business's revenue and expenses and determining which facilities and products account for the business's profits and costs.

8.  When I was engaged, I expected that the Debtors would provide a substantial amount of the information in short order so that I would have a reasonable period of time to analyze the voluminous data in these documents. However, the Debtors failed to provide this information in a timely fashion, and some of it, as of the date of this Declaration, has still not been provided—many of the invoices, for example, are still missing. On January 28-29, 2020, the Debtors produced approximately 140 FMMO Reports, 160 PSF Handler Statements, and 377 of the 2019 Invoices, and between February 21, 2020 and February 24, 2020, following what I understand to

be repeated requests from the Ad Hoc Group's professionals, the Debtors produced 24 of the 2019 Invoices, another 123 of the FMMO Reports, and 46 of the PSF Reports, out of the hundreds that had to exist. While this initial disclosure was helpful, it was entirely insufficient to complete an analysis of the Debtors' business.

9.      It was not until March that the Debtors produced the bulk of these materials. Between March 3, 2020 and March 5, 2020, I received 480 FMMO Reports and 420 PSF Handler Statements as well as approximately 70 MIP Statements. On the very tight timeline between the date I received these documents and the date of this Declaration, I was able to complete a preliminary review of these documents.

## Overview of Milk Price Regulation

10.      Milk prices are regulated by federal government agencies, and each month, two sets of prices are publicly available from the AMS.

a.  The Uniform Price: The uniform price is the federally regulated minimum price that a dairy processor like the Debtors must pay for producer milk within a particular geographic region (called a Federal Milk Marketing Order or FMMO). (In addition, the Debtors operate in markets regulated by the states, which may require a different minimum price.) To determine the uniform milk price, AMS receives information on the receipt and use of milk by milk processors and other milk handlers. The price of milk varies based on its use. Milk bottled for drinking—so-called "fluid milk"—generally has the highest price, whereas milk used for cheese or powder, for example, generally has a lower price. The uniform milk price is a weighted average of prices for the different uses of milk within the FMMO. (Dairy processors such as the Debtors who process a large volume of fluid

milk, for which they generally receive a relatively high price, contribute to the Producer Settlement Fund mentioned above, whereas dairy processors who process mostly lower milk price products such as cheese draw from the fund, so that all milk producers receive at least the uniform price for their milk.)

b. <u>The All Milk Price</u>:  The "all milk" price, unlike the uniform price, is based on a USDA survey of dairy producers and cooperatives in a region.  The survey seeks to determine the gross price farmers actually received in the preceding month per hundredweight of milk sold in each of the 23 major milk-producing states.  The gross price is before deductions for items such as hauling and stop charges, advertising and promotion costs, and cooperative dues.  It does not include hauling subsidies, but does include premiums and discounts for quality, quantity, or other reasons, including so-called "reblends."  "Reblends" are the discount below the uniform price that a cooperative may pay its member farmers (because a cooperative is owned by its members, it is not required to pay the uniform price to its members).

11.     Because the USDA publishes both the all milk and uniform milk prices, it is possible for dairy processors such as the Debtors to compare their actual transactions to the USDA prices to determine whether their pricing is comparable to the market. ████████████████████████████████████████

12.     Based on my review of the Debtors' FMMO Reports and PSF Statements to date, along with publicly available milk prices, ████████████████████████████ ███████████████████████████████    From the data produced, ████████

7

██████████████████████████████████████████████████████████

███████████████████████████████

13.    The Debtors purchase milk from DFA ████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████

14.    ████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████

15.    Based on my review of the relevant documents, including the FMMO Reports and

PSF Statements, as well as the all milk and uniform prices, ████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████ I believe that, once the Debtors provide the Ad Hoc Group with

all of the requested diligence, and there has been sufficient time to analyze it, █████████████████

██████████████████████████████████████████████████████████

8

████████████████████████████████████████████████████████

███████████████████████████████████████████████.  I also

believe that, ████████████████████████████████████████████

███████████████████████████████

     16.      Set forth on **Exhibit 3** to this declaration is ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ ███████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

—————————————————

████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
██████████████

17.

18.

19. ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

20.     In my experience in the dairy industry, █████████████████████

████████ █████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████.

21.     Indeed, it appears that █████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████

22.     Attached hereto as **<u>Exhibit 4</u>** is █████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████.

23.     Moreover, in reviewing the invoices the Debtors have received from DFA, ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ .

24.     Based on my analysis to date, I believe that ████████████████

████████████████████████████████████████████████████

██████████████████████████████████████ . As the further

diligence requested from the Company is provided, ████████████████████

████████████████████████████████████████████████████

██████████████████ .

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge and belief.

Executed on March 9, 2020 in Boulder, Colorado.

