

March 30, 2020

**By Email**
Tony Magro, Senior Managing Director
tony.magro@evercore.com
John Kimm, Managing Director
john.kimm@evercore.com
Julie Raviv, Vice President
julie.raviv@evercore.com
Evercore
55 East 52nd Street
New York, NY 10055

Re:  **MDVA Offer for High Point, NC Plant and Chesapeake, VA Branch**

Dear Mr. Magro, Mr. Kimm, and Ms. Raviv:

Maryland and Virginia Milk Producers Cooperative Association, Incorporated ("MDVA" or "Purchaser") hereby submits this Offer in accordance with the terms and conditions of your March 13, 2020 Letter and the terms and conditions of all applicable orders and requirements of the U.S. Bankruptcy Court for the Southern District of Texas.  This offer is MDVA's Best and Final Offer and includes the following:

1.  Purchaser Identity: The legal identity is Maryland and Virginia Milk Producers Cooperative Association, Inc., a Virginia Cooperative Association, with its headquarters in Reston, Virginia. It will be the beneficial owner of the assets if the Offer is accepted.

2.  Purchase Price: The amount of cash, in U.S. Dollars, that MDVA hereby offers to pay for the High Point, NC milk processing plant and the Chesapeake, VA branch facility, and all related included assets, is Eighteen Million, One Hundred Twenty-Nine Thousand Dollars ($18,129,000.00).

3.    Asset Purchase Agreement: A duly authorized and executed asset purchase agreement (the "APA") that includes the items described below, marked against a form APA that Evercore has provided is attached. This APA identifies, with as much specificity as possible, all assets to be purchased. It also identifies contracts and leases to be assumed, and it also provides that the Purchaser shall be responsible for any cure costs associated with the assumption of such contracts and leases. The APA does not propose for the Purchaser to assume any liabilities. The APA also includes a statement of its plan for employment offers and proposed terms of employment for those employees who currently work at the High Point, NC plant and at the Chesapeake, VA branch. The facilities Purchaser is seeking to purchase are non-union facilities. The employment terms being offered do not impact the Debtor's current collective bargaining agreements and labor unions.

4.    Financial Wherewithal: This is an all-cash deal based on MDVA's demonstration of its financial wherewithal to consummate the Offer. As noted in the attached letter from MDVA's lender, EagleBank, "Maryland and Virginia Milk Producers Cooperative Association Incorporated has been a valued client of EagleBank since 2018 and currently has a $50,000,000 Revolving Line of Credit with us."

5.    Adequate Assurance: The evidence supporting Purchaser's ability to comply with section 365 of the Bankruptcy Code (to the extent applicable), including the provision of adequate assurance of your ability to perform under any Contracts and Leases to be assumed. As noted above, MDVA has the demonstrated financial wherewithal to purchase the assets that are the subject of this Offer and to take on the employment and lease obligations that are included assets that are a part of this Offer. Moreover, MDVA has been operating milk processing plants producing fluid milk products for a long time, including its fluid milk plant located at Newport News, VA, and its fluid milk plant located at Landover, MD.

6.      No Due Diligence or Financing Contingency: The attached APA contains no condition or contingency based on the obtaining of funding or financing to permit the Purchaser to close or on the outcome of unperformed due diligence.

7.      Good Faith Deposit: At the time of the submission of the Offer a cash deposit by wire transfer to a Deposit Agent in an amount equal to 7% of the proposed purchase price will be made by Purchaser. The deposit will be fully refundable if this Offer is not accepted.

8.      Regulatory and Other Approvals: As the former operator of a fluid milk plant in New Bern, NC, MDVA is very familiar with the governmental, licensing, regulatory and other approvals or consents that are required to take over the operations of a fluid dairy processing plant such as the one at High Point, NC.  Once this Offer is accepted MDVA will undertake to notify all applicable governmental and regulatory agencies and seek the transfer of all applicable licenses and approvals to MDVA as the new operator of the assets that are the subject of this Offer.  MDVA estimates that such approvals can be obtained by the date the plant purchase is closed upon.

9.      Irrevocable Offer: Confirmation that the Offer has received all requisite corporate or internal approvals and is irrevocable until consummation. In this regard the Board of MDVA held a meeting on March 28, 2020, and at the meeting formally approved the submission of this offer and all related documents including the APA unanimously.

10.     Transition Services: Purchaser anticipates that it may require limited transition services for a period of time following the closing on the purchase, including, but not limited to, all Information Technology services currently used at the plant and branch locations, all accounting services currently used at the plant and branch locations, all software and software licenses currently used at the plant and branch locations.  We

do not have enough information to estimate the cost and timeframe for the use of such services but anticipate that a contract for the temporary provision of such services can negotiated.

11. Single-Employer Pension Plan: Purchaser will not assume (i) sponsorship of all or any part of, or (ii) any of the potential liabilities associated with the Deans Food Consolidated Pension Plan ("Single-Employer Pension Plan").

12. Employee Obligations:
    With respect to the assets that are the subject of this Offer:
    a. Purchaser proposes to provide base salaries, target incentive compensation opportunities and employee benefits (not including the Single-Employer Pension Plan) that are substantially comparable in the aggregate to the base salaries, target incentives compensation opportunities and employee benefits the employees were receiving prior to Closing.
    b. Purchaser will not assume any obligations and/or liabilities under any of Debtors' prepetition collective bargaining agreements.
    c. Purchaser will not participate in the Single-Employer Pension Plan.
    d. Purchaser will not assume any obligations and/or liabilities whatsoever for any pension benefits.
    e. Purchaser will not participate in any multi-employer pension and health plans.
    f. Purchaser will not assume sponsorship of all or any portion of the Single-Employer Pension Plan.

13. Other Considerations: Buyer has determined, in good faith, that its proposed acquisition of the assets that are the subject of this Offer is not reportable under the Hart-Scott-Rodino Act. Buyer further represents that its proposed acquisition of the assets that are the subject of this Offer is not anticompetitive and will not involve additional delay related to extended antitrust investigation by the U.S. Department of Justice.

Rather, Buyer's acquisition of such assets will restore competition in the Carolinas and facilitate regulatory review of other potential transactions involving the Debtor's remaining assets.

14.  Contact Person(s): Jay Bryant, CEO, MDVA: jbryant@mdvamilk.com (703) 217-9450; Jon Cowell, CFO, MDVA: jcowell@mdvamilk.com (571) 435-9757. Mr. Bryant and Mr. Cowell may be reached by email or by calling their cell phone numbers as shown above.

Sincerely yours,

Maryland and Virginia Milk Producers Cooperative Association, Inc.

By:

*Jay Bryant*

Jay Bryant, CEO

**CONFIDENTIAL**
*Excluded Assets Version*

**ASSET PURCHASE AGREEMENT**

DATED AS OF [●]MARCH 30, 2020

BY AND AMONG

DEAN FOODS COMPANY,

EACH OF THE SUBSIDIARIES OF DEAN FOODS COMPANY

LISTED ON THE SIGNATURE PAGES HERETO,

AND

[BUYER]MARYLAND AND VIRGINIA MILK PRODUCERS COOPERATIVE
ASSOCIATION, INCORPORATED

# TABLE OF CONTENTS

PAGE

## ARTICLE 1
## DEFINITIONS

Section 1.01. *Definitions.* .................................................................1
Section 1.02. *Other Definitions and Interpretive Matters.* .........................................16~~16~~

## ARTICLE 2
## PURCHASE AND SALE

Section 2.01. *Purchase and Sale.* ................................................................17~~17~~
Section 2.02. *Excluded Assets.* ................................................................20~~20~~
Section 2.03. *Assumed Liabilities.* ................................................................22~~22~~
Section 2.04. *Excluded Liabilities.* ................................................................23~~23~~
Section 2.05. *Cure Costs; Desired 365 Contracts.* ........................................................23~~23~~
Section 2.06. *Assignment of Assets Subject to Consent Requirements.* .......................24~~24~~
Section 2.07. *Misallocated Assets.* ................................................................24~~24~~
Section 2.08. *Further Assurances.* ................................................................24~~24~~
Section 2.09. *Withholding.* ................................................................25~~25~~

## ARTICLE 3
## PURCHASE PRICE

Section 3.01. *Purchase Price.* ................................................................25~~25~~
Section 3.02. *Good Faith Deposit* ................................................................25~~25~~

## ARTICLE 4
## CLOSING

Section 4.01. *Closing Date.* ................................................................26~~26~~
Section 4.02. *Payments on the Closing Date.* ........................................................26~~26~~
Section 4.03. *Buyer's Deliveries.* ................................................................26~~26~~
Section 4.04. *The Selling Entities' Deliveries.* ........................................................26~~26~~

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF SELLING ENTITIES

Section 5.01. *Organization and Good Standing.* ........................................................27~~27~~
Section 5.02. *Authority; Validity.* ................................................................28~~27~~
Section 5.03. *Governmental Approvals; No Conflict.* ................................................28~~28~~
Section 5.04. *Seller SEC Documents.* ................................................................29~~29~~
Section 5.05. *No Undisclosed Material Liabilities.* ................................................29~~29~~
Section 5.06. *Absence of Certain Changes.* ........................................................29~~29~~
Section 5.07. *Legal Proceedings.* ................................................................30~~29~~
Section 5.08. *Compliance with Laws; Permits.* ........................................................30~~30~~
Section 5.09. *Food Safety Matters.* ................................................................30~~30~~

Section 5.10.   Material Contracts.................................................................3232
Section 5.11.   *Intellectual Property.*............................................................3333
Section 5.12.   *Environmental, Health and Safety Matters.*...........................3535
Section 5.13.   *Title.*...................................................................................3535
Section 5.14.   *Matters Related to Assets; Casualty Losses*...........................3737
Section 5.15.   *Inventory.*...........................................................................3737
Section 5.16.   *Insurance*............................................................................3737
Section 5.17.   *Security Arrangements*.........................................................3837
Section 5.18.   *Customers and Suppliers.*......................................................3838
Section 5.19.   *Anti-Corruption.*..................................................................3838
Section 5.20.   *Brokers or Finders.*..............................................................3938
Section 5.21.   *Employee Benefit Plans; Labor and Employment Matters.*.................3938
Section 5.22.   *Taxes.*.................................................................................4040

ARTICLE 6
REPRESENTATIONS AND WARRANTIES OF BUYER

Section 6.01.   *Organization and Good Standing.*.........................................4141
Section 6.02.   *Authority; Validity; Consents.*..............................................4141
Section 6.03.   *No Conflict*.........................................................................4241
Section 6.04.   *Legal Proceedings.*..............................................................4242
Section 6.05.   *Bankruptcy.*........................................................................4242
Section 6.06.   *Brokers or Finders*...............................................................4242
Section 6.07.   *Financing.*...........................................................................4342
Section 6.08.   *Independent Evaluation.*.......................................................4444

ARTICLE 7
ACTIONS PRIOR TO THE CLOSING DATE

Section 7.01.   *Access and Reports.*.............................................................4545
Section 7.02.   *Operations Prior to the Closing Date.*...................................4545
Section 7.03.   *Commercially Reasonable Efforts*.........................................4747
Section 7.04.   *Regulatory Approvals*..........................................................4848
Section 7.05.   *Bankruptcy Court Approval.*.................................................4949
Section 7.06.   *Alternative Proposals*...........................................................5050
Section 7.07.   *Damage or Destruction*.........................................................5050
Section 7.08.   [*Buyer Efforts to Obtain Financing*.......................................5050
Section 7.09.   [*Cooperation with Financing*................................................5252
Section 7.10.   *Additional Selling Entities.*...................................................5454
Section 7.11.   *Public Announcements; Filings.*............................................5454

ARTICLE 8
ADDITIONAL AGREEMENTS

Section 8.01.   *Taxes.*.................................................................................
Section 8.02.   *Allocation of Purchase Price.*................................................5555
Section 8.03.   *Assigned Contracts; Adequate Assurance and Performance.*...............5656
Section 8.04.   *Employee Matters.*...............................................................5657

Section 8.05.  *Post-Closing Books and Records.* ........................................................... 57~~58~~
Section 8.06.  *Use of Trademarks* ................................................................................... 58~~58~~
Section 8.07.  *Title Matters* ............................................................................................ 58~~58~~
Section 8.08.  *Insurance Access* ...................................................................................... 58~~58~~
Section 8.09.  *Disclaimers.* .............................................................................................. 59~~59~~
Section 8.10.  *Collection of Accounts Receivable.* .......................................................... 61~~61~~

ARTICLE 9
CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

Section 9.01.  *Accuracy of Representations.* ................................................................... 62~~62~~
Section 9.02.  *Selling Entities' Performance* .................................................................. 62~~62~~
Section 9.03.  *Seller's Deliveries* .................................................................................... 62~~62~~

ARTICLE 10
CONDITIONS PRECEDENT TO THE OBLIGATION OF BUYER AND THE
SELLING ENTITIES

Section 10.01. *No Order* .................................................................................................. 63~~63~~
Section 10.02. *Sale Order* ............................................................................................... 63~~63~~
Section 10.03. *HSR Act* ................................................................................................... 63~~63~~

ARTICLE 11
CONDITIONS PRECEDENT TO THE OBLIGATION OF THE SELLING ENTITIES
TO CLOSE

Section 11.01. *Accuracy of Representations* ................................................................... 63~~63~~
Section 11.02. *Buyer's Performance* ............................................................................... 63~~63~~
Section 11.03. *Buyer's Deliveries.* .................................................................................. 63~~63~~

ARTICLE 12
TERMINATION

Section 12.01. *Termination Events.* ................................................................................. 63~~64~~
Section 12.02. *Effect of Termination* ............................................................................... 65~~65~~
Section 12.03. *Procedure Upon Termination* .................................................................. 65~~65~~

ARTICLE 13
GENERAL PROVISIONS

Section 13.01. *No Survival of Representations and Warranties.* ..................................... 65~~65~~
Section 13.02. *Notices.* .................................................................................................... 66~~66~~
Section 13.03. *Waiver.* .................................................................................................... 67~~67~~
Section 13.04. *Entire Agreement; Amendment.* ............................................................... 67~~67~~
Section 13.05. *Assignment.* .............................................................................................. 67~~67~~
Section 13.06. *Severability.* ............................................................................................ 68~~68~~
Section 13.07. *Expenses.* ................................................................................................. 68~~68~~
Section 13.08. *Specific Performance.* .............................................................................. 68~~68~~

iii

Section 13.09. *Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.* ................................................................................... 6969

Section 13.10. *Counterparts.* ...................................................................... 6969

Section 13.11. *Parties in Interest; No Third Party Beneficiaries.* .................. 7070

Section 13.12. *No Recourse.* ....................................................................... 7070

Section 13.13. *Disclosure Schedules; Materiality.* ........................................ 7171

Section 13.14. *Liquidating Trustee.* ............................................................. 7171

Section 13.15. *Conflicts; Privileges.* ............................................................ 7272

Section 13.16. [*Liability of Financing Sources* .......................................... 7373

**Exhibits:**

| | |
|---|---|
| Exhibit A | Bidding Procedures |
| Exhibit B | Bidding Procedures Order |
| Exhibit C | Form of IP Assignment Agreement |
| Exhibit D | Form of Master Assignment |
| Exhibit E | Form of Sale Order |
| Exhibit F | Facilities Legal Descriptions– |

**Schedules**:

| | |
|---|---|
| Schedule 1.01(a) | Independent Contractors |
| Schedule 1.01(b)(1) | Seller Knowledge Persons |
| Schedule 1.01(b)(2) | Buyer Knowledge Persons |
| Schedule 2.01(b)(xiii) | Certain Seller Benefit Plans |
| Schedule 2.01(b)(xiv) | Assumed CBAs |
| Schedule 2.05(a) | 365 Contracts |
| Schedule 7.02 | Operation Prior to Close |
| Schedule 7.04 | Transferred Permits |
| Disclosure Schedules | |

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of [●] March__, 2020 is by and among Dean Foods Company, a company organized under the laws of the State of Delaware whose address is 2711 North Haskell Avenue, Suite 3400, Dallas, TX 75204 ("**Seller**"), each of the Subsidiaries of Seller listed on the signature pages hereto (together with Seller, the "**Selling Entities**") and [BUYER] Maryland and Virginia Milk Producers Cooperative Association, Incorporated, a [●]a Virginia corporation organized as a cooperative association under Virginia law, or its designee pursuant to Section 13.05 below ("**Buyer**"). Capitalized terms used but not otherwise defined herein have the meanings set forth in Article 1Article 1. The Selling Entities and Buyer are sometimes referred to collectively herein as the "**Parties**" and individually as a "**Party**".

## RECITALS

WHEREAS, the Selling Entities are engaged in the Business;

WHEREAS, on November 12, 2019 (the "**Petition Date**"), the Selling Entities commenced voluntary cases (the "**Bankruptcy Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**");

WHEREAS, the Selling Entities desire to sell to Buyer all of the Assets, and Buyer desires to purchase from the Selling Entities all of the Assets and assume all of the Assumed Liabilities, upon the terms and conditions hereinafter set forth;

WHEREAS, the Parties intend to effectuate the transactions contemplated by this Agreement through a sale of the Assets pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Rules 2002, 4001, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"); and

WHEREAS, the Selling Entities' ability, and Buyer's willingness, to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

ARTICLE 1
DEFINITIONS

Section 1.01.   *Definitions.*

For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"**365 Contracts**" means all of the Selling Entities' respective executory Contracts and unexpired Leases, in each case, within the meaning of Section 365 of the Bankruptcy Code exclusively related to the Business.  For the avoidance of doubt, none of the Hedge Contracts are 365 Contracts.

"**Accounts Receivable**" means any and all (i) accounts receivable, notes receivable and other amounts receivable owed to Seller or any of its Subsidiaries (whether current or non-current), together with all security or collateral therefor and any interest or unpaid financing charges accrued thereon, including all Proceedings pertaining to the collection of amounts payable, or that may become payable, to Seller or any of its Subsidiaries with respect to products sold or services performed on or prior to the Closing Date, (ii) construction allowances and other amounts due from landlords (including in respect of prior overcharges and insurance recoveries), (iii) license and royalty receivables, (iv) rebate receivables from suppliers, (v) insurance claims receivables, and (vi) other amounts due to Seller or any of its Subsidiaries which they have historically classified as accounts receivable in the consolidated balance sheet of Seller, in each case exclusively related to the Business.

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly (through one or more intermediaries) Controls, is Controlled by or is under common Control with such specified Person; *provided* that none of the equity holders of Buyer or Seller or creditors of the Selling Entities (other than any equity holder of Seller or creditor who is a Subsidiary of any Selling Entity), or any of the Specified Entities, will be considered an Affiliate of the Buyer or a Selling Entity for purposes of this Agreement.

"**Agreement**" has the meaning set forth in the introductory paragraph.

"**Allocation**" has the meaning set forth in Section 8.02(a)Section 8.02(a).

["**Alternative Financing**" has the meaning set forth in Section 7.08(d).][1]

["**Alternative Financing Commitment Letter**" has the meaning set forth in Section 7.08(d).]

"**Antitrust Division**" has the meaning set forth in Section 7.04Section 7.04.

"**Antitrust Laws**" means, collectively, the HSR Act, the Sherman Act, the Clayton Act, the Federal Trade Commission Act and any other federal or state or foreign statutes, rules, regulations, orders, decrees, administrative or judicial doctrines or other Applicable Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade.

"**Anti-Corruption Laws**" has the meaning set forth in Section 5.19Section 5.19.

---

[1] **Note to Draft**: Debt financing definitions and provisions have been included throughout for review to the extent Buyer requires such financing to consummate the transaction. To the extent Buyer requires debt financing, all such definitions and provisions should be tailored to conform to the requirements of such debt financing. Proposals that do not require debt financing will be viewed more favorably by Seller.

"**Applicable Food Safety Laws**" has the meaning set forth in Section 5.09~~Section 5.09~~.

"**Applicable Law**" means, with respect to any Person, any transnational, domestic or foreign federal, state, provincial, municipal or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, Order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, promulgated, enforced or applied by a Governmental Authority that is binding upon or applicable to such Person or its properties, as amended unless expressly specified otherwise.

"**Assets**" has the meaning set forth in Section 2.01(b)~~Section 2.01(b)~~.

"**Assigned Contracts**" has the meaning set forth in Section 2.01(b)(v)~~Section 2.01(b)(v)~~.

"**Assumed CBAs**" has the meaning set forth in Section 2.01(b)(xiv)~~Section 2.01(b)(xiv)~~.

"**Assumed Liabilities**" has the meaning set forth in Section 2.03~~Section 2.03~~.

"**Assumed Plans**" has the meaning set forth in Section 2.01(b)(xiii)~~Section 2.01(b)(xiii)~~.

"**Avoidance Actions**" has the meaning set forth in Section 2.01(b)(xix)~~Section 2.02(q)~~.

"**Bankruptcy Cases**" has the meaning set forth in the recitals.

"**Bankruptcy Code**" has the meaning set forth in the recitals.

"**Bankruptcy Court**" has the meaning set forth in the recitals.

"**Bankruptcy Rules**" has the meaning set forth in the recitals.

"**Bidding Procedures**" means the procedures employed with respect to the proposed sale of the Assets and the assumption of the Assumed Liabilities attached hereto as Exhibit A.

"**Bidding Procedures Order**" means the Order of the Bankruptcy Court approving the Bidding Procedures attached hereto as Exhibit B.

"**Business**" means the business of manufacturing, marketing, distributing and selling certain branded and private label dairy and dairy case products, including fluid milk, ice cream, cultured dairy products, creamers, ice cream mix and other dairy products, and certain juices, teas and bottled water products, in each case to retailers, distributors, food service outlets, educational institutions and Governmental Authorities in the United States, as conducted by the Selling Entities, at or exclusively related to the Facilities, including the ownership and operation of the Assets.

"**Business Day**" means any day, other than Saturday or Sunday, on which commercial banks are open for commercial business with the public in New York City, New York and Dallas, Texas.

"**Business IT Assets**" has the meaning set forth in Section 5.11(f)~~Section 5.11(f)~~.

3

"**Buyer**" has the meaning set forth in the introductory paragraph.

"**Buyer Welfare Plan**" has the meaning set forth in Section 8.04(c)Section 8.04(c).

"**Cash Purchase Price**" has the meaning set forth in Section 3.01(a)Section 3.01(a).

"**Casualty Loss**" means any loss, damage or destruction of the Assets that occurs for any reason, including any act of God, fire, explosion, collision, earthquake, windstorm, flood, hurricane, tropical storm, terrorism, or other casualty or condemnation taking under the right of eminent domain, but excluding any loss, damage, or destruction as a result of depreciation or ordinary wear and tear.

"**Claim**" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

["**Clean Team Agreement**" means that certain Clean Team Agreement dated as of [●], March 27, 2020 by and between Dean Foods Company and [Buyer].]²

"**Closing**" has the meaning set forth in Section 4.01Section 4.01.

"**Closing Date**" has the meaning set forth in Section 4.01Section 4.01.

"**Code**" means the United States Internal Revenue Code of 1986.

"**Collective Bargaining Agreement**" means any written agreement between any Selling Entity with a union representing any Company Employees that governs the terms and conditions of employment, whether or not such agreement is expired by its terms.

"**Committee**" shall mean that certain Official Committee of Unsecured Creditors appointed by the Office of the United States Trustee for the Southern District of Texas on November 22, 2019 in the chapter 11 cases of Southern Foods Group, Dean Foods Company, and certain of their debtor affiliates.

"**Company Employees**" means those employees of a Selling Entity, or those independent contractors, in each case as set forth on Disclosure Schedule 1.011.01(a).³

"**Confidentiality Agreement**" has the meaning set forth in Section 7.01(b)Section 7.01(b).

"**Contract**" means any agreement, contract, lease, deed, license, instrument, commitment, undertaking or obligation (in each case, whether written or oral) that is legally binding, including the Leases.

---

² **Note to Draft**: If applicable.

³ **Note to Draft**: Transferred personnel to be set forth on a schedule; parties to discuss what personnel will be available to Buyer based on specific Assets being acquired.

"**Control**" means the ability (directly or indirectly through one or more intermediaries) to direct or cause the direction of the management or affairs of a Person, whether through the ownership of voting interests, by Contract or otherwise.

"**Copyrights**" means any copyright, any copyrightable work, any work of authorship, any moral rights related to any of the foregoing, any registration or recording of any copyright, copyrightable work or work of authorship, and any application in connection therewith, including any such registration, recording, or application in the United States Copyright Office or in any similar office or agency of the United States, any State thereof, or any other jurisdiction, and any renewal of any of the foregoing.

