**ASSET PURCHASE AGREEMENT**

DATED AS OF _____, 2020

BY AND AMONG

DEAN FOODS COMPANY,

EACH OF THE SUBSIDIARIES OF DEAN FOODS COMPANY

LISTED ON THE SIGNATURE PAGES HERETO,

AND

PRAIRIE FARMS DAIRY, INC.

# TABLE OF CONTENTS

PAGE

## ARTICLE 1
## DEFINITIONS

Section 1.01.  *Definitions.* ..................................................................................1
Section 1.02.  *Other Definitions and Interpretive Matters.* .............................19

## ARTICLE 2
## PURCHASE AND SALE

Section 2.01.  *Purchase and Sale.* .......................................................................21
Section 2.02.  *Excluded Assets.* ...........................................................................24
Section 2.03.  *Assumed Liabilities.* .....................................................................26
Section 2.04.  *Excluded Liabilities.* .....................................................................26
Section 2.05.  *Cure Costs; Desired 365 Contracts.* ...........................................27
Section 2.06.  *Assignment of Assets Subject to Consent Requirements.* ...........28
Section 2.07.  *Additional Excluded Assets.* .......................................................28
Section 2.08.  *Misallocated Assets.* .....................................................................29
Section 2.09.  *Further Assurances.* ......................................................................29
Section 2.10.  *Withholding.* ..................................................................................29

## ARTICLE 3
## PURCHASE PRICE

Section 3.01.  *Purchase Price.* ..............................................................................30
Section 3.02.  *Good Faith Deposit* .......................................................................30
Section 3.03.  *Estimated Cash Purchase Price* ...................................................31
Section 3.04.  *Determination of Final Cash Purchase Price* .............................31

## ARTICLE 4
## CLOSING

Section 4.01.  *Closing Date.* .................................................................................35
Section 4.02.  *Payments on the Closing Date.* .....................................................35
Section 4.03.  *Buyer's Deliveries.* ........................................................................35
Section 4.04.  *The Selling Entities' Deliveries.* ..................................................36

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF SELLING ENTITIES

Section 5.01.  *Organization and Good Standing.* ...............................................37
Section 5.02.  *Authority; Validity.* .......................................................................37
Section 5.03.  *Governmental Approvals; No Conflict.* .......................................38
Section 5.04.  *Seller SEC Documents.* .................................................................38
Section 5.05.  *Financial Statements.* ...................................................................39
Section 5.06.  *No Undisclosed Material Liabilities.* ...........................................39

i

Section 5.07.   *Absence of Certain Changes.* ..............................................39
Section 5.08.   *Legal Proceedings.* ...........................................................39
Section 5.09.   *Compliance with Laws; Permits.* ......................................40
Section 5.10.   *Food Safety Matters.* ........................................................40
Section 5.11.   *Material Contracts.* ..........................................................41
Section 5.12.   *Intellectual Property.* .......................................................43
Section 5.13.   *Environmental, Health and Safety Matters.* .....................45
Section 5.14.   *Title.* ..................................................................................46
Section 5.15.   *Matters Related to Assets; Casualty Losses* .....................48
Section 5.16.   *Inventory.* ..........................................................................48
Section 5.17.   *Insurance.* ..........................................................................48
Section 5.18.   *Security Arrangements* ......................................................48
Section 5.19.   *Customers and Suppliers.* ..................................................49
Section 5.20.   *Anti-Corruption.* ...............................................................49
Section 5.21.   *Brokers or Finders.* ...........................................................50
Section 5.22.   *Seller Benefit Plans; Labor and Employment Matters.* ............50
Section 5.23.   *Taxes.* .................................................................................52

ARTICLE 6
REPRESENTATIONS AND WARRANTIES OF BUYER

Section 6.01.   *Organization and Good Standing.* .....................................53
Section 6.02.   *Authority; Validity; Consents.* ..........................................53
Section 6.03.   *No Conflict.* .......................................................................53
Section 6.04.   *Legal Proceedings.* ...........................................................54
Section 6.05.   *Bankruptcy.* .......................................................................54
Section 6.06.   *Brokers or Finders.* ...........................................................54
Section 6.07.   *Financing.* ..........................................................................54
Section 6.08.   *Independent Evaluation.* ...................................................55
Section 6.09.   *No Other Representations or Warranties.* ..........................55

ARTICLE 7
ACTIONS PRIOR TO THE CLOSING DATE

Section 7.01.   *Access and Reports.* ..........................................................56
Section 7.02.   *Operations Prior to the Closing Date.* ...............................56
Section 7.03.   *Commercially Reasonable Efforts* .....................................59
Section 7.04.   *Regulatory Approvals* ........................................................59
Section 7.05.   *Bankruptcy Court Approval.* .............................................61
Section 7.06.   *Damage or Destruction* ......................................................61
Section 7.07.   *Buyer Efforts to Obtain Financing* ....................................61
Section 7.08.   *Cooperation with Financing* ..............................................62
Section 7.09.   *Section 1113 Collective Bargaining Agreement.* ..............63
Section 7.10.   *Additional Selling Entities.* ...............................................63
Section 7.11.   *Public Announcements; Filings.* ........................................64

## ARTICLE 8
## ADDITIONAL AGREEMENTS

Section 8.01.   *Taxes.* ........................................................................................64
Section 8.02.   *Allocation of Purchase Price.* ......................................................65
Section 8.03.   *Assigned Contracts; Adequate Assurance and Performance.* ...................65
Section 8.04.   *Employee Matters.* ......................................................................65
Section 8.05.   *Post-Closing Books and Records.* .................................................67
Section 8.06.   *Intellectual Property Matters* .......................................................68
Section 8.07.   *Title Matters* ..............................................................................69
Section 8.08.   *Insurance Access* ........................................................................70
Section 8.09.   *Collection of Accounts Receivable.* ..............................................70
Section 8.10.   *Cure Costs; Accrued Liabilities* ..................................................71
Section 8.11.   *Permits* ......................................................................................71
Section 8.12.   *Lease Expirations* .......................................................................71

## ARTICLE 9
## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

Section 9.01.   *Accuracy of Representations* ........................................................71
Section 9.02.   *Selling Entities' Performance* ......................................................72
Section 9.03.   *Seller's Deliveries* ......................................................................72
Section 9.04.   *Sale Order* ..................................................................................72
Section 9.05.   *Collective Bargaining Agreements* ...............................................72

## ARTICLE 10
## CONDITIONS PRECEDENT TO THE OBLIGATION OF BUYER AND THE
## SELLING ENTITIES

Section 10.01. *No Order* ....................................................................................72
Section 10.02. *Competitive Concerns* .................................................................72
Section 10.03. *Sale Order* ..................................................................................72
Section 10.04. *Successor Liability* ......................................................................73

## ARTICLE 11
## CONDITIONS PRECEDENT TO THE OBLIGATION OF THE SELLING ENTITIES
## TO CLOSE

Section 11.01. *Accuracy of Representations* ........................................................73
Section 11.02. *Buyer's Performance* ...................................................................73
Section 11.03. *Buyer's Deliveries.* ......................................................................73

## ARTICLE 12
## TERMINATION

Section 12.01. *Termination Events.* ....................................................................73
Section 12.02. *Effect of Termination* ..................................................................75
Section 12.03. *Procedure Upon Termination* .......................................................75

ARTICLE 13
INDEMNIFICATION

Section 13.01. *Indemnification by Selling Parties* .............................................................75
Section 13.02. *Payment of Claims* .....................................................................................76
Section 13.03. *Release of Customer Deductions Escrow Funds* ........................................76

ARTICLE 14
GENERAL PROVISIONS

Section 14.01. *No Survival of Representations and Warranties.* .......................................76
Section 14.02. *Notices.* .....................................................................................................76
Section 14.03. *Waiver.* ......................................................................................................77
Section 14.04. *Entire Agreement; Amendment.* .................................................................78
Section 14.05. *Assignment.* ...............................................................................................78
Section 14.06. *Severability.* ..............................................................................................78
Section 14.07. *Expenses.* ...................................................................................................78
Section 14.08. *Specific Performance.* ................................................................................79
Section 14.09. *Governing Law; Consent to Jurisdiction and Venue; Jury Trial*
*Waiver.* ........................................................................................................79
Section 14.10. *Counterparts.* .............................................................................................80
Section 14.11. *Parties in Interest; No Third Party Beneficiaries.* .....................................80
Section 14.12. *No Recourse.* ..............................................................................................81
Section 14.13. *Disclosure Schedules; Materiality.* ............................................................81
Section 14.14. *Liquidating Trustee.* ...................................................................................81
Section 14.15. *Conflicts; Privileges.* ..................................................................................82
Section 14.16. *Liability of Financing Sources* ..................................................................82
Section 14.17. *Release* .......................................................................................................83

iv

**Exhibits:**

| | |
|---|---|
| Exhibit A | Form of Sale Order |
| Exhibit B | IP Assignment Agreement |
| Exhibit C | Master Assignment |

**Schedules**:

| | |
|---|---|
| Schedule 1.01(a) | Company Employees |
| Schedule 1.01(b)(1) | Seller Knowledge Persons |
| Schedule 2.01(b)(v) | Acquired Owned Real Property |
| Schedule 2.01(b)(v) | Acquired Leased Real Property |
| Schedule 2.02(i) | D&O Policy |
| Schedule 2.02(r) | Excluded Real Property |
| Schedule 2.05(a) | 365 Contracts |
| Schedule 7.02 | Operation Prior to Close |
| Schedule 7.04 | Transferred Permits |
| Schedule 7.09 | Collective Bargaining Agreement Modifications |
| Disclosure Schedules | |

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of _____, 2020, is by and among Dean Foods Company, a company organized under the laws of the State of Delaware whose address is 2711 North Haskell Avenue, Suite 3400, Dallas, TX 75204 ("**Seller**"), each of the Subsidiaries of Seller listed on the signature pages hereto (together with Seller, the "**Selling Entities**") and Prairie Farms Dairy, Inc., a cooperative organized under the laws of the State of Illinois ("**Buyer**"). Capitalized terms used but not otherwise defined herein have the meanings set forth in Article 1. The Selling Entities and Buyer are sometimes referred to collectively herein as the "**Parties**" and individually as a "**Party**".

## RECITALS

WHEREAS, the Selling Entities are engaged in the Business (as defined herein);

WHEREAS, on November 12, 2019 (the "**Petition Date**"), the Selling Entities commenced voluntary cases (the "**Bankruptcy Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**");

WHEREAS, the Selling Entities desire to sell to Buyer all of the Assets (as defined herein), and Buyer desires to purchase from the Selling Entities all of the Assets and assume all of the Assumed Liabilities (as defined herein), upon the terms and conditions hereinafter set forth;

WHEREAS, the Parties intend to effectuate the transactions contemplated by this Agreement through a sale of the Assets pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Rules 2002, 4001, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"); and

WHEREAS, the Selling Entities' ability, and Buyer's willingness, to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order (as defined herein) by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

ARTICLE 1
DEFINITIONS

Section 1.01.    *Definitions.*

For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"**365 Contracts**" means all of the Selling Entities' respective executory Contracts and unexpired Leases, in each case, within the meaning of Section 365 of the Bankruptcy Code, that

1

are used in the operation of the Business, or related to the Assets or Assumed Liabilities.  For the avoidance of doubt, none of the Hedge Contracts are 365 Contracts.

"**Accounting Firm**" has the meaning set forth in Section 3.04(b).

"**Accounting Principles**" means GAAP applied on a basis consistent with the preparation of the Financial Statements; *provided*, *however*, that in the event of a conflict between GAAP and consistent application, GAAP shall prevail.

"**Accounts Receivable**" means any and all accounts receivable, notes receivable and other amounts receivable owed to Seller or any of its Subsidiaries (whether current or non-current), together with all security or collateral therefor and any interest or unpaid financing charges accrued thereon, including all Proceedings pertaining to the collection of amounts payable, or that may become payable, to Seller or any of its Subsidiaries with respect to products sold or services performed on or prior to the Closing Date.

"**Acquired Inventory**" has the meaning set forth in Section 2.01(b)(iv).

"**Acquired Leased Real Property**" has the meaning set forth in Section 2.01(b)(v).

"**Acquired Owned Real Property**" has the meaning set forth in Section 2.01(b)(v).

"**Acquired Real Property**" has the meaning set forth in Section 2.01(b)(v).

"**Adjustment Escrow Account**" has the meaning set forth in Section 4.02.

"**Adjustment Escrow Amount**" means an amount in cash equal to $10,000,000.

"**Adjustment Escrow Funds**" means the funds held in the Adjustment Escrow Account from time to time.

"**Adjustment Time**" means 12:01 am (prevailing Eastern Time) on the Closing Date.

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly (through one or more intermediaries) Controls, is Controlled by or is under common Control with such specified Person; *provided* that none of the equity holders of Seller or creditors of the Selling Entities (other than any equity holder of Seller or creditor who is a Subsidiary of any Selling Entity), or any of the Specified Entities, will be considered an Affiliate of a Selling Entity for purposes of this Agreement.

"**Agreement**" has the meaning set forth in the introductory paragraph.

"**Allocation**" has the meaning set forth in Section 8.02(a).

"**Anti-Corruption Laws**" has the meaning set forth in Section 5.20.

"**Antitrust Division**" has the meaning set forth in Section 7.04.

"**Applicable Food Safety Laws**" has the meaning set forth in Section 5.10.

2

"**Applicable Law**" means, with respect to any Person, any transnational, domestic or foreign federal, state, provincial, municipal or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, Order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, promulgated, enforced or applied by a Governmental Authority that is binding upon or applicable to such Person or its properties, as amended unless expressly specified otherwise.

"**Assets**" has the meaning set forth in Section 2.01(b).

"**Assigned Contracts**" has the meaning set forth in Section 2.01(b)(vi).

"**Assumed Indebtedness**" means all obligations under leases that are Assigned Contracts and that are required to be capitalized in accordance with GAAP.

"**Assumed Liabilities**" has the meaning set forth in Section 2.03.

"**Avoidance Actions**" has the meaning set forth in Section 2.01(b)(xix).

"**Bankruptcy Cases**" has the meaning set forth in the recitals.

"**Bankruptcy Code**" has the meaning set forth in the recitals.

"**Bankruptcy Court**" has the meaning set forth in the recitals.

"**Bankruptcy Rules**" has the meaning set forth in the recitals.

"**Base Purchase Price** " has the meaning set forth in Section 3.01(a).

"**Bidding Procedures**" means the procedures to be employed with respect to the proposed sale of the Assets pursuant to the Bidding Procedures Order.

"**Bidding Procedures Order**" means the *Order (I) Approving Bidding Procedures For Sale Of Debtors' Assets, (II) Scheduling Hearing To Approve Sale Of Debtors' Assets, (III) Approving Form And Manner Of Notices Of Sale And Sale Hearing, (IV) Approving Assumption And Assignment Procedures, And (V) Granting Related Relief* [Docket No. 1178], entered in the Bankruptcy Cases on March 19, 2020.

"**Business**" means the business of manufacturing, marketing, distributing and selling certain branded and private label dairy and dairy case products, including fluid milk, ice cream, cultured dairy products, creamers, ice cream mix and other dairy products, and certain juices, teas and bottled water products, in each case to retailers, distributors, food service outlets, educational institutions, food processors and Governmental Authorities, as conducted by Seller or any of its Subsidiaries, at or primarily related to the Facilities, including the ownership and operation of the Assets.

"**Business Day**" means any day, other than Saturday or Sunday, on which commercial banks are open for commercial business with the public in New York City, New York and Dallas, Texas.

3

"**Business IT Assets**" has the meaning set forth in Section 5.12(g).

"**Buyer**" has the meaning set forth in the introductory paragraph.

"**Buyer Indemnified Parties**" has the meaning set forth in Section 13.01.

"**Buyer Released Party**" or "**Buyer Released Parties**" has the meaning set forth in Section 14.17(b).

"**Buyer Releasors**" has the meaning set forth in Section 14.17(a).

"**Buyer Welfare Plan**" has the meaning set forth in Section 8.04(c).

"**Cash Purchase Price**" has the meaning set forth in Section 3.01(a).

"**Casualty Loss**" means any loss, damage or destruction of the Assets that occurs for any reason, including any act of God, fire, explosion, collision, earthquake, windstorm, flood, hurricane, tropical storm, terrorism, or other casualty or condemnation taking under the right of eminent domain, but excluding any loss, damage, or destruction as a result of depreciation or ordinary wear and tear.

"**Causes of Action**" has the meaning set forth in Section 14.17(a).

"**Claim**" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"**Closing**" has the meaning set forth in Section 4.01.

"**Closing Assumed Indebtedness**" has the meaning set forth in Section 3.04(a).

"**Closing Date**" has the meaning set forth in Section 4.01.

"**Closing Payment Amount**" means an amount equal to (a) the Estimated Cash Purchase price *minus* (b) the Customer Deductions Escrow Amount *minus* (c) the Adjustment Escrow Amount.

"**Closing Property Tax Purchase Price Adjustment**" has the meaning set forth in Section 3.04(a).

"**Closing Statement**" has the meaning set forth in Section 3.04(a).

"**Closing Transfer Tax Purchase Price Adjustment**" has the meaning set forth in Section 3.04(a).

"**Closing Working Capital**" has the meaning set forth in Section 3.04(a).

"**Code**" means the United States Internal Revenue Code of 1986.

"**Collective Bargaining Agreement**" means any written agreement between any Selling Entity with a union representing any Company Employees that governs the terms and conditions of employment, whether or not such agreement is expired by its terms.

"**Company Employees**" means those employees and those independent contractors of a Selling Entity, in each case as set forth on Schedule 1.01(a).[1]

"**Company Service Providers**" means those current and former employees, consultants, independent contractors and other service providers of Seller or any of its Subsidiaries who provide or provided services to the Business or a Facility, including all Company Employees.

"**Confidentiality Agreement**" has the meaning set forth in Section 7.01(b).

"**Contract**" means any agreement, contract, lease, deed, license, instrument, commitment, undertaking or obligation (in each case, whether written or oral) that is legally binding, including the Leases.

"**Control**" (including the terms "**Controlled by**" and "**under common Control with**") means the ability (directly or indirectly through one or more intermediaries) to direct or cause the direction of the management or affairs of a Person, whether through the ownership of voting interests, by Contract or otherwise.

"**Copyright**" means any copyright (including software), any copyrightable work, any work of authorship, any moral rights related to any of the foregoing, any registration or recording of any copyright (including software), copyrightable work or work of authorship, and any application in connection therewith, including any such registration, recording, or application in the United States Copyright Office or in any similar office or agency of the United States, any State thereof, or any other jurisdiction, and any renewal of any of the foregoing.

"**Cure Costs**" means all monetary Liabilities, including pre-petition monetary Liabilities, of the Selling Entities that must be paid or otherwise satisfied to cure all of the Selling Entities' monetary and other defaults under the Assigned Contracts pursuant to Section 365 of the Bankruptcy Code at the time of the assumption thereof and assignment of the Assigned Contracts to Buyer as provided hereunder, as such amounts are determined by the Bankruptcy Court or approved pursuant to the assignment and assumption procedures provided for in the Bidding Procedures Order.

"**Current Assets**" means, the Acquired Inventory to the extent historically included in the current assets of the Selling Entities prior to the date of this Agreement as reflected in Seller's Financial Statements and, in each case, outstanding as of the Adjustment Time. For purposes of determining the amount of the Current Assets (a) Acquired Inventory shall be valued at the lower of cost or market on a first-in-first-out basis, net of required inventory reserves and (b) Acquired Inventory that is of a category that historically has not been reflected in Seller's Financial Statements shall be assigned no value.

---

[1] **Note**: Schedule to describe all employees of the Selling Entities primarily or exclusively providing services to the Facilities and to address treatment of inactive employees.

"**Current Liabilities**" means the following Liabilities of Seller or its Subsidiaries to the extent exclusively related to the Business: (a) the accrued but unpaid portion of the payroll liability with respect to Company Employees for pay periods beginning before the Closing but ending after the Closing, (b) accrued but unpaid bonuses and incentives under the annual incentive plans of the Selling Entities in place for the 2020 performance year with respect to Company Employees, (c) accrued but unpaid utility liabilities, (d) accrued but unpaid real estate and personal property Taxes, (e) any amounts payable by check or wire transfer to customers under rebate programs, and (f) accrued but unused paid vacation, paid sick-leave and other paid time off with respect to Company Employees to the extent not required by Applicable Law to be paid by a Selling Entity to the Company Employees upon termination of employment as a result of or in connection with Closing, in each case, outstanding as of the Adjustment Time.[2]

"**Current Representation**" has the meaning set forth in Section 14.15.

"**Customer Deductions**" means all deductions and offsets against customer accounts receivables for discounts, returns, spoils, damages, shortages, short pays and promotions arising from sales to customers prior to the Closing Date.

"**Customer Deductions Claim**" has the meaning set forth in Section 13.01.

"**Customer Deductions Escrow Amount**" means an amount in cash equal to $3,000,000.

"**Customer Deductions Escrow Funds**" means the funds held in the Customer Deductions Escrow Account from time to time.

"**Damage or Destruction Loss**" has the meaning set forth in Section 7.06.

"**Damages**" means all damages, losses, costs, Taxes, payments, royalties and expenses that are incurred or suffered, that are reasonably likely to be incurred or suffered, or that are claimed by a Third Party to be incurred or suffered by a party with respect to or relating to an event, circumstance or state of facts. Damages shall specifically include court costs and the reasonable fees and expenses of legal counsel arising out of or relating to any direct or Third Party claims, demands, actions, causes of action, suits, litigations, arbitrations or Liabilities.

"**Data Protection Laws**" means the data protection and privacy laws of each jurisdiction where any Selling Entity is operating the Business and those of each jurisdiction where any Personal Information is collected, transmitted, secured, stored, shared or otherwise processed by or on behalf a Selling Entity in connection with the operation of the Business, including, to the extent applicable, the General Data Protection Regulation (EU 2016/679) (GDPR), the e-Privacy Directive (Directive 2002/58/EC) and the e-Privacy Regulation (Regulation 2017/003) (once it takes effect), the California Consumer Privacy Act, Section 5 of the (U.S.) Federal Trade Commission Act and any and all laws and regulations governing privacy, cybercrime, use of electronic data, or unfair or deceptive trade practices.

---

[2]     **Note**: Assumption of Current Liabilities related to Company Employees is subject to transition services discussions.

"**Data Security Requirements**" has the meaning set forth in Section 5.12(h).

"**Davis Polk**" has the meaning set forth in Section 14.15.

"**Deal Communications**" has the meaning set forth in Section 14.15(b).

"**Debt Commitment Letter**" has the meaning set forth in Section 6.07.

"**Debt Financing**" has the meaning set forth in Section 6.07.

"**Debt Financing Agreements**" has the meaning set forth in Section 7.07(b).

"**Debt Financing Source**" means, in its capacity as such, any lender or similar debt financing source with respect to the Debt Financing and their respective Affiliates, and such lender's or other debt financing source's (and their respective Affiliates') employees, officers, directors, attorneys, agents or advisors.

"**Deposit Amount**" has the meaning set forth in Section 3.02.

"**Deposit Escrow Account**" means the deposit escrow account maintained with the Escrow Agent on behalf of Seller.

"**Designated Person**" has the meaning set forth in Section 14.15.

"**Desired 365 Contracts**" has the meaning set forth in Section 2.05(a).

"**DIP Credit Agreement**" has the meaning ascribed to such term in the DIP Order, as in effect as of the date of this Agreement.

"**DIP Order**" means the Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, 507, and 552 and Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Post-Petition Financing, and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Providing Adequate Protection to Prepetition Secured Parties, and (IV) Granting Related Relief Docket No. 608 entered by the Bankruptcy Court on December 23, 2019.

"**Encumbrance**" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, charge, interests, debentures, Claims, licenses, assignments by way of security or otherwise, security interests, conditional sales contracts or other title retention agreements, rights of first refusal or similar interests or instruments charging, or creating a security interest in the Assets or any part thereof or interest therein, and any agreements, leases, licenses, occupancy agreements, options, easements, rights of way, restrictions, executions or other encumbrances (including notices or other registrations in respect of any of the foregoing) affecting any right or title to the Assets or any part thereof or interest therein, in each case of any type, nature or kind whatsoever (whether known or unknown, secured or unsecured or in the nature of setoff or recoupment, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-

contingent, liquidated or unliquidated, matured or unmatured, material or nonmaterial, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Bankruptcy Cases, and whether imposed by agreement, understanding, Applicable Law, equity, or otherwise, including claims otherwise arising under doctrines of successor liability), including any liens or security interests provided for in or in relation to the DIP Order, Withdrawal Liability and all other interests as such term is used in Section 363(f) of the Bankruptcy Code.

"**Environmental, Health and Safety Laws**" means any and all Applicable Laws concerning or relating to worker and occupational health and safety, pollution, the protection of human health and safety (with respect to exposure to Hazardous Substances), the environment, climate change and greenhouse gases, animal welfare, natural resources, or threatened and endangered species and their habitats, including any and all Applicable Laws concerning or relating to the use, generation, management, handling, treatment, storage, disposal, transportation or Release of, or exposure to, Hazardous Substances.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**ERISA Affiliate**" means any entity, trade or business (whether or not incorporated) that, together with any other entity, trade or business, is treated as a single employer under Section 414(b), (c), (m) or (o) of the Code.

"**Escrow Agent**" means Citibank, N.A.

"**Escrow Agreement**" means the escrow agreement to be entered into as of the Closing Date, by and among Seller, Buyer and the Escrow Agent, in form and substance reasonably satisfactory to Buyer.

"**Estimated Assumed Indebtedness**" has the meaning set forth in Section 3.03.

"**Estimated Cash Purchase Price**" has the meaning set forth in Section 3.03.

"**Estimated Closing Statement**" has the meaning set forth in Section 3.03.

"**Estimated Property Tax Purchase Price Adjustment**" has the meaning set forth in Section 3.03.

"**Estimated Transfer Tax Purchase Price Adjustment**" has the meaning set forth in Section 3.03.

"**Estimated Working Capital**" has the meaning set forth in Section 3.03.

"**Exchange Act**" has the meaning set forth in Section 5.04(a).

"**Excluded Assets**" has the meaning set forth in Section 2.02.

"**Excluded Contracts**" means all Contracts of Seller or any of its Subsidiaries other than the Assigned Contracts, including, for the avoidance of doubt, all Hedge Contracts and all customer contracts.

"**Excluded Facilities**" means all the plants, offices, and manufacturing, processing, distribution, storage, warehousing and other facilities owned and operated by Seller or any Selling Entities, other than the Facilities.

"**Excluded Liabilities**" has the meaning set forth in Section 2.04.

"**Excluded Real Property Interests**" has the meaning set forth in Section 2.02(q).

"**Excluded Records**" means (a) the general corporate files and records of each Selling Entity related to such entity's organization and existence, (b) each Selling Entity's respective federal, state, local or non-U.S. income, franchise or margin tax files and records, (c) employee files (other than files of Company Employees that are permitted to be transferred pursuant to Applicable Law), (d) records relating to the sale of the Assets, including competing bids, (e) proprietary data (including any engineering studies and forecasts and economic studies) to the extent relating exclusively to Excluded Assets, (f) information and data that is subject to Third Party contractual restrictions on assignment or disclosure to the extent exclusively relating to Excluded Assets, (g) copies of records stored for archival or back up purposes to the extent exclusively relating to Excluded Assets or Excluded Liabilities, and (h) any other files or records to the extent exclusively relating to any Excluded Assets or Excluded Liabilities.

