IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| SOUTHERN FOODS GROUP, LLC *et al*. | : | Case No. 19-36313 (DRJ) |
|  | : |  |
| Debtors.[1] | : | (Jointly Administered) |

**MDVA'S OBJECTION AND RESERVATION OF RIGHTS IN RESPONSE TO THE DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) AUTHORIZING SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS, INTERESTS, AND ENCUMBRANCES, (B) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM THEIR OBLIGATIONS UNDER THE ASSET PURCHASE AGREEMENT AND RELATED DOCUMENTS, (C) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND <u>UNEXPIRED LEASES, AND (D) GRANTING RELATED RELIEF</u>**

[Relates to Docket Nos. 925, 1178, & 1270]

Maryland and Virginia Milk Producers Cooperative Association, Incorporated ("<u>MDVA</u>"), a supplier of raw milk and other dairy and drink products and creditor in the above-captioned cases, by counsel, files this objection and reservation of rights (this "<u>Objection</u>") to (1) the Debtors' motion (the "<u>Sale Motion</u>") [D.I. 925][2] seeking entry of an order authorizing, among

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: Southern Foods Group, LLC (1364); Dean Foods Company (9681); Alta-Dena Certified Dairy, LLC (1347); Berkeley Farms, LLC (8965); Cascade Equity Realty, LLC (3940); Country Fresh, LLC (6303); Dairy Information Systems Holdings, LLC (9144); Dairy Information Systems, LLC (0009); Dean Dairy Holdings, LLC (9188); Dean East II, LLC (9192); Dean East, LLC (8751); Dean Foods North Central, LLC (7858); Dean Foods of Wisconsin, LLC (2504); Dean Holding Company (8390); Dean Intellectual Property Services II, Inc. (3512); Dean International Holding Company (9785); Dean Management, LLC (7782); Dean Puerto Rico Holdings, LLC (6832); Dean Services, LLC (2168); Dean Transportation, Inc. (8896); Dean West II, LLC (9190); Dean West, LLC (8753); DFC Aviation Services, LLC (1600); DFC Energy Partners, LLC (3889); DFC Ventures, LLC (4213); DGI Ventures, Inc. (6766); DIPS Limited Partner II (7167); Franklin Holdings, Inc. (8114); Fresh Dairy Delivery, LLC (2314); Friendly's Ice Cream Holdings Corp. (7609); Friendly's Manufacturing and Retail, LLC (9828); Garelick Farms, LLC (3221); Mayfield Dairy Farms, LLC (3008); Midwest Ice Cream Company, LLC (0130); Model Dairy, LLC (7981); Reiter Dairy, LLC (3675); Sampson Ventures, LLC (7714); Shenandoah's Pride, LLC (2858); Steve's Ice Cream, LLC (6807); Suiza Dairy Group, LLC (2039); Tuscan/Lehigh Dairies, Inc. (6774); Uncle Matt's Organic, Inc. (0079); and Verifine Dairy Products of Sheboygan, LLC (7200). The debtors' mailing address is 2711 North Haskell Avenue, Suite 3400, Dallas, TX 75204.

other things, (A) the sale of certain assets of the Debtors free and clear of all claims, liens, liabilities, rights, interests, and encumbrances, (B) the Debtors to enter into and perform their obligations under the asset purchase agreement and related documents, (C) the Debtors to assume and assign certain executory contracts and unexpired leases, and (D) granting related relief, and (2) the Debtors' Notice of Bid Results [D.I. 1270] designating Dairy Farmers of America, Inc. ("DFA") as Successful Bidder for substantially all of Debtors' assets. In support of the Objection, MDVA respectfully states as follows:

## PRELIMINARY STATEMENT

The Debtors seek approval of a sale of substantially all their assets to DFA, and approval of DFA's bid and accompanying Asset Purchase Agreement ("APA") [D.I. 1278]. Yet, as the Debtors and most parties in interest are aware, this sale to DFA continues to raise significant red flags for antitrust regulators and private parties alike. DFA is by far the largest dairy cooperative in the United States, and it also owns dairy processing facilities throughout the United States, while Debtor Dean Foods Company, DFA's largest customer, is the largest dairy processing company in the United States. Cooperatives marketing and selling raw milk in the Southeast like MDVA, which compete with DFA to supply raw milk to milk processors and consumer fluid milk to retailers and other consumers of fluid milk, have legitimate antitrust concerns, which the Debtors have done nothing to address. After running an expedited sale process on a very compressed time frame the Debtors articulate no reason to believe that regulators and private parties will not challenge a sale with DFA, instead remaining steadfast in their pursuit of such a sale — regardless of the cost to their estates and the effect on competition in the dairy market. While DFA's bid is contingent on, and contemplates resolution of government regulators'

---

[2] Capitalized terms used but not otherwise defined in this Objection shall have the meanings given to them in the Sale Motion documents, as applicable.

