**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|   |   |   |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| SOUTHERN FOODS GROUP, LLC, *et al.*, | ) | Case No. 19-36313 (DRJ) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |
| | ) | |

**DEBTORS' REPLY IN SUPPORT OF MOTION TO APPROVE SALES OF
DEBTORS' ASSETS AND RELATED RELIEF**

**[RELATES TO DKT. NOS. 925, 1178, 1214, 1234, 1249, 1331, 1342, 1350, 1353, 1356, 1377, 1381, 1390, 1392, 1393, 1397, 1406, 1412, 1415, 1418, 1426, & 1434]**

Southern Foods Group, LLC, Dean Foods Company, and certain of their debtor affiliates

(collectively, the "**Debtors**"), each of which is a debtor and debtor in possession in the above-

captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this omnibus reply (the

"**Reply**") to the Objections (as defined herein) filed in connection with the proposed Sale Orders[2]

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: Southern Foods Group, LLC (1364); Dean Foods Company (9681); Alta-Dena Certified Dairy, LLC (1347); Berkeley Farms, LLC (8965); Cascade Equity Realty, LLC (3940); Country Fresh, LLC (6303); Dairy Information Systems Holdings, LLC (9144); Dairy Information Systems, LLC (0009); Dean Dairy Holdings, LLC (9188); Dean East II, LLC (9192); Dean East, LLC (8751); Dean Foods North Central, LLC (7858); Dean Foods of Wisconsin, LLC (2504); Dean Holding Company (8390); Dean Intellectual Property Services II, Inc. (3512); Dean International Holding Company (9785); Dean Management, LLC (7782); Dean Puerto Rico Holdings, LLC (6832); Dean Services, LLC (2168); Dean Transportation, Inc. (8896); Dean West II, LLC (9190); Dean West, LLC (8753); DFC Aviation Services, LLC (1600); DFC Energy Partners, LLC (3889); DFC Ventures, LLC (4213); DGI Ventures, Inc. (6766); DIPS Limited Partner II (7167); Franklin Holdings, Inc. (8114); Fresh Dairy Delivery, LLC (2314); Friendly's Ice Cream Holdings Corp. (7609); Friendly's Manufacturing and Retail, LLC (9828); Garelick Farms, LLC (3221); Mayfield Dairy Farms, LLC (3008); Midwest Ice Cream Company, LLC (0130); Model Dairy, LLC (7981); Reiter Dairy, LLC (3675); Sampson Ventures, LLC (7714); Shenandoah's Pride, LLC (2858); Steve's Ice Cream, LLC (6807); Suiza Dairy Group, LLC (2039); Tuscan/Lehigh Dairies, Inc. (6774); Uncle Matt's Organic, Inc. (0079); and Verifine Dairy Products of Sheboygan, LLC (7200). The debtors' mailing address is 2711 North Haskell Avenue, Suite 3400, Dallas, TX 75204.

[2] The proposed sale orders filed by the Debtors and the respective proposed buyers comprise the following:

- *Order (A) Authorizing Sale of Certain Debtors' Assets Free and Clear of all Claims, Liens, Interests, and Encumbrances, (B) Authorizing the Debtors to Enter into and Perform their Obligations Under the Asset Purchase Agreement and Related Documents, (C) Authorizing Assumption*

filed pursuant to the *Order (I) Approving Bidding Procedures for Sale of Debtors' Assets, (II) Scheduling Hearing to Approve Sale of Debtors' Assets, (III) Approving Form and Manner of Notices of Sale and Sale Hearing, (IV) Approving Assumption and Assignment Procedures, and (V) Granting Related Relief* [D.I. 1178] (the "**Bidding Procedures Order**"),[3] and respectfully submit as follows:

## PRELIMINARY STATEMENT

1.      The Debtors have concluded an exhaustive marketing and sale process and the following six parties are the Successful Bidders for substantially all of the Debtors' assets:  Dairy Farmers of America ("**DFA**") acquiring 44 plants, Prairie Farms Dairy, Inc. ("**Prairie Farms**") acquiring 8 plants, Mana Saves McArthur, LLC ("**Mana**") acquiring the Miami, Florida plant, Producers Dairy Foods ("**Producers**") acquiring the Reno, Nevada plant and the "Berkeley

---

*and Assignment of Certain Executory Contracts and Unexpired Leases, and (D) Granting Related Relied* [D.I. 1350-1], as modified and attached hereto (the "**DFA Sale Order**");

•       *Order (A) Authorizing Sale of Certain Debtors' Assets Free and Clear of all Claims, Liens, Interests, and Encumbrances, (B) Authorizing the Debtors to Enter into and Perform their Obligations Under the Asset Purchase Agreement and Related Documents, (C) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (D) Granting Related Relied* [D.I. 1350-2], as modified and attached hereto (the "**Prairie Farms Sale Order**"); and

•       *Order (A) Authorizing Sale of Certain Debtors' Assets Free and Clear of all Claims, Liens, Interests, and Encumbrances, (B) Authorizing the Debtors to Enter into and Perform their Obligations Under the Asset Purchase Agreement and Related Documents, (C) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (D) Granting Related Relied* [D.I. 1350-3], as modified and attached hereto (the "**Producers Dairy Foods Sale Order**")

(individually as defined above and including additional or amended filings, and collectively, the "**Sale Orders**" and the "**Buyers**").

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Motion of Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for Sale of Debtors' Assets, (B) Approving the Designation of Dairy Farmers Of America, Inc. as the Stalking Horse Bidder for Substantially all of Debtors' Assets, (C) Authorizing and Approving Entry Into the Stalking Horse Asset Purchase Agreement, (D) Approving Bid Protections, (E) Scheduling Auction for, and Hearing to Approve, Sale of Debtors' Assets, (F) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, (G) Approving Assumption and Assignment Procedures, and (H) Granting Related Relief and (II)(A) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [D.I. 925] (the "**Sale Motion**"), the Bidding Procedures Order [D.I. 1178], the Sale Orders, or the Asset Purchase Agreements (each as attached to the Sale Orders), as applicable.

Farms" trademark and related intellectual property, Harmoni, Inc. ("**Harmoni**") acquiring all assets, rights, and properties in connection with the "Uncle Matt's Organic" branded juice products and popsicles, and Industrial Realty Group, LLC ("**IRG**") acquiring 2 Hawaii plants, in each case plus additional related assets. Collectively, the Successful Bids represent the clear highest and best available option for the Debtors and their estates, are anticipated to preserve the vast majority of the 15,000 jobs, and help ensure continuity of supply of milk across the country. *See Notice of Bid Results* [D.I. 1270]; *Supplemental Notice of Bid Results* [D.I. 1463].

2.      This reality is recognized by all of the Debtors' major constituents.

3.      Approval of the proposed sale transactions (the "**Sale Transactions**") is supported by the Committee (albeit reluctantly for the reasons set forth in the Committee's Statement of Support [D.I. 1430]) as well as the Debtors' DIP Agent. The Committee, in particular, has closely scrutinized the Debtors' efforts to achieve a successful outcome from the outset of these cases and has not hesitated to express its views to the Court. Given the Committee's active role, its affirmative support for the Sale Transactions weighs heavily in favor of approval. It is likewise significant that the Ad Hoc Group, after spending months working to develop a plan of reorganization, ultimately did not deliver a bid of any kind and even *withdrew* its limited objection to the Sale Transaction, further clearing the way for approval. *See Notice of Withdrawal of Limited Objection of the Ad Hoc Group of Bondholders Regarding Sale of Debtors' Assets to Dairy Farmers of America, Inc.* [D.I. 1457]. Nor have any of the Debtors' multiple unions objected to the proposed sales, implicitly acknowledging that the Sale Transactions are the best outcome for their members, even though all of the Successful Bids require changes to the Debtors' collective bargaining agreements.

4. The pathway from the beginning of these cases to the proposed Sale Transactions has been difficult and laden with unprecedented challenges that have made prompt approval urgently necessary. From the outset of the marketing and sale process, the Debtors explored and encouraged all possible options to maximize value for their estates and creditors. The Debtors entered the Chapter 11 Proceedings having announced that they were in advanced discussions with DFA with respect to a possible stalking horse bid. The Debtors had also engaged with the Ad Hoc Group prior to the Petition Date regarding a variety of structures, including a potential capital raise or DIP loan, neither of which came to fruition.

