## Exhibit A

**Antitrust Complaint**

**DRAFT**

## UNITED STATES DISTRICT COURT
## FOR THE [] DISTRICT OF []

| |
|---|
| Maryland & Virginia Milk Producers Cooperative Association and Food Lion, LLC, |
|     *Plaintiffs*, |
| v. |
| Dean Foods Company and Dairy Farmers of America, Inc., |
|     *Defendants*. |

## COMPLAINT

This action arises out of Defendants Dairy Farmers of America, Inc. ("DFA") and Dean Foods Company's ("Dean") longstanding effort to seize control of the supply chain for fluid milk in the Southeast, including most notably milk processing plants in the Carolinas.  For the past two decades, DFA has dominated the U.S. market for sales of raw milk not by competing on the merits, but through unlawful conduct and anti-competitive agreements by which it has gained near-complete control over the raw milk purchasing decisions of milk processors.  DFA has done so in partnership with Dean—a partnership forged and sealed through a "corrupt bargain" entered into at the time of a prior merger between Dean and another dairy processing giant to secure U.S. Department of Justice approval through deceptive conduct.  Together, these conglomerates have bolstered each other's respective market concentration and suppressed competition ever since, to the detriment of independent dairy farmers at one end of the milk supply chain and customers at the other.  Dean and DFA have done so through a mutually reinforcing process that feeds on itself: the more dominant DFA becomes in raw milk, the more

control DFA and Dean can exercise over processed milk, the more dominant DFA becomes in raw milk, and so on, until there is no competition left in the raw or processed milk markets in which each dominates.  As a result, both entities have been subject to an avalanche of lawsuits across the country addressing their anticompetitive practices, resulting in a series of settlements totaling hundreds of millions of dollars.  But DFA and Dean still persist.

This anti-competitive cycle of harm was about to slow or end in the near future, or so the dairy industry thought.  On or about April 2021, a twenty-year exclusive raw milk supply agreement between DFA and Dean that was a key part of the original "corrupt bargain"— structured as a series of one-year evergreen provisions to avoid a prior DOJ consent decree against DFA's predecessor—is scheduled to end on its terms.  If that happened, Dean would be forced to make raw milk purchasing decisions on the competitive merits—rather than because those decisions are controlled by DFA—for essentially the first time in the twenty-first century. DFA, however, could not let that happen.  Instead, to avoid the prospect of competition and protect its market power, DFA engineered a "solution" to permanently solidify and complete its control over Dean's purchasing decisions by buying all forty-four Dean processing plants (the "Asset Sale") out of a pre-packaged bankruptcy process that has been strategically designed to ensure that very result.  Indeed, the Dean bankruptcy—no doubt necessitated in part by the hundreds of millions Dean had to pay resolve allegations of prior anti-competitive conduct—is designed to take advantage of the truncated antitrust review period under the bankruptcy laws and avoid the extended scrutiny that would otherwise result.

If DFA gains controls of all of Dean's milk processing plants, it will be the *coup de grâce* for competition in the relevant fluid milk markets, leading inevitably to the death of the independent, family-owned dairy farm and skyrocketing prices for consumers who depend on

milk for their daily sustenance.  Indeed, a fully integrated DFA/Dean will compel independent

dairy farmers and cooperatives to either join DFA/Dean or cease to exist; create an even more

difficult environment for new entrants to compete for the supply of raw milk; and in turn

entrench DFA's control over both raw and processed milk supply in the Southeast.  This harm

will be particularly acute in the areas surrounding milk processors in North and South Carolina,

where Plaintiff Maryland & Virginia Milk Producers Cooperative Association ("MDVA") is

DFA's only significant remaining competitor for the supply of raw milk and Plaintiff Food Lion

LLC ("Food Lion") is one of the largest grocery retailers selling milk directly to consumers.

Accordingly, MDVA and Food Lion bring this action under Section 7 of the Clayton Act,

15 U.S.C. § 18, to prevent irreversible harm to competition and consumers.  While MDVA and

Food Lion believe that the proposed transaction will substantially lessen competition across the

country, this action has a more narrow focus to allow for expedited action.  To that end, MDVA

and Food Lion are not seeking to prevent the sale of Dean's assets to DFA except to the extent

required to address the reduction in competition in and around the Carolinas caused by the

proposed deal.  Specifically, MDVA and Food Lion seek to enjoin the deal from closing unless

and until DFA and Dean agree to divest at least one of the three Dean milk processing facilities

in the Carolinas to a viable, qualified, and independent purchaser unaffiliated with DFA who will

ensure competition in the region's fluid milk markets going forward, or until such a time as an

alternative remedy can be fashioned that accomplishes the same goal. Without such a remedy,

competition in the fluid milk markets in the region will be lost forever.

## THE PARTIES

1.      Plaintiff Maryland & Virginia Milk Producers Cooperative Association

("MDVA") is a corporation organized and existing under the laws of the State of Virginia with

its principal place of business in Reston, Virginia.  MDVA is a dairy cooperative with approximately 950 farmer-members in eleven states throughout the Mid-Atlantic and Southeast.

2.    Plaintiff Food Lion, LLC ("Food Lion") is a North Carolina limited liability company headquartered in Salisbury, North Carolina. It operates more than 1000 supermarkets, either directly or through affiliates, in 10 states, including approximately 600 supermarkets in North and South Carolina. Food Lion purchases processed milk in interstate commerce and is one of the largest retail purchasers of processed milk in North and South Carolina.

3.    Defendant Dean Foods Company ("Dean") is a leading public food and beverage company organized and existing under the laws of the State of Delaware, with its principal place of business in Dallas, Texas. Dean is the largest processor and direct-to-store distributor of raw fluid milk and other dairy and dairy case products in the U.S.  Among other things, Dean manufactures, markets, and distributes raw fluid milk to retailers, distributors, foodservice outlets, educational institutions, and governmental entities across the U.S., including from its milk processing plants in North and South Carolina.

4.    Defendant Dairy Farmers of America, Inc. ("DFA") is a dairy cooperative organized and existing under the laws of the State of Kansas, with its principal place of business in Kansas City, Missouri, and with its Southeast Council headquarters in Knoxville, Tennessee. DFA is the largest dairy cooperative in the U.S. with over 14,000 dairy producers. It is also one of the largest milk handlers in the U.S. and, in certain markets, is vertically integrated so that it not only engages in the production of fresh fluid milk, but also hauls, processes, bottles, and distributes fluid milk.

## JURISDICTION, VENUE, AND INTERSTATE COMMERCE

5.      This Court has subject-matter jurisdiction over this action to prevent and restrain DFA and Dean from violating Section 7 of the Clayton Act, 15 U.S.C. § 18, pursuant to 15 U.S.C. § 26; 28 U.S.C. §§ 1331; and/or 28 U.S.C. § 1337(a).

6.      This Court has personal jurisdiction over DFA and Dean under Section 12 of the Clayton Act, 15 U.S.C. § 22, because both DFA and Dean may be found and transact business in this judicial district.

7.      Venue is proper in this judicial district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c), because DFA and Dean regularly transact business and are found within this District.

8.      Dean and DFA are engaged in, and their activities substantially affect, interstate commerce, and the conduct alleged herein substantially affects interstate commerce. Among other things, Dean purchases, processes, and ships milk across state lines. DFA markets, processes, and ships milk across state lines. Both Defendants receive substantial payments across state lines for the sale of raw and/or processed milk.  DFA's acquisition of Dean's three facilities in the Carolinas would have adverse effects on competition and consumers, including for the production and processing of raw fluid milk sold, in North and South Carolina.

