**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| SOUTHERN FOOD GROUPS, LLC *et al.*, | § | Case No. 19-36313 (DRJ) |
|  | § | (Jointly Administered) |
| Debtors.[1] | § |  |
|  | § |  |

**NOTEHOLDERS' RESPONSE TO EMERGENCY MOTION OF FOOD LION LLC AND MARYLAND AND VIRGINIA MILK PRODUCERS COOPERATIVE ASSOCIATION, INC. FOR RELIEF FROM THE AUTOMATIC STAY TO ALLOW COMMENCEMENT OF ANTITRUST ACTION AND REQUEST FOR STATUS REPORT AND STATUS CONFERENCE PURSUANT TO BANKRUPTCY CODE SECTION 105(d)**
(Relates To ECF No. 1693)

---

[1]   The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: Southern Foods Group, LLC (1364); Dean Foods Company (9681); Alta-Dena Certified Dairy, LLC (1347); Berkeley Farms, LLC (8965); Cascade Equity Realty, LLC (3940); Country Fresh, LLC (6303); Dairy Information Systems Holdings, LLC (9144); Dairy Information Systems, LLC (0009); Dean Dairy Holdings, LLC (9188); Dean East II, LLC (9192); Dean East, LLC (8751); Dean Foods North Central, LLC (7858); Dean Foods of Wisconsin, LLC (2504); Dean Holding Company (8390); Dean Intellectual Property Services II, Inc. (3512); Dean International Holding Company (9785); Dean Management, LLC (7782); Dean Puerto Rico Holdings, LLC (6832); Dean Services, LLC (2168); Dean Transportation, Inc. (8896); Dean West II, LLC (9190); Dean West, LLC (8753); DFC Aviation Services, LLC (1600); DFC Energy Partners, LLC (3889); DFC Ventures, LLC (4213); DGI Ventures, Inc. (6766); DIPS Limited Partner II (7167); Franklin Holdings, Inc. (8114); Fresh Dairy Delivery, LLC (2314); Friendly's Ice Cream Holdings Corp. (7609); Friendly's Manufacturing and Retail, LLC (9828); Garelick Farms, LLC (3221); Mayfield Dairy Farms, LLC (3008); Midwest Ice Cream Company, LLC (0130); Model Dairy, LLC (7981); Reiter Dairy, LLC (3675); Sampson Ventures, LLC (7714); Shenandoah's Pride, LLC (2858); Steve's Ice Cream, LLC (6807); Suiza Dairy Group, LLC (2039); Tuscan/Lehigh Dairies, Inc. (6774); Uncle Matt's Organic, Inc. (0079); and Verifine Dairy Products of Sheboygan, LLC (7200). The debtors' mailing address is 2711 North Haskell Avenue, Suite 3400, Dallas, TX 75204.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ....................................................................................1

    A.     Dean Foods' Pending § 363 Sales To DFA and Prairie Farms .............................5

           1.     Antitrust Concerns ...................................................................10

    B.     Borden Chapter 11 Bankruptcy ......................................................14

    C.     Borden-Dean Proposed Plan Of Merger .............................................15

    D.     Debtors' Exclusive Period, Request for Status Conference...............................19

CONCLUSION...................................................................................................22

# TABLE OF AUTHORITIES

**Page**

**Cases**

*In re Aspen Limousine Serv., Inc.*,
   187 B.R. 989 (Bankr. D. Colo. 1995) ...................................................................... 20

*Complaint, U.S. v. Dean Foods Co.*,
   Case No. 10-C-0059 (E.D. Wisc. 2010) ........................................................... 10, 12

*In re Gulf Coast Oil Corp.*,
   404 B.R. 407 (Bankr. S.D. Tex. 2009) ................................................................... 20

*In re King*,
   546 B.R. 682 (Bankr. S.D. Tex. 2016) ................................................................... 20

*Sitts v. Dairy Farmers of America, Inc.*,
   417 F. Supp.3d 433 (D. Vt. 2019) .......................................................................... 11

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
   549 U.S. 312 (2007)................................................................................................ 11

*In re Xenon Anesthesia of Tex.*,
   510 B.R. 106 (Bankr. S.D. Tex. 2014) ..................................................................... 3

**Statutes**

11 U.S.C. § 105(d) .................................................................................................... 4, 20

Clayton Act, 15 U.S.C.A. § 18 ...................................................................................... 10

**Legislative Materials**

Rep. No. 109-31, 109th Cong., 1st Sess. 93 (2005)....................................................... 20

**Other Authorities**

*Leaving Time to Litigate: Lesson from Recent Merger Challenges, The Antitrust Source* (October 2018) ........................................................................................................................ 13

Knighthead Capital Management, LLC, Ascribe III Investments LLC, Ensign Peak Advisors, Inc., Kingsferry Capital LLC, and Behrens Investment Group Management, LLC (together, the "Noteholders"), as holders of 6.500% Senior Notes due 2023 (the "Senior Notes") issued pursuant to that certain Indenture, dated as of November 25, 2015, by and among Dean Foods Company ("Dean Foods"), as Issuer, the guarantors party thereto, and Bank of New York Mellon Trust Company, N.A., as Trustee, by and through its undersigned counsel, in conjunction with other holders of Senior Notes ("Other Bondholders") and independent dairy farmers (Noteholders, Other Bondholders, and such farmers, collectively, the "Proponents"), hereby file the *Noteholders' Response to Emergency Motion Of Food Lion LLC And Maryland And Virginia Milk Producers Cooperative Association, Inc. For Relief From The Automatic Stay To Allow Commencement Of Antitrust Action (ECF No. 1693) And Request For Status Report And Status Conference Pursuant To Bankruptcy Code Section 105(d)* ("Response"), and respectfully represents as follows:

## PRELIMINARY STATEMENT[2]

1.      On April 5th and 7th, 2020, this Court entered orders approving the sales of a majority of the Debtors' assets to DFA and Prairie Farms pursuant to section 363 of the Bankruptcy Code.  Both transactions are still pending.  Among other things, they require regulatory approval from the Antitrust Division of the United States Department of Justice (the "Antitrust Division").  The Antitrust Division's concerns about these sales are well-known. On March 11, 2020, Assistant United States Attorney General Makan Delrahim wrote a letter to the UCC's counsel informing it that the DFA Sale would constitute a "dramatic reorganization of the American dairy industry" and "appears to pose a serious risk of anticompetitive harm that

---

[2]      Capitalized terms not defined in the Preliminary Statement are defined in the Factual Background section herein.

would likely need to be addressed either through divestitures or an injunction enjoining the transaction if DFA and Dean are unwilling or unable to agree to appropriate remedies needed to protect American farmers and consumers." (ECF 1111, Ex. A at 1). Likewise, at an April 14, 2020 hearing, the Debtors informed the Court that the Antitrust Division continued to investigate the Prairie Farms Sale. (Hearing Transcript dated April 14, 2020, at 10:3-20; 11:7-16).

2.      Thus, the Noteholders, like all parties in interest, understand that there is material risk that the DFA and Prairie Farms Asset Sales will not be consummated due to antitrust concerns. Moreover, the Noteholders recognize that if the Assets Sales are not consummated, the consequences to the Debtors, their 15,000 employees, other stakeholders of the Debtors, and the dairy industry in general will be grave. As the Court observed when it approved the Asset Sales on a truncated schedule, its "concern always has been [and] remains the impact that this company has on our country and the fact that we have roughly 15,000 jobs at stake." (Hearing Transcript dated April 3, 2020, at 104:21-24).

3.      In the interest of prudence, the Noteholders have continued to collaborate with other parties in interest on a backup plan to preserve the value of the Debtors' estates for all constituencies in the event that the Assets Sales are not consummated. Specifically, multiple Dean Foods stakeholders have continued exploring an industry-welcome combination with Borden Dairy Company ("Borden"), a debtor in possession with its own chapter 11 case pending before Judge Sontchi in Delaware, with the support of affiliates of KKR & Co. Inc. ("KKR"), Borden's largest secured lender (the "Borden-Dean Merger"). In the event the Asset Sales are not consummated, the Borden-Dean Merger presents a viable "Plan B" transaction that would maximize the value of both estates.

4.      The Noteholders submit this Response to apprise the Court and parties in interest of the existence of, and support for, the Borden-Dean Merger.   In determining whether "cause" exists under Bankruptcy Code section 362(d)(1) to grant the Emergency Lift Stay Motion filed by Food Lion and MDVA, the Court will likely consider "the impact of the stay on the parties and the balance of harm."   *See, e.g.*, *In re Xenon Anesthesia of Tex.*, 510 B.R. 106, 112 (Bankr. S.D. Tex. 2014).   The Noteholders agree with the Court that the impact on our nation and Dean Foods' 15,000 employees must be given great weight.   As such, the Noteholders submit this Response to inform the Court that—as a result of the progress made to date on the Borden-Dean Merger—the fate of Dean Foods, its employees, and the national milk market do not depend on the DFA and Prairie Farms Asset Sales.   Indeed, in the event they are not consummated, the Proponents are ready, willing, and financially able to execute the Borden-Dean Merger.

5.      The Borden-Dean Merger would be consummated through separate but coordinated plans of reorganization across two judicial districts to facilitate the exit of both companies from bankruptcy.   This historic transaction would preserve thousands of jobs as well as ensure robust competition within the dairy industry.   In spite of the shutdown of the capital markets caused by the COVID-19 pandemic, the Proponents of the Borden-Dean Merger have already obtained commitments in excess of $1 billion in capital in the form of equity and debt financing, as further described below.   Among other things, the proceeds of the financing would be used to effect the favorable business combination; preserve jobs; pay off Dean Foods' senior-most creditors (including administrative expenses); provide Dean Foods noteholders the right to subscribe to the rights offering; allow general unsecured creditors (including the Noteholders) a direct stake in the new entity; and provide substantial and necessary capital for the new entity to operate as a strengthened market participant in the nation's dairy industry.   Moreover, in light

of the Debtors' severe liquidity constraints, and as part of the committed capital, a subgroup of the Proponents have commitments to provide a junior debtor-in-possession financing facility (the "Junior DIP Facility") to provide Dean Foods with sufficient runway to execute on the Borden-Dean Merger through a confirmed chapter 11 plan.

6.      In light of the Debtors' precarious financial condition, the Noteholders recognized the importance of a "Plan B" well before Food Lion's and MDVA's Emergency Lift Stay Motion.   As the Debtors have informed the Court, the impact of COVID-19 has caused additional strains on the Debtors' liquidity and, absent a capital infusion and deleveraging of its balance sheet, Dean Foods' ability to continue its operations is in serious doubt.   (Hearing Transcript dated March 12, 2020, at 13:12-15:1).   Moreover, based on concerns expressed to this Court by numerous interested parties, there remains significant execution risk to the Asset Sales, especially with respect to antitrust clearance.   Under the terms of their respective agreements, if such clearance is not obtained by June 1, 2020, the acquirers would have the unilateral right to terminate the Asset Sales, thereby devastating the Debtors' estates and leaving them administratively insolvent.   In such event, the impact on the nation's milk supply chain could be severe and long-lasting, even implicating national security concerns.   The Noteholders respectfully submit that, during these perilous times, such risks must be avoided at all costs and all eggs should not be placed in one basket.