*/s/ Sally K. Keefe*

_____

13

EXHIBIT 1
C.V. OF SALLY K. KEEFE

## SALLY K. KEEFE

### PROFESSIONAL EXPERIENCE

**skFigures**, Boulder, Colorado; 2013 – Present
  **Agriculture & Food Management Consultant**, March 2013 – Present
- Provide management consulting services and technical expertise to agriculture and food businesses and groups. Clients include: agricultural producers, dairy processors, and a trade association.
- Expertise on regulatory and policy matters including:
  - USDA National Organic Program regulation and organic certification
  - Federal Milk Marketing Orders (FMMOs)
  - Agricultural advertising and promotion orders
- Business analyses including:
  - Strategic reviews of new product and market opportunities
  - Evaluations of value-added opportunities for producers such as on-farm processing
  - Supply chain optimization
  - Development of long-term sustainable procurement strategies

**Aurora Organic Dairy,** Boulder, Colorado; 2003 – 2012
  **Vice President, Legal & Government Affairs**, November 2007 – December 2012
  **Vice President, Supply Chain**, January 2005 – October 2007
  **Supply Chain Director**, December 2003 – December 2004
  **Dairy Consultant**, June 2003 – November 2003
- Key member of management team who created and developed this innovative organic dairy company to serve the private label organic milk market.
- Expertise in all supply chain areas including milk production, processing and distribution. Experienced with both self-manufacturing and co-packing.
- Built and led supply chain team to direct all milk utilization, logistics, and customer service aspects of the business. From cow to customer, this involved producing, processing and distributing more than 200 million pounds of milk, butter and powder to more than 100 distribution centers annually.
- Managed milk balancing activities in both robust and recessionary market environments.
- Administered organic compliance and regulatory requirements for six organic dairy farms, about 20,000 cow herd, in Colorado and Texas as well as a fluid milk processing plant.
- Responsible for government and legal relations for the company, including directing company strategy for regulatory issues and changes, providing testimony in federal order hearings, litigation matters and contract negotiations with customers and vendors.
- Directed compliance and reporting for federal milk order, state milk order and dairy promotion regulatory requirements.
- Executive team member, key participant in strategic planning, annual budgeting and business development.

**SALLY K. KEEFE**

## PROFESSIONAL EXPERIENCE CONT.

**Horizon Organic Dairy**, Longmont, Colorado; 1996 – 2001
 **Milk Procurement Director**, August 2000 – June 2001
 **Milk Manager**, November 1998 – August 2000
 **Operations Supervisor**, March 1998 – November 1998
 **Operations Coordinator**, July 1996 – March 1998

- Developed new position to manage this rapidly growing dairy company's milk procurement and balancing functions. Purchased 31 million gallons of organic milk annually.
- Managed complex organic milk supply chain. Responsible for the allocation and balancing of milk supplies involving more than 200 dairy farmers among 20 processing plants manufacturing in nine states.
- Coordinated fluid milk processing and distribution as well as raw milk allocation between fluid and other dairy product including yogurt, cheese, butter and powder.
- Integrated *The Organic Cow of Vermont* and *Juniper Valley* supply chains into operations following brand acquisitions.
- Responsible for milk order and dairy promotion compliance and reporting.

**Hagler Bailly Consulting**, Boulder, Colorado; 1994 – 1996
 **Associate, Environmental Economics & Policy Group**, June 1995 – July 1996
 **Research Associate, Environmental Economics & Policy Group**, Jan. 1994 – June 1995

- Conducted economic research and analysis for government, non-profit and private clients.
- Developed air pollution policy evaluation model, assessed feasibility of connecting drinking water systems, determined benefits of natural gas fueled vehicle use and evaluated economic impacts of climate change.
- Performed data collection and analysis for environmental risk assessments as well as cost-benefit and regulatory impact analyses.

**Putnam, Hayes & Bartlett**, Washington, D.C.; 1993
**Research Assistant**, June 1993 – November 1993

- Supported clients in the financial services, pharmaceutical and natural gas industries.
- Performed statistical analyses on sales, futures markets and environmental data.

## EDUCATION

**University of Colorado, MBA, 2003**. Focus: Entrepreneurship / Finance.

- Venture Capital Association of Colorado Entrepreneurship Fellowship 2001 – 2002.
- Price Institute Entrepreneurship Fellowship 2002 – 2003.
- Social Responsibility Vice President Graduate Students of Business Association 2002.

**Middlebury College, BA, 1993**. Major: Economics. Minor: Environmental Studies.

- Awards: Cum Laude, Highest Honors in Economics, College Scholar, Dean's List.
- Senior Honors Thesis: "Leverage and Production in the U.S. Forest Products Industry."

EXHIBIT 2
(filed under seal)

EXHIBIT 3
(filed under seal)

EXHIBIT 4
(filed under seal)