"**Cure Costs**" means all monetary Liabilities, including pre-petition monetary Liabilities, of the Selling Entities that must be paid or otherwise satisfied to cure all of the Selling Entities' monetary and other defaults under the Assigned Contracts pursuant to Section 365 of the Bankruptcy Code at the time of the assumption thereof and assignment of the Assigned Contracts to Buyer as provided hereunder as such amounts are determined by the Bankruptcy Court or approved pursuant to the assignment and assumption procedures provided for in the Bidding Procedures Order.

"**Current Representation**" has the meaning set forth in Section 13.15~~Section 13.15~~.

"**Damage or Destruction Loss**" has the meaning set forth in Section 7.07~~Section 7.07~~.

"**Data Protection Laws**" means the data protection and privacy laws of each jurisdiction where any Selling Entity is established and operating the Business and those of each jurisdiction where any Personal Information is collected, transmitted, secured, stored, shared or otherwise processed by or on behalf a Selling Entity in connection with the operation of the Business, including, to the extent applicable, the General Data Protection Regulation (EU 2016/679) (GDPR), the e-Privacy Directive (Directive 2002/58/EC) and the e-Privacy Regulation (Regulation 2017/003) (once it takes effect), the California Consumer Privacy Act, Section 5 of the (U.S.) Federal Trade Commission Act and any and all laws and regulations governing privacy, cybercrime, use of electronic data, or unfair or deceptive trade practices.

"**Davis Polk**" has the meaning set forth in Section 13.15~~Section 13.15~~.

"**Deal Communications**" has the meaning set forth in Section 13.15(b)~~Section 13.15(b)~~.

~~[ "**Debt Commitment Letter**" has the meaning set forth in Section 6.07.]~~

~~["**Debt Financing**" has the meaning set forth in Section 6.07.]~~

~~["**Debt Financing Agreements**" has the meaning set forth in Section 7.08.]~~

~~["**Debt Financing Source**" shall mean, in its capacity as such, any lender or similar debt financing source with respect to the Debt Financing and their respective Affiliates, and such lender's or other debt financing source's (and their respective Affiliates') equityholders, members, employees, officers, directors, attorneys, agents or advisors.]~~

"**Deposit Amount**" has the meaning set forth in Section 3.02~~Section 3.02~~.

"**Deposit Escrow Account**" means the deposit escrow account to be maintained with the Escrow Agent on behalf of the Selling Entities.

"**Designated Person**" has the meaning set forth in Section 13.15~~Section 13.15~~.

"**Desired 365 Contracts**" has the meaning set forth in Section 2.05(a)~~Section 2.05(a)~~.

~~"**DFA APA**" has the meaning set forth in Section 2.02(c).~~

"**Encumbrance**" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, charge, interests, debentures, Claims, assignments by way of security or otherwise, security interests, conditional sales contracts or other title retention agreements, rights of first refusal or similar interests or instruments charging, or creating a security interest in the Assets or any part thereof or interest therein, and any agreements, leases, licenses, occupancy agreements, options, easements, rights of way, restrictions, executions or other encumbrances (including notices or other registrations in respect of any of the foregoing) affecting any right or title to the Assets or any part thereof or interest therein, in each case of any type, nature or kind whatsoever (whether known or unknown, secured or unsecured or in the nature of setoff or recoupment, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or nonmaterial, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Bankruptcy Cases, and whether imposed by agreement, understanding, Applicable Law, equity, or otherwise, including claims otherwise arising under doctrines of successor liability).[4]

"**Environmental, Health and Safety Laws**" means any and all Applicable Laws concerning worker and occupational health and safety, pollution or relating to the protection of human health and safety (with respect to exposure to Hazardous Substances), the environment or natural resources, or to the use, generation, management, handling, disposal, transportation or Release of, or exposure to, Hazardous Substances.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" means any entity, trade or business (whether or not incorporated) that, together with any other entity, trade or business, is treated as a single employer under Section 414(b), (c), (m) or (o) of the Code.

"**Escrow Agent**" means Citibank, N.A..

"**Exchange Act**" has the meaning set forth in Section 5.04(a)~~Section 5.04(a)~~.

"**Excluded Assets**" has the meaning set forth in Section 2.02~~Section 2.02~~.

---

[4] ~~**Note to Draft**: Scope of "Encumbrances" to be updated as necessary to align with Encumbrances discharged by the final Sale Order~~.

"**Excluded Contracts**" means all Contracts of each Selling Entity other than the Assigned Contracts.

"**Excluded Liabilities**" has the meaning set forth in Section 2.04~~Section 2.04~~.

"**Excluded Records**" means (a) the general corporate files and records of each Selling Entity related to such entity's organization and existence, (b) each Selling Entity's respective federal, state, local or non-U.S. income, franchise or margin tax files and records, (c) employee files (other than files of Transferred Employees that are permitted to be transferred pursuant to Applicable Law), (d) records relating to the sale of the Assets, including competing bids, (e) proprietary data (including any engineering studies and forecasts and economic studies) to the extent relating to Excluded Assets, (f) information and data that is subject to Third Party contractual restrictions on assignment or disclosure to the extent relating to Excluded Assets, or any privileged information to the extent the transfer pursuant hereto would jeopardize such privilege, (g) copies of records stored for archival and/or back up purposes to the extent relating to Excluded Assets or Excluded Liabilities, and (h) any other files or records to the extent relating to any Excluded Assets or Excluded Liabilities.

"**Facilities**" has the meaning set forth in Section 2.01(b)(i)~~Section 2.01(b)(i)~~.

"**FDA**" means the United States Food and Drug Administration.

"**FDC Act**" means the United States Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301 et seq.).

"**Final DIP Order**" means the *Final Order Pursuant to Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, 507, and 522 and Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Post-Petition Financing, and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Providing Adequate Protection to Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [D.I. 608] entered by the Bankruptcy Court on December 23, 2019.

"**Final Order**" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Cases (or the docket of such other court), which is in full force and effect, which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari,* or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or motion for new trial, stay, reargument or rehearing is then pending or (b) if an appeal, writ of *certiorari* new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other court of competent jurisdiction has been affirmed by the highest court to which such order was appealed, or *certiorari* has been denied, or a new trial, stay, reargument or rehearing has been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired, as a result of which such order has become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil

Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, will not cause such order not to be a Final Order as long as such motion has not been filed.

[~~"**Financing Deliverables**" means the following documents to be delivered in connection with the Debt Financing: (a) customary perfection certificates and corporate organizational documents for the Selling Entities; (b) agreements, documents or certificates that facilitate the creation or perfection of customary liens securing the Debt Financing as are reasonably requested (with sufficient advanced notice) by the Buyer or otherwise required to be delivered hereunder (but in each case, excluding to the extent not required to obtain the Debt Financing); and (c) such information with respect to the Selling Entities as is reasonably available and customary for the completion or delivery of schedules and opinions in connection with financings similar to the Debt Financing.]~~

"**Food and Beverage Products**" means all food and beverage products of all types (whether branded or private label, finished food or beverages, works in process, or food or beverage ingredients) manufactured, processed, labeled, held, packed, or packaged by, or for, the Business.

"**FTC**" has the meaning set forth in Section 7.04~~Section 7.04~~.

"**GAAP**" means generally accepted accounting principles in the United States.

"**Governmental Authority**" means any court or tribunal in any jurisdiction (domestic or foreign) or any federal, tribal, state, parish, county, municipal or other governmental or quasi-governmental, administrative or regulatory body, agency, authority, department, board, commission, bureau, official or other authority or instrumentality.

"**Governmental Authorization**" means any approval, consent, license, Permit, waiver permission, clearance, designation, qualification or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to Applicable Law.

"**Hazardous Substance**" means any pollutants, contaminants, NORM and other radioactive materials, chemicals, petroleum, petroleum products, or hydrocarbons, asbestos or any asbestos-containing material, per- and polyfluoroalkyl substances, polychlorinated biphenyls or industrial, toxic or hazardous substances and any "contaminant," "pollutant", "hazardous waste," "hazardous material", "hazardous substance", "extremely hazardous substance" or "toxic substance" or words of similar import under any Applicable Law relating to the environment or human health and safety.

"**Hedge Contracts**" means any Contract to which a Selling Entity is a party with respect to any swap, forward, future or derivative transaction or option or similar agreement, whether exchange traded, "over the counter," or otherwise, involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"**Insurance Policies**" has the meaning set forth in Section 5.16~~Section 5.16~~.

"**Intellectual Property**" means any Copyright, Patent, Trademark, trade secret, know-how, software, rights in data and databases, inventions (whether patentable or not), or any other similar type of proprietary right or intellectual property right.

"**Interim DIP Order**" means the *Interim Order Pursuant to Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, 507, and 522 and Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Post-Petition Financing, and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Providing Adequate Protection to Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [D.I. 133].

"**IP Assignment Agreement**" means the IP Assignment Agreement in the form attached hereto as Exhibit A.

"**Knowledge**" means, with respect to any matter in question, (a) in the case of each Selling Entity, the knowledge, after reasonable inquiry, of any of the individuals listed on Schedule 1.01(b)(1), and (b) in the case of Buyer, the knowledge, after reasonable inquiry, of any of the individuals listed on Schedule 1.01(b)(2) with respect to such matter.

"**Leased Real Property**" has the meaning set forth in Section 5.13(b)~~Section 5.13(b)~~.

"**Leases**" has the meaning set forth in Section 5.13(b)~~Section 5.13(b)~~.

"**Liability**" means any and all Claims, debts, indebtedness, liens, losses, damages, adverse claims, liabilities, fines, penalties, duties, responsibilities, obligations and expenses (including reasonable attorneys' fees and reasonable costs of investigation and defense) of any kind, character, or description, whether known or unknown, direct or indirect, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, ascertained or ascertainable, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, vested or unvested, executory, determined, determinable, in contract, tort, strict liability, or otherwise, or otherwise due or to become due.

"**Licensed Intellectual Property**" has the meaning set forth in Section 5.11(b)~~Section 5.11(b)~~.

"**Major Customer**" has the meaning set forth in Section 5.18(a)~~Section 5.18(a)~~.

"**Major Supplier**" has the meaning set forth in Section 5.18(b)~~Section 5.18(b)~~.

"**Malicious Code**" means any "back door," "drop dead device," "time bomb," "Trojan horse," "virus," "worm," "spyware," "vulnerability" or "adware" (as such terms are commonly understood in the software industry) or any other code designed or intended to have, or capable of performing or facilitating, any of the following functions: (a) disrupting, disabling, harming, or otherwise impeding in any manner the operation of, or providing unauthorized access to, a computer system or network or other device on which such code is stored or installed; or (b)

9

compromising the privacy or data security of a user or damaging or destroying any data or file without the user's consent.

"**Master Assignment**" means the Master Assignment, Bill of Sale, Deed, and Conveyance in the form attached hereto as Exhibit B.

"**Material Adverse Effect**" means any event, condition, circumstance, development, or change or effect that, individually or in the aggregate with all other events, changes, conditions, circumstances, developments and effects, (a) has had or would reasonably be expected to have a material adverse effect on the value, operation or condition (financial or otherwise) of the Business or the Assets or Assumed Liabilities, considered as a whole or (b) has or would reasonably be expected to prevent or materially impair the ability of the Selling Entities to consummate the transactions contemplated hereby; *provided* that, no effect arising from any of the following will be taken into account in determining whether there has been or would reasonably be expected to be a Material Adverse Effect under the foregoing clause (a): (i) any change in the United States or foreign economies, financial markets, credit markets, commodity markets or political conditions; (ii) any change that generally affects the business or areas in which the Business operates, including changes in the prices or industry margins of the products sold, and the raw materials used by, the Business or any increase in operating costs or capital expenses; (iii) any Proceeding by any Person by reason of, based upon, attributable to, resulting from or arising in connection with, the negotiation, entry into or consummation of the transactions contemplated by this Agreement, any other Transaction Document or the Confidentiality Agreement; (iv) any change arising in connection with hostilities, act of war, civil unrest, cyber-attack, sabotage or terrorism or military actions or any escalation or worsening of any such hostilities, acts of war, civil unrest, cyber-attack, sabotage or terrorism or military action; (v) any act of God, hurricane, flood, tornado, fire, explosion, weather event, earthquake, landslide, other natural disaster, epidemic, plague, pandemic, other outbreak of illness or public health event (whether human or animal) and any other force majeure events; (vi) any change or proposed change in Applicable Law or accounting rules (or the interpretation or enforcement thereof) after the date hereof; (vii) any action taken or proposed to be taken by Buyer or any of its Affiliates; (viii) any effect resulting from the public announcement of this Agreement, the negotiation, execution, performance of this Agreement or the consummation of the transactions contemplated by this Agreement, the identity of Buyer or any facts or circumstances relating to Buyer or the announcement or other disclosure of Buyer's plans or intentions with respect to the conduct of the Business, including the effect of any of the foregoing on the relationships, contractual or otherwise, of the Business with clients, customers, employees, suppliers, vendors, service providers or Governmental Authorities (including the failure to obtain any consents in connection with the transactions contemplated hereby); (ix) any effect resulting from the filing or continuation of the Bankruptcy Cases, including the Selling Entities' inability to pay its obligations as a result of the filing of the Bankruptcy Cases and any Orders of, or action or omission approved by, the Bankruptcy Court (or any other Governmental Authority of competent jurisdiction in connection with any such Proceeding); (x) any decline, in and of itself, in the market price or trading volume of Seller's common stock (it being understood and agreed that the foregoing will not preclude Buyer from asserting that any facts or occurrences giving rise to or contributing to such decline in market price or trading volume that are not otherwise excluded from the definition of Material Adverse Effect may be taken into account in determining whether there has been or would reasonably be expected to be a Material Adverse Effect); (xi) any failure to meet any projections, budgets, forecasts, estimates, plans, predictions,

performance metrics or operating statistics (it being understood and agreed that the foregoing will not preclude Buyer from asserting that any facts or occurrences giving rise to or contributing to such failure that are not otherwise excluded from the definition of Material Adverse Effect may be taken into account in determining whether there has been or would reasonably be expected to be a Material Adverse Effect); (xii) any action taken (or omitted to be taken) at the request or with the consent of Buyer or any of its Affiliates; (xiii) any action taken (or not taken) by Seller or any of its Subsidiaries or the Business that is required, expressly contemplated or permitted to be taken (or not taken) pursuant to this Agreement and (xiv) any matter disclosed on the Disclosure Schedules or in any filings by Seller or any of its Subsidiaries with the Bankruptcy Court or the Securities and Exchange Commission prior to the date of this Agreement, or any other matter known to Buyer as of the date hereof; *provided however*, that, in the case of clauses (i), (ii), (v) and (vi), such effects shall be taken into account in determining whether a Material Adverse Effect has occurred to the extent that any such effects have a disproportionate adverse effect on the Business, the Assets and the Assumed Liabilities, taken as a whole, as compared to other similarly situated businesses.

"**Material Contracts**" has the meaning set forth in Section 5.09Section 5.10.

"**Multiemployer Plan**" means a "multiemployer plan" as defined in Section 3(37) of ERISA in which any Selling Entity has an interest.

"**Necessary Consent**" has the meaning set forth in Section 2.06(i)Section 2.06(i).

"**OPEB**" means other post-employment health benefits.

"**Order**" means any award, writ, injunction, judgment, stay, temporary restraining order, order, decree or other restraint entered, issued, made or rendered by any Governmental Authority.

"**Outside Date**" has the meaning set forth in Section 12.01(b)(i)Section 12.01(b)(i).

"**Owned Intellectual Property**" means all Intellectual Property to the extent owned or purported to be owned by any Selling Entity and used or held for use exclusively in connection with the operation of the Business.

"**Owned Real Property**" has the meaning set forth in Section 5.13(a)Section 5.13(a).

"**Party**" and "**Parties**" each have the meaning set forth in the introductory paragraph.

"**Party Affiliate**" has the meaning set forth in Section 13.12Section 13.12.

"**Patents**" means any letters patent, applications for letters patent, statutory invention registrations, registered designs, and similar or equivalent rights in inventions and designs, and any reissues, divisionals, continuations, continuations-in-part, reissues, re-examinations, renewals, provisional, and extensions thereof, including any patents or patent applications in the United States Patent and Trademark Office, the World Intellectual Property Organization, or any similar office or agency in any other jurisdiction.

11

"**Pension Plan**" means any Seller Benefit Plan (other than any Multiemployer Plan) that is subject to Title IV of ERISA.

"**Permits**" means any approvals, authorizations, consents, licenses, permits, registrations or certificates of any Governmental Authority.

"**Permitted Encumbrances**" means any of the following:

(a) any rights, obligations, or duties reserved to or vested in any municipality or other Governmental Authority to: (i) control or regulate any Asset in any manner, including all Applicable Laws, (ii) purchase, condemn, expropriate, or recapture any Asset, (iii) consent to a purchase of any Asset, including the Necessary Consents, or (iv) use any Asset in any manner;

(b) easements, rights-of-way, servitudes, Permits, surface leases, sub-surface leases, grazing rights, logging rights, ponds, lakes, waterways, canals, ditches, reservoirs, equipment, pipelines, utility lines, railways, streets, roads, structures and similar rights on, over or in respect of any of the Assets which, in each case, do not (or would not reasonably be expected to) materially impair the ownership, operation, use or value of the impacted Asset(s) as currently owned, operated and used;

(c) immaterial defects or irregularities of title (i) as to which the relevant statute(s) of limitations or prescription would bar any attack or claim against any Selling Entity's title, (ii) arising out of lack of corporate authorization or a variation in corporate name, or (iii) consisting of the failure to recite marital status or omissions of heirship proceedings in documents;

(d) statutory liens or other Encumbrances for Taxes not yet due and payable;

(e) ~~immaterial materialman's, mechanic's, repairman's, employee's, contractor's, operator's and other similar Encumbrances (i) arising in the ordinary course of business, (ii) existing prior to the commencement of the Bankruptcy Cases, or (iii) perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code;~~[Intentionally Deleted]

(f) ~~any undetermined or inchoate liens or charges constituting or securing the payment of expenses that were incurred incidental to the operation or use of such Asset;~~[Intentionally Deleted]

(g) Assumed Liabilities;

(h) conventional rights of reassignment that have not been triggered at or prior to Closing;

(i) any other imperfections in title, charges, easements, restrictions, licenses and Encumbrances that do not materially affect the value or use of the Assets subject thereto;

(j) Encumbrances arising by, through or under Buyer's financing for the transactions contemplated hereby, if any;

(k) all Necessary Consents;

(l) licenses of Intellectual Property granted in the ordinary course; and

(m) any Encumbrances that will be released by the Sale Order.; and

(n) any Encumbrances arising under the DFA APA.

"**Person**" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization or other entity or Governmental Authority.

"**Personal Information**" means any information relating to an identified or identifiable natural person; an "identifiable person" is one who can be identified, directly or indirectly, in particular by reference to an identification number or to one or more factors specific to his or her physical, physiological, mental, economic, cultural or social identity, including, unique device or browser identifiers, names, addresses, telephone numbers, email addresses, social security numbers, or account information.

"**Petition Date**" has the meaning ascribed to such term in the recitals.

"**Post-Closing Covenant**" means any covenant to the extent required to be performed by any Selling Entity or by Buyer, as applicable, under this Agreement following the Closing.

"**Post-Closing Tax Period**" means any Tax period beginning on or after the Closing Date and that portion of a Straddle Period beginning on the Closing Date.

"**Pre-Closing Tax Period**" means any Tax period ending before the Closing Date and that portion of any Straddle Period ending before the Closing Date.

"**Proceeding**" means any Claim, action, arbitration, audit, appeal, petition, inquiry, investigation, complaint, hearing, litigation, suit, or other dispute (whether civil, criminal or administrative) commenced, brought, conducted, or heard by or before any Governmental Authority or arbitrator.

"**Property Taxes**" means all real property Taxes, personal property Taxes, similar ad valorem Taxes or other similar periodic Taxes not based on income or receipts.

"**Purchase Price**" has the meaning set forth in Section 3.01Section 3.01.

"**Property Tax Credit Amount**" means the amount of any Property Taxes that are assessed on, or in respect of, the Assets and attributable to any Post-Closing Tax Period (or portion thereof) that were paid by Seller (or any of its Subsidiaries) on or prior to the Closing.

"**Property Tax Debit Amount**" means the amount of any Property Taxes that are assessed on, or in respect of, the Assets and attributable to any Pre-Closing Tax Period (or portion thereof) that were not paid by Seller (or any of its Subsidiaries) on or prior to the Closing.

"**Property Tax Purchase Price Adjustment**" means the difference between the Property Tax Credit Amount and the Property Tax Debit Amount.

13

"**R&W Insurance Policy**" has the meaning set forth in ~~Section 13.12(c)~~Section 13.12(c).

"**Real Property Interests**" has the meaning set forth in ~~Section 2.01(b)(iv)~~Section 2.01(b)(iv).

"**Records**" has the meaning set forth in ~~Section 2.01(b)(vii)~~Section 2.01(b)(vii).

"**Registered Intellectual Property**" has the meaning set forth in ~~Section 5.11(a)~~Section 5.11(a).

"**Related Party Agreement**" means any Contract among any Selling Entity and any of its Affiliates and applicable to the Business.

"**Release**" means any presence, spill, emission, leaking, pumping, pouring, placing, injection, deposit, disposal, discharge, dispersal, dumping, emptying, migrating, escaping or leaching into, onto, under or through the environment.

"**Released Parties**" has the meaning set forth in ~~Section 13.12(b)~~Section 13.12(b).

"**Releasors**" has the meaning set forth in ~~Section 13.12(b)~~Section 13.12(b).

"**Representative**" means, with respect to a particular Person, any director, officer, member, manager, partner, employee, agent, consultant, advisor, investor, shareholder, contractor, subcontractor or other equity holder or representative of such Person, including legal counsel, accountants and financial advisors.

"**Sale Order**" means an Order of the Bankruptcy Court, which Order is substantially in the form attached hereto as Exhibit E, with such changes as are required by the Bankruptcy Court to which Seller and Buyer have consented (such consent not to be unreasonably withheld, delayed or conditioned).

"**Seller**" has the meaning set forth in the introductory paragraph.

"**Seller Benefit Plans**" any (i) "employee benefit plan" as defined in Section 3(3) of ERISA (whether or not subject to ERISA), (ii) employment, consulting, severance, termination protection, change in control, transaction bonus, retention or similar plan, program, policy, agreement or arrangement or (iii) other plan, agreement, policy, program, or arrangement providing for compensation, bonuses, profit-sharing, or other forms of incentive or deferred compensation, vacation benefits, insurance, medical, dental, vision, prescription or fringe benefits, life insurance, disability or sick leave benefits or post-employment or retirement benefits, in each case that is sponsored, maintained, contributed to or required to be maintained or contributed to or entered into by any Selling Entity for the benefit of any current or former Company Employee.

"**Seller Credit Obligations**" has the meaning set forth in ~~Section 8.03(c)~~Section 8.03(c).

"**Seller Related Party**" means the Selling Entities and each of their respective stockholders, partners, members, Affiliates, directors, officers, employees, controlling persons and agents.

14

"**Seller SEC Document**" means, collectively, any form, report, statement, certification or other document (including all exhibits, amendments and supplements thereto) filed or furnished by any Selling Entity with the Securities and Exchange Commission since January 1, 2017.

"**Selling Entities**" has the meaning set forth in the introductory paragraph.

"**Straddle Period**" means any Tax period beginning before and ending on or after the Closing Date.

"**Subsidiary**" means any entity with respect to which a specified Person (or a Subsidiary thereof) (a) has the power, through the ownership of securities or otherwise, to elect a majority of the directors or similar managing body or (b) holds a majority of the equity interest; *provided* that none of the Specified Entities will be considered a Subsidiary of any Selling Entity for purposes of this Agreement.

"**Superior Proposal**" means any bona fide proposal or offer to or from a Person other than Buyer or its Representatives with respect to (a) any plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or equity interests or restructuring involving the Assets, or (b) any other direct or indirect acquisition involving the Assets, that, in each case, the Selling Entities have determined in their business judgment would, if consummated, result in a transaction superior to the transactions contemplated hereunder.

"**Tax**" or "**Taxes**" (and with correlative meaning, "**Taxable**", "**Taxation**" "**Taxing**") means all federal, state, local or foreign taxes, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, real property, personal property, unclaimed property and estimated taxes or other tax of any kind whatsoever, including any interest, penalties and additions thereto, whether disputed or not, and including any obligation to indemnify or otherwise assume or succeed to the tax liability of any other Person.

"**Tax Authority**" means any Governmental Authority charged with the administration of any Applicable Law relating to Taxes, including the imposition, assessment or collection of Taxes.

"**Tax Return**" means any return, declaration, report, estimate, information return and statement filed or required to be filed in respect of any Taxes (including any attachment thereto or amendment thereof).

"**Third Party**" means any Person other than the Selling Entities, Buyer or any of their respective Affiliates.