"**Facility Balance Sheet**" has the meaning set forth in Section 5.05(b).

"**Facility Balance Sheet Date**" means January 31, 2020.

"**Facilities**" has the meaning set forth in Section 2.01(b)(i).

"**FDA**" means the United States Food and Drug Administration.

"**FDC Act**" means the United States Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301 et seq.).

"**Final Cash Purchase Price**" has the meaning set forth in Section 3.04(a)(i).

"**Final Closing Statement**" has the meaning set forth in Section 3.04(a)(i).

"**Final Order**" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Cases (or the docket of such other court), which is in full force and effect, which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari,* or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or motion for new trial, stay, reargument or rehearing is then pending or (b) if an appeal, writ of *certiorari* new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other court of competent jurisdiction has been affirmed by the highest court to which such order was appealed,

or *certiorari* has been denied, or a new trial, stay, reargument or rehearing has been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired, as a result of which such order has become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, will not cause such order not to be a Final Order as long as such motion has not been filed.

"**Financial Statements**" has the meaning set forth in Section 5.05(a).

"**Financing Deliverables**" means the following documents to be delivered in connection with the Debt Financing:  (a) customary perfection certificates related to the Assets; (b) corporate organizational documents for the Selling Entities; (c) documentation and other information reasonably requested by the Buyer to evidence compliance with Applicable Laws including (i) as may be required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations (including PATRIOT Act) and (ii) OFAC, FCPA and the Investment Company Act; (d) agreements, documents or certificates that facilitate the creation, perfection or enforcement of Encumbrances on the Assets securing the Debt Financing (including original copies of all certificated securities (with transfer powers executed in blank)) as are requested by Buyer or otherwise required to be delivered hereunder (including documents customarily provided to or requested by financing sources in connection with a real estate financing, including in connection with the provision of customary title insurance and mortgages, or receivables facilities); and (e) such information with respect to the Assets and Assumed Liabilities as is required for the completion or delivery of schedules and opinions in connection with the Debt Financing.

"**Food and Beverage Products**" means all food and beverage products of all types (whether branded or private label, finished food or beverages, works in process, or food or beverage ingredients) manufactured, processed, labeled, held, packed, or packaged by, or for, the Business.

"**FTC**" has the meaning set forth in Section 7.04.

"**GAAP**" means generally accepted accounting principles in the United States.

"**Governmental Authority**" means any court or tribunal in any jurisdiction (domestic or foreign) or any federal, tribal, state, parish, county, municipal or other governmental or quasi-governmental, administrative or regulatory body, agency, authority, department, board, commission, bureau, official or other authority or instrumentality.

"**Governmental Authorization**" means any approval, consent, license, Permit, waiver permission, clearance, designation, qualification or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to Applicable Law.

"**Hammond Lease Agreement**" means that certain Lease dated as of May 1, 2019, with Winn Dixie, as landlord, and Southern Food Group, LLC, as tenant, for premises located at 3925 Highway 190 West, Hammond, Louisiana 70401.

"**Hazardous Substance**" means any pollutants, contaminants, radioactive materials, chemicals, petroleum, petroleum products, or hydrocarbons, asbestos or any asbestos-containing material, per- and polyfluoroalkyl substances, polychlorinated biphenyls or industrial, toxic or hazardous substances and any "contaminant," "pollutant", "hazardous waste," "hazardous material", "hazardous substance", "extremely hazardous substance" or "toxic substance" or words of similar import under any Applicable Law relating to the environment or human health and safety, and any materials, substances or wastes that may give rise to Liabilities under any applicable Environmental Law.

"**Hedge Contracts**" means any Contract to which a Selling Entity is a party with respect to any swap, forward, future or derivative transaction or option or similar agreement, whether exchange traded, "over the counter," or otherwise, involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"**Insurance Policies**" has the meaning set forth in Section 5.17.

"**Intellectual Property**" means any Copyright, Patent, Trademark, trade secret, know-how, software, rights in data, databases and confidential information, inventions (whether patentable or not), or any other similar type of proprietary right or intellectual property right in any jurisdiction.

"**IP Assignment Agreement**" means the IP Assignment Agreement to be entered into as of the Closing Date, by and among the Selling Entities and Buyer (or a designated Subsidiary of Buyer), in the form attached hereto as Exhibit B.

"**IT Assets**" means software, systems, servers, computers, hardware, firmware, middleware, networks, data communications lines, routers, hubs, switches and all other information technology equipment, and all associated documentation.

"**Knowledge**" means, with respect to any matter in question, (a) in the case of each Selling Entity, the knowledge, after reasonable inquiry, of any of the individuals listed on Schedule 1.01(b)(1), and (b) in the case of Buyer, the knowledge, after reasonable inquiry, of Ed Mullins, CEO/Executive Vice President of Buyer, Jason Geminn, CFO of Buyer and Christopher "Kit" Webb, Attorney, Office of General Counsel of Buyer, with respect to such matter.

"**Leased Real Property**" has the meaning set forth in Section 5.14(b).

"**Leases**" has the meaning set forth in Section 5.14(b).

"**Liability**" means any and all Claims, debts, indebtedness, liens, losses, damages, adverse claims, liabilities, fines, penalties, duties, responsibilities, obligations and expenses (including reasonable attorneys' fees and reasonable costs of investigation and defense) of any kind, character, or description, whether known or unknown, direct or indirect, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, ascertained or

ascertainable, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, vested or unvested, executory, determined, determinable, in contract, tort, strict liability, or otherwise, or otherwise due or to become due.

"**Licensed Intellectual Property**" has the meaning set forth in Section 5.12(b).

"**Major Customers**" has the meaning set forth in Section 5.19(a).

"**Major Suppliers**" has the meaning set forth in Section 5.19(b).

"**Malicious Code**" means any "back door," "drop dead device," "time bomb," "Trojan horse," "virus," "worm," "spyware," "vulnerability" or "adware" (as such terms are commonly understood in the software industry) or any other code designed or intended to have, or capable of performing or facilitating, any of the following functions: (a) disrupting, disabling, harming, or otherwise impeding in any manner the operation of, or providing unauthorized access to, a computer system or network or other device on which such code is stored or installed; or (b) compromising the privacy or data security of a user or damaging or destroying any data or file without the user's consent.

"**Master Assignment**" means the Master Assignment, Bill of Sale, Deed, and Conveyance with respect to all Assets, to be entered into as of the Closing Date, by and among the Selling Entities and Buyer (or a designated Subsidiary of Buyer), in the form attached hereto as Exhibit C.

"**Material Adverse Effect**" means any event, condition, circumstance, development, or change or effect that, individually or in the aggregate with all other events, changes, conditions, circumstances, developments and effects, (a) has had or would reasonably be expected to have a material adverse effect on the value, operation or condition (financial or otherwise) of the Business or the Assets or Assumed Liabilities, considered as a whole or (b) has or would reasonably be expected to prevent or materially impair the ability of the Selling Entities to consummate the transactions contemplated by this Agreement or any other Transaction Document; *provided* that, no effect arising from any of the following will be taken into account in determining whether there has been or would reasonably be expected to be a Material Adverse Effect under the foregoing clause (a): (i) any change in the United States or foreign economies, financial markets, credit markets, commodity markets or political conditions; (ii) any change that generally affects the business or areas in which the Business operates, including changes in the prices or industry margins of the products sold, and the raw materials used by, the Business or any increase in operating costs or capital expenses; (iii) any change arising in connection with hostilities, act of war, civil unrest, cyber-attack, sabotage or terrorism or military actions or any escalation or worsening of any such hostilities, acts of war, civil unrest, cyber-attack, sabotage or terrorism or military action; (iv) any act of God, hurricane, flood, tornado, fire, explosion, weather event, earthquake, landslide, other natural disaster, epidemic, plague, pandemic, other outbreak of illness or public health event (whether human or animal) and any other force majeure events; (v) any change or proposed change in Applicable Law or accounting rules (or the interpretation or enforcement thereof) after the date hereof; (vi) any action taken or proposed to be taken by Buyer or any of its Affiliates; (vii) any effect resulting from the public announcement of this Agreement; (viii) any effect resulting from the filing or continuation of the Bankruptcy Cases; (ix) any failure

to meet any projections, budgets, forecasts, estimates, plans, predictions, performance metrics or operating statistics (it being understood and agreed that the foregoing will not preclude Buyer from asserting that any facts or occurrences giving rise to or contributing to such failure that are not otherwise excluded from the definition of Material Adverse Effect may be taken into account in determining whether there has been or would reasonably be expected to be a Material Adverse Effect); (x) any action taken (or omitted to be taken) at the written request or with the written consent of Buyer or any of its Affiliates; and (xi) any action taken (or not taken) by Seller or any of its Subsidiaries or the Business that is required or expressly contemplated to be taken (or not taken) pursuant to this Agreement; *provided however*, that, in the case of <u>clauses (i)</u>, <u>(ii)</u>, <u>(iv)</u> and <u>(v)</u>, such effects shall be taken into account in determining whether a Material Adverse Effect has occurred to the extent that any such effects have a disproportionate adverse effect on the Business, the Assets and the Assumed Liabilities, taken as a whole, as compared to other similarly situated businesses.

"**Material Contracts**" has the meaning set forth in Section 5.11(a).

"**Multiemployer Plan**" means a "multiemployer plan" as defined in Section 3(37) of ERISA in which any Selling Entity has participated or has an interest.

"**Necessary Consent**" has the meaning set forth in Section 2.06(i).

"**Net Working Capital**" means an amount (which may be a negative number) equal to the Current Assets less the Current Liabilities, determined in accordance with the Accounting Principles; *provided* that "Net Working Capital" shall not include any Tax assets or Tax Liabilities.

"**Notice of Acceptance**" has the meaning set forth in Section 3.04(a)(i).

"**Notice of Disagreement**" has the meaning set forth in Section 3.04(a)(ii).

"**OPEB**" means other post-employment health and welfare benefits.

"**Order**" means any award, writ, injunction, ruling, stipulation, judgment, stay, temporary restraining order, order, decree or other restraint entered, issued, made or rendered by any Governmental Authority.

"**Outside Date**" has the meaning set forth in Section 12.01(b)(i).

"**Owned Intellectual Property**" means (a) all Intellectual Property to the extent owned or purported to be owned by any Selling Entity and used or held for use primarily in connection with the operation of the Business, (b) all Intellectual Property in the customer list related to the facility located at Louisville, Kentucky.

"**Owned Real Property**" has the meaning set forth in Section 5.14(a).

"**Party**" and "**Parties**" each have the meaning set forth in the introductory paragraph.

"**Party Affiliate**" has the meaning set forth in Section 14.12.

"**Patents**" means any patents, patent applications, statutory invention registrations, registered designs, and similar or equivalent rights in inventions and designs, and any reissues, divisionals, continuations, continuations-in-part, reissues, re-examinations, renewals, provisional, and extensions thereof, including any patents or patent applications in the United States Patent and Trademark Office, the World Intellectual Property Organization, or any similar office or agency in any other jurisdiction.

"**Pension Plan**" means any Seller Benefit Plan (other than any Multiemployer Plan) that is subject to Title IV of ERISA.

"**Permits**" means any approvals, authorizations, consents, licenses, permits, registrations or certificates of any Governmental Authority.

"**Permitted Encumbrances**" means any of the following:

(a) any rights, obligations, or duties reserved to or vested in any municipality or other Governmental Authority to: (i) control or regulate any Asset in any manner, including all Applicable Laws, (ii) purchase, condemn, expropriate, or recapture any Asset, (iii) consent to a purchase of any Asset, including the Necessary Consents, or (iv) use any Asset in any manner;

(b) easements, rights-of-way, servitudes, Permits, surface leases, sub-surface leases, grazing rights, logging rights, ponds, lakes, waterways, canals, ditches, reservoirs, equipment, pipelines, utility lines, railways, streets, roads, structures and similar rights on, over or in respect of any of the Assets which, in each case, do not (or would not reasonably be expected to) materially impair the ownership, operation, use or value of the impacted Asset(s) as currently owned, operated and used;

(c) immaterial defects or irregularities of title (i) as to which the relevant statute(s) of limitations or prescription would bar any attack or claim against any Selling Entity's title, (ii) arising out of lack of corporate authorization or a variation in corporate name, or (iii) consisting of the failure to recite marital status or omissions of heirship proceedings in documents;

(d) immaterial statutory liens or other Encumbrances for Taxes not yet due and payable arising in the ordinary course of business;

(e) Encumbrances arising by, through or under Buyer's financing for the transactions contemplated hereby, if any; and

(f) non-exclusive licenses of Intellectual Property granted in the ordinary course.

For the avoidance of doubt, Permitted Encumbrances does not include any Encumbrance evidencing or purporting to evidence indebtedness or any other debt obligation of any person (other than Buyer) that is recorded or filed against any of the Assets.

"**Person**" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization or other entity or Governmental Authority.

"**Personal Information**" means any information relating to an identified or identifiable natural person; an "identifiable person" is one who can be identified, directly or indirectly, in particular by reference to an identification number or to one or more factors specific to his or her physical, physiological, mental, economic, cultural or social identity, including, unique device or browser identifiers, names, addresses, telephone numbers, email addresses, social security numbers, or account information.

"**Petition Date**" has the meaning ascribed to such term in the recitals.

"**Post-Closing Covenant**" means any covenant to the extent required to be performed by any Selling Entity or by Buyer, as applicable, under this Agreement following the Closing.

"**Post-Closing Tax Period**" means any Tax period beginning on or after the Closing Date and that portion of a Straddle Period beginning on the Closing Date.

"**Pre-Closing D&O Claims**" has the meaning set forth in Section 2.01(b)(ix).

"**Pre-Closing Tax Period**" means any Tax period ending before the Closing Date and that portion of any Straddle Period ending before the Closing Date.

"**Proceeding**" means any Claim, action, arbitration, audit, appeal, petition, inquiry, investigation, complaint, hearing, litigation, suit, or other dispute (whether civil, criminal or administrative) commenced, brought, conducted, or heard by or before any Governmental Authority or arbitrator.

"**Property Taxes**" means all real property Taxes, personal property Taxes, similar ad valorem Taxes or other similar periodic Taxes not based on income or receipts, but excluding any Transfer Taxes arising from or relating to the consummation of the transactions contemplated by this Agreement.

"**Proposed Adjustment**" has the meaning set forth in Section 3.04(a)(ii).

"**Purchase Price**" has the meaning set forth in Section 3.01.

"**Property Tax Credit Amount**" means the amount of any Property Taxes that are assessed on, or in respect of, the Assets and attributable to any Post-Closing Tax Period (determined, in the case of the portion of a Straddle Period beginning on the Closing Date, pursuant to Section 8.01(b)) that were paid by Seller (or any of its Subsidiaries) on or prior to the Closing.

"**Property Tax Debit Amount**" means the amount of any Property Taxes that are assessed (or are reasonably expected to be assessed) on, or in respect of, the Assets and attributable to any Pre-Closing Tax Period (determined, in the case of the portion of a Straddle Period ending on the day before the Closing Date, pursuant to Section 8.01(b)) that were not paid by Seller (or any of its Subsidiaries) on or prior to the Closing.

"**Property Tax Purchase Price Adjustment**" means the amount, which may be a positive or negative number, equal to (a) the Property Tax Credit Amount *minus* (b) the Property Tax Debit Amount.

"**Real Property Interests**" means all rights-of-way, surface leases, surface use agreements, easements, real property interests, real rights, licenses, servitudes, Permits and privileges, in each case, constituting real property or a real property interest, together with the rights, tenements, appurtenant rights and privileges relating thereto (in each case, excluding unexpired Leases that are 365 Contracts).

"**Records**" has the meaning set forth in Section 2.01(b)(viii).

"**Registered Intellectual Property**" has the meaning set forth in Section 5.12(a).

"**Related Party Agreement**" means any Contract among any Selling Entity and any of its Affiliates and applicable to the Business, the Assets or the Assumed Liabilities.

"**Release**" means any presence, release, spill, emission, leaking, pumping, pouring, placing, injection, deposit, disposal, discharge, dispersal, dumping, emptying, migrating, escaping or leaching into, onto, under or through the environment.

"**Representative**" means, with respect to a particular Person, any director, officer, member, manager, partner, employee, agent, consultant, advisor, investor, shareholder, contractor, subcontractor or other equity holder or representative of such Person, including legal counsel, accountants and financial advisors.

"**Restrictive Covenant Agreements**" mean non-disclosure, confidentiality, non-compete, non-solicitation and non-disparagement agreements.

"**Retained Intellectual Property**" has the meaning set forth in Section 8.06(a).

"**Sale Order**" means an Order of the Bankruptcy Court, substantially in the form attached hereto as Exhibit A, with such changes as may be required by the Bankruptcy Court and to which Buyer, in its sole and absolute discretion, has consented.

"**Securities Act**" has the meaning set forth in Section 5.04.

"**Seller**" has the meaning set forth in the introductory paragraph.

"**Seller Benefit Plans**" means any (i) "employee benefit plan" as defined in Section 3(3) of ERISA (whether or not subject to ERISA), (ii) employment, consulting, severance, termination protection, change in control, transaction bonus, retention or similar plan, program, policy, agreement or arrangement or (iii) other plan, agreement, policy, program, or arrangement providing for compensation, bonuses, profit-sharing, or other forms of incentive or deferred compensation, equity compensation, vacation benefits, insurance, medical, dental, vision, prescription or fringe benefits, perquisites, life insurance, disability or sick leave benefits or post-employment or retirement benefits, in each case that is sponsored, maintained, contributed to or required to be maintained or contributed to or entered into by Seller or any of its Subsidiaries for the benefit of any Company Service Provider or their beneficiaries or in which any Company Service Provider or their beneficiaries participates or is eligible to participate.

16

"**Seller Related Party**" means the Selling Entities and each of their respective stockholders, partners, members, Affiliates, directors, officers, employees, controlling persons and agents.

"**Seller Released Party**" or "**Seller Released Parties**" has the meaning set forth in Section 14.17(a).

"**Seller SEC Document**" means, collectively, any form, report, statement, certification or other document (including all exhibits, amendments and supplements thereto) filed or furnished by any Selling Entity with the Securities and Exchange Commission since January 1, 2017.

"**Selling Entities**" has the meaning set forth in the introductory paragraph.

"**Selling Entity Releasors** " has the meaning set forth in Section 14.17(b).

"**Straddle Period**" means any Tax period beginning before and ending on or after the Closing Date.

"**Subsidiary**" means any entity with respect to which a specified Person (or a Subsidiary thereof) (a) has the power, through the ownership of securities or otherwise, to elect a majority of the directors or similar managing body or (b) holds a majority of the equity interest; *provided* that none of the Specified Entities will be considered a Subsidiary of any Selling Entity for purposes of this Agreement.

"**Successful Bidder**" means the bidder with the highest or otherwise best bid as determined in accordance with the Bidding Procedures.

"**Target Net Working Capital**" means $22,750,000.

"**Tax**" or "**Taxes**" (and with correlative meaning, "**Taxable**," "**Taxation**," "**Taxing**") means all federal, state, local or foreign taxes, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, real property, personal property, unclaimed property and estimated taxes or other tax of any kind whatsoever, including any interest, penalties and additions thereto, whether disputed or not, and including any obligation to indemnify or otherwise assume or succeed to the tax liability of any other Person.

"**Tax Authority**" means any Governmental Authority charged with the administration of any Applicable Law relating to Taxes, including the imposition, assessment or collection of Taxes.

"**Tax Return**" means any return, declaration, report, claim for refund or credit, schedule, estimate, information return and statement filed or required to be filed in respect of any Taxes (including any attachment thereto or amendment thereof).

"**Third Party**" means any Person other than the Selling Entities, Buyer or any of their respective Affiliates.

"**Trademarks**" means any trademark, trade name, corporate name, business name, domain name, social media account, trade style, trade dress, service mark, logo, source identifier, business identifier, or design of like nature, and all goodwill associated therewith, any registration of the foregoing, and any application in connection therewith, including any such registration or application in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, or any other jurisdiction, and all extensions or renewals of any of the foregoing.

"**Transaction Documents**" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

"**Transition Service Agreement**" means the transition service agreement to be entered into as of the Closing Date, by and among Seller (or any acquirer of substantially all of the assets of Seller) and Buyer, in form and substance reasonably satisfactory to Buyer.[3]

"**Transfer Tax Purchase Price Adjustment**" means the amount, which may be a positive or negative number, equal to (a) fifty percent (50%) of the aggregate amount of Transfer Taxes that are reasonably expected to be payable by Seller under Applicable Laws in connection with the consummation of the transactions contemplated by this Agreement *minus* (b) fifty percent (50%) of the aggregate amount of Transfer Taxes that are reasonably expected to be payable by Buyer under Applicable Laws in connection with the consummation of the transactions contemplated by this Agreement.

"**Transfer Taxes**" means all documentary, stamp, stamp duty reserve, conveyance, transfer (including real property transfer), motor vehicle registration, sales, use, value added, excise and other similar non-income Taxes and all filing and recording fees (and any interest, penalties and additions with respect to such Taxes and fees).

"**Transferred Employees**" has the meaning set forth in Section 8.04(a).

"**Transferred Intellectual Property**" has the meaning set forth in Section 2.01(b)(xiv).

"**Transferred IP Contracts**" all Contracts to which a Selling Entity is a party or beneficiary, or by which a Selling Entity or the Business, or any of its properties or assets may be bound, concerning Intellectual Property or IT Assets that are used or held for use primarily in connection with the Business, including, in each case, all (a) licenses of Intellectual Property by a Selling Entity to any Third Party, (b) licenses of Intellectual Property by any Third Party to any Selling Entity, (c) contracts between any Third Party and any Selling Entity relating to the transfer, development, maintenance or use of Intellectual Property or IT Assets, the development or transmission of data, or the use, modification, framing, linking, advertisement or other practices with respect to Internet websites, and (d) consents, settlements, decrees, orders, injunctions, judgments or rulings governing the use, validity or enforceability of Intellectual Property or IT Assets.

---

[3]     **Note**: The transitional services to be provided to Buyer to encompass the transitional services set forth on Exhibit A to the form of Transitional Services Agreement to be entered into between Buyer and the acquirer of substantially all of the assets of Seller included as file 31.17 of the electronic data room hosted by Merrill DatasiteOne.

"**Transferred Trademarks**" means all right, title and interest of each Selling Entity in and to the Trademarks related to the BARBERS DAIRY, BROUGHTON, BROWN'S DAIRY, COUNTRY FRESH, REITER, PET or LAND O LAKES brands, together with all variations, derivatives and acronyms thereof.

"**Transferred Trademark Contracts**" means all Contracts, including all Trademark licenses, to which a Selling Entity is a party or beneficiary, or by which a Selling Entity or the Business, or any of its properties or assets may be bound, related to the Transferred Trademarks.

"**Trustee**" has the meaning set forth in Section 14.14.

"**Tulsa Lease Agreement**" means that certain Lease dated as of January 1, 2002, with Douglas & Victoria Peterson, Bank of America as Trustee-Barbara Mullins Trust, as landlord, and Southern Foods Group, LLC, as tenant, for premises located at 215 N. Denver Avenue, Tulsa, Oklahoma 74103.

"**Unresolved Adjustment**" has the meaning set forth in Section 3.04(b).

"**Unresolved Balance**" has the meaning set forth in Section 3.04(b).

"**USDA**" means the United States Department of Agriculture.

"**WARN**" means the Worker Adjustment Retraining and Notification Act of 1988, as amended, or any similar applicable state laws.

"**Withdrawal Liability**" means any Liability on account of a "complete withdrawal" (within the meaning of Section 4203 of ERISA ) or a "partial withdrawal" (within the meaning of Section 4205 of ERISA ) from any Multiemployer Plan and includes the Liability of successors and potential successors, regardless of when such Liability is incurred or assessed.

Section 1.02.     *Other Definitions and Interpretive Matters.*

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation will apply:

(i)     *Calculation of Time Period*.   When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(ii)     *Dollars*.   Any reference in this Agreement to "**Dollars**" or "**$**" means United States dollars.

(iii)     *Exhibits; Schedules; Disclosure Schedules*.   All Exhibits, Schedules and Disclosure Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any

capitalized terms used in any Exhibit, Schedule or Disclosure Schedule but not otherwise defined therein will be defined as set forth in this Agreement.

(iv)  *Gender and Number*.  Any reference in this Agreement to gender includes all genders, and words imparting the singular number also include the plural and vice versa.

(v)  *Headings*.  The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and will not affect or be utilized in the construction or interpretation of this Agreement.  All references in this Agreement to any "Section" or "Article" are to the corresponding Section or Article of this Agreement unless otherwise specified.

(vi)  *Accounting Terms*.  All accounting terms used in this Agreement and not otherwise defined herein have the meanings assigned to them under GAAP.

(vii)  *Herein*.  Words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(viii)  *Or.*  The word "or" when used in this Agreement is not meant to be exclusive unless expressly indicated otherwise.

(ix)  *Including*.  The word "including" or any variation thereof means "including, without limitation", and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(x)  *Statute*.  Unless otherwise specified, references to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules or regulations promulgated thereunder; *provided* that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance with, any Applicable Law, the reference to such Applicable Law means such Applicable Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(xi)  *Contract*.  References to a Contract mean such Contract as amended from time to time (except for any Contract identified in the Disclosure Schedule).

(b)  *No Strict Construction*.  Buyer, on the one hand, and the Selling Entities, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as jointly drafted by Buyer, on the one hand, and the Selling Entities, on the other hand, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson will be applied against any Person with respect to this Agreement.

ARTICLE 2
PURCHASE AND SALE

Section 2.01.    *Purchase and Sale.*

(a)    Upon the terms and subject to the conditions of this Agreement, at the Closing, the Selling Entities will sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer (or a designated Subsidiary of Buyer), and Buyer (or a designated Subsidiary of Buyer) will purchase, acquire and accept, the Assets, free and clear of all Encumbrances (other than Permitted Encumbrances).