2

objections to, its acquisition of the Debtors' Assets, nothing filed with the Debtors' Notice of Bid Results or DFA's Offer confirms that such an agreement has actually been concluded. *See* D.I. 1278-1, at 2 of 4 (summary of Regulatory Approvals). The Debtors' actions in this regard are commercially unreasonable and will, if permitted to proceed, likely lead to challenges on antitrust grounds.

Because the Debtors have not satisfied their burden to establish a sound business reason for a sale of almost all of their assets to DFA, their Sale Motion must be denied. Or, at the very least, the order approving the sale with DFA must preserve all antitrust claims and challenges arising from the sale, and the rights of all governmental and private parties to assert such claims.

## JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this Objection pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested in this Objection are sections 105, 363, and 365 of the Bankruptcy Code.

## BACKGROUND

4. On November 12, 2019 (the "Petition Date"), each of the Debtors filed voluntary petitions with this Court for relief under chapter 11 of the Bankruptcy Code. The Debtors' cases (the "Chapter 11 Cases") are being jointly administered for procedural purposes only under case number 19-36313 (DRJ). *See Order Directing Joint Administration of Chapter 11 Cases* [D.I. 9].

5. The Debtors remain in possession of their property and continue to manage their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6. On November 22, 2019, the Office of the United States Trustee for the Southern District of Texas appointed an Official Committee of Unsecured Creditors. *See Notice of Appointment of Committee of Unsecured Creditors* [D.I. 288].

7. No trustee or examiner has been appointed in the Chapter 11 Cases.

<u>The Bidding Procedures Motion and Hearings</u>

8. On February 17, 2020, the Debtors filed the *Motion of Debtors for Entry of Orders (I)(a) Approving Bidding Procedures for Sale of Debtors' Assets, (b) Approving the Designation of Dairy Farmers of America, Inc. as the Stalking Horse Bidder for Substantially All of Debtors' Assets, (c) Authorizing and Approving Entry into the Stalking Horse Asset Purchase Agreement, (d) Approving Bid Protections, (e) Scheduling Auction for, and Hearing To Approve, Sale of Debtors' Assets, (f) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, (g) Approving Assumption and Assignment Procedures, and (h) Granting Related Relief and (II)(a) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (b) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (c) Granting Related Relief* (the "<u>Bidding Procedures Motion</u>") [D.I. 925].

9. The same day, the Debtors filed the *Debtors' Notice of Filing of Stalking Horse Asset Purchase Agreement* [D.I. 935], which disclosed that the Debtors intended to designate DFA as the stalking horse bidder. The "Stalking Horse Agreement" [D.I. 935-1] between the Debtors and DFA was attached as Exhibit A.

10. On March 3, 2020, MDVA filed and served an objection (the "<u>Procedures Objection</u>") [D.I. 1058] to the Bidding Procedures Motion. Other parties in interest filed similar objections.

4

11. In the Procedures Objection, MDVA argued (among other things) the following: (1) the Bidding Procedures Motion glossed over the regulatory issues that would arise if DFA was the "Successful Bidder" and lacked adequate justification for the overly aggressive schedule for bidding and approval of a sale; and (2) the Stalking Horse Agreement between the Debtors and DFA prejudiced potential bidders such as MDVA, which seek to purchase one or two of the Debtors' facilities,[3] by failing to allocate the purchase price among the assets DFA would purchase.

12. Many creditors and other parties in interest have stated similar unfairness concerns or echoed MDVA's unfairness concerns.[4]

13. On the morning of March 12, 2020, Debtors filed an omnibus reply (the "Reply") to the various objections to the Bidding Procedures Motion. While the Debtors made certain concessions and revised the proposed order granting the Bidding Procedures Motion accordingly, they failed to remedy the major deficiencies that MDVA and others had identified.