5. Following the Petition Date, the Debtors and their advisors contacted scores of potential bidders, negotiated confidentiality agreements, facilitated exhaustive diligence efforts (including document review, plant tours, and management meetings and calls), and adopted bidding procedures intended to accommodate proposals with varying structure and scope—entertaining offers in the form of restructurings or section 363 sales, and offers for all or various packages of assets. In total, the Debtors and Evercore communicated with 186 entities, ranging from potential strategic buyers (93, including 54 regional dairy companies) to potential financial buyers (93, including 50 real estate investors).

6. On February 17, 2020, the Debtors filed the Sale Motion, proposing certain bidding procedures and requesting authorization to enter into a stalking horse agreement with DFA. An initial hearing was held on the motion on March 12, 2020 (the "**March 12 Hearing**"), by which time the COVID-19 pandemic was already impacting the Debtors' liquidity and operations, and the Court expressed concerns and stressed the importance of an open and transparent process that could be brought to a swift conclusion. As a result, on the record, the Court and other parties in interest discussed a potential accelerated timeline and efficient bidding

process and the Court adjourned the Hearing for one week to March 19, 2020 (the "**March 19 Hearing**") to allow parties to confer further.

7.    Following a week of extensive discussions, the Debtors returned (telephonically) to the court at the March 19 Hearing to announce the withdrawal of the request to approve DFA as stalking horse, and to agree on the new timeline and Bidding Procedures, all with the support of the Committee, DIP Agent, and the Ad Hoc Group.

8.    With the new accelerated timeline, the Debtors set out to balance the herculean tasks of facilitating the most competitive sale process possible while dealing with the growing crisis caused by the COVID-19 pandemic.  Notwithstanding a shrinking liquidity runway, the logistical obstacles of arranging plant tours and diligence meetings while facing shelter-in-place orders, and the deeply personal effort of protecting the health and safety of their nearly 15,000 employees across the country, the Debtors sprinted toward the Bid Deadline working around the clock to seek both the highest and best outcome possible.

9.    The robust process, fulsome participation by numerous bidders, and the general support of or withdrawal of objections by the Debtors' largest and most active constituencies underscore clearly that consummation of the Sale Transactions constitutes an exercise of sound business judgment by the Debtors and should be approved.

10.    In total, proceeds from the Sale Transactions (including subsequent sales of certain excluded interests and real estate parcels from closed operations), net of fees, is estimated to equal over $425 million for the Debtors' estates.   With more than an additional $400 million estimated to be recoverable during the wind-down of the remainder of the Debtors' estates, from certain tax assets, cash, inventory, additional sales of owned real estate and equipment, and the unwinding of the Debtors' securitization facility, the Debtors are hopeful that they will be in a

position to satisfy all administrative claims and to provide a small but positive recovery to prepetition unsecured creditors.  By comparison, the total estimated recovery from a hypothetical piecemeal sale excluding the DFA Bid would produce an overall recovery of almost $150 million less, and likely leave the Debtors' estates administratively insolvent.

11.     Along with this reply, the Debtors have submitted written testimony, in the form of declarations, from two witnesses: Tony Magro of Evercore and Jeff Stegenga of A&M (together, the "**Sale Declarations**").[4]  In his declaration, Mr. Magro describes the extensive, months-long marketing process that the Debtors undertook with Evercore's assistance.  *See* Magro Decl. ¶¶ 8–12.  The Magro Declaration also explains why DFA's bid, Prairie Farms' bid, and several other bids were selected as the winning bids after the court-approved auction process.  *See id.* ¶ 16.  Specifically, these bids will result in the greatest recovery to the Debtors' estates, and forgoing these offers amid growing liquidity issues would jeopardize the Debtors' ability to recover meaningful value for their stakeholders.  *See id.* ¶¶ 20–21.  In his declaration Mr. Stegenga describes A&M's analysis of the recovery projected to flow to the Debtors' stakeholders if the Sale Transactions are approved and consummated.  *See* Stegenga Decl. ¶¶ 10–12.  The Debtors' witnesses will be available by videoconference to testify at the hearing.  However, the Debtors are not aware of any party that wishes to cross-examine their witnesses and, if that is the case, the Debtors will propose that the Court admit the Sale Declarations as affirmative testimony and proceed to hear oral argument based on this record.

---

[4] The Debtors also listed Kristy Waterman and Bruce Matson on their Exhibit and Witness List, but do not intend at this time to offer testimony from either of them.  The Debtors reserve their rights to offer live testimony from these witnesses, if necessary, at the hearing.

In addition to the *Declaration of Anthony Magro in Support of the Debtors' Reply in Support of Motion to (i) Approve Sale of Debtors' Assets, and (ii) Related Relief* (the "**Magro Declaration**"), and the *Declaration of Jeffrey J. Stegenga in Support of the Debtors' Reply in Support of Motion to (i) Approve Sale of Debtors' Assets, and (ii) Related Relief* (the "**Stegenga Declaration**"), the Debtors submitted a declaration from Mr. Magro in support of the Sale Motion, dated February 17, 2020, *see* [D.I. 925-1] (the "**Magro Sale Motion Declaration**").

12.     A number of limited objections were filed, almost none of which seek outright denial of the Sale Transactions.  Pursuant to the Debtors *Notice Regarding Proposed Assumption and Assignment of Executory Contracts or Unexpired Leases and Cure Costs* [D.I. 1436], the Debtors are not seeking relief from the Court at this date with respect to the assumption and assignment of any contract or lease, and instead will be seeking such relief at a later date.

13.     The remaining objections to the sale (collectively, the "**Objections**")[5] as well as their current status and proposed and/or agreed resolutions are listed on the summary chart in

---

[5] The Objections comprise the following:

- The Chubb Companies [D.I. 1214] ("**Chubb**" and, the objection, the "**Chubb Objection**");
- Siemens Financial Services, Inc. [D.I. 1234] ("**SFS**" and, the objection, the "**SFS Objection**");
- Texas Taxing Authorities [D.I. 1249] ("**Texas Taxing Authorities**" and, the objection, the "**Texas Taxing Authorities Objection**");
- Sompo Holdings, Inc. [D.I. 1331] ("**Sompo**" and, the objection, the "**Sompo Objection**");
- Travelers Casualty and Surety Company of America [D.I. 1326] ("**Travelers**" and, the objection, the "**Travelers Objection**");
- Travelers Casualty and Surety Company of America [D.I. 1326] ("**Travelers**" and, the objection, the "**Travelers Objection**");
- Zurich American Insurance Company [D.I. 1367] ("**Zurich**" and, the objection, the "**Zurich Objection**");
- CentiMark Corporation [D.I. 1342] ("**CentiMark**" and, the objection, the "**CentiMark Objection**");
- Sabatte Family Creditors [D.I. 1353] ("**Sabatte**" and, the objection, the "**Sabatte Objection**");
- Oracle Credit Corporation and Oracle America, Inc. [D.I. 1356] ("**Oracle**" and, the objection, the "**Oracle Objection**");
- Texas Taxing Entities [D.I. 1377] ("**Texas Taxing Entities**" and, the objection, the "**Texas Taxing Entities Objection**");
- Norse Dairy Systems, LLC [D.I. 1231, 1371, 1381] ("**Norse Dairy**" and, the objection, the "**Norse Dairy Objection**");
- Land O'Lakes, Inc. [D.I. 1390] ("**Land O'Lakes**" and, the objection, the "**Land O'Lakes Objection**");
- Nestlé Dreyer's Ice Cream Company [D.I. 1392] ("**Nestlé**" and, the objection, the "**Nestlé Objection**")
- Videojet Technologies Inc. [D.I. 1393] ("**Videojet**" and, the objection, the "**Videojet Objection**");
- Bradley Arant Boult Cummings LLP [D.I. 1397] ("**Bradley**" and, the objection, the "**Bradley Objection**");
- The Stop & Shop Supermarket Company LLC and Food Lion LLC [D.I. 1406] ("**Stop & Shop**" and, the objection, the "**Stop & Shop Objection**");
- Cooperative Regions of Organic Producer Pools [D.I. 1412] ("**CROPP**" and, the objection, the "**CROPP Objection**");
- Maryland and Virginia Milk Producers Cooperative Association, Incorporated [D.I. 1415] ("**MDVA**" and, the objection, the "**MDVA Objection**");

section VI herein.   The Objections broadly relate to either vague concerns about potential antitrust issues that are wholly unfounded and/or not the purview of this Court to decide; complaints about the process from disgruntled would-be bidders who failed to raise them before the March 30 bid deadline, as the Court expressly directed them to do at the prior two hearings; and other parochial concerns that are easily addressed below.