## RELEVANT MARKETS

### *The Relevant Product Markets*

9.      There are two relevant product markets at issue in this case.

10.     The first market is an upstream market for the supply of raw fluid Grade A milk by dairy producers, in which both DFA and MDVA compete (the "raw fluid milk market").

11.     The second market is the downstream processing and co-packing of fluid milk products to retailers like Food Lion and other customers (the "processed fluid milk market").

12.     These two product markets have been treated in the ordinary course of business as distinct by DFA, Dean, and the milk industry, and also have been recognized as relevant product markets by federal courts in prior litigation involving Dean and DFA, including in *In re: Southeastern Milk Antitrust Litigation*, No. 2:08-md-1000 (E.D. Tenn.).

13.     Raw fluid milk is a fungible, homogenous and perishable commodity.  Dairy farmers milk their cows at least twice a day and the milk must be transported from farms to raw Grade A milk processors nearly every day.  Raw fluid milk is typically stored in refrigerated tanks until it is picked up by a milk hauler who transports it in insulated trucks to raw fluid milk processing plants.  Milk processing plants prepare this milk for human consumption and process and package it for wholesale or retail sale.

14.     Dairy farmers sell raw fluid milk to milk processors who have no feasible substitutes.  Similarly, processors sell processed fluid milk to retailers, who can sell other beverages, but none that are good substitutes for raw fluid Grade A milk.

15.     Federal milk sanitation standards distinguish between milk eligible for use in fluid products—"Grade A" milk—and milk eligible only for manufactured dairy products.  The highest standards are established for Grade A fluid milk because of safety risks associated with fluid milk products.  There is no substitute for raw Grade A milk.  Pursuant to the 1937 Agriculture Act, the U.S. Dairy Association ("USDA") classifies as "Class I" raw Grade A milk used in beverage milk products for human consumption.

16.     Each month, the USDA calculates minimum prices pursuant to its formula for Grade A fluid milk marketed in different geographic regions, known as Federal Milk Marketing

Orders ("FMMO").  Currently, there are ten FMMOs.  The plants at issue in this Complaint are included in FMMO 5, which includes all of North and South Carolina.

17.     USDA regulations mandate that cooperatives and independent dairy farmers participating in the FMMO program receive at least the weighted uniform average or minimum "blend" price for raw Grade A milk that is "pooled" on an Order.  Dairy farmers "pool' raw Grade A milk on an FMMO by delivering specified minimum quantities of such milk to USDA-regulated fluid milk processing plants associated with that FMMO.

18.     USDA minimum prices for raw Grade A fluid milk represent the minimum prices that milk processors must pay for such milk marketed pursuant to USDA regulation.  These minimum prices, however, are less than the farmers' cost to produce the milk.  Farmers must sell their milk for more than these minimum prices in order to survive.

19.     A hypothetical monopolist of raw fluid milk could impose a small but significant non-transitory increase in price ("SSNIP") to milk processors.  Processors could not turn to purchasing other products in sufficient quantity to render a SSNIP on raw fluid milk unprofitable.

20.     A hypothetical monopolist of processed milk could impose a SSNIP to customers of processed milk, such as grocery retailers.  Retailers and other processed milk customers could not turn to purchasing other products in sufficient quantity or numbers to render as SSNIP on processed milk unprofitable.

### *The Relevant Geographic Market*

21.     For purposes of this action, the relevant geographic market for both the supply of raw fluid milk and its processing and co-packing consists of the processing plants in North and South Carolina.  Dairies and cooperatives to which these plants may reasonably turn for supply

**DRAFT**

of raw milk for these facilities are included in the geographic market for raw fluid milk. Similarly, customers of processed milk including retailers that can reasonably turn for purchase of processed milk from these facilities are included in the geographic market for processed milk.

22. Transportation costs and perishability limit the distance over which raw fluid milk can be profitably shipped. Shipping costs are estimated to increase by approximately $0.10 per gallon for every additional 100 miles shipped. In North and South Carolina, dairy farms are fewer in number and located farther apart than in Northern Virginia, Maryland, and Pennsylvania. This makes the need to transport milk to the closest processing facility even more important in order to manage transportation costs.

23. North and South Carolina also have two additional geographic features that limit the region within which raw fluid milk can be profitably shipped: the Atlantic Ocean to the East and the Appalachian Mountains to the West. Shipping across the Appalachian Mountains is not economically feasible due to the increased transportation costs associated with crossing the mountains. The economic and transportation costs of shipping milk imply that the long-term viability and overall competitiveness of a dairy cooperative supplying raw fluid milk to a processor in the Carolinas relies on the cooperative's ability to transport its members' milk to a local processing facility.

24. These geographic and cost constraints leave dairy producers located near the processing facilities in North and South Carolina with only six processing and packaging facilities to sell raw fluid milk to: (1) MilkCo, (2) Dean Foods, Spartanburg, (3) Dean Foods, Winston-Salem, (4) Dean Foods, High Point (5) Kroger's Hunter Farms facility, and (6) Borden. Likewise, the geographic and cost constraints leave the six processing plants reliant on raw milk producers located near the processing plants. Downstream, as geographic and transportation

costs also constrain the shipment of processed milk, purchasers of processed milk rely on nearby milk processing facilities. Below is a map identifying these facilities' respective locations.

**Figure One: Milk Processing Facilities in the Carolinas**



25.     A hypothetical monopolist of cooperatives and independent dairies that sold raw fluid milk to the processors located in North and South Carolina could impose a SSNIP. This is because even if the processors considered purchasing milk from more distant cooperatives, the associated costs would make it uneconomical for them to do so in response to a small price increase.

26.     A hypothetical monopolist of milk processors located in North and South Carolina could impose a SSNIP in price to customers such as retailers. This is because retailers, collectively, would not be able to profitably offset such a price increase by shipping milk from more distant milk processors. Even if some customers closer to the market boundary did find it

economical to substitute more distant processors, this would not be sufficient to offset the aggregate profitability of a price increase.

## BACKGROUND OF CONSOLIDATION IN THE MILK INDUSTRY

### *Milk Cooperatives*

27.     The dairy industry in the United States is highly concentrated, at both the raw milk producer and processor levels.

28.     Dairy cooperatives are associations of dairy farmers who agree to market collectively their raw fluid milk and other dairy products.  Cooperatives are supposed to be "voluntary associations," owned, operated, and controlled by their farmer members. Cooperatives typically "market" their farmers' raw fluid milk, which usually consists of locating buyers, negotiating sales prices, coordinating the hauling, performing the testing, recording and reporting related data to milk market regulators, and paying member farmers for their raw milk.

29.     One of the key responsibilities of cooperatives is to negotiate prices higher than the FMMO minimum prices.  The amounts by which prices paid for Grade A milk exceed FMMO minimum prices are known generically as "over-order premiums." Access to milk processing plants in the Carolinas and receipt of FMMO minimum prices and over-order premiums is necessary and essential to the economic viability of dairy farmers.

30.     Not all dairy farmers are cooperative members. Some dairy farmers seek to remain independent of cooperatives and are referred to as "independent dairy farmers." Independent dairy farmers seek to market their raw fluid milk to fluid milk processing plants by contracting with processing plants either directly or through agents and/or marketing associations.

31.     On January 1, 1998, DFA, a new marketing cooperative, was created from the merger of four competing dairy cooperatives. By 2000, DFA had emerged as the largest dairy cooperative in the United States and controlled more than 50% of the raw Grade A milk produced in the Southeast United States. DFA's members, all of which are producers of raw milk, include both individual farmers and other member-owned milk marketing cooperatives.