7.      Consequently, in recognition of the significant execution risks to the Assets Sales, the Proponents have worked for several months (and continue to work) diligently and collaboratively to put together a backup transaction that would ensure Dean Foods' continued operation while also maximizing the value of its estate.   The Noteholders provide this information in connection with the Emergency Lift Stay Motion to the extent the Court deems it

relevant to that matter, and do not take a formal position on the relief requested by Food Lion and MDVA.   Moreover, nothing herein prejudices any party or is inconsistent with, or otherwise interferes with the DFA or Prairie Farms Sale Orders.   Rather, the Proponents believe that the Borden-Dean Merger outlined herein represents a thoughtful and prudent alternative under the circumstances, and consideration of that alternative is in the best interests of the Debtors' employees and other creditors, especially in light of the multiple execution risks (including DFA and Prairie Farms' unilateral ability to terminate their respective obligations on June 1, 2020 if antitrust approval has not been obtained).

8.     The Court has substantial power under section 105 of the Bankruptcy Code, including holding status conferences and prescribing limitations and conditions in connection with formulation of a plan "as the court deems appropriate."   11 U.S.C. § 105(d)(2).   In order to ensure that the Borden-Dean Merger can become actionable promptly upon termination of the APAs by their terms, the Proponents respectfully request that the Court direct that (1) the Debtors file a status report with the Court by no later than May 1, 2020 on the status of discussions with the Antitrust Division and (2) the Debtors and their key constituents appear at a telephonic status conference before the Court on May 4, 2020.   In the event that the Court determines at such conference that there is a material risk that the Asset Sales will not close, the Proponents request that the Debtors make their data room available (upon the execution of an acceptable confidentiality agreement) to those parties that are willing to provide capital in support of the Borden-Dean Merger.

## FACTUAL BACKGROUND

### A.     Dean Foods' Pending § 363 Sales To DFA and Prairie Farms

9.     On November 12, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

10.     In connection with the first day hearing, the Debtors advised the Court and all parties-in-interest that they were in active discussions with Dairy Farmers of America ("DFA") to act as a stalking horse bidder for a substantial portion of the Debtors' assets.   On February 17, 2020, the Debtors filed (1) a motion to, *inter alia*, approve DFA as the stalking horse bidder for substantially all of the Debtors' assets (ECF No. 925) and (2) a stalking horse asset purchase agreement (ECF No. 935).   The Debtors' motion proposed an April 13, 2020 deadline for the submission of qualified bids on all or a portion of the Debtors' assets.

11.     The following week, on March 9, 2020, the Official Committee of the Unsecured Creditors (the "UCC") objected to the proposed sale to DFA, which it characterized "as a one-way option in DFA's favor."   (ECF No. 1060).   Pension Benefit Guaranty Corporation ("PBGC") filed a joinder to the UCC's objection (ECF No. 1064) and separate objections raising antitrust concerns were filed by Southeast Milk, Inc. (ECF No. 1062) and The Stop & Shop Supermarket Company LLC ("Stop and Shop") and Food Lion LLC ("Food Lion") (ECF No. 1065).   At the March 12, 2020 hearing, the Court declined to approve the stalking horse bid or sale procedures.

12.     On March 19, 2020, the Court entered an order (i) approving the Bidding Procedures for sales of the Debtors' assets, (ii) scheduling a hearing to approve sales of the Debtors' assets, (iii) approving the form and manner of notices of sales and sale hearing, (iv) approving assumption and assignment procedures, and (v) granting related relief (the "Bidding Procedures Order") (ECF No. 1178).   Pursuant to the Bidding Procedures Order, the Court expedited the deadline for parties to submit bids for Dean Foods' assets, reducing the original deadline by two weeks from April 13, 2020 to March 30, 2020.

13.     Under the Bidding Procedures Order, the Debtors were required to determine and identify the highest or otherwise best offer(s) (the "Successful Bid(s)") as well as the next highest or otherwise best offer(s) (the "Alternate Bid(s)") and file notice of the Successful Bidder(s) and Alternative Bidder(s) by 11:59 p.m. (prevailing Central Time) on March 30, 2020. The deadline for sale objections was 12:00 p.m. (prevailing Central Time) on April 1, 2020, and the Sale Hearing was scheduled for April 3, 2020.

14.     On March 30, 2020, the Debtors filed their Notice of Bids Results (ECF No. 1270), designating DFA as Successful Bidder for 43 facilities and Prairie Farms Dairy, Inc. ("Prairie Farms") as Successful Bidder for 10 facilities.   On March 31, 2020, the Debtors filed their Notice of Sale Orders (ECF No. 1350) containing final forms of orders approving sale transactions with DFA (ECF No. 1350-1) and Prairie Farms (ECF No. 1350-2).

15.     On April 1, 2020, multiple parties-in-interest objected to these sales, including Stop & Shop and Food Lion (ECF No. 1406) and the Maryland and Virginia Milk Producers Cooperative Association Incorporated ("MDVA") (ECF No. 1415).   On that same day, an unincorporated association of individual dairy farmers (the "Individual Dairy Farmers") filed a motion to intervene seeking to "voice concerns and objections" to the sales.   (ECF No. 1426).

16.     At the April 3, 2020 Sale Hearing, Debtors' counsel reported on the status of discussions with the Antitrust Division concerning the proposed sale transactions, and informed the Court that the parties were aiming to close the DFA transaction by the end of April. (Hearing Transcript dated Apr. 3, 2020, at 62:6-13).