"**Trademarks**" means any trademark, trade name, corporate name, business name, domain name, trade style, trade dress, service mark, logo, source identifier, business identifier, or design of like nature, and all goodwill associated therewith, any registration of the foregoing, and any application in connection therewith, including any such registration or application in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, or any other jurisdiction, and all extensions or renewals of any of the foregoing.

"**Transaction Documents**" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

"**Transfer Taxes**" has the meaning set forth in *Section 8.01(a)Section 8.01(a)*.

"**Transferred Employees**" has the meaning set forth in Section 8.04(a)Section 8.04(a).

"**Trustee**" has the meaning set forth in Section 13.14Section 13.14.

"**USDA**" means the United States Department of Agriculture.

Section 1.02.    *Other Definitions and Interpretive Matters.*

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation will apply:

(i)    *Calculation of Time Period*.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(ii)    *Dollars*.  Any reference in this Agreement to "**Dollars**" or "**$**" means United States dollars.

(iii)    *Exhibits; Schedules; Disclosure Schedules*.  All Exhibits, Schedules and Disclosure Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit, Schedule or Disclosure Schedule but not otherwise defined therein will be defined as set forth in this Agreement.

(iv)    *Gender and Number*.  Any reference in this Agreement to gender includes all genders, and words imparting the singular number also include the plural and vice versa.

(v)    *Headings*.  The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and will not affect or be utilized in the construction or interpretation of this Agreement.  All references in this Agreement to any "Section" or "Article" are to the corresponding Section or Article of this Agreement unless otherwise specified.

(vi)    *Accounting Terms*.  All accounting terms used in this Agreement and not otherwise defined herein have the meanings assigned to them under GAAP.

(vii)    *Herein*.  Words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(viii)    *Or.*   The word "or" when used in this Agreement is not meant to be exclusive unless expressly indicated otherwise.

(ix)    *Including.*   The word "including" or any variation thereof means "including, without limitation", and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(x)    *Statute.*   Unless otherwise specified, references to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules or regulations promulgated thereunder; *provided* that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance with, any Applicable Law, the reference to such Applicable Law means such Applicable Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(xi)    *Contract.*   References to a Contract mean such Contract as amended from time to time.

(b)    *No Strict Construction.*   Buyer, on the one hand, and the Selling Entities, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as jointly drafted by Buyer, on the one hand, and the Selling Entities, on the other hand, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson will be applied against any Person with respect to this Agreement.

ARTICLE 2
PURCHASE AND SALE

Section 2.01.   *Purchase and Sale.*

(a)    Upon the terms and subject to the conditions of this Agreement, at the Closing, the Selling Entities will sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer will purchase, acquire and accept, the Assets, free and clear of all Encumbrances (other than Permitted Encumbrances).

(b)    The "**Assets**" means all right, title and interest of Seller or any of its Subsidiaries in, to or under all of their respective assets, rights and properties exclusively related to the Facilities, including the following, but excluding, for the avoidance of doubt, the Excluded Assets:

(i)    all plants, offices, and manufacturing, processing, distribution, storage, warehousing and other facilities of Seller or any of its Subsidiaries used (or held for use) in connection with the ownership or operation of the Business at Seller's following facilities: [*Description of specific facilities to be acquired by Buyer*]milk processing plant and all related real estate and other assets located at High Point, NC with an address of 1350 West Fairfield, High Point, NC 27263 and the current lease(s) for the branch facility

17

located at Chesapeake, VA with an address of 916 Cavalier Boulevard, Chesapeake, VA 23223 including but not limited to that more specifically described in Exhibit F attached hereto and made a part hereof (collectively, the "**Facilities**"), together with all equipment, machinery, vehicles, fixtures, supplies, furniture, leasehold improvements, and other personal, movable and mixed property of Seller or any of its Subsidiaries exclusively related to the Facilities;

(ii)     all items of tangible personal property or equipment owned, leased, or used (or held for use) by Seller or any of its Subsidiaries and exclusively related to the Facilities;

(iii)     all inventory in respect of the Business (including raw materials, component parts, spare parts, packaging and packaging materials, products in-process and finished products) owned or used (or held by Seller or any of its Subsidiaries for use), whether in transit to or from Seller or any of its Subsidiaries and whether in Seller's or any of its Subsidiaries' warehouses, distribution facilities, held by any third parties or otherwise and all open purchase orders with suppliers (but excluding any products shipped to third parties prior to the Closing Date);

(iv)     the Owned Real Property, the Leased Real Property and all other rights-of-way, surface leases, surface use agreements, easements, real property interests, real rights, licenses, servitudes, Permits and privileges owned or held for use by Seller or any of its Subsidiaries or hereinafter acquired by Seller or any such Subsidiary prior to Closing, in each case, in connection with the Business constituting real property or a real property interest, together with the rights, tenements, appurtenant rights and privileges relating thereto (in each case, excluding unexpired Leases that are 365 Contracts) (collectively, the "**Real Property Interests**");

(v)     (A) each Hedge Contract and (B) all Contracts that constitute, as of the Closing, Desired 365 Contracts (collectively, the "**Assigned Contracts**");

(vi)     all transferable Permits of any Governmental Authority and transferable Orders of any Governmental Authority (in each such case, whether preliminary or final) required of Seller or any of its Subsidiaries for the ownership, operation or use (or held for use) of the Assets;

(vii)     all books, databases, files, records, plans, advertising and promotional materials, information, data and other similar items (other than the Excluded Records) in Seller's or any of its Subsidiaries' possession, whether in written or electronic or any other format, including customer and supplier lists, mailing lists, sales and promotional literature, other sales related materials to the extent exclusively related to the Assets (collectively, the "**Records**");

(viii)     all rights, claims, accounts and causes of action (including warranty and similar claims) of Seller or any of its Subsidiaries against Persons (including any of Seller's Subsidiaries) other than any other Selling Entity (regardless of whether or not such claims and causes of action have been asserted by the Selling Entities) and all rights of indemnity, rights of contribution, rights to refunds, rights of reimbursement and other rights of

recovery, including rights to insurance proceeds, possessed by Seller or any of its Subsidiaries (regardless of whether such rights are currently exercisable) exclusively related to the Assets;

(ix)     to the extent transferable, all current and prior insurance policies of any of Seller or any of its Subsidiaries exclusively related to the Assets or the Assumed Liabilities, and all rights and benefits of any of Seller or any of its Subsidiaries of any nature (except for any rights to insurance recoveries thereunder required to be paid to other Persons under any Order of the Bankruptcy Court relating to any debtor-in-possession financing obtained by the Selling Entities) with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, in each case to the extent they are exclusively related to other Assets, Assumed Liabilities or the operation of such other Assets;

(x)     the amount of and all rights to any proceeds received by Seller or any of its Subsidiaries in respect of (x) the loss, destruction or condemnation of any Assets occurring prior to, on or after the Closing or (y) any Assumed Liabilities or the operation of such Assets;

(xi)     all warranty or indemnity claims that may be made against any Person, other than Seller or any Affiliate thereof, under any Assigned Contract, in each case, exclusively relating to the Assets, or any products or services provided in connection therewith;

(xii)     all Owned Intellectual Property all rights to assert, defend, sue, and recover damages for any past, present and future infringement, misuse, misappropriation, impairment, unauthorized use or other violation of any rights in or to any such Owned Intellectual Property and any and all corresponding rights that have been, now or hereafter may be secured throughout the world with respect to any Owned Intellectual Property;

(xiii)     [the Seller Benefit Plans set forth on Schedule 2.01(b)(xiii) (the "Assumed Plans"), and in each case, all assets held with respect to the Assumed Plans[Intentionally Deleted] ;

(xiv)     the Collective Bargaining Agreements set forth on Schedule 2.01(b)(xiv) (the "Assumed CBAs");]5[Intentionally Deleted]

(xv)     all goodwill and other intangible assets exclusively related to the Assets, including all customer relationships, all rights under any confidentiality agreements executed by any third party for the benefit of Seller or any of its Subsidiaries to the extent relating to the Assets, and all information and documents related thereto (other than the Excluded Records);

(xvi)     to the extent exclusively related to the Business, all rights of Seller or any of its Subsidiaries under non-disclosure or confidentiality, non-compete, or non-

---

5 Note to Draft: Parties to discuss whether Buyer desires any Seller Benefit Plans or Collective Bargaining Agreements, in each case to the extent they are available for assumption

solicitation agreements with any current or former employees, or current or former directors, consultants, independent contractors and agents of Seller or any of its Subsidiaries or any of their Affiliates or with third parties in respect of the Business;

(xvii)    all rights to any credits, statements, rebates (including vendor or supplier rebates), reimbursement or rights of set off to the extent exclusively related to the Business;

(xviii)    any rights, claims or causes of action as of the Closing of Seller or any of its Subsidiaries relating to or arising against suppliers, vendors, merchants, manufacturers, counterparties to leases, counterparties to licenses, and counterparties to any Assigned Contracts or Real Property Interests in respect of the Business or the Assets, as applicable; and

(xix)    all prepaid and deferred items, including any royalties, advance payments, prepayments, prepaid expenses, prepaid rentals prepaid assets, unbilled charges, fees, security and other deposits or the like (excluding prepaid Taxes of Seller or any of its Subsidiaries or with respect to the Assets except to the extent taken into account in determining Property Tax Credit Amount ), in each case, related to the Assets and made by or on behalf of Seller or its Subsidiaries before the Closing Date, to the extent related to the period after the Closing.

Section 2.02.   *Excluded Assets.*

Notwithstanding the foregoing, nothing herein will be deemed to constitute an agreement to sell, transfer, assign or convey the Excluded Assets to Buyer, and the Selling Entities will retain all right, title and interest to, in and under the Excluded Assets.  The term "**Excluded Assets**" means the following assets, rights and properties of the Selling Entities:

(a)    Any amounts (including the Purchase Price) paid or payable to Seller or any of its Subsidiaries pursuant to this Agreement or any other Transaction Document;

(b)    any shares of capital stock or other equity interest of Seller or any of Seller's Subsidiaries or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of Seller or any of Seller's Subsidiaries;

(c)    all assets, rights, properties and interests to be acquired, or available to be acquired, under that certain Asset Purchase Agreement dated as of February 16, 2020, by and among Seller, the Subsidiaries of Seller party thereto and Dairy Farmers of America Inc. (the "DFA APA")[Intentionally Deleted];

(d)    all minute books and other corporate books to the extent relating to a Selling Entity's organization or existence, and all stock ledgers, corporate seals and stock certificates of Seller or any of its Subsidiaries;

(e)    all Excluded Records;

(f)    all Excluded Contracts;

(g)     all rights to any credits, statements, rebates or reimbursement for any costs borne by Seller or any of its Subsidiaries or Tax refunds or credits, in each case attributable to any period (or portion thereof) ending prior to the Closing Date;

(h)     all rights to any Tax refunds or credits attributable to any period (or portion thereof) ending on or prior to the Closing Date; and to any refunds or credits with respect to Property Taxes that are assessed on, or in respect of, the Assets and attributable to any Post-Closing Tax Period (or portion thereof) that were paid by Seller (or any of its Subsidiaries) except to the extent taken into account in determining Property Tax Credit Amount;

(i)     (i) all insurance policies and rights to proceeds thereof that are non-transferable or solely to the extent they are related to the Excluded Assets, Excluded Liabilities or the operation of the Excluded Assets and (ii) the assets set forth on Disclosure Schedule 2.02(i)2.02(i);[6]

(j)     all cash and cash equivalents (including (w) any cash that (A) is collateralizing any letters of credit issued pursuant to any credit agreement or facility or (B) held in trust or any trust account for or on behalf of any Selling Entity, (x) marketable securities, (y) short-term investments and (z) checks, ACH transactions or other wire transfers or drafts deposited or available for deposit, and net of issued but uncleared checks or drafts written or issued by any of Seller or its Subsidiaries) and all Accounts Receivable, in each case, other than any cash or other proceeds received or to which Buyer is or may be entitled under or pursuant to Sections 2.01(b)(viii), 2.01(b)(x), 2.01(b)(xi) and 2.01(xviii).

(k)     all bank accounts, safety deposit boxes, lock boxes and securities accounts of Seller or any of its Subsidiaries and the contents thereof;

(l)     all outside of the ordinary course of business deposits made or required to be made by Seller or any of its Subsidiaries to suppliers or customers after the Petition Date as a result of the filing of the Bankruptcy Cases;

(m)     all rights, claims or causes of action by or in the right of Seller or any of its Subsidiaries, on the one hand, against any current or former director or officer of Seller or any of its Subsidiaries, on the other hand;

(n)     any rights, claims or causes of action of Seller or any of its Subsidiaries under this Agreement, any other Transaction Document or the Confidentiality Agreement;

(o)     each 365 Contract that, as of the Closing, is not designated as a Desired 365 Contract;

(p)     the proceeds of the sale of any Excluded Assets;

(q)     all avoidance actions or similar causes of action arising under sections 544 through 553 of the Bankruptcy Code related to the Assets, including any proceeds thereof (the "**Avoidance Actions**");

---

[6] **Note to Draft**: Schedule to include Seller's existing D&O policy.

(r)    all assets held with respect to all Seller Benefit Plans that are not Assumed Plans; ~~and~~

(s)    those other properties and assets described on Disclosure Schedule 2.02(s)~~(s)~~.[7]

(t)    Seller Benefit Plans, including but not limited to Pension Plans, within the meaning of Section 1.01 of this Agreement.

(u)    Collective Bargaining Agreements within the meaning of Section 1.01 of this Agreement.

(v)    Ray milk supply agreements.

Section 2.03.    *Assumed Liabilities.*

Upon the terms and subject to the conditions of this Agreement, at the Closing, Buyer will assume and agree to discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof), the following Liabilities (collectively, the "**Assumed Liabilities**"):

(a)    *Generally.*  All Liabilities arising from the ownership or operation of the Business or the Assets by Buyer at and after the Closing (including all Liabilities for Taxes arising from the ownership or operation of the Assets by Buyer on or after the Closing Date and the amount of any Property Taxes attributable to a Straddle Period as determined pursuant to Section 8.01(b)~~Section 8.01(b)~~);

(b)    *Assigned Contract*s.  All of the Selling Entities' Liabilities under the Assigned Contracts (other than the Hedge Contracts), to the extent arising or attributable to any period after the Closing or arising on or prior to the Closing to the extent requiring non-monetary performance after the Closing;

(c)    *[Intentionally Deleted]*  ~~*Hedge Contracts*.  All of Seller's and its Subsidiaries' Liabilities under the Hedge Contracts, to the extent arising or attributable to any period after the Closing, including Liability for any termination or similar payments relating thereto;~~

(d)    *Cure Costs.*  All Cure Costs required to be paid by Buyer pursuant to Section 2.05~~Section 2.05~~;

(e)    *Taxes.*  100% of the Transfer Taxes and all Taxes taken into account in determining Property Tax Debit Amount;

(f)    *Transferred Employees; ~~Assumed Plans; Assumed CBAs~~.*  All Liabilities ~~(i)~~ owed to any Transferred Employee ~~or (ii)~~(i) arising under any Assumed Plans and Assumed CBAs, in each

---

[7] ~~**Note to Draft**: Schedule 2.02(s) to include certain of Seller's closed and/or inactive plants for which sale transactions are already pending.~~

~~ease,~~ to the extent arising or attributable to any period after the Closing ~~or arising on or prior to the Closing to the extent requiring performance after the Closing~~; and

(g)     *Environmental.*  All Liabilities relating to the Assets or the Business arising from or relating to any Environmental, Health and Safety Laws or the presence or Release of any Hazardous Substance at, on, under or migrating from any Assets, to the extent arising or attributable to any period at or after the Closing.

Section 2.04.  *Excluded Liabilities.*

Notwithstanding anything herein to the contrary, Buyer will not assume and will not be obligated to assume or be obliged to pay, perform or otherwise discharge or in any other way be liable or responsible for any Liability of Seller or any of its Subsidiaries other than the Assumed Liabilities (such Liabilities, collectively, the "**Excluded Liabilities**").

Section 2.05.  *Cure Costs; Desired 365 Contracts.*

(a)     Disclosure Schedule 2.05(a)~~2.05(a)~~ sets forth a complete list as of the date hereof of all 365 Contracts that Buyer intends to assume at the Closing (the "**Desired 365 Contracts**"). Upon Closing, subject to the terms and conditions hereof, Seller or its Subsidiaries, as applicable will assign the Desired 365 Contracts to Buyer, and Buyer will assume all Liabilities pursuant thereto and will pay or cause to be paid, pursuant to Section 365 of the Bankruptcy Code and the Sale Order, all Cure Costs relating thereto as and when finally determined by the Bankruptcy Court pursuant to the procedures set forth in the Sale Order.

(b)     At any time prior to the Closing Date, but only to the extent consistent with the Bidding Procedures Order and the Bidding Procedures, Buyer will have the right, in consultation with Seller, to provide written notice to Seller of Buyer's election to:

(i)     designate a 365 Contract (including any 365 Contract that is a Desired 365 Contract immediately before such designation, and excluding, for the avoidance of doubt, the Hedge Contracts) as an Excluded Contract, and upon such designation such 365 Contract will constitute an Excluded Contract and Excluded Asset (and, if applicable, will cease to constitute an Asset); and

(ii)     designate a 365 Contract as a Desired 365 Contract, and upon such designation such 365 Contract will constitute an Asset and Assigned Contract and will be conveyed to Buyer under this Agreement at Closing (and, if applicable, will cease to constitute an Excluded Asset), so long as (A) such 365 Contract is added to the Assigned Contracts prior to the entry of any Order of the Bankruptcy Court approving the rejection of such 365 Contract, and (B) the assumption and assignment has been or is approved by the Bankruptcy Court (including through the Sale Order).

(c)     To the extent that Buyer makes a valid designation with respect to any 365 Contracts pursuant to clause (b)~~(b)~~ above, the applicable Exhibits and Schedules to this Agreement will be deemed to have automatically been updated (without action of any Party or Person) to reflect such designation.

23

(d)     If Buyer exercises its rights in clause (b)(b) above to designate a 365 Contract as a Desired 365 Contract or as an Excluded Asset (as the case may be), then the Parties acknowledge and agree that there will be no increase or reduction in the Cash Purchase Price as a result of such designation or change in designation, nor will there be any delay to the Closing.

Section 2.06.   *Assignment of Assets Subject to Consent Requirements.*

Notwithstanding any other provision of this Agreement to the contrary, this Agreement will not constitute an agreement to assign or transfer and will not implement the assignment or transfer of any Asset if (i) an attempted assignment or transfer thereof, without the approval, authorization or consent of, or granting or issuance of any license or Permit by, any Third Party thereto (each such action, a "**Necessary Consent**"), would constitute a breach thereof or of any Applicable Law or Order or in any way adversely affect the rights of Buyer thereunder, (ii) such Necessary Consent has not been obtained and (iii) the Bankruptcy Court has not entered an Order providing that such Necessary Consent is not required.  In such event, subject to the terms and conditions hereof, the Closing will proceed with respect to the remaining Assets, and there will be no reduction in the Purchase Price as a result thereof, and, for a period of 6 months after the Closing Date, (A) Seller and Buyer will use their respective commercially reasonable efforts to obtain the Necessary Consents with respect to any such purchased Asset or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to Buyer as Buyer may reasonably request; *provided* that Seller will not be obligated to pay any consideration or grant any accommodation therefor to any Third Party from whom consent or approval is requested or to initiate any Proceedings to obtain any such consent or approval; and (B) Seller and Buyer will cooperate in a mutually agreeable arrangement, to the extent feasible and without the need for any Necessary Consent , under which Buyer would obtain the benefits and assume the obligations under such purchased Assets in accordance with this Agreement, including subcontracting, sub-licensing, or sub-leasing to Buyer, or under which the Selling Entities would enforce their rights thereunder for the benefit of Buyer with Buyer assuming each applicable Selling Entities' obligations thereunder.

Section 2.07.   *Misallocated Assets.*

Subject to Section 2.06Section 2.06, if after the Closing (i) Buyer or any of its Subsidiaries holds any Excluded Assets or Excluded Liabilities or (ii) Seller or any Subsidiary of Seller holds any Assets or Assumed Liabilities, Buyer, Seller or the applicable Subsidiary of Seller will promptly transfer (or cause to be transferred) such assets or assume (or cause to be assumed) such Liabilities to or from (as the case may be) the other Party.  Prior to any such transfer, the Party receiving or possessing any such asset will hold it in trust for the benefit of such other Party.

Section 2.08.   *Further Assurances.*

From time to time following the Closing, the Parties will execute, acknowledge and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments, and will take such further actions, as may be reasonably necessary or appropriate to assure fully to Buyer and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and to assure fully to Selling Entities and their respective successors and assigns, the assumption of the Assumed Liabilities intended to be assumed by Buyer under this Agreement, and to otherwise

make effective the transactions contemplated hereby; *provided* that nothing in this Section 2.08~~Section 2.08~~ will prohibit Seller or any Subsidiary of Seller from ceasing operations or winding up its affairs following the Closing.

Section 2.09.   *Withholding*.

Buyer shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to any Selling Entity or any other Person such amounts as Buyer is required to deduct and withhold under the Code, or any Tax law, with respect to the making of such payment. To the extent that amounts are so withheld and paid to the applicable Governmental Authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

ARTICLE 3
PURCHASE PRICE

Section 3.01.   *Purchase Price*.

The aggregate purchase price for the purchase, sale, assignment and conveyance of the Selling Entities' respective right, title and interest in, to and under the Assets will consist of the following (collectively, the "**Purchase Price**"):

(a)    An amount in cash equal to Eighteen Million One Hundred Twenty-Nine Thousand and No/100 Dollars ($18,129,000.00)[●] (the "**Cash Purchase Price**"), *plus* the Property Tax Purchase Price ~~Amount~~Adjustment and subject to other typical Closing adjustments such as for utilities, inventory, etc;

(b)    the assumption of the Assumed Liabilities; and

(c)    Cure Costs (to the extent payable under Section 2.05~~Section 2.05~~).

The Purchase Price will be delivered by Buyer as set forth in Section 4.02~~Section 4.02~~.

Section 3.02.   *Good Faith Deposit*.  Buyer has deposited into the Deposit Escrow Account with the Escrow Agent an amount equal to One Million Two Hundred Sixty-Nine Thousand Thirty and No/100 ($1,269,030.00) ~~$[*10%*(i.e., 7%* of the Cash Purchase Price)]~~ (such amount, the "**Deposit Amount**") in cash. The Deposit Amount will be released by the Escrow Agent and delivered to either Buyer or Seller, in accordance with the Bidding Procedures. The Deposit Amount will be distributed out of the Deposit Escrow Account as follows (and Buyer and the Selling Entities agree to promptly deliver joint written instructions to the Escrow Agent to the extent required by the Escrow Agent to effect such distributions as and when required hereunder):

(a)    if the Closing occurs, the Deposit Amount will be delivered to Seller and applied towards the amount payable by Buyer pursuant to Sections 3.01~~3.01~~ and 4.02~~4.02~~;

(b)    if this Agreement is terminated by Seller pursuant to Section 12.01(d)~~Section 12.01(d)~~ or (e)~~(e)~~, the Deposit Amount will be delivered to Seller within two Business Days after

such termination by wire transfer of immediately available funds to the accounts designated in writing by Seller; and

(c)    if this Agreement is terminated for any reason other than by Seller pursuant to Section 12.01(d)Section 12.01(d) or (e)(e), the Deposit Amount will be returned to Buyer within two Business Days after such termination by wire transfer of immediately available funds to the accounts designated in writing by Buyer.

ARTICLE 4
CLOSING

Section 4.01.    *Closing Date.*

Subject to the satisfaction of the conditions set forth in Article 9Article 9, Article 10Article 10 and Article 11Article 11 hereof (or the waiver thereof by each Party entitled to waive that condition), the closing of the sale of the Assets and the assumption of the Assumed Liabilities contemplated hereby (the "**Closing**") will take place remotely via the exchange of electronic documents and signatures by electronic mail on the date that is two Business Days after the satisfaction or waiver of the conditions set forth in Article 9Article 9, Article 10Article 10 and Article 11Article 11 (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another place, date or time is agreed to in writing by the Selling Entities and Buyer; provided, however, that Closing shall not occur later than the Outside Date (hereinafter defined in Section 12.01(b)(i). The date and time at which the Closing actually occurs is hereinafter referred to as the "**Closing Date.**" For purposes of this Agreement, from and after the Closing, the Closing shall be deemed to have occurred at 12:01 am (prevailing Eastern Time) on the Closing Date.

Section 4.02.    *Payments on the Closing Date*.

At the Closing, Buyer will pay an amount equal to the Cash Purchase Price in cash by wire transfer of immediately available funds to the accounts designated in writing by Seller at least three Business Days prior to the Closing Date.