(b)    The "**Assets**" means all right, title and interest of Seller or any of its Subsidiaries as of the Closing Date in, to or under all of their respective assets, rights, interests and properties primarily related to the Facilities or the conduct of the Business at the Facilities (excluding the Excluded Assets), and as set forth in Section 2.01(b)(xxiii), with respect to the facility located at Louisville, Kentucky, including the following:

(i)    all plants, offices, and manufacturing, processing, distribution, storage, warehousing and other facilities of Seller or any of its Subsidiaries used (or held for use) in connection with the ownership or operation of the Business at Seller's following facilities: Birmingham, Alabama, Tulsa, Oklahoma, Sioux Falls, South Dakota, Bismarck, North Dakota, Woodbury, Minnesota, Marietta, Ohio, O'Fallon, Illinois, Akron, Ohio, Livonia, Michigan and Hammond, Louisiana (collectively, the "**Facilities**");

(ii)    all equipment, machinery, vehicles, fixtures, supplies, furniture, leasehold improvements, and other personal, movable and mixed property of Seller or any of its Subsidiaries primarily related to the Facilities, including cases, bossies, and carts;

(iii)    without limiting Section 2.01(b)(ii), all items of tangible personal property or equipment, including depots and vehicles, owned, leased, or used (or held for use) by Seller or any of its Subsidiaries and primarily related to the Facilities;

(iv)    all inventory (including raw milk and cream, raw materials, ingredients, packaging and packaging materials, products in-process and finished products), along with any spare parts, chemicals or other supplies owned or used (or held for use) by Seller or any of its Subsidiaries, regardless of whether or not they are reflected on the Facility Balance Sheets, whether in transit to or from Seller or any of its Subsidiaries and whether in Seller's or any of its Subsidiaries' warehouses, distribution facilities, held by any Third Parties or otherwise, excluding any products shipped to Third Parties prior to the Closing Date for which title has passed to such Third Party (collectively, the "**Acquired Inventory**");

(v)    (A) the Owned Real Property identified on Schedule 2.01(b)(v) (the "**Acquired Owned Real Property**"), (B) the Leased Real Property identified on Schedule 2.01(b)(v) (the "**Acquired Leased Real Property**") and (C) all other Real Property Interests owned or held for use by Seller or any of its Subsidiaries or hereinafter acquired by Seller or any such Subsidiary prior to Closing, excluding, for the avoidance of doubt,

21

the Excluded Real Property Interests (such Real Property Interests, together with the Acquired Owned Real Property and the Acquired Leased Real Property, the "**Acquired Real Property**");

(vi)     (A) all Contracts that constitute, as of the Closing, Desired 365 Contracts, (B) the Transferred IP Contracts and (C) the Transferred Trademark Contracts (collectively, the "**Assigned Contracts**");

(vii)    all transferable Permits of any Governmental Authority and transferable Orders of any Governmental Authority (in each such case, whether preliminary or final) required of Seller or any of its Subsidiaries for the ownership, operation or use (or held for use) of the Assets;

(viii)   (A) all books, databases, files, records (including shipping records) and ledgers, Tax Returns, plans, sales, advertising and promotional materials (including list of prices and lists of distributors, wholesalers and group purchasing organizations), information, correspondence, data and other similar items (other than the Excluded Records) in Seller's or any of its Subsidiaries' possession, whether in written or electronic or any other format, including customer and supplier lists, mailing lists, sales and promotional literature, other sales related materials to the extent related to the Assets or the Company Employees and (B) the customer list related to the facility located at Louisville, Kentucky; *provided* that Seller and its Subsidiaries reserve the right to redact any information contained in the foregoing documents and records that is not related to the Business prior to any sale, assignment, transfer or delivery to Buyer (collectively, the "**Records**");

(ix)     all rights, claims (including claims for past infringement or misappropriation of Transferred Intellectual Property), accounts and causes of action (including warranty and similar claims) of Seller or any of its Subsidiaries against Persons (including any of Seller's Subsidiaries) other than any other Selling Entity (regardless of whether or not such claims and causes of action have been asserted by the Selling Entities) primarily related to, associated with or arising out of the Assets or the Business, and all rights of indemnity, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, possessed by Seller or any of its Subsidiaries (regardless of whether such rights are currently exercisable) primarily related to, associated with or arising out of the Assets or the Business; *provided* that the foregoing shall exclude all rights, claims and causes of action against any director or officer of any Selling Entity attributable to, arising during or related to any pre-Closing period (the "**Pre-Closing D&O Claims**");

(x)      to the extent transferable, all current and prior insurance policies of any of Seller or any of its Subsidiaries primarily related to the Assets or the Assumed Liabilities, and all rights and benefits of any of Seller or any of its Subsidiaries of any nature (except for any rights to insurance recoveries thereunder required to be paid to other Persons under any Order of the Bankruptcy Court relating to any debtor-in-possession financing obtained by the Selling Entities) with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, in each case to

22

the extent they are primarily related to other Assets, Assumed Liabilities or the operation of such other Assets;

(xi)     the amount of and all rights to any proceeds received by Seller or any of its Subsidiaries, including all insurance recoveries and recoveries from other Third Parties, in respect of, in connection with, or arising from (A) the loss, destruction or condemnation of any Assets or otherwise involving or relating to any Asset or Company Employee of the Business, in each case, whether occurring prior to, on or after the Closing or (B) any Assumed Liabilities or the operation of such Assets;

(xii)     all warranty or indemnity claims that may be made against any Person, other than Seller or any Affiliate thereof, under any Assigned Contract, in each case, primarily relating to the Assets, or any products or services provided in connection therewith;

(xiii)     (A) all prepaid real and personal property Taxes related to, associated with or arising out of the Facilities, (B) all prepayments related to Business IT Assets and other IT related service, maintenance and support arrangements, (C) all prepaid cleaning supplies, fuel and oil, and rentals, in each case, related to, associated with or arising out of the Facilities or any other Asset, and (D) all prepaid licenses related to rolling stock used or held for use in connection with the Facilities, along with all deposits related to the Facilities or the Assets;

(xiv)     (A) all Owned Intellectual Property and Transferred Trademarks (together, the "**Transferred Intellectual Property**") and (B) all rights to assert, defend, sue, and recover damages for any past, present and future infringement, misuse, misappropriation, impairment, unauthorized use or other violation of any rights in or to any such Transferred Intellectual Property and any and all corresponding rights that have been, now or hereafter may be secured throughout the world with respect to any Transferred Intellectual Property;

(xv)     all Business IT Assets that are used or held for use primarily related to the Facilities;

(xvi)     all goodwill and other intangible assets primarily related to the Assets, including all customer relationships, all rights under any confidentiality agreements executed by any Third Party for the benefit of Seller or any of its Subsidiaries to the extent relating to the Assets, and all information and documents related thereto (other than the Excluded Records);

(xvii)     to the extent primarily related to the Business, all rights of Seller or any of its Subsidiaries under Restrictive Covenant Agreements with any Company Service Provider or current or former directors, consultants, independent contractors and agents of Seller or any of its Subsidiaries or any of their Affiliates or with third parties in respect of the Business and any Restrictive Covenant Agreement entered into with a Company Employee;

(xviii)     all rights to any credits, statements, rebates (including vendor or supplier rebates), reimbursement or rights of set off to the extent primarily related to the Business;

23

(xix)     all avoidance actions or similar causes of action arising under sections 544 through 553 of the Bankruptcy Code, including any proceeds thereof, related to the Assets or the Business, including all claims arising under section 547 of the Bankruptcy Code related to payments for goods or services delivered or provided to any of the Facilities (the "**Avoidance Actions**");

(xx)     any rights, claims or causes of action as of the Closing of Seller or any of its Subsidiaries relating to or arising against suppliers, vendors, merchants, manufacturers, counterparties to leases, counterparties to licenses, and counterparties to any Assigned Contracts or Acquired Real Property in respect of the Business or the Assets, as applicable;

(xxi)     all outside of the ordinary course of business deposits made or required to be made by Seller or any of its Subsidiaries to suppliers or customers after the Petition Date as a result of the filing of the Bankruptcy Cases primarily related to the Assets;

(xxii)     all prepaid and deferred items, including any royalties, advance payments, prepayments, prepaid expenses, prepaid rentals prepaid assets, unbilled charges, fees, security and other deposits or the like (excluding prepaid Taxes of Seller or any of its Subsidiaries or with respect to the Assets except to the extent taken into account in determining Property Tax Credit Amount ), in each case, related to the Assets and made by or on behalf of Seller or its Subsidiaries before the Closing Date, to the extent related to the period after the Closing; and

(xxiii)     all of the customer lists for the Facilities and for the facility located at Louisville, Kentucky.

Section 2.02.     *Excluded Assets.*

Notwithstanding the foregoing, nothing herein will be deemed to constitute an agreement to sell, transfer, assign or convey the Excluded Assets to Buyer, and the Selling Entities will retain all right, title and interest to, in and under the Excluded Assets.  The term "**Excluded Assets**" means the following assets, rights and properties of the Selling Entities:

(a)     all Excluded Facilities;

(b)     any amounts (including the Purchase Price) paid or payable to Seller or any of its Subsidiaries pursuant to this Agreement or any other Transaction Document;

(c)     any shares of capital stock or other equity interest of Seller or any of Seller's Subsidiaries or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of Seller or any of Seller's Subsidiaries;

(d)     all minute books and other corporate books to the extent relating to a Selling Entity's organization or existence, and all stock ledgers, corporate seals and stock certificates of Seller or any of its Subsidiaries;

(e)     all Excluded Records;

(f)     all Excluded Contracts;

(g)     all rights to any credits, statements, rebates or reimbursement for any costs borne by Seller or any of its Subsidiaries, in each case attributable to any period (or portion thereof) ending prior to the Closing Date;

(h)     all rights to any Tax refunds or credits attributable to any Pre-Closing Tax Period (including any refunds or credits with respect to Property Taxes that are assessed on, or in respect of, the Assets and attributable to any Post-Closing Tax Period (or portion thereof) that were paid by Seller (or any of its Subsidiaries)), except to the extent that such Tax refund or credit (or an overpayment of Taxes giving rise to such Tax refund or credit) was taken into account in determining Property Tax Credit Amount;

(i)     (i) all insurance policies and rights to proceeds thereof that are non-transferable or solely to the extent they are primarily related to the Excluded Assets, Excluded Liabilities or the operation of the Excluded Assets and (ii) the assets set forth on Schedule 2.02(i);

(j)     all cash and cash equivalents (including (w) any cash that (A) is collateralizing any letters of credit issued pursuant to any credit agreement or facility or (B) held in trust or any trust account for or on behalf of any Selling Entity, (x) marketable securities, (y) short-term investments and (z) checks, ACH transactions or other wire transfers or drafts deposited or available for deposit, and net of issued but uncleared checks or drafts written or issued by any of Seller or its Subsidiaries) and all Accounts Receivable, in each case, other than any cash or other proceeds received or to which Buyer is or may be entitled under or pursuant to Section 2.01(b)(ix), Section 2.01(b)(xi), Section 2.01(b)(xii) and Section 2.01(b)(xx).

(k)     all bank accounts, safety deposit boxes, lock boxes and securities accounts of Seller or any of its Subsidiaries and the contents thereof;

(l)     all rights, claims or causes of action by or in the right of Seller or any of its Subsidiaries, on the one hand, against any current or former director or officer of Seller or any of its Subsidiaries, on the other hand;

(m)     any rights, claims or causes of action of Seller or any of its Subsidiaries under this Agreement, any other Transaction Document or the Confidentiality Agreement;

(n)     each 365 Contract that, as of the Closing, is not designated as a Desired 365 Contract;

(o)     the Pre-Closing D&O Claims;

(p)     the proceeds of the sale of any Excluded Assets;

(q)     all assets held with respect to all Seller Benefit Plans;

(r)     all Real Property Interests owned or held for use by Seller or any of its Subsidiaries or hereinafter acquired by Seller or any such Subsidiary prior to Closing exclusively in connection with the use, ownership or operation of an Excluded Facility, as historically used, owned or

operated, or underlying or comprising part of any Excluded Facility, including the Real Property Interests set forth on Schedule 2.02(r) (the "**Excluded Real Property Interests**"); and

(s)     those other properties and assets designated by Buyer pursuant to Section 2.07.

Section 2.03.     *Assumed Liabilities.*

Upon the terms and subject to the conditions of this Agreement, at the Closing, Buyer (or a designated Subsidiary of Buyer) will assume and agree to discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof), the following (and no other) Liabilities of the Selling Entities (collectively, the "**Assumed Liabilities**"):

(a)     *Assigned Contract*s.  All of the Selling Entities' Liabilities under the Assigned Contracts (other than the Hedge Contracts and excluding, for the avoidance of doubt, any Cure Costs) if, in each case, such Assigned Contract is validly transferred to Buyer (or a designated Subsidiary of Buyer) pursuant to Section 2.01(b)(vi), other than Liabilities, claims or causes of action arising out of any breach, default or violation (or any event, circumstance or condition that (with or without notice or lapse of time or both) will, or could reasonably be expected to, result in a breach, default or violation) of any Assigned Contract by Seller or any of its Subsidiaries at or prior to the Closing;

(b)     *Taxes*.  All Property Taxes attributable to the portion of a Straddle Period ending before the Closing Date (as determined pursuant to Section 8.01(b)) to the extent that such Property Taxes were taken into account in determining the Property Tax Debit Amount; and

(c)     *Current Liabilities.* All Current Liabilities solely to the extent deducted in calculating the Purchase Price.

Section 2.04.     *Excluded Liabilities.*

Notwithstanding anything herein to the contrary, and regardless of any disclosure to Buyer, Buyer will not assume and will not be obligated to assume or be obliged to pay, perform or otherwise discharge (and Seller shall retain, pay, perform, satisfy, observe or otherwise discharge without recourse whatsoever to Buyer) or in any other way be liable or responsible for any Liability whatsoever of Seller or any of its Subsidiaries of any kind, character or description whatsoever, whether direct or indirect, known or unknown, absolute or contingent, other than the Assumed Liabilities (such Liabilities, collectively, the "**Excluded Liabilities**"); *provided* that for the avoidance of doubt, Excluded Liabilities that are not being assumed by the Buyer include:

(a)     all Liabilities arising out of or relating to the Excluded Assets, including Customer Deductions;

(b)     all indebtedness of Seller or any of its Subsidiaries;

(c)     all Proceedings arising out of or relating to the pre-Closing conduct of the Business or the Assets or the Assumed Liabilities;

(d)      all Liabilities relating to the Assets or the Business arising from or relating to any Environmental, Health and Safety Laws or Hazardous Substances (i) that relate to or are attributable to any act, omission, circumstance or condition originating, occurring or existing on or before the Closing, including any violation of or noncompliance with any Environmental, Health and Safety Laws at the Owned Real Property or Leased Real Property or in connection with the Business, any Release of any Hazardous Substance at, in, on, under or migrating to or from any Owned Real Property or Leased Real Property or in connection with the Business, or any exposure to any Hazardous Substance at any Owned Real Property or Leased Real Property or in connection with the Business, or (ii), whether arising on, before or after the Closing, that relate to any real property that is not an Owned Real Property or Leased Real Property, including any real property formerly owned or leased by any Selling Entity or in connection with the Business, and any real property to which Hazardous Substances  were sent for treatment, storage, disposal, or recycling on or before the Closing from any Owned Real Property or Leased Real Property or in connection with the Business;

(e)      all Multiemployer Plans (including any Withdrawal Liability);

(f)      all Seller Benefit Plans (including all Pension Plans and related Liabilities), and all Liabilities of any kind with respect to Company Service Providers other than the Current Liabilities;

(g)      all Collective Bargaining Agreements;

(h)      all Liability to any stockholder or other equityholder of any Selling Entity;

(i)      all Liabilities that are not Assumed Liabilities; and

(j)      all Cure Costs.

Section 2.05.    *Cure Costs; Desired 365 Contracts.*

(a)      Schedule 2.05(a) sets forth a complete list as of the date hereof of all 365 Contracts that Buyer intends to assume at the Closing (the "**Desired 365 Contracts**"). Upon Closing, subject to the terms and conditions hereof, the Selling Entities will assign the Desired 365 Contracts to Buyer, and Buyer will assume all Assumed Liabilities pursuant thereto solely to the extent provided in Section 2.03(a).

(b)      At any time prior to the Closing Date, consistent with the Bidding Procedures Order and/or the Sale Order, Buyer will have the right to provide written notice to Seller of Buyer's election to:

(i)      designate a 365 Contract (including any 365 Contract that is a Desired 365 Contract immediately before such designation) as an Excluded Contract, and upon such designation such 365 Contract will constitute an Excluded Contract and Excluded Asset (and, if applicable, will cease to constitute an Asset); and

(ii)      designate a 365 Contract as a Desired 365 Contract, and upon such designation such 365 Contract will constitute an Asset and Assigned Contract and will be

conveyed to Buyer under this Agreement at Closing (and, if applicable, will cease to constitute an Excluded Asset), so long as (A) such 365 Contract is added to the Assigned Contracts prior to the entry of any Order of the Bankruptcy Court approving the rejection of such 365 Contract, and (B) the assumption and assignment has been or is approved by the Bankruptcy Court (including through the Sale Order).

(c)     To the extent that Buyer makes a designation with respect to any 365 Contracts pursuant to clause (b) above, the applicable Exhibits and Schedules to this Agreement will be deemed to have automatically been updated (without action of any Party or Person) to reflect such designation.

(d)     If Buyer exercises its rights in clause (b) above to designate a 365 Contract as a Desired 365 Contract or as an Excluded Asset (as the case may be), then the Parties acknowledge and agree that any Cure Cost associated with such a 365 Contract remain an Excluded Liability.

Section 2.06.     *Assignment of Assets Subject to Consent Requirements.*

Notwithstanding any other provision of this Agreement to the contrary, this Agreement will not constitute an agreement to assign or transfer and will not implement the assignment or transfer of any Asset if (i) an attempted assignment or transfer thereof, without the approval, authorization or consent of, or granting or issuance of any license or Permit by, any Third Party thereto (each such action, a "**Necessary Consent**"), would constitute a breach thereof or of any Applicable Law or Order or in any way adversely affect the rights of Buyer thereunder, (ii) such Necessary Consent has not been obtained and (iii) the Bankruptcy Court has not entered an Order providing that such Necessary Consent is not required.  In such event, subject to the terms and conditions hereof, the Closing will proceed with respect to the remaining Assets, and there will be no reduction in the Purchase Price as a result thereof, and, for a period of six (6) months after the Closing Date, (A) the Selling Entities and Buyer will use their respective commercially reasonable efforts (at the sole expense of the Selling Entities and at no expense and without any Liability to Buyer) to obtain the Necessary Consents with respect to any such purchased Asset or any claim or right or any benefit arising thereunder for the assignment or transfer thereof to Buyer as Buyer may reasonably request; and (B) the Selling Entities and Buyer will cooperate in a mutually agreeable arrangement, to the extent feasible and without the need for any Necessary Consent, at the sole expense of the Selling Entities and at no expense and without any Liability to Buyer, under which Buyer would obtain the benefits and assume the obligations under such purchased Assets in accordance with this Agreement, including subcontracting, sub-licensing, or sub-leasing to Buyer, or under which the Selling Entities would enforce their rights thereunder for the benefit of Buyer with Buyer assuming each applicable Selling Entities' obligations thereunder.

Section 2.07.     *Additional Excluded Assets.*

(a)     Notwithstanding any other provision of this Agreement to the contrary, at any time prior to the Closing, Buyer will have the right, in its sole and absolute discretion, to provide written notice to the Selling Entities of Buyer's election to designate any right, property, interest or other asset (or portion thereof) as an Excluded Asset (including any such asset that was immediately prior to such designation an Asset), and upon such designation such asset will constitute an

Excluded Asset for all purpose of this Agreement and any Liabilities associated therewith or related thereto shall be Excluded Liabilities.

(b)     To the extent that Buyer makes a designation with respect to any asset pursuant to clause (a) above, the applicable Exhibits and Schedules to this Agreement will be deemed to have automatically been updated (without action of any Party or Person) to reflect such designation.

(c)     If Buyer exercises its rights in clause (a) above to designate an asset as an Excluded Asset, then the Parties acknowledge and agree that there will be no reduction in the Purchase Price as a result of such designation or change in designation, nor will there be any delay to the Closing.

Section 2.08.     *Misallocated Assets.*

Subject to Section 2.06, if after the Closing (i) Buyer or any of its Subsidiaries holds any Excluded Assets or Excluded Liabilities or (ii) Seller or any Subsidiary of Seller holds any Assets or Assumed Liabilities, Buyer or Seller (or the applicable Subsidiary of Seller), as applicable, will promptly transfer (or cause to be transferred) such assets or assume (or cause to be assumed) such Liabilities to or from (as the case may be) the other Party.  Prior to any such transfer, the Party receiving or possessing any such asset will hold it in trust for the benefit of such other Party.

Section 2.09.     *Further Assurances.*

From time to time following the Closing, the Parties will execute, acknowledge and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments, and will take such further actions, as may be reasonably necessary or appropriate to assure fully to Buyer and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and to assure fully to Selling Entities and their respective successors and assigns, the assumption of the Assumed Liabilities intended to be assumed by Buyer under this Agreement, and to otherwise make effective the transactions contemplated hereby; *provided* that nothing in this Section 2.09 will prohibit Seller or any Subsidiary of Seller from ceasing operations or winding up its affairs following the Closing.

Section 2.10.     *Withholding.*

Buyer shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to any Selling Entity or any other Person such amounts as Buyer is required to deduct and withhold under the Code, or any Tax law, with respect to the making of such payment. To the extent that amounts are so withheld and paid to the applicable Governmental Authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

ARTICLE 3

PURCHASE PRICE

Section 3.01.    *Purchase Price.*

The aggregate purchase price for the purchase, sale, assignment and conveyance of the Selling Entities' respective right, title and interest in, to and under the Assets will consist of the following (collectively, the "**Purchase Price**"):

(a)    an amount in cash equal to:

(i)    $75,000,000 (the "**Base Purchase Price**"), *plus*

(ii)    the amount, if any, by which the Net Working Capital exceeds the Target Net Working Capital, *minus* the amount, if any, by which the Target Net Working Capital exceeds the Net Working Capital, *minus*

(iii)    the amount of the Assumed Indebtedness (if any), *plus*

(iv)    the Property Tax Purchase Price Adjustment, *plus*

(v)    the Transfer Tax Purchase Price Adjustment (the sum of the amounts in clauses (i) – (v), the "**Cash Purchase Price**"), *minus*

(vi)    the Customer Deductions Escrow Amount, and *minus*

(vii)    the Adjustment Escrow Amount; and

(b)    the assumption of the Assumed Liabilities.

The Purchase Price will be delivered by Buyer as set forth in Section 3.04 and Section 4.02.

Section 3.02.    *Good Faith Deposit*.  Buyer has deposited into the Deposit Escrow Account with the Escrow Agent an amount equal to $5,250,000 (such amount, the "**Deposit Amount**") in cash.  The Deposit Amount will be released by the Escrow Agent and delivered to either Buyer or Seller, in accordance with the Bidding Procedures. The Deposit Amount will be distributed out of the Deposit Escrow Account as follows (and Buyer and the Selling Entities agree to promptly deliver joint written instructions to the Escrow Agent to the extent required by the Escrow Agent to effect such distributions as and when required hereunder):

(a)    if the Closing occurs, the Deposit Amount will be delivered to Seller and applied towards the amount payable by Buyer pursuant to Sections 3.01 and 4.02;

(b)    if this Agreement is terminated by Seller pursuant to Section 12.01(d) or Section 12.01(e), the Deposit Amount will be delivered to Seller within two Business Days after such termination by wire transfer of immediately available funds to the accounts designated in writing by Seller; and

(c)     if this Agreement is terminated for any reason other than by Seller pursuant to Section 12.01(d) or Section 12.01(e), the Deposit Amount will be returned to Buyer within two Business Days after such termination by wire transfer of immediately available funds to the accounts designated in writing by Buyer.

The Parties acknowledge and agree that Seller's entitlement to the Deposit Amount under Section 3.02(b) will constitute liquidated damages (and not a penalty) and, if Seller retains such amount, then notwithstanding anything to the contrary contained herein, but subject to Seller's right to seek specific performance pursuant to Section 14.08, such Deposit Amount shall be the sole and exclusive remedy available to the Selling Entities and any other Person against Buyer, its Subsidiaries, and its other Party Affiliates in connection with this Agreement and the transactions contemplated hereby (including as a result of the failure to consummate the Closing or for a breach or failure to perform hereunder or otherwise) and none of Buyer, its Subsidiaries and its other Party Affiliates shall have any further Liability relating to or arising out of this Agreement or the transactions contemplated hereby.  For the avoidance of doubt, (i) under no circumstances shall Seller or any of its Affiliates be entitled to monetary damages other than retention of the Deposit Amount and (ii) while Seller may pursue both a grant of specific performance in accordance with Section 14.08 and retaining the Deposit Amount pursuant to this Section 3.02, under no circumstances shall Seller or any of its Affiliates be permitted or entitled to receive both a grant of specific performance and any money damages, including retention of all or any portion of the Deposit Amount.

Section 3.03.  *Estimated Cash Purchase Price*.  At least three (3) Business Days prior to the Closing Date, Seller shall deliver to Buyer a statement (the "**Estimated Closing Statement**"), together with reasonable supporting documentation, setting forth Seller's good faith estimate of the amounts of the Net Working Capital (the "**Estimated Working Capital**"), the Assumed Indebtedness (the "**Estimated Assumed Indebtedness**"), the Property Tax Purchase Price Adjustment (the "**Estimated Property Tax Purchase Price Adjustment**") and the Transfer Tax Purchase Price Adjustment (the "**Estimated Transfer Tax Purchase Price Adjustment**") and, based thereon, its good faith estimate of the Cash Purchase Price (such estimated amount, the "**Estimated Cash Purchase Price**").  Seller shall prepare the Estimated Closing Statement in accordance with the Accounting Principles.  Following the delivery of the Estimated Closing Statement, Seller shall provide Buyer and its Representatives with reasonable access to work papers and other books and records for purposes of assisting Buyer in its review of the Estimated Closing Statement.  Prior to the Closing, Seller shall consider in good faith any revisions to the Estimated Closing Statement raised by Buyer in connection with its review of the Estimated Closing Statement (which shall be modified to include any such revisions accepted by Seller in good faith).  In connection with the preparation of the Estimated Closing Statement, within seven (7) days prior to the Closing, Buyer shall have the right to cause Seller to conduct a physical count of the Acquired Inventory, which Buyer and its Representatives may observe.

Section 3.04.  *Determination of Final Cash Purchase Price*.