14. Later that day, this Court held a hearing on the Bidding Procedures Motion. At the outset, this Court recognized that it could not approve the Bidding Procedures on file because they could not ensure a fair, open, and transparent sale process. Bidding Procedures Hr'g Tr. 15:20; 16:22 – 17:2; 24:20 – 27:14. To that end, it was decided that the Debtors would not conduct an auction with a stalking horse bidder. Instead, any party interested in bidding on one

---

[3] Consistent with prior guidelines that it received from Evercore, MDVA submitted bid "proposals" on February 18, 2020 for the raw milk processing plants in High Point and Winston Salem, North Carolina and Lansdale, Pennsylvania.

[4] On March 11, 2020, the DOJ sent a letter to counsel for the Official Committee of Unsecured Creditors (the "Committee") stating that "an acquisition of Dean by DFA appears to pose a serious risk of anticompetitive harm that would likely need to be addressed either through divestitures or an injunction enjoining the transaction if DFA and Dean are unwilling or unable to agree to appropriate remedies needed to protect American farmers and consumers." *See Supplemental Objection of the Official Committee of Unsecured Creditors to Debtors' Motion for Approval of Bidding Procedures and Stalking Horse Asset Purchase Agreement* filed March 11, 2020 [D.I. 1111] and Exhibit A thereto.

5

or more of the assets (including DFA) would be required to submit its bid by a certain deadline, and then the Debtors would determine which of the "Qualified Bids" was the highest and best offer. Moreover, the Debtors would be required to file copies of all bids to the case docket.[5]

15. Regarding antitrust issues, counsel for the DOJ advised the Court that it had not yet reached an agreement with DFA on which facilities DFA would divest in order to obtain DOJ's approval of a sale of substantially all the Debtors' assets to DFA. According to the DOJ's counsel, there was still a concerning "gap" between the parties' relative positions, which the Court appreciated. *See* Bidding Procedures Hr'g Tr. 66:11-21.[6] The Court also heard from counsel for certain identified retailers who explained that antitrust claims held by private parties may arise from a sale between the Debtors and DFA even if any regulatory challenges are discontinued or otherwise resolved. *See* Bidding Procedures Hr'g Tr. 87:12-90:5. Therefore, the Court asked counsel for those retailers to file a short memorandum addressing the legal basis for a private party to obtain relief under the antitrust laws if DFA is the Successful Bidder (which memorandum was filed on March 20, 2020).[7]

16. The Court adjourned the hearing to March 19, 2020, primarily to address the DFA Bid Protections in view of the revised Bidding Procedures. Prior to the continued hearing, however, the Debtors and DFA agreed that DFA would not seek any Bid Protections or act as stalking horse.

---

[5] By letter dated March 13, 2020, Evercore informed MDVA of the new schedule for submission of bids and related sale events and deadlines (as approved by the Court at the hearing and embodied in the order that followed).

[6] Counsel for the DOJ further advised the Court that it takes the position that only an Article III court should hear any lawsuit commenced by the DOJ on the grounds that a sale to DFA violates antitrust law. Bidding Procedures Hr'g Tr. 12:8-13.

[7] *See Memorandum of the Stop & Shop Supermarket Company LLC and Food Lion LLC Regarding Private Rights of Action to Challenge Anti-Competitive Mergers and Enforce the Antitrust Laws* [D.I. 1186].

17. On March 19, 2020, the Court entered the *Order (I) Approving Bidding Procedures for Sale of Debtors' Assets, (II) Scheduling Hearing to Approve Sale of Debtors' Assets, (III) Approving Form and Manner of Notices of Sale and Sale Hearing, (IV) Approving Assumption and Assignment Procedures, and (V) Granting Related Relief* [D.I. 1178] (the "Bidding Procedures Order"). Consistent with the record of the prior hearings, the Bidding Procedures Order established the following schedule:

| | |
|---|---|
| **March 30, 2020 at 12:00 p.m. (prevailing Central Time)** | Bid Deadline |
| **March 30, 2020 at 11:59 p.m. (prevailing Central Time)** | Deadline for the Debtors to file with the Court copies of all bids received by the Bid Deadline, the Notice of Bid Results, and the proposed Sale Order(s) |
| **April 1, 2020 at 12:00 p.m. (prevailing Central Time)** | Deadline to object to the Sale Transaction(s) to the Successful Bidder(s), and Assumption and Assignment Objection Deadline |
| **April 3, 2020 at 9:00 a.m. (prevailing Central Time)** | Sale Hearing |