14.     The Debtors have resolved a number of the Objections following communications with the applicable Objectors through revisions to the proposed Sale Orders or other agreement, and hope to resolve others prior to the Sale Hearing.   To the extent any of the Objections remain unresolved at that time, the Debtors respectfully submit that such Objections should be overruled, for the reasons set forth below.

## ARGUMENT

### I.   Selection of the Winning Bids is an Exercise of the Debtors' Sound Business Judgement

15.     Pursuant to section 363(b)(1) of the Bankruptcy Code, a debtor is permitted to "use, sell, or lease, other than in the ordinary course of business, property of the estate."   11 U.S.C. § 363(b)(1).   A debtor may perform any of these actions as long as use, sale, or lease of assets is "supported by an articulated business justification, good business judgment, or sound business reasons."   *Black v. Shor (In re BNP Petroleum Corp.)*, 642 F. App'x 429, 435 (5th Cir. 2016) (*quoting Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010)); *see also*

---

- Local Texas Tax Authorities [D.I. 1418] ("**Local Texas Tax Authorities**" and, the objection, the "**Local Texas Tax Authorities Objection**");
- United States of America [D.I. 1407] ("**United States**" and, the objection, the "**U.S. Objection**");
- California Dairies, Inc. [D.I. 1434] ("**California Dairies**" and, the statement, the "**California Dairies Statement**"); and
- Individual Dairy Farmers etc. Et Al an Unincorporated Group & Associated Motion for Intervention of Right and alternatively Motion for Permissive Intervention [D.I. 1426] ("**Individual Dairy Farmers**" and, the motion, the "**Individual Dairy Farmers Motion**")

(individually as defined above, and collectively, the "**Objectors**" and the "**Objections**").

*Inst'l Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."). A sound business reason for selling assets outside the ordinary course of business may include that a sale is necessary to preserve the value of an estate for the benefit of creditors and interest holders. *See generally Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 772 F.2d 1063, 1070–71 (2d Cir. 1983).

16.     "The business judgment standard in section 363 is flexible and encourages discretion." *ASARCO, Inc., v. Elliott Mgmt. (In re Asarco, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business . . . ."). "Great judicial deference is given to the [debtor's] exercise of business judgment." *GBL Holding Co. v. Blackburn/Travis/Cole, Ltd. (In re State Park Building Grp., Ltd.)*, 331 B.R. 251, 254 (N.D. Tex. 2005). "As long as [the sale] appears to enhance a debtor's estate, court approval of a [debtor's] decision to [sell] should only be withheld if the [debtor's] judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code." *Id.* at 255 (*quoting Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985)).

17.     As detailed below and is supported by the Sale Declarations, the Debtors and their advisors, in consultation with the Consultation Parties, exercised sound business judgement in evaluating the bids and designating the Winning Bids.

A.     **The Marketing and Sale Process was Fair, Transparent, and Robust**

18.     The Debtors conducted an extensive strategic review beginning in early 2019, and identified key potential buyers of the Debtors' assets during this review.  Discussions with DFA about a potential sale of substantially all of the Debtors' assets began prior to the Petition Date, and a robust marketing process involving a large number of parties continued through the Chapter 11 Cases up through the bidding process.  *See* Magro Decl. ¶¶ 12, 14, 16.  As discussed in the Sale Motion and in the Magro Sale Motion Declaration filed in support thereof, the Debtors and Evercore began as early as February 2019 to seek a feasible out-of-court path forward for the Debtors.  *See* Magro Sale Mot. Decl. ¶ 89.  The avenues they considered included, but were not limited to, the following: sale of the enterprise; strategic business combinations; the disposition of certain assets; and the formation of new joint ventures.  *Id.*  It was eventually determined that none of these options could be pursued for a variety of reasons, including, among others, the potential contingent liabilities that the Debtors face relating to the underfunded status of certain multi-employer pension plans in which they participate. *Id.* at ¶8.  Accordingly, Evercore explored potential out-of-court financing transactions, which led to discussions with a number of potential lenders, including certain holders of the Debtors' prepetition senior unsecured notes.  *Id.* at ¶ 9.  Ultimately, the Debtors commenced the Chapter 11 Cases in order to manage liquidity and pursue one or more sale transactions or a plan of reorganization through a court-supervised process.  *Id.*

19.     Discussions had begun prior to the Petition Date such that the Debtors were able to identify DFA publicly as a potential stalking horse bidder at the first-day hearing in the Chapter 11 Cases.  *See id.* ¶ 11.  The Debtors believed that it was important to demonstrate to customers and employees from the outset that a stable and prompt exit from chapter 11 was achievable in the face of an increasingly challenging competitive environment.  Nonetheless,

even before withdrawing the request for the stalking horse appointment, the Debtors and their advisors aggressively pursued all alternative potential value-maximizing outcomes.  Over the course of the Chapter 11 Cases—through the Bid Deadline— Evercore communicated with 186 entities, ranging from potential strategic buyers (93, including 54 regional dairy companies) to potential financial buyers (93, including 50 real estate investors).  *See* Magro Decl. ¶ 11.  To encourage these potential bidders, Evercore and the Debtors' management facilitated exhaustive diligence efforts.  105 of these potential bidder entities executed non-disclosure agreements and all these parties accessed virtual data rooms managed by Evercore containing confidential information about the bid assets.  1,052 total diligence questions were closed during this process, of which 471 came from regional buyers and 190 from strategic or financial buyers other than DFA.

20.     In addition to providing diligence through the data rooms and in response to direct requests, Evercore and the Debtors held 60 plant tours.  Notably, even as site visits became increasingly difficult and risky in the face of the COVID-19 crisis, and even as potential bidders were themselves cancelling visits, the Debtors' plant staff continued to offer tours with safety protocols as long as possible by capping the number of attendees and the length of the tours, and limiting attendees to those not coming from particularly risky locations such as Seattle and New York.  As in-person tours became impossible, the Debtors facilitated 24 calls with plant management to support the potential bidders' diligence to the greatest degree possible.

21.     The Debtors have also consistently and meaningfully engaged with their major stakeholders, including the Committee, the DIP Agent, and the Ad Hoc Group, from a very early stage in the Chapter 11 Cases with respect to the sale and marketing process.  The Debtors' advisors held weekly calls with the Committee's advisors and the DIP Agent's advisors updating

-11-

them on the sale and marketing process, have regularly sent, since early December, to the Committee's advisors and the DIP Agent's advisors updated "Buyer Trackers" depicting all the potential parties that the Debtors' advisors have contacted regarding a sale of the Debtors' assets and the level of engagement that the Debtors' advisors have received from them, and have worked collaboratively to engage the Committee's advisors in the outreach to potential bidders. Those Committee calls increased to a daily frequency over the last two weeks as the Bid Deadline neared.

22.     The Debtors also provided virtual data room access to the advisors of the Committee as early as December 7, 2019, and the advisors of the Ad Hoc Group as early as October 27, 2019.  The Debtors have populated those data rooms with tens of thousands of documents, and have continued to add thousands more over the recent weeks in response to continuing diligence requests.  These documents included appraisals, tax materials, support for corporate real estate values, severance costs, and more.  *See generally* Magro Decl. ¶¶ 10–12.

23.     Following the March 19 Hearing, the Debtors advisors continued their round-the-clock efforts to support the diligence efforts of all potential bidders, holding near daily status and diligence calls with the advisors and consultants to just the Ad Hoc Group, in addition to many other regional bidders.