32.     Today, DFA is still the largest dairy cooperative and raw fluid milk producer in the U.S.  In 2018, DFA produced 52.7 billion pounds of raw fluid milk, making it more than three times larger than the next largest dairy cooperative, California Dairies Inc., which is a DFA partner.  DFA's annual sales exceed $18 billion.  DFA recently started issuing non-voting preferred stock, and its equity from this stock comprises a large portion of DFA's total equity.

33.     Through various transactions, partnerships, joint ventures, and contractual relationships, DFA has expanded its dominance of the milk supply chain, establishing vertical relationships and interests in everything from processing to delivery.  Thus, DFA currently controls both ends of the milk supply chain in many markets in which it operates.

34.     MDVA is a dairy cooperative with approximately 1,000 farmer-members in 11 states throughout the Mid-Atlantic and Southeast.  In 2018, MDVA produced 1% of the raw milk produced in the U.S.  To compare their relative size, MDVA sold 2.9 billion pounds of raw milk in 2018 compared to DFA's 52.7 billion pounds, making MDVA only the thirteenth largest dairy cooperative in the U.S.  MDVA nevertheless acts as a strong competitive constraint on DFA in the states in which MDVA operates.  In the Carolinas, MDVA is the only significant competitive constraint on DFA.

35.     In the Carolinas, there are other small milk producers and independent dairy farmers that are not affiliated with either DFA or MDVA.  However, their raw fluid milk

production is dwarfed by DFA and MDVA.  These small milk producers and independent dairy

farmers lack the size and scale to act as a competitive check on DFA.

*Milk Processors*

36.     Milk processors process raw fluid milk purchased from cooperatives, independent

dairy farmers, or other supply plants into pasteurized milk for human consumption.  Processors

process milk into a variety of beverage products including whole milk, fat-free or skim milk, low

and reduced-fat milk, chocolate milk, buttermilk, and cream.  The processed milk is then

packaged into a variety of consumer containers including gallon jugs, half-gallon cartons, and

other smaller packages.  Milk processing plants then sell the processed milk to retail outlets, like

Food Lion, and other customers.

37.     Milk processors include independent processing plants, processors owned by

cooperatives or in joint ventures with cooperatives, and retail food chains that own their own

processing plants.  The processing plants of some retail chains are referred to as "captive"

because they process and bottle milk exclusively for the retail outlets owned by that chain except

for some insignificant "merchant" sales to unaffiliated retailers.

38.     In 1996, there were sixty-two milk processing plants in the Southeast United

States.  Following a series of acquisitions, a Texas-based dairy company named Suiza Foods had

become the largest fluid milk processor in the United States.  At the time, Suiza owned 67 dairy

processing plants in 29 states with net sales of more than $5 billion.

39.     Following its own series of acquisitions a company that had the same name as

defendant Dean, referred to herein as "Old Dean" had become the second-largest buyer of raw

fluid milk and the second-largest bottler of processed milk in the United States, operating 43

dairy processing plants in 19 states and with net sales of approximately $4.4 billion.

### The Old Dean/Suiza Merger and the Corrupt Bargain

40.     Thus, by 2001 DFA was the largest dairy cooperative in the United States, Suiza was the largest processor, and Old Dean was the second-largest processor.

41.     In 2001, Suiza Foods announced a plan to merge with Old Dean and to thereafter operate the merged company under the name Dean, which corporate entity is the defendant in this case.  DFA was materially involved in this merger in at least three ways: (1) pre-merger, it owned a stake in Suiza which it sold in the merger, (2) following the merger, it became the part owner of certain milk processing plants which were spun off in connection with the merger, in order, purportedly, to preserve competition for processed milk, and (3) its exclusive contracts to supply raw fluid milk to the Dean plants.

42.     In connection with the merger, the parties entered into a "corrupt bargain" consisting of two side deals: Dean (the defendant here, known as Suiza before the merger) agreed that it would buy all of its raw milk from DFA; and DFA, in return, agreed that the milk processing plants it owned would not compete with Dean, as described below.

43.     In its review of the merger, the Department of Justice raised, among other matters, the following two concerns relating to post-merger competition: (1) that there would have to be open competition for the supply of raw fluid milk to the newly created milk processing company, and (2) that certain plants would have to be divested to preserve competition at the milk processing level.  The first concern was driven both by an analysis of the then current state of competition, as well as by the fact that DFA was then party to a 1977 consent decree limiting its ability to enter into contracts for the sale of raw milk with a duration more than one year.

44.     Regarding the first concern, in their merger presentation to DOJ, the parties to the merger provided to the DOJ a series of milk supply contracts between DFA and Dean that in fact

contained a one-year term (which would be renewed in successive years if not terminated by the parties) and also contained "competitive pricing clauses" that would allow Dean to purchase milk from lower-cost providers during the contracts' terms.

45.      But the parties also entered into an unlawful "Side Note" that imposed the very restriction on competition for raw milk purchases they said did not exist.  DFA's control over the raw milk processing decisions of milk processors since 2001 has been exercised in significant part through the anticompetitive terms of this Side Note.

46.      On December 21, 2001, Dean issued a contingent, subordinated promissory note to DFA in the original principal amount of $40 million (the "Side Note").  The Side Note has a twenty-year term that bears interest based on the consumer price index.  Interest will not be paid in cash but will be added to the principal amount of the note annually, up to a maximum principal amount of $96 million.  The Side Note will become payable only if Dean materially breaches or terminates its milk supply agreement with DFA without renewal or replacement. Otherwise, the Side Note will expire in 2021, without any obligation to pay any portion of the principal or interest.  The Side Note thus effectively created a $96 million penalty if Dean did not purchase its requirements for raw milk from DFA, notwithstanding the terms of the relevant supply contracts.  The parties to the merger did not share the Side Note with the DOJ.

47.      The quid pro quo for this Side Note was a second illegal side agreement that undermined the second concern raised by the Department of Justice (the "Horizontal Non-Compete").  In connection with the merger, the parties created a new company, controlled by DFA, that would own the milk processing plants divested in connection with the merger.  But they also entered into the illegal Horizontal Non-Compete pursuant to which those plants would not compete vigorously with Dean.  In other words, at the same time the merging parties were

holding these plants out to the DOJ as viable plants that would preserve competition, they had agreed that they would not vigorously compete.  They were in fact aware at the time of the merger that some of those plants would close shortly after the merger.

### Anticompetitive Vertical Effects of the Corrupt Bargain, and Related Litigation

48.     The Side Note has materially harmed competition in the relevant markets and beyond throughout its almost twenty-year life, as described below.

49.     Immediately after the Suiza/Old Dean merger, DFA lacked sufficient raw milk capacity to supply all of the Dean plants in the Carolinas.  Thus, it refrained from exercising its right under the Side Note and the various one-year supply agreements locked in place thereby to be the exclusive supplier to the Dean plants in the Carolinas.

50.     Instead, DFA caused to be created an organization known as the Southern Marketing Agency, or SMA, which was an association of milk cooperatives including DFA, MDVA, and others.  Those cooperatives pooled their milk, shared revenues and expenses equally, and with DFA's acquiescence notwithstanding its exclusive rights, sold raw milk to the Dean plants in the Carolinas.