17.     On April 5, 2020, the Court entered an *Order (A) Authorizing Sale Of Certain of Debtors' Assets To Dairy Farmers Of America, Inc. Free And Clear Of All Claims, Liens, Interests, And Encumbrances, (B) Authorizing The Debtors To Enter Into And Perform Their*

*Obligations Under The Asset Purchase Agreement And Related Documents, And (C) Granting Related Relief* (the "DFA Sale Order") (ECF No. 1572).   Pursuant to the DFA Sale Order, the Court approved the Asset Purchase Agreement (the "DFA APA"), by and among the Debtors and DFA (the "DFA Sale").

18.     Likewise, on April 7, 2020, the Court entered an *Order (A) Authorizing Sale Of Certain of Debtors' Assets To Prairie Farms Dairy, Inc. Free And Clear Of All Claims, Liens, Interests, And Encumbrances, (B) Authorizing The Debtors To Enter Into And Perform Their Obligations Under The Asset Purchase Agreement And Related Documents, And (C) Granting Related Relief* (the "Prairie Farms Sale Order") (ECF No. 1594).   Pursuant to the Prairie Farms Sale Order, the Court approved the Asset Purchase Agreement (the "Prairie Farms APA," and together with the DFA APA, the "APAs"), by and among the Debtors and Prairie Farms (the "Prairie Farms Sale" and together with the DFA Sale, the "Asset Sales").[3]

19.     Under the DFA APA, DFA would acquire 44 of the Debtors' facilities and related business assets for $433 million in cash (subject to certain purchase price adjustments).   Under the Prairie Farms APA, Prairie Farms would acquire 10 of the Debtors' facilities and related business assets that were excluded from the Revised DFA APA for $75 million in cash (also subject to certain purchase price adjustments).

20.     The ad hoc group of holders of Senior Notes (the "Ad Hoc Group") initially objected to the asset sales to DFA and Prairie Farm.   (ECF No. 1439).[4]   In its objection, the Ad Hoc Group explained that it "ha[d] formulated an advanced proposal to reorganize the Debtors through confirmation of a chapter 11 plan (the "Ad Hoc Proposal")" and "continue[d] to pursue the reorganization" with the goal of maximizing value for all stakeholders.   *Id.* at ¶ 1.

---

[3]   Additional sale orders were entered with respect to the purchase by other parties of certain the Debtors' other facilities. (*See* ECF Nos. 1583-1585, and 1595).
[4]   The Ad Hoc Group subsequently withdrew its objection (ECF No. 1457).

In connection with such proposal, the Ad Hoc Group negotiated with several individual dairy farmers and cooperatives to provide preferred equity financing to support the Ad Hoc Proposal. *Id.* at ¶ 2. Nevertheless, as the Ad Hoc Group explained, "[g]iven the nature of this process (including the myriad difficulties in diligence …), the current state of the capital markets, and the recent enactment of the CARES Act, it was simply not possible to propose a fully committed value maximizing proposal by the March 30 bid deadline." *Id.* at ¶ 5.[5]

21. While the UCC did not formally object to the DFA or Prairie Farms Sale Orders, that was at least partly due to the fact that "DFA included a provision in its bid that automatically would reduce its purchase price by $25 million if the [UCC] objected to any provisions of DFA's bid." *See Statement Of The Official Committee of Unsecured Creditors In Support of (I) Motion Of Debtors For Entry Of Orders Approving Sale Of Debtors' Assets And (II) Notice Of Bid Results* (the "UCC Statement") (ECF No. 1430) at n. 3. Nevertheless, the UCC did state that: (1) "[t]he Successful Bids are not perfect and contain a number of closing conditions that make consummation of the applicable transactions uncertain"; (2) "[i]n a different world and if the Debtors had the financial resources available to provide prospective bidders with additional time, the [UCC] most likely would be objecting to the proposed sales; and (3) the UCC was expressing its support for the sales "reluctantly." *Id.*

22. In addition, the UCC identified for the Court six conditions to closing and termination rights contained in the DFA APA that could present obstacles to closing: (1) the need for antitrust approval; (2) certain collective bargaining agreements; (3) confirmation that no "material adverse effect" has occurred; (4) breach by the Debtors; (5) the Outside Date set forth

---

[5]   Likewise, California Dairies, Inc. ("California Dairies"), a member of the UCC, filed a statement that it was "the position of [California Dairies] that the sale process resulting in the bid of [DFA] failed to afford all prospective buyers a full, fair, and reasonable opportunity for all persons to make informed bids." (ECF No. 1434 at ¶ 3). California Dairies is the second largest milk marketing and processing cooperative, owned by nearly 400 California dairy farmers. *Id.* at ¶ 1.

in the DFA APA; and (6) DFA's entrance into transition services agreements. *See id.* at ¶ 3. Likewise, the Prairie Farms APA contains antitrust closing conditions that could also present obstacles to closing that transaction.   *See id.* at ¶ 5.

23.     As of the date of this filing, the DFA and Prairie Farms transactions have not been consummated and—for the reasons set forth below—remain contingent on events beyond the Debtors' control.

        1.     <u>Antitrust Concerns</u>

24.     DFA is the largest raw milk supplier in the United States.   (ECF 1111, Ex. A at 1).   It purchases and re-sells raw milk from its members and operates its own milk processing facilities.   Dean Foods is the largest processor and direct-to-store distributor of fluid milk in the United States.   *Id.*; *see also* First Day Declaration of Gary Rahlfs (ECF No. 46 at ¶ 8). Accordingly, the proposed sales of Dean Foods' assets to DFA and Prairie Farms raise significant competitive concerns because they will substantially increase market power that DFA already possesses and "the effect of such may be substantially to lessen competition," in a manner that could be deemed to violate Section 7 of the Clayton Act, 15 U.S.C.A. § 18.