Section 4.03.    *Buyer's Deliveries.*

At the Closing, Buyer will deliver or cause to be delivered to Seller (or such other Persons where so designated):

(a)    the payments required to be made at the Closing pursuant to Section 4.02Section 4.02;

(b)    a Master Assignment and each other Transaction Document to which Buyer is a party, duly executed (and acknowledged, where applicable) by Buyer; and

(c)    the certificates of Buyer to be received by Seller pursuant to Section 11.01Section 11.01 and Section 11.02Section 11.02.

Section 4.04.    *The Selling Entities' Deliveries.*

26

At the Closing, the Selling Entities will deliver to Buyer:

(a)     a Master Assignment and each other Transaction Document to which a Selling Entity is a party (including letters-in-lieu of transfer orders), duly executed (and acknowledged, where applicable) by such Selling Entity;

(b)     the certificates of the Selling Entities to be received by Buyer pursuant to Section 9.01Section 9.01 and Section 9.02Section 9.02;

(c)     a copy of the Sale Order as entered by the Bankruptcy Court;

(d)     possession of each Owned Real Property, together with duly executed special warranty deeds for each Owned Real Property conveying fee simple title in such Owned Real Property to Buyer, subject only to Permitted Encumbrances; and

(e)     a certificate of non-foreign status of each Selling Entity (or, if such Selling Entity is a disregarded entity within the meaning of Treasury Regulations Section 1.1445-2(b)(2)(iii), the entity that is treated as the transferor of property for U.S. federal income tax purposes) meeting the requirements of Treasury Regulation Section 1.1445-2(b)(2).

ARTICLE 5
REPRESENTATIONS AND WARRANTIES OF SELLING ENTITIES[8]

Except as (i) disclosed in any Seller SEC Document filed and publicly available as of the date hereof (but excluding any such disclosure set forth in any section thereof entitled "Risk Factors" or in any "forward-looking statements" section thereof that is cautionary, forward-looking or predictive in nature set forth therein, in each case other than any specific historical factual information contained therein, which will not be excluded), (ii) disclosed in connection with the Bankruptcy Cases or (iii) set forth in the Disclosure Schedules, each Selling Entity jointly and severally represents and warrants to Buyer, as of the date hereof and as of the Closing Date, as follows:

Section 5.01.   *Organization and Good Standing.*

Seller and each Subsidiary of Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.  Subject to the limitations imposed on Seller or any such Subsidiary as a result of having filed a petition for relief under the Bankruptcy Code, Seller and each such Subsidiary has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.  Seller and each Subsidiary of Seller is duly qualified, licensed or otherwise authorized to do business and is in good standing in each jurisdiction where the character of its business or the nature of its properties makes such qualification, licensing or authorization necessary, except for such failures

---

[8] **Note to Draft**: As a general matter, Seller reserves the right to modify certain representations as necessary to tailor to the specific Assets that Buyer proposes to acquire.

to be so qualified, licensed, authorized or in good standing as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.02.  *Authority; Validity.*

Subject to entry of the Sale Order and such other authorization as is required by the Bankruptcy Court, each Selling Entity has the requisite power and authority necessary to enter into, deliver and perform its respective obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby, and the execution, delivery and performance of this Agreement and such other Transaction Documents and the consummation by such Selling Entity of the transactions contemplated herein and therein have been duly and validly authorized and approved by the board of directors or other governing body, as applicable, of such Selling Entity and no other corporate proceedings on the part of such Selling Entity or vote of such Selling Entity's stockholders or members are necessary to authorize the execution and delivery by such Selling Entity of this Agreement and the consummation of the transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by such Selling Entity and each other Transaction Document required to be executed and delivered by such Selling Entity at the Closing will be duly and validly executed and delivered by such Selling Entity at the Closing.  Subject to entry of the Sale Order and assuming the due authorization, execution and delivery by the other Parties, no other action on the part of such Selling Entity, its Affiliates or their respective Representatives is necessary to authorize this Agreement and the other Transaction Documents to which such Selling Entity is or will be a party and this Agreement and such other Transaction Documents, when so executed and delivered, will constitute the legal, valid and binding obligations of such Selling Entity, enforceable against such Selling Entity in accordance with their respective terms, and, except in each case as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Applicable Laws affecting the enforcement of creditors' rights generally and by general principles of equity, including principles of commercial reasonableness, good faith and fair dealing, regardless of whether such principles are considered in a proceeding at law or in equity.

Section 5.03.  *Governmental Approvals; No Conflict.*

Except for (a) entry of the Sale Order and/or the Bidding Procedures Order, (b) notices, filings and consents required in connection with the Bankruptcy Cases, (c) any applicable notices, filing, consents or approvals under any applicable antitrust, competition or trade regulation or other Applicable Laws, including the HSR Act, and (d) items listed on Disclosure Schedule 5.035.03, if any, none of the Selling Entities is required to give any notice to, make any filing with or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery by such Selling Entity of this Agreement and the other Transaction Documents to which it is or will be a party or the consummation or performance by such Selling Entity of any of the transactions contemplated hereby and thereby, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  When the consents and other actions described in the preceding sentence, including entry of the Sale Order, have been obtained and taken, the execution and delivery by the Selling Entities of this Agreement and the other Transaction Documents to which such Selling Entity is or will be a party and the consummation of the transactions provided for herein and therein will not result in the

breach or violation of any of the terms and provisions of, or constitute a default (with or without notice or lapse of time or both) under, or conflict with, or cause any acceleration of any obligation of any Selling Entity under (i) the certificate of incorporation, bylaws or other governing documents of such Selling Entity, (ii) any Order applicable to such Selling Entity or any of the Assets owned or held by it or on its behalf, (iii) any Applicable Law, or (iv) require any consent under, or give any third party any rights of termination, amendment, suspension, revocation or cancellation of, any note, bond, mortgage or indenture, Material Contract, agreement, lease, sublease, license, Permit, franchise or other instrument or arrangement to which any of the Selling Entities is a party as of the Closing and which constitutes an Asset or Assumed Liability, or result in the creation of any Encumbrance (other than a Permitted Encumbrance) as of the Closing on any of the Assets, except to the extent that any such rights of termination, amendment, acceleration, suspension, revocation or cancellation as a result of such Encumbrance will not be (x) material or (y) enforceable against such Asset or Assumed Liability following the Closing in accordance with the Sale Order.

Section 5.04.  *Seller SEC Documents*.

(a)     All of the Seller SEC Documents (i) as of its date, complied as to form in all material respects with the applicable requirements of the United States Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder (the "**Securities Act**"), or the United States Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder (the "**Exchange Act**"), as the case may be, as in effect on the date so filed, (ii) did not, at the time it was filed (or, if subsequently amended or supplemented, at the time of such amendment or supplement), contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading, and (iii) to the extent they contained consolidated financial statement of Seller, such financial statements were prepared in accordance with GAAP applied on a consistent basis throughout the periods indicated (except as may be indicated in the notes thereto and in the case of unaudited quarterly financial statements, as permitted by Form 10-Q under the Exchange Act).

(b)     Except for matters disclosed in the Seller SEC Documents (excluding any "risk factors" or forward looking statements or similar disclosure contained therein), since January 1, 2017, no Material Adverse Effect has occurred.

Section 5.05.  *No Undisclosed Material Liabilities*.

As of the date hereof, there are no material Liabilities (whether accrued, absolute, contingent or otherwise) of the Business, other than (a) Liabilities incurred in the ordinary course of business since the Petition Date; (b) Liabilities incurred in connection with the transactions contemplated by this Agreement or disclosed in Disclosure Schedule 5.05~~5.05~~; and (c) Liabilities that will constitute Excluded Liabilities.

Section 5.06.  *Absence of Certain Changes*.

From the Petition Date, the Business has been conducted, and the Assets have been maintained and operated, in the ordinary course and consistent in all material respects with past

practices and there has not been any event, occurrence, development or state of circumstances or facts that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.07.   *Legal Proceedings.*

Except for the Bankruptcy Cases and any adversary Proceedings or contested motions commenced in connection therewith, after giving effect to the Sale Order, there is no Proceeding or Order pending, outstanding or, to the Knowledge of each Selling Entity, threatened by any Person, relating to the Business, the Assets or Assumed Liabilities (a) that is material to the Business or that would reasonably be expected to give rise to any material Liability of Buyer or be materially adverse to the ownership or use by Buyer of the Assets after the Closing, as such Assets are presently owned and used (or held for use) by Seller and/or its Subsidiaries, as applicable, (b) that would challenge the validity or enforceability of the obligations of any Selling Entity under this Agreement and the other Transaction Documents to which it is or will be a party or (c) that is against any Selling Entity and seeks to prevent, restrain, materially delay, prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or by any of the other Transaction Documents. There is no Order enjoining any Selling Entity from engaging in or continuing any conduct or practice, or requiring such Selling Entity to take any material action, in connection with the ownership, lease, possession, use or operation of the Assets owned or held by such Selling Entity, and such Selling Entity is not, nor are any of its respective Affiliates, is subject to any outstanding Order relating to the Business, the Assets, or Assumed Liabilities other than, in each case, Orders of general applicability.

Section 5.08.   *Compliance with Laws; Permits.*

(a)      The ownership and operation of the Business or the Assets by the Selling Entities is and since January 1, 2017, has been, in material compliance with all Applicable Laws.

(b)      The Selling Entities have obtained and maintained all necessary material Permits with regard to the ownership or operation of the Assets and the conduct of the Business, (ii) no Selling Entity has received written notice of material default under any such Permit and (iii) no material violations exist in respect of Permits, except for such non-compliance and such facts, conditions or circumstances, the subject of which have been finally resolved.

Section 5.09.   *Food Safety Matters*.

Except as otherwise set forth on Disclosure Schedule 5.09~~5.09~~, the Business is, and has been since January 1, 2017, conducted in material compliance with all Applicable Laws related to the development, cultivation, manufacture, production, import, export, packaging, packing, labeling, handling, storage, transportation, distribution, purchase, sale, advertising or marketing of food and related products (collectively, "**Applicable Food Safety Laws**"). Without limiting the generality of the immediately preceding statement, except as otherwise set forth on Disclosure Schedule 5.09~~5.09~~:

(a)      no Selling Entity has sold or distributed any Food and Beverage Products, and there are not any Food and Beverage Products currently in inventory, which are or were "adulterated,"

30

"misbranded," or otherwise violative in any material respect within the meaning of the FDC Act, and/or under any other Applicable Food Safety Law;

(b)     all of the operations of the Business are and have been in material compliance with all Applicable Laws issued or implemented by the FDA, USDA, FTC and/or any other comparable Governmental Authority, including those related to recordkeeping, prior notice of imported food, food safety, hazard analysis and preventive controls, sanitary transportation, food additives, food contact substances, supplier verification, food facility registration, current good manufacturing practices, allergen control, and food labeling and advertising;

(c)     no Selling Entity has been subject to any inspection identifying critical violations of Applicable Food Safety Laws, FDA Form 483, warning letter, untitled letter, finding of deficiency, investigation, or any other compliance or enforcement Proceeding, or other correspondence or notice alleging or asserting material noncompliance with any Applicable Food Safety Laws or Permit, from or by any Governmental Authority with respect to the Business, nor are there any such Proceedings pending or threatened in writing;

(d)     since January 1, 2017, no Selling Entity has received any material written, oral or other notice from the FDA, USDA, FTC or any other comparable Governmental Authority in connection with any Food and Beverage Product manufactured, sold or distributed by or on behalf of the Business;

(e)     since January 1, 2017, no Selling Entity has been excluded, suspended or debarred from participation under any government program with respect to the Business pursuant to any Applicable Food Safety Law;

(f)     since January 1, 2017, there have been no recalls, withdrawals, field notifications or other notices of action relating to any lack of safety or regulatory compliance of or regarding any Food and Beverage Product cultivated, manufactured, produced, packaged, labeled, distributed or sold by or on behalf of the Business, whether ordered by a Governmental Authority or undertaken voluntarily by any Selling Entity, and there have been no claims or other instances of the presence of or exposure to any food contaminants or adulterants, food borne pathogens, food poisoning, pests, or other Hazardous Substance in or related to any such products, nor any other food-related conditions with respect to the Business;

(g)     each Food and Beverage Product cultivated, manufactured, produced, packaged, labeled, distributed or sold by or on behalf of the Business conforms in all material respects to any promises, claims or affirmations of fact made on the container or label for such product or in connection with its distribution or sale (including, without limitation, all nutrition facts, ingredient statements, nutrient content claims, structure/function claims, health claims and to the extent that such products are being marketed as such, "non-GMO," "fresh," "organic," "all natural," "sustainable," "U.S. grown," "made with natural ingredients," "gluten free," "made with rBST-free milk," "kosher," "all natural," "no corn syrup," "no artificial colors, flavors, or sweeteners," "nutritious" or with similar claims) and the Selling Entities possess appropriate certifications or scientifically reliable materials to substantiate all such promises, claims and affirmations of fact; and

(h)     each Food and Beverage Product cultivated, manufactured, produced, packaged, labeled, distributed or sold by or on behalf of the Business complies in all material respects with FDA's requirements in Title 21 of the Code of Federal Regulations section 100.100 for nonfunctional slack fill and with any other similar state or local requirements, and no Selling Entity has received any correspondence from any Governmental Authority alleging that any Food and Beverage's container and/or packaging is deceptive because of nonfunctional slack fill.

Section 5.10.   Material Contracts.

(a)     Disclosure Schedule 5.105.10 sets forth a complete list of 365 Contracts (or in the case of Disclosure Schedule 5.105.10(a)(ii)(A) and 5.105.10(a)(ii)(B), counterparties to 365 Contracts) identified as of the date hereof that fall within the following categories (collectively, the "**Material Contracts**"):

(i)     any material lease or sublease of real property included as an Asset (whether a Selling Entity is lessor, sublessor, lessee or sublessee);

(ii)     other than purchase orders issued in the ordinary course of business, any Contract for the purchase or supply of goods or services providing for either (A) annual payments by the Business of $5,000,000 or more; or (B) annual receipts by the Business of more than $10,000,000 in any calendar year;

(iii)     any partnership agreement, joint venture agreement, strategic alliance, stockholders' agreement or limited liability company agreement;

(iv)     any Contract relating to the acquisition or disposition of any material business (whether by merger, sale of stock, sale of assets or otherwise) pursuant to which a Selling Entity or Buyer would have continuing obligations applicable to the Business or the Assets following the date of this Agreement;

(v)     any Contract where the Business is, and Buyer would be required to become, obligor or guarantor relating to indebtedness, except for any Related Party Agreements;

(vi)     any Contract containing covenants expressly limiting, individually or in the aggregate, in any material respect the freedom of the Business or Assets to compete with any Person in a product or line of business or operate in any jurisdiction;

(vii)     any Hedge Contract;

(viii)     any Contract that contains exclusivity, requirements or similar provisions binding on the Business or the Assets;

(ix)     any Contract containing "most favored nation" provisions applicable to the Business or the Assets;

(x)     each Collective Bargaining Agreement that is an Assumed CBA;

32

(xi)    any Contract pursuant to which any of Selling Entity (A) licenses or is otherwise permitted by a third party to use any Intellectual Property material to the Business (other than any "shrink wrap," "commercially available software package" or "click through" license that is generally available on and actually licensed under standard terms) or (B) licenses any material Owned Intellectual Property to a third party (other than any non-exclusive licenses granted in the ordinary course of business); or

(xii)    any Related Party Agreement.

(b)    Except as would not, individually or in the aggregate, reasonably be expected to materially affect value ascribed to the Material Contracts, each Material Contract is a legal, valid and binding obligation of the Selling Entity party thereto and, to the Knowledge of each Selling Entity, the other parties thereto in accordance with its terms and conditions, and is enforceable against such Selling Entity except as such legality, validity and enforceability may be limited by (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, (ii) equitable principles of general applicability (whether considered in a proceeding at law or in equity), and (iii) the obligation to pay Cure Costs.  No event has occurred which, with the passage of time or the giving of notice, or both, would constitute a material default under or a material violation of any Material Contract or would cause the acceleration of any obligation of any Selling Entity or, to the Knowledge of each Selling Entity, any other party thereto or the creation of a lien upon any Asset.

Section 5.11.   *Intellectual Property.*

(a)    Disclosure Schedule 5.11(a)5.11(a) sets forth a list of all registrations and applications for registration of the Owned Intellectual Property as of the date hereof (collectively, "**Registered Intellectual Property**"), setting forth for each item (i) the record owner, and, if different, the legal owner and beneficial owner of such item; (ii) the jurisdiction in which such item is issued, registered or pending; (iii) the issuance, registration, filing or application date and serial or identification number of such item; and (iv) for domain names, the extension and jurisdiction (if any).  The Registered Intellectual Property (A) has not been abandoned, canceled or otherwise compromised; (B) has been maintained effective by all requisite filings and renewals; and (C) remains in full force and effect.

(b)    The Selling Entities are the sole and exclusive owner of the Owned Intellectual Property free and clear of all Encumbrances (other than Permitted Encumbrances). The Registered Intellectual Property is subsisting and, to the Knowledge of each Selling Entity, valid and enforceable.  Except as limited by Section 365(c)(1)(A) of the Bankruptcy Code, the Selling Entities have a right to use, all material Intellectual Property (other than Owned Intellectual Property) used or held for use in connection with the operation of the Business by the Selling Entities (the "**Licensed Intellectual Property**") as currently conducted, free and clear of all Encumbrances (other than Permitted Encumbrances).  To the Knowledge of each Selling Entity, the Owned Intellectual Property together with the Licensed Intellectual Property constitute all of the Intellectual Property necessary for the operation of the Business as currently conducted in all material respects (it being understood that the foregoing is not a representation or warranty regarding infringement, misappropriation or other violation of any Intellectual Property of any Person).

33

(c)     No Proceedings are pending or, to the Knowledge of each Selling Entity, threatened against any Selling Entity before a Governmental Authority with regard to the ownership or use by any Selling Entity of any Owned Intellectual Property or the validity, scope or enforceability of any Registered Intellectual Property.  To the Knowledge of each Selling Entity, the operation of the Business by the Selling Entities does not infringe, misappropriate or otherwise violate, and, since January 1, 2017, has not infringed, misappropriated or otherwise violated, any Intellectual Property of any Person in any material respect.  No Selling Entity has received any written notice since January 1, 2017 alleging that the operation of the Business by any Selling Entity infringes, misappropriates, or otherwise violates the Intellectual Property of any other Person.  To the Knowledge of each Selling Entity, no Person is infringing, misappropriating or otherwise violating any Owned Intellectual Property and no such Proceedings are currently being asserted or threatened in writing against any Person by any Selling Entity.

(d)     The Selling Entities have taken commercially reasonable steps to protect and maintain any material trade secrets and know-how included in the Owned Intellectual Property, and, to the Knowledge of each Selling Entity, there are no unauthorized uses or disclosures of any such trade secrets or know-how.

(e)     Except as set forth in Disclosure Schedule 5.11(e)5.11(e), no Selling Entity owns any proprietary software that is used or held for use in connection with the operation of the Business.

(f)     The information technology systems owned or controlled by each Selling Entity in connection with the Business (the "**Business IT Assets**") (i) operate and perform and have been maintained, in each case, in all material respects in accordance with their documentation and functional specifications and otherwise as required for the conduct of the Business as currently conducted in all material respects; (ii) have not malfunctioned or failed in any material respect; and (iii) do not contain any Malicious Code in any material respect.  Each Selling Entity has taken technical, physical and organizational steps commercially reasonable in accordance with customary industry standards and practices to protect the confidentiality, integrity and security of Business IT Assets (and all information and transactions stored or contained therein or transmitted thereby) from Malicious Code, unauthorized use, access, interruption, modification or corruption.  Each Selling Entity has in place commercially reasonable data backup, data storage, system redundancy and disaster avoidance recovery plans, as well as a commercially reasonable business continuity plan, in each case consistent with customary industry practices.  Since January 1, 2017, to the Knowledge of each Selling Entity, there have been no unauthorized intrusions or breaches of security with respect to the Business IT Assets, and, since January 1, 2017, there have been no Proceedings initiated or, to the Knowledge of each Selling Entity, threatened against any Selling Entity with regard to the use or maintenance of its Business IT Assets.

(g)     The Selling Entities take and have since January 1, 2017 taken commercially reasonable measures to ensure that Personal Information collected, stored or used by the Selling Entities is protected against unauthorized access, loss, damage, use, sharing, modification, or other misuse, and, since January 1, 2017, there has been no material unauthorized access, loss, damage use, sharing, modification, or other misuse of any such Personal Information by any Selling Entity.  No Proceeding relating to any material improper use, unauthorized access or disclosure of, or a material breach in the security of, any Personal Information has been made since January 1, 2017

or, to the Knowledge of each Selling Entity, is threatened against any Selling Entity.  Since January 1, 2017, no Selling Entity has been notified or has been required by any Applicable Law, Governmental Authority or other agreement to notify in writing any Person of any material security breach or material unauthorized use or disclosure of Personal Information.  No Selling Entity has received any notice since January 1, 2017 of any Proceedings against any Selling Entity with respect to an alleged violation of Applicable Laws with respect to Personal Information processed by such Selling Entity.

Section 5.12.  *Environmental, Health and Safety Matters.*

Except for facts, circumstances or conditions that would not, individually or in the aggregate, reasonably be expected to be material to the Business or be materially adverse to the ownership or use by Buyer of the Assets:

(a)    The Assets owned or held by the Selling Entities and their operations are in compliance with applicable Environmental, Health and Safety Laws;

(b)    The Selling Entities hold and are in compliance with all material Permits required under Environmental, Health and Safety Laws in connection with the ownership and operation of the Assets and Business, and all such Permits are in full force and effect;

(c)    With respect to each Selling Entity's operations of the Assets owned or held by such Selling Entity, such Selling Entity has not received any written notice alleging non-compliance with or violation of applicable Environmental, Health and Safety Law from any Governmental Authority or other third party, the subject of which is unresolved;

(d)    There is no Proceeding or Order pending, outstanding, or threatened in writing, to the Knowledge of each Selling Entity, against any Selling Entity pursuant to Environmental, Health and Safety Law with respect to the Assets owned or held by such Selling Entity or such Selling Entity's operation of such Assets;

(e)    There has been no Release of Hazardous Substances by any Selling Entity or any third Person on, under, in or at any Owned Real Property or Leased Real Property included in the Assets; and

(f)    The Selling Entities have made available to Buyer true, complete and correct copies of all material, non-privileged environmental site assessments and audit reports (including Phase I or Phase II reports) prepared since January 1, 2017 relating to environmental, health and safety matters concerning the Business and Assets prepared on behalf of any Selling Entity.

Section 5.13.  *Title.*

(a)    Disclosure Schedule 5.13(a)5.13(a)(i) sets forth a complete and accurate list of all of the Real Property Interests owned in fee by Seller or any of its Subsidiaries as of the date hereof, that are used, or held for use, by the Business (the Real Property Interests listed or required to be listed on Disclosure Schedule Section 5.13(a)5.13(a)(i), the "**Owned Real Property**"), specifying the street address, the current owner and the current use of each parcel of Owned Real Property.  Each Selling Entity has good and valid fee simple title to all Owned Real Property owned by it,

free and clear of all Encumbrances, except for Permitted Encumbrances and Encumbrances listed on Disclosure Schedule 5.13(a)5.13(a)(ii). The Selling Entities shall release and remove, at or prior to Closing, all monetary liens and encumbrances encumbering the Owned Real Property and created by or on behalf of one or more of the Selling Entities or arising out of the ownership of one or more of the Selling Entities, including but not limited to, all unpaid taxes and assessments assessed, levied or imposed upon the Owned Real Property which are due and payable, but subject to customary adjustment at Closing among the parties. No Selling Entity currently leases any parcel or any portion of any parcel of any Owned Real Property to any other Person.

(b)      Disclosure Schedule 5.13(b)5.13(b)(i) sets forth a list and brief description of all Real Property Interests that are leased by Seller or any of its Subsidiaries as of the date hereof, that are used, or held for use, by the Business (the Real Property interests listed or required to be listed on Disclosure Schedule 5.13(b)(i), the "**Leased Real Property**"), and a description of the associated leases therefore (the "**Leases**"). To the Knowledge of each Selling Entity, each of the Leases constitutes the legal, valid, binding and enforceable obligation of the applicable Selling Entity and is in full force and effect in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Applicable Laws relating to or affecting creditors' rights generally or general principles of equity (regardless of whether enforcement is sought in a Proceeding in equity or at law). The applicable Selling Entity has good and valid leasehold title to all of the Leased Real Property free and clear of all Encumbrances, except for Permitted Encumbrances and Encumbrances listed on Disclosure Schedule 5.13(b)5.13(b)(ii). The Selling Entities have made available to Buyer true, correct and complete copies of each Lease.