(a)     Buyer shall, no later than ninety (90) days after the Closing Date, prepare and deliver to Seller a statement (the "**Closing Statement**"), together with reasonable supporting documentation, setting forth in reasonable detail Buyer's good faith calculation of the amount of the Net Working Capital (the "**Closing Working Capital**"), the Assumed Indebtedness (the

"**Closing Assumed Indebtedness**"), the Property Tax Purchase Price Adjustment (the "**Closing Property Tax Purchase Price Adjustment**") and the Transfer Tax Purchase Price Adjustment (the "**Closing Transfer Tax Purchase Price Adjustment**"), and the Cash Purchase Price.  Buyer shall prepare the Closing Statement in accordance with this Agreement and the Accounting Principles.  During the thirty (30)-day period following the delivery of the Closing Statement, Buyer shall provide Seller and its Representatives with reasonable access to work papers and other books and records related to the preparation of the Closing Statement for purposes of assisting Seller in its review of the Closing Statement.  At or prior to the end of such thirty (30)-day period, Seller shall either:

(i)     deliver a notice to Buyer confirming that no adjustments are proposed by Seller to Buyer's calculation of the Closing Working Capital, the Closing Assumed Indebtedness, the Closing Property Tax Purchase Price Adjustment, the Closing Transfer Tax Purchase Price Adjustment and, based thereon, the Cash Purchase Price, as set forth on the Closing Statement (a "**Notice of Acceptance**"), after which, the Closing Statement and the calculation of the Cash Purchase Price as set forth therein shall be final and binding on the Parties as the "**Final Closing Statement**" and "**Final Cash Purchase Price**," respectively; or

(ii)    deliver a written notice to Buyer to the effect that Seller believes that Buyer's calculation of Closing Working Capital, the Closing Assumed Indebtedness, the Closing Property Tax Purchase Price Adjustment, the Closing Transfer Tax Purchase Price Adjustment and, based thereon, the Cash Purchase Price, as set forth on the Closing Statement contains mathematical errors or is otherwise not in accordance with the terms of this Agreement (a "**Notice of Disagreement**"), and specifying in reasonable detail and accompanied by supporting calculations and documentation, the nature of such mathematical errors or noncompliance with the terms of this Agreement and the resulting adjustments including each specific amount that, in Seller's view, should be made to the calculation of the Closing Working Capital, the Closing Assumed Indebtedness, the Closing Property Tax Purchase Price Adjustment, the Closing Transfer Tax Purchase Price Adjustment and, based thereon, the Cash Purchase Price in order to comply with this Agreement (collectively, the "**Proposed Adjustments**"); *provided* that any item in the Closing Statement that is not disputed in the Notice of Disagreement shall be final and binding on the Parties for the purposes of determining the Final Closing Statement and Final Cash Purchase Price hereunder; *provided*, *however*, that if Seller fails to deliver a Notice of Acceptance or a Notice of Disagreement within such thirty (30)-day period, then the Closing Statement and the calculation of the Cash Purchase Price as set forth therein shall be final and binding on the Parties as the "**Final Closing Statement**" and "**Final Cash Purchase Price**," respectively.

(b)     If there are any Proposed Adjustments, Buyer shall, no later than thirty (30) days after Buyer's receipt of the Notice of Disagreement, notify Seller whether Buyer accepts or rejects each such Proposed Adjustment.  Thereafter, Seller and Buyer shall work in good faith to resolve any differences that remain with respect to the Proposed Adjustments.  If any of the Proposed Adjustments are not so resolved (the "**Unresolved Adjustments**," and the aggregate difference between the Parties' respective calculations of the Cash Purchase Price resulting from the Unresolved Adjustments, the "**Unresolved Balance**") within thirty (30) days after Buyer's notice

to Seller of its rejection of any Proposed Adjustments (or such longer period as the Parties may mutually agree in writing), then, at the request of either Seller or Buyer, the Unresolved Adjustments will be jointly submitted for arbitration to a mutually agreed nationally recognized firm with accounting expertise and relevant experience in resolving similar purchase price adjustment disputes (the "**Accounting Firm**"), and the Parties will enter into an engagement letter if requested by the Accounting Firm.  The Parties shall mutually determine the procedures with respect to the resolution of the Unresolved Adjustments; *provided* that if the Parties do not reach an agreement on such process within ten (10) Business Days of the engagement of the Accounting Firm, then the Accounting Firm shall, within the subsequent ten (10) Business Days, unilaterally determine such procedures, and inform the Parties in writing of such procedures.  The scope of the review by the Accounting Firm will be limited to:  (i) a disposition of the Unresolved Adjustments through a strict application of the Accounting Principles and the terms of this Agreement; (ii) based on its determination of the matters described in clause (i) above and all items and amounts that were previously accepted or agreed upon or deemed agreed upon by the Parties in accordance with this Section 3.04(b), as applicable, a calculation of the Closing Working Capital, the Closing Assumed Indebtedness, the Closing Property Tax Purchase Price Adjustment, the Closing Transfer Tax Purchase Price Adjustment and, based thereon, the Cash Purchase Price; and (iii) an allocation of the fees and expenses of the Accounting Firm determined in accordance with the formula specified below in this Section 3.04(b).  No Party shall disclose to the Accounting Firm, and the Accounting Firm will not consider for any purpose, any settlement discussions or offers made by any Party with respect to the Unresolved Adjustments or otherwise unless expressly agreed to by both Parties in writing.  In no event shall either Party or its Representatives have any ex parte communications or meetings with the Accounting Firm without the prior written consent of the other Party.  The Accounting Firm shall not be entitled to, and the Parties shall not individually request the Accounting Firm to, (A) make any determination other than as set forth above, (B) determine any Unresolved Adjustment to be a value higher than the highest value or lower than the lowest value proposed by the Parties in Seller's Closing Statement or Buyer's Notice of Disagreement, or (C) undertake any independent investigation of the facts relating to the Unresolved Adjustments.  The Accounting Firm will be instructed to render, as promptly as practicable and, if at all possible, within thirty (30) days after such submission of the Unresolved Adjustments to the Accounting Firm, its written decision resolving the matters submitted to it, which written decision will include a worksheet setting forth the reason for each Unresolved Adjustment determination, the material calculations used to determine the Accounting Firm's ruling including the calculation of the Closing Working Capital, the Closing Assumed Indebtedness, the Closing Property Tax Purchase Price Adjustment, the Closing Transfer Tax Purchase Price Adjustment and the Final Cash Purchase Price, and the allocation of its fees and expenses.  The determination of the Cash Purchase Price by the Accounting Firm and the statement prepared by the Accounting Firm setting forth such determination will, absent manifest error, be final and binding on the Parties as the "**Final Cash Purchase Price**" and the "**Final Closing Statement**," respectively, and judgment may be entered upon such determination and statement in any court of competent jurisdiction.  The fees and expenses of the Accounting Firm incurred pursuant to this Section 3.04(b) shall be borne by Buyer, on the one hand, and Seller, on the other hand, as determined by the Accounting Firm based on the inverse of the percentage that the Accounting Firm's determination (before such allocation) bears to the total value of each Party's respective position in relation to the total amount of the Unresolved Balance.  For purposes of illustration only, if the Unresolved Balance is $100, and the written determination of the

Accounting Firm states that $80 of the Unresolved Balance is resolved in Buyer's favor and $20 of the Unresolved Balance is resolved in Seller's favor, Buyer would bear 20% of the Accounting Firm's costs and expenses, on the one hand, and Seller would bear 80% of such costs and expenses, on the other hand.  All other fees, expenses, and costs incurred by a Party or its Representatives in connection with this Section 3.04 shall be borne by such Party.

    (c)    Payment Upon Final Determination of Final Cash Purchase Price:

        (i)    If the Final Cash Purchase Price is greater than the Estimated Cash Purchase Price, then (i) Buyer shall pay to Seller, within five (5) Business Days after the date on which the Final Cash Purchase Price becomes final and binding pursuant to this Section 3.04, by wire transfer of immediately available funds to the account or accounts Seller designate in writing to Buyer, an amount in cash equal to such difference and (B) within three (3) Business Days after the date on which the Final Cash Purchase Price is finally determined, Seller and Buyer shall deliver joint written instructions to the Escrow Agent directing the Escrow Agent to release and pay to Seller, within two (2) Business Days of the date such joint written instructions are delivered to the Escrow Agent, by wire transfer of immediately available funds to the account or accounts Seller designates in such joint written instructions, the Adjustment Escrow Funds.

        (ii)    If the Final Cash Purchase Price is less than the Estimated Cash Purchase Price, then within three (3) Business Days after the date on which the Final Cash Purchase Price becomes final and binding pursuant to this Section 3.04, Seller and Buyer shall deliver joint written instructions to the Escrow Agent directing the Escrow Agent to release and pay within two (2) Business Days of the date such joint written instructions are delivered to the Escrow Agent, by wire transfer of immediately available funds to the account or accounts designated in such joint written instructions (A) to Buyer the portion of the Adjustment Escrow Funds equal to the amount of such shortfall and, if such shortfall is greater than the amount of the Adjustment Escrow Funds, at Buyer's election, in its sole discretion, the portion of the Customer Deductions Escrow Funds equal to such remaining shortfall amount, and (B) to Seller the remaining portion of the Adjustment Escrow Funds, if any.

        (iii)    If the Final Cash Purchase Price is equal to the Estimated Cash Purchase Price, then Seller and Buyer shall, promptly after the date on which the Final Cash Purchase Price becomes final and binding pursuant to this Section 3.04, deliver joint written instructions to the Escrow Agent directing the Escrow Agent to release and pay to Seller, within two (2) Business Days of the date such joint written instructions are delivered to the Escrow Agent, by wire transfer of immediately available funds to the account or accounts Seller designates in such joint written instructions, all of the Adjustment Escrow Funds.

Any payments made pursuant to this Section 3.04 shall be treated by the Parties as an adjustment to the Purchase Price for Tax purposes and shall be reported as such by the Parties on their Tax Returns, in each case to the greatest extent permitted by Applicable Law.

ARTICLE 4
CLOSING

Section 4.01.    *Closing Date.*

Subject to the satisfaction of the conditions set forth in Article 9, Article 10 and Article 11 hereof (or the waiver thereof by each Party entitled to waive that condition), the closing of the sale of the Assets and the assumption of the Assumed Liabilities contemplated hereby (the "**Closing**") will take place remotely via the exchange of electronic documents and signatures by electronic mail on the date that is the later to occur of (a) thirty (30) days after the date of this Agreement and (b) two Business Days after the satisfaction or waiver of the conditions set forth in Article 9, Article 10 and Article 11 (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another place, date or time is agreed to in writing by the Selling Entities and Buyer.  The date and time at which the Closing actually occurs is hereinafter referred to as the "**Closing Date**."  For purposes of this Agreement, from and after the Closing, the Closing shall be deemed to have occurred at 12:01 am (prevailing Eastern Time) on the Closing Date.

Section 4.02.    *Payments on the Closing Date.*

At the Closing, Buyer will (a) pay by wire transfer of immediately available funds an amount equal to the Closing Payment Amount to the accounts designated in writing by Seller at least three Business Days prior to the Closing Date, (b) deposit the Customer Deductions Escrow Amount into a separate and distinct escrow account (the "**Customer Deductions Escrow Account**") to be established and maintained by the Escrow Agent in accordance with the Escrow Agreement and distributed in accordance therewith and (c) deposit the Adjustment Escrow Amount into a separate and distinct escrow account (the "**Adjustment Escrow Account**") to be established and maintained by the Escrow Agent in accordance with the Escrow Agreement and distributed in accordance therewith.  For the avoidance of doubt, any Customer Deductions Escrow Amount or Adjustment Escrow Amount deposited in escrow with the Escrow Agent shall not constitute property of any Selling Entity's estate within the meaning of section 541 of the Bankruptcy Code; *provided*, *however*, that any interest in or claim to such amount shall constitute property of estate of each applicable Selling Entity.

Section 4.03.    *Buyer's Deliveries.*

At the Closing, Buyer will deliver or cause to be delivered to Seller (or such other Persons where so designated):

(a)    the payments required to be made at the Closing pursuant to Section 4.02;

(b)    a Master Assignment, the IP Assignment Agreement, the Transition Service Agreement, the Escrow Agreement and each other Transaction Document to which Buyer is a party, in each case duly executed (and acknowledged, where applicable) by Buyer; and

(c)    the certificates of Buyer to be received by Seller pursuant to Section 11.01 and Section 11.02.

Section 4.04.    *The Selling Entities' Deliveries.*

At the Closing, the Selling Entities will deliver to Buyer:

(a)    a Master Assignment, the IP Assignment, the Transition Service Agreement, the Escrow Agreement and each other Transaction Document to which a Selling Entity is a party (including letters-in-lieu of transfer orders), in each case duly executed (and acknowledged, where applicable) by the applicable Selling Entity, with all required Transfer Taxes paid and required stamps affixed, if any;

(b)    such other instruments of assignment or conveyance duly executed by the applicable Selling Entities as shall be reasonably requested or reasonably necessary to transfer the Assets to Buyer in accordance with this Agreement;

(c)    the certificates of the Selling Entities to be received by Buyer pursuant to Section 9.01 and Section 9.02;

(d)    a copy of the Sale Order as entered by the Bankruptcy Court;

(e)    certified copies of the organizational documents of each Selling Entity and the authorizing resolutions authorizing this Agreement, each other Transaction Document to which such Selling Entity is a party and the consummation of the transactions contemplated hereby and thereby;

(f)    possession of each Acquired Owned Real Property, together with duly executed special warranty deeds in form and substance reasonably satisfactory to Buyer, as applicable, for each Owned Real Property conveying fee simple title in such Acquired Owned Real Property to Buyer, subject only to Permitted Encumbrances and possession of each Acquired Leased Real Property, together with duly executed assignments of the leases or subleases, in form and substance reasonably satisfactory to Buyer, as applicable, for each Acquired Leased Real Property conveying the leasehold interest in such Acquired Owned Real Property to Buyer, subject only to Permitted Encumbrances;

(g)    a properly completed U.S. Internal Revenue Service Form W-9 from each Selling Entity (or, if the applicable Selling Entity is a disregarded entity within the meaning of Treasury Regulations Section 1.1445-2(b)(2)(iii), the entity that is treated as the transferor of property for U.S. federal income tax purposes) pursuant to Proposed Treasury Regulations Section 1.1445-2(b)(2)(v);

(h)    all Necessary Consents other than those Necessary Consents that are not material to the operation of the Assets at Closing; and

(i)    all Permits of Seller or any of its Subsidiaries related to the ownership, operation or use of the Assets as historically owned, operated, or used other than those Permits that are not material to the operation of the Assets at Closing, each of which shall have been duly transferred and/or reissued to Buyer pursuant to Applicable Laws (including Environmental, Health and Safety Laws).

ARTICLE 5

REPRESENTATIONS AND WARRANTIES OF SELLING ENTITIES

Except as set forth in the Disclosure Schedules, each Selling Entity jointly and severally represents and warrants to Buyer, as of the date hereof and as of the Closing Date, as follows:

Section 5.01.    *Organization and Good Standing.*

Seller and each Subsidiary of Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.  Subject to the limitations imposed on Seller or any such Subsidiary as a result of having filed a petition for relief under the Bankruptcy Code, Seller and each such Subsidiary has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.  Seller and each Subsidiary of Seller is duly qualified, licensed or otherwise authorized to do business and is in good standing in each jurisdiction where the character of its business or the nature of its properties makes such qualification, licensing or authorization necessary, except for such failures to be so qualified, licensed, authorized or in good standing as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.02.    *Authority; Validity.*

Subject to entry of the Sale Order and such other authorization as is required by the Bankruptcy Court, each Selling Entity has the requisite power and authority necessary to enter into, deliver and perform its respective obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby, and the execution, delivery and performance of this Agreement and such other Transaction Documents and the consummation by such Selling Entity of the transactions contemplated herein and therein have been duly and validly authorized and approved by the board of directors or other governing body, as applicable, of such Selling Entity and no other corporate proceedings on the part of such Selling Entity or vote of such Selling Entity's stockholders or members are necessary to authorize the execution and delivery by such Selling Entity of this Agreement and the consummation of the transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by such Selling Entity and each other Transaction Document required to be executed and delivered by such Selling Entity at the Closing will be duly and validly executed and delivered by such Selling Entity at the Closing.  Subject to entry of the Sale Order and assuming the due authorization, execution and delivery by the other Parties, no other action on the part of such Selling Entity, its Affiliates or their respective Representatives is necessary to authorize this Agreement or the other Transaction Documents to which such Selling Entity is or will be a party and this Agreement and such other Transaction Documents, when so executed and delivered, will constitute the legal, valid and binding obligations of such Selling Entity, enforceable against such Selling Entity in accordance with their respective terms, and, except in each case as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Applicable Laws affecting the enforcement of creditors' rights generally and by general principles of equity, including principles of commercial reasonableness, good faith and fair dealing, regardless of whether such principles are considered in a proceeding at law or in equity.

Section 5.03.     *Governmental Approvals; No Conflict.*

Except for (a) entry of the Sale Order and/or the Bidding Procedures Order, (b) notices, filings and consents required in connection with the Bankruptcy Cases, (c) any applicable notices, filing, consents or approvals under any Applicable Laws, and (d) items listed on Disclosure Schedule 5.03, if any, none of the Selling Entities is required to give any notice to, make any filing with or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery by such Selling Entity of this Agreement and the other Transaction Documents to which it is or will be a party or the consummation or performance by such Selling Entity of any of the transactions contemplated hereby and thereby, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. When the consents and other actions described in the preceding sentence, including entry of the Sale Order, have been obtained and taken, the execution and delivery by the Selling Entities of this Agreement and the other Transaction Documents to which such Selling Entity is or will be a party and the consummation of the transactions provided for herein and therein will not result in the breach or violation of any of the terms and provisions of, or constitute a default (with or without notice or lapse of time or both) under, or conflict with, or cause any acceleration of any obligation of any Selling Entity under (i) the certificate of incorporation, bylaws or other governing documents of such Selling Entity, (ii) any Order applicable to such Selling Entity or any of the Assets owned or held by it or on its behalf, (iii) any Applicable Law, or (iv) require any consent under, or give any Third Party any rights of termination, amendment, suspension, revocation or cancellation of, any note, bond, mortgage or indenture, Material Contract, agreement, lease, sublease, license, Permit, franchise or other instrument or arrangement to which any of the Selling Entities is a party as of the Closing and which constitutes an Asset or Assumed Liability, or result in the creation of any Encumbrance (other than a Permitted Encumbrance) as of the Closing on any of the Assets, except to the extent that any such rights of termination, amendment, acceleration, suspension, revocation or cancellation as a result of such Encumbrance will not be enforceable against such Asset or Assumed Liability following the Closing in accordance with the Sale Order.

Section 5.04.     *Seller SEC Documents.*

(a)      All of Seller SEC Documents (i) as of its date, complied as to form in all material respects with the applicable requirements of the United States Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder (the "**Securities Act**"), or the United States Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder (the "**Exchange Act**"), as the case may be, as in effect on the date so filed, (ii) did not, at the time it was filed (or, if subsequently amended or supplemented, at the time of such amendment or supplement), contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading, and (iii) to the extent they contained consolidated financial statement of Seller, such financial statements were prepared in accordance with GAAP applied on a consistent basis throughout the periods indicated (except as may be indicated in the notes thereto and in the case of unaudited quarterly financial statements, as permitted by Form 10-Q under the Exchange Act).

(b)      Except for matters disclosed in Seller SEC Documents (excluding any "risk factors" or forward looking statements or similar disclosure contained therein), since January 1,

2017, no Material Adverse Effect has occurred.

Section 5.05.    *Financial Statements.*

(a)    The audited consolidated financial statements of Seller and its Subsidiaries as of December 31, 2017, December 31, 2018 and December 31, 2019 and the related audited consolidated statements of operations, comprehensive income (loss), stockholders' equity and cash flows for the fiscal years then ended (the "**Financial Statements**") fairly present, in conformity with GAAP applied on a consistent basis (except as may be indicated in the notes thereto), the consolidated financial position of Seller and its Subsidiaries as of the dates thereof and for the periods then ended.

(b)    True and complete copies of the balance sheet extracts as of January 31, 2020 relating to each Facility (each, a "**Facility Balance Sheet**") have been made available by Seller to Buyer. Each Facility Balance Sheet (i) was prepared in accordance with the books of account and other financial records of Seller and its Subsidiaries (except as may be indicated in the notes thereto), and (ii) was prepared in accordance with GAAP applied on a basis consistent with the preparation of the Financial Statements.

Section 5.06.    *No Undisclosed Material Liabilities.*

There are no material Liabilities (whether accrued, absolute, contingent or otherwise) of the Business, other than (a) Liabilities incurred since the Petition Date in the ordinary course of business of the Selling Entities that are not material to the Business; (b) Liabilities incurred in connection with the transactions contemplated by this Agreement or disclosed in Disclosure Schedule 5.06; and (c) Liabilities that will constitute Excluded Liabilities.  There are no obligations under leases that are Assigned Contracts and that are required to be capitalized in accordance with GAAP.

Section 5.07.    *Absence of Certain Changes.*

From the Petition Date, (a) the Business has been conducted, and the Assets have been maintained and operated, in the ordinary course and consistent in all material respects with past practices and (b) there has not been any event, occurrence, development or state of circumstances or facts that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.08.    *Legal Proceedings.*

Except for the Bankruptcy Cases and any adversary Proceedings or contested motions commenced in connection therewith, after giving effect to the Sale Order, there is no Proceeding or Order pending, outstanding or, to the Knowledge of each Selling Entity, threatened by any Person, relating to the Business, the Assets or Assumed Liabilities (a) that is material to the Business or the Assets or that would reasonably be expected to give rise to any material Liability of Buyer or be materially adverse to the ownership or use by Buyer of the Assets after the Closing, as such Assets are presently owned and used (or held for use) by Seller and/or its Subsidiaries, as applicable, (b) that would challenge the validity or enforceability of the obligations of any Selling Entity under this Agreement and the other Transaction Documents to which it is or will be a party

or (c) that is against any Selling Entity and seeks to prevent, restrain, materially delay, prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or by any of the other Transaction Documents.  There is no Order enjoining any Selling Entity from engaging in or continuing any conduct or practice, or requiring such Selling Entity to take any material action, in connection with the ownership, lease, possession, use or operation of the Assets owned or held by such Selling Entity, and such Selling Entity is not, nor are any of its respective Affiliates, is subject to any outstanding Order relating to the Business, the Assets, or Assumed Liabilities other than, in each case, Orders of general applicability.

Section 5.09.    *Compliance with Laws; Permits.*

(a)    The ownership and operation of the Business or the Assets by the Selling Entities is and since January 1, 2017, has been, in material compliance with all Applicable Laws.

(b)    (i) The Selling Entities have obtained and maintained all necessary Permits, including Permits required under Environmental, Health and Safety Laws and Applicable Food Safety Laws, with regard to the ownership or operation of the Assets and the conduct of the Business, and all such Permits are listed on Disclosure Schedule 5.09(b)(i), (ii) no Selling Entity has received written notice of material default under any such Permit and (iii) no material violations exist in respect of Permits, except for such non-compliance and such facts, conditions or circumstances, the subject of which have been finally resolved.

Section 5.10.    *Food Safety Matters*.

Except as otherwise set forth on Disclosure Schedule 5.10, the Business is, and has been since January 1, 2017, conducted in compliance in all material respects with all Applicable Laws related to the development, cultivation, manufacture, production, import, export, packaging, packing, labeling, handling, storage, transportation, distribution, purchase, sale, advertising or marketing of food and related products (collectively, "**Applicable Food Safety Laws**").  Without limiting the generality of the immediately preceding statement, except as otherwise set forth on Disclosure Schedule 5.10:

(a)    no Selling Entity has sold or distributed any Food and Beverage Products, and there are not any Food and Beverage Products cultivated, manufactured, produced, packaged, labeled, distributed or sold by or on behalf of the Business currently in inventory, which are or were "adulterated," "misbranded," or otherwise violative in any material respect within the meaning of the FDC Act, and/or under any other Applicable Food Safety Law;

(b)    all of the operations of the Business are and have been in compliance in all material respects with all Applicable Laws issued or implemented by the FDA, USDA, FTC and/or any other comparable Governmental Authority, including those related to recordkeeping, prior notice of imported food, food safety, hazard analysis and preventive controls, sanitary transportation, food additives, food contact substances, supplier verification, food facility registration, current good manufacturing practices, allergen control, and food labeling and advertising;

(c)    no Selling Entity has been subject to any inspection identifying material violations of Applicable Food Safety Laws, FDA Form 483, warning letter, untitled letter, finding of deficiency, investigation, or any other compliance or enforcement Proceeding, or other

40

correspondence or notice alleging or asserting material noncompliance with any Applicable Food Safety Laws or Permit, from or by any Governmental Authority with respect to the Business, nor are there any such Proceedings pending or threatened in writing;

(d)     since January 1, 2017, no Selling Entity has received any material written, oral or other notice from the FDA, USDA, FTC or any other comparable Governmental Authority in connection with any Food and Beverage Product manufactured, sold or distributed by or on behalf of the Business;

(e)     since January 1, 2017, no Selling Entity has been excluded, suspended or debarred from participation under any government program with respect to the Business pursuant to any Applicable Food Safety Law;

(f)     since January 1, 2017, there have been no recalls, withdrawals, field notifications or other notices of action relating to any lack of safety or regulatory compliance of or regarding any Food and Beverage Product cultivated, manufactured, produced, packaged, labeled, distributed or sold by or on behalf of the Business, whether ordered by a Governmental Authority or undertaken voluntarily by any Selling Entity, and there have been no claims or other instances of the presence of or exposure to any food contaminants or adulterants, food borne pathogens, food poisoning, pests, or other Hazardous Substance in or related to any such products, nor any other food-related conditions with respect to the Business;

(g)     each Food and Beverage Product cultivated, manufactured, produced, packaged, labeled, distributed or sold by or on behalf of the Business conforms in all material respects to any promises, claims or affirmations of fact made on the container or label for such product or in connection with its distribution or sale (including, without limitation, all nutrition facts, ingredient statements, nutrient content claims, structure/function claims, health claims and to the extent that such products are being marketed as such, "non-GMO," "fresh," "organic," "all natural," "sustainable," "U.S. grown," "made with natural ingredients," "gluten free," "made with rBST-free milk," "kosher," "no corn syrup," "no artificial colors, flavors, or sweeteners," "nutritious" or with similar claims) and the Selling Entities possess appropriate certifications or scientifically reliable materials to substantiate all such promises, claims and affirmations of fact; and

(h)     each Food and Beverage Product cultivated, manufactured, produced, packaged, labeled, distributed or sold by or on behalf of the Business complies in all material respects with FDA's requirements in Title 21 of the Code of Federal Regulations section 100.100 for nonfunctional slack fill and with any other similar state or local requirements, and no Selling Entity has received any correspondence from any Governmental Authority alleging that any Food and Beverage's container or packaging is deceptive because of nonfunctional slack fill.

Section 5.11.   *Material Contracts*.

(a)     Disclosure Schedule 5.11 sets forth a complete list of all 365 Contracts (including, in the case of Disclosure Schedule 5.11(a)(ii)(A) and 5.11(a)(ii)(B), counterparties to 365 Contracts), including 365 Contracts identified as of the date hereof that fall within the following categories (collectively, the "**Material Contracts**"):

41

(i)     any material lease or sublease of real property included as an Asset (whether a Selling Entity is lessor, sublessor, lessee or sublessee);

(ii)     other than purchase orders issued in the ordinary course of business, any Contract for the purchase or supply of goods or services providing for either (A) annual payments by the Business of $1,000,000 or more; or (B) annual receipts by the Business of more than $1,000,000 in any calendar year;

(iii)     any partnership agreement, joint venture agreement, strategic alliance, stockholders' agreement or limited liability company agreement;

(iv)     any Contract with any sales representative, reseller, agent, marketing partner, distributor or franchisee of any Selling Entity relating to the Business;

(v)     any Contract relating to the acquisition or disposition of any material business (whether by merger, sale of stock, sale of assets or otherwise) pursuant to which a Selling Entity or Buyer would have continuing obligations applicable to the Business or the Assets following the date of this Agreement;

(vi)     any Contract where the Business is, and Buyer would be required to become, obligor or guarantor relating to indebtedness, except for any Related Party Agreements;

(vii)     any Contract containing covenants expressly limiting, individually or in the aggregate, in any material respect the freedom of the Business or Assets to compete with any Person in a product or line of business or operate in any jurisdiction;

(viii)     any Hedge Contract;

(ix)     any Contract that contains exclusivity, requirements or similar provisions binding on the Business or the Assets;

(x)     any Contract containing "most favored nation" provisions applicable to the Business or the Assets;

(xi)     any Contract pursuant to which any Selling Entity (A) licenses or is otherwise permitted by a Third Party to use any Intellectual Property material to the Business (other than any "shrink wrap," "commercially available software package" or "click through" license that is generally available on and actually licensed under standard terms) or (B) licenses any material Transferred Intellectual Property to a Third Party (other than any non-exclusive licenses granted in the ordinary course of business);

(xii)     any Transferred Trademark Contract; or

(xiii)     any Related Party Agreement.