*The Bids and Sale-Related Filings*

18. On March 30, 2020, MDVA submitted its Qualified Bid for the Debtors' raw milk processing plant in High Point, North Carolina (the "High Point Facility") and the related branch facility in Chesapeake, Virginia. *See* Additional Attachments Re: Bid No. 21 - Maryland and Virginia Milk Producers Cooperative Association, Inc. [D.I. 1292].

19. Following the expiration of the Bid Deadline and starting around 12:11 a.m. prevailing Central Time on March 31, 2020, the Debtors filed (a) the Notice of Bid Results [D.I. 1270] providing, *inter alia*, that DFA was the Successful Bidder for substantially all the Debtors' assets, including the Debtors' High Point, NC plant and related facilities (the "Assets"), having submitted a bid in the amount of approximately $433 million subject to certain adjustments, and (b) copies of all timely bids and related documents that the Debtors had received (as supplemented) [D.I. 1271–1307, 1319 & 1321]. MDVA was designated the Alternate Bidder for

7

the High Point assets. The DFA bid does not allocate any portion of the purchase price among the various plants and related assets that DFA proposes to purchase.

20. No declaration from the Debtors or their professionals was filed in support of the selection of DFA as the Successful Bidder — even though the Debtors have the burden to establish the propriety of the sale.

21. MDVA respectfully submits that the proposed sale to DFA should not be approved.

**ARGUMENT**

I. **The Court Should Not Approve The Sale Of The Debtors' Assets To DFA Because DFA's Offer Was Not The "Highest And Best" Offer.**

A. **DFA's Acquisition Of The Assets Will Violate Section 7 Of The Clayton Act.**

22. DFA's proposed acquisition of Debtors' Assets raises a substantial antitrust closing risk. For example, the proposed DFA acquisition of Debtors' three milk processing plants in the Carolinas (i.e., North and South Carolina) will substantially lessen (if not entirely eliminate) competition for the supply of raw fluid milk and for the sale of consumer fluid milk and other fresh dairy products in that region. This effect on competition will cause significant losses and harm to MDVA, which requires access to milk processing and packaging facilities to sell the raw milk produced by its members, many of whom are located in or near the Carolinas. Both the federal government and private parties have standing to assert antitrust claims under section 7 of the Clayton Act, which prevents acquisitions that tend to substantially lessen competition. Even if the DOJ ultimately approves this acquisition, private parties such as MDVA have standing to challenge and enjoin the acquisition. *See California v. Am. Stores Co.*, 495 U.S. 271, 271 (1990) (private right of action to enjoin a transaction under section 7 of the Clayton Act); *In re AMR Corp.*, 527 B.R. 874, 882 (Bankr. S.D.N.Y. 2015) (section 7 applies to

8

bankruptcy asset sales); *Sprint Nextel Corp. v. AT&T Cos.*, 2011 WL 5188081, at *7 (D.D.C. 2011) (foreclosure of access to handsets by virtue of a proposed wireless industry merger is a recognized antitrust injury by a competitor).

23. DFA is by far the largest dairy cooperative in the United States. The Debtors are the largest processor of raw fluid milk in the United States. The transaction that the Debtors have proposed will eliminate competition for the supply of raw fluid milk in the Carolinas while also entrenching DFA's control of the market by creating an even more difficult environment for new entrants to compete. The proposed transaction also substantially limits options for retailers located in or near the Carolinas to have dairy processing entities compete to supply fluid milk and other fresh dairy products at competitive prices.