24.     Only one party—California Dairies—raised any issues with respect to diligence in their filings.  Notably, while their filing is styled a "Statement and Joinder" to another objection, California Dairies makes a point of recognizing the "general economic position of the Debtors and the urgency with which the estates' assets must be liquidated and monetized" to explain why they do not appear to independently request that the Sale Transactions be denied.  California Dairies Statement ¶ 3.  For these reasons, California Dairies filed a "[s]tatement in lieu of an

objection to the sale." *Id.* ¶ 5.  The Debtors disagree with the characterization of the exchanges over diligence requests in the statement, and, as they advised California Dairies repeatedly, many of the requested contracts and vendor details were negotiated and applicable only on a national level and simply not relevant to regional purchasers (like California Dairies, which bid on the two Debtor facilities in Southern California).  *See* Magro Decl. ¶ 13.  Certain competitively sensitive documents and data relevant only to the Debtors' national business were not made available to potential bidders with interest in only regional assets, as such documents would not have been relevant to diligencing or formulating a bid for the purchase of such assets. Ultimately, as California Dairies acknowledges, the Debtors worked with California Dairies to provide much of this information by using a Clean Team Agreement.  *Id.*  More importantly, the Court has repeatedly directed parties to seek assistance from the Court if they thought necessary to receive diligence information.[6]  *Id.*  It is disingenuous to present such complaints now if these requests truly hindered their diligence and bidding plans.  In fact, the Debtors received a bid with a higher price than California Dairies for only one of the two facilities that California Dairies bid on, and this party requested significantly less confidential information and completed its diligence in a significantly shorter time period than California Dairies.  *Id.*

25.     Additionally, some of the Objectors level various complaints regarding the sale process, especially with respect to the shortened timeline.[7]  Although the originally proposed timeline was more typical of precedent for a company of this size and character, the challenges facing the Debtors are without precedent and require a more accelerated approach.  In the face of

---

[6] *See* Nov. 13, Hrg. Tr. 51:11-52:2; Mar. 19, Hrg. Tr. 15:7–11 ("[i]f you feel like you need to [seek the assistance of the Court with respect to diligence] please do it on an emergency basis, and before you file it if you would call and get a hearing and time, then that way we can get that out and we can get everybody on the phone and work through it.")

[7] Because the vast majority of these objections are with respect to assumption issues, these objections are not currently applicable due to the Debtors' extension of that process and objection deadline.

this once-in-a-century global crisis with nearly 30% of the Debtors' operating margin coming from schools and foodservice, substantially all of which has been shut down for an indeterminate period of time, the Debtors are in a race against the clock to resolve their Chapter 11 cases.  The Debtors' liquidity can be measured in a matter of weeks rather than months.  Additionally, the asset purchase agreements of the Winning Bids requires the Debtors' successful completion of a process of negotiation in accordance with sections 1113 and 1114 of the Bankruptcy Code leading to modifications to certain CBAs and retiree benefits.   If such modifications cannot be achieved consensually, they will be the subject of a motion by the Debtors under sections 1113 and 1114 of the Bankruptcy Code, which will need to be filed, litigated, and adjudicated quickly, given the timelines for the Sale Transactions.

26.     Most importantly, the timing complaints were already litigated before the Court at the March 12 Hearing.  The Court opened the floor to any and all parties-in-interest, expressly "mak[ing] the circle" around the room repeatedly to invite comment from counsel to address any concerns or questions they had about the timeline and sale process.[8]  The hearing was then adjourned until March 19, 2020.  The Debtors formally proposed the timeline as discussed through their filing of a *Notice of Modified Bidding Procedures and Supplemental Reply* [D.I. 1167] on the afternoon of March 18, 2020, and with 125 parties dialed into a (largely telephonic) hearing,[9] the Court again asked explicitly for any objections.  None were raised beyond limited reservations of rights.[10]  Parties had two hearings and an entire week to comment or file further

---

[8] Mar. 12, Hr'g Tr. 39-7:21, 81:5-8, 95:1-15, 98:8-99:15, 111:24-112:4, 121:9-23.

[9] Mar. 19 Hr'g Tr. 5:20.

[10] Mar. 19, Hrg. Tr. 9:18-22 ("Let me ask, I've had the opportunity to review the revised order as well as the revised procedures attached to the revised order. Is there any party that has an objection to the proposed order and/or procedures as revised? (No audible response.)").

objections or reservations of rights, but except for the Ad Hoc Group, no party even requested to reserve their rights to seek a further extension.

27.     Accordingly, the Sale Process, even as shortened from the original proposal, was fair, appropriate, and necessary in light of the unprecedented circumstances facing the Debtors and the world today, and all interested parties had several opportunities to be heard if they disagreed.  Incredibly, in the face of a global pandemic, the Debtors still received a total of 44 bids and 35 Qualified Bids.

### B.     The Sale Transactions are the Best Transactions Available

28.     The Sale Transactions are the best available transactions for the Debtors and their estates.  In the context of section 363(b) of the Bankruptcy Code, a debtor must "demonstrate that the proposed sale price is the highest and best offer, though a bankruptcy court may accept a lower bid in the presence of sound business reasons."  *Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010).  "In determining whether the highest bid is the 'best bid,' the fiduciary and reviewing court must consider factors such as 'the risks associated with each bid and the probabilities that the proposed terms will come to fruition' as well as 'contingencies, conditions, timing, or other uncertainties in an offer that may render it less appealing."  *In re Tresha-Mob*, *LLC*, No. 18-52420-RBK, 2019 Bankr. LEXIS 1333, at *5 (Bankr. W.D. Tex. Apr. 3, 2019) (internal citation omitted).

29.     Prior to the Bid Deadline, the Debtors anticipated evaluating three primary potential bid outcomes: (a) a complete piecemeal sale on a plant-by-plant or region-by-region basis, (b) a combination of DFA for a substantial portion of all assets and other regional or individual plant bidders for the remainder, and (c) the Ad Hoc Group plan transaction.  In the end—in part because the Ad Hoc Group did not actually submit a bid—the choice was straightforward.  The Debtors, in consultation with their advisors and in their sound business

judgment, have determined that the Winning Bids taken as a package, clearly comprise not only the highest total dollar value, but also the best available option when weighing committed financing, documentation, timing, and execution risk, among other factors.

i.     The Sale Prices are Fair and Reasonable

30.     As discussed above, the Sales are the culmination of a rigorous marketing process pursued over several months and conducted pursuant to the timeline and procedures approved by the Court and not subject to a single objection at the March 19, 2020 hearing.  The Winning Bids represent the best prices available in the market from executable, reliable bids, and no combination of bids received aggregated to a higher dollar value for the Debtors' estates.  *See* Magro Decl. ¶¶ 17, 20–21.  As the Court has observed, all parties have had a fair and reasonable chance to put their best foot forward and confirm the best price available for the Debtors' assets.

ii.     The Winning Bids Have the Fewest Contingencies and Lowest Execution Risk

31.     The Debtors' advisors evaluated each bidder for financial wherewithal, finality of documentation, conditionality and contingency risk, and level of consistent or serious interest demonstrated during the diligence and bidding stages.  The Winning Bids clearly represented the lowest overall execution risk as a package.   Importantly, DFA substantially reduced the contingencies as compared to its proposed stalking horse APA, including, for example with respect to strengthening their regulatory undertaking to take specified actions, based on feedback from the DOJ, needed to obtain antitrust approvals, and removing termination rights relating to milestones and defaults under the DIP.  *See* Magro Decl. ¶ 19.

32.     First and foremost, the Buyers represent a total of 7 proposed sale transactions, whereas the hypothetical piecemeal scenario would entail 14 sale transactions, many of which have been identified as including greater contingencies or uncertainties than the Winning Bids.

Each additional transaction by definition adds incremental risk of failure to close financing, finalize and execute all relevant documentation, receive all necessary regulatory approvals, or otherwise proceed to closing and consummation of the transactions in a timely fashion.  As noted above, the Ad Hoc Group has not submitted a bid package.

33.     MDVA, California Dairies—each a regional bidder that was not selected as a Winning Bidder—, and Stop & Shop, have revived their critique of the DFA Sale Transaction with respect to antitrust risk.  As confirmed at the March 12, 2020 Hearing, this transaction has received the attention at the very highest levels of the Antitrust Division of the Department of Justice ("**DOJ**").  Counsel for DFA will be prepared to address the status of discussions with the DOJ at the hearing.  The Debtors are confident that the DFA Sale Transaction is lawful and there are remedies available to address any antitrust concerns about the deal.[11]

34.     To the extent the Objectors directly allege that Sale Transactions are anticompetitive rather than opine on the execution risk posed by DOJ review, that question is simply not relevant for purposes of these proceedings and not a question appropriate to raise before the Court here.  If these Objectors or any other private party wishes to bring suit at a later date pursuant to their private right of action under any law, that is their prerogative, but does not present a closing obstacle to the Sale Transactions today.   Notably, none of the objectors affirmatively even state that they intend to bring such suits.