51.     This arrangement was not as anticompetitive as the full denial of all access to Dean plants later caused by DFA, but it was nevertheless anticompetitive.  DFA had a higher cost structure than MDVA and other cooperatives.  By agreeing to share costs equally, the other cooperatives effectively subsidized DFA's inefficiencies.  But for DFA's exclusive supply rights created by the Side Note, MDVA would not have agreed to this arrangement, which was anticompetitive and harmful to consumers because it effectively "taxed" lower-cost producers and "subsidized" higher-cost ones.

52.     In 2007, two class action lawsuits were filed that (i) challenged the unlawful Side Note and Horizontal Non-Compete and also (ii) temporarily mitigated the anticompetitive effects of the Side Note because DFA and Dean wanted to present the artificial appearance of competition during the pendency of those lawsuits.  *See generally In re: Southeastern Milk Antitrust Litigation*, No. 2:08-md-1000 (E.D. Tenn.).

53.     First, a putative class of dairy farmers filed a suit captioned *Sweetwater Valley Farm, Inc. et al. v. Dean Foods Co. et al.*, No. 2:07-cv-208 (E.D. Tenn.).  The farmers alleged that Dean, DFA, and several other dairy marketing service providers conspired to control the milk supply chain and prices for milk in the Southeastern United States by requiring farmers to use DFA-controlled marketing entities (e.g. SMA) in exchange for access to processing plants, punishing cooperatives and processors, and other conduct.

54.     The dairy farmers' litigation resulted in a settlement of $140 million with Dean in July 2011 and an additional $140 million settlement with DFA in late 2013.

55.     A related class action case filed by dairy farmers in the Northeast settled for $30 million from Dean in 2011 and $50 million from DFA in 2013. *See Allen et al. v. Dairy Farmers of America, Inc. et al.*, No. 2:09-cv-230 (D. Vt.) (filed Oct., 8, 2009). The opt-outs of the Northeast settlement are continuing to pursue their antitrust claims in *Sitts v. Dairy Farmers of America, Inc.*, No. 2:16-cv-287 (D. Vt.).

56.     Also in August of 2007, a putative class of retailers filed a suit captioned *Food Lion et al. v. Dean Foods Co. et al.*, No. 2:07-cv-188 (E.D. Tenn.). The retailers alleged that Dean and DFA had violated Section 1 of the Sherman Act by, *inter alia*, entering into the illegal Horizontal Non-Compete as the quid pro quo for the Side Note. Food Lion's case was settled on undisclosed terms on March 27, 2017.

57.     By the time of DFA's settlements with dairy farmers in late 2013, the supply and demand factors that had existed immediately after the Dean-Suiza merger had changed. Consumer demand for processed milk had decreased, whereas DFA's production capacity had increased.  DFA was thus able, and incentivized, at that time to take full advantage of the anticompetitive Side Note, and caused Dean to reduce then eliminate MDVA's supply to the Dean plants in the Carolinas.

58.     MDVA had previously been permitted to obtain raw milk access at Dean's Carolinas facilities in exchange for a cost-sharing agreement that heavily favored DFA. Following the settlements, Dean began to limit MDVA's and other non-DFA cooperatives' access to these facilities.

59.     Thus, in 2013, MDVA sold 1.142 billion pounds of raw milk to Dean plants in the Carolinas.  At the end of 2014, Dean notified MDVA that it would be moving raw milk volume from MDVA to DFA to honor its 2001 supply contract with DFA. Dean began to reduce its purchases from MDVA because of DFA's direction that it do so, and regardless of price, service and other competitive factors.  Consequently, in 2015, MDVA lost over 300 million pounds of raw milk volume at the Dean Carolinas plants to DFA.  By the end of 2018, MDVA's raw milk supply to Dean facilities in the Carolinas had dropped to just over 200 million pounds, with the vast majority of MDVA's former business moving to DFA.  By 2019, MDVA was no longer supplying Dean in any facility.

60.     Dean's and DFA's conduct after the settlement of the Sweetwater Valley Farms case demonstrate exactly what will happen if the merger is allowed to proceed.  When DFA is able to exert control over Dean's raw milk purchase decisions, as it did because of the Side Note and as it would continue to do if the merger were allowed, they cut off raw milk access to Dean

plants, as they did from when they cut off MDVA's access from 2014 to 2019. Without the present Asset Sale, the Side Note would expire in 2021. But if the merger is allowed to proceed, its anticompetitive effects will continue in magnified form because joint ownership will create even greater anticompetitive effects than did the Side Note.

### *Current Raw Milk Suppliers for the North and South Carolina Processed Milk Plants*

61.     There are currently only two competitively significant suppliers of raw milk in North and South Carolina: DFA and MDVA. DFA and MDVA, together with their partner cooperatives, account for virtually all of the raw milk supply in North Carolina and South Carolina, with DFA holding the dominant share in each state.

62.     While DFA's operations span the country, its control over the supply of raw fluid milk is particularly strong in and around the Carolinas. As shown in the figure below, in 2018, DFA with its partner cooperatives supplied 65% of North Carolina's raw milk production (611 of 937 million pounds) and 59% of South Carolina's milk production (143 of 242 million pounds). Such high market share is presumptive indicia of DFA's market power.

**Figure Two: Raw Milk Supply in North and South Carolina, 2018**

| 2018 | State Milk Volume (millions lbs.) | DFA with Partners Milk Volume (millions lbs.) | % DFA with Partners | MDVA with Partners Milk Volume (millions lbs.) | % MDVA with Partners | MDVA with Partners + DFA with Partners |
|------|------|------|------|------|------|------|
| NC | 937 | 611 | 65% | 326 | 35% | 100% |
| SC | 242 | 143 | 59% | 99 | 41% | 100% |

63.     No other independent dairy cooperative or independent dairy farmer in the Carolinas has sufficient presence or size to impede the exercise of market power of DFA.

64.     As detailed above, for several years, MDVA has been losing members to DFA, due largely to the anticompetitive effects of the "Side Note."

### *Current Milk Processors in North and South Carolina*

65.     The milk processing plants located in North and South Carolina are shown on Figure One above.  Within North and South Carolina, Dean controls 45% and 80%, respectively, of the sales of processed milk.  Dean owns three critical fluid milk processing plants in the Carolinas: the High Point and Winston-Salem plants in North Carolina and the Spartanburg plant in South Carolina.

66.     Dean's competitive significance in the Carolinas is even stronger than indicated by these market shares because 25% of the sales of processed milk are controlled by a "captive" milk plant owned by Kroger which is operating at 90% of its capacity.  Although that plant does not exclusively sell to Kroger and in fact currently sells to Food Lion, its principal purpose is to provide a reliable source of milk to its owner Kroger.

67.     Neither DFA nor MDVA owns any milk processing facilities in the Carolinas.

68.     There are several milk processing facilities in North and South Carolina that are aligned with specific retailers and serve as a source of their raw fluid milk.  For example, Kroger's Hunter Farms plant in North Carolina is owned by and affiliated with supermarket chain Kroger.  Milkco's Asheville, North Carolina facility is owned by and affiliated with supermarket chain Ingles Markets.

69.     The chart below lists all of the competitively significant milk processors in North and South Carolina, stating their owner, location and current estimated production level as a percentage of total production capacity.