25.     As the Antitrust Division has recognized, the relevant geographic markets for dairy products are local in nature.   *See, e.g.*, Complaint, *U.S. v. Dean Foods Co*., Case No. 10-C-0059 (E.D. Wisc. 2010) ("Each school district in Wisconsin and the UP constitutes a relevant geographic market or section of the country within the meaning of Section 7 of the Clayton Act."); Verified Complaint, *U.S. v. Dairy Farmers of America*, Case No. 00-1663 (D.D.C. 2000) ("[T]he greater Philadelphia and New York metropolitan areas each constitute a section of the country or relevant geographic market within the meaning of Section 7 of the Clayton Act."). In   many geographic areas—the Northeast (including Pennsylvania, New York, and New Jersey) and the Midwest (including Iowa, Minnesota, Nebraska, Illinois and Missouri), for

example—the milk processing facilities owned by Dean Foods are the only source of competition that constrains the facilities owned or controlled by DFA.   Independent dairy farmers in those areas have few, if any, alternatives.   Concerns about the impact on these independent dairy farmers were raised by Zippy Duvall, President of the American Farm Bureau Federation, in a March 26, 2020 letter to Attorney General William P. Barr, attached hereto as **Exhibit A**.

26.     DFA controls approximately 50% of the supply of raw milk in those states, either through its own processing operations, or indirectly, through long-term supply agreements with independent milk processors.   This market power is a competition problem, even without DFA acquiring Dean Foods.   As the district court overseeing a recent case involving antitrust claims against DFA recognized, a "market share in the range of 50% is evidence of monopsony power," *Sitts v. Dairy Farmers of America, Inc.*, 417 F.Supp.3d 433, 477 (D. Vt. 2019), which "is market power on the buy side of the market," *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320 (2007).   Thus, DFA already possesses monopsony power in many markets.

27.     DFA wields its clout to restrict access to milk processing operations, which in turn suppresses the market price for raw milk that is received by independent dairy farmers. *See America's Dairy Farmers are Hurting.   A Giant Merger Could Make Things Worse,* dated Dec. 19, 2011, New York Times, *available at* https://www.nytimes.com/2019/12/11/business/dean-foods-dairy-farmers-antitrust.html.

28.     DFA's acquisition of Dean Foods' assets could be deemed to exacerbate the problem caused by DFA's power.   Transactions that substantially increase monopsony power are likely to raise competitive concerns under Section 7 of the Clayton Act.   *See, e.g.,*

Horizontal Merger Guidelines § 1, United States Dep't of Justice & Federal Trade Comm'n (2010) ("Enhancement of market power by buyers, sometimes called 'monopsony power,' has adverse effects comparable to enhancement of market power by sellers."). Indeed, under the DOJ's Horizontal Merger Guidelines, in a highly concentrated market where the largest player controls a 50% share of the market, any transaction in which the largest firm increases its market share by 10% or more is "presumed to be likely to enhance market power." *Id*. § 5.3. And such an increase in market power is precisely what Section 7 of the Clayton Act is intended to prevent. *Id*. § 1 ("[M]ergers should not be permitted to create, enhance, or entrench market power or to facilitate its exercise.")

29. After gaining control of the Dean Food assets, DFA will control between 60% and 70% of the supply of raw milk in many states, which will increase its ability to restrict access to milk processing operations. Left with nowhere else to turn, independent milk farmers in those parts of the country could be forced to accept prices for raw milk that may be artificially suppressed by DFA's enhanced monopsony power. And lower raw milk prices would exacerbate the trend of milk farmers around the country going out of business, particularly in light of the ongoing COVID-19 crisis and its impact on the economy. *See America's Dairy Farmers are Hurting. A Giant Merger Could Make Things Worse,* dated Dec. 11, 2019, New York Times, *available at* https://www.nytimes.com/2019/12/11/business/dean-foods-dairy-farmers-antitrust.html; *see also Antitrust concerns cloud DFA's purchase of Dean Foods' assets*, dated Apr. 16, 2020, Food Dive, *available at* https://www.fooddive.com/news/antitrust-concerns-cloud-dfas-purchase-of-dean-foods-assets/576027/.

30. Given the significant competitive concerns raised by the proposed transactions, it came as no surprise when both the New York Times and the Wall Street Journal reported this

winter that the Antitrust Division was investigating the competitive impact of DFA's proposed takeover of Dean Foods.[6]   On March 11, 2020, Assistant United States Attorney General Makan Delrahim acknowledged the existence of that investigation in a letter to counsel for the UCC.   (ECF 1111, Ex. A at 1).   In his letter, Mr. Delrahim expressed concern about the "dramatic reorganization of the American dairy industry" and warned that "an acquisition of Dean by DFA appears to pose a serious risk of anticompetitive harm that would likely need to be addressed either through divestitures or an injunction enjoining the transaction if DFA and Dean are unwilling or unable to agree to appropriate remedies needed to protect American farmers and consumers."   *Id.*

31.   The sale of certain Dean Foods facilities to Prairie Farms may not alleviate the competitive concerns raised by the proposed DFA transaction.   DFA and Prairie Farms are closely affiliated through Hiland Dairy Foods, a cooperative they incorporated together, which means that any sale of assets to Prairie Farms may not completely remove those assets from the ambit of DFA's control and influence.