(c)      No event has occurred and, to the Knowledge of each Selling Entity, no circumstances exist that, with the delivery of notice, the passage of time or both, would constitute such a material breach or material default, or permit the termination or modification of, or acceleration of rent under, any Lease. No Selling Entity has received written notice of any claim by any Person under any such Lease alleging that a Selling Entity has committed a breach of any such Lease, and has not provided or received any written notice of any intention to terminate any such Lease.

(d)      The Owned Real Property and Leased Real Property constitute all of the real property rights necessary to own and conduct the Business in all material respects as currently owned, operated and conducted by the Seller or any of its Subsidiaries.

(e)      There are no condemnation, expropriation or other Proceedings with eminent domain pending or, to the Knowledge of each Selling Entity, threatened, with respect to any Real Property Interest.

(f)      The buildings and improvements on the Owned Real Property are located within the boundary lines of the described parcels of land, are not in material violation of applicable setback requirements, zoning laws, and ordinances (and none of the properties or buildings or improvements thereon are subject to "permitted non-conforming use" or "permitted non-conforming structure" classifications), and do not encroach on any easement which may burden the land in any material respect.

36

(g)     There are no assets or properties that are necessary for the use, maintenance of the Owned Real Property or the Leased Real Property and the operation of the Business as currently operated that are not included in the assets to be transferred under this Agreement, except for such assets where the omission thereof would not materially impede the use or maintenance of the applicable Owned Real Property or Leased Real Property.

(h)     All water, sewer, gas, electric, telephone and drainage facilities and all other utilities and public or quasi-public improvements related thereto upon or adjacent to the Owned Real Property required by Applicable Law or required for the operation of the Business at the Owned Real Property, are (i) installed and serve the Owned Real Property and (ii) have direct access to the Owned Real Property from a public road or right of way.

Section 5.14.   *Matters Related to Assets; Casualty Losses*.

(a)     All of the rights, properties, interests, equipment and other tangible and intangible assets that constitute Assets are owned, leased or used (or held for use) by the Selling Entities and are free and clear of all Encumbrances (other than Permitted Encumbrances).

(b)     All of the equipment, machinery, vehicles and other tangible assets that constitute Assets (i) in good condition and repair, except for ordinary wear and tear and ordinary and routine repairs and maintenance requirements, for assets of comparable age and usage, (ii) not in need of any repairs, which, if not made, would materially and adversely affect the integrity or safety of such Assets, and (iii) suitable for use by the Selling Entities to conduct the Business as currently conducted by the Selling Entities with respect to such Assets, in each case in all material respects.

(c)     There has been no Casualty Loss (whether or not covered by insurance) materially affecting any of the Assets owned or used (or held for use) by Seller or any of its Subsidiaries that has not subsequently been completely repaired, replaced or restored.

Section 5.15.   *Inventory*. The inventories of the Selling Entities associated with, related to or used in connection with the Business are saleable in the ordinary course of business, other than for normal discounts in the ordinary course of business and except that milk products are perishable.

Section 5.16.   *Insurance*.

A true, correct and complete list of the material insurance policies related to the Business currently conducted by Seller and its Subsidiaries with respect to the Assets owned or held by Seller and its Subsidiaries (including policy periods and the amounts of coverage, limits and deductibles) as of the date hereof is attached hereto as Disclosure Schedule 5.16~~5.16~~ (collectively, the "**Insurance Policies**"). Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, all of the Insurance Policies are in full force and effect. To the Knowledge of each Selling Entity, no event has occurred, including the failure by Seller or if applicable, any such Subsidiary of Seller, to give any notice or information or the delivery of any inaccurate or erroneous notice or information, which materially limits or impairs the rights of Seller or any of its Subsidiaries under any of the Insurance Policies.  Except as set forth in Disclosure Schedule 5.16~~5.16~~, no material claim is outstanding under any of the Insurance

Policies, and no carrier of any Insurance Policy of Seller or any such Subsidiary has asserted in writing any denial of coverage of any material claim.

Section 5.17.   *Security Arrangements*.

All of the bonds, letters of credit and guarantees posted by Seller or any of its Subsidiaries with Governmental Authorities or Third Parties and relating to the Assets owned or held by Seller or any such Subsidiary as of the date hereof are described on Disclosure Schedule 5.17~~5.17~~.

Section 5.18.   *Customers and Suppliers.*

(a)   Disclosure Schedule 5.18(a)~~5.18(a)~~ contains a list of the 25 largest customers, including distributors, of the Business, taken as a whole, for the twelve (12) months ended December 31, 2019 (determined on the basis of the total dollar amount of sales) ("**Major Customers**"), showing the total dollar amount of gross sales to each such Major Customer during such period.

(b)   Disclosure Schedule 5.18(b)~~5.18(b)~~ contains a list of the 25 largest suppliers of the Business, taken as a whole, for the twelve (12) months ended December 31, 2019 (determined on the basis of the total dollar amount of purchases) ("**Major Suppliers**"), showing the total dollar amount of purchases by the Business from each such Major Supplier during such period.

Section 5.19.   *Anti-Corruption*.

(a)   No Selling Entity, nor any of their respective Representatives or other Persons that act for or on behalf of any Selling Entity has since January 1, 2017, in connection with or relating to the Business or the Assets, directly or indirectly, violated the U.S. Foreign Corrupt Practices Act or any other applicable anti-bribery law (collectively, the "**Anti-Corruption Laws**"). The Selling Entities have in place and maintain policies, procedures and controls with respect to the Business that are reasonably designed to promote and ensure compliance with Anti-Corruption Laws in each jurisdiction in which the Business operates. There is no pending or threatened investigation, inquiry, or enforcement Proceeding upon the Business or the Assets by any Governmental Authority regarding any offense or alleged offense under Anti-Corruption Laws. To the Knowledge of each Selling Entity, none of the current officers, directors or employees of any Selling Entity is an employee of any Governmental Authority or of any instrumentality of a Governmental Authority.

(b)   The Business has been conducted and the Assets have been operated in material compliance with all applicable anti-money laundering and financial record-keeping and reporting laws. The Selling Entities have maintained and currently maintain (i) books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the Business, and (ii) internal accounting controls reasonably designed to provide reasonable assurances that all transactions and access to assets of the Business were, have been and are executed only in accordance with management's general or specific authorization. There is no pending or threatened investigation, inquiry, or enforcement Proceeding upon the Business or the Assets by any Governmental Authority regarding any actual or possible violation of any anti-money laundering or financial record-keeping and reporting laws, and since January 1, 2017 there has been no such Proceeding.

Section 5.20.   *Brokers or Finders*.

~~Except for fees and expenses payable to Evercore Group, L.L.C., n~~No Selling Entity has incurred any obligation or Liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable. Selling Entities have incurred an obligation to Evercore Group, L.L.C. for fees and expenses which shall be paid by the Selling Entities at or prior to Closing and for which Buyer shall not be liable,

Section 5.21.   *Employee Benefit Plans; Labor and Employment Matters*.

(a)   Disclosure Schedule 5.21(a)~~5.21(a)~~ contains a complete and accurate list of each material Seller Benefit Plan as of the date hereof.  The Seller has not made available to Buyer a copy of, to the extent applicable, each material Seller Benefit Plan. There will not be any Assumed Plans.  ~~With respect to each Assumed Plan, the Seller has made available to Buyer a copy of, to the extent applicable, (i) each trust related thereto, (ii) the most recent financial statements and actuarial or other valuation reports prepared with respect thereto, (iii) the most recent annual report on Form 5500 required to be filed with the Internal Revenue Service with respect thereto, (iv) the most recent summary plan description and any material modification with respect thereto, and (v) the most recent determination or opinion letter received from the Internal Revenue Service with respect to each Assumed Plan intended to qualify under Section 401 of the Code.~~

(b)   Each Seller Benefit Plan (and any related trust or other funding vehicle) has been maintained, operated and administered in material compliance with applicable Laws and with the terms of such Seller Benefit Plan.  There are no pending or, to the Knowledge of each Selling Entity, threatened in writing material investigations by any Governmental Authority with respect to, or termination proceedings or other material claims, suits or proceedings (except routine claims for benefits payable in the ordinary course) against or involving any Seller Benefit Plan.

(c)   Except pursuant to the Seller Benefit Plans or other agreements or arrangements listed on Disclosure Schedule 5.21(c)~~5.21(c)~~, none of the execution and delivery of this Agreement or any of the other Transaction Documents or the consummation of the transactions contemplated hereby or thereby (alone or in conjunction with any other event, including any termination of employment on or following the Closing) will (i) (i) entitle any Company Employee to any material compensation or benefit, (ii) (ii) accelerate the time of payment or vesting, or trigger any payment or funding, of any compensation or benefits for any Company Employee or trigger any other material obligation under any Seller Benefit Plan or (iii) (iii) result in any material breach or violation of or material default under, or limit Buyer's right with respect to an Assumed Plan) to amend, modify or terminate, any material Seller Benefit Plan.

(d)   Except that would not reasonably be expected to have a Material Adverse Effect, (i) there are no material controversies, strikes, slowdowns, work stoppages or any other material labor disputes involving any Company Employee pending or, to the Knowledge of each Selling Entity, threatened in writing nor have there been any such material controversies, strikes, slowdowns or work stoppages in the past three years and (ii) there are no material grievances or unfair labor practice complaints pending against any of the Selling Entities before the National

Labor Relations Board or any other Governmental Authority with respect to any Company Employee.

(e)     Except that would not reasonably be expected have a Material Adverse Effect, (i) the Selling Entities are in compliance with all Applicable Laws relating to employment or labor, including those related to hiring, background checks, wages, pay equity, hours, collective bargaining and labor relations, classification of independent contractors and employees, equal opportunity, document retention, notice, plant closing and mass layoff, health and safety, employment eligibility verification, immigration, child labor, discrimination, harassment, retaliation, accommodations, disability rights or benefits, affirmative action, workers' compensation, unemployment insurance, employment and reemployment rights of members of the uniformed services, secondment, employee leave issues and the payment of social security and other Taxes, and are not liable for any arrears of wages, other compensation or benefits (other than such Liabilities that have been incurred in the ordinary course of business of the Selling Entities), or any Taxes or penalties for failure to comply with any of the foregoing and (ii) except as set forth in Disclosure Schedule 5.21(e)5.21(e), there is no material employment- or labor-related claim pending against any Selling Entity brought by or on behalf of any Company Employee or any Governmental Authority and no such claim is threatened in writing.

(f)     Disclosure Schedule 5.21(f)5.21(f) sets forth a complete and correct list of all Company Employees who are employees by: name; title or position; status (part-time, full-time, exempt, non-exempt, etc.); whether paid on a salaried, hourly or other basis; current base salary or wage rate; current target bonus; and an indication of whether or not such employee is on leave of absence. Disclosure Schedule 5.21(f)5.21(f) sets forth a complete and correct list of all Company Employees who are independent contractors of any Selling Entity by: job position or function; hourly pay rate or other material compensatory arrangement. Seller shall update Disclosure Schedule 5.21(f)5.21(f) as of seven days prior to the Closing Date.

Section 5.22.   *Taxes*.

(a)     Each Selling Entity has timely filed (taking into account any extensions of time for such filings that have been properly and timely requested) all material Tax Returns that were required to be filed.  All such Tax Returns are complete and accurate in all material respects.  All material Taxes owed by any Selling Entity (whether or not shown on any Tax Return) have been paid.  No Selling Entity is currently the beneficiary of any extension of time within which to file any material Tax Return.  No material claim has ever been made (and remains unsolved) by an authority in a jurisdiction in which a Selling Entity does not file Tax Returns that such Selling Entity is or may be subject to Taxation by that jurisdiction.

(b)     There are no pending or threatened audits, investigations, disputes, notices of deficiency, claims or other actions for or relating to any liability for any material Taxes of any Selling Entity.  No Selling Entity has waived any statute of limitations in respect of Taxes that remain unpaid or agreed to any extension of time with respect to an open Tax assessment or deficiency.

(c)     No Asset (i) constitutes "tax-exempt use property" within the meaning of Section 168(h) of the Code, (ii) is "tax-exempt bond financed property" within the meaning of Section

168(g) of the Code or (iii) secures any debt the interest of which is tax-exempt under Section 103(a) of the Code.

(d)     None of the Selling Entities have been a party to a transaction that is or is substantially similar to a "reportable transaction," as such term is defined in Treasury Regulations Section 1.6011-4(b)(1), or any other transaction requiring disclosure under analogous provisions of state, local or foreign Tax law.

ARTICLE 6
REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to the Selling Entities as of the date hereof and as of the Closing Date as follows:

Section 6.01.   *Organization and Good Standing*.

Buyer Maryland and Virginia Milk Producers Cooperative Association, Incorporated is a [•],  Virginia corporation organized as a cooperative association under Virginia law, duly organized, validly existing and in good standing under the laws of the State Commonwealth of [•]. Virginia. Buyer has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.  Buyer is (or at the Closing will be) duly qualified, licensed or otherwise authorized to do business and is in good standing in the state(s) where the Assets are located and Buyer or Buyer's Affiliates will be duly qualified, licensed or otherwise authorized to own or lease and to operate and use the Assets in the state(s) where the Assets are located other than where failure to be so qualified would not have a material adverse effect. Buyer has made available to Seller true and correct copies of Buyer's governing documents as in effect as of the date hereof and as of the Closing, as applicable, including Buyer's certificate of incorporation and bylaws.

Section 6.02.   *Authority; Validity; Consents*.

Buyer has the requisite power and authority necessary to enter into, deliver and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement by Buyer and such other Transaction Documents to which it is a party and the consummation by Buyer of the transactions contemplated herein and therein have been duly, validly authorized and approved and approved by the board of directors of Buyer and no other corporate proceedings on the part of Buyer or vote of Buyer's stockholders are necessary to authorize the execution and delivery by Buyer of this Agreement and the consummation of the transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a party that is required to be executed and delivered by Buyer at the Closing will be duly and validly executed and delivered by Buyer, as applicable, at the Closing.  No other action on the part of Buyer, its Affiliates or their respective Representatives is necessary to authorize this Agreement or the other Transaction Documents to which Buyer is a party and this Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except in each case as such

enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Applicable Laws affecting the enforcement of creditors' rights generally and by general principles of equity, including principles of commercial reasonableness, good faith and fair dealing, regardless of whether such principles are considered in a proceeding at law or in equity.

Section 6.03.   *No Conflict*.

Except for (a) any applicable notices, filing, consents or approvals under any applicable antitrust, competition or trade regulation or other Applicable Laws, including the HSR Act and (b) items listed on Disclosure Schedule 6.03, Buyer is not and will not be required to give any notice to, make any filing with or obtain any consent not already received from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby, except as would not, individually or in the aggregate, reasonably be expected to affect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.  When the consents and other actions described in the preceding sentence have been obtained and taken, the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the breach or violation of any of the terms and provisions of, or constitute a default (with or without notice or lapse of time or both) under, or conflict with, or cause any acceleration of any obligation of any Buyer under (i) any agreement, indenture, bond, debenture, note, mortgage or other instrument to which it or its assets is bound, (ii) the certificate of incorporation, bylaws or other governing documents of Buyer, (iii) any Order applicable to Buyer or its assets or (iv) any Applicable Law, except as would not, individually or in the aggregate, reasonably be expected to affect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

Section 6.04.   *Legal Proceedings*.

There are no Proceedings or Orders pending or outstanding or, to the Knowledge of Buyer, threatened by any Person, that seek to prevent, restrain, materially delay, prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or that would, individually or in the aggregate, reasonably be expected to delay the Closing or have an adverse effect on Buyer's performance of any of its obligations and covenants under this Agreement and the other Transaction Documents to which it is a party that are to be performed prior to, at or after Closing.

Section 6.05.   *Bankruptcy*.

There are no bankruptcy, reorganization or arrangement Proceedings pending, being contemplated by or, to the Knowledge of Buyer, threatened against Buyer.

Section 6.06.   *Brokers or Finders*.

Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or

on account of the transactions contemplated by this Agreement for which Seller or any of it is Subsidiaries is or will become liable.

Section 6.07.  *Financing*.

[(a) Buyer has, and will have at the Closing, sufficient funds available in cash to pay the Purchase Price, the Cure Costs and any fees and expenses incurred by or otherwise required to be paid by Buyer in connection with the acquisition of the Assets and the assumption of the Assumed Liabilities pursuant to this Agreement and the transactions contemplated by this Agreement.]

[OR]

[(a) Buyer has delivered to Seller prior to the date hereof true and complete copies of (i) a fully executed commitment letter, dated as of the date hereof, by and among [●], including all annexes, exhibits, schedules, supplements, term sheets and other attachments thereto and all executed fee letters, fee credit letters and engagement letters associated therewith (other than the fees set forth therein, which have been redacted) (the "**Debt Commitment Letter**"), dated as of the date hereof, pursuant to which the lenders and other parties thereto have committed and confirmed, on the terms and subject to the conditions set forth therein, to provide Buyer with debt financing in the amounts set forth therein in connection with the transactions contemplated hereby (the "**Debt Financing**").

(b) (i) The Debt Commitment Letter is in full force and effect and constitutes a valid and binding obligation of Buyer and, to the knowledge of Buyer, the other parties thereto, and (ii) the Debt Commitment Letter is enforceable against Buyer and, to the Knowledge of Buyer, the other parties thereto in accordance with its terms, except in each case as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Applicable Laws affecting the enforcement of creditors' rights generally and by general principles of equity, including principles of commercial reasonableness, good faith and fair dealing, regardless of whether such principles are considered in a proceeding at law or in equity.  As of the date hereof, the Debt Commitment Letter has not been amended or modified in any respect, no provisions or rights thereunder have been waived and the respective commitments contained therein have not been withdrawn, rescinded or otherwise modified in any respect, nor is any such amendment, modification, withdrawal or rescission currently contemplated or the subject of discussions.  No event has occurred which, with or without notice, lapse of time or both, would constitute a default or breach under the Debt Commitment Letter on the part of Buyer or, to the knowledge of Buyer, any other party thereto.  Buyer is not aware of any fact, event or other occurrence that makes any of the representations and warranties of Buyer in the Debt Commitment Letter inaccurate in any material respect.  There are no conditions precedent or other contingencies directly or indirectly related to the funding of the full amount of the Debt Financing (including any flex provisions) other than the conditions precedent expressly set forth in the Debt Commitment Letters, and Buyer has no reason to believe that (i) it or any other party thereto will not be able to satisfy on a timely basis any term or condition of the Debt Commitment Letter, including any condition to the closing of the Debt Financing, or (ii) the full amount of the Debt Financing will not be made available to Buyer at or prior to the Closing.  Other than the Debt Commitment Letter, there are no side letters or other contracts, arrangements or understandings (written or oral) directly or indirectly related to the Debt Financing.  The aggregate proceeds of the Debt Financing are in

~~an amount sufficient to pay the Purchase Price, the Cure Costs and any fees and expenses incurred by or otherwise required to be paid by Buyer in connection with the acquisition of the Assets and the assumption of the Assumed Liabilities pursuant to this Agreement and the transactions contemplated by this Agreement.  Buyer has fully paid, or caused to be paid, any and all commitment fees and any and all other fees and expenses, in each case as are required to be paid pursuant to the terms of the Debt Commitment Letters.]~~ [9]

[(b)/~~(e)~~] Upon the consummation of the transactions contemplated hereby, (i) [Buyer~~]~~ will not be insolvent as defined in Section 101 of the Bankruptcy Code, (ii) [Buyer~~]~~ will not be left with unreasonably small capital, (iii) [Buyer~~]~~ will not have incurred debts beyond its ability to pay such debts as they mature, and (iv) the capital of [Buyer~~]~~ will not be impaired.[10]

~~[(e)/(d)] For the avoidance of doubt, Buyer acknowledges and agrees that, notwithstanding anything to the contrary in this Agreement, the consummation of the Debt Financing shall not be a condition to any obligations of Buyer hereunder, including the obligation to consummate the transactions contemplated hereby.]~~

Section 6.08.   *Independent Evaluation*.

Buyer (a) is experienced in the evaluation, purchase, ownership and operation of assets of the types and natures consistent with those used in the operations of the Business and the Assets and is aware of the risks associated with the purchase, ownership and operation of such assets and interests related thereto, (b) is capable of evaluating, and hereby acknowledges that it has so evaluated, the merits and risks of the Assets, ownership and operation thereof and its obligations hereunder, and (c) is able to bear the economic risks associated with the Assets, ownership and operation thereof and its obligations hereunder.  In entering into this Agreement and except for the representations and warranties expressly set forth in <u>Article 5</u>~~Article 5~~ of this Agreement, none of Seller, Seller's Subsidiaries, their respective Affiliates, Seller's, its Subsidiaries or their respective Affiliates' respective Representatives or any Person acting on Seller's, its Subsidiaries or its or their Affiliates' behalf is making or has made any other express or any implied representations or warranties, and Buyer disclaims reliance upon any other representations and warranties (including as to the accuracy and completeness thereof), with respect to Seller, its Subsidiaries or any of its or their respective Affiliates, any of their respective business, operations, assets, liabilities, condition (financial or otherwise) or prospects or any other matter relating to Seller, its Subsidiaries or any of its or their respective Affiliates.  Buyer acknowledges and affirms that it has relied and will rely solely on the terms of this Agreement and the Transaction Documents and upon its independent analysis, evaluation and investigation of, and judgment with respect to, the business, economic, legal, tax or other consequences of the transactions contemplated by this Agreement.

---

[9] ~~**Note to Draft**: If Buyer requires financing to consummate the transaction, we would like to discuss Buyer's proposal with respect to financing. Seller would expect financing to be fully committed as of signing.~~

[10] ~~**Note to Draft**: Subject to revisions as necessary based on Buyer's proposed structure.~~

ARTICLE 7
ACTIONS PRIOR TO THE CLOSING DATE

Section 7.01.  *Access and Reports.*

(a)     From the date hereof through Closing, subject to Applicable Laws, upon the reasonable request from Buyer of any such activities, each Selling Entity will afford Buyer's officers and other authorized Representatives reasonable access, during normal business hours, (i) to those of its officers, employees, consultants and authorized Representatives (including its legal advisors and accountants) possessing information relating to the Assets or the Business, (ii) to all books, records and other documents and data in the locations in which they are normally maintained, and to make copies of all such books, records, and other documents to the extent relating to the Assets or the Assumed Liabilities, (iii) to any reasonably available financial and operating data and other information in connection with the Assets and (iv) to all offices, plants, buildings, facilities and other physical locations and properties included in the Asset, to make such investigation and physical inspection of the Assets and the Assumed Liabilities as it reasonably requests; *provided* that, in connection with such access, Buyer's authorized Representatives will (i) abide by any reasonable safety rules, regulations and operating policies provided in writing by Seller or its Representatives and (ii) at Seller's option, be accompanied by at least one (1) Representative of Seller.  Notwithstanding anything herein to the contrary, no such investigation or examination will be permitted to the extent that it would unreasonably interfere with the conduct of the business of the Selling Entities or would require a Selling Entity to disclose information that would violate the attorney-client privilege or any other applicable privileges or immunities; provided that the Selling Entities use reasonable effort to disclose such information without disclosing the privileged information (for example, by redacting such information as reasonably necessary to avoid such violation).

(b)     Buyer acknowledges that Confidential Information (as defined in the Confidentiality Agreement) has been, and in the future will be, provided to it in connection with this Agreement, including under Section 7.01(a)Section 7.01(a), and is subject to the terms of the confidentiality agreement dated February 14, 2020 [•] between Seller and [Buyer] and, if applicable, the Clean Team Agreement and the joint defense and common interest agreement dated as of [•]March 27, 2020, between Seller, [Buyer] and their respective outside counsel (collectively, the "**Confidentiality Agreement**"), the terms of each of which are incorporated herein by reference. Buyer acknowledges and understands that this Agreement may be provided to lenders or be publicly filed in the Bankruptcy Court and further made available by Seller to prospective bidders and that such disclosure will not be deemed to violate any confidentiality obligations owing to Buyer, whether pursuant to this Agreement, the Confidentiality Agreement, the Clean Team Agreement or otherwise.