(b)     Each Material Contract is a legal, valid and binding obligation of the Selling Entity party thereto and, to the Knowledge of each Selling Entity, the other parties thereto in accordance

with its terms and conditions, and is enforceable against such Selling Entity except as such legality, validity and enforceability may be limited by (i) bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and (ii) equitable principles of general applicability (whether considered in a proceeding at law or in equity). No event has occurred or not occurred and no circumstance or condition exists, as a result of the action or inaction of any Selling Entity or, to the Knowledge of each Selling Entity, the action or inaction of any Third Party which, with the passage of time or the giving of notice, or both, will, or would reasonably be expected to, (A) constitute a material default under or a material violation of any Material Contract, (B) cause the acceleration of any obligation of any Selling Entity or, to the Knowledge of each Selling Entity, any other party thereto or the creation of an Encumbrance upon any Asset or (C) give any Person the right to cancel, terminate or modify any Material Contract.

Section 5.12.   *Intellectual Property.*

(a)     Disclosure Schedule 5.12(a) sets forth a list of all registrations and applications for registration of the Transferred Intellectual Property as of the date hereof (collectively, "**Registered Intellectual Property**"), setting forth for each item (i) the record owner, and, if different, the legal owner and beneficial owner of such item; (ii) the jurisdiction in which such item is issued, registered or pending; (iii) the issuance, registration, filing or application date and serial or identification number of such item; and (iv) for domain names, the registrant, the registrar, and the expiration date (if any).  The Registered Intellectual Property (A) has not been abandoned, canceled or otherwise compromised; (B) has been maintained effective by all requisite filings and renewals; and (C) remains in full force and effect.

(b)     The Selling Entities are the sole and exclusive owner of the Transferred Intellectual Property free and clear of all Encumbrances (other than Permitted Encumbrances).  The Transferred Intellectual Property is valid, enforceable and subsisting.  Except as limited by Section 365(c)(1)(A) of the Bankruptcy Code, the Selling Entities have a right to use all material Intellectual Property (other than Transferred Intellectual Property) used or held for use in connection with the operation of the Business by the Selling Entities or any of their Affiliates (including pursuant to the Transferred IP Agreements and the Transferred Trademark Contracts) (the "**Licensed Intellectual Property**") as currently conducted, free and clear of all Encumbrances (other than Permitted Encumbrances).  The Transferred Intellectual Property together with the Licensed Intellectual Property constitute all of the Intellectual Property necessary for or material to the operation of the Business as currently conducted in all material respects.

(c)     No Proceedings are pending or threatened in writing against any Selling Entity before a Governmental Authority and there are no Orders, in each case with regard to  the ownership or use by any Selling Entity of any Transferred Intellectual Property, the use by any Selling Entity of any Licensed Intellectual Property or the validity, scope or enforceability of any Transferred Intellectual Property.  The operation of the Business by the Selling Entities does not infringe, misappropriate or otherwise violate, and, since January 1, 2014, has not infringed, misappropriated or otherwise violated, any Intellectual Property of any Third Party in any material respect.  No Selling Entity or any of its Affiliates has received any written notice since January 1, 2014 alleging that (i) the operation of the Business or the use of any Transferred Intellectual Property or Licensed Intellectual Property infringes, misappropriates, or otherwise violates or (ii) otherwise inviting to

take a license to, in each case of (i) and (ii), the Intellectual Property of any Third Party.  To the Knowledge of each Selling Entity, no Third Party is infringing, misappropriating or otherwise violating any Transferred Intellectual Property and no such Proceedings are currently being asserted or threatened in writing against any Third Party by any Selling Entity.

(d)     All former and current employees, consultants, advisors, agents and independent contractors employed or engaged by any Selling Entity in connection with the Business who have (i) been involved in the creation, development or modification of any material Intellectual Property have entered into valid and binding agreements in which they have effectively assigned all of their rights in and to such Intellectual Property to the applicable Selling Entity and (ii) had access to any material trade secret included in the Transferred Intellectual Property or the Licensed Intellectual Property have executed valid and binding agreements that reasonably protect the confidentiality of such trade secrets.  To the Knowledge of each Selling Entity, none of the counterparties to the agreements that are the subject of the previous sentence is in breach thereof.  No university, military, educational institution, research center, Governmental Authority or other organization has funded or sponsored research and development conducted in connection with the Business, or has any claim of right to, ownership of or other Encumbrance on any Transferred Intellectual Property.

(e)     The Selling Entities have taken all commercially reasonable steps to protect and maintain the confidentiality and value of any material trade secrets and know-how included in the Transferred Intellectual Property or Licensed Intellectual Property and, to the Knowledge of each Selling Entity, there are no unauthorized uses or disclosures of any such trade secrets or know-how.

(f)     Except as set forth in Disclosure Schedule 5.12(e), no Selling Entity or any of its Affiliates owns any proprietary software that is used or held for use in connection with the operation of the Business.

(g)     The IT Assets used or held for use by each Selling Entity or any of its Affiliates in connection with the Business (the "**Business IT Assets**") (i) operate and perform and have been maintained, in each case, in all material respects in accordance with their documentation and functional specifications and otherwise as required for the conduct of the Business as currently conducted in all material respects; (ii) have not malfunctioned or failed in any material respect; and (iii) do not contain any Malicious Code in any material respect.  Each Selling Entity has taken technical, physical and organizational steps commercially reasonable in accordance with customary industry standards and practices to protect the confidentiality, integrity and security of Business IT Assets (and all information and transactions stored or contained therein or transmitted thereby) from Malicious Code, unauthorized use, access, interruption, modification or corruption.  Each Selling Entity and its Affiliates has in place commercially reasonable data backup, data storage, system redundancy and disaster avoidance recovery plans, as well as a commercially reasonable business continuity plan, in each case consistent with customary industry practices.  Since January 1, 2017, to the Knowledge of each Selling Entity, there have been no unauthorized intrusions or breaches of security with respect to the Business IT Assets, and there are no Proceedings pending or threatened in writing against any Selling Entity or its Affiliates with regard to the use or maintenance of its Business IT Assets.  The Selling Entities and their Affiliates own

or have a valid right to access and use all Business IT Assets used in connection with the Business as presently conducted.

(h)     Each Selling Entity's and its Affiliates' privacy practices and use of Personal Information, in each case with respect to the Business, conform and at all times have conformed, in each case in all material respects, to all (i) privacy and security policies and procedures of such Selling Entity and its Affiliates, (ii) Contracts to which any Selling Entity or any of its Affiliates is a party or is otherwise bound and (iii) Data Protection Laws ((i)-(iii), collectively, "**Data Security Requirements**").

(i)     The Selling Entities and their Affiliates take and have since January 1, 2017 taken commercially reasonable measures to ensure that Personal Information collected, stored or used by or on behalf of the Business is protected against unauthorized access, loss, damage, use, sharing, modification, or other misuse, and, since January 1, 2017, there has been no material unauthorized access, loss, damage use, sharing, modification, or other misuse of any such Personal Information. No complaint or Proceeding relating to any material improper use, unauthorized access or disclosure of, or a material breach in the security of, any Personal Information has been made since January 1, 2017 or is threatened in writing against any Selling Entity.  Since January 1, 2017, no Selling Entity has been notified or has been required by any Applicable Law, Governmental Authority or other agreement to notify in writing any Third Party of any material security breach or material unauthorized use or disclosure of Personal Information.  There are no Proceedings pending against or investigation (including investigations by a Governmental Authority) regarding any Selling Entity with respect to an alleged or potential violation of Applicable Laws with respect to Personal Information processed by or on behalf of such Selling Entity.

(j)     The execution and delivery by each Selling Entity of this Agreement, the IP Assignment Agreement and the other Transaction Documents to which it is or will be a party and the consummation of the transactions provided for herein and therein will not result in (i) the loss, limitation, termination or other impairment of, or give rise to any right of any Third Party to cancel, limit, terminate or otherwise impair the right such Selling Entity currently has with respect to any Transferred Intellectual Property or Licensed Intellectual Property or (ii) violate any Data Security Requirements.

Section 5.13.     *Environmental, Health and Safety Matters.*

(a)     The Assets owned or held by the Selling Entities and their operations are, and for the past three years have been, in compliance with applicable Environmental, Health and Safety Laws in all material respects;

(b)     The Selling Entities hold all material Permits required under Environmental, Health and Safety Laws in connection with the ownership and operation of the Assets and Business, all such Permits are in full force and effect, and the Selling Entities are, and for the past three years have been, in compliance with such Permits in all material respects;

(c)     With respect to each Selling Entity's operations of the Assets owned or held by such Selling Entity, such Selling Entity has not received any written notice alleging non-compliance

with or violation of applicable Environmental, Health and Safety Law from any Governmental Authority or other Third Party, the subject of which is unresolved;

(d)    There is no Proceeding or Order pending, outstanding, or threatened in writing against any Selling Entity pursuant to Environmental, Health and Safety Law with respect to the Assets owned or held by such Selling Entity or such Selling Entity's operation of such Assets;

(e)    There has been no Release of Hazardous Substances by any Selling Entity or any third Person on, under, in or at any Owned Real Property or Leased Real Property included in the Assets; and

(f)    The Selling Entities have made available to Buyer true, complete and correct copies of all material, non-privileged environmental site assessments, environmental audit reports, or other environmental, health or safety reports (including Phase I or Phase II reports) prepared since January 1, 2017 relating to environmental, health and safety matters concerning the Business or Assets prepared on behalf of, or that are in the possession of, any Selling Entity.

Section 5.14.    *Title*.

(a)    Disclosure Schedule 5.14(a)(i) sets forth a complete and accurate list of all of the Real Property Interests owned in fee by Seller or any of its Subsidiaries (the Real Property Interests listed or required to be listed on Disclosure Schedule 5.14(a)(i), the "**Owned Real Property**"), specifying the street address, the current owner and the current use of each parcel of Owned Real Property.  Each Selling Entity has good and valid fee simple title to all Acquired Owned Real Property owned by it, free and clear of all Encumbrances, except for Permitted Encumbrances and any leases or subleases listed on Disclosure Schedule 5.14(a)(ii) with respect to any Acquired Owned Real Property.  No Selling Entity currently leases any parcel or any portion of any parcel of any Owned Real Property to any other Person.

(b)    Disclosure Schedule 5.14(b)(i) sets forth a complete and accurate list and brief description of all Real Property Interests that are leased by Seller or any of its Subsidiaries (the Real Property Interests listed or required to be listed on Disclosure Schedule 5.14(b)(i), the "**Leased Real Property**"), and a description of the associated leases therefore (the "**Leases**"). Each of the Leases that is included in the Acquired Leased Real Property constitutes the legal, valid, binding and enforceable obligation of the applicable Selling Entity and is in full force and effect in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Applicable Laws relating to or affecting creditors' rights generally or general principles of equity (regardless of whether enforcement is sought in a Proceeding in equity or at law).  The applicable Selling Entity has good and valid leasehold title to all of the Acquired Leased Real Property free and clear of all Encumbrances, except for Permitted Encumbrances and leases or subleases listed on Disclosure Schedule 5.14(b)(ii) with respect to any Acquired Leased Real Property.  Except as set forth on Disclosure Schedule 5.14(b)(ii), there is not any current sublease or assignment entered into by any Selling Entity in respect of the Acquired Leased Real Property or any portion thereof.  The Selling Entities have made available to Buyer true, correct and complete copies of each Lease.

(c)     No event has occurred and no circumstances exist that, with the delivery of notice, the passage of time or both, would constitute such a material breach or material default, or permit the termination or modification of, or acceleration of rent under, any Lease. No Selling Entity has received written notice of any claim by any Person under any such Lease alleging that a Selling Entity has committed a breach of any such Lease, and has not provided or received any written notice of any intention to terminate any such Lease.

(d)     The Acquired Owned Real Property and Acquired Leased Real Property constitute all of the real property rights necessary to own and conduct the Business in all material respects as currently owned, operated and conducted by Seller or any of its Subsidiaries.

(e)     There are no condemnation, expropriation or other Proceedings with eminent domain pending or, to the Knowledge of each Selling Entity, threatened, with respect to any Acquired Real Property.

(f)     The buildings and improvements on the Acquired Owned Real Property are located within the boundary lines of the described parcels of land, are not in violation of applicable setback requirements, zoning laws, and ordinances (and none of the properties or buildings or improvements thereon are subject to "permitted non-conforming use" or "permitted non-conforming structure" classifications), and do not encroach on any easement which may burden the land.

(g)     None of the Acquired Owned Real Properties are located within any flood plain or subject to any similar type restriction for which any permits or licenses necessary to the use thereof have not been obtained.

(h)     Each parcel of Acquired Owned Real Property constitutes a legally subdivided lot in compliance with all applicable subdivision laws and similar regulations, separate from any adjoining land or improvements.

(i)     There are no assets or properties that are necessary for the use, maintenance of the Acquired Owned Real Property or the Acquired Leased Real Property and the operation of the Business as currently operated that are not included in the Assets, except for such assets where the omission thereof would not impede the use or maintenance of the applicable Acquired Owned Real Property or Acquired Leased Real Property in any material respect.

(j)     The improvements or facilities located on the Acquired Owned Real Property are presently used and operated in compliance with all material covenants, easements and restrictions affecting such Acquired Owned Real Property.

(k)     All water, sewer, gas, electric, telephone and drainage facilities and all other utilities and public or quasi-public improvements related thereto upon or adjacent to the Acquired Owned Real Property required by Applicable Law or required for the operation of the Business at the Acquired Owned Real Property, are (i) installed and serve the Acquired Owned Real Property and (ii) have direct access to the Acquired Owned Real Property from a public road or right of way.

(l)     All of the Acquired Owned Real Property has access to a public road or right of way.

Section 5.15.    *Matters Related to Assets; Casualty Losses*.

(a)    All of the rights, properties, interests, equipment and other tangible and intangible assets that constitute Assets are owned, leased or used (or held for use) by the Selling Entities and are free and clear of all Encumbrances (other than Permitted Encumbrances).

(b)    All of the equipment, machinery, vehicles and other tangible assets that constitute Assets are (i) in good condition and repair, except for ordinary wear and tear and ordinary and routine repairs and maintenance requirements, for assets of comparable age and usage, (ii) not in need of any repairs, which, if not made, would materially and adversely affect the integrity or safety of such Assets, and (iii) suitable for use by the Selling Entities to conduct the Business as currently conducted by the Selling Entities with respect to such Assets, in each case in all material respects.

(c)    The Assets owned or used (or held for use) by the Selling Entities constitute all assets, properties, rights, privileges and interests of whatever kind or nature, real or personal or mixed, tangible or intangible, used or necessary, and such assets are sufficient, to operate the Facilities and conduct the Business as currently conducted by the Selling Entities in all material respects, other than the operations and business conducted with respect to the Excluded Assets.

(d)    There has been no Casualty Loss (whether or not covered by insurance) materially affecting any of the Assets owned or used (or held for use) by Seller or any of its Subsidiaries that has not subsequently been completely repaired, replaced or restored.

Section 5.16.    *Inventory*. The Acquired Inventory is in good and marketable condition and is saleable in the ordinary course of business, other than for normal discounts in the ordinary course of business and except that milk products are perishable.  The inventory set forth on each Facility Balance Sheet was stated therein in accordance with GAAP applied on a consistent basis with the preparation of the Financial Statements and present fairly, in all material respects, the inventory of each Facility as of the respective dates thereof.

Section 5.17.    *Insurance*.

A true, correct and complete list of the material insurance policies related to the Business currently conducted by Seller and its Subsidiaries with respect to the Assets owned or held by Seller and its Subsidiaries (including policy periods and the amounts of coverage, limits and deductibles) as of the date hereof is attached hereto as Disclosure Schedule 5.17 (collectively, the "**Insurance Policies**").  All of the Insurance Policies are in full force and effect.  No event has occurred, including the failure by Seller or if applicable, any such Subsidiary of Seller, to give any notice or information or the delivery of any inaccurate or erroneous notice or information, which materially limits or impairs the rights of Seller or any of its Subsidiaries under any of the Insurance Policies.  Except as set forth in Disclosure Schedule 5.17, no material claim is outstanding under any of the Insurance Policies, and no carrier of any Insurance Policy of Seller or any such Subsidiary has asserted in writing any denial of coverage of any material claim.

Section 5.18.    *Security Arrangements*.

All of the bonds, letters of credit and guarantees posted by Seller or any of its Subsidiaries with Governmental Authorities or Third Parties and relating to the Assets owned or held by Seller or any such Subsidiary as of the date hereof are described on Disclosure Schedule 5.18.

Section 5.19.    *Customers and Suppliers.*

(a)    Disclosure Schedule 5.19(a) contains a list of the 25 largest customers, including distributors, of the Business, taken as a whole, for the twelve (12) months ended December 31, 2019 (determined on the basis of the total dollar amount of sales) ("**Major Customers**"), showing the total dollar amount of gross sales to each such Major Customer during such period.

(b)    Disclosure Schedule 5.19(b) contains a list of the 25 largest suppliers of the Business, taken as a whole, for the twelve (12) months ended December 31, 2019 (determined on the basis of the total dollar amount of purchases) ("**Major Suppliers**"), showing the total dollar amount of purchases by the Business from each such Major Supplier during such period.

(c)    From December 31, 2019 through the date of this Agreement, no Major Customer or Major Supplier has terminated, materially reduced, or otherwise materially changed its business with the Business or provided written or oral, notice to any Selling Entity stating that it intends to terminate, materially reduce or otherwise materially change its business with the Business (including by seeking to renegotiate contractual terms) or that it is materially dissatisfied with the performance of the Business (or any portion thereof).

Section 5.20.    *Anti-Corruption.*

(a)    No Selling Entity, nor any of their respective Representatives or other Persons that act for or on behalf of any Selling Entity has, in connection with or relating to the Business or the Assets, directly or indirectly, violated the U.S. Foreign Corrupt Practices Act or any other Applicable Law relating to anti-bribery (collectively, the "**Anti-Corruption Laws**").  The Selling Entities have in place and maintain policies, procedures and controls with respect to the Business that are reasonably designed to promote and ensure compliance with Anti-Corruption Laws in each jurisdiction in which the Business operates.  There is no pending or threatened investigation, inquiry, or enforcement Proceeding upon the Business or the Assets by any Governmental Authority regarding any offense or alleged offense under Anti-Corruption Laws.  To the Knowledge of each Selling Entity, none of the current officers, directors or employees of any Selling Entity is an employee of any Governmental Authority or of any instrumentality of a Governmental Authority.

(b)    The Business has been conducted and the Assets have been operated in compliance in all material respects with all applicable anti-money laundering and financial record-keeping and reporting laws.  The Selling Entities have maintained and currently maintain (i) books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the Business, and (ii) internal accounting controls reasonably designed to provide reasonable assurances that all transactions and access to assets of the Business were, have been and are executed only in accordance with management's general or specific authorization.  There is no pending or threatened investigation, inquiry, or enforcement Proceeding upon the Business or the Assets by any Governmental Authority regarding any actual or possible violation of any

Applicable Law relating to anti-money laundering or financial record-keeping and reporting, and there has been no such Proceeding.

Section 5.21.    *Brokers or Finders*.

Except for fees and expenses payable to Evercore Group, L.L.C., no Selling Entity has incurred any obligation or Liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable.

Section 5.22.    *Seller Benefit Plans; Labor and Employment Matters*.

(a)    Disclosure Schedule 5.22(a) contains a complete and accurate list of each Seller Benefit Plan and Restrictive Covenant Agreement with a Company Service Provider. The Selling Entities have made available to Buyer a copy of, to the extent applicable, each Seller Benefit Plan and, with respect to any unwritten Seller Benefit Plan, a written summary of such Seller Benefit Plan. With respect to each Seller Benefit Plan, Seller has made available to Buyer a copy of, to the extent applicable, (i) each trust, insurance, annuity or other funding Contract related thereto, (ii) the most recent financial statements and actuarial or other valuation reports prepared with respect thereto, (iii) the most recent annual report on Form 5500 required to be filed with the Internal Revenue Service with respect thereto, (iv) the most recent summary plan description and any material modification with respect thereto, and (v) the most recent determination or opinion letter received from the Internal Revenue Service with respect to each Seller Benefit Plan intended to qualify under Section 401 of the Code, and (vi) all non-routine, written communications relating thereto.

(b)    Each Seller Benefit Plan (and any related trust or other funding vehicle) has been maintained, operated and administered in material compliance with Applicable Laws and with the terms of such Seller Benefit Plan. There are no pending or, to the Knowledge of each Selling Entity, threatened material investigations by any Governmental Authority with respect to, or termination proceedings or other material claims, suits or proceedings (except routine claims for benefits payable in the ordinary course) against or involving any Seller Benefit Plan.

(c)    Except as otherwise provided in Disclosure Schedule 5.22(c), none of the execution and delivery of this Agreement or any of the other Transaction Documents or the consummation of the transactions contemplated hereby or thereby (alone or in conjunction with any other event, including any termination of employment on or following the Closing) will (i) entitle any Company Service Provider to any compensation or benefit, (ii) accelerate the time of payment or vesting, or trigger any payment or funding, of any compensation or benefits for any Company Service Provider or trigger any other material obligation under any Seller Benefit Plan, (iii) result in any breach or violation of or default under, or limit any right to amend, modify or terminate, any Seller Benefit Plan, or (iv) result in the payment of any "excess parachute payment" (as defined in Section 280G(b)(1) of the Code). No Company Service Provider is entitled to receive any gross-up or additional payment in connection with any Tax, including any Tax required by Section 409A or Section 4999 of the Code.

(d)      Except as otherwise provided in Disclosure Schedule 5.22(d), with respect to each Pension Plan or any Multiemployer Plan that is or is required to be sponsored, maintained or contributed to, or has been sponsored, maintained or contributed to or required to be maintained or contributed to within the six years prior to the date of this Agreement, by Seller or any of its ERISA Affiliates:  (i) no withdrawal liability, within the meaning of Section 4201 of ERISA, has been incurred, which withdrawal liability has not been satisfied, and (ii) no condition exists or event or transaction has occurred with respect to any such plan that would reasonably be expected to result in Buyer or any of its Affiliates incurring any Liability, fine or penalty.

(e)      There are no material controversies, strikes, slowdowns, work stoppages or any other material labor disputes involving any Company Service Provider pending or, to the Knowledge of each Selling Entity, threatened nor have there been any such material controversies, strikes, slowdowns or work stoppages in the past three years.  There are no material grievances or unfair labor practice complaints pending against Seller or any of its Subsidiaries before the National Labor Relations Board or any other Governmental Authority with respect to any Company Service Provider.

(f)      Disclosure Schedule 5.22(f) contains a complete and accurate list of all Collective Bargaining Agreements.  Seller and its Subsidiaries are in compliance in all material respects with all Applicable Laws relating to employment or labor, including those related to hiring, background checks, wages, pay equity, hours, collective bargaining and labor relations, classification of independent contractors and employees, equal opportunity, document retention, notice, plant closing and mass layoff, health and safety, employment eligibility verification, immigration, child labor, discrimination, harassment, retaliation, accommodations, disability rights or benefits, affirmative action, workers' compensation, unemployment insurance, employment and reemployment rights of members of the uniformed services, secondment, employee leave issues and the payment of social security and other Taxes, and are not liable for any arrears of wages, other compensation or benefits (other than such Liabilities that have been incurred in the ordinary course of business of Seller and its Subsidiaries), or any Taxes or penalties for failure to comply with any of the foregoing.  Except as set forth in Disclosure Schedule 5.22(f), there is no material employment- or labor-related claim pending against Seller or any of its Subsidiaries brought by or on behalf of any Company Service Provider or any Governmental Authority and, to the Knowledge of the Selling Entities, no such claim is threatened.  No Company Service Provider has been improperly excluded from participation in any Seller Benefit Plan, and neither Seller nor any of its Subsidiaries has any direct or indirect Liability, whether absolute or contingent, with respect to any misclassification of any Person as an independent contractor or on any other non-employee basis for Seller or its Subsidiaries rather than as an employee, including with respect to any individual employed, engaged or leased by Seller or any of its Subsidiaries from another employer, or with respect to any misclassification of any employee of Seller or its Subsidiaries as exempt versus non-exempt.   In the last five years, no allegations of sexual or other unlawful harassment or discrimination have been made against (i) the Selling Entities with respect to any Company Service Provider, (ii) any Company Service Provider at a level of Vice President or above, or (iii) to the Knowledge of the Selling Entities, any Company Service Provider at a level below Vice President.

(g)      Disclosure Schedule 5.22(g) sets forth a complete and correct list of all Company Employees who are employees by: name; title or position; status (part-time, full-time, exempt,

non-exempt, etc.); whether paid on a salaried, hourly or other basis; current base salary or wage rate; current target bonus; start date; service reference date (if different from the start date); work location (city and state); amount of accrued but unused paid vacation, paid sick-leave and other paid time off by category; and an indication of whether or not such employee is on leave of absence.  Disclosure Schedule 5.22(g) sets forth a complete and correct list of all Company Employees who are independent contractors by: name; job position or function; work location (city and state); hourly pay rate or other compensatory arrangement; hire date; regular hours per work week; term of engagement; and the total amount paid by Seller to such Person in 2019. Seller shall update Disclosure Schedule 5.22(g) from time to time and as of seven days prior to the Closing Date.  All Company Employees are authorized to work in the United States.

Section 5.23.    *Taxes*.

(a)    Each Selling Entity has timely filed (taking into account any extensions of time for such filings that have been properly and timely requested) all material Tax Returns that were required to be filed.  All such Tax Returns are complete and accurate in all material respects.  All material Taxes owed by any Selling Entity (whether or not shown on any Tax Return) have been timely paid.  No Selling Entity is currently the beneficiary of any extension of time within which to file any material Tax Return.  No material claim has ever been made (and remains unsolved) by an authority in a jurisdiction in which a Selling Entity does not file Tax Returns that such Selling Entity is or may be subject to Taxation by that jurisdiction.

(b)    There are no pending or threatened audits, investigations, disputes, notices of deficiency, claims or other actions for or relating to any liability for any material Taxes of any Selling Entity.  No Selling Entity has waived any statute of limitations in respect of Taxes that remain unpaid or agreed to any extension of time with respect to an open Tax assessment or deficiency.

(c)    There are no Encumbrances for Taxes on the Assets (other than Permitted Encumbrances).