24. Over the past two decades, Debtors and DFA have been closely aligned in increasing their respective concentration and suppressing competition, both by driving down payments to milk farmers and increasing their cut of milk processing and packaging costs. Both entities have been subject to antitrust lawsuits addressing this coordination and other anticompetitive practices, including in an MDL Class Action which covered Appalachia and the Southeast that was settled in 2013 for nearly $300 million. *See In re Southeastern Milk Antitrust Litigation*, 2:08-md-01000 (E.D. Tenn.). The almost complete integration of DFA and Debtors contemplated by the successful DFA Bid will be the culmination of the anticompetitive concentration of the fluid milk industry across the nation but with particularly harmful and anticompetitive effects in the Carolinas. This Dean/DFA Merger will compel independent dairy farmers and milk cooperatives seeking to sell their raw milk throughout the Carolinas to face a stark choice — join DFA or die.

27. MDVA, a competing milk cooperative, is the only significant competitor to DFA

9

for the supply of raw milk in the Carolinas. If the transaction proposed by Debtors and DFA is approved by this Court and permitted to close, this competition will be permanently lost. To continue as a viable competitor, MDVA's farmers need access to processing facilities to sell the raw milk produced on their dairy farms. However, post-transaction, DFA will have the ability and incentive to foreclose MDVA and all non-DFA dairy milk farmers from access to local milk processing facilities like High Point, NC, Winston-Salem, NC, and Spartanburg, SC. The cobbled-together temporary patchwork of non-Debtor/non-Dean Foods processing facilities that MDVA currently relies on is not sustainable in the long-term.

28. MDVA will lose farmers if it cannot provide them with access to local processing facilities. A longer-term consequence of the transaction is that MDVA will be pushed out of the market for the supply of raw milk entirely, making DFA the only significant cooperative in the Carolinas.

29. Therefore, MDVA and perhaps other parties have significant and meritorious antitrust claims, which render the sale to DFA too risky and uncertain for this Court to approve. At a minimum, this Court should not enter a sale order prejudging these claims or precluding MDVA and others from asserting them in the proper forum.

### B. The Debtors, As Debtors-In-Possession, Must Operate And Manage Their Estates In Accordance With Applicable Law.

30. Filing a petition for relief under chapter 11 of the Bankruptcy Code does not excuse a debtor-in-possession from complying with non-bankruptcy law — including federal antitrust statutes.

31. Pursuant to 28 U.S.C. § 959 (emphasis added),

> debtors in possession. . . may be sued, without leave of the court appointing them, **with respect to any of their acts or transactions in carrying on business connected with such property**. Such actions shall be subject to the general equity power

> of such court so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to trial by jury.
>
> [A] debtor in possession. . . **shall manage and operate the property in his possession. . . according to the requirements of the valid laws of the State** in which such property is situated. . . .

Therefore, a debtor-in-possession is prohibited from engaging in transactions that violate other laws, and the debtor is not immune from the consequences of failing to adhere to them.[8] *See Norris Square Civic Ass'n v. St. Mary Hosp. (In re St. Mary Hosp.),* 86 B.R. 393, 398 (Bankr. E.D. Pa. 1988) ("We believe that it is inescapable to avoid the conclusion that 28 U.S.C. § 959(b) requires a debtor to conform with applicable federal, state, and local law in conducting its business.").

32. More to the point, section 363(b) of the Bankruptcy Code does not preempt the Clayton Act. *See* 11 U.S.C. § 363(b)(2) (recognizing Clayton Act notice requirements);[9] *see also In re Pac. Gas & Elec. Co.,* 273 B.R. 795, 806 & n. 10 (Bankr. N.D. Cal. 2002) ("[T]he court does not believe Congress intended to eviscerate all antitrust laws for debtors in bankruptcy . . . ."); *In re Jartran, Inc.*, 44 B.R. 331, 385 n. 116 (Bankr. N.D. Ill. 1984) (noting that acquisition offer within a proposed plan raised antitrust concerns); *c.f. In re United Healthcare Sys., Inc.,* No. CIV. A. 97-1159 (NHP), 1997 WL 176574, at *10 (D.N.J. Mar. 26, 1997) ("The Court recognizes that by binding the Bankruptcy Court to certain state laws and state agency decisions, the Bankruptcy Court may be hindered in achieving the highest price for the bankrupt estate's assets. However, the '[t]he text and

---

[8] Although there are limited circumstances under which a debtor-in-possession may act contrary to otherwise applicable federal law, none apply here.