---

[11] A group calling itself "Individual Group of Farmers and Dairy Farmers" has filed a motion to intervene seeking to be heard with respect to the Sale Transactions.  As a threshold matter, the Individual Dairy Farmers Motion was unnecessary given that all parties-in-interest have the right to be heard at the hearing.  *See* 11 U.S.C. § 1109.  The substance of the Individual Dairy Farmers Motion fares no better, essentially repeating the same antitrust concerns that other parties have expressed.  While the Debtors have no objection to this party's right to be heard, to the extent the Individual Dairy Farmers Motion is also an objection it should be overruled for the reasons set forth in herein.

35.     It is clear that these objections are primarily sour grapes by Objectors selected as an Alternative Bidder and as discussed further in the next section, this is not a proper grounds for objection.

C.     **Competing Bidders Do Not Have Standing to Object to the Sale Transactions**

36.     To the extent MDVA and California Dairies object to the Sale Transaction on the grounds that their bids represented better offers than the winning Bids, such objections should be granted little credence.  Numerous courts have held that a potential alternative bidder or an unsuccessful bidder does not have the standing to object to a sale in a chapter 11 case.  *In re Quanalyze Oil & Gas Corp.*, 250 B.R. 83, 89 (Bankr. W.D. Tex. 2000) ("[a] competing bidder normally lacks standing to even challenge a sale, much less seek reconsideration of an order approving sale"); *Kabro Assocs. of West Islip,, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269 (2d Cir. 1997) (noting that an unsuccessful bidder, whose only pecuniary loss is the speculative profit it might have made had it succeeded in purchasing property at an auction, lacks standing to challenge a bankruptcy court's approval of a sale transaction); *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 531 (3d. Cir. 1999) (noting that creditors usually have standing to challenge a bankruptcy sale, but disappointed prospective purchasers do not); *In re Gulf States Steel, Inc. of Ala. (In re Gulf States Steel)*, 285 B.R. 739, 742–43 (Bankr. N.D. Ala. 2002) (agreeing that a competing bidder lacks standing to challenge a sale); *In re Condere Corp.*, 228 B.R. 615, 624 (Bankr. S.D. Miss. 1998) (same).

II.     **The Winning Bidders Are Good Faith Purchasers**

37.     Section 363(m) of the Bankruptcy Code "protects, from later modification on appeal, an authorized sale where the purchaser acted in good faith and the sale was not stayed

-18-

pending appeal." *Newco Energy v. Energytec, Inc. (In re Energytec, Inc).,* 739 F.3d 215, 218–19 (5th Cir. 2013) (internal citations omitted).

38.     Courts in the Fifth Circuit and elsewhere have defined a "good faith purchaser" as "one who purchases the assets for value, in good faith, and without notice of adverse claims," but also have held that "the misconduct that would destroy a purchaser's good faith status… involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of the other bidders." *O'Dwyer v. O'Dwyer* (*In re O'Dwyer*)*,* 611 F. Appx. 195, 200 (5th Cir. 2015) (per curiam) (citing *TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.),* 764 F.3d 512, 521 (5th Cir. 2014) (citing *Hardage v. Herring Nat'l Bank,* 837 F.2d 1319, 1323 (5th Cir. 1988)); *see also SEC v. Janvey,* 404 F. Appx. 912, 916 (5th Cir. 2010) (applying the "good faith" standard set forth in *Hardage*); *In re Butan Valley, N.V.,* 2009 WL 2407967 at 2 (S.D. Tex. 2009) (a finding of a good faith purchaser may be supported if "the sale price was not controlled by an agreement among potential bidders.") (citing the bankruptcy court sale order).

39.     Bankruptcy Courts in this District have held that a buyer was a good faith purchaser for purposes of section 363(m) where the buyer participated in the auction for the purchase of the assets in good faith, without collusion and at arms' length. *In re Amidee Capital Grp., Inc*., No. 10-20041, 2010 WL 5141278 at *3 (Bankr. S.D. Tex. Oct. 12, 2010); *In re Asbury/Memorial, LP*, No. 10-34387, 2010 WL 5301247 at *2 (Bankr. S.D. Tex. June 22, 2010) (same).  In addition, a challenge to a good faith purchaser without evidence or any factual basis is not enough to overturn a judgment of a good faith purchase by the Bankruptcy Court.  *See In re Butan Valley, N.V.,* 2009 WL 2407967, at *2.

40. Here, the Successful Bidders are all good faith buyers for purposes of Section 363(m), and no party has claimed otherwise. The Sale Process and the proposed Sale Transactions involve no misconduct, fraud, collusion, or any attempts to take unfair advantage of other bidders, and the Buyers are all good faith, arms' length purchasers. As noted above, bids were submitted after an extensive marketing and diligence period, during which Evercore solicited any potential interest from 186 parties. *See* Magro Decl. ¶ 11. All potential bidders have been consistently noticed of updates to the case and sale timeline and provided every opportunity to conduct diligence in the form of review of relevant documents, on-the-ground plant tours, and, when plant tours no longer became safe or feasible, conference calls directly with plant management. All potential parties were invited to concurrently put their best foot forward without early access or knowledge of any other party's bid, and all bids were published publicly following selection of the Winning Bids.

### III.    A "Free and Clear" Sale is Warranted and Should be Approved

41. Section 363(f) of the Bankruptcy Code provides that a debtor may sell assets free and clear of liens, claims, and other encumbrances or interests of an entity if (1) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f).

42. Importantly, the foregoing requirements are written in disjunctive and the Debtors only need to satisfy one of the five conditions to invoke section 363(f). *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) (finding that section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the

conditions of section 363(f) have been met); *In re Elliot*, 94 B.R, 343, 345 (E.D. Pa. 1988) (same); *In re Dundee Equity Corp.*, Bankr. No. 89–B–10233, 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) (same).  This burden is easily met.  Of the five conditions justifying a sale free and clear of any interest under section 363(f), at least two—section 363(f)(3) and section (f)(5)—are satisfied here.

43.     Only one party— CentiMark—objects to the Sale Transactions on the grounds that the Debtors "have not shown that the sale price exceeds the aggregate face value of all liens in order to confirm that all lienholders will be paid in full."  *See* CentiMark Objection ¶ 8. CentiMark is a creditor on account of commercial roofing jobs, and certain of CentiMark's prepetition claims are allegedly secured by statutory liens attached to the respective Debtors' real property pursuant to relevant state law.  *See id.*  ¶¶ 2-4.  CentiMark purports to have a lien on certain real property of Dean Dairy Holdings, LLC situated in Orange County, Florida for the unpaid amount of $113,000 and of Suiza Dairy Group, LLC, situated in Davidson County, Tennessee for the unpaid amount of $172,662.  *Id.* ¶ 6.  CentiMark's objection should be overruled on three grounds: (a) the Sale Orders provide for the preservation of any liens in the same priority and scope as applied to the assets being sold, (b) such a showing is not necessary under the majority reading of section 363(f)(3) of the Bankruptcy Code, and (c) the Debtors are also permitted to sell the property free and clear of CentiMark's claims pursuant to Section 365(f)(5) of the Bankruptcy Code.