**DRAFT**

**Figure Three: Processing Facility Capacity Utilization in the Carolinas**

| Facility | | Current Volumes | | | Maximum Capacity | | | Estimated utilization % |
|---|---|---|---|---|---|---|---|---|
| | | Loads / Day | Annualized lbs | Annualized Gal | Loads / Day | Annualized lbs | Annualized Gal | |
| Dean | | 79 | 1,422,000,000 | 165,348,837 | 118 | 2,124,000,000 | 246,976,744 | |
| | Spartanburg, SC | 40 | 720,000,000 | 83,720,930 | 55 | 990,000,000 | 115,116,279 | 73% |
| | High Point, NC | 14 | 252,000,000 | 29,302,326 | 28 | 504,000,000 | 58,604,651 | 50% |
| | Winston-Salem, NC | 25 | 450,000,000 | 52,325,581 | 35 | 630,000,000 | 73,255,814 | 71% |
| Kroger | Hunter Farms, NC | 22 | 396,000,000 | 46,046,512 | 24 | 432,000,000 | 50,232,558 | 92% |
| Milkco | Asheville, NC | 24 | 432,000,000 | 50,232,558 | 32 | 576,000,000 | 66,976,744 | 75% |
| Borden | Charleston, SC | 10 | 180,000,000 | 20,930,233 | 20 | 360,000,000 | 41,860,465 | 50% |
| Total | | 135 | 2,430,000,000 | 282,558,140 | 194 | 3,492,000,000 | 406,046,511 | |

70.     Dean's concentration has worked to the detriment of DFA's only competitor in the region, MDVA.  Following MDVA's loss of access to the Dean facilities in the Carolinas, it was forced to develop a patchwork system of processing facilities to take its farmers' raw milk.  Currently, this patchwork system includes Hunter Farms, Milkco, and Borden.  This system is not sustainable in the long term.  MDVA believes at least a half of the 255 million pounds of raw milk it produces in the Carolinas is at risk for loss of access to processing facilities.

71.     Upon information and belief, Kroger's Hunter Farms facility currently operates at over 90% of its capacity, and Kroger's production needs will not allow the facility to take on any additional supply from MDVA.  Similarly, upon information and belief, Ingles' MilkCo facility is operating at 75% of its capacity.  And the majority of Milkco's raw milk is supplied by DFA.  Neither Kroger nor Ingles has an economic incentive to permit MDVA to continue to have long-term access to these two facilities because MDVA is having its dairy farmers' milk processed to be sold to competitors of Kroger and Ingles.  Accordingly, MDVA believes that it ultimately will lose access to Hunter Farms.

72.     MDVA also sells raw milk to the Kroger plant by marketing the milk of another cooperative, Cobblestone. Cobblestone is also currently able to sell some raw milk to the Dean plant in Spartanburg, South Carolina, also through a marketing arrangement with MDVA.

73.     The final option, Borden Dairy Co. ("Borden"), is currently the second largest fluid milk processor in the U.S.  However, many of its facilities are viewed as inferior by dairy

farmers and retailers.  Borden filed for Chapter 11 bankruptcy in January 2020 and it is difficult to predict the long-term viability of Borden's facilities. Furthermore, Borden has never been a viable option for MDVA because it is located away from the major dairy farms in Appalachia and close to the South Carolina coast.  Borden's proximity to the Atlantic Ocean cuts its serviceable area in half, and shipping to this facility results in higher hauling costs and logistical problems.

74.    Similarly, sending raw milk north to an out-of-state milk processing facility is also not a viable option long-term because the shipping costs associated with transporting raw milk that distance sharply cuts into the already thin margins for MDVA farmers.

75.    With the 2021 sunset date for the DFA long-term supply commitment approaching, the ability to compete for and add fluid milk capacity in the Carolinas is critical. Without the ability to compete for the supply to Dean facilities in the Carolinas, MDVA will cease to be a viable cooperative in that region.  In fact, as a direct result of the Asset Sale, MDVA and other non-DFA milk producers will suffer an immediate and permanent loss of access to the Dean facilities in the Carolinas because DFA will never allow a rival to access its facilities, irrespective of capacity. The transaction would decisively and permanently foreclose any hope that MDVA would sell bulk raw milk to Dean's milk processing facilities.

76.    At the other end of the supply chain, there is no economically viable source of processed milk other than these six plants for a purchaser of processed milk in the region.  And even those plants are not all economically viable sources, as explained below with regard to the Dean High Point plant.

77.    By way of example, at the end of 2017, Food Lion sought an alternative processed milk supplier for several of its distribution centers, two of which were in North Carolina. At the

time, Dean was supplying the two North Carolina distribution centers, but at non-competitive prices.  Food Lion received bids for one of the distribution centers (Salisbury) from Kroger and a bid for the other distribution center (Dunn) from a MDVA facility in Newport News, Virginia. In addition, Dean bid on the two plants, but Dean's bids were not competitive.  The current Dean price and the Dean bid, were higher than the Kroger bid for Salisbury by more than 10% and more than 7%, respectively.  The current Dean price, and the Dean bid, were higher than the MDVA bid for Dinn by more than 8% and more than 4%, respectively.

78.     MDVA was not then, and is not now, a competitive source or the Salisbury distribution center because the MDVA facility is much farther away from Salisbury than Dean or Kroger will be a competitive source for either facility in the future if the Asset Sale is permitted to proceed, for the reasons explained herein.

79.     Dean's 2017 bid to Food Lion demonstrates Dean's practice of seeking supracompetitive pricing, despite the fact that it has substantial excess capacity, when it believes it is the only viable processing plant for a retailer. Food Lion was forced to instead contract with a more distant plant owned by its direct competitor, and which was operating at over 90% of its capacity while Dean's nearby High Point facility was operating at 50% of its capacity.

### DFA's Proposed Acquisition of Dean's Assets

80.     The proposed sale of assets (including the processing plants in North and South Carolina) by Dean to DFA is being accomplished through a bankruptcy proceeding initiated by Dean on November 12, 2019, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, Case No. 19-36313.  At the time the bankruptcy case was filed, Dean issued a press release stating that it was in advanced negotiations with DFA—and only DFA—to sell substantially all of its assets to DFA in a bankruptcy process designed to avoid antitrust

scrutiny.  In essence, the parties were once again turning to each other—just as they did at the time of the Suiza-Dean merger—to further their joint anti-competitive goals and deflect the harsh light of antitrust review and challenge..

81.     Subsequently, on February 17, 2020, Dean filed a motion (the "Sale Motion") [Docket No. 925] seeking the entry of several orders in the bankruptcy case, including (a) an order establishing bidding procedures for a sale of the company's assets (the "Bidding Procedures"), (b) an order approving DFA as the "stalking horse bidder" under the bidding procedures and (c) an order authorizing the sale of Dean's assets to DFA or an alternative purchaser.  The court initially set the bidding procedures portion of the Sale Motion for hearing on March 12, 2020 (the "Bidding Procedures Hearing").

82.     On March 9, 2020, Food Lion filed its Objection to the Bidding Procedures [Docket No. 1065], expressing concerns about the impact that a potential sale to DFA would have on the raw and processed milk markets in the North and South Carolina market, and proposing changes to the bid procedures to provide for fair, competitive bidding on Dean's assets—notably that DFA's purchase price should be allocated among the various assets it proposed purchasing.

83.     If DFA's purchase price had been so allocated, it would have been feasible to choose an alternate buyer in the Carolinas, because, if such a buyer emerged, that buyer could buy a sufficient number of plants in the Carolinas to ensure competition, and DFA, if it submitted the winning bid, could buy the rest, at the purchase price it would have itemized for whatever plants were not sold to the alternate bidder.