32.   If the Antitrust Division determines to challenge the pending Asset Sales, DFA and Prairie Farms could elect to terminate their transactions.   And even if they opt to litigate with the Antitrust Division, it would tie-up the Debtors' estates in litigation for months and place a cloud of uncertainty over the continuing viability of the Debtors' assets.   *See Leaving Time to Litigate: Lesson from Recent Merger Challenges*, The Antitrust Source (October 2018), at 4 (the average time from complaint to trial in recent government antitrust merger cases is around seven

---

[6]   *See America's Dairy Farmers are Hurting.   A Giant Merger Could Make Things Worse,* dated Dec. 11, 2019, New York Times*, available at* https://www.nytimes.com/2019/12/11/business/dean-foods-dairy-farmers-antitrust.html; *Regulators Probe Potential Dean Foods Merger*, dated Jan. 27, 2020, Wall Street Journal, *available at* https://www.wsj.com/articles/regulators-probe-potential-dean-foods-merger-11580147236.

months), *available at* https://www.lw.com/thoughtLeadership/leaving-time-litigate-merger-challenges.

33.    On April 20, 2020, Food Lion and MDVA filed an *Emergency Motion For Relief From The Automatic Stay To Allow Commencement Of Antitrust Action* (the "Emergency Lift Stay Motion") (ECF No. 1693).   Food Lion and MDVA attached a draft complaint to their motion, which seeks to enjoin the consummation of the DFA Sale to eliminate anticompetitive effects in and around North and South Carolina. (ECF No. 1693-1 at 3).[7]

34.    Given the antitrust risk associated with the Asset Sales, there is material risk of harm to the Debtors' estates from having no viable backup plan regardless of whether the Court grants the Emergency Lift Stay Motion.   At the same time, the existence of the Borden-Dean Merger effectively eliminates any indirect harm that could be caused by granting the Emergency Lift Stay Motion because—to the extent Food Lion's and MDVA's Antitrust Action interfered with the consummation of the DFA and Prairie Farms Asset Sales—the Borden-Dean Merger presents a viable value-maximizing alternative.

**B.    Borden Chapter 11 Bankruptcy**

35.    On January 5, 2020 Borden and certain of its affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the District of Delaware.   Founded in 1857, Borden is one of the oldest and largest milk producers in the United States.   Its principal business is the production and distribution of a wide variety of branded and private-label traditional, flavored and specialty milk, buttermilk, dips and sour cream, juices, tea, and flavored drinks to mass merchandisers, educational institutions, food service retailers, grocery stores, drug stores, convenience stores, food and beverage wholesale distributors, and retail warehouse club

---

[7]    Additionally, on April 21, 2020, the Individual Dairy Farmers group filed a motion requesting a telephonic hearing in light of the antitrust concerns they previously raised and DFA's alleged lack of transparency, cooperation, and honesty.   (ECF No. 1698).

stores across the United States.   *See* Declaration Of Jason Monaco In Support Of Chapter 11 Petitions And First Day Motions (Monaco Decl.) (Bankr. D. Del. Case No. 20-10010-CSS) at ¶ 4.

### C.   Borden-Dean Proposed Plan Of Merger

36.   As the Ad Hoc Group explained in its initial objection to the Asset Sales, while the Ad Hoc Proposal was in its advanced stages, it was unable to propose a fully committed value maximizing proposal by the March 30 Bid Deadline.   Nevertheless, the Proponents have continued to work alongside other stakeholders to create an alternative and viable plan of reorganization in the event that the Asset Sales are not consummated.   Simply put, termination of the APAs without an alternative path forward would be disastrous for all Dean Food's stakeholders, costing thousands of jobs during what could be the worst economic crisis since the Great Depression.   Thus, in order to avoid this untenable situation, the Proponents have worked tirelessly to assemble a fully committed financing package to facilitate a Borden-Dean Merger as a backup plan.

37.   The Borden-Dean Merger would be effectuated through separate and coordinated chapter 11 plans in their respective chapter 11 cases.   Upon consummation of the Borden-Dean Merger, a wholly-owned subsidiary of Borden will merge with and into Dean Foods and, upon consummation of the merger, Dean Foods would be a wholly-owned subsidiary of Borden.   In order to finance the Borden-Dean Merger, the Proponents (which include major stakeholders of Dean) and KKR have obtained commitments for debt and equity financing in excess of $1 billion for the merged entity.   The financing consists of the following:

- $260 million term loan credit facility, a portion of which will be used to refinance certain of Borden's existing term loan facility, provided by KKR Credit Advisors (US) LLC, Knighthead, and Ensign Peak Advisors Inc.   A copy of the Commitment Letter for such term loan credit facility is attached hereto as **Exhibit B**.

- $150 million of 8% Preferred Stock to be issued to Unitas Dairy Holdings LLC.   A copy of the Commitment Letter for the subscription of the Preferred Stock is attached hereto as **Exhibit C**.

- $225 million of equity commitments through (a) a $175 million rights offering by Dean Foods for 67.5% of the new common stock in the merged entity open to holders of the Senior Notes, $116.25 million of which is backstopped by the Noteholders plus up to an additional $50 million of which is backstopped by lenders under the Junior DIP Facility in respect of amounts outstanding under the Junior DIP agreement in the event the rights offering subscriptions do not exceed $125 million; and (b) a rights offering open to Borden's stakeholders of $50 million which will be backstopped by KKR for up to 25% of the new common stock of the merged entity.   The 25% equity of the merged entity received by the Borden estate will be split between the above rights offering and the equitization of the remaining portion of KKR's debt. Each of Dean Foods' general unsecured creditors other than holders of the Senior Notes will receive its ratable share of 7.5% of the new common stock in the merged entity.   A draft Backstop Commitment Agreement for the Dean Foods rights offering is attached hereto as **Exhibit D**.