Section 7.02.  *Operations Prior to the Closing Date.*

Except (a) as otherwise expressly contemplated by this Agreement, (b) as disclosed in Schedule 7.027.02, (c) with the prior written consent of Buyer (which consent will not be unreasonably withheld, conditioned or delayed) or the approval of the Bankruptcy Court, (d) as otherwise required by Applicable Laws or any Contract to which Seller or any of its Subsidiaries are bound, or as requested or required by any Governmental Authority, or (e) as required or

45

prohibited pursuant to a Bankruptcy Court Order or the Bankruptcy Cases or limited by restrictions or limitations under the Bankruptcy Code on Chapter 11 debtors, including (x) the exercise by the board of directors of Seller of its fiduciary duties to maximize the value of Seller's estate and (y) limitations on Seller's or its Subsidiaries' ability to pay amounts relating to the period prior to the Petition Date and the impact of Seller filing for bankruptcy with respect to any Contract to which it or any of its Subsidiaries is a party, from the date hereof until the Closing Date: [11]

(i)     Seller will use its reasonable best efforts to (A) operate the Facilities and other Assets operated by Seller and its Subsidiaries in the ordinary course of business in all material respects and to maintain all Assets in good working order and condition (ordinary wear and tear excepted) (including, without limitation, conducting all inspections and acts of service and repair with at least the level of care and frequency required to comply with (A) manufacturer recommendations or guidelines or (B) customary industry practice for similar assets as the applicable Asset), (B) maintain books, accounts and records relating to such Assets in accordance with past custom and practice in all material respects, (C) preserve intact the business organizations and relationships with Third Parties of the Assets and keep available the services of Company Employees, consultants and agents of the Selling Entities in connections with the services such persons provided in respect of the Assets in the ordinary course of business,[12] and (D) comply with all Applicable Laws and Orders applicable to the Assets and give prompt notice to Buyer of any notice of any material damage or any material Casualty Loss and any notice received or made by Seller of any claim asserting any material tort or violation of Applicable Law or any new Proceeding that (in each case) relates to such Assets; and

(ii)     Seller will not, and will cause its Subsidiaries not to, solely with respect to the Assets:

(A)     liquidate, dissolve, recapitalize or otherwise wind up its operations of the Business;

(B)     terminate, cancel, materially amend or modify, grant a material waiver or consent with respect to or extend any Material Contract, or enter in to any Contract that would be a Material Contract, in each case other than in the ordinary course of business;

(C)     sell, lease, transfer, abandon, permit to lapse, fail to maintain, exclusively license, assign or otherwise dispose of any material Assets, in each case other than in the ordinary course of business;

(D)     acquire (by merger, consolidation, acquisition of stock or assets or otherwise), directly or indirectly, any material assets, securities, properties,

---

[11] **Note to Draft**: Certain of these restrictions to be removed to the extent they would not affect the specific Assets being acquired.

[12] **Note to Draft**: Only to be included to the extent the Assets include operational facilities.

interests or businesses for the conduct of the Business, in each case other than pursuant to existing Contracts or in the ordinary course of business;

(E) other than as permitted by Section 7.02(e)(ii)(D)Section 7.02(e)(ii)(D), make any material loans, advances or capital contributions to, or investments in, any other Person (other than any Subsidiary of Seller) with respect to the Business, other than advances to employees in the ordinary course of business;

(F) subject any of the Assets to any Encumbrances, except for Permitted Encumbrances;

(G) enter into any agreement or arrangement that materially limits or otherwise restricts in any material respect the conduct of the Business or the use or saleability of the Assets or that would reasonably be expected to, after the Closing Date, limit or restrict in any material respect the Business or Buyer's use of the Assets;

(H) change its accounting methods, policies or practices, in each case as they relate to the Assets;

(I) commence, settle or propose to settle any Proceedings that could reasonably be expected to materially diminish the value of the Assets or impair title thereto;

(J) other than in the ordinary course of business or as required by Applicable Law or by the terms of any Seller Benefit Plan or Collective Bargaining Agreement as in effect on the date hereof, (1) hire or promote or terminate the employment (other than for cause or due to the elimination of a position) of any Company Employee with annual salary in excess of $120,000, (2) grant or increase any severance, change in control, retention, termination or similar compensation or benefits to (or materially amend any existing severance, change in control, retention, termination or similar compensation, benefits or arrangement with) any exempt Company Employee, (3) establish, adopt, materially amend, or terminate any Collective Bargaining Agreement (other than as contemplated under this Agreement) or Seller Benefit Plan or (4) increase the compensation, bonus or other benefits payable to any exempt Company Employee;

(K) cancel or modify any Insurance Policy, except where replaced with a substantially similar policy; or

(L) agree or commit to do any of the foregoing.

Section 7.03. *Commercially Reasonable Efforts*. Subject to Section 7.03Section 7.03, Seller, on the one hand, and Buyer, on the other hand, will use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make

47

effective, in the most expeditious manner practicable, the transactions contemplated hereby, including using commercially reasonable efforts to accomplish the following: (i) the taking of all reasonable acts necessary to cause the conditions precedent to the other party's obligations to consummate the Closing set forth in Article 9Article 9, Article 10Article 10 and Article 11Article 11 to be satisfied, (ii) the obtaining, at the earliest practicable date, of all necessary Governmental Authorizations and the making of all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any) and the taking of all reasonable steps as may be necessary to avoid any Proceeding by any Governmental Authority, and (iii) the execution or delivery of any additional instruments necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement. Nothing in this Section 7.03Section 7.03 will require Buyer, Seller or any of their respective Subsidiaries to pay any consideration to any Third Party, to initiate any Proceedings, to incur any obligation or to waive any right under this Agreement or to assist any Party in connection with the transactions contemplated hereby.

Section 7.04.   *Regulatory Approvals.* (a) Buyer and Seller will (i) make or cause to be made all filings required of each of them or any of their respective Affiliates under the HSR Act or other Applicable Laws with respect to the transactions contemplated hereby as promptly as practicable and, in any event, within ten Business Days after the date of this Agreement in the case of all filings required under the HSR Act or any other Applicable Laws, (ii) comply at the earliest practicable date with any request under the HSR Act or other Applicable Laws for additional information, documents or other materials received by each of them or any of their respective subsidiaries from the Federal Trade Commission (the "**FTC**"), the Antitrust Division of the United States Department of Justice (the "**Antitrust Division**") or any other Governmental Authority in respect of such filings or such transactions, and (iii) cooperate with each other in connection with (A) any such filing (including, to the extent permitted by Applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith), (B) resolving any investigation or other inquiry of any of the FTC, the Antitrust Division or other Governmental Authority under any Applicable Laws with respect to any such filing or any such transaction, and (C) updating, transferring, replacing, cancelling or obtaining (1) the Permits set forth in Schedule 7.047.04 and [(2) applicable registrations with the FDA]. Each such Party will use commercially reasonable efforts to furnish to each other all information required for any application or other filing to be made pursuant to any Applicable Law in connection with the transactions contemplated by this Agreement. Each such Party will promptly inform the other parties of any oral communication with, and provide copies of written communications with, any Governmental Authority regarding any such filings or any such transaction. No Party hereto will independently participate in any formal meeting with any Governmental Authority in respect of any such filings, investigation, or other inquiry without giving the other parties prior notice of the meeting and, to the extent permitted by such Governmental Authority, the opportunity to attend and/or participate. Subject to Applicable Law, the Parties will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party relating to Proceedings under the HSR Act or other Applicable Laws. Seller and Buyer may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 7.04Section 7.04 as "outside counsel only." Such materials and the information contained therein will be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel

to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Seller or Buyer, as the case may be).

(b)    Buyer understands and agrees that Buyer will use its reasonable best efforts to take, and will cause its Affiliates to take, all actions necessary to obtain all Governmental Authorizations and to avoid or eliminate each and every impediment under any Applicable Law or otherwise so as to enable the consummation of the transactions contemplated by this Agreement and the other Transaction Documents to occur as soon as possible (and in any event prior to the Outside Date); *provided* that the Parties hereto understand and agree that the reasonable best efforts of Buyer, solely for purposes of this Section 7.04(b)~~Section 7.04(b)~~, will be deemed to include: (i) (A) entering into any settlement, undertaking, consent decree, stipulation or agreement with or required by any Governmental Authority in connection with the transactions contemplated hereby; (B) proposing, negotiating, committing to and effecting, by consent decree, hold separate order or otherwise, the sale, divestiture or disposition of businesses, product lines or assets, including the assets of Buyer or any of its Affiliates or the Assets;   (C) terminating existing relationships, contractual rights or obligations of Buyer or its Affiliates (including those relating to the Assets); and (D) otherwise taking or committing to take actions that after the Closing would limit Buyer's or its Affiliates' freedom of action with respect to, or its ability to retain or exercise rights of ownership or control with respect to, one or more of the businesses, product lines or assets of Buyer or its Affiliates (including the Assets), in each case in this clause (i)~~(i)~~, including to the extent required or proposed by any Governmental Authority in connection with the transactions contemplated hereby; (ii) defending any Proceeding (including by appeal if necessary) that challenges any of the transactions contemplated by this Agreement or which would otherwise prohibit, materially delay or materially impair the consummation of the transactions contemplated by this Agreement or the other Transaction Documents; (iii) seeking to have lifted, vacated or reversed any Order entered by any Governmental Authority with respect to this Agreement or the other Transaction Documents or the transactions contemplated hereby or thereby; and (iv) not taking any action (including the acquisition by it or any of its Affiliates of any interest in any Person) if such action would make it more likely that there would arise any impediments under any Applicable Law that may be asserted by any Governmental Authority to the consummation of the transactions contemplated by this Agreement or the other Transaction Documents as promptly as reasonably practicable or that would result in any delay of the Closing; *provided* that, notwithstanding the foregoing or anything to the contrary herein, neither Buyer nor any of its Affiliates will be required to take (or commit to take) any of the actions listed in clauses (i)~~(i)~~ through (iii)~~(iii)~~ of this Section 7.04(b)~~Section 7.04(b)~~ to the extent that such action, individually or in the aggregate, would reasonably be expected to have a material adverse effect on the Assets, Buyer and all of Buyer's Affiliates, taken as a whole.  Notwithstanding anything to the contrary herein, any material breach of Buyer of this Section 7.04~~Section 7.04~~ will constitute a willful and material breach of the covenants and agreements on the part of Buyer set forth in this Agreement for all purposes hereof.

Section 7.05.  *Bankruptcy Court Approval.*

(a)    The Selling Entities and Buyer each acknowledges that this Agreement and the sale of the Assets to Buyer and the assumption of the Assumed Liabilities by Buyer are subject to Bankruptcy Court approval.  Buyer acknowledges that (i) to obtain such approval, the Selling Entities must demonstrate that they have taken reasonable steps to obtain the highest and otherwise

best offer possible for the Assets, and that such demonstration will include giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court and (ii) Buyer must provide adequate assurance of future performance as required under the Bankruptcy Code with respect to each Assigned Contract.

(b)     Buyer agrees that it will promptly take such actions as are reasonably requested by the Selling Entities to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer of the Assigned Contracts, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  In the event the entry of the Sale Order is appealed, Buyer will use its commercially reasonable efforts to defend such appeal(s).

(c)     Seller will give Buyer reasonable advance notice and proposed drafts of all pleadings, motions, Orders, notices, other papers, hearings, and other Proceedings related to this Agreement and the transactions contemplated hereby, and will provide Buyer and its counsel with a reasonable opportunity to review such papers prior to filing with the Bankruptcy Court unless such advance notice is impossible or impracticable under the circumstances, in which case the Selling Entities will deliver copies of such papers substantially simultaneously with the filing with the Bankruptcy Court.

Section 7.06.  *Alternative Proposals*.  Buyer agrees and acknowledges that the Selling Entities, including through their respective Representatives, are and may continue soliciting inquiries, proposals, or offers from Third Parties for all or any part of the Assets, and are and may continue discussing and negotiating such inquiries, proposals or offers and providing information to Third Parties in connection therewith, as contemplated by the Bidding Procedures.

Section 7.07.  *Damage or Destruction*. Until the Closing, the Assets shall remain at the risk of the Selling Entities.  In the event of any material damage to or destruction of any of the Assets after the date hereof and prior to the Closing (in any such case, a "**Damage or Destruction Loss**"), Seller shall give prompt written notice thereof to Buyer.  If any such Damage or Destruction Loss is covered by insurance policies and, if such damage or destruction is to a facility, is not repaired or replaced by a similar facility in reasonable proximity to any former facility, all right and claim of the Selling Entities to any proceeds of insurance for such Damage or Destruction Loss shall be assigned and (if previously received by the Selling Entities and not used prior to the Closing Date to repair any damage or destruction) paid to Buyer at Closing in accordance with Section 2.01(b)(x)~~Section 2.01(b)(x)~~.

Section 7.08.   [Intentionally Deleted]  ~~*Buyer Efforts to Obtain Financing.*~~

~~(a)        From and after the date hereof, Buyer shall take all commercially reasonable  actions that are necessary, proper or advisable to as promptly as practicable obtain the Debt Financing in a quantum sufficient to consummate the transactions contemplated hereby and to pay all applicable amounts hereunder, including taking all actions that are necessary, proper or advisable to: (i) maintain in effect the Debt Commitment Letter and/or to obtain and maintain in effect such other definitive documentation as necessary to effectuate the Debt Financing (the "**Debt Financing**~~

Agreements"); (ii) negotiate and enter into the Debt Financing Agreements on the terms and conditions contained in the Dent Commitment Letter (including any flex provisions) or on other terms reasonably available; (iii) satisfy on timely basis (or obtain a waiver thereof with regard to) all conditions applicable to the funding of the Debt Financing that are within Buyer's control; (iv) assuming that all conditions of the Buyer to the Debt Commitment Letter are satisfied, consummate the Debt Financing at or prior to the Closing; and (v) enforce its rights under the Debt Commitment Letter and/or Debt Financing Agreements (including, the commencement of litigation against the sources of the Debt Financing). Buyer shall furnish true and complete copies of the Debt Financing Agreements and any fully executed commitment letter, fee letter, annexes, exhibits, schedule and other attachment associated therewith to Seller promptly upon their execution.

(b)      Buyer shall keep Seller reasonably informed with respect to all material activity concerning the status of the Debt Financing contemplated by the Debt Commitment Letter and shall give Seller notice of any material adverse change with respect to the Debt Financing as promptly as practicable. Without limiting the generality of the foregoing, Buyer shall give the Seller prompt notice of: (w) the termination, repudiation, rescission, cancellation or expiration of the Debt Commitment Letter or the Debt Financing Agreements, (x) any breach or default (or any event or circumstance that, with or without notice, lapse of time or both, could reasonably be expected to give rise to any breach or default) by any party to the Debt Commitment Letter or the Debt Financing Agreements in each case of which Buyer becomes aware, (y) the receipt of any written notice or other written communication, in each case received from any Debt Financing Source with respect to any (1) breach of Buyer's obligations under the Debt Commitment Letter or the Debt Financing Agreements, or actual or potential default, termination or repudiation by any party the Debt Commitment Letter or the Debt Financing Agreements (including any proposal by any Debt Financing Source, lender or other Person to withdraw, terminate, repudiate, rescind or make a material change in the terms of (including the amount of Debt Financing contemplated) the Debt Commitment Letter) or (2) material dispute between or among any parties to the Debt Commitment Letter or the Debt Financing Agreements or any provisions of any of the Debt Commitment Letter, in each case, with respect to the obligation to fund the Debt Financing or the amount of the Debt Financing to be funded at Closing and (z) of the receipt of any written notice or other written communication on the basis of which Buyer expects that a party to the Debt Financing will fail to fund the Debt Financing or is reducing the amount of the Debt Financing; *provided* that in no event shall Buyer be under any obligation to disclose any information pursuant to clauses (1) or (2) that would waive the protection of attorney-client or similar privilege if such party shall have used reasonable best efforts to disclose such information in a way that would not waive such privilege. As soon as reasonably practicable, but in any event within five Business Days of the date Seller delivers to Buyer a written request, Buyer shall provide any information reasonably requested by Seller relating to any circumstance referred to in clauses (w), (x), (y) or (z) of the immediately preceding sentence. Buyer shall allow Seller to reasonably consult with the Debt Financing Sources and providers of the Debt Financing regarding the status of the Debt Financing (provided that Buyer shall have the right to have one or more Representatives present during any such consultation).

(c)      Buyer shall have the right from time to time to amend, supplement, terminate or otherwise modify or waive its rights under the Debt Commitment Letter; *provided* that, no such amendment, supplement, termination, modification or waiver shall (i) reduce (or have the effect of reducing) the aggregate amount of available Debt Financing (including by increasing the amount of fees to be paid or original issue discount (except as set forth in any "market flex" provisions existing

on the date of this Agreement)) to less than the amount required to consummate the transactions contemplated by this Agreement, (ii) impose new or additional conditions precedent or expand upon the conditions precedent to the Debt Financing as set forth in the existing Debt Commitment Letter in a manner that would reasonably be expected to (A) make the timely funding of the Debt Financing, or the satisfaction of the conditions to obtaining the Debt Financing less likely to occur when required pursuant to the terms hereof or (B) adversely impact the ability of either Buyer or Seller to enforce its rights against other parties to the Debt Commitment Letter, (iii) adversely change the timing of the funding of the Debt Financing thereunder, (iv) be reasonably expected to impair, delay or prevent the availability of all or a portion of the Debt Financing or the consummation of the transactions contemplated by this Agreement, or (v) otherwise materially adversely affect the ability of Buyer to enforce its rights under the Debt Commitment Letter or to consummate the transactions contemplated by this Agreement or the timing of the Closing, including by making the funding of the Debt Financing less likely to occur. Buyer shall furnish to Seller a copy of any executed written amendment, restatement, replacement, supplement, modification, waiver or consent of or relating to the Debt Commitment Letter or the Debt Financing Agreements. For purposes of this Agreement (other than with respect to representations in this Agreement made by Parent that speak as of the date hereof), references to the "Debt Commitment Letter" shall include such document as permitted or required by this Section 7.08(c) to be amended, restated, replaced, supplemented or otherwise modified or waived, in each case from and after such amendment, restatement, replacement, supplement or other modification or waiver and, for the avoidance of doubt, references to "Debt Financing" shall include, in whole or in part (as applicable), any replacement or substitute financing provided for thereunder.

(d)     In the event that any portion of the Debt Financing becomes unavailable on the terms and conditions contemplated by the Debt Commitment Letter (including the flex provisions) (other than as a result of Seller's breach of any provision of this Agreement or failure to satisfy the conditions set forth in Article 9), (i) Buyer shall promptly notify Seller and (ii) Buyer shall use its reasonable best efforts to (A) arrange and obtain any such portion from alternative sources, on terms, taken as whole, that are no more adverse to Buyer (including after giving effect to the market flex provisions) ("**Alternative Financing**"), as promptly as practicable following the occurrence of such event and (B) provide the Company with a copy of the new financing commitment that provides for such Alternative Financing (the "**Alternative Financing Commitment Letter**"); *provided* that the terms of such Alternative Financing shall not (A) impose new or additional conditions precedent or expand upon the conditions precedent to the Debt Financing as set forth in the existing Debt Commitment Letter, (B) reduce the aggregate amount of available Debt Financing to less than the amount required to consummate the transactions contemplated by this Agreement or (C) otherwise reasonably be expected to materially delay or prevent the Closing. As applicable, references in this Agreement (other than with respect to representations in this Agreement made by Buyer that speak as of the date hereof) to (x) the Debt Financing shall include such Alternative Financing and (y) the Debt Commitment Letter shall include the Alternative Financing Commitment Letter.]

Section 7.09.   [Intentionally Deleted]  *Cooperation with Financing*.

Prior to the Closing, the Selling Entities shall use commercially reasonable efforts to provide to Buyer all customary cooperation that is reasonably requested by Buyer in connection with the Debt Financing, including using commercially reasonable efforts to: (i) facilitate the pledging of collateral, provided that no pledge shall be effective until the Closing; (ii) deliver to

Buyer and its Debt Financing Sources the Financing Deliverables as promptly as reasonably practicable following Buyer's request therefor; (iii) assist Buyer in the negotiation of Debt Financing Agreements, including guarantee and collateral documents, and customary closing certificates as may be required by the Debt Financing Sources, including the Financing Deliverables (it being understood that such negotiations shall be led by Buyer, and Seller shall only have the obligation to use commercially reasonable efforts to provide input where specifically requested); (iv) to the extent applicable, cause its independent auditors to cooperate with the Debt Financing and (v) to the extent reasonably requested by Buyer in writing at least ten Business Days prior to the Closing Date, provide, no later than three Business Days prior to the Closing Date, all documentation and other information about the Selling Entities required under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act; *provided*, *however*, that, notwithstanding the foregoing, nothing in this Agreement shall require such cooperation to the extent it would interfere unreasonably with the business or operations of the Selling Entities; and *provided*, *further*, that notwithstanding anything in this Agreement to the contrary, the Selling Entities shall not (A) be required to pay any fees (including commitment or other similar fees) or to give any indemnities or incur any liabilities, (B) have any liability or obligation under any loan agreement, debt security or any related document or any other agreement or document related to the Debt Financing, (C) be required to provide access to or disclose information where such access or disclosure would (or would be reasonably expected to) jeopardize the attorney-client privilege or contravene any Law or violate any contract, agreement or confidentiality obligation binding on the Selling Entities or their Affiliates, (D) take any action in respect of the Debt Financing to the extent that such action would cause any condition to Closing to fail to be satisfied by the Outside Date or otherwise result in a breach of this Agreement by any of the Selling Entities or their Affiliates, (E) result in the contravention of, or violation of breach of, or default under, any material contract to which the Selling Entities or any of their Affiliates is a party, (F) subject any of the Selling Entities or their Subsidiaries, or any of its or their respective directors, managers, officers or employees to any actual or potential personal liability, (G) waive or amend any terms of this Agreement or any other contract to which any Selling Entity is party, (H) take any action that would subject it to actual or potential Liability, to bear any cost or expense or to make any other payment or agree to provide any indemnity in connection with the Debt Financing, the definitive documents related to the Debt Financing or any information utilized in connection therewith (in each case except following the Closing Date) or (G) be required to execute any document, certificate or instrument, or make any representation or warranty, in connection with the Debt Financing, except for customary authorization letters and any such contractual obligation, document, certificate or instrument that is conditioned upon, and not effective until, the consummation of the Closing.

(b)    Notwithstanding anything to the contrary set forth herein, the Selling Entities and their Affiliates shall be deemed to have complied with their obligations under this Section 7.09 for all purposes of this Agreement unless the applicable Debt Financing has not been obtained primarily as a result of the Selling Entities' or any of their Affiliates' intentional and material breach of their obligations under this Section 7.09.

(c)    The Selling Entities hereby consent to the use of their respective logos in marketing materials for the Debt Financing; *provided*, *however*, that such logos are used solely in a manner that is not intended to or reasonably likely to harm or disparage the Selling Entities or the reputation or goodwill of the Selling Entities.

(d) ~~Notwithstanding any other provision set forth herein or in any other agreement between the Selling Entities and Buyer (or, in each case, their Affiliates), the Selling Entities agree that Buyer may share non-public or confidential information regarding the Selling Entities and their businesses with the Debt Financing Sources, and that Buyer, its Affiliates and such Debt Financing Sources may share such information with potential financing sources in connection with any marketing efforts (including any syndication) in connection with the Debt Financing; *provided* that the recipients of such information shall be treated as "**Representatives**" of Buyer pursuant to the Confidentiality Agreement.~~

(e) ~~Buyer shall (i) promptly, upon request by the Selling Entities, reimburse the Selling Entities for all reasonable, documented, out-of-pocket costs and expenses (including reasonable attorneys' fees) incurred by any Selling Entity or any of its Affiliates in connection with the cooperation of the Selling Entities and their Affiliates contemplated by this Section 7.09, which shall be based on reasonably detailed summary invoices, redacted if and to the extent necessary to preserve privileged information, and (ii) indemnify and hold harmless the Selling Entities, their Affiliates and their respective Representatives from and against any and all losses, damages, claims, costs or expenses actually suffered or incurred by any of them of any type in connection with the arrangement of any Debt Financing and any information used in connection therewith, except to the extent such losses, damages, claims, costs or expenses result from the actual fraud or intentional misconduct of the Selling Entities or their respective Representatives, and the foregoing obligations shall survive termination of this Agreement.]~~

Section 7.10.  *Additional Selling Entities*.

If, at any time after the date of this Agreement either Party discovers that any of the rights, interests, properties, or other assets constituting the Assets is owned by a Subsidiary of Seller who is not a Selling Entity, Seller shall promptly cause such Subsidiary to become a Selling Entity hereunder as if an original party hereto, to deliver a joinder in form and substance reasonably acceptable to Buyer and, subject to <u>Section 2.06</u>~~Section 2.06~~, to promptly transfer (or cause to be transferred) such assets to Buyer.  Prior to any such transfer, the applicable Subsidiary of Seller possessing any such asset will hold it in trust for the benefit of Buyer.

Section 7.11.  *Public Announcements; Filings*.

No Party nor any of its Affiliates shall make any public announcement or issue any press release or make any filings at any time concerning this Agreement or any Transaction Document or any of the transactions contemplated hereby or thereby, without the prior written approval of the other Parties, not to be unreasonably withheld, delayed or conditioned.  Notwithstanding the immediately preceding sentence, in the event any Party reasonably determines, on advice of counsel, that any such filing is required by the Bankruptcy Court or otherwise under Applicable Law, such Party shall give the other Parties advance written notice of, and a meaningful opportunity (as practicable under the circumstances) to review and comment on, the proposed form and substance of any such filing, but prior written approval shall not be required.  The Party whose proposed filing is the subject of review shall consider carefully and in good faith all comments timely received from the other Parties.