(d)    No Asset (i) constitutes "tax-exempt use property" within the meaning of Section 168(h) of the Code, (ii) is "tax-exempt bond financed property" within the meaning of Section 168(g) of the Code or (iii) secures any debt the interest of which is tax-exempt under Section 103(a) of the Code.

(e)    None of the Selling Entities have been a party to a transaction that is or is substantially similar to a "reportable transaction," as such term is defined in Treasury Regulations Section 1.6011-4(b)(1), or any other transaction requiring disclosure under analogous provisions of state, local or foreign Tax law.

(f)    The terms and conditions of any Tax incentive, Tax exemption or other Tax reduction agreement or order of a Tax Authority with respect to the Assets or the Business have been complied with, and all submissions for such Tax incentive, exemption or other reduction agreement or order are complete and accurate in all material respects.

ARTICLE 6

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to the Selling Entities as of the date hereof and as of the Closing Date as follows:

Section 6.01.    *Organization and Good Standing*.

Buyer is duly organized, validly existing and in good standing under the laws of the State of Illinois.  Buyer has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.  Buyer is (or at the Closing will be) duly qualified, licensed or otherwise authorized to do business and is in good standing in the state(s) where the Assets are located and Buyer or Buyer's Affiliates will be duly qualified, licensed or otherwise authorized to own or lease and to operate and use the Assets in the state(s) where the Assets are located other than where failure to be so qualified would not have a material adverse effect.

Section 6.02.    *Authority; Validity; Consents*.

Buyer has the requisite power and authority necessary to enter into, deliver and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement by Buyer and such other Transaction Documents to which it is a party and the consummation by Buyer of the transactions contemplated herein and therein have been duly, validly authorized and approved and approved by the board of directors of Buyer and no other corporate proceedings on the part of Buyer or vote of Buyer's members are necessary to authorize the execution and delivery by Buyer of this Agreement and the consummation of the transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a party that is required to be executed and delivered by Buyer at the Closing will be duly and validly executed and delivered by Buyer, as applicable, at the Closing.  No other action on the part of Buyer, its Affiliates or their respective Representatives is necessary to authorize this Agreement or the other Transaction Documents to which Buyer is a party and this Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except in each case as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar Applicable Laws affecting the enforcement of creditors' rights generally and by general principles of equity, including principles of commercial reasonableness, good faith and fair dealing, regardless of whether such principles are considered in a proceeding at law or in equity.

Section 6.03.    *No Conflict*.

Except for (a) any applicable notices, filing, consents or approvals under any Applicable Laws, and (b) items listed on Disclosure Schedule 6.03, Buyer is not and will not be required to give any notice to, make any filing with or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the

other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby, except as would not, individually or in the aggregate, reasonably be expected to affect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.  When the consents and other actions described in the preceding sentence have been obtained and taken, the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the breach or violation of any of the terms and provisions of, or constitute a default (with or without notice or lapse of time or both) under, or conflict with, or cause any acceleration of any obligation of any Buyer under (i) any agreement, indenture, bond, debenture, note, mortgage or other instrument to which it or its assets is bound, (ii) the certificate of incorporation, bylaws or other governing documents of Buyer, (iii) any Order applicable to Buyer or its assets or (iv) any Applicable Law, except as would not, individually or in the aggregate, reasonably be expected to affect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

Section 6.04.    *Legal Proceedings*.

As of the date hereof, there are no Proceedings or Orders pending or outstanding or, to the Knowledge of Buyer, threatened by any Person, that seek to prevent, restrain, materially delay, prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or that would, individually or in the aggregate, reasonably be expected to delay the Closing or have an adverse effect on Buyer's performance of any of its obligations and covenants under this Agreement and the other Transaction Documents to which it is a party that are to be performed prior to, at or after Closing.

Section 6.05.    *Bankruptcy*.

There are no bankruptcy, reorganization or arrangement Proceedings pending, being contemplated by or, to the Knowledge of Buyer, threatened against Buyer.

Section 6.06.    *Brokers or Finders*.

Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement for which Seller or any of it is Subsidiaries is or will become liable.

Section 6.07.    *Financing*.

(a)    Buyer will have at the Closing sufficient funds available in cash to pay the Purchase Price and any fees and expenses incurred by or otherwise required to be paid by Buyer in connection with the acquisition of the Assets and the assumption of the Assumed Liabilities pursuant to this Agreement and the transactions contemplated by this Agreement.

(b)    Buyer has delivered to Seller prior to the date hereof a true and complete copy of a fully executed commitment letter, dated as of March 27, 2020, by and among Buyer and CoBank, ACB (the "**Debt Commitment Letter**"), pursuant to which the lender has committed and

confirmed, on the terms and subject to the conditions set forth therein, to provide Buyer with debt financing in the amounts set forth therein in connection with the transactions contemplated hereby (the "**Debt Financing**").

(c)     For the avoidance of doubt, Buyer acknowledges and agrees that, notwithstanding anything to the contrary in this Agreement, the consummation of any financing to be provided by CoBank, ACB shall not be a condition to any obligations of Buyer hereunder, including the obligation to consummate the transactions contemplated hereby.

Section 6.08.     *Independent Evaluation*.

Buyer (a) is experienced in the evaluation, purchase, ownership and operation of assets of the types and natures consistent with those used in the operations of the Business and the Assets and is aware of the risks associated with the purchase, ownership and operation of such assets and interests related thereto, (b) is capable of evaluating, and hereby acknowledges that it has so evaluated, the merits and risks of the Assets, ownership and operation thereof and its obligations hereunder, and (c) is able to bear the economic risks associated with the Assets, ownership and operation thereof and its obligations hereunder.  In entering into this Agreement and except for the representations and warranties expressly set forth in Article 5 of this Agreement, none of Seller, Seller's Subsidiaries, their respective Affiliates, Seller's, its Subsidiaries or their respective Affiliates' respective Representatives or any Person acting on Seller's, its Subsidiaries or its or their Affiliates' behalf is making or has made any other express or any implied representations or warranties, and Buyer disclaims reliance upon any other representations and warranties (including as to the accuracy and completeness thereof), with respect to Seller, its Subsidiaries or any of its or their respective Affiliates, any of their respective business, operations, assets, liabilities, condition (financial or otherwise) or prospects or any other matter relating to Seller, its Subsidiaries or any of its or their respective Affiliates.  Buyer acknowledges and affirms that it has relied and will rely solely on the terms of this Agreement and the Transaction Documents and upon its independent analysis, evaluation and investigation of, and judgment with respect to, the business, economic, legal, tax or other consequences of the transactions contemplated by this Agreement.

Section 6.09.     *No Other Representations or Warranties*.

Except for the representations and warranties expressly set forth in this Article 6, neither Buyer nor any Person acting on behalf of Buyer makes any other representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, regarding Buyer or any of its Affiliates, and Buyer hereby disclaims all other representations and warranties of any kind whatsoever, express or implied, written or oral, at law or in equity, whether made by or on behalf of Buyer.

ARTICLE 7
ACTIONS PRIOR TO THE CLOSING DATE

Section 7.01.    *Access and Reports.*

(a)    From the date hereof through Closing, subject to Applicable Laws, upon the reasonable request from Buyer of any such activities, each Selling Entity will afford Buyer's officers and other authorized Representatives reasonable access, during normal business hours, (i) to its officers, employees, consultants and Representatives (including its legal advisors and accountants), (ii) to all books, records and other documents and data in the locations in which they are normally maintained, and to make copies of all such books, records, and other documents to the extent relating to the Assets or the Assumed Liabilities, (iii) to any reasonably available financial and operating data and other information in connection with the Assets and (iv) to all offices, plants, buildings, facilities and other physical locations and properties that are an Asset, to make such investigation and physical inspection of the Assets and the Assumed Liabilities as it reasonably requests; *provided* that, in connection with such access, Buyer's authorized Representatives will (i) abide by any reasonable safety rules, regulations and operating policies provided in writing by Seller or its Representatives and (ii) at Seller's option, be accompanied by at least one (1) Representative of Seller.  Notwithstanding anything herein to the contrary, no such investigation or examination will be permitted to the extent that it would unreasonably interfere with the conduct of the business of the Selling Entities or would require a Selling Entity to disclose information that would violate the attorney-client privilege or any other applicable privileges or immunities; provided that the Selling Entities use reasonable effort to disclose such information without disclosing the privileged information (for example, by redacting such information as reasonably necessary to avoid such violation).

(b)    Buyer acknowledges that Confidential Information (as defined in the Confidentiality Agreement) has been, and in the future will be, provided to it in connection with this Agreement, including under Section 7.01(a), and is subject to the terms of the confidentiality agreement entered into between Seller and Buyer (the "**Confidentiality Agreement**"), the terms of which are incorporated herein by reference.  Buyer acknowledges and understands that this Agreement may be provided to lenders or be publicly filed in the Bankruptcy Court and further made available by Seller to prospective bidders and that such disclosure will not be deemed to violate any confidentiality obligations owing to Buyer, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise.

Section 7.02.    *Operations Prior to the Closing Date.*

Except (a) as otherwise expressly contemplated by this Agreement, (b) as disclosed in Schedule 7.02, (c) with the prior written consent of Buyer (which consent will not be unreasonably withheld, conditioned or delayed), or (d) as otherwise required by Applicable Laws, or as required by any Governmental Authority, from the date hereof until the Closing Date:

(i)    Seller shall, and shall cause each of its Subsidiaries to, operate the Facilities and other Assets operated by Seller and its Subsidiaries in the ordinary course of business in all material respects and to maintain, or cause to be maintained, all Assets in good working order and condition (ordinary wear and tear excepted) (including, without

limitation, conducting all inspections and acts of service and repair with at least the level of care and frequency required to comply with (1) manufacturer recommendations or guidelines or (2) customary industry practice for similar assets as the applicable Asset), and Seller shall, and shall cause each of its Subsidiaries to, use its reasonable best efforts to (A) maintain books, accounts and records relating to such Assets in accordance with past custom and practice in all material respects, (B) preserve intact the business organizations of Seller and its Subsidiaries, (C) preserve its current relationships with Third Parties, including suppliers, vendors, customers, clients, contractors and others, related to the Assets or having business dealings related to the Business (including with respect to sales of products and volumes of production) and keep available the services of Company Employees, consultants and agents of the Selling Entities in connections with the services such persons provided in respect of the Assets and the Business in the ordinary course of business, and (D) comply with all Applicable Laws and Orders applicable to the Assets or the Business and give prompt notice to Buyer of any notice of any material damage or any material Casualty Loss and any notice received or made by Seller of any claim asserting any material tort or violation of Applicable Law or any new Proceeding that (in each case) relates to such Assets or the Business; and

(ii)     Without limiting the foregoing, Seller shall not, and shall cause each of its Subsidiaries not to, do any of the following without the prior written consent of Buyer (which consent shall not be unreasonably withheld, delayed or conditioned):

(A)     liquidate, dissolve, recapitalize or otherwise wind up its operations of the Business;

(B)     terminate, cancel, materially amend or modify, grant a waiver or consent with respect to or extend any Material Contract, or enter into any Contract that would be a Material Contract, in each case other than in the ordinary course of business consistent with past practice;

(C)     (1) sell, lease, transfer, dedicate to the public, abandon, permit to lapse, fail to maintain, exclusively license, assign or otherwise dispose of any Assets, in each case other than in the ordinary course of business consistent with past practice, or (2) effect any sale (whether by merger, consolidation, acquisition of stock or assets or otherwise) of the Business;

(D)     acquire (by merger, consolidation, acquisition of stock or assets or otherwise), directly or indirectly, any material assets, securities, properties, interests or businesses for the conduct of the Business, in each case other than pursuant to existing Contracts or in the ordinary course of business consistent with past practice;

(E)     other than as permitted by Section 7.02(d)(ii)(D), make any material loans, advances or capital contributions to, or investments in, any other Person (other than any Subsidiary of Seller) with respect to the Business, other than advances to employees in the ordinary course of business consistent with past practice;

57

(F)     subject any of the Assets to any Encumbrances, except for Permitted Encumbrances;

(G)     enter into any agreement or arrangement that materially limits or otherwise restricts in any material respect the conduct of the Business or the use or saleability of the Assets or that would reasonably be expected to, after the Closing Date, limit or restrict in any material respect the Business or Buyer's use of the Assets;

(H)     change its accounting methods, policies or practices, in each case as they relate to the Assets;

(I)     commence, settle or propose to settle any Proceedings that could reasonably be expected to materially diminish the value of the Assets or impair title thereto;

(J)     other than as required by Applicable Law, by the terms of any Seller Benefit Plan or Collective Bargaining Agreement as in effect on the date hereof or expressly by this Agreement, (1) hire or promote or terminate the employment (other than for cause or due to the elimination of a position) of any Company Employee with annual salary in excess of $75,000, (2) grant or increase any severance, change in control, retention, termination or similar compensation or benefits to (or amend any existing severance, change in control, retention, termination or similar compensation, benefits or arrangement with) any Company Employee, (3) establish, adopt, amend, or terminate any Collective Bargaining Agreement or Seller Benefit Plan, or (4) grant, pay or increase the compensation, bonus or other benefits of (or amend any existing compensation, bonus or other benefits) or make a loan to any Company Employee or accelerate the vesting or payment of any compensation, bonus or other benefit to any Company Employee;

(K)     fail to keep in force, cancel or modify any Insurance Policy, except where replaced with a substantially similar policy;

(L)     make any material change in the customary methods of operations of the Business, including practices and policies relating to manufacturing, purchasing, inventories, marketing, selling, credit and pricing;

(M)     fail to maintain inventory to and including the Closing Date of a quality usable and salable in the ordinary course of business and in sufficient quantities to operate the Business as it is and has been historically conducted in all material respects;

(N)     write down or write up (or fail to write down or write up in accordance with GAAP consistent with past practice) the value of any inventories or revalue any of the Assets other than in the ordinary course of business and in accordance with GAAP;

    (O)    take any action that could cause any asset that is an Asset as of the date hereof to no longer be an Asset as of Closing, including transferring any asset that is used or held for use in connection with a Facility or the operations of a Facility to an Excluded Facility, except for the sale of inventory to a Third Party in the ordinary course; or

    (P)    agree or commit to do any of the foregoing.

Section 7.03.   *Commercially Reasonable Efforts*.  Subject to Section 7.03, Seller, on the one hand, and Buyer, on the other hand, will use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, including using commercially reasonable efforts to accomplish the following: (i) the taking of all reasonable acts necessary to cause the conditions precedent to the other party's obligations to consummate the Closing set forth in  Article 9, Article 10 and Article 11 to be satisfied, (ii) the obtaining, at the earliest practicable date, of all necessary Governmental Authorizations and the making of all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any) and the taking of all reasonable steps as may be necessary to avoid any Proceeding by any Governmental Authority, and (iii) the execution or delivery of any additional instruments necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement. Nothing in this Section 7.03 will require Buyer, Seller or any of their respective Subsidiaries to pay any consideration to any Third Party, to initiate any Proceedings, to incur any obligation or to waive any right under this Agreement or to assist any Party in connection with the transactions contemplated hereby.

Section 7.04.   *Regulatory Approvals.* (a) Buyer and Seller will (i) make or cause to be made any filings required of each of them or any of their respective Affiliates under the HSR Act or other Applicable Laws with respect to the transactions contemplated hereby as promptly as practicable and, in any event, within ten Business Days after the date of this Agreement in the case of all filings required under the HSR Act or any other Applicable Laws, (ii) comply at the earliest practicable date with any request under the HSR Act or other Applicable Laws for additional information, documents or other materials received by each of them or any of their respective subsidiaries from the Federal Trade Commission (the "**FTC**"), the Antitrust Division of the United States Department of Justice (the "**Antitrust Division**") or any other Governmental Authority in respect of such filings or such transactions, and (iii) cooperate with each other in connection with (A) any such filing (including, to the extent permitted by Applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith), (B) resolving any investigation or other inquiry of any of the FTC, the Antitrust Division or other Governmental Authority under any Applicable Laws with respect to any such filing or any such transaction, and (C) updating, transferring, replacing, cancelling or obtaining (1) the Permits set forth in Schedule 7.04 and (2) applicable registrations with the FDA. Each such Party will use commercially reasonable efforts to furnish to each other all information required for any application or other filing to be made pursuant to any Applicable Law in connection with the transactions contemplated by this Agreement.  Each such Party will promptly inform the other parties of any oral communication with, and provide copies of written communications with, any Governmental Authority regarding any such filings or

any such transaction. No Party hereto will independently participate in any formal meeting with any Governmental Authority in respect of any such filings, investigation, or other inquiry without giving the other parties prior notice of the meeting and, to the extent permitted by such Governmental Authority, the opportunity to attend and/or participate. Subject to Applicable Law, the Parties will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party relating to Proceedings under the HSR Act or other Applicable Laws. Seller and Buyer may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 7.04 as "outside counsel only." Such materials and the information contained therein will be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Seller or Buyer, as the case may be). Notwithstanding anything to the contrary in this Agreement, as promptly as practicable and, in any event, within five (5) Business Days after the date of this Agreement, the Parties shall notify the Antitrust Division of this Agreement and the transactions contemplated by this Agreement, and shall furnish to the Antitrust Division a copy of this Agreement and any additional information reasonably requested by such Governmental Authority.

(b)     Buyer understands and agrees that Buyer will use its reasonable best efforts to take, and will cause its Affiliates to take, all actions necessary to obtain all Governmental Authorizations and to avoid or eliminate each and every impediment under any Applicable Law or otherwise so as to enable the consummation of the transactions contemplated by this Agreement and the other Transaction Documents to occur as soon as possible (and in any event prior to the Outside Date); *provided* that the Parties hereto understand and agree that the reasonable best efforts of Buyer, solely for purposes of this Section 7.04(b), will not, and will not be deemed to, include: (i) (A) entering into any settlement, undertaking, consent decree, stipulation or agreement with or required by any Governmental Authority in connection with the transactions contemplated hereby; (B) proposing, negotiating, committing to and effecting, by consent decree, hold separate order or otherwise, the sale, divestiture or disposition of businesses, product lines or assets, including the assets of Buyer or any of its Affiliates or the Assets; (C) terminating existing relationships, contractual rights or obligations of Buyer or its Affiliates (including those relating to the Assets); or (D) otherwise taking or committing to take actions that after the Closing would limit Buyer's or its Affiliates' freedom of action with respect to, or its ability to retain or exercise rights of ownership or control with respect to, one or more of the businesses, product lines or assets of Buyer or its Affiliates (including the Assets), in each case in this clause (i), including to the extent required or proposed by any Governmental Authority in connection with the transactions contemplated hereby; (ii) defending any Proceeding (including by appeal if necessary) that challenges any of the transactions contemplated by this Agreement or which would otherwise prohibit, materially delay or materially impair the consummation of the transactions contemplated by this Agreement or the other Transaction Documents; (iii) seeking to have lifted, vacated or reversed any Order entered by any Governmental Authority with respect to this Agreement or the other Transaction Documents or the transactions contemplated hereby or thereby; and (iv) not taking any action (including the acquisition by it or any of its Affiliates of any interest in any Person) if such action would make it more likely that there would arise any impediments under any Applicable Law that may be asserted by any Governmental Authority to the consummation of the transactions contemplated by this Agreement or the other Transaction Documents as promptly

as reasonably practicable or that would result in any delay of the Closing. Notwithstanding anything to the contrary herein, any material breach of Buyer of this Section 7.04 will constitute a willful and material breach of the covenants and agreements on the part of Buyer set forth in this Agreement for all purposes hereof.

Section 7.05.    *Bankruptcy Court Approval.*

(a)     The Selling Entities and Buyer each acknowledges that this Agreement and the sale of the Assets to Buyer and the assumption of the Assumed Liabilities by Buyer are subject to Bankruptcy Court approval. Buyer acknowledges that (i) to obtain such approval, the Selling Entities must demonstrate that they have taken reasonable steps to obtain the highest and otherwise best offer possible for the Assets, and that such demonstration will include giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court and (ii) Buyer must provide adequate assurance of future performance as required under the Bankruptcy Code with respect to each Assigned Contract.

(b)     Buyer agrees that it will take such actions as are reasonably requested by the Selling Entities to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer of the Assigned Contracts, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(c)     Seller will give Buyer reasonable advance notice and proposed drafts of all pleadings, motions, Orders, notices, other papers, hearings, and other Proceedings related to this Agreement and the transactions contemplated hereby, and will provide Buyer and its counsel with a reasonable opportunity to review such papers prior to filing with the Bankruptcy Court.

Section 7.06.    *Damage or Destruction.* Until the Closing, the Assets shall remain at the risk of the Selling Entities. In the event of any material damage to or destruction of any of the Assets after the date hereof and prior to the Closing (in any such case, a "**Damage or Destruction Loss**"), Seller shall give prompt written notice thereof to Buyer. If any such Damage or Destruction Loss is covered by insurance policies and, if such damage or destruction is to a facility, is not repaired or replaced by a similar facility in reasonable proximity to any former facility, all right and claim of the Selling Entities to any proceeds of insurance for such Damage or Destruction Loss shall be assigned and (if previously received by the Selling Entities and not used prior to the Closing Date to repair any damage or destruction) paid to Buyer at Closing in accordance with Section 2.01(b)(xi).

Section 7.07.    *Buyer Efforts to Obtain Financing.*

(a)     From and after the date hereof, Buyer shall use its reasonable best efforts to take, or cause to be taken, all actions that are necessary, proper or advisable to obtain the Debt Financing on the terms and conditions described in the Debt Commitment Letter or any alternative financing documents in the event the Debt Commitment Letter is terminated prior to the Closing.

(b)     Without limiting the foregoing, Buyer shall (i) negotiate and enter into definitive agreements with respect to the Debt Financing contemplated by the Debt Commitment Letter on

the terms and conditions (including any flex provisions) contained in the Debt Commitment Letter (the "**Debt Financing Agreements**"); (ii) satisfy (or obtain a waiver thereof with regard to) all conditions applicable to the funding of the Debt Financing that are within Buyer's control; (iii) assuming that all conditions of the Buyer to the Debt Commitment Letter are satisfied, consummate the Debt Financing at or prior to the Closing, in any case, subject to the terms and conditions of the Debt Commitment Letter; and (iv) enforce its rights under the Debt Commitment Letter to draw upon and consummate the Debt Financing, subject to the terms and conditions of the Debt Commitment Letter.  Buyer shall keep Seller reasonably informed on a reasonably current basis and in reasonable detail with respect to all material activity concerning the status of its efforts to arrange the Debt Financing contemplated by the Debt Commitment Letter and shall give Seller notice of any material adverse change with respect to the Debt Financing as promptly as practicable.

Section 7.08.    *Cooperation with Financing*.

(a)    Prior to the Closing, the Selling Entities shall use reasonable best efforts to provide to Buyer all customary cooperation that is reasonably requested by Buyer in connection with the Debt Financing, including: (i) using reasonable best efforts to facilitate the pledging of collateral, provided that no pledge shall be effective until the Closing; (ii) deliver to Buyer and its Debt Financing Sources the Financing Deliverables as promptly as reasonably practicable following Buyer's request therefor; (iii) participate in meetings and due diligence sessions and using reasonable best efforts to furnish Buyer and its Debt Financing Sources with the information (financial or otherwise) regarding Seller and its Subsidiaries that is required to be delivered pursuant to the Debt Commitment Letter; (iv) assist Buyer in the negotiation and preparation of Debt Financing Agreements, including guarantee and collateral documents, and customary closing certificates as may be required by the Debt Financing Sources, including the Financing Deliverables (it being understood that such negotiations shall be led by Buyer, and Seller shall only have the obligation to use commercially reasonable efforts to provide input where specifically requested); (v) to the extent applicable, using reasonable best efforts to cause its independent auditors to cooperate with the Debt Financing (including to obtain such accountants' comfort letters and reports as may be reasonably requested by Buyer and the consent of such auditors to the use of their reports in any materials relating to the Debt Financing); (vi) using reasonable best efforts to obtain such consents, legal opinions, surveys and title insurance as reasonably requested by Buyer; and (vii) to the extent reasonably requested by Buyer in writing at least ten (10) Business Days prior to the Closing Date, provide, no later than five (5) Business Days prior to the Closing Date, all documentation and other information about the Selling Entities required under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act; *provided*, *however*, that, notwithstanding the foregoing, nothing in this Agreement shall require such cooperation to the extent it would unreasonably interfere with the conduct of the Business by the Selling Entities; and *provided*, *further*, that notwithstanding anything in this Agreement to the contrary, the Selling Entities shall not (A) be required to pay any fees (including commitment or other similar fees) or to give any indemnities or incur any liabilities, in each case, in connection with the Debt Financing for which they would not otherwise be reimbursed or indemnified pursuant to this Agreement, (B) have any liability or obligation under any loan agreement, debt security or any related document or any other agreement or document related to the Debt Financing, (C) be required to provide access to or disclose information where such access or disclosure would (or would be reasonably expected to) jeopardize the attorney-client privilege or

contravene any Law or violate any contract, agreement or confidentiality obligation binding on the Selling Entities or their Affiliates, (D) take any action in respect of the Debt Financing to the extent that such action would cause any condition to Closing to fail to be satisfied by the Outside Date or otherwise result in a breach of this Agreement by any of the Selling Entities or their Affiliates, (E) result in the contravention of, or violation of breach of, or default under, any material contract to which the Selling Entities or any of their Subsidiaries is a party, (F) subject any of the Selling Entities or their Subsidiaries, or any of its or their respective directors, managers, officers or employees to any actual or potential personal liability, (G) waive or amend any terms of this Agreement or any other contract to which any Selling Entity is party, (H) take any action that would subject it to actual or potential Liability, to bear any cost or expense or to make any other payment or agree to provide any indemnity in connection with the Debt Financing, the definitive documents related to the Debt Financing or any information utilized in connection therewith (in each case except following the Closing Date) or (G) be required to execute any document, certificate or instrument, or make any representation or warranty, in connection with the Debt Financing, except for customary authorization letters and any such contractual obligation, document, certificate or instrument that is conditioned upon, and not effective until, the consummation of the Closing.

(b)     Notwithstanding anything to the contrary set forth herein, the Selling Entities and their Affiliates shall be deemed to have complied with their obligations under this Section 7.08 for all purposes of this Agreement unless the applicable Debt Financing has not been obtained primarily as a result of the Selling Entities' or any of their Affiliates' intentional and material breach of their obligations under this Section 7.08.

Section 7.09.     *Section 1113 Collective Bargaining Agreement.*

Between the date of this Agreement and the Closing, the Selling Entities shall seek to reject or modify each Collective Bargaining Agreement in the manner set forth on Schedule 7.09,[4] in each case pursuant to Section 1113 of the Bankruptcy Code; *provided* that any modification to a Collective Bargaining Agreement shall be in a manner acceptable, in form and substance, to Buyer in its sole discretion.  To the extent that any such Collective Bargaining Agreement would expire prior to the Closing, the applicable Selling Entity with the written consent of Buyer will use commercially reasonable efforts to extend the terms of any such Collective Bargaining Agreement, but only to the extent such extension is necessary in order for such Collective Bargaining Agreement to be rejected, or modified in a manner consistent with the first sentence of this Section 7.09, in form and substance, to Buyer, under Section 1113 of the Bankruptcy Code.