[9] Had Congress intended for the Bankruptcy Code to preempt all aspects of the Clayton Act, it would have said so. Instead, section 363(b)(2) only limits who is required to provide notice and the review period's duration.

spirit of the bankruptcy provision have not been held to preempt state laws limiting the alienability or present liquidation value of the assets, even though those limitations may undermine the expeditious liquidation of the bankruptcy estate.'" (citation omitted)). Rather, these statutes co-exist. *See generally Morton v. Mancari*, 417 U.S. 535, 551 (1974) ("The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.").[10]

33. MDVA respectfully submits that this Court should harmonize the policies underlying the Bankruptcy Code and the Clayton Act by denying the Sale Motion and encouraging the Debtors to move for authority to sell one or more dairy plant Assets in the Carolinas to the applicable Alternate Bidders, such as the sale of the High Point, NC plant to MDVA.[11] Selling one or more dairy plant Assets in the Carolinas to someone other than DFA will afford the estate the maximum recovery possible within the confines of antitrust law. As explained in more detail below, a sale to DFA is not in the best interests of the estate because there is a serious risk that a court will determine that the sale will violate section 7 of the Clayton Act and, for that reason, enjoin it. Creditors and all parties in interest, including any potential antitrust claimants, will benefit substantially more from a sale to the Alternate Bidders for the Assets — regardless of whether the dollar amount of DFA's bid was higher.

---

[10] Indeed, this Court has recognized that it would not "ignore" the antitrust arguments raised by private parties. *See* Bidding Procedures Hr'g Tr. 89:1–90:3.

[11] "The Bankruptcy Code, like any law, must be read in its context as a tool of mankind, not a body of edicts to which mankind is a slave irrespective of its interests to the contrary." *In re After Six, Inc.*, 154 B.R. 876, 882 (Bankr. E.D. Pa. 1993).

C. **The Debtors' Discretion To Determine The "Highest And Best" Offer For The Assets Is Not Unfettered: A Bankruptcy Court Is Authorized To Reject A Sale When, As Is The Case Here, The Debtors Received A Superior Offer From The Estate's Perspective.**

34. Pursuant to section 363 of the Bankruptcy Code, a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §§ 363(b)(1), 1107.[12] Implicit in section 363(b) is the principle that a debtor-in-possession has a certain amount of discretion when conducting a sale outside the ordinary course. *See, e.g., In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("The rule adopted by the Fifth Circuit requires that a Judge determining a § 363(b) application expressly find from the evidence presented at hearing a good business reason to grant the application."). The debtor's discretion extends to the selection of a successful bidder after an auction or other court-sanctioned sale process.

35. But there are limits.

36. Among other things, "[t]he debtor must demonstrate that the purchase price is not merely the highest dollar amount — but the highest and best offer." *In re Flour City Bagels*, 557 B.R. 53, 78 (Bankr. W.D.N.Y. 2016) (explaining that, in addition to price, the debtor "should weigh other factors, 'such as contingencies, conditions, timing, or other uncertainties in an offer that may render it less appealing.'" (citation omitted)); *see also In re VCR I, L.L.C.*, 922 F.3d 323, 327 (5th Cir. 2019) ("[B]ankruptcy court may accept a lower bid in the presence of sound business reasons. . . ."); *In re Tresha-Mob*, LLC, No. 18-52420-RBK, 2019 WL 1785431, at *2 (Bankr. W.D. Tex. Apr. 3, 2019) (rejecting "one-track value-maximization argument that ignore[d] mountains of precedent in which

---

[12] It is undisputed that the sale of substantially all the Debtors' assets is outside the ordinary course of the Debtors' business.

13

trustees, debtors-in-possession, and courts have rejected the highest bid when it was not the 'best bid'"); *In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998) (explaining that trustee has a duty "to avoid undue risk" when conducting section 363 sale).[13]

37. If a bankruptcy court determines that another offer is more advantageous for the estate, then the court may exercise its discretion to deny approval of the offer that the debtor wants to accept. *See In re Broadmoor Place Investments, L.P.,* 994 F.2d 744, 746 (10th Cir. 1993) ("[W]e hold that a Bankruptcy Court in a case such as this does have the power to disapprove a proposed sale recommended by a trustee or debtor-in-possession if it has an awareness there is another proposal in hand which, from the estate's point of view, is better or more acceptable."); *see also In re Fairfield Sentry Ltd.,* 768 F.3d 239, 246–47 (2d Cir. 2014) (recognizing bankruptcy court's "broad discretion and flexibility. . . to enhance the value of the estates before it" and that bankruptcy court's "principal responsibility. . . is to secure for the benefit of creditors the best possible bid."); *Lithograph Legends, LLC v. U.S. Tr.,* No. 09-CV-943JMR, 2009 WL 1209469, at *3 (D. Minn. Apr. 30, 2009) (finding that bankruptcy court had discretion to disapprove bid originally selected by the debtors in view of lower—yet superior—bid).