###     A.     The Sale Transaction Satisfies Section 363(f)(5)

44.     The Debtors submit that they may sell their assets free and clear of any interests, liens, claims, or encumbrances under section 363(f)(5) because "such entit[ies] could be compelled, in a legal or equitable proceeding, to accept money satisfaction of such interests."  11 U.S.C. § 363(f)(5).  Courts generally interpret the phrase "could be compelled" under section

363(f)(5) broadly to require only that the interest in question be subject to money satisfaction on a hypothetical basis, even if no such proceeding has been actually initiated.  *See In re Love*, 553 B.R. 54, 59 (Bankr. S.C. 2016) (courts generally interpret the phrase "could be compelled" to contemplate a hypothetical proceeding that is "legally possible."); *In re Gulf States Steel)*, 285 B.R. at 508 (Bankr. N.D. Ala. 2002) (the phrase "could be compelled" only requires showing that a mechanism exists whereby a lien or interest could be extinguished); *In re P.K.R. Convalescent Centers, Inc.*, 189 B.R. 90 (Bankr. E.D. Va. 1995) (allowing the sale of nursing home assets under § 363(f)(5) over objection where interest was reducible to a claim and subject to a hypothetical money satisfaction); *In re Healthco Int'l, Inc.*, 174 B.R. 174, 176 (Bankr. D. Mass. 1994) (holding that section 363(f)(5) "requires only that the interest in question be subject to final satisfaction on a hypothetical basis, not that there be an actual payment in satisfaction of the interest from the proceeds of the sale in question.").  Section 363(f)(5) is satisfied even if such interest cannot be paid in full, so long as a mechanism exists to extinguish the liens even only for partial payment.  *See In re Gulf States Steel*, 285 B.R. at 508 (noting that "[s]ection 363(f)(5) does not require that the sale price for the [assets] must exceed the value of the interest, but rather, only that the mechanism exists to address extinguishing the lien or interest without paying such interest in full."); *In re Grand Slam U.S.A., Inc. (In re Grand Slam)*, 178 B.R. 460, 462 (E.D. Mich. 1995) ("it is clear that [s]ection 363(f)(5) allows trustees of an estate to sell property free and clear of liens when 'a legal or equitable proceeding' exists that will force the lien holder to accept less than full money satisfaction of their interest."); *In re Terrace Chalet Apartments, Ltd.*, 159 B.R. 821, 829 (N.D. Ill. 1993) ("[b]y its express terms, [s]ection 363(f)(5) permits lien extinguishment if the trustee can demonstrate the existence of another legal mechanism by which a lien could be extinguished without full satisfaction of the secured debt.").

45.     Section 363(f)(5) is satisfied where nonbankruptcy law, such as state law, provides for a legal or equitable proceeding by which a creditor could be compelled to accept money satisfaction of its interest.  Courts have routinely found that foreclosure, receiver, and similar proceedings satisfy the section 363(f)(5) requirement.  *See, e.g.*, *In re Boston Generating, LLC*, 440 B.R. 302, 333 n.29 (S.D.N.Y. 2010) (noting that section 363(f)(5) is satisfied where "[u]nder New York law, a junior lienholder (either in a foreclosure of real property or of collateral under the Uniform Commercial Code) is entitled to nothing more than the surplus cash generated in a sale."); *In re Johan, Inc.*, 403 B.R. 866, 869–70 (Bankr. W.D. Wash. 2009) (holding that a Washington state statute authorizing a receiver to sell estate property free and clear of liens satisfied section 363(f)(5) with the liens attaching to the proceeds notwithstanding that those proceeds may be insufficient to pay all liens); *In re Gulf States Steel*, 285 B.R. at 508–09 (authorizing sale where Alabama law provides that junior lienholders can be "compelled as a matter of law to release [their liens] in a judicial or non-judicial foreclosure of the senior liens").

46.     Several proceedings exist under Florida law in which the lienholders could be compelled to accept money satisfaction of their interest.  Under sections 679.608, 679.615, and 679.617 of the Florida Statutes, a secured party's foreclosure and disposition of collateral after default discharges any subordinate security interest or other subordinate lien, and the secured party must pay the excess cash proceeds to satisfy obligations secured by subordinate security interests.[12]  Additionally, under section 713.24(1) of the Florida Statutes, any person with an interest in the property or in the contract under which a construction lien is claimed may, by filing a bond or cash deposit, transfer the lien to such bond or cash deposit.[13]

---

[12] FLA. STAT. §§ 679.608(1)(a)(3), 679.615(1)(c), 679.617(1)(c).

[13] FLA. STAT. § 713.24(1).

47.     Similar state statutes exist under Tennessee law.  Under sections 47-9-608, 47-9-615, and 47-9-617 of the Tennessee Code, a secured party's foreclosure and disposition of collateral after default discharges any subordinate security interest or other subordinate lien and the security party shall pay the excess cash proceeds to satisfy obligations secured by subordinate security interests.[14]  Additionally, under section 66-11-142 of the Tennessee Code, any person may record a bond to indemnify against a mechanic's lien, and once this is done, a claim to enforce the lien must be brought on the bond.[15]  Since the applicable state statutes in the various states provides for legal or equitable proceedings that could compel money satisfaction of the interests, a free and clear sale is warranted under section 363(f)(5).

48.     The majority of courts that have opined on the issue have found that the availability of a hypothetical "cramdown" pursuant to section 1129(b)(2)(A) of the Bankruptcy Code satisfies section 363(f)(5), even where the sale was not under a plan or there otherwise was no such cramdown, and no courts in the Fifth Circuit have held otherwise.  *In re Inv. Co. of the Sw., Inc.*, 302 B.R. 112 (B.A.P. 10th Cir., 2003) (recognizing chapter 11 cramdown provision as a legal or equitable proceeding under section 363(f)(5), citing Collier's bankruptcy treatise); *In re Grand Slam*, 178 B.R. at 464 (noting that a legal proceeding that forces the lienholder to accept a money satisfaction of such interest, as is in the "cram down" provision of section 1129(b)(2)(A), satisfies section 363(f)(5)); *In re Healthco Int'l, Inc.*, 174 B.R. at 176 ("such a 'cramdown' proceeding complies with the description of proceedings referred to in subparagraph (f)(5), and many courts have so held."); *In re Terrace Chalet Apartments, Ltd.*, 159 B.R. at 829

---

[14] TENN. CODE ANN. §§ 47-9-608(a)(1)(C), 47-9-615(a)(3), 47-9-617(a)(3).

[15] *See* TENN. CODE ANN. §§ 66-11-126(5)(A), 66-11-142(1).

(noting that "the clear statutory language [of section 363(f)(5)] suggests a [s]ection 1129(b)(2) cram down.").

49.     In addition, section 724(b) of the Bankruptcy Code, provides for the subordination of certain tax liens to administrative expenses.  Section 724(b) does not only dictate the priority of distribution, but also create a mechanism by which tax lien creditors are compelled to receive less than full payment for their interest.  *In re Grand Slam*, 178 B.R. at 461–64 (reversing a bankruptcy court decision that section 724(b) comes into play for distribution purposes only after a sale qualifies under section 363(f)(5) and holding that section 724(b) provides for a proceeding contemplated under section 363(f)(5)).  In conjunction with section 365(f)(5), section 724(b) provides another basis for approving the free and clear sale of encumbered property over a tax lien creditor's objection, and many courts have so held; *In re Gulf States Steel*, 285 B.R. at 509 (comparing section 724(b) to cramdown and holding that section 724(b) is likewise a basis for approving a free and clear sale); *In re Oglesby*, 196 B.R. 938, 944 (Bankr. E.D. Va. 1996) ("cases have held that both a 'cram down' as allowed in a chapter 11 case and a subordination of tax liens pursuant to § 724(b) in a chapter 7 case are 'legal and equitable' proceedings which may be invoked under § 363(f)(5) to authorize [a] sale free of a lien."); *In re Healthco Intern., Inc.*, 174 B.R. at 177 (relying on section 724(b) to authorize a sale free and clear of tax lien creditors' liens under section 363(f)(5)).  Accordingly, to the extent any of the Debtors' assets are encumbered by tax liens, such assets can be sold free and clear of such liens under section 363(f)(5) because section 724(b)(2) could otherwise be used to compel a money satisfaction in the form of less than the full amount of their claim through subordination to administrative claim.

50.     Because both applicable state law and the Bankruptcy Code establish proceedings in which the Lienholders could be compelled to accepted a money satisfaction of their interests, section 363(f)(5) is satisfied.  Accordingly, a free and clear sale is warranted.