84.     MDVA filed a similar objection to the Bidding Procedures.  [Docket No. 1058].

85.     The Bankruptcy Court conducted the hearing on the Bidding Procedures and entered an order establishing bidding procedures, [Docket No. 1178]. Pursuant to that order, interested parties were authorized to bid on individual assets, pools of assets or for all of Dean's assets. However, the Bidding Procedures Order did not require bidders to allocate their purchase price among the various assets that it proposed purchasing.  As explained in further detail below, in making this ruling, the bankruptcy court did not consider any aspect of the antitrust laws, but instead explicitly provided that those laws would be applied, if at all, to the sale via a separate proceeding.

86.     On March 30, 2020, several parties submitted bids for various of Dean's assets, including (a) DFA, which submitted a bid to purchase certain Dean assets, including Dean's three milk plants in North and South Carolina, as well as thirty-eight other milk plants across the United States and (b) MDVA, which submitted a bid to purchase only the processing plant in Highpoint, NC.

87.     As required by the Bidding Procedures Order, shortly after midnight of March 30-31, 2020, Dean filed with the Bankruptcy Court the Notice of Bid Results [Docket No. 1270], which, *inter alia,* predictably identified DFA as the winning bidder for assets it bid on, including the processing plant in High Point, NC, and identified MDVA as the backup bidder for the processing plant in High Point, NC.

88.     On April 1, 2020, Food Lion and a related corporate entity filed a Limited Objection [Docket No. 1406] to the proposed sale of certain of Dean's assets to DFA due to the potential anticompetitive impact the sale would have on the raw and processed milk markets in the Carolinas.  On the same date, MDVA filed a similar Objection [Docket No. 1415] to the proposed sale of certain assets by Dean to DFA.

89.     The Bankruptcy Court authorized Dean to sell all of the assets to DFA but expressly did not address the issues under the antitrust laws presented by the present complaint. The Bankruptcy Court entered an order dated April 5, 2020 permitting the sale to proceed pursuant to the terms of the asset purchase agreement attached thereto.  (The "Sale Order"), Docket Number 1572.  The Sale Order further authorized Dean, in the event DFA fails to close on its APA, to sell assets to the backup bidders, including the processing plant in Highpoint, NC to MARVA.

90.     In order to resolve Food Lion's and MDVA's objections to the Sale Motion, the Bankruptcy Court included the following provisions to preserve Food Lion's and MDVA's rights to challenge the Asset Sale::

> **Anti-Trust Enforcement.**  Notwithstanding anything to the contrary contained herein, no provision of this [Sale] Order or the APA shall operate to impair, prejudice, or otherwise abrogate the rights (if any) of The Stop & Shop Supermarket Company LLC and Food Lion LLC, the Maryland and Virginia Milk Producers Cooperative Association, Inc. and the California Dairies, Inc. and any of their affiliates, subsidiaries, successors, or assigns, to challenge the Sale Transaction under the antitrust laws of the United States.  All such rights are explicitly reserved pursuant to this order.

91.     As such, while the Sale Order, Docket No. 1572, authorizes Dean to sell certain assets to DFA, the order further preserves Food Lion's and MDVA's rights to file the present challenge to the asset sale.

92.     MDVA was and is a willing and viable buyer for the High Point plant who could operate that plant effectively and whose ownership thereof would avoid or mitigate the anti-competitive effects complained of herein.

93.     The High Point plant only operates at 50% capacity.  DFA has insisted on buying that plant as a "take it or leave it" package deal that must include all forty-four plants or none.  It has done so not because its business goal is to operate the plant but rather for the purpose of

creating the anticompetitive effects described herein.  Specifically, the only purpose for this

tactic—and the only reason that DFA is interested in the High Point plant—is because of its

strategic role in helping DFA to suppress competition from its one remaining competition in the

Carolinas.

## ANTICOMPETITIVE EFFECTS

94.    Section 7 of the Clayton Act prohibits mergers if "the effect of such acquisition

may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.

This includes vertical mergers, as Congress made plain in the 1950 amendments to the Clayton

Act. A vertical merger may violate the antitrust laws where the merging parties would—by

means of their control of an input that their competitors need—have the incentive and ability to

substantially lessen competition by withholding or raising the price for that input.

95.    Absent Dean's and DFA's mutual incentives to stifle competition against each

other in both the raw milk and processed milk markets, both would become more competitive.

But with the Asset Sale, each will become less competitive.  In short, the window for

competition which would otherwise be opened by expiration of the Side Note will be closed by

the proposed Asset Sale.

96.    As set forth below, the Asset Sale will substantially lessen competition for the

production, processing and distribution of raw fluid milk in the region and cause significant

losses and harm to MDVA and Food Lion.

### *Effect on Raw Milk Market*

97.    Dean is only a fluid milk processor and relies on dairy cooperatives and

independent farms for raw fluid milk.  Therefore, even though Dean recently stopped purchasing

**DRAFT**

MDVA raw milk, absent a DFA-Dean Foods combination, MDVA would continue to have the opportunity to compete for the Dean business in the future.

98.     This is not merely theoretical competition.   There is a critical upcoming event that, absent this transaction, would shortly permit MDVA to compete to supply Dean's North and South Carolina milk processing facilities.  Namely, the contingent promissory note that Dean issued to DFA following the Dean-Suiza merger twenty years ago that obligates Dean to maintain an exclusive milk supply agreement with DFA is set to expire next year.  Following the expiration of the contingent promissory note, MDVA is well positioned to compete for access to the Dean facilities if Dean remains independent.

99.     But for the Asset Sale, some or all of the following effects are likely with the impending expiration of the Side Note:

- o  The Dean plants would select the most efficient way of purchasing raw milk
- o  DFA competitors such as MDVA would have access to Dean processing plants when they are the most efficient or cost-effective option
- o  DFA competitors such as MDVA would be able to recruit farms to their cooperatives from DFA as those farms would have the potential to better market their milk through more efficient cooperatives.
- o  Non-Dean plants would have multiple, competitive suppliers of raw milk, which would allow those plants to seek efficient, low-cost raw milk supplier agreements.

100.     The expected result of the above is that raw milk would be provided to each processing plant by the closest, most efficient dairies or cooperatives, reducing market waste through excessive transportation and through continued support of inefficient dairies and cooperatives.

101.     The resulting greater competition at the raw milk level would result in better raw milk prices to milk processors.  To try to gain and retain members, DFA and MDVA would have to compete to offer the best prices to processors.

102.    But with the Asset Sale, none of these effects will be realized and raw milk prices will increase.  Non-DFA dairy producers in the Carolinas require access to the Dean facilities to stay in business.  Following the transaction, DFA will have the ability and incentive to foreclose MDVA, other non-DFA cooperatives, and independent dairy farms from access to the acquired Dean facilities in the Carolinas for raw fluid milk sales.

103.    Historically, MDVA and DFA have competed closely in the market for the supply of raw fluid milk.  MDVA successfully competed against DFA on price and maintained exclusive access to the Dean Foods High Point facility from 2006 until 2015, at which point Dean Foods gave approximately half of the supply to DFA.

104.    Until 2019, when MDVA's access was finally cut off, MDVA and DFA continued to compete for raw milk sales at the Dean facilities.  If DFA acquires all of the Dean facilities in the Carolinas, MDVA will be permanently foreclosed from the ability to compete to supply these three crucial facilities, forcing it to turn to more distant plants, making its bids at those plants less competitive due to its higher transportation costs, and thus eliminating key competition for the supply of raw milk in the Carolinas.

105.    Without the prospect of offering its farmers access to the Dean plants if they provide a competitive price, quality, etc. MDVA will continue to lose farmers and potentially cease to exist.