38.     In addition to the committed financing, the Proponents have obtained a "highly confident letter" from Wingspire Capital ("Wingspire") with respect to arranging a $600 million senior asset-based lending facility, including a commitment of up to $75 million from Wingspire. A copy of the highly confident letter for such ABL facility is attached hereto as **Exhibit E**. While the Proponents continue to work diligently to receive a firm commitment for the ABL facility, their efforts have been hampered by unprecedented market conditions caused by the COVID-19 pandemic.   As the Court is well aware, obtaining commitments for the senior-most part of the capital structure of a company is typically far easier than the junior portions.   The dramatic nationwide draws on revolving credit facilities over a short-period of time, however, has caused this segment of the financing markets to freeze up temporarily.   Notwithstanding the frozen ABL markets, the Proponents are optimistic that they will obtain commitments for an ABL facility in the near term provided that the Debtors provide access to their data room containing due diligence materials needed by the proposed ABL lenders.   Towards that end, following a telephonic status conference described below, if appropriate, the Proponents

respectfully request that the Court direct the Debtors to provide access to the data room it established in connection with its sale process to such potential lenders upon the execution of a standard confidentiality agreement.

39.     As noted above, upon the termination of the APAs and ability to propose a chapter 11 plan for the Borden-Dean Merger, Proponents stand ready to make the Junior DIP Facility available to the Debtors.   Among other things, the Junior DIP Facility will permit the Debtors to stabilize their operations, preserve value, and instill confidence in their customers and vendors regarding the Debtors' ability to continue as a going concern.   Upon consummation of the Borden-Dean Merger, any amounts outstanding under the Junior DIP Facility will reduce the amount of the backstop commitment dollar-for-dollar.   A copy of the Junior DIP Facility Commitment Letter is attached hereto as **Exhibit F**.

40.     In addition to maximizing the value of the Dean Foods and Borden estates, the combination will have significant societal and economic benefit, as detailed by Borden CEO Tony Sarsam in an April 21, 2020 letter expressing support for the Borden-Dean Merger (attached hereto as **Exhibit G**):

- ***Jobs Saved.***   Dean Foods has approximately 15,000 employees.   Borden has approximately 3,250 employees.   Many of these jobs are at risk if the Asset Sales are not consummated absent the Borden-Dean Merger.   Moreover, by strengthening the balance sheet for the combined entity, employees would benefit from additional security and stability in this uncertain time.

- ***Milk Supply Guaranteed.***   The COVID-19 crisis has impaired both the Dean Foods and Borden businesses.   Merging these two entities would allow uninterrupted supply of milk throughout the crisis recovery period.

- ***Independent Farmers Protected.***   Borden is well-known in the dairy industry for its commitment to small independent farmers.   Over 250 independent farmers supply Borden's business.   These farmers face the growing threat that they will lose access to the most favorable pricing (known as Class 1 FMMO pricing) for their milk, and their businesses could be severely damaged in an environment in which all processing is controlled by large cooperatives.   If the Borden-Dean Merger is consummated,

independent farmers throughout the United States whose businesses might be devastated by the DFA acquisition would instead have continued access to Class 1 FMMO pricing.

- ***School Milk Supply Protected.***   The combined fleet of Borden and Dean Foods will add immediate effectiveness and efficiency to the over 40,000 schools and millions of children counting on school milk programs for nutrition.   The Borden-Dean Merger would afford the Debtors the ability to keep more of Dean Foods' current plants open, and supplying schools effectively, than the DFA acquisition, which could jeopardize the school supply chain.

- ***Improved Industry Capability.***   A Borden-Dean Merger would strengthen the dairy industry, creating a better assurance of supply and jobs in the future.

41.     Knowing how important antitrust concerns can be to consummating any transaction in the dairy industry, the Proponents have been advised there would be no significant competitive issues raised by a merger of Borden and Dean Foods.   There is little to no overlap between Borden's and Dean Foods' milk processing operations.   And Borden does not have the same level of buying power as DFA because its milk processing operations are smaller than DFA's operations in areas where it competes with Dean Foods and it does not have the same level of purchasing clout that DFA has amassed through its far-reaching membership.   In short, Borden merging with Dean Foods does not have significant overlap in the local geographies and thus raises far less competition concerns than DFA acquiring Dean Foods.

42.     Proponents have been informed by Borden that the Antitrust Division has already begun evaluating a potential combination of Borden and Dean.   In a March 30, 2020 email from Karl Knutsen, the lead Antitrust Division attorney investigating possible acquisitions of Dean's assets, to Borden's antitrust counsel, Mr. Knutsen makes this clear:

> The Division has not had sufficient time to complete its evaluation of the competitive implications posed by Borden's proposed purchase of Dean plants since Borden has only recently advised the Division of its plans.   Borden's proposed purchase of up to 55 Dean plants does not appear to raise any vertical competitive concerns.   The Division is currently evaluating whether the proposed transaction would raise horizontal competitive concerns in 9 geographic areas. Borden has agreed to divest assets eliminating the competitive overlaps in

each of these markets, to the extent necessary, and is committed to working with the Division to resolve any other concerns.    With Borden's expeditious and complete cooperation, the Division is committed to evaluating the competitive implications of this proposed transaction, and any proposed transaction involving the Dean plants, as quickly as possible in light of Dean's liquidity issues.

*See* Letter from Borden dated Apr. 21, 2020 (attaching Email from K. Knutsen dated Mar. 30, 2020), attached hereto as **Exhibit G**.

### D.    Debtors' Exclusive Period, Request for Status Conference

43.    On March 11, 2020, the Debtors filed their *Motion For Entry Of An Order Extending The Exclusive Periods Within Which To File A Chapter 11 Plan And Solicit Acceptances Thereof* (the "Motion to Extend Exclusivity") (ECF No. 1110).  Pursuant to the Motion to Extend Exclusivity, the Debtors sought to extend the Debtors' exclusive period to file a chapter 11 plan by 75 days through and including May 25, 2020 (the "Proposed Exclusive Period") for 75 days through July 24, 2020.