ARTICLE 8
ADDITIONAL AGREEMENTS

Section 8.01.  *Taxes.*

(a)  *Transfer Taxes*.  Buyer shall be responsible for all documentary, stamp, transfer (including real property transfer), motor vehicle registration, sales, use, value added, excise and other similar non-income Taxes and all filing and recording fees (and any interest, penalties and additions with respect to such Taxes and fees) arising from or relating to the consummation of the transactions contemplated by this Agreement (collectively, "**Transfer Taxes**"), regardless of the party on whom Liability is imposed under the provisions of the Applicable Laws relating to such Transfer Taxes.  Seller and Buyer will consult and cooperate on a reasonable basis in preparing and timely filing all Tax Returns with respect to any Transfer Taxes and will cooperate on a reasonable basis and otherwise take commercially reasonable efforts to obtain any available exemptions from or reductions in such Transfer Taxes.  To the extent Seller or any of its Subsidiaries is required by Applicable Law to pay any Transfer Taxes to a Tax Authority (including pursuant to a post-Closing adjustment or Order), Buyer will remit an amount equal to such Transfer Taxes to Seller not less than five Business Days prior to the due date for such payment.

(b)  *Straddle Periods*.  In the case of any Straddle Period, (i) all Property Taxes for any such period shall be apportioned between the Pre-Closing Tax Period and the Post-Closing Tax Period on a per diem basis and (ii) all other Taxes shall be apportioned between the Pre-Closing Tax Period and the Post-Closing Tax Period as if the Pre-Closing Tax Period ended at the close of business on the date prior to the Closing Date.

(c)  *Cooperation and Audits*.  Buyer and its Affiliates, and Seller and its Affiliates will cooperate on a reasonable basis with each other regarding Tax matters governed by this Agreement and will make available to the other as reasonably requested all information, records and documents relating to Taxes governed by this Agreement and the filing of Tax Returns until the expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals or litigation with respect to such Taxes.

Section 8.02.  *Allocation of Purchase Price.*

(a)  The Purchase Price (plus any Assumed Liabilities and other amounts properly taken into account under the Code) shall be allocated among the Assets in accordance with Section 1060 of the Code and the Treasury regulations promulgated thereunder (and any similar provision of state, local or foreign law, as appropriate) (the "**Allocation**").  The Allocation shall be delivered by Buyer to Seller within 60 days after the Closing Date for Seller's review and comment.  If, within 30 days after the delivery of the Allocation, Seller notifies Buyer in writing that Seller objects to any allocation set forth thereon, Buyer and Seller shall negotiate in good faith to resolve such objection.  In the event that Buyer and Seller are unable to resolve such dispute within 30 days following Seller's notification of such objection, Buyer and Seller shall jointly retain a referee chosen and mutually acceptable to both Buyer and Seller to resolve the disputed items.  Upon resolution of the disputed items, the Allocation shall be adjusted to reflect such resolution.  The costs, fees and expenses of the referee shall be borne equally by Buyer and Seller.

55

(b)    (i) Seller and Buyer will report, act and file (and will cause their respective Affiliates to report, act and file) Tax Returns (including IRS Form 8594) in all respects and for all purposes consistent with the Allocation and (ii) neither Seller nor Buyer will take any position (or will allow any of their respective Affiliates to take any position) (whether in audits, Tax Returns, or otherwise) that is inconsistent with the Allocation, except, in each case, to the extent otherwise required by Applicable Law.

Section 8.03.  *Assigned Contracts; Adequate Assurance and Performance.*

(a)    With respect to each Assigned Contract, Buyer will deliver within 24 hours of approval of this Agreement by the Bankruptcy Court information it reasonably believes to be sufficient to demonstrate Buyer's adequate assurance of the future performance by Buyer of each such Assigned Contract as required under Section 365 of the Bankruptcy Code, which information Seller or if applicable, Seller's Subsidiaries, will be permitted to disseminate to any Third Party that is a party to any 365 Contract. In the event Buyer cannot demonstrate adequate assurance of future performance with respect to an Assigned Contract, at Buyer's election, such Assigned Contract shall become an Excluded Contract.

(b)    From and after Closing, Buyer will pay, perform or satisfy the Assumed Liabilities from time to time and as such Assumed Liabilities become due and payable or are required to be performed or satisfied in accordance with their respective terms.

(c)    Without limiting the provisions of Section 8.03(a)Section 8.03(a), Buyer acknowledges that neither Seller nor any Subsidiary of Seller will have any duty to maintain any bonds, letters of credit, guarantees, cash deposits or insurance to secure performance or payment under any Assigned Contracts (collectively, "**Seller Credit Obligations**") after the Closing or otherwise with respect to the Business.  On or before the Closing, Buyer will use commercially reasonable efforts to obtain from the creditor or other counterparty (or, in the case of letters of credit, bonds or other similar Seller Credit Obligations, the issuing bank (or similar entity) thereof) a full release (in a form and substance reasonably satisfactory to Seller) of all parties liable, directly or indirectly, for reimbursement to the creditor or issuing bank (or similar entity), as applicable, or fulfillment of other obligations to a counterparty or issuing bank (or similar entity), as applicable, under the Seller Credit Obligations (including any lenders or other financing parties participating in such letters of credit, bonds or similar Seller Credit Obligations). If any Seller Credit Obligation remains outstanding as of the Closing Date, Buyer will indemnify Seller and its Subsidiaries and hold them harmless against any Liabilities that Seller or any such Subsidiary may incur under any such Seller Credit Obligations attributable to periods from and after the Closing.

(d)    Notwithstanding anything to the contrary contained herein, Buyer will not (i) enter into any transactions after the Closing in the name of Seller or any of its Affiliates or that would be covered by Seller Credit Obligations or (ii) amend, modify, extend or renegotiate any material term of any obligation that is covered by a Seller Credit Obligations in any manner that increases or extends the potential exposure of Seller, any Subsidiary of Seller, or any of its or their respective Affiliates under any Seller Credit Obligations.

Section 8.04.  *Employee Matters.*

(a)     *Transferred Employees*.  Prior to the Closing, Buyer will offer employment to each of the Company Employees who remain employed immediately prior to the Closing on employment terms that are consistent with the requirements of this ~~Section 8.04~~Section 8.04.  Such individuals who accept such offer by the Closing Date are hereinafter referred to as the "**Transferred Employees.**"

(b)     ~~*Seller Benefit Plans*.  Prior to the Closing, Buyer and the Selling Entities will, or will cause their respective Subsidiaries to, take such actions as are necessary to cause the sponsorship of the Assumed Plans to transfer to Buyer and to facilitate Buyer's assumption of the Liabilities associated with such Assumed Plans, in each case effective as of the Closing.~~[Intentionally Deleted]

(c)     *Compensation and Benefits.* For a period of not less than 12 months after the Closing Date, Buyer will provide base salaries, target incentive compensation opportunities and employee benefits to the Transferred Employees that are substantially comparable in the aggregate to the base salaries, target incentive compensation opportunities and employee benefits such Transferred Employees were receiving or were eligible to receive immediately prior to the Closing. In the event that any Transferred Employee first becomes eligible to participate in a welfare benefit plan of Buyer or any of its Affiliates after the Closing Date (each, a "**Buyer Welfare Plan**"), Buyer will, or will cause its Affiliates to, (i) waive all limitations as to preexisting conditions, exclusions and all waiting periods with respect to participation and coverage requirements applicable to each Transferred Employee under any such Buyer Welfare Plan to the same extent as such conditions, exclusions and waiting periods have been waived under any analogous Seller Benefit Plan prior to the Closing Date and (ii) credit each Transferred Employee for any co-payments, deductibles and other out-of-pocket expenses paid prior to the Closing Date under the terms of any analogous Seller Benefit Plan in satisfying any applicable co-payment, deductible or out-of-pocket requirements for the plan year in which the Closing Date occurs under such Buyer Welfare Plan.

(d)     *No Obligations*.  No provision in this ~~Section 8.04~~Section 8.04 or otherwise in this Agreement, whether express or implied, will (i) create any third-party beneficiary or other rights in any current or former Company employee (including any beneficiary or dependent thereof), any other participant in any Seller Benefit Plan or any other Person; (ii) create any rights to continued employment with Seller, Buyer or any of their respective Subsidiaries or Affiliates or in any way limit the ability of Seller, Buyer or any of their respective Subsidiaries or Affiliates to terminate the employment of any individual at any time and for any reason; or (iii) constitute or be deemed to constitute an amendment to any Seller Benefit Plan or any other employee benefit plan, program, policy, agreement or arrangement sponsored or maintained by Seller, Buyer or any of their respective Subsidiaries or Affiliates.

Section 8.05.  *Post-Closing Books and Records.*

Until the earlier of the closure of the Bankruptcy Cases and five (5) years after the Closing Date, (a) Buyer will use commercially reasonable efforts not to dispose of or destroy any of the Records received by Buyer as Assets and (b) Buyer will allow such Selling Entity (including, for clarity, any trust established under a Chapter 11 plan of such Selling Entity or any other successors of such Selling Entity) and any of its respective directors, officers, employees, counsel, Representatives, accountants and auditors reasonable access during normal business hours, upon

reasonable advance notice, to any Records included in the Assets for purposes relating to the Bankruptcy Cases, the wind-down of the operations of such Selling Entity or any such trusts or successors and such Selling Entity (including any such trust or successors) and such directors, officers, employees, counsel, Representatives, accountants and auditors will have the right to make copies of any such Records for such purposes. Until the liquidation and winding up of each Selling Entity's estate, such Selling Entity may keep a copy of the Records.  In the event any Party desires to destroy any such Records prior to the time during which they must be maintained pursuant to this Section 8.05~~Section 8.05~~, such Party will first give 30 days' prior written notice to the other Party and such other Party will have the right at their option and expense, upon prior written notice given within such 30 day period to the Party desiring to destroy such Records or records, to take possession of the Records within 60 days after the date of such notice, or such shorter period as the liquidation and winding up of each applicable Selling Entity's estate will permit.  Except as required by Applicable Laws or to the extent required to enforce its rights with respect to the Excluded Liabilities, from and after the Closing, the Selling Entities will keep confidential and not use the Records that would have been included in the Records but for the failure to obtain a material Third Party consent or any Records to which it has access under this Section 8.05~~Section 8.05~~, except for the use thereof as expressly permissible hereunder.

Section 8.06.  *Use of Trademarks.*  Effective as of the Closing, Buyer, on behalf of itself and its Affiliates, hereby grants to Seller and its Subsidiaries an irrevocable, worldwide, non-exclusive, fully paid-up, royalty-free right and license to use any and all Trademarks included in the Assets for the purposes of winding down the operations of Seller and its Subsidiaries following the Closing.

Section 8.07.  *Title Matters*.  The Selling Entities will deliver, or cause to be delivered, to Buyer, at or prior to the Closing, (i) copies of existing surveys, legal descriptions and title policies relating to the Owned Real Property in each case, in any Selling Entities' possession or control, (ii) such bills of sale, deeds, endorsements,  assignments and other customary instruments of conveyance and transfer, in form and substance reasonably satisfactory to Buyer, as Buyer may reasonably request in order to vest in Buyer all of the applicable Selling Entity's right, title and interests in, to or under any or all Real Property Interests, in each case, in any Selling Entities' possession or control and (iii) such ordinary and customary documents (including any factually accurate title affidavits) as may be reasonably required by any title company or title insurance underwriter to enable Buyer to acquire, at Buyer's sole election and sole cost and expense, one or more owner policies of title insurance issued by such title company covering any or all of the Owned Real Property.

Section 8.08.  *Insurance Access*.  Following the Closing Date, with respect to any actions, inactions, events, omissions, conditions, facts, circumstances, losses, damages and Liabilities which occurred or are alleged to have occurred, or were incurred or claimed to have been incurred, with respect to the Assets prior to the Closing Date, Seller will provide Buyer with access to, and Buyer may, upon prior written notice to Seller, make claims under Seller's and its Subsidiaries' non-transferable third-party insurance policies (excluding any self-insurance policies or programs, or any insurance policies or programs that are substantially similar in effect to self-insurance) that are "occurrence based" insurance policies in place immediately prior to the Closing (each such policy, an "**Available Insurance Policy**"); *provided*, that such access to, and the right to make claims under, such insurance policies, shall be subject to the terms and conditions of such insurance

58

policies, including any restrictions on coverage or scope, any deductibles, retentions or self-insurance provision, and any fees, costs, or other expenses, and shall be subject to the following additional conditions:

(a)     Buyer shall report any potentially insured pre-Closing Date claim to Seller, as promptly as practicable and in any event in sufficient time so that such claim may be made in accordance with Seller's claim reporting procedures in effect immediately prior to the Closing;

(b)     Premiums and premium increases, fees and expenses incurred by Seller or any of its Subsidiaries to the extent resulting from any access to, or any claims made by Buyer or any of its Affiliates under, any Available Insurance Policy, including any reasonable legal fees and allocated claims, expenses or claim handling fees, whether such claims are made by Buyer, its Affiliates or its or their respective Representatives, will, in each case, be promptly reimbursed to Seller by Buyer;

(c)     Any recovery under any available Insurance Policy shall be net of all uninsured, uncovered, unavailable or uncollectible amounts of all such claims made by Buyer or any of its Affiliates under the policies as provided for under the Available Insurance Policies (including any deductible, retention or other similar amounts);

(d)     Claims made by Buyer pursuant to this Section 8.08Section 8.08 will be subject to (and recovery thereon will be reduced by the amount of) any applicable deductibles, retentions, or self-insurance provisions under the Available Insurance Policies. With respect to any deductibles, retentions or self-insurance provisions described in the immediately preceding sentence that require a payment by Seller or any of its Subsidiaries, Buyer shall reimburse Seller or such Subsidiary for such payment. It is understood that Buyer will not have access to or coverage under any non-transferable insurance policy retained by Seller or any of its Subsidiaries that is not "occurrence based"; and

(e)     Without limiting Buyer's right to make claims directly against the applicable insurance policies, in no event shall any Selling Entity be required to provide Buyer access under this Section 8.08Section 8.08 after such entity's Bankruptcy Case has been closed.

Section 8.09.   *Disclaimers.*

(a)     *General Disclaimer.*  To the extent required by Applicable Laws to be operative, the disclaimers of certain warranties contained in this Section 8.09Section 8.09 are "conspicuous disclaimers" for purposes of any Applicable Laws.

**(b)     EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER EXPRESSLY SET FORTH IN ARTICLE 5ARTICLE 5 (AS MODIFIED OR QUALIFIED BY THE SCHEDULES HERETO OR OTHERWISE AS PROVIDED HEREIN), (I) NONE OF SELLER, ANY SUBSIDIARY OF SELLER NOR ANY OTHER PERSON MAKE ANY REPRESENTATIONS OR WARRANTIES, EXPRESS, STATUTORY OR IMPLIED OR OTHERWISE, WITH RESPECT TO, OR IN RELATION TO, ANY OF THE ASSETS OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AND BUYER EXPRESSLY WAIVES AND ACKNOWLEDGES THAT NONE OF SELLER, ANY SUBSIDIARY OF SELLER NOR**

ANY OTHER PERSON MAKE ANY SUCH WARRANTY OR REPRESENTATION, AND BUYER IS NOT RELYING ON ANY SUCH WARRANTY OR REPRESENTATION, (II) SELLER, ON BEHALF OF ITSELF AND ITS SUBSIDIARIES, EXPRESSLY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED (ORALLY, IN WRITING OR OTHERWISE) TO BUYER OR ANY OF ITS AFFILIATES, EMPLOYEES, AGENTS, CONSULTANTS OR REPRESENTATIVES (INCLUDING ANY STATEMENT, OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN PROVIDED TO BUYER BY ANY OFFICER, DIRECTOR, EMPLOYEE, AGENT, CONSULTANT, REPRESENTATIVE OR ADVISOR OF EACH SELLER OR ANY OF ITS RESPECTIVE AFFILIATES) AND (III) ALL PROPERTIES INCLUDED IN THE ASSETS WILL BE CONVEYED BY SELLER OR ITS APPLICABLE SUBSIDIARIES AND ACCEPTED BY BUYER PRECISELY AND ONLY AS IS, WHERE IS, AND WITH ALL DEFECTS AND FAULTS WITHOUT RECOURSE AND WITHOUT WARRANTY (INCLUDING WITHOUT ANY WARRANTY OF TITLE).

(c)     EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER EXPRESSLY SET FORTH IN ARTICLE 5ARTICLE 5 OF THIS AGREEMENT (AS MODIFIED OR QUALIFIED BY THE SCHEDULES HERETO OR OTHERWISE AS PROVIDED HEREIN), BUYER ACKNOWLEDGES AND AGREES THAT SELLER AND SELLER'S SUBSIDIARIES ARE CONVEYING THE ASSETS WITHOUT REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED AT COMMON LAW, BY STATUTE, OR OTHERWISE (ALL OF WHICH SELLER HEREBY DISCLAIMS), RELATING TO (I) TITLE, (II) THE MERCHANTABILITY, DESIGN, OR QUALITY OF ASSETS, (III) THE FITNESS OF THE ASSETS FOR ANY PARTICULAR PURPOSE, (IV) THE ABSENCE OF PATENT, LATENT OR REDHIBITORY VICES OR DEFECTS, (V) THE ENVIRONMENTAL OR PHYSICAL CONDITION OF THE ASSETS (SURFACE AND SUBSURFACE), (VI) COMPLIANCE WITH APPLICABLE LAWS, (VII) THE CONTENTS, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM OR MANAGEMENT PRESENTATION, (VIII) ANY ESTIMATES OF THE VALUE OF THE ASSETS OR FUTURE REVENUES GENERATED BY THE ASSETS, (IX) CONTRACTUAL, ECONOMIC, FINANCIAL INFORMATION AND/OR OTHER DATA AND ANY RELATED ESTIMATIONS OR PROJECTIONS MADE IN SALE PRESENTATIONS OR MARKETING MATERIALS, (X) CONTINUED FINANCIAL VIABILITY, INCLUDING PRESENT OR FUTURE VALUE OR ANTICIPATED INCOME OR PROFITS, (XI) THE CONTENT, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM, REPORTS, BROCHURES, CHARTS OR STATEMENTS PREPARED BY THIRD PARTIES, (XII) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE OR COMMUNICATED TO BUYER OR ITS AFFILIATES, OR ITS OR THEIR EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO, (XIII) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM INTELLECTUAL PROPERTY INFRINGEMENT, MISAPPROPRIATION OR OTHER VIOLATION OR (XIV) ANY OTHER MATTER WHATSOEVER (INCLUDING THE

**ACCURACY OR COMPLETENESS OF ANY INFORMATION PROVIDED TO BUYER), IT BEING EXPRESSLY UNDERSTOOD AND AGREED BY THE PARTIES THAT BUYER WILL BE DEEMED TO BE OBTAINING THE ASSETS IN THEIR PRESENT STATUS, CONDITION AND STATE OF REPAIR, "AS IS" AND "WHERE IS" WITH ALL FAULTS AND THAT BUYER HAS MADE OR CAUSED TO BE MADE SUCH INSPECTIONS AS BUYER DEEMS APPROPRIATE AND BUYER IRREVOCABLY WAIVES ANY AND ALL CLAIMS IT MAY HAVE AGAINST SELLER OR ANY SUBSIDIARY OF SELLER ASSOCIATED WITH SAME.**

(d)     **EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER EXPRESSLY SET FORTH IN ~~ARTICLE 5~~ARTICLE 5 OF THIS AGREEMENT (AS MODIFIED OR QUALIFIED BY THE SCHEDULES HERETO OR OTHERWISE AS PROVIDED HEREIN), SELLER AND SELLER'S SUBSIDIARIES HAVE NOT AND WILL NOT MAKE ANY REPRESENTATION OR WARRANTY REGARDING ANY MATTER OR CIRCUMSTANCE RELATING TO ENVIRONMENTAL, HEALTH AND SAFETY LAWS, ASSUMED LIABILITIES RELATING TO ENVIRONMENTAL, HEALTH AND SAFETY LAWS, THE RELEASE OF MATERIALS INTO THE ENVIRONMENT OR THE PROTECTION OF HUMAN HEALTH, SAFETY, NATURAL RESOURCES OR THE ENVIRONMENT, OR ANY OTHER ENVIRONMENTAL CONDITION OF THE ASSETS, AND NOTHING IN THIS AGREEMENT OR OTHERWISE WILL BE CONSTRUED AS SUCH A REPRESENTATION OR WARRANTY, AND BUYER IS DEEMED TO BE TAKING THE ASSETS "AS IS" AND "WHERE IS" FOR PURPOSES OF THEIR ENVIRONMENTAL CONDITION.**

Section 8.10.   *Collection of Accounts Receivable.*

(a)     As of the Closing Date, each Selling Entity hereby (i) authorizes Buyer to open any and all mail addressed to any Selling Entity relating to the Assets and delivered to the offices of the Business or otherwise to Buyer if received on or after the Closing Date and (ii) appoints Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer after the Closing Date with respect to accounts receivable relating to work performed or products sold by Buyer after the Closing, as the case may be, made payable or endorsed to any Selling Entity or Selling Entity's order, for Buyer's own account.

(b)     As of the Closing Date, each Selling Entity agrees that any monies, checks or negotiable instruments received or identified by any Selling Entity after the Closing Date with respect to accounts receivable relating to work performed or products sold by Buyer after the Closing, as the case may be, shall be held in trust by such Selling Entity for Buyer's benefits and accounts, not commingled with other funds of such Selling Entity, and promptly upon receipt by a Selling Entity of any such payment, such Selling Entity shall pay over to Buyer the amount of such payments without any right of set-off or reimbursement.  In addition, Buyer agrees that, after the Closing, it will seek to collect all Accounts Receivable in the ordinary course of business, and will hold and will promptly transfer and deliver to Seller, from time to time as and when received or identified by Buyer or its Affiliates, any cash, checks with appropriate endorsements, payment of an account, trade, note receivable or other payment or property or assets that Buyer or its

Affiliates may receive or identify on or after the Closing which properly belongs to the Selling Entities as an Excluded Asset.

(c)     As of the Closing Date, Buyer shall have the sole authority to bill and collect accounts receivable relating to work performed or products sold by Buyer after the Closing.

ARTICLE 9
CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

The obligation of Buyer to consummate the Closing is subject to the satisfaction or, to the extent permitted by Applicable Law, waiver in writing by Buyer, at or prior to the Closing, of each of the following conditions:

Section 9.01.   *Accuracy of Representations.*

(a)     The representations and warranties of the Selling Entities contained in Sections 5.015.01 (solely the first sentence thereof) and 5.025.02 will be true and correct in all material respects at and as of the Closing, as if made at and as of such time, except to the extent expressly made as of an earlier date, in which case as of such earlier date, (b) the other representations and warranties of Seller contained in this Agreement (without giving effect to any qualifications or exceptions as to "materiality" or "Material Adverse Effect" set forth therein) will be true and correct at and as of the Closing, as if made at and as of such time, except to the extent expressly made as of an earlier date, in which case as of such earlier date, except for such failures to be so true and correct, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and (c) Buyer will have received a certificate on behalf of each Selling Entity to such effect signed by a duly authorized officer of Seller.

Section 9.02.   *Selling Entities' Performance.*  (a) No Selling Entity will have breached the covenants that such Selling Entity is required to perform pursuant to this Agreement prior to the Closing in any material respect (or will have cured any such breach to the extent necessary to satisfy this condition), and (b) Buyer will have received a certificate of each Selling Entity to such effect signed by a duly authorized officer thereof.

Section 9.03.   *Seller's Deliveries.*   Each of the deliveries required to be made to Buyer pursuant to Section 4.04Section 4.04 will have been delivered (or the applicable Selling Entity will make such deliveries at the Closing).

ARTICLE 10
CONDITIONS PRECEDENT TO THE OBLIGATION OF BUYER AND THE SELLING ENTITIES

The respective obligations of Buyer and the Selling Entities to consummate the Closing are subject to the satisfaction or, to the extent permitted by Applicable Law, waiver in a joint writing by Buyer and the Selling Entities, at or prior to the Closing, of each of the following conditions:

Section 10.01. *No Order*.  There will not be in effect any Order by any court of competent jurisdiction in the United States prohibiting the Closing.

Section 10.02. *Sale Order*.  The Bankruptcy Court will have entered the Sale Order, and each such order will be a Final Order in full force and effect and will not have been stayed or vacated.

Section 10.03. *HSR Act*.   The waiting period applicable to the transactions contemplated by this Agreement under the HSR Act will have expired or early termination will have been granted.