Section 7.10.     *Additional Selling Entities.*

If, at any time after the date of this Agreement, either Party discovers that any of the rights, interests, properties, or other assets constituting the Assets is owned by a Subsidiary of Seller who is not a Selling Entity, Seller shall promptly cause such Subsidiary to become a Selling Entity

---

[4]     **Note**: Schedule to provide for modifications required by the Buyer in order to meet the Closing Conditions. Such modifications will not include anything in addition to already requested modifications in the draft negotiation documents shared with the Buyer on March 28, 2020 and Buyer does not require modification to provide reductions from current wages. Assumption to be discussed based on modification.

hereunder as if an original party hereto, to deliver a joinder in form and substance reasonably acceptable to Buyer and, subject to Section 2.06, to promptly transfer (or cause to be transferred) such assets to Buyer. Prior to any such transfer, the applicable Subsidiary of Seller possessing any such asset will hold it in trust for the benefit of Buyer.

Section 7.11.   *Public Announcements; Filings*.

No Selling Entity nor any of its Affiliates shall make any public announcement or issue any press release or make any filings at any time concerning this Agreement or any Transaction Document, any of the transactions contemplated hereby or thereby, or the Bankruptcy Case or any aspect thereof without the prior written approval of Buyer and without giving Buyer a meaningful opportunity to review and comment on any such proposed public announcement or press release. Notwithstanding the immediately preceding sentence, in the event a Selling Entity reasonably determines, on advice of counsel, that any such filing is required by the Bankruptcy Court, Seller shall give Buyer advance written notice of, and a meaningful opportunity (as practicable under the circumstances) to review and comment on, the proposed form and substance of any such filing. The Selling Entity whose proposed filing is the subject of review shall consider carefully and in good faith all comments timely received from Buyer and shall disclose only such information, and only to the minimal extent, as is required by the Bankruptcy Court.

ARTICLE 8
ADDITIONAL AGREEMENTS

Section 8.01.   *Taxes*.

(a)   *Transfer Taxes*.   Buyer and Seller shall each be responsible for fifty percent (50%) of all Transfer Taxes arising from or relating to the consummation of the transactions contemplated by this Agreement, regardless of the party on whom Liability is imposed under the provisions of the Applicable Laws relating to such Transfer Taxes; provided, that each party's sole recourse and remedy from the other party for such other party's share of Transfer Taxes shall be an adjustment to the Transfer Tax Purchase Price Adjustment (until the Final Cash Purchase Price has been finally determined pursuant to Section 3.04). Seller and Buyer will consult and cooperate on a reasonable basis in preparing and timely filing all Tax Returns with respect to any Transfer Taxes and will cooperate on a reasonable basis and otherwise take commercially reasonable efforts to obtain any available exemptions from or reductions in such Transfer Taxes.

(b)   *Straddle Periods*.   In the case of any Straddle Period, (i) all Property Taxes for any such period shall be apportioned between the Pre-Closing Tax Period and the Post-Closing Tax Period on a per diem basis and (ii) all other Taxes shall be apportioned between the Pre-Closing Tax Period and the Post-Closing Tax Period as if the Pre-Closing Tax Period ended at the close of business on the date prior to the Closing Date.

(c)   *Cooperation and Audits*.   Buyer and its Affiliates, and Seller and its Affiliates will cooperate on a reasonable basis with each other regarding Tax matters governed by this Agreement and will make available to the other as reasonably requested all information, records and documents relating to Taxes governed by this Agreement and the filing of Tax Returns until the

expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals or litigation with respect to such Taxes.

Section 8.02.    *Allocation of Purchase Price.*

(a)     The Purchase Price (plus any Assumed Liabilities and other amounts properly treated as additional purchase price under the Code) shall be allocated among the Assets in accordance with Section 1060 of the Code and the Treasury regulations promulgated thereunder (and any similar provision of state, local or foreign law, as appropriate) (the "**Allocation**").  The Allocation shall be delivered by Buyer to Seller within 60 days after the Closing Date for Seller's review and comment.  If, within 30 days after the delivery of the Allocation, Seller notifies Buyer in writing that Seller objects to any allocation set forth thereon, Buyer and Seller shall negotiate in good faith to resolve such objection.  In the event that Buyer and Seller are unable to resolve such dispute within 30 days following Seller's notification of such objection, Buyer and Seller shall jointly retain a referee chosen and mutually acceptable to both Buyer and Seller to resolve the disputed items.  Upon resolution of the disputed items, the Allocation shall be adjusted to reflect such resolution.  The costs, fees and expenses of the referee shall be borne equally by Buyer and Seller.

(b)     (i) Seller and Buyer will report, act and file (and will cause their respective Affiliates to report, act and file) Tax Returns (including IRS Form 8594) in all respects and for all purposes consistent with the Allocation and (ii) neither Seller nor Buyer will take any position (or will allow any of their respective Affiliates to take any position) (whether in audits, Tax Returns, or otherwise) that is inconsistent with the Allocation, except, in each case, to the extent otherwise required by Applicable Law.

Section 8.03.    *Assigned Contracts; Adequate Assurance and Performance.*

(a)     With respect to each Assigned Contract, Buyer will deliver within twenty-four (24) hours of the designation of Buyer as the Successful Bidder in respect of the Assets in accordance with the Bidding Procedures Order, information it reasonably believes to be sufficient to demonstrate Buyer's adequate assurance of the future performance by Buyer of each such Assigned Contract as required under Section 365 of the Bankruptcy Code, which information Seller or if applicable, Seller's Subsidiaries, will be permitted to disseminate to any Third Party that is a party to any 365 Contract.  In the event Buyer cannot demonstrate adequate assurance of future performance with respect to an Assigned Contract, at Buyer's election, such Assigned Contract shall become an Excluded Contract.

(b)     From and after Closing, Buyer will pay, perform or satisfy the Assumed Liabilities from time to time and as such Assumed Liabilities become due and payable or are required to be performed or satisfied in accordance with their respective terms.

(c)     Without limiting the provisions of Section 8.03(a), Buyer acknowledges that neither Seller nor any Subsidiary of Seller will have any duty to maintain any bonds, letters of credit, guarantees, cash deposits or insurance to secure performance or payment under any Assigned Contracts after the Closing or otherwise with respect to the Business.

Section 8.04.    *Employee Matters.*

(a)      *Transferred Employees*.  Prior to the Closing, Buyer will offer employment to each of the Company Employees who remain employed immediately prior to the Closing on employment terms that are consistent with the requirements of this Section 8.04.  Such individuals who accept such offer by the Closing Date are hereinafter referred to as the "**Transferred Employees.**"

(b)      *Seller Benefit Plans*.  Prior to the Closing, Buyer and the Selling Entities will, or will cause their respective Subsidiaries to, take such actions as are necessary to cause the Current Liabilities related to Transferred Employees to transfer to Buyer and to facilitate Buyer's assumption of the Liabilities associated with such Assumed Liabilities, in each case effective as of the Closing.

(c)      *Compensation and Benefits*. During employment, for a period of not less than 12 months after the Closing Date, Buyer will provide base salaries to the Transferred Employees that are no less than the base salaries such Transferred Employees were receiving immediately prior to the Closing, and the Transferred Employees will be eligible to participate in welfare benefit plans of Buyer or its Affiliates (each, a "**Buyer Welfare Plan**"). As of the Closing Date, Buyer will, or will cause its Affiliates to, use commercially reasonable efforts to (i) waive all limitations as to preexisting conditions, exclusions and all waiting periods with respect to participation and coverage requirements applicable to each Transferred Employee under any such Buyer Welfare Plan to the same extent as such conditions, exclusions and waiting periods have been waived under any analogous Seller Benefit Plan prior to the Closing Date and (ii) credit each Transferred Employee for any co-payments, deductibles and other out-of-pocket expenses paid prior to the Closing Date under the terms of any analogous Seller Benefit Plan in satisfying any applicable co-payment, deductible or out-of-pocket requirements for the plan year in which the Closing Date occurs under such Buyer Welfare Plan.

(d)      *Vesting*. Prior to the Closing and thereafter (as applicable), the Selling Entities shall take, or shall cause Seller's Subsidiaries to take, any and all actions as may be required to fully vest the Transferred Employees in their account balances, to the extent not already fully vested, under any Seller Benefit Plan that is a tax qualified defined contribution retirement plan, a nonqualified deferred compensation plan, any other qualified or non-qualified profit sharing plan or an equity or equity-based compensation plan.

(e)      *No Obligations*.  No provision in this Section 8.04 or otherwise in this Agreement, whether express or implied, will (i) create any third-party beneficiary or other rights in any Company Service Provider (including any beneficiary or dependent thereof), any other participant in any Seller Benefit Plan or any other Person; (ii) create any rights to continued employment with Seller, Buyer or any of their respective Subsidiaries or Affiliates or in any way limit the ability of Seller, Buyer or any of their respective Subsidiaries or Affiliates to terminate the employment of any individual at any time and for any reason; or (iii) constitute or be deemed to constitute an amendment to any Seller Benefit Plan or any other employee benefit plan, program, policy, agreement or arrangement sponsored or maintained by Seller, Buyer or any of their respective Subsidiaries or Affiliates.

(f)      *WARN*.  The Parties agree to cooperate in good faith to determine whether any notification may be required under WARN as a result of the transactions contemplated by this

66

Agreement. The Selling Entities shall provide any required notice under, and shall retain all liabilities relating to WARN with respect to any event affecting the Company Employees prior to the Closing. The Selling Entities shall notify Buyer prior to the Closing of any layoffs in the 90-day period prior to the Closing of any Company Employees or any other employees by the Selling Entities or their Affiliates who would be aggregated with any Company Employees for purposes of determining whether a "plant closing" or "mass layoff" or group termination under WARN has occurred.

(g)     *Cooperation*. Subject to Applicable Law, any restrictions under this Agreement and the Selling Entities' policies and practices regarding employee privacy, the Selling Entities shall provide to Buyer, in a timely manner, information that Buyer may reasonably request with respect to the terms and conditions of the Company Employees' employment. The Selling Entities and Buyer shall cooperate in communications with Company Employees with respect to matters arising in connection with this Agreement and the transactions contemplated hereby. The Selling Entities shall consult and obtain Buyer's consent before distributing any communications to any Company Employees that relate to any post-Closing compensation, benefits or terms of employment.

Section 8.05.     *Post-Closing Books and Records.*

(a)     Until the earlier of the liquidation and winding up of each Selling Entity's estate and two (2) years after the Closing Date, (i) Buyer will use commercially reasonable efforts not to dispose of or destroy any of the Records received by Buyer as Assets and (ii) Buyer will allow such Selling Entity (including, for clarity, any trust established under a Chapter 11 plan of such Selling Entity or any other successors of such Selling Entity) and any of its respective directors, officers, employees, counsel, Representatives, accountants and auditors reasonable access during normal business hours, upon reasonable advance notice, to any Records included in the Assets for purposes relating to the Bankruptcy Cases, the wind-down of the operations of such Selling Entity or any such trusts or successors and such Selling Entity (including any such trust or successors) and such directors, officers, employees, counsel, Representatives, accountants and auditors will have the right to make copies of any such Records for such purposes (at its sole cost and expense). Until the liquidation and winding up of each Selling Entity's estate, such Selling Entity may keep a copy of the Records.  Except as required by Applicable Laws or to the extent required to enforce its rights with respect to the Excluded Liabilities, from and after the Closing, the Selling Entities will keep confidential and not use the Records that would have been included in the Records but for the failure to obtain a material Third Party consent or any Records to which it has access under this Section 8.05, except for the use thereof as expressly permissible hereunder; *provided*, *however*, that if practicable and permitted by Applicable Law, such disclosing Selling Entity shall provide Buyer with prompt written notice of any such requirement so that Buyer may seek a protective order or other appropriate remedy or waive compliance with the provisions of this Section 8.05, and *provided further* that such disclosing Selling Entity shall reasonably cooperate with Buyer in seeking such a protective order and/or other appropriate remedy.

(b)     Until the earlier of the liquidation and winding up of each Selling Entity 's estate and seven (7) years after the Closing Date, (i) each Selling Entity will use commercially reasonable efforts not to dispose of or destroy any of the Records within its possession or control and (ii) each Selling Entity will allow Buyer and any of its respective directors, officers, employees, counsel,

Representatives, accountants and auditors reasonable access during normal business hours, upon reasonable advance notice, to any such Records for any purpose relating to the Business or any Assets and Buyer and such directors, officers, employees, counsel, Representatives, accountants and auditors will have the right to make copies of any such Records for such purposes (at its sole cost and expense).  Except as required by Applicable Laws or stock exchange requirement or to the extent required to enforce its rights with respect to the Assumed Liabilities, from and after the Closing, Buyer will keep confidential and not use the Records to which it has access under this Section 8.05, except for the use thereof as expressly permissible hereunder; *provided*, *however*, that if practicable and permitted by Applicable Law, Buyer will provide Seller with prompt written notice of any such requirement so that Seller may seek a protective order or other appropriate remedy or waive compliance with the provisions of this Section 8.05, and *provided further* that such Buyer shall reasonably cooperate with Buyer in seeking such a protective order and/or other appropriate remedy.

(c)     In the event any Party desires to destroy any such Records prior to the time during which they must be maintained pursuant to this Section 8.05, such Party will first give thirty (30) days' prior written notice to the other Party and such other Party will have the right at their option and expense, upon prior written notice given within such thirty (30)-day period to the Party desiring to destroy such Records or records, to take possession of such Records within sixty (60) days after the date of such notice, or such shorter period as the liquidation and winding up of each applicable Selling Entity 's estate will permit, if applicable.

Section 8.06.     *Intellectual Property Matters.*

(a)     Effective as of the Closing, Seller, on behalf of itself and its Affiliates, hereby grants to Buyer and its Affiliates an irrevocable, worldwide, non-exclusive, transferable, fully paid-up, royalty-free right and license to use any and all Intellectual Property (excluding Trademarks) not included in the Assets that is used or held for use in connection with the operation of the Business as of the Closing (the "**Retained Intellectual Property**") solely in connection with the continued operation of the Business as of the Closing and all logical extensions thereof following the Closing.  The foregoing license shall be sublicensable to third parties solely for the benefit of Buyer and its Affiliates in connection with the continued operation of the Business and all logical extensions thereof.  Upon the Closing, Seller shall deliver to Buyer all embodiments of the Retained Intellectual Property (including any software (in source code and object code form)).

(b)     Effective as of the Closing, Buyer, on behalf of itself and its Affiliates, hereby grants to Seller and its Affiliates an irrevocable, worldwide, non-exclusive, transferable, fully paid-up, royalty-free right and license to use any and all Intellectual Property (excluding Trademarks) included in the Assets used or held for use in connection with the retained businesses of Seller and its Affiliates as of the Closing solely in connection with the continued operation of their retained businesses as of the Closing and all logical extensions thereof following the Closing, except for within the Business.  The foregoing license shall be sublicensable to third parties solely for the benefit of Seller and its Affiliates in connection with the continued operation of their businesses as of the Closing and all logical extensions thereof.

(c)     Effective as of the Closing, Buyer, on behalf of itself and its Affiliates, hereby grants to Seller and its Subsidiaries, for a period of three (3) months, an irrevocable, worldwide, non-exclusive, fully paid-up, royalty-free right and license to use any and all Trademarks included in the Assets solely for the purposes of winding down the operations of Seller and its Subsidiaries following the Closing.  Effective as of the Closing, Seller, on behalf of itself and its Affiliates, hereby grants to Buyer and its Affiliates, for a period of one (1) year, an irrevocable, worldwide, non-exclusive, fully paid-up, royalty-free right and license to use any and all Trademarks not included in the Assets and used in connection with the operation of the Business as of the Closing, including the DEAN FOODS Trademark, in a manner reasonably consistent with the operation of the Business prior to Closing.  Each of Buyer and Seller agrees that it shall, and shall cause its Affiliates to, use the Trademarks licensed to Buyer or Seller, as applicable, pursuant to this Section 8.06 only in connection with goods or services of a similar quality as the goods and services that such Trademarks were used in connection with prior to the Closing.

(d)     The assignment of any Intellectual Property that is the subject to any of the licenses granted in this Section 8.06 shall be made subject to such license.  The licenses granted in this Section 8.06 are, and shall otherwise be deemed to be, for the purposes of Section 365(n) of the Bankruptcy Code, licenses to rights in "intellectual property" as defined under the Bankruptcy Code.  As licensees of such rights under this Agreement, Buyer and its Affiliates or Seller and its Affiliates (as applicable), as licensees, shall retain and may fully exercise all of their rights and elections under the Bankruptcy Code. Upon the commencement of bankruptcy or insolvency proceedings by or against the licensor party under the Bankruptcy Code, Buyer and its Affiliates or Seller and its Affiliates (as applicable), as licensees, shall be entitled to retain all of their rights under this Section 8.06.

(e)     On or prior to the Closing, Seller shall (i) furnish to Buyer a true and complete list of all applicable filings, recordings and other acts, and all fees, Taxes and other payments, that are required to be made within ninety (90) days after Closing to maintain the validity and enforceability of the Registered Intellectual Property and (ii) ensure that the Registered Intellectual Property is registered, without any gaps in the chain-of-title, in the name of the appropriate Selling Entity that is the owner of such Registered Intellectual Property.

Section 8.07.    *Title Matters*.  The Selling Entities will deliver, or cause to be delivered, to Buyer, at or as promptly as practicable but in any event at least thirty (30) days prior to the Closing, (i) copies of existing surveys, legal descriptions, title policies and all applicable leases and subleases relating to the Acquired Real Property in each case, in any Selling Entities' possession or control, (ii) such bills of sale, deeds, endorsements,  assignments and other customary instruments of conveyance and transfer, in form and substance reasonably satisfactory to Buyer, as Buyer may reasonably request in order to vest in Buyer all of the applicable Selling Entity's right, title and interests in, to or under any or all Acquired Real Property, in each case, in any Selling Entities' possession or control and (iii) such ordinary and customary documents (including any factually accurate title affidavits) as may be reasonably required by any title company or title insurance underwriter to enable Buyer to acquire, at Buyer's sole election and sole cost and expense, one or more fee or leasehold owner policies of title insurance issued by such title company covering any or all of the Acquired Owned Real Property.

Section 8.08.  *Insurance Access*.  Following the Closing Date, with respect to any actions, inactions, events, omissions, conditions, facts, circumstances, losses, damages and Liabilities which occurred or are alleged to have occurred, or were incurred or claimed to have been incurred, with respect to the Assets or the Assumed Liabilities prior to the Closing Date, Seller will provide Buyer with access to, and Buyer may, upon prior written notice to Seller, make claims under Seller's and its Subsidiaries' third-party insurance policies (excluding any self-insurance policies or programs, or any insurance policies or programs that are substantially similar in effect to self-insurance) that are "occurrence based" insurance policies in place immediately prior to the Closing (each such policy, an "**Available Insurance Policy**"); *provided*, that such access to, and the right to make claims under, such insurance policies, shall be subject to the terms and conditions of such insurance policies, including any restrictions on coverage or scope, any deductibles, retentions or self-insurance provision, and any fees, costs, or other expenses, and shall be subject to the following additional conditions:

(a)    In the event that an Available Insurance Policy does not permit Buyer access thereto, or the right to make a claim thereunder, Seller shall make the applicable claim on Buyer's behalf, and pay over any recovery to Buyer, under such Available Insurance Policy as contemplated by this Section 8.08;

(b)    Any recovery under any Available Insurance Policy shall be net of all premiums and premium increases, fees and expenses reasonably incurred by Seller or any of its Subsidiaries to the extent resulting from any access to, or any claims made by Buyer or any of its Affiliates under, any Available Insurance Policy, including any reasonable legal fees and allocated claims, expenses or claim handling fees, whether such claims are made by Buyer, its Affiliates or its or their respective Representatives;

(c)    Claims made by Buyer pursuant to this Section 8.08 will be subject to (and recovery thereon will be reduced by the amount of) any applicable deductibles, retentions, or self-insurance provisions under the Available Insurance Policies.  With respect to any deductibles, retentions or self-insurance provisions described in the immediately preceding sentence that require a payment by Seller or any of its Subsidiaries, Buyer shall reimburse Seller or such Subsidiary for such payment; and

(d)    Without limiting Buyer's right to make claims directly against the applicable insurance policies, in no event shall any Selling Entity be required to provide Buyer access under this Section 8.08 after such entity's Bankruptcy Case has been closed.

Section 8.09.  *Collection of Accounts Receivable.*

(a)    As of the Closing Date, each Selling Entity hereby (i) authorizes Buyer to open any and all mail addressed to any Selling Entity relating to the Assets and delivered to the offices of the Business or otherwise to Buyer if received on or after the Closing Date and (ii) appoints Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer after the Closing Date with respect to accounts receivable relating to work performed or products sold by Buyer after the Closing, as the case may be, made payable or endorsed to any Selling Entity or Selling Entity's order, for Buyer's own account.

(b)     As of the Closing Date, each Selling Entity agrees that any monies, checks or negotiable instruments received or identified by any Selling Entity after the Closing Date with respect to accounts receivable relating to work performed or products sold by Buyer after the Closing, as the case may be, shall be held in trust by such Selling Entity for Buyer's benefits and accounts, not commingled with other funds of such Selling Entity, and promptly upon receipt by a Selling Entity of any such payment, such Selling Entity shall pay over to Buyer the amount of such payments without any right of set-off or reimbursement.  In addition, Buyer agrees that, after the Closing, it will hold and will promptly transfer and deliver to Seller, from time to time as and when received or identified by Buyer or its Affiliates, any cash, checks with appropriate endorsements, payment of an account, trade, note receivable or other payment or property or assets that Buyer or its Affiliates may receive or identify on or after the Closing which properly belongs to the Selling Entities as an Excluded Asset.

(c)     As of the Closing Date, Buyer shall have the sole authority to bill and collect accounts receivable relating to work performed or products sold by Buyer after the Closing.

Section 8.10.    *Cure Costs; Accrued Liabilities*.  On or prior to Closing, Seller shall pay, or shall cause to be paid, pursuant to Section 365 of the Bankruptcy Code and the Sale Order, all Cure Costs relating to the Assigned Contracts as and when finally determined by the Bankruptcy Court pursuant to the procedures set forth in the Sale Order.  Additionally, Seller shall pay, or shall cause to be paid, as they come due (whether prior to or after Closing), any accrued liabilities arising under any Assigned Contracts attributable to, arising during or related to any pre-Closing period.

Section 8.11.    *Permits*.  Seller shall cooperate, before and after the Closing, with Buyer in connection with the transfer of any Permits from the Selling Entities to Buyer that are listed on Disclosure Schedule 5.09(b)(i) and that are transferable, and in connection with Buyer obtaining any Permits that are listed on Disclosure Schedule 5.09(b)(i) and that are not transferrable.  Such cooperation shall include signing any documents reasonably necessary in connection with the transfer of any Permit or Buyer obtaining any non-transferrable Permit, and, at Buyer's expense, maintaining any Permit in full force and effect after the Closing for the benefit of Buyer to allow Buyer to operate the Business in the ordinary course after the Closing until such time as any Permit is transferred to Buyer or Buyer obtains any non-transferrable Permit.

Section 8.12.    *Lease Expirations*.  At the direction of Buyer and at Buyer's sole cost and expense, Seller shall use its commercially reasonable efforts to renew or otherwise extend the term of the Tulsa Lease Agreement and the term of the Hammond Lease Agreement.

# ARTICLE 9
# CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

The obligation of Buyer to consummate the Closing is subject to the satisfaction or, to the extent permitted by Applicable Law, waiver in writing by Buyer, at or prior to the Closing, of each of the following conditions:

Section 9.01.    *Accuracy of Representations*.  (a) The representations and warranties of the Selling Entities contained in Article 5, that (i) are subject to any qualifications or exceptions as to "materiality" or "Material Adverse Effect," will be true and correct in all respects at and as of the

71

Closing, as if made at and as of such time, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and (ii) are not subject to any qualifications or exceptions as to "materiality" or "Material Adverse Effect," will be true and correct in all material respects at and as of the Closing, as if made at and as of such time, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and (b) Buyer will have received a certificate on behalf of each Selling Entity to such effect signed by a duly authorized officer thereof.

Section 9.02.    *Selling Entities' Performance*.  (a) No Selling Entity will have breached the covenants that such Selling Entity is required to perform pursuant to this Agreement prior to the Closing in any material respect (or will have cured any such breach to the extent necessary to satisfy this condition), and (b) Buyer will have received a certificate of each Selling Entity to such effect signed by a duly authorized officer thereof.

Section 9.03.    *Seller's Deliveries*.  Each of the deliveries required to be made to Buyer pursuant to Section 4.04 will have been delivered (or the applicable Selling Entity will make such deliveries at the Closing).

Section 9.04.    *Sale Order*.  The Bankruptcy Court will have entered the Sale Order, and such order will be a Final Order in full force and effect and will not have been stayed or vacated.

Section 9.05.    *Collective Bargaining Agreements*.  The Bankruptcy Court shall have entered an order approving (a) the rejection of each Collective Bargaining Agreement or (b) the modification of each Collective Bargaining Agreement, in each case, in a manner consistent with Section 7.09 and pursuant to Section 1113 of the Bankruptcy Code, and the order approving each such rejection or modification shall have become a Final Order.

# ARTICLE 10
## CONDITIONS PRECEDENT TO THE OBLIGATION OF BUYER AND THE SELLING ENTITIES

The respective obligations of Buyer and the Selling Entities to consummate the Closing are subject to the satisfaction or, to the extent permitted by Applicable Law, waiver in a joint writing by Buyer and the Selling Entities, at or prior to the Closing, of each of the following conditions:

Section 10.01.  *No Order*.  There will not be in effect any Order by any court of competent jurisdiction in the United States prohibiting the Closing.

Section 10.02.  *Competitive Concerns*.  None of the FTC, the Antitrust Division or other Governmental Authority having communicated to Buyer that such Governmental Authority (i) intends to file a judicial or administrative action to restrict, alter or enjoin the transactions contemplated by this Agreement pursuant to Applicable Law, or (ii) has concerns that such transactions may violate Applicable Law.

Section 10.03.  *Sale Order*.  The Bankruptcy Court will have entered the Sale Order, and such order will not have been stayed or vacated.

Section 10.04.  *Successor Liability*.  The Sale Order shall provide that no successor liability, including any successorship obligations under any Collective Bargaining Agreement and any successor liability with respect to any Multiemployer Plan or with respect to any Seller Benefit Plan (including any Pension Plan) or with respect to any Liability related to any Company Service Provider, shall be transferred to Buyer.