38. Here, the Debtors' desire to consummate the sale transaction with DFA on the terms proposed must yield to the requirements of the Clayton Act and the Bankruptcy Code as well as what is in the best interests of the Debtors' estates. As codified in 28 U.S.C. § 959(b), implied by sections 363(b) and 1107 of the Bankruptcy Code, and expressly held

---

[13] Indeed, the Debtors' own Bidding Procedures as approved by the Court recognize that price alone may not be definitive of whether an offer is the "highest and best." *See* Bidding Procedures at 6, D.I. 1178 at 21/43 ("For the avoidance of doubt, the presence of any governmental, licensing, regulatory, or other approvals or consents in a bid, and the anticipated timing or likelihood of obtaining such approvals or consents, may be grounds for the Debtors, in consultation with the Consultation Parties, to determine that such bid (i) is not a Qualified Bid or (ii) is not higher or otherwise better than any other Qualified Bid.").

by courts throughout the country, debtors-in-possession — which the Debtors in these Chapter 11 Cases are — owe fiduciary duties to their estates. Those duties include transacting business in accordance with non-bankruptcy law (subject to certain exceptions not applicable here) and maximizing the value of their assets.

39. While DFA's offer may (or may not) provide the highest consideration for substantially all of the Assets, it cannot reasonably be deemed the best offer because its acceptance will likely result in a transaction that violates antitrust law and will spawn time-consuming and potentially expensive litigation. Interested DFA competitors, such as MDVA, retailers, and consumers, will be entitled to an injunction enjoining or unwinding the sale. *See supra,* Arg.I.A. If that occurs, the closing on the DFA acquisition can be delayed to as far out as December 1, 2020,[14] increasing the chances that the Debtors will be unable to continue as a going concern. "[T]housands of jobs" will be lost, and "the nation's milk supply" will be disrupted — exactly what the Debtors, this Court, and other parties in interest have been working so hard to avoid. *See* Reply ¶ 1. For the benefit of all stakeholders, the Debtors should proceed with MDVA's bid for the High Point Facility, which the Debtors selected as the Alternative Bid. MDVA submits that its bid is superior because it does not suffer from the risk and uncertainty that a sale will not close for antitrust reasons as the DFA bid does.[15]

40. There are also other aspects of DFA's offer that make it materially inferior to MDVA's all-cash bid for the High Point, NC assets with Closing by April 20, 2020. For example, if the DFA Asset Purchase Agreement is approved, DFA will have sole discretion to

---

[14] *See* DFA APA at §12.01(b).

[15] Selecting the Alternate Bidders as the Successful Bidders should not upset the reasonable expectations of any party as all were informed that a sale to DFA would be contingent on this Court's approval. *See In re Payless Cashways, Inc.*, 281 B.R. 648, 653 (B.A.P. 8th Cir. 2002) (citing 11 U.S.C. § 363(b)).

15

extend the "Outside Closing Date" of the sale to December 1, 2020. *See* DFA APA 12.01(b)(ii) [D.I. 1321-1] (Ex. A-1). As the Debtors have stated on the record and in various Court filings, time is of the essence for a sale in these Chapter 11 cases. Yet a sale with DFA may not close (assuming it can close at all) until nine months from now. In contrast, the offer submitted by MDVA for the High Point NC Plant provides for Closing on or before April 20, 2020, does not provide for an extension and, therefore, is far more advantageous for the estates.