**B.      The Sale Transaction Satisfies Section 363(f)(3)**

51.     Section 363(f)(3) provides additional grounds for approval of the Sale Transactions free and clear.  Section 363(f)(3) permits a sale free and clear of any interest if "such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property."  11 U.S.C. § 363(f)(3).  Although there is a split in authority regarding the meaning of the phrase "aggregate value of all such liens," the majority of courts, including at least one court in this Circuit, have adopted the economic value approach and held that "value" as used in section 363(f)(3) refers to the actual value of the lien, *i.e.*, the value of the collateral securing the lien.[16]  *In re Terrace Gardens Park Partn.*, 96 B.R. 707 (Bankr. W.D. Tex. 1989) (holding that the sale price need only exceed the value of the property); *In re Boston Generating, LLC*, 440 B.R. at 332  (referencing section 506(a) and holding that "value" in section 363(f)(3) means actual economic value of liens, not face amount of liens); *In re Beker Indus. Corp.*, 63 B.R. 474, 476-77 (Bankr. S.D.N.Y. 1986) (same); *In re Collins*, 180 B.R. 447, 450-01 (Bankr. E.D. Va. 1995) (same); *Milford Grp., Inc. v. Concrete Step Units, Inc. (In re Milford Grp., Inc.)*, 150 B.R. 904, 906 (Bankr. M.D. Pa. 1992) (same); *see also 3 Collier on Bankruptcy*, ¶363.06[4] (16th ed. 2020) (noting that the economic value approach is the prevailing view, especially in chapter 11 cases where a sale free and clear of liens, even

---

[16] Although some courts adopt the "face value approach" whereby section 363(f)(3) is only satisfied if the sale price is greater than the total amount of claims secured by liens, these cases rely on a hyper-technical and highly implausible interpretation of a "less than perfect statutory provision."  *In re Boston Generating*, *LLC,* 440 B.R. at 332 ("[I]t is hard to imagine that Congress intended to so limit a debtor's power to dispose of encumbered assets, particularly where such disposition otherwise satisfies the requirements of section 363(b)."). Additionally, the face value approach "ignores the Code's focus on protecting the value of collateral, thereby allowing an unsecured creditor to obstinately block an otherwise sensible sale." *In re Terrace Gardens Park Partn.* 96 B.R. at 712.

undersecured liens, is often required as a practical matter to permit the sale of business as a going concern).

52.     As described above, the Debtors have run a thorough sale process and believe that the successful bid represents the best value available for their asset that has been tested by the market.   *See generally* Magro Decl.   The Debtors submit that the value of their assets is not greater than the Sale Price.   Thus, section 363(f)(3) is satisfied and a free and clear sale is warranted.

IV.   **All Objections Should be Overruled**

53.   Each of the Objections is listed and addressed in the summary chart below.  The Debtors respectfully submit that all of

the Objections should be overruled for the reasons set forth below:

| No. | Issues | Objecting Parties and Objections | Reply |
|---|---|---|---|
| 1. | Antitrust concerns | **Stop & Shop Supermarket and Food Lion LLC** [D.I. 1406]<br><br>• DFA has huge market power in the dairy industry, and its acquisition of the Debtors' assets raises antitrust concerns and may destroy competition.  Stop & Shop Objection ¶ 4.<br><br>• The Retailer objectors have concerns that there will be a monopoly for raw milk and unreasonable restraint of trade in violation of antitrust laws.  Stop & Shop Objection ¶¶ 4, 6.<br><br>• The sale to DFA is a violation of Section 7 of the Clayton Act. Stop & Shop Objection ¶ 7.<br><br>• The Retailer objectors have a private of action pursuant to Section 16 of the Clayton Act. Stop & Shop Objection ¶ 8.<br><br>**Maryland and Virginia Milk Producers** [D.I. 1415][17]<br><br>• The sale to DFA presents significant antitrust closing risk, which will cause significant harm to MDVA and other milk producers in the U.S. MDVA Objection ¶¶ 22-24.<br><br>• The sale to DFA is a violation of Section 7 of the Clayton Act. MDVA Objection ¶ 22. | • The Debtors believe that steps being taken currently between DFA and the DOJ should be sufficient to resolve any remaining antitrust concerns. *See* section I(B)(ii) herein.<br><br><br>• The Debtors have proposed additional language to Sale Orders in an effort to address these concerns.<br><br><br>• The Debtors believe that steps being taken currently between DFA and the DOJ should be sufficient to resolve any remaining antitrust concerns. *See* section I(B)(ii) herein.<br><br>• Objections from the posture of an |

---

[17] California Dairies joins the MDVA Objection.  California Dairies Statement ¶ 18.

| | | | unsuccessful bidder should not be given credence. *See* section I(C) herein. |
|---|---|---|---|
| | | • MDVA retains certain private rights of action under applicable antitrust law. MDVA Objection ¶¶ 39 and 43.<br><br>**Individual Dairy Farmers** [D.I. 1426] | • The Debtors have proposed additional language to Sale Orders in an effort to address these concerns.<br><br>• *See* footnote 11 herein. |
| 2. | The sale process has been problematic | **California Dairies, Inc.** [D.I. 1434]<br><br>• Key diligence items were not provided during the sale process including vendor information, stand-alone costs, and intercompany purchase details. California Dairies Statement ¶ 13.<br><br>• Debtors did not aggressively market their assets to California Dairies. California Dairies Statement ¶ 17. | • The Debtors disagree with the characterization of the exchanges over diligence requests in the statement, and, as they advised California Dairies repeatedly, many of the requested contracts and vendor details were negotiated and applicable only on a national level and simply not relevant to regional purchasers (like California Dairies, which bid on the two Debtor facilities in Southern California). Certain competitively sensitive documents and data relevant only to the Debtors' national business were not made available to potential bidders with interest in only regional assets, as such documents would not have been relevant to diligencing or formulating a bid for the purchase of such assets. Ultimately, as California Dairies acknowledges, the Debtors worked with California Dairies to provide much of this information by using a Clean Team Agreement. *See* section I(A) herein. |

| | | **Maryland and Virginia Milk Producers** [D.I. 1415] | |
|---|---|---|---|
| | | • The underlying sale process disadvantaged regional bidders. MDVA Statement ¶ 42. | • The marketing and sale process was fair, transparent, and robust. See section I(A) herein.<br>• Objections from the posture of an unsuccessful bidder should not be given credence. *See* section I(C) herein. |
| 3. | The Winning Bids are not the highest or best offers | **Maryland and Virginia Milk Producers** [D.I. 1415]<br><br>• DFA was not the "highest and best offer" given the large potential for antitrust risk and litigation costs following the sale. MDVA Objection ¶ 33, 39.<br><br>• MDVA's offer is all cash and therefore has less contingency. MDVA Objection ¶¶40-41. | • The Winning Bids collectively represent the highest dollar value and lowest execution risk as a package for the Debtors' estates. *See* section I(B)(ii).<br><br>• Objections from the posture of an unsuccessful bidder should not be given credence. *See* section I(C) herein. |
| 4. | The proposed sale involves impermissible free and clear sale of property | **Nestle Dreyer's Ice Cream Company** [D.I. 1392]<br><br>• Nestle objects to the Motion and Sale Orders to the extent that, if the Transition Agreement is assumed and assigned, it extinguishes Nestle's right of setoff; and negates the obligations under the Transition Agreement to enter into the New Distribution Agreements. Nestle Objection ¶¶ 12-13.<br><br>**Siemens Financial Services, Inc.** [D.I. 1234]<br><br>• To the extent the Debtors are seeking to sell their lease free and | • Assumption and assignment issues are no longer before the Court at the Sale Hearing pursuant to the *Notice Regarding Proposed Assumption and Assignment of Executory Contracts or Unexpired Leases and Cure Costs* [D.I. 1436] and proposed changes to the Sale Orders to remove all references thereto should resolve this concern.<br><br>• Assumption and assignment issues are no |