### Effect on Processed Milk Market

106.    Absent the Asset Sale, competition would increase at the processed milk level because when DFA (through Dean) sells processed milk, it needs to offer a price that is more favorable than its next-best rival. That is, the price a processor offers to retailers for processed

milk is the highest price that it can offer without losing the business. Therefore, it is the second-most competitive processor that determines the price offered by the winning bidder.

107.    But with the Asset Sale, with control of raw milk pricing, DFA/Dean would be able to force its processed milk rivals to pay more for raw milk and thus increase their prices of processed milk offered to retailers. This would allow Dean to offer and receive higher prices.

108.    Moreover, even if DFA/Dean's costs go down, due to the nature of competition in the processed milk market (or lack thereof), processed milk prices offered by Dean would still be likely to go up because DFA/Dean's competitors would see their costs for raw milk go up.  The higher costs of DFA/Dean's rivals would force those rivals to raise their prices to retailers, and this would allow DFA/Dean to bid and win at higher prices.

109.    DFA's ownership of the Dean plants will also create an incentive for DFA to advantage the Dean plants by reducing competing plants' access to raw milk.  As above, this will raise rivals' costs which will allow DFA/Dean to sell milk at better prices.  The lack of access to the Dean plants will also make it unlikely that MDVA will be able to continue as an independent cooperative, eliminating choice for farmers and placing DFA/Dean in a position to raise prices to retailers and other customers.

110.    The Dean plants will also have the ability, if it is more profitable, to simply cut off the raw milk supply to competing plants.  Currently the Kroger processed milk plant in High Point, North Carolina is the only plant that is willing to sell milk to Food Lion at a competitive price.  That Kroger plant operates at 92% of its capacity.  The Kroger plant currently purchases raw milk from MDVA, both from MDVA farmers as well as from farmers belonging to Cobblestone, whose milk is marketed through MDVA.

111.    As shown in the table above, Dean's High Point plant operates at 50% of capacity; its Spartanburg plant at 73% of capacity and its Winston Salem plant at 71%.

112.    If the Asset Sale proceeds, DFA will have the option of simply cutting off the raw milk supply ability to Kroger and sending that raw milk to any of the three Dean plants operating below capacity.  If that option is more profitable than merely raising the price of raw milk, then that is what Dean will do.

113.    If that happens, the result will be a decline in Kroger's production of processed milk.  And because Kroger is owned by a grocery chain, it will serve itself first, leaving Food Lion with a reduced volume or no milk at all, and/or the ability to purchase milk only at supracompetitive prices.

114.    The Asset Sale would also make new entry, which already faces substantial barriers, impossible because DFA would control the sales of raw milk and there would not be multiple raw milk suppliers competing for the business of a potential new entrant.

### *Significant Barriers to Entry*

115.     Due to Appalachia's geography and the relatively high transportation costs, most milk processors located outside of the Carolinas are not economically viable options for Carolina dairy farmers and cooperatives.

116.    Moreover, due to the Carolinas' relatively low dairy production as compared to the national average, the construction of a new local milk processing facility is not economically feasible.  Upon information and belief, of the six facilities currently serving the region, only one facility is above 80% utilization.  National dairy demand has been declining consistently over the last few years.  The dairy processing industry in the Carolinas is currently facing an over-capacity problem that makes the region an unlikely target for entry of additional milk processors.

**DRAFT**

The two largest independent milk processors – Dean and Borden – recently filed for bankruptcy protection, which would likely make financing such a project nearly impossible.

117.    MDVA previously analyzed whether building a new processing facility would be a financially viable option, and after careful consideration, it has determined that it would not be feasible, particularly in the face of high costs and declining milk demand, unless certain circumstances presented themselves.  Upon information and belief, other participants in the milk supply chain have reached a similar conclusion concerning a new processing plant.  The Asset Sale would make it even more difficult, if not impossible, for a new milk processing facility to enter the market.

118.    Absent the Asset Sale, a potential new entrant would have MDVA, DFA and its affiliated cooperatives and a handful of other milk producers to compete for bulk raw milk access at its facility.  Even with DFA's long-standing relationship with Dean, DFA currently still competes for access to other facilities in the region.  Following the Asset Sale, however, DFA and its affiliated cooperatives will have no incentive to bid for access to other facilities because they will have more than enough capacity for their Carolina farmers at the three Dean facilities that they are attempting to acquire.

119.    Upon information and belief, DFA and its affiliated cooperatives account for approximately 65% of the raw fluid milk volume in North Carolina and 59% of the volume in South Carolina.  A new entrant would only have less than half of the dairy supply in the region competing for access to its processing facility.  This leads to a far less competitive market for raw milk access than if DFA was also competing for the business.  This transaction therefore increases the already high barriers to entry in the Carolinas.

## THREATENED ANTITRUST INJURY

### *Harm to Plaintiffs*

120.    The reduction in competition described above threatens to and will result in antitrust injury to Plaintiffs MDVA and Food Lion, as it tends to and will substantially lessen competition. Its entire premise is for DFA to increase control over dairy farmers and increase the likelihood that MDVA, other milk cooperatives and independent dairy farmers would be foreclosed from access to milk processing, which would increase their transportation costs to make their milk production businesses not economically viable.  Therefore, following the transaction, DFA will have the ability and incentive to foreclose MDVA and other non-DFA milk producers from access to the acquired Dean facilities for raw milk sales.

121.    MDVA has seen these events unfold as DFA has purchased milk processors in other parts of the country.  For example, in 2017, DFA purchased Cumberland Dairy, a former independent processor located in New Jersey, with whom MDVA had previously enjoyed a profitable and mutually beneficial relationship that included the sale of bulk raw milk and a successful co-packing partnership. Almost immediately follow DFA's takeover of the facility, MDVA lost all of its bulk raw milk business as Cumberland quickly switched to DFA farmers for their milk supply.

122.    The most important factor influencing the long-term viability and overall competitiveness of a dairy cooperative is the cooperative's ability to transport its members' milk to a local processing facility.  To continue as a viable competitor, MDVA's farmers must have access to local processing facilities to sell their milk.  But if DFA is permitted to acquire all three Dean facilities in the Carolinas, MDVA and other non-DFA milk producers will be permanently

cut off from access to DFA-owned processing facilities in the region because DFA will not allow direct competitor having access to a DFA-owned processing facility.

123.    Moreover, MDVA's access to non-Dean facilities in the Carolinas is untenable and unsustainable in the long run.

124.    This lack of access will also make it unlikely that MDVA will be able to continue as an independent cooperative.  In the short term, many farmers will face a choice between less profitable, more distant processing partners, or joining DFA.  As it loses members to DFA, MDVA will eventually be significantly weakened or pushed out of the market for the supply of raw milk, leaving DFA as the only economically significant dairy cooperative in the Carolinas, and thus eliminating cooperative choice for farmers.

125.    The proposed transaction would reduce competition in both markets and result in injury to milk producers.  The proposed transaction would also harm downstream consumers of processed milk, such as retailers.

126.    The Asset Sale and the resulting harm to competition in the relevant geographic market for raw milk, will cause MDVA to lack access to the Dean plants regardless of price, quality or other pro-competitive factors and solely because of the anticompetitive incentives of the shared ownership between DFA and Dean.  With the Asset Sale, MDVA will continue to lose members to DFA and potentially cease to exist entirely and face other harm that constitutes threatened injury to MDVA under Section 16 of the Clayton Act.

127.    The Asset Sale and the resulting harm to competition in the relevant geographic markets for both raw and processed milk will cause Food Lion to pay higher prices for processed milk due to both higher raw milk prices as well as less competition among milk processors and less access to raw milk by milk processors, and potentially to lose access to processed milk at all.