44.    On April 22, 2020, the Court entered an Order granting the Motion to Extend Exclusivity.   (ECF No. 1726).   While the Noteholders did not object to the Motion to Extend Exclusivity, they believe that it is prudent for them to finalize the Borden-Dean Merger as a backup transaction given the material risk that the DFA and Prairie Farms Asset Sales may not close.   To that end, pursuant to section 105(d) of the Bankruptcy Code,[8] the Noteholders hereby request the following:

---

[8]  The Court has substantial power under section 105 of the Bankruptcy Code to impose conditions and establish a framework for a backup plan of the type described herein.  *See* 11 U.S.C. § 105(d) ("The court, on its own motion or on the request of a party in interest (1) shall hold such status conferences as are necessary to further the expeditious and economical resolution of the case; and (2) unless inconsistent with another provision of this title or with applicable Federal Rules of Bankruptcy Procedure, may issue an order at any such conference prescribing such limitations and conditions as the court deems appropriate to ensure that the case is handled expeditiously and economically."); *In re King*, 546 B.R. 682, 724 (Bankr. S.D. Tex. 2016) ("[T]he Court notes that § 105(d)(1) states that any party-in-interest can request status conferences in a case 'as are necessary to further the expeditious and economical resolution of the case.'"); *In re Gulf Coast Oil Corp.*, 404 B.R. 407, 425 (Bankr. S.D. Tex. 2009) ("Bankruptcy Code § 105(d) requires a bankruptcy court to hold a case management conference at which the court will

- On May 1, 2020, the Debtors should be directed to file a status report with the Court, advising of the prospects of satisfying the conditions to closing of the pending Asset Sales;

- On May 4, 2020, the Debtors and key parties in interest should be required to appear for a telephonic status conference to answer any questions of the Court or other parties-in-interest about the risks associated with the contingent nature of the pending Asset Sales; and

- If the Court determines at such conference that there remains material risk associated with the pending Asset Sales, the Debtors should be directed to make themselves and their data room available to parties who have agreed and are seeking to provide capital to support the Borden-Dean Merger.

45.     These measures will ensure that other interested parties can finalize the commitments for a value-maximizing alternative plan of reorganization as soon as practicable. The Court has repeatedly cautioned all parties-in-interest that the stakes for the Debtors and their 15,000 employees are high.   If the Asset Sales do not close, then—absent an alternative plan of reorganization—many thousands of employees could lose their jobs and the Debtors could be forced to conduct fire sales for their assets.

46.     By contrast, the Borden-Dean Merger presents a viable, value-maximizing alternative to lift two different companies out of bankruptcy in an historic transaction implemented through separate but coordinated plans of reorganization in two judicial districts.

---

issue such orders as are appropriate for the expeditious and economical resolution of the case."); *In re Aspen Limousine Serv., Inc.*, 187 B.R. 989, 995 (Bankr. D. Colo. 1995) ("Section 105(d)(2) … is an omnibus provision with which the Court can customize Chapter 11 preconfirmation procedures, as long as those procedures are not inconsistent with other provisions of the Code."); H. Rep. No. 109-31, 109th Cong., 1st Sess. 93 (2005), *reprinted in* App. Pt. 10(b) (Section 105(d) "mandate[s] that a bankruptcy court hold status conferences as are necessary to further the expeditious and economical resolution of a bankruptcy case").

Regrettably, as a result of the COVID-19 pandemic and resulting expedited sale timeline, parties were unable to submit the Borden-Dean Merger proposal before the Bid Deadline. Nevertheless, the Borden-Dean Merger provides security and value as a backup plan if the Asset Sales do not successfully close.

47.    It cannot be seriously questioned that the Debtors' stakeholders would benefit from the ability to consider the Borden-Dean Merger as a failsafe if the Asset Sales fall through. Indeed, the Debtors have themselves acknowledged that they are in a race for time.   Modified Bidding Procedures ¶ 5 (Debtors pushed up bidding deadline and Sale Hearing "to reflect their shorter-than-anticipated liquidity runway").   The Proponents have worked diligently (and around-the-clock in an extremely challenging time even to connect and collaborate with each other) to present an alternative transaction and line up the necessary funding commitments to pursue the Borden-Dean Merger.

48.    The relief sought by this Response is well within the power afforded by section 105(d) of the Bankruptcy Code, and poses a very small cost for the Debtors in expense and time in return for the substantial benefits provided by the possibility of the Borden-Dean Merger if the Asset Sales cannot be consummated.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Noteholders respectfully submit this Response and request for a status conference under section 105(d) of the Bankruptcy Code for the Court's consideration.

Respectfully submitted this 23rd date of April, 2020.

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**

By: /s/ *Patricia B. Tomasco*

Patricia B. Tomasco (SBN 01797600)
Devin van der Hahn
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
711 Louisiana Street, Suite 500
Houston, TX 77002
Telephone: (713) 221-7000
Facsimile: (713) 221-7100

-and-

Susheel Kirpalani (*pro hac vice*)
Eric Kay (*pro hac vice*)
Jordan Harap (*pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:   (212) 849-7000
Facsimile:   (212) 849-7100

*Counsel for Noteholders*

## **CERTIFICATE OF SERVICE**

     I hereby certify that on April 23, 2020, a copy of the foregoing statement was served through the Court's CM/ECF notification system to all parties who have appeared in this case through counsel or who have submitted a request for service by CM/ECF.

*/s/ Patricia B. Tomasco*
Patricia B. Tomasco