ARTICLE 11

CONDITIONS PRECEDENT TO THE OBLIGATION OF THE SELLING ENTITIES TO CLOSE

The Selling Entities' obligation to consummate the Closing is subject to the satisfaction or, to the extent permitted by Applicable Law, waiver in writing by Seller, at or prior to the Closing, of each of the following conditions:

Section 11.01. *Accuracy of Representations*.  (a) The representations and warranties of Buyer contained in Article 6~~Article 6~~ of this Agreement that are not qualified by materiality will be true and correct in all material respects at and as of the Closing, as if made at and as of such time, except to the extent expressly made as of an earlier date, in which case as of such earlier date, (b) the representations and warranties of Buyer contained in this Agreement that are qualified by materiality will be true and correct in all respects at and as of the Closing, as if made at and as of such time, except to the extent expressly made as of an earlier date, in which case as of such earlier date and (c) Seller will have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

Section 11.02. *Buyer's Performance*.  (a) Buyer will not have breached its covenants that it is required to perform pursuant to this Agreement prior to the Closing in any material respect (or will have cured any such breach to the extent necessary to satisfy this condition) and (b) Seller will have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

Section 11.03. *Buyer's Deliveries.*

Each of the deliveries required to be made to Seller pursuant to Section 4.03~~Section 4.03~~ will have been delivered (or Buyer will make such deliveries at the Closing).

ARTICLE 12

TERMINATION

Section 12.01. *Termination Events.*

Notwithstanding anything herein to the contrary, this Agreement may be terminated at any time prior to the Closing:

63

(a)     by mutual written agreement of Seller and Buyer;

(b)     by written notice of either Seller or Buyer to such other Party if:

(i)     the Closing has not occurred by the close of business on ~~[●]~~ April 20, 2020 (the "**Outside Date**"); *provided*, ~~if all conditions specified in Articles 9, 10 and 11 have been satisfied or waived as of the initial Outside Date (or, with respect to those conditions which, by their nature can only be satisfied at the Closing, would reasonably be capable of satisfaction as of such date), other than the conditions set forth in Section 10.03 and Section 10.01 (if the Order relates to the matters referenced in Section 10.03), then the Outside Date shall be further extended to [●] if either Buyer or Seller notifies the other party in writing on or prior to the initial Outside Date of its election to extend the Outside Date to such date; *provided, further,*~~ that a Party may not terminate this Agreement pursuant to this Section 12.01(b)(i)~~Section 12.01(b)(i)~~ if such Party is in material breach of any of its representations, warranties, covenants or agreements contained herein;

(ii)     there is in effect a Final Order by any court of competent jurisdiction in the United States prohibiting the Closing; *provided* that a Party may not terminate this Agreement pursuant to this Section 12.01(b)(ii)~~Section 12.01(b)(ii)~~ if such party is in material breach of any of its representations, warranties, covenants or agreements contained herein beyond all notice and cure periods, if any;

(iii)     any of the Selling Entities enter into a definitive agreement providing for a Superior Proposal and the closing of the sale of the relevant Assets to the applicable acquirer pursuant to such Superior Proposal has occurred; or

(iv)     if, after their respective entry, either the Bidding Procedures Order or Sale Order ceases to be in full force and effect;

(c)     so long as Buyer is not in material breach of any of its representations, warranties, covenants or agreements contained herein, by Buyer by written notice to the Selling Entities if (i) any Selling Entity breaches any representation or warranty or any covenant or agreement contained in this Agreement, (ii) such breach would result in a failure of a condition set forth in Article 9~~Article 9~~ or Article 10~~Article 10~~ and (iii) such breach has not been cured by the earlier of (1) 10 Business Days after the giving of written notice by Buyer to the Selling Entities of such breach and (2) the Outside Date;

(d)     so long as no Selling Entity is in material breach of any of its representations, warranties, covenants or agreements contained herein, by the Selling Entities by written notice to Buyer if (i) Buyer breaches any representation or warranty or any covenant or agreement contained in this Agreement, (ii) such breach would result in a failure of a condition set forth in Article 10~~Article 10~~ or Article 11~~Article 11~~ and (iii) such breach has not been cured by the earlier of (1) 10 Business Days after the giving of written notice by the Selling Entities to Buyer of such breach and (2) the Outside Date;

(e)     by the Selling Entities by written notice to Buyer if Buyer fails to consummate the transactions contemplated hereby, including payment of the Cash Purchase Price, as and when required by Article 4~~Article 4~~ hereof; or

64

(f)      by Seller by written notice to Buyer if (x) the Bankruptcy Cases are, without Seller's consent, converted into cases under Chapter 7 of the Bankruptcy Code or dismissed, or (y) without Seller's consent, a trustee under Chapter 11 of the Bankruptcy Code is appointed in the Bankruptcy Cases.

Section 12.02. *Effect of Termination*.  In the event of a valid termination of this Agreement by Buyer or the Selling Entities pursuant to this Article 12~~Article 12~~, all rights and obligations under this Agreement will terminate without any Liability of any Party or Person to any other Party or Person; *provided* that, subject to Section 13.07~~Section 13.07~~ (if applicable), nothing herein will relieve any Party from Liability for any failure to consummate the transactions contemplated hereby when required pursuant to this Agreement or any willful and material breach of this Agreement prior to such termination; and *provided*, *further*, that the provisions of this Section 12.02~~Section 12.02~~, Section 12.03~~Section 12.03~~, Section 3.02~~Section 3.02~~, Section 7.01(b)~~Section 7.01(b)~~, Section 1.01(a)~~Section 7.09(e)~~,] Section 8.09~~Section 8.09~~ and Section 13.07~~Section 13.07~~ (and, to the extent applicable to the interpretation or enforcement of such provisions, Article 1~~Article 1~~ and Article 13~~Article 13~~) will survive the termination of this Agreement.

Section 12.03. *Procedure Upon Termination*.   In the event of termination pursuant to Section 12.01~~Section 12.01~~, the terminating Party must give written notice thereof, specifying the provision pursuant to which the Agreement is being terminated, to the other Party, and this Agreement will terminate (subject to Section 12.02~~Section 12.02~~) and the purchase of the Assets hereunder will be abandoned without further action by Buyer or Seller.  If this Agreement is terminated as provided herein, Seller will be deemed to have delivered notice to Buyer that it must return or destroy all Confidential Information (as defined in the Confidentiality Agreement) pursuant to Section [●]7 of the Confidentiality Agreement and Buyer will redeliver to the Selling Entities or destroy all documents, work papers and other materials of Buyer and its Representatives relating to the transactions contemplated hereby, in accordance with the terms of the Confidentiality Agreement, including the requirement to confirm any such destruction in writing to the Selling Entities.

ARTICLE 13
GENERAL PROVISIONS

Section 13.01. *No Survival of Representations and Warranties.*

The representations and warranties contained herein and in any certificate or other Transaction Document delivered by any Party pursuant to this Agreement will terminate upon and not survive the Closing and there will be no Liability thereafter in respect thereof.  Each Party's covenants and other agreements contained in this Agreement will terminate upon the Closing, except the Post-Closing Covenants applicable to such Party, which will survive the Closing until the earlier of (a) performance of such Post-Closing Covenant in accordance with this Agreement or (b)(i) if time for performance of such Post-Closing Covenant is specified in this Agreement, 90 days following the expiration of the time period for such performance, or (ii) if time for performance of such Post-Closing Covenant is not specified in this Agreement, the expiration of the applicable statute of limitations with respect to any claim for any failure to perform such Post-Closing Covenant; *provided* that if a written notice of any claim with respect to any Post-Closing Covenant is given prior to the expiration thereof then such Post-Closing Covenant will survive

until, but only for purposes of, the resolution of such claim by final, non-appealable judgment or settlement.

Section 13.02. *Notices.*

All notices, consents, waivers and other communications under this Agreement must be in writing and will be deemed to have been duly given (a) when delivered by hand (with written confirmation of receipt), (b) when sent by email (with read receipt received), (c) one Business Day following the day sent by overnight courier (with written confirmation of receipt), or (d) when received by the addressee, if sent by registered or certified mail (postage prepaid, return receipt requested), in each case to the appropriate addresses and Representatives (if applicable) set forth below (or to such other addresses and Representatives as a Party may designate by notice to the other Parties):

(i)     If to any Selling Entity, then to:

Dean Foods Company
2711 North Haskell Avenue, Suite 3400
Dallas, TX 75204
Attn: Office of the General Counsel
E-mail: kristy_waterman@deanfoods.com

with a copy (which will not constitute notice) to:

Davis Polk & Wardwell LLP
Attn: Louis Goldberg
        Brian Resnick
        Harold Birnbaum
450 Lexington Avenue
New York, NY 10017
E-mail: louis.goldberg@davispolk.com
        brian.resnick@davispolk.com
        harold.birnbaum@davispolk.com

(ii)     If to Buyer:

Maryland and Virginia Milk Producers
Cooperative Association, Incorporated
Attn: Jay Bryant, Chief Executive Officer
1985 Isaac Newton Square, Suite 200
Reston, VA  20190
E-Mail:     JBryant@mdvamilk.com
[*Party*]
Attn: [●]
[*Address*]
E-mail: [●]

with a copy (which will not constitute notice) to:

66

[*Party*]
Watkinson Miller PLLC
Attn: [●]
Wayne Watkinson, Esq
1100 New Jersey Avenue, SE, Suite 910
Washington, DC 20003[*Address*]
E-mail:wwatkinson@ watkinsonmiller.com [●]

Section 13.03. *Waiver.*

Neither the failure nor any delay by any Party in exercising any right, power or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.  To the maximum extent permitted by Applicable Laws, (i) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given, and (ii) no notice to or demand on one Party will be deemed to be a waiver of any right of the party hereto that gives such notice or demand to take further action without notice or demand.

Section 13.04. *Entire Agreement; Amendment.*

This Agreement (including the Schedules, Disclosure Schedules and the Exhibits), the other Transaction Documents and the Confidentiality Agreement supersede all prior agreements between Buyer and the Selling Entities with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between Buyer and the Selling Entities with respect to the subject matter hereof and thereof.  Except as permitted under Section 2.05(c)Section 2.05(c), this Agreement, including all exhibits hereto, may not be amended, modified or supplemented, or the terms hereof waived, except by a written agreement executed by all of the Parties.  [Notwithstanding the foregoing, this Section 13.04, Section 13.12 and Section 13.16, in each case to the extent the proposed amendment to any such Section is adverse to any Debt Financing Source, may not be amended without the consent of such Debt Financing Source.]

Section 13.05. *Assignment.*

This Agreement, and the rights, interests and obligations hereunder, may not be assigned by any Party (by operation of law or otherwise) without the express written consent of the other Parties; *provided,* that this Agreement and the rights and obligations of Buyer hereunder may be assigned by Buyer, without the prior written consent of any Selling Entity, to one or more of Buyer's Subsidiaries including but not limited to a to-be-formed limited liability company wholly owned by Buyer, so long as (x) such Subsidiary is designated in writing by Buyer to Seller prior to the Closing, (y) Buyer continues to remain obligated in full hereunder, and (z) any such assignment would not reasonably be expected to impede or delay the Closing; *provided, further* that Seller may assign some or all of its rights or delegate some or all of their obligations hereunder to successor entities pursuant to a plan of reorganization confirmed by the Bankruptcy Court.  Any attempted or purported assignment in violation of this Section 13.05Section 13.05 will be deemed

void *ab initio*.  This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

Section 13.06. *Severability.*

The provisions of this Agreement will be deemed severable, and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected by such invalidity or unenforceability.

Section 13.07. *Expenses.*

Each of Seller, on the one hand, and Buyer, on the other hand, will bear its own respective expenses incurred in connection with the negotiation and execution of this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby; *provided* that (a) Buyer shall pay all filing fees and expense of the Parties required in connection with any HSR Act filing or any other filing in connection with any Antitrust Laws, if such filings are necessary, and (b) Seller will pay all fees or expenses required to be paid to the Escrow Agent in connection with the Deposit Escrow Account.

Section 13.08. *Specific Performance.*

The Parties agree that irreparable damage would occur if any provision of this Agreement is not performed in accordance with the terms hereof, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement, and that monetary damages, even if available, would not be an adequate remedy therefor. Accordingly, each Party will be entitled to an injunction or injunctions without proof of damages or posting a bond or other security to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, including specific performance of the covenants, promises or agreements contained in this Agreement or an Order enjoining the applicable Party from any threatened, or from the continuation of any actual, breach of such covenants, promises or agreements, in each case in this sentence, in addition to any other remedy to which they are entitled at law or in equity.  Unless otherwise expressly stated in this Agreement (including pursuant to Section 13.07~~Section 13.07~~), no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a Party from pursuing other rights and remedies to the extent available under this Agreement, at law or in equity.  The right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Seller nor Buyer would have entered into this Agreement.  Notwithstanding the foregoing, it is understood and agreed that no Selling Entity shall have the right to seek specific performance of Buyer's obligation to consummate the Closing unless all conditions set forth in Article 9~~Article 9~~ and in Article 10~~Article 10~~ have been satisfied or waived by Buyer.

Section 13.09. *Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.*

(a) **Except (i) to the extent the mandatory provisions of the Bankruptcy Code apply and (ii) except for any real or immovable property issues, which will be governed by and construed and enforced in accordance with the internal laws of the State or Commonwealth in which such real or immovable property is located (without reference to the choice of law rules of such State), this Agreement will be governed by, and construed in accordance with, the laws of the State of Delaware applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.**

(b) Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes, which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing will be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; *provided* that, if the Bankruptcy Cases are closed pursuant to Section 350 of the Bankruptcy Code, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Delaware Chancery Court or, if such court will not have jurisdiction, any federal court located in the State of Delaware or other Delaware state court, and any appellate court from any thereof for the resolution of any such claim or dispute.  The Parties each hereby irrevocably waive, to the fullest extent permitted by Applicable Laws, the defense of an inconvenient forum to the maintenance of any such Proceeding.  The Parties each consent to service of process by mail (in accordance with Section 13.02Section 13.02) or any other manner permitted by law.

(c) THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF ANY PARTY OR SUCH PARTY'S REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF[, IN EACH CASE, INCLUDING ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF THE DEBT COMMITMENT LETTER OR IN CONNECTION WITH THE DEBT FINANCING.].

Section 13.10. *Counterparts.*

This Agreement and any amendment hereto may be executed in one (1) or more counterparts, each of which will be deemed to be an original of this Agreement or such amendment and all of which, when taken together, will constitute one and the same instrument. Notwithstanding anything to the contrary in Section 13.02Section 13.02, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by email attachment will be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

69

Section 13.11. *Parties in Interest; No Third Party Beneficiaries.*

This Agreement will inure to the benefit of and be binding upon Buyer, Seller and their respective successors and permitted assigns.  This Agreement is for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or will confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind, except that Section 13.12~~Section 13.12~~ is intended for the benefit of and is enforceable by the Party Affiliates; *provided* that in each case such party will be subject to all the limitations and procedures of this Agreement as if it were a Party hereunder.  ~~[Notwithstanding the foregoing, the provisions of Section 13.04, this Section 13.11 and Section 13.16 shall be enforceable by the Debt Financing Sources and such Debt Financing Sources shall be entitled to enforce such provisions and to avail themselves of the benefits of any remedy for any breach of such provisions, all to the same extent as if such persons were signatories to this Agreement.]~~

Section 13.12. *No Recourse.*

(a)     Notwithstanding anything that may be expressed or implied in this Agreement or any other Transaction Document, and notwithstanding the fact that any Party may be a partnership or limited liability company, each Party, by its acceptance of the benefits of this Agreement, covenants, agrees and acknowledges that no Persons other than the Parties will have any obligation hereunder and that it has (on behalf of itself and its Subsidiaries) no rights of recovery thereunder against, and no recourse thereunder or in respect of any oral representations made or alleged to be made in connection therewith will be had against, any former, current or future Affiliate, incorporator, controlling Person, fiduciary, Representative, co-owner or equity holder of any Party (or any of their successors or permitted assignees) (each, other than, for the avoidance of doubt, a Party itself a "**Party Affiliate**"), whether by or through attempted piercing of the corporate veil, by or through a claim (whether in tort, Contract or otherwise) by or on behalf of such Person against the Party Affiliates, by the enforcement of any assessment or by any legal or equitable Proceeding, or by virtue of any statute, regulation or other Applicable Law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever will attach to, be imposed on or otherwise be incurred by any Party Affiliate, as such, for any obligations of the applicable Party hereunder or the transaction contemplated hereby, under any documents or instruments delivered contemporaneously herewith, in respect of any oral representations made or alleged to be made in connection herewith, or for any claim (whether in tort, Contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation.

(b)     Effective as of the ~~Closing (but only if the Closing actually occurs)~~, except for any rights or obligations under this Agreement, the other Transaction Documents and the Confidentiality Agreement, Buyer, on behalf of itself and each of its Affiliates and each of its and their respective ~~past,~~ present and/or future officers, directors (and Persons in similar positions), employees, ~~agents,~~ general or limited partners, managers, management companies, members, ~~advisors, stockholders, equity holders,~~ controlling Persons, other Representatives or Affiliates, or any heir, executor, administrator, successor or assign of any of the foregoing (collectively, the "**Releasors**"), hereby irrevocably and unconditionally releases and forever ~~discharges~~ waives to pursue each Selling Entity, each other Subsidiary of Seller, their respective Affiliates and each of the foregoing's respective past, present and/or future officers, directors

(and Persons in similar positions), employees, agents, general or limited partners, managers, management companies, members, advisors, stockholders, equity holders, controlling Persons, other Representatives or Affiliates, or any heir, executor, administrator, successor or assign of any of the foregoing (collectively, the "**Released Parties**") of and from any and all actions, causes of action, suits, Proceedings, executions, Orders, duties, debts, dues, accounts, bonds, Liabilities, Contracts and covenants (whether express or implied), and claims and demands whatsoever whether in law or in equity (whether based upon contract, tort or otherwise), which any of the Releasors may have against any of the Released Parties, now or in the future, in each case solely in respect of any cause, matter or thing relating to the Assets, the Business or any action taken or failed to be taken by any of the Released Parties in any capacity related to the Selling Entities, the Assets or the Business occurring or arising on or prior to the Closing Date. From and after the Closing and notwithstanding any applicable statute of limitations, Buyer will not, and to the extent within Buyer's control, will cause each of the other Releasors not to, bring any action, suit or Proceeding against Seller or any of the other Released Parties, whether at law or in equity, with respect to any of the rights or claims waived and released by Buyer on behalf of itself and the other Releasors hereunder.

(c)　　Buyer agrees that if Buyer or any of its Affiliates obtains or binds a representations and warranties insurance policy with respect to any of the representations or warranties set forth in Article 5Article 5 of this Agreement (each, a "**R&W Insurance Policy**"), each such R&W Insurance Policy will at all times provide that: (1) the insurer will have no, and will waive and not pursue any and all, subrogation rights against Seller, any of its Subsidiaries or any of its or their respective Affiliates, (2) Seller is third party beneficiary of such waiver and (3) Buyer will have no obligation to pursue any claim against Seller or any of its Subsidiaries in connection with any Liability.

Section 13.13. *Disclosure Schedules; Materiality.*

The inclusion of any matter in any Disclosure Schedule will be deemed to be a disclosure in all other Disclosure Schedules, without the need for repetition or cross reference, to the extent that the relevance of such disclosure to the other Disclosure Schedules is reasonably apparent on its face.  The inclusion of any matter in any Disclosure Schedule will not be deemed to constitute an admission, or otherwise imply, that any such matter is material or creates a measure for materiality for purposes of this Agreement.  The disclosure of any particular fact or item in any Disclosure Schedule will not be deemed an admission as to whether the fact or item is "material" or would constitute a "Material Adverse Effect."

Section 13.14. *Liquidating Trustee.*

If at any time Seller liquidates, its estate is converted to Chapter 7, or otherwise has a trustee or other Representative appointed by the Bankruptcy Court (as applicable, a "**Trustee**"), then (a) such Trustee will be bound to perform the obligations of Seller and will be entitled to exercise the rights of Seller under this Agreement, and (b) with respect to all of Seller's or its Subsidiaries' assets that are abandoned (if any) following the date hereof, Seller grants to such Trustee a power of attorney for purposes performing Seller's obligations under Section 2.06Section 2.06 with respect to such abandoned assets.  Seller acknowledges and agrees that the power of attorney granted to such Trustee (if any) pursuant to the foregoing clause (b)(b) is coupled

with an interest and will be irrevocable.  Further, such power of attorney will also be granted to Buyer for purposes of performing Seller's obligations under ~~Section 2.06~~Section 2.06 with respect to such abandoned assets, as determined by Buyer, and in the event Buyer exercises such power of attorney, the Trustee will not commit any act or take any action that is inconsistent with such exercise by Buyer, except as requested in writing by Buyer.

Section 13.15. *Conflicts; Privileges.*

(a)     It is acknowledged by each of the parties that Seller has retained Davis Polk & Wardwell LLP ("**Davis Polk**") to act as its counsel in connection with this Agreement and the transactions contemplated hereby (the "**Current Representation**"), and that no other party has the status of a client of Davis Polk for conflict of interest or any other purposes as a result thereof. Buyer hereby agrees that after the Closing, Davis Polk may represent Seller or any of its Affiliates or any of their respective Representatives (any such Person, a "**Designated Person**") in any matter involving or arising from the Current Representation, including any interpretation or application of this Agreement or any other agreement entered into in connection with the transactions contemplated hereby, and including for the avoidance of doubt any Proceeding between or among Buyer or any of its Affiliates, and any Designated Person, even though the interests of such Designated Person may be directly adverse to Buyer or any of its Affiliates, and even though Davis Polk may have represented Buyer in a substantially related matter, or may be representing Buyer in ongoing matters.  Buyer hereby waives and agrees not to assert (1) any claim that Davis Polk has a conflict of interest in any representation described in this Section or (2) any confidentiality obligation with respect to any communication between Davis Polk and any Designated Person occurring during the Current Representation.

(b)     Buyer hereby agrees that all communications (whether before, at or after the Closing) between Davis Polk and any Designated Person that relate in any way to the Current Representation that are attorney-client privileged (the "**Deal Communications**") and all rights to any other evidentiary privilege, and the protections afforded to information relating to representation of a client under applicable rules of professional conduct that may apply to such Deal Communications, belong to Seller and may be controlled by Seller and will not pass to or be claimed by Buyer or any of its Representatives and Buyer hereby agrees that it will not seek to compel disclosure to Buyer or any of its Representatives of any such communication that is subject to attorney client privilege, or any other evidentiary privilege.

(c)     Notwithstanding the foregoing, in the event that a dispute arises between Buyer, on the one hand, and a third party other than any Selling Entity, on the other hand, Buyer may assert the attorney-client privilege to prevent the disclosure of the Deal Communications to such third party; *provided*, *however*, that Buyer may not waive such privilege without the prior written consent of the Selling Entities (which such consent shall not be unreasonably withheld, conditioned or delayed).  In the event that Buyer or any of its respective directors, officers, employees or other representatives is legally required by governmental order or otherwise to access or obtain a copy of all or a portion of the Deal Communications, Buyer shall, to the extent legally permissible, (x) reasonably promptly notify the Selling Entities in writing (including by making specific reference to this Section 13.15(c)~~Section 13.15(c)~~), (y) agree that the Selling Entities may seek a protective order and (z) use, at the Selling Entities' sole cost and expense, commercially reasonable efforts to assist therewith.

Section 13.16. [Intentionally Deleted]  *Liability of Financing Sources.*  No Seller Related Party shall have any rights or claims against any Debt Financing Source in connection with this Agreement, the Debt Financing or the transactions contemplated hereby or thereby, whether at law or equity, in contract, in tort or otherwise; *provided* that, notwithstanding the foregoing, nothing in this Section 13.16 shall in any way limit or modify the rights and obligations of Buyer under this Agreement or any Debt Financing Source's obligations to Buyer under the Debt Financing or any financing commitment in respect thereof.]

[*Signature pages follows.*]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the day and year first above written.

**SELLER:**

**DEAN FOODS COMPANY**

By: _____
Name: _____
Title: _____

**SELLING ENTITIES:**

**[ • ]**

By: _____
Name: _____
Title: _____

**[ • ]**

By: _____
Name: _____
Title: _____

**[ • ]**

By: _____
Name: _____
Title: _____

*[Signature Page to Asset Purchase Agreement]*

[BUYER]MARYLAND AND VIRGINIA MILK
PRODUCERS COOPERATIVE
ASSOCIATION, INCORPORATED, a Virginia
corporation organized as a cooperative
association under Virginia law

By:

Name: Jay Bryant
Title: CEO

*[Signature Page to Asset Purchase Agreement]*