## ARTICLE 11
## CONDITIONS PRECEDENT TO THE OBLIGATION OF THE SELLING ENTITIES TO CLOSE

The Selling Entities' obligation to consummate the Closing is subject to the satisfaction or, to the extent permitted by Applicable Law, waiver in writing by Seller, at or prior to the Closing, of each of the following conditions:

Section 11.01.  *Accuracy of Representations*.  (a) The representations and warranties of Buyer contained in Article 6, that (i) are subject to any qualifications or exceptions as to "materiality" or "material adverse effect" set forth therein, will be true and correct in all respects at and as of the Closing, as if made at and as of such time, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and (ii) are not subject to any qualifications or exceptions as to "materiality" or "material adverse effect" set forth therein, will be true and correct in all material respects at and as of the Closing, as if made at and as of such time, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and (b) Seller will have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

Section 11.02.  *Buyer's Performance*.  (a) Buyer will not have breached its covenants that it is required to perform pursuant to this Agreement prior to the Closing in any material respect (or will have cured any such breach to the extent necessary to satisfy this condition) and (b) Seller will have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

Section 11.03.  *Buyer's Deliveries.*

Each of the deliveries required to be made to Seller pursuant to Section 4.03 will have been delivered (or Buyer will make such deliveries at the Closing).

## ARTICLE 12
## TERMINATION

Section 12.01.  *Termination Events.*

Notwithstanding anything herein to the contrary, this Agreement may be terminated at any time prior to the Closing:

(a)      by mutual written agreement of Seller and Buyer;

(b)      by written notice of either Seller or Buyer to such other Party if:

(i)    the Closing has not occurred by the close of business on June 1, 2020 (the "**Outside Date**"); *provided,* that a Party may not terminate this Agreement pursuant to this Section 12.01(b)(i) if such Party is in material breach of any of its representations, warranties, covenants or agreements contained herein;

(ii)    there is in effect a Final Order by any court of competent jurisdiction in the United States restraining, enjoining or otherwise prohibiting the Closing; *provided* that a Party may not terminate this Agreement pursuant to this Section 12.01(b)(ii) if such Party is in material breach of any of its representations, warranties, covenants or agreements contained herein and such material breach is the primary cause or grounds for such Final Order; or

(iii)    if, after their respective entry, either the Bidding Procedures Order or Sale Order ceases to be in full force and effect;

(c)    so long as Buyer is not in material breach of any of its representations, warranties, covenants or agreements contained herein, by Buyer by written notice to Seller if

(i)    (A) any Selling Entity breaches any representation or warranty or any covenant or agreement contained in this Agreement, (B) such breach would result in a failure of a condition set forth in Article 9 or Article 10 and (C) such breach has not been cured by the earlier of (1) ten (10) Business Days after the giving of written notice by Buyer to the Selling Entities of such breach and (2) the Outside Date;

(ii)    any Selling Entity files a motion (without Buyer's consent) to have the Bankruptcy Court enter an Order dismissing or converting the Bankruptcy Cases into cases under Chapter 7 of the Bankruptcy Code or appointing a trustee in the Bankruptcy Cases or appointing an examiner with enlarged power related to the operation of the Business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code or the occurrence of any of the foregoing;

(iii)    the Sale Order is not entered on or before April 10, 2020;

(iv)    any Selling Entity files a motion in the Bankruptcy Court seeking to approve any transaction or plan of reorganization that involves any Assets in any manner materially inconsistent with the terms hereof; or

(v)    either an Event of Default (as defined in the DIP Credit Agreement) or the Termination Date (as defined in the DIP Order, as applicable) shall have occurred;

(d)    so long as no Selling Entity is in material breach of any of its representations, warranties, covenants or agreements contained herein, by the Selling Entities by written notice to Buyer if (i) Buyer breaches any representation or warranty or any covenant or agreement contained in this Agreement, (ii) such breach would result in a failure of a condition set forth in Article 10 or Article 11 and (iii) such breach has not been cured by the earlier of (1) ten (10) Business Days after the giving of written notice by the Selling Entities to Buyer of such breach and (2) the Outside Date;

(e)      by the Selling Entities by written notice to Buyer if Buyer fails to consummate the transactions contemplated hereby, including payment of the Closing Payment Amount, as and when required by Article 4 hereof; or

(f)      by Buyer by written notice to Seller, if any creditor of a Selling Entity or its Affiliates obtains relief from the stay to foreclose on, or otherwise take possession of, a material portion of the Assets.

(g)      by Buyer with written notice to Seller, if the FTC, the Antitrust Division or other Governmental Authority has communicated to Buyer that such Governmental Authority (i) intends to file a judicial or administrative action to restrict, alter or enjoin the transactions contemplated by this Agreement pursuant to Applicable Law, or (ii) has concerns that such transactions may violate Applicable Law and that such Governmental Authority is unable to resolve competitive concerns prior to the Outside Date.

Section 12.02.  *Effect of Termination*.  In the event of a valid termination of this Agreement by Buyer or the Selling Entities pursuant to this Article 12, all rights and obligations under this Agreement will terminate without any Liability of any Party or Person to any other Party or Person; *provided* that, subject to Section 14.07 (if applicable), nothing herein will relieve any Party from Liability for any willful and material breach of this Agreement prior to such termination; and *provided*, *further*, that the provisions of this Section 12.02, Section 12.03, Section 3.02, Section 7.01(b) and Section 14.07 (and, to the extent applicable to the interpretation or enforcement of such provisions, Article 1 and Article 14) will survive the termination of this Agreement.

Section 12.03.  *Procedure Upon Termination*.  In the event of termination pursuant to Section 12.01, the terminating Party must give written notice thereof, specifying the provision pursuant to which the Agreement is being terminated, to the other Party, and this Agreement will terminate (subject to Section 12.02) and the purchase of the Assets hereunder will be abandoned without further action by Buyer or Seller.

# ARTICLE 13
# INDEMNIFICATION

Section 13.01.  *Indemnification by Selling Parties*.  Subject to the limitations set forth in this Article 13, from and after the Closing, until the six (6) month anniversary of the Closing Date, each Selling Entity shall, severally and jointly, indemnify and hold harmless Buyer and Buyer's directors, managers, officers, employees, Affiliates, direct and indirect partners, cooperative members, equityholders, agents, attorneys, representatives, successors and assigns (collectively, the "**Buyer Indemnified Parties**"), from and against any and all Damages incurred or suffered buy any Buyer Indemnified Party in connection with, related to or arising out of any claim or demand by any Person with respect to any Customer Deductions, but excluding any rebates payable by check or wire transfer that are Current Liabilities (a "**Customer Deductions Claim**").  For the avoidance of doubt, any payment Buyer, in its sole discretion, elects to make to any Person who has made a Customer Deductions Claim or who takes or threatens to take an adverse action in connection with such a deduction or chargeback shall be deemed indemnifiable Damages for purposes of this Article 13.

Section 13.02. *Payment of Claims*. In the event of any *bona fide* claim for indemnification hereunder, Buyer shall notify Seller thereof in writing and, upon presentation by Buyer to the Escrow Agent of a certified statement of the Customer Deductions Claim, in reasonable detail, and evidence of payment of such Customer Deductions Claim, the Escrow Agent shall disburse to Buyer from the then-remaining Customer Deductions Escrow Amount the aggregate Damages incurred by Buyer in connection with such Customer Deductions Claim.

Section 13.03. *Release of Customer Deductions Escrow Funds*. Upon the six (6) month anniversary of the Closing Date, Buyer shall cause the Escrow Agent, in accordance with the terms of the Escrow Agreement, to pay by wire transfer of immediately available funds to the account designated by Seller, the then-remaining balance, if any, of the Customer Deductions Escrow Amount less the amount of any pending claim of indemnification made by Buyer in accordance with this Article 13 prior to the six (6) month anniversary of the Closing Date.

## ARTICLE 14
## GENERAL PROVISIONS

Section 14.01. *No Survival of Representations and Warranties.*

The representations and warranties contained herein and in any certificate or other Transaction Document delivered by any Party pursuant to this Agreement will terminate upon and not survive the Closing and there will be no Liability thereafter in respect thereof. Each Party's covenants and other agreements contained in this Agreement will terminate upon the Closing, except the Post-Closing Covenants applicable to such Party, which will survive the Closing until the earlier of (a) performance of such Post-Closing Covenant in accordance with this Agreement or (b)(i) if time for performance of such Post-Closing Covenant is specified in this Agreement, ninety (90) days following the expiration of the time period for such performance, or (ii) if time for performance of such Post-Closing Covenant is not specified in this Agreement, the expiration of the applicable statute of limitations with respect to any claim for any failure to perform such Post-Closing Covenant; *provided* that if a written notice of any claim with respect to any Post-Closing Covenant is given prior to the expiration thereof then such Post-Closing Covenant will survive until, but only for purposes of, the resolution of such claim by final, non-appealable judgment or settlement.

Section 14.02. *Notices.*

All notices, consents, waivers and other communications under this Agreement must be in writing and will be deemed to have been duly given (a) when delivered by hand (with written confirmation of receipt), (b) when sent by email (with read receipt received), (c) one Business Day following the day sent by overnight courier (with written confirmation of receipt), or (d) when received by the addressee, if sent by registered or certified mail (postage prepaid, return receipt requested), in each case to the appropriate addresses and Representatives (if applicable) set forth below (or to such other addresses and Representatives as a Party may designate by notice to the other Parties):

        (i)     If to any Selling Entity, then to:

Dean Foods Company
2711 North Haskell Avenue, Suite 3400
Dallas, TX 75204
Attn: Office of the General Counsel
E-mail: kristy_waterman@deanfoods.com

with a copy (which will not constitute notice) to:

Davis Polk & Wardwell LLP
Attn: Louis Goldberg
     Brian Resnick
     Harold Birnbaum
450 Lexington Avenue
New York, NY 10017
E-mail: louis.goldberg@davispolk.com
     brian.resnick@davispolk.com
     harold.birnbaum@davispolk.com

    (ii)    If to Buyer:

Office of General Counsel
Attn: Prairie Farms Legal
1701 Towanda Ave
Bloomington, Illinois 61702-2901
E-mail: kwebb@ilfb.org

with a copy (which will not constitute notice) to:

Shearman & Sterling LLP
Attn: Fredric Sosnick
     George Karafotias
     Ian Roberts
599 Lexington Avenue
New York, NY 10022
E-mail: fsosnick@shearman.com
     gkarafotias@shearman.com
     ian.roberts@shearman.com

Section 14.03.  *Waiver.*

Neither the failure nor any delay by any Party in exercising any right, power or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.  To the maximum extent permitted by Applicable Laws, (i) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given, and (ii) no notice to or demand on one Party will be deemed to be a waiver of any right

of the party hereto that gives such notice or demand to take further action without notice or demand.

Section 14.04. *Entire Agreement; Amendment.*

This Agreement (including the Schedules, Disclosure Schedules and the Exhibits), the other Transaction Documents and the Confidentiality Agreement supersede all prior agreements between Buyer and the Selling Entities with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between Buyer and the Selling Entities with respect to the subject matter hereof and thereof.  Except as permitted under Section 2.05(c), this Agreement, including all exhibits hereto, may not be amended, modified or supplemented, or the terms hereof waived, except by a written agreement executed by all of the Parties. Notwithstanding the foregoing, this Section 14.04, Section 14.12 and Section 14.16, in each case to the extent the proposed amendment to any such Section is adverse to any Debt Financing Source, may not be amended without the consent of such Debt Financing Source.

Section 14.05. *Assignment.*

This Agreement, and the rights, interests and obligations hereunder, may not be assigned by any Party (by operation of law or otherwise) without the express written consent of the other Parties; *provided,* that this Agreement and the rights and obligations of Buyer hereunder may be assigned by Buyer, without the prior written consent of any Selling Entity, to one or more of Buyer's Subsidiaries, so long as such Subsidiary is designated in writing by Buyer to Seller prior to the Closing, and Buyer continues to remain obligated in full hereunder; *provided, further* that Seller may assign some or all of its rights or delegate some or all of their obligations hereunder to successor entities pursuant to a plan of reorganization confirmed by the Bankruptcy Court.  Any attempted or purported assignment in violation of this Section 14.05 will be deemed void *ab initio*. This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

Section 14.06. *Severability.*

The provisions of this Agreement will be deemed severable, and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected by such invalidity or unenforceability.

Section 14.07. *Expenses.*

Each of Seller, on the one hand, and Buyer, on the other hand, will bear its own respective expenses incurred in connection with the negotiation and execution of this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby; *provided that* Seller

will pay all fees or expenses required to be paid to the Escrow Agent in connection with the Escrow Agreement or the Deposit Escrow Account.

Section 14.08.  *Specific Performance.*

The Parties agree that irreparable damage could occur in the event that any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement in accordance with its specified terms. Accordingly, and notwithstanding anything herein to the contrary, the Parties explicitly agree that:

(a)     Each Party will be entitled to seek an injunction or injunctions without proof of damages or posting a bond or other security to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, including specific performance of the covenants, promises or agreements contained in this Agreement or an Order enjoining the applicable Party from any threatened, or from the continuation of any actual, breach of such Party's covenants, promises or agreements, in each case in this sentence, in addition to any other remedy to which the non-breaching Party is entitled at law or in equity; *provided* that, the right of any Party to seek specific performance or other equitable remedies solely in connection with enforcing the other Party's obligation to consummate the Closing shall be subject to the requirement that (i) all of the conditions set forth in Article 9 and Article 10 with respect to Buyer, or Article 10 and Article 11 with respect to Seller or any Selling Entity, as applicable (in each case, other than conditions that by their nature are to be satisfied by the delivery of documents or taking of actions at the Closing) have been satisfied or waived, and (ii) such Party has irrevocably confirmed that if specific performance is granted, then it would take such actions required of it by this Agreement to cause the Closing to occur.  Unless otherwise expressly stated in this Agreement, no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude any Party from pursuing other rights and remedies to the extent available under this Agreement, at law or in equity.

(b)     The rights of specific performance and other equitable relief to the extent explicitly set forth and granted in this Section 14.08 are an integral part of the transactions contemplated by this Agreement and without that right, neither Seller nor Buyer would have entered into this Agreement.

Section 14.09.  *Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.*

(a)     **Except (i) to the extent the mandatory provisions of the Bankruptcy Code apply and (ii) except for any real or immovable property issues, which will be governed by and construed and enforced in accordance with the internal laws of the State in which such real or immovable property is located (without reference to the choice of law rules of such State), this Agreement will be governed by, and construed in accordance with, the laws of the State of Delaware applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.**

(b)     Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement

and to decide any claims or disputes, which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing will be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; *provided* that, if the Bankruptcy Cases are closed pursuant to Section 350 of the Bankruptcy Code, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Delaware Chancery Court or, if such court will not have jurisdiction, any federal court located in the State of Delaware or other Delaware state court, and any appellate court from any thereof for the resolution of any such claim or dispute.  The Parties each hereby irrevocably waive, to the fullest extent permitted by Applicable Laws, the defense of an inconvenient forum to the maintenance of any such Proceeding.  The Parties each consent to service of process by mail (in accordance with Section 14.02) or any other manner permitted by Applicable Law.

(c)     THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF ANY PARTY OR SUCH PARTY'S REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF, IN EACH CASE, INCLUDING ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF THE DEBT COMMITMENT LETTER OR IN CONNECTION WITH THE DEBT FINANCING.

Section 14.10.  *Counterparts.*

This Agreement and any amendment hereto may be executed in one (1) or more counterparts, each of which will be deemed to be an original of this Agreement or such amendment and all of which, when taken together, will constitute one and the same instrument. Notwithstanding anything to the contrary in Section 14.02, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by email attachment will be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

Section 14.11.  *Parties in Interest; No Third Party Beneficiaries.*

This Agreement will inure to the benefit of and be binding upon Buyer, Seller and their respective successors and permitted assigns.  This Agreement is for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or will confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind, except that Section 14.12 is intended for the benefit of and is enforceable by the Party Affiliates; *provided* that in each case such party will be subject to all the limitations and procedures of this Agreement as if it were a Party hereunder.  Notwithstanding the foregoing, the provisions of Section 14.04, this Section 14.11 and Section 14.16 shall be enforceable by the Debt Financing Sources and such Debt Financing Sources shall be entitled to enforce such provisions and to avail themselves of the benefits of any remedy for any breach of such provisions, all to the same extent as if such persons were signatories to this Agreement.

Section 14.12.  *No Recourse.*

(a)     Notwithstanding anything that may be expressed or implied in this Agreement or any other Transaction Document, and notwithstanding the fact that any party to any Transaction Document may be a partnership or limited liability company, each Party, by its acceptance of the benefits of this Agreement, covenants, agrees and acknowledges that no Persons other than the Persons that are expressly parties to each Transaction Document will have any obligation thereunder and that it has (on behalf of itself and its Subsidiaries) no rights of recovery thereunder against, and no recourse thereunder or in respect of any oral representations made or alleged to be made in connection therewith will be had against, any former, current or future Affiliate, incorporator, controlling Person, fiduciary, Representative, co-owner or equity holder of any Party (or any of their successors or permitted assignees) (other than a Party) (each, a "**Party Affiliate**"), whether by or through attempted piercing of the corporate veil, by or through a claim (whether in tort, Contract or otherwise) by or on behalf of such Person against the Party Affiliates, by the enforcement of any assessment or by any legal or equitable Proceeding, or by virtue of any statute, regulation or other Applicable Law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever will attach to, be imposed on or otherwise be incurred by any Party Affiliate, as such, for any obligations of the applicable Person under any Transaction Document or the transaction contemplated thereby, under any documents or instruments delivered contemporaneously therewith, in respect of any oral representations made or alleged to be made in connection therewith, or for any claim (whether in tort, Contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation.

Section 14.13.  *Disclosure Schedules; Materiality.*

The inclusion of any matter in any Disclosure Schedule will be deemed to be a disclosure in all other Disclosure Schedules, without the need for repetition or cross reference, to the extent that the relevance of such disclosure to the other Disclosure Schedules is reasonably apparent on its face.  The inclusion of any matter in any Disclosure Schedule will not be deemed to constitute an admission, or otherwise imply, that any such matter is material or creates a measure for materiality for purposes of this Agreement.  The disclosure of any particular fact or item in any Disclosure Schedule will not be deemed an admission as to whether the fact or item is "material" or would constitute a "Material Adverse Effect."

Section 14.14.  *Liquidating Trustee.*

If at any time Seller liquidates, its estate is converted to Chapter 7, or otherwise has a trustee or other Representative appointed by the Bankruptcy Court (as applicable, a "**Trustee**"), then (a) such Trustee will be bound to perform the obligations of Seller and will be entitled to exercise the rights of Seller under this Agreement, and (b) with respect to all of Seller's or its Subsidiaries' assets that are abandoned (if any) following the date hereof, Seller grants to such Trustee a power of attorney for purposes performing Seller's obligations under Section 2.06 with respect to such abandoned assets.  Seller acknowledges and agrees that the power of attorney granted to such Trustee (if any) pursuant to the foregoing clause (b) is coupled with an interest and will be irrevocable.  Further, such power of attorney will also be granted to Buyer for purposes of performing Seller's obligations under Section 2.06 with respect to such abandoned assets, as determined by Buyer, and in the event Buyer exercises such power of attorney, the Trustee will

not commit any act or take any action that is inconsistent with such exercise by Buyer, except as requested in writing by Buyer.

Section 14.15.  *Conflicts; Privileges.*

(a)     It is acknowledged by each of the parties that Seller has retained Davis Polk & Wardwell LLP ("**Davis Polk**") to act as its counsel in connection with this Agreement and the transactions contemplated hereby (the "**Current Representation**"), and that no other party has the status of a client of Davis Polk for conflict of interest or any other purposes as a result thereof. Buyer hereby agrees that after the Closing, Davis Polk may represent Seller or any of its Affiliates or any of their respective Representatives (any such Person, a "**Designated Person**") in any matter involving or arising from the Current Representation, including any interpretation or application of this Agreement or any other agreement entered into in connection with the transactions contemplated hereby, and including for the avoidance of doubt any Proceeding between or among Buyer or any of its Affiliates, and any Designated Person, even though the interests of such Designated Person may be directly adverse to Buyer or any of its Affiliates, and even though Davis Polk may have represented Buyer in a substantially related matter, or may be representing Buyer in ongoing matters.  Buyer hereby waives and agrees not to assert (1) any claim that Davis Polk has a conflict of interest in any representation described in this Section or (2) any confidentiality obligation with respect to any communication between Davis Polk and any Designated Person occurring during the Current Representation.

(b)     Buyer hereby agrees that all communications (whether before, at or after the Closing) between Davis Polk and any Designated Person that relate in any way to the Current Representation that are attorney-client privileged (the "**Deal Communications**") and all rights to any other evidentiary privilege, and the protections afforded to information relating to representation of a client under applicable rules of professional conduct that may apply to such Deal Communications, belong to Seller and may be controlled by Seller and will not pass to or be claimed by Buyer or any of its Representatives and Buyer hereby agrees that it will not seek to compel disclosure to Buyer or any of its Representatives of any such communication that is subject to attorney client privilege, or any other evidentiary privilege.

(c)     Notwithstanding the foregoing, in the event that a dispute arises between Buyer, on the one hand, and a third party other than any Selling Entity, on the other hand, Buyer may assert the attorney-client privilege to prevent the disclosure of the Deal Communications to such third party; *provided*, *however*, that Buyer may not waive such privilege without the prior written consent of the Selling Entities (which such consent shall not be unreasonably withheld, conditioned or delayed).   In the event that Buyer or any of its respective directors, officers, employees or other representatives is legally required by governmental order or otherwise to access or obtain a copy of all or a portion of the Deal Communications, Buyer shall, to the extent legally permissible, (x) reasonably promptly notify the Selling Entities in writing (including by making specific reference to this Section 14.15(c)), (y) agree that the Selling Entities may seek a protective order and (z) use, at the Selling Entities' sole cost and expense, commercially reasonable efforts to assist therewith.

Section 14.16.  *Liability of Financing Sources*.  No Seller Related Party shall have any rights or claims against any Debt Financing Source in connection with this Agreement, the Debt

Financing or the transactions contemplated hereby or thereby, whether at law or equity, in contract, in tort or otherwise; *provided* that, notwithstanding the foregoing, nothing in this Section 14.16 shall in any way limit or modify the rights and obligations of Buyer under this Agreement or any Debt Financing Source's obligations to Buyer under the Debt Financing or any financing commitment in respect thereof.

Section 14.17.  *Release*.

(a)      Effective as of the Closing (but only if the Closing actually occurs), except for (i) any rights or obligations under this Agreement, the other Transaction Documents and the Confidentiality Agreement, (ii) any Assets acquired under or pursuant to this Agreement or the other Transaction Documents, and (iii) any Claims of Buyer or any of its Affiliates against any Seller Released Party (as defined below) relating to transactions (whether pre-petition or post-petition) between Buyer or any of its Affiliates, on the one hand, and any Selling Entity, on the other hand, in the ordinary course of business, Buyer, on behalf of itself and each of its Affiliates and each of its and their respective past, present and/or future officers, directors (and Persons in similar positions), employees, agents, general or limited partners, managers, management companies, members, advisors, stockholders, equity holders, controlling Persons, other Representatives or Affiliates, or any heir, executor, administrator, successor or assign of any of the foregoing, in each case claiming by, through, or under Buyer (collectively, the "**Buyer Releasors**"), hereby irrevocably and unconditionally releases and forever discharges each Selling Entity, each other Subsidiary of Seller, their respective Affiliates and each of the foregoing's respective past, present and/or future officers, directors (and Persons in similar positions), employees, agents, general or limited partners, managers, management companies, members, advisors, stockholders, equity holders, controlling Persons, other Representatives or Affiliates, or any heir, executor, administrator, successor or assign of any of the foregoing (each, a "**Seller Released Party**," and collectively, the "**Seller Released Parties**") of and from any and all actions, causes of action, suits, Proceedings, executions, Orders, duties, debts, dues, accounts, bonds, Liabilities, Contracts and covenants (whether express or implied), and claims and demands whatsoever whether in law or in equity (whether based upon contract, tort or otherwise) (collectively, "**Causes of Action**"), which any of the Buyer Releasors may have against any of Seller Released Parties, now or in the future, in each case in respect of any cause, matter or thing relating to the Selling Entities, the Assets, the Business or any action taken or failed to be taken by any of Seller Released Parties in any capacity related to the Selling Entities, the Assets or the Business occurring or arising on or prior to the Closing Date; *provided*, *however*, that, notwithstanding the foregoing, no Seller Released Party shall be released or discharged by Buyer from any Cause of Action related to any act or omission that constitutes actual fraud, gross negligence, or willful misconduct.  From and after the Closing and notwithstanding any applicable statute of limitations, Buyer will not and will use commercially reasonable efforts to cause each of the other Buyer Releasors not to, bring any action, suit or Proceeding against Seller or any of the other Seller Released Parties, whether at law or in equity, with respect to any of the rights or claims waived and released by Buyer on behalf of itself and the other Buyer Releasors hereunder.

(b)      Effective as of the Closing (but only if the Closing actually occurs), except for any rights or obligations under this Agreement, the other Transaction Documents and the Confidentiality Agreement, each Selling Entity, on behalf of itself and each of its Affiliates and each of its and their respective past, present and/or future officers, directors (and Persons in similar

positions), employees, agents, general or limited partners, managers, management companies, members, advisors, stockholders, equity holders, controlling Persons, other Representatives or Affiliates, or any heir, executor, administrator, successor or assign of any of the foregoing, in each case claiming by, through, or under such Selling Entity (collectively, the "**Selling Entity Releasors**"), hereby irrevocably and unconditionally releases and forever discharges Buyer, each Subsidiary of Buyer, their respective Affiliates and each of the foregoing's respective past, present and/or future officers, directors (and Persons in similar positions), employees, agents, general or limited partners, managers, management companies, members, advisors, stockholders, equity holders, controlling Persons, other Representatives or Affiliates, or any heir, executor, administrator, successor or assign of any of the foregoing (each, a "**Buyer Released Party**," and collectively, the "**Buyer Released Parties**") of and from any and all Causes of Action, which any of the Selling Entity Releasors may have against any of the Buyer Released Parties, now or in the future, in each case in respect of any cause, matter or thing relating to Buyer, the Assets, the Business or any action taken or failed to be taken by any of the Buyer Released Parties in any capacity related to Buyer, the Assets or the Business occurring or arising on or prior to the Closing Date; *provided*, *however*, that, notwithstanding the foregoing, no Buyer Released Party shall be released or discharged by the Selling Entities from any Cause of Action related to any act or omission that constitutes actual fraud, gross negligence, or willful misconduct.  From and after the Closing and notwithstanding any applicable statute of limitations, each Selling Entity will not and will use commercially reasonable efforts to cause each of the Selling Entity Releasors not to, bring any action, suit or Proceeding against Buyer or any of the other Buyer Released Parties, whether at law or in equity, with respect to any of the rights or claims waived and released by a Selling Entity on behalf of itself and the other Selling Entity Releasors hereunder.

[*Signature pages follow.*]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the day and year first above written.

**SELLER:**

**DEAN FOODS COMPANY**

By: _____
Name: _____
Title: _____


**SELLING ENTITIES:**

**[ ● ]**

By: _____
Name: _____
Title: _____


**[ ● ]**

By: _____
Name: _____
Title: _____


**[ ● ]**

By: _____
Name: _____
Title: _____

*[Signature Page to Asset Purchase Agreement]*

**PRAIRIE FARMS DAIRY, INC.**

By: _____

Name: _____

Title: _____

*[Signature Page to Asset Purchase Agreement]*