41. Likewise, DFA's offer is inferior to MDVA's offer because it requires outside financing. The Debtors advised bidders that "[p]roposals that do not require debt financing will be viewed more favorably by Seller." MDVA's offer for the High Point Facility is all cash — thus reducing risk to the estates and providing the Debtors the immediate liquidity that they say they need.[16]

42. The Court should also decline to defer to the Debtors' selection of DFA as the Successful Bidder because the underlying sale process disadvantaged regional bidders, such as MDVA, that submitted "Partial Bids" on less than substantially all the Debtors' assets. MDVA understands and appreciates that the Debtors revised the Bidding Procedures to make the sale process more open and transparent. As courts have noted, "[t]he purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate." *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998). But the changes that the Debtors made to the Bidding Procedures did not remedy all defects. Notably, under the Bidding Procedures, bidders were not required to allocate the purchase price among the assets they sought to purchase. It is, therefore, unclear how (or

---

[16] *See f*ootnote 1 to the form of Asset Purchase Agreement that Debtors provided to MDVA and other bidders.

16

whether) the Debtors reasonably evaluated Partial Bids against DFA's bid.[17] Because the bid process was not sufficiently detailed and transparent, this Court should reject the results.

II. **Alternatively, If The Court Approves The Sale, It Should Preserve The Rights Of Private Parties To Effectively Resolve A Challenge To A Sale Of The Debtors' Assets To DFA Under Section 7 Of The Clayton Act.**

43. At a minimum, the legitimate antitrust concerns raised by MDVA and other parties in interest justify including a provision in the sale order that recognizes MDVA and other parties' ability to effectively resolve all antitrust claims, challenges, and proceedings arising from the sale transaction between the Debtors and DFA. Absent a provision in the sale order preserving parties' rights to effectively resolve such claims, there is a risk that those claims could be effectively mooted. Since the Court has itself questioned its ability to make decisions affecting the antitrust laws and claims of governmental and private parties under them, *see* n. 10, *supra*, MDVA respectfully requests that a sale order, if entered, expressly provide that, notwithstanding the Court's approval of the sale, all antitrust claims by all governmental and private parties arising from or related to the sale are preserved.

## RESERVATION OF RIGHTS

44. MDVA reserves its rights to amend, modify, and/or supplement this Objection and to raise additional objections prior to or at the hearing on the Sale Motion. MDVA further reserves its rights to file a separate lawsuit with this or any other court challenging the sale on the grounds that such a sale would violate applicable antitrust laws and seek, among other relief, an injunction enjoining the sale.

---

[17] This Court stated that there was a way other than requiring allocation to address this issue. *See* Bidding Procedures Hr'g Tr. 84:10–12. It does not seem, however, that the Debtors devised an alternative or implemented it.

17

**CONCLUSION**

WHEREFORE, MDVA respectfully requests that this Court deny the Sale Motion or, alternatively, enter an order approving a sale of the High Point, NC assets to MDVA as Alternate Bidder, or, alternatively, enter an order approving the sale that expressly provides that (i) the Court is not determining whether the sale would or would not violate applicable antitrust laws, and (ii) the Court's approval of the sale in no way affects any antitrust claims, challenges, or proceedings arising from the sale, and recognizes MDVA's and other parties' ability to effectively resolve all antitrust claims, challenges, and proceedings arising from the sale transaction between the Debtors and DFA, and that all such claims, challenges, and proceedings are preserved.

Dated: April 1, 2020
      Houston, Texas

Respectfully submitted,

**O'CONNORWECHSLER PLLC**

 /s/ Annie E. Catmull
Annie E. Catmull
State Bar No. 00794932
4400 Post Oak Parkway
Suite 2360
Houston, Texas 77027
Tel.: (281) 814-5977
aecatmull@o-w-law.com

*-and-*

**TROUTMAN SANDERS LLP**

Richard E. Hagerty (admitted *pro hac vice*)
VSB No. 47673
401 9th Street, N.W.,
Suite 1000
Washington, D.C. 20004
Tel.: (202) 274-1910
richard.hagerty@troutman.com

*Attorneys for MDVA*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 1st day of April, 2020, I caused the foregoing *Objection* to be filed via the Court's CM/ECF system, which will cause notice of filing to be served on all registered users. I FURTHER CERTIFY that I caused true and correct copies to be served via e-mail or first-class mail, postage prepaid, on all other parties on the most recent *Master Service List* filed by the Debtors.

　　　　　　　　　　　　　　　　　　　 */s/ Richard E. Hagerty*
　　　　　　　　　　　　　　　　　　　Richard E. Hagerty