| | | | |
|---|---|---|---|
| | | clear of SFS' liens, SFS is entitled to payment in full of the SFS Lease Property Value.  SFS Objection ¶ 12. | longer before the Court at the Sale Hearing pursuant to the *Notice Regarding Proposed Assumption and Assignment of Executory Contracts or Unexpired Leases and Cure Costs* [D.I. 1436] and proposed changes to the Sale Orders to remove all references thereto should resolve this concern. |
| | | **CentiMark Corporation** [D.I. 1342]<br><br>• CentiMark requests that an escrow be established from the sale proceeds in an amount sufficient to pay CentiMark's secured claims against its secured property in full, pending further proceedings and a Court order.  CentiMark Objection ¶ 7. | • Assets may be sold free and clear of such interests pursuant to section 363(f) of the Bankruptcy Code without establishment of an escrow account.  *See* section III herein. |
| | | **Bradley Arant Boult Cummings LLP** [D.I. 1397]<br><br>• Bradley objects to the sale to the extent the Debtors seek to sell the causes of action set forth in the Litigation free and clear of Bradley's contingency fee interest.  Bradley Objection ¶¶9-11. | • Given the limited information provided in the Bradley Objection as to the nature of its claim and purported interest, the Debtors have incorporated language in the Sale Order that defers this issue to a further hearing. |
| 5. | The proposed sale involves impermissible transfer of property | **Videojet Technologies Inc.** [D.I. 1393]<br><br>• The Videojet lease equipment is not property of the Debtors' estate and must be excluded from the sale.  Videojet Objection ¶¶ 20-22.<br><br>**Cooperative Regions of Organic Producer Pools** [D.I. 1412]<br><br>• CROPP objects to the sale of Dean's interest in OV Fresh and its designation as a subsidiary as it is a violation of the OV Fresh Operating Agreement.  CROPP Objection ¶¶ 9-10. | • The Debtors have proposed additional language to Sale Orders in an effort to address these concerns.<br><br>• The Debtors have proposed additional language to Sale Orders in an effort to address these concerns. |

| | | | |
|---|---|---|---|
| | | • CROPP does not provide consent for the Debtors to convey all of the OV Fresh equity interest to DFA.  CROPP Objection ¶¶ 28-30.<br><br>**Oracle Credit Corporation and Oracle America, Inc.** [D.I. 1356]<br>• The Oracle Agreements involve the non-exclusive license of copyrighted software that may not be assigned without Oracle's consent.  Oracle Objection §A.<br><br>**Land O'Lakes** [D.I. 1390]<br><br>• Land O' Lakes asserts that the Milk Trust rights under Minnesota State law require payment in full of trust amount on closing.  Land O'Lakes Objection ¶¶ 12-16.<br><br>**Norse Dairy Systems, LLC n/k/a Interbake Foods, LLC** [D.I. 1381]<br><br>• Norse Dairy proposed language for the Sale Order that specifies its equipment to resolve its objection that Norse Dairy's equipment should be excluded from the sale.  Norse Dairy Objection ¶¶ 1, 6. | • The Debtors have proposed additional language to Sale Orders in an effort to address these concerns.<br><br><br>• The Debtors have proposed additional language to Sale Orders in an effort to address these concerns.<br><br><br>• The Debtors have proposed additional language to Sale Orders in an effort to address these concerns. |
| 6. | Taxing concerns | **Texas Taxing Authorities** [D.I. 1249]<br>• The Taxing Authorities do not oppose the sale, so long as the taxes are paid at closing from the proceeds.  The Taxing Authorities attached a proposed language to be added to the Sale Order.  Texas Taxing Authorities Objection ¶¶ 1-4.<br><br>**Certain Texas Taxing Entities (Brazoria County Tax Office)** [D.I. 1377]<br><br>• The Taxing Authorities object to the Sale in that it seeks to sell assets free and clear of the tax liens without providing adequate protection in the form of segregated funds.  Texas Taxing Entities Objection ¶¶ 7-10.<br><br>• The Taxing Authorities request the creation of a segregated account for the sole purpose of paying these claims.  The Taxing | • The Debtors have proposed additional language to Sale Orders in an effort to address these concerns.<br><br><br>• The Debtors have proposed additional language to Sale Orders in an effort to address these concerns. |

| | | | |
|---|---|---|---|
| | | Authorities also submit that it is the stated intent of the parties that the tax liens attach to the sale proceeds.  They have attached proposed language to be added to the Sale Order.  Texas Taxing Entities  Objection ¶¶ 7-10.<br><br>**Local Texas Tax Authorities** [D.I. 1418]<br><br>• The Taxing Authorities object that although the sale motion proposes that tax liens will attach to the sale proceeds, this does not adequately protect the tax liens and claims.  Local Texas Taxing Authorities Objection §III. | • The Debtors have proposed additional language to Sale Orders in an effort to address these concerns. |
| 7. | The objector proposed alternate sale order language | **Sabatte Family Creditors** [D.R. 1353]<br><br>• Sabatte Family are beneficiaries under Berkeley Farms, Inc. Sabatte Family Executive Retirement Plan ("**Sabatte Plan**"). Sabatte Objection ¶ 1.<br><br>• The Sabatte Family asserts that the Sabatte Plan must be assumed by the buyer, but such requirement is not repeated in the offering or sale documents, making them "contrary to law" and they should not be approved.  Sabatte Objection ¶ 6.<br><br>**Sompo Holdings, Inc.** [D.I. 1331]<br><br>• Sompo requests language in the sale documentation with regards to the adequate assurance for and the treatment of surety bonds. Sompo Objection ¶ 19-22.<br><br>**Chubb Companies** [D.I. 1214]<br><br>• The Chubb insurance programs and the obligations thereunder are indivisible and cannot be assumed or assigned in pieces or without prior written consent of Chubb.  Chubb Objection ¶¶ 18-21.<br><br>• Chubb asserts that its collateral in the form of letters of credit and | • Sabatte makes no valid argument as to why the assets cannot be sold free and clear of the plan obligations pursuant to section 363(f) of the Bankruptcy Code. *See* section III herein.<br><br>• The Debtors have proposed additional language to Sale Orders in an effort to address these concerns.<br><br>• The Debtors have proposed additional language to Sale Orders in an effort to address these concerns. |

proceeds therefrom are not property of the estate.   Chubb Objection ¶ 43.

- Chubb asserts that it should not be required to make coverage determinations between the debtors and any successful bidder if covered assets are sold in parts.  Chubb Objection ¶¶ 29-31.

**Travelers Casualty and Surety Company of America** [D.I. 1326]

- Joins the Chubb Companies objection. Travelers Objection Introduction.

**Zurich American Insurance Company** [D.I. 1367]

- Zurich asserts that its collateral in the form of letters of credit and proceeds therefrom are not property of the estate.   Zurich Objection ¶ 13.

- Zurich asserts that its surety programs cannot be assumed or assigned without its consent.  Zurich Objection ¶ 13.

**United States** [D.I. 1407]

- The United States requests certain additional language with respect to application of law and regulatory impact.

- The Debtors have proposed additional language to Sale Orders in an effort to address these concerns.

- The Debtors have proposed additional language to Sale Orders in an effort to address these concerns.

- The Debtors have proposed additional language to Sale Orders in an effort to address these concerns.

## **CONCLUSION**

54.     For all of the foregoing reasons, the Court should overrule the Objections, grant the relief sought in the Motion as modified by the Sale Orders, enter orders substantially in the form of the Sale Orders filed in conjunction herewith, and grant such other and further relief the Court may deem just and proper.

Dated: April 3, 2020  
Houston, Texas

Respectfully submitted,

**NORTON ROSE FULBRIGHT US LLP**

*/s/ William R. Greendyke*
William R. Greendyke (SBT 08390450)
Jason L. Boland (SBT 24040542)
Robert B. Bruner (SBT 24062637)
Julie Goodrich Harrison (SBT 24092434)
1301 McKinney Street, Suite 5100
Houston, Texas 77010-3095
Tel.:  (713) 651-5151
Fax:  (713) 651-5246
william.greendyke@nortonrosefulbright.com
jason.boland@nortonrosefulbright.com
bob.bruner@nortonrosefulbright.com
julie.harrison@nortonrosefulbright.com

*-and-*

**DAVIS POLK & WARDWELL LLP**

Brian M. Resnick (admitted *pro hac vice*)
Elliot Moskowitz (admitted *pro hac vice*)
James M. Millerman, III (admitted *pro hac vice*)
Steven Z. Szanzer (admitted *pro hac vice*)
Nate Sokol (admitted *pro hac vice*)
450 Lexington Avenue
New York, New York 10017
Tel.: (212) 450-4000
Fax: (212) 701-5800
brian.resnick@davispolk.com
elliot.moskowitz@davispolk.com
james.millerman@davispolk.com
steven.szanzer@davispolk.com
nathaniel.sokol@davispolk.com

*Counsel to the Debtors and Debtors in Possession*