This and other potential harm that will result in either or both markets constitutes threatened injury to Food Lion under Section 16 of the Clayton Act.

### *Harm to Competition*

128.     As alleged above, dairy farmers and milk cooperatives like MDVA will suffer antitrust harm due to their foreclosure from access to economically viable milk processing.

129.     Milk customers, including retailers, would also be harmed.  The reduction of competition from, or elimination of, MDVA will bring about the "downstream" effect of higher prices for processed milk, both because higher raw milk prices will be passed on by milk processors, and because competition between milk processors will be reduced.  Once DFA controls enough of the raw milk supply, it will reduce or eliminate that supply to the processing plants that compete with the newly acquired plants.  Critically, Dean's plants in North and South Carolina are operating well below their capacity, so that Dean/DFA can profitably increase their own processed milk utilization while creating a gallon-for-gallon reduction in the amount of milk supplied by their competitors.  As a result, processed milk prices to retailers such as Plaintiff Food Lion, LLC, and ultimately to consumers, will increase.

130.     . In *In re Southeastern Milk Antitrust Litigation* and the related direct-action case by Food Lion, retailers developed extensive factual and economic evidence that coordination between DFA and Dean resulted in increased milk prices for retailers.  Post-transaction, with DFA and Dean effectively in control over milk production and distribution in the Carolinas, and without the ability of rival milk cooperatives like MDVA to act as a check on milk processing costs, retailers and customers would be at the mercy of a monopolist.

131.     Because the injury to MDVA (market foreclosure) and Food Lion (increased prices) flows directly from both the reduction in competition caused by the transaction, as well as

**DRAFT**

from anticompetitive acts made possible by the illegal transaction, the injuries to MDVA and Food Lion from the transaction would constitute antitrust injury.

132.    These anticompetitive results are likely to occur because they are the economically rational result of placing under combined ownership a company that possesses market power over an input (DFA, and raw milk) and a company that possesses market power over a product made from that input (Dean and processed milk).

133.    This case, however, presents the rare scenario where a court considering a prospective merger need not base its decision solely on economic consequences likely to occur in the future.  Here, the market is already lacking in competition for the same reasons that would be perpetuated by the merger: a shared interest between DFA and Dean.  The Side Note has created a lack of competition that without the asset sale would go away and be replaced with greater competition with the expiration of the Side Note, but with the Asset Sale will get even worse because of joint ownership.

134.    The injuries to MDVA, Food Lion, and the public at large would be irreparable if the transaction were completed.  Those injuries would not be adequately compensable by money damages.

135.    The public interest, including the interest in ensuring competition, weigh heavily in favor of an injunction.

136.    DFA and Dean have no legitimate and cognizable interest in completing an illegal acquisition.

### *Injunctive Relief is Narrowly Tailored to Ensure Competition*

137.     The three Dean processing facilities in North and South Carolina are included in the proposed sale to DFA.  If allowed to go forward, this transaction will allow DFA to

**DRAFT**

effectively control the markets for the supply of raw milk and processed and packaged dairy products in the Carolinas.  In fact, DFA's control of the Carolinas' fluid milk market will be even stronger than that of Dean following the Dean-Suiza divestiture which has been described as "a case study in how unchecked mergers beget abusive monopolies that harm both farmers and consumers."  Claire Kelloway, *The Monopolization of Milk*, *How America's biggest dairy co-op is trying to become even bigger.* WASHINGTON MONTHLY, Nov. 21, 2019, *available at* https://washingtonmonthly.com/2019/11/21/the-monopolization-of-milk/.  The loss of competition will be particularly acute in the Carolinas for the reasons described above.

138.    To ensure competition in the supply of raw milk and finished fluid milk products, it is critical that at least one of the three Dean facilities located in the Carolinas be sold to an independent and qualified buyer.  The long-term anticompetitive consequences of the Dean-Suiza merger have shown what will happen in the absence of a robust divestiture here.

139.    Such a divestiture buyer should: (i) be a true competitor in the Carolinas; (ii) have a proven track record and experience with processing and co-packing consumer products; and (iii) be truly independent.

140.    To effectively utilize one of the Dean processing facilities to increase competition in the Carolinas, the divestiture buyer must be incentivized to compete vigorously as a dairy producer in the area.  A cooperative without dairy production in the area will have perverse incentives to deal exclusively with the largest cooperative in the area, DFA, in hopes of gaining favor that could benefit the purchaser in the regions where DFA and the purchaser actually compete.

141.    To ensure that competition is effective and sustainable into the future, the divestiture buyer should also have a proven track record and past experience with processing and co-packing consumer products.

142.    The relief sought is narrowly tailored.  If granted, DFA could still move forward with much of its proposed transaction, including purchasing 98% of Dean's plants, including two of Dean's three facilities in the Carolinas.  DFA will continue to maintain a substantial presence in the Carolinas.  As Dean long ago engaged an investment banker to market its assets and MDVA previously bid for all three Carolinas facilities, there is no legitimate basis to urge that time is of the essence to close the current anticompetitive transaction or risk the loss of needed fluid raw milk for the marketplace.  Dean is in the position to promptly divest one of its three Carolinas processing facilities.

## COUNT ONE

### (Violation of Section 7 of the Clayton Act, 15 U.S.C. § 18)

143.    The foregoing allegations are incorporated as though re-alleged herein.

144.    MDVA and Food Lion bring this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain the Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18. The effect of the proposed DFA-Dean Asset Sale will be substantially to lessen competition or to tend to create a monopoly in the markets for raw and/or processed milk in North and South Carolina, or in another line of commerce, in violation of Section 7 of the Clayton Act.

145.    The relevant product markets include the upstream market for the supply of raw fluid milk and the downstream market for milk processing and co-packing fluid milk for sale.

The relevant geographic markets for both the supply of raw fluid milk and its processing and co-packing consists of the processing plants in North and South Carolina.

146.    The relevant markets are concentrated and the proposed transaction would increase DFA's market power in the upstream market and place DFA in the position to restrict its competitors' access to the downstream fluid milk processing and packaging market.

147.    Barriers to entry and expansion are high and new entry would not be timely, likely or economical to replace the competition that would be lost as a result of the transaction.

148.    There are no efficiencies that are transaction-specific, let alone sufficient to overcome the permanent loss of competition.  In fact, DFA's over twenty-year supply relationship with Dean militates against the need for a transaction because a combination is not required for these two companies to engage commercially.

149.    Plaintiffs are threatened with further loss or damage by reason of the actual or likely lessening of competition described above and are entitled to injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, sufficient to ensure competition in the market for processed milk in North and South Carolina or other relevant line of commerce.

## REQUESTED RELIEF

150.    In light of the foregoing, Plaintiffs MDVA and Food Lion respectfully request that the Court enter a judgment in their favor and against Defendants DFA and Dean and grant the following relief:

a.    DFA's proposed acquisition of all three Dean facilities in North and South Carolina be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

b.    Dean and DFA be (i) enjoined from consummating any aspect of the proposed Asset Sale, or from entering into or carrying out any agreement, understanding, or plan,

**DRAFT**

the effect of which would cause the anticompetitive effects described herein; or in the alternative, (ii) ordered to divest such assets from the Asset Sale as would be sufficient to ensure competition in the relevant line of commerce;

      c.     Plaintiffs be awarded reasonable attorneys' fees and costs of this action, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26; and

      d.     Plaintiffs receive such other relief as the Court deems just and proper.