# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| SOUTHERN FOODS GROUP, LLC, *et al.*[1] | § | Case No. 19-36313 (DRJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

## REPLY BRIEF IN FURTHER SUPPORT OF EMERGENCY MOTION OF FOOD LION LLC AND MARYLAND AND VIRGINIA MILK PRODUCERS COOPERATIVE ASSOCIATION, INC. FOR RELIEF FROM THE AUTOMATIC STAY TO ALLOW COMMENCEMENT OF ANTITRUST ACTION
### [Relates to Docket No. 1693]

Food Lion LLC ("**Food Lion**") and Maryland and Virginia Milk Producers Cooperative Association, Inc. ("**MDVA**" and together with Food Lion, "**Movants**") hereby file this reply (the "**Reply**") in support of the *Emergency Motion of Food Lion LLC and Maryland and Virginia Milk Producers Cooperative Association, Inc. for Relief from the Automatic Stay to Allow Commencement of Antitrust Action* [Docket No. 1693] (the "**Motion**") and respectfully state as follows:

---

[1]   The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: Southern Foods Group, LLC (1364); Dean Foods Company (9681); Alta-Dena Certified Dairy, LLC (1347); Berkeley Farms, LLC (8965); Cascade Equity Realty, LLC (3940); Country Fresh, LLC (6303); Dairy Information Systems Holdings, LLC (9144); Dairy Information Systems, LLC (0009); Dean Dairy Holdings, LLC (9188); Dean East II, LLC (9192); Dean East, LLC (8751); Dean Foods North Central, LLC (7858); Dean Foods of Wisconsin, LLC (2504); Dean Holding Company (8390); Dean Intellectual Property Services II, Inc. (3512); Dean International Holding Company (9785); Dean Management, LLC (7782); Dean Puerto Rico Holdings, LLC (6832); Dean Services, LLC (2168); Dean Transportation, Inc. (8896); Dean West II, LLC (9190); Dean West, LLC (8753); DFC Aviation Services, LLC (1600); DFC Energy Partners, LLC (3889); DFC Ventures, LLC (4213); DGI Ventures, Inc. (6766); DIPS Limited Partner II (7167); Franklin Holdings, Inc. (8114); Fresh Dairy Delivery, LLC (2314); Friendly's Ice Cream Holdings Corp. (7609); Friendly's Manufacturing and Retail, LLC (9828); Garelick Farms, LLC (3221); Mayfield Dairy Farms, LLC (3008); Midwest Ice Cream Company, LLC (0130); Model Dairy, LLC (7981); Reiter Dairy, LLC (3675); Sampson Ventures, LLC (7714); Shenandoah's Pride, LLC (2858); Steve's Ice Cream, LLC (6807); Suiza Dairy Group, LLC (2250); Tuscan/Lehigh Dairies, Inc. (6774); Uncle Matt's Organic, Inc. (0079); and Verifine Dairy Products of Sheboygan, LLC (7200). The debtors' mailing address is 2711 North Haskell Avenue, Suite 3400, Dallas, TX 75204.

## PRELIMINARY STATEMENT[2]

1.      The parties agree that the Court should grant Movants relief from the automatic stay if they have established "cause" under 11 U.S.C. § 362(d)(1). But the Debtors would have this analysis take place in a vacuum—devoid of consideration for the devastating impact that allowing the DFA Sale to close on its current terms will have on dairy farmers, milk consumers, and even the Debtors' own employees, as well as on those groups' ability to have their day in court. Instead, the Debtors focus on Movants' timeliness, ostensible post-sale remedies, and a series of alleged repercussions that ignore the realities of how DFA has gamed the system up until this point. The Debtors also engage in wild speculation about measures that DFA will take if stay relief is granted. Movants ask the Court not to condone DFA and the Debtors' efforts to push through a deal that will forever change the dairy farming and milk processing industries, without first allowing an Article III court to assess—on an expedited basis—the merits of Movants' antitrust claims and whether preliminary injunctive relief should issue.

2.      The objection to the Motion filed by the Debtors (the "**Objection**") [Docket No. 1804] reveals the extent to which they are capitalizing on the "empty chair" to these proceedings: DFA, the soon-to-be largest raw milk cooperative *and* largest milk processor in the United States. The Debtors insist that the requested relief will disrupt the entire DFA Sale (not just the Carolinas Facilities), yet DFA has refused to provide its valuation of individual plants to enable a clean hold separate order or sale renegotiation. More importantly, while the Debtors speculate about this and other actions DFA *might* take if Movants are granted preliminary injunctive relief, DFA does not endorse any of its speculations. The Debtors claim that DFA may walk away if it can only close on 43 of 44 plants. DFA understandably does not assert this to be true, given that it lacks

---

[2]     Capitalized terms used but not defined herein have the meaning given to them in the Motion

credibility. The Debtors also claim that workers may lose their jobs, but DFA says nothing, which is not surprising given the potential that DFA will close plants after the DFA Sale is complete. And the Debtors insinuate that Movants' antitrust claims are better suited for a post-sale challenge, yet DFA refuses to tell this Court that it will take steps to ensure that meaningful post-sale relief will be available. As set forth below, it is DFA's intransigent, "all-or-nothing" approach to the DFA Sale—not Movants' claims—that would cause the alleged harms.

3. Movants, on the other hand, have been fully transparent in voicing their objection to the DFA Sale from the outset: in bid procedures objections, in sale objections, in a March 20th brief to this Court, in the DOJ review process, and at multiple hearings. At each step, Movants made known their concern that the DFA Sale will suppress competition in the markets for raw and processed milk in the Carolinas, and about their intent to challenge the merger by filing a private antitrust suit under Sections 7 and 16 of the Clayton Act, 15 U.S.C. §§ 16 and 26, if this concern went unaddressed. Yet DFA and the Debtors continued to sprint toward the finish line, well aware of the issues that the Debtors now claim have blindsided them.

4. Finally, Movants note that DFA's termination rights under the parties' Asset Purchase Agreement will not be triggered by a lifting of the automatic stay. Thus, none of the effects set forth in the Objection will result from the Court's granting of relief from the automatic stay. The DFA Sale will only be affected if a court finds that Movants are likely to succeed on their claim that the DFA Sale will have anticompetitive effects in and around the Carolinas, and even then the impact will only be on one Carolina facility (for which there is already an approved back-up bidder). DFA and the Debtors cannot be given a pass simply because they need to expend a modest amount of time and resources to bring their sale into compliance with the law.

3

5.       DFA and the Debtors are using these bankruptcy proceedings as both a sword and a shield. They have taken advantage of its truncated antitrust review period, and its bid procedures that did not require asset allocation, to move swiftly toward the massive consolidation of one of this country's most important industries. Now they are hiding behind the Debtors' automatic stay protections to deprive Movants of their statutory right to seek a narrow preliminary injunction that would likely only affect one of the forty-four plants in the DFA Sale. The Debtors insist upon a full balancing of the equities, but *no valid balancing can take place without due consideration of Movants' antitrust concerns, which in turn must take into account not just Movants' own interests, but also those of the farmers and consumers for whom they are acting as "private attorneys general."* It is through an expedited preliminary injunction request—not the instant motion—that a court should conduct this analysis.

## ARGUMENT

6.       The most expeditious, economical, and equitable manner of resolving Movants' claims is not by depriving them of access to district court and forcing the parties into prolonged post-sale litigation, but by allowing the claims to be heard and resolved before the Asset Sale forever changes the landscape of the milk industry.

**I.       As private parties who have substantial evidence that the DFA Sale violates federal antitrust laws, Movants have a right to move to preliminarily enjoin certain aspects of the DFA Sale before it is consummated.**

7.       The antitrust laws were designed to be "a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958); *see also Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262 (1972) ("Every violation of the antitrust laws is a blow to the free-enterprise system envisaged by Congress. This system depends on strong competition for its health and vigor, and strong competition depends, in turn, on compliance with antitrust legislation.") (internal citations

4

omitted). Included among them is Section 7 of the Clayton Act, 15 U.S.C. § 18, which prohibits an acquisition where its effect "may be substantially to lessen competition, or to tend to create a monopoly."

8.      In addition to authorizing the Department of Justice to enjoin violations of the Clayton Act by filing suit under 15 U.S.C. §§ 4 and 25, and in order to "'open[] the door of justice' to individuals harmed by antitrust violations while at the same time penalizing antitrust violators," Congress chose to allow individual plaintiffs to serve as "private attorneys general" in antitrust actions. *In re High-Tech Employee Antitrust Litig.*, 985 F. Supp. 2d 1167, 1179 (N.D. Cal. 2013) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 486 n.10 (1977)) (alteration in original). Congress passed Section 16 of the Clayton Act, 15 U.S.C. § 26, allowing individuals to obtain injunctive relief preventing "threatened loss or damage by a violation of the antitrust laws." Section 16 also expressly provides that "upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue." *Id.*

9.      As the Supreme Court noted in *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979), "[t]hese private suits provide a significant supplement to the limited resources available to the Department of Justice for enforcing the antitrust laws and deterring violations." Thus, private Section 16 challenges complement their government counterparts, and the government's decision not to pursue the latter has no bearing on the viability of the former. Indeed, as the Supreme Court has recognized in the context of judicial review of agency inaction:

> [A]n agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise. Thus, the agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake

> the action at all. An agency generally cannot act against each technical violation of the statute it is charged with enforcing.

*Hechler v. Chaney*, 470 U.S. 821, 831 (1985). The DOJ recently reiterated these principles in response to a private litigant's inquiry as to the implications of a DOJ decision to close an antitrust investigation:

> [T]here are many reasons why a Division investigation may be closed, and the fact that an investigation has been closed should not be taken as confirmation that a transaction is either completely neutral or procompetitive. Nor should any inference be drawn from the fact that the Division did not bring an action challenging any particular transaction.

Letter from Maribeth Petrizzi, Dec. 5, 2017, attached here as **Exhibit A**. Thus, contrary to popular parlance, the DOJ does not "clear" or "approve" a transaction; instead, it simply decides based on a balancing of merits- and non-merits-based considerations whether it will file a pre-merger challenge to the transaction as anticompetitive. Even when it declines to exercise its right to file a pre-merger challenge to a merger, the Department retains the statutory right, which it exercises from time to time, to challenge a merger post-closing, even if it has already opened and closed an investigation pre-closing of the merger. The entire Hart Scott Rodino pre-merger notification scheme[3] exists, not to make a final determination of a merger's lawfulness, but for the practical reason—fully borne out in the present circumstances—that under general principles of equity, it is much more efficient and sensible for a merger to be challenged before its happens than after.

10.     Finally, the DFA Sale, like any sale, must comply with applicable antitrust laws, including Section 7 of the Clayton Act.[4] DFA and the Debtors' Asset Purchase Agreement

---

[3]     The Hart-Scott-Rodino Antitrust Improvements Act, 15 U.S.C. § 18(a), is the statute that requires parties to certain mergers to (i) notify the United States of their plan to merge and (ii) refrain from closing during a mandatory waiting period while the United States considers whether or not to file a lawsuit challenging the merger pre-closing. The waiting periods are shorter where the merged assets are part of a bankruptcy estate.

[4]     *See, e.g.*, *In re AMR Corp.*, 527 B.R. 874, 882 (Bankr. S.D.N.Y. 2015) (addressing Section 7 of the Clayton Act with respect to a merger in bankruptcy).

("**APA**") acknowledges the necessity of antitrust review, making completion of that review a condition precedent to DFA's obligation to close. *See* APA § 10.03 [Docket No. 1572]. And with the agreement of all parties, the Court's sale order specifically carved out and reserved Movants' private rights under antitrust law:

> **Anti-Trust Enforcement.** Notwithstanding anything to the contrary contained herein, no provision of this Order or the APA shall operate to impair, prejudice, or otherwise abrogate the rights (if any) of The Stop & Shop Supermarket Company LLC and Food Lion LLC, the [MDVA] and the California Dairies, Inc. and any of their affiliates, subsidiaries, successors, or assigns, to challenge the Sale Transaction under the antitrust laws of the United States. All such rights are explicitly reserved pursuant to this order.

Sale Order ¶ 37. This carve-out was a reflection that bankruptcy courts are courts of limited jurisdiction and can enter final orders and judgments only with respect to "core proceedings." 28 U.S.C. § 157(b). Further, where "resolution of the proceeding requires consideration of both title 11 and other laws of the United States," the district court ***must*** withdraw the reference upon a timely motion. *Id.* § 157(d).

## II.  Movants have established sufficient "cause" to warrant relief from the automatic stay to pursue preliminary injunctive relief in a federal district court.

11.     The factors that courts consider in assessing whether cause exists under 11 U.S.C. § 362(d)(1) to modify an automatic stay weigh heavily in favor of allowing Movants to pursue their injunctive relief in district court prior to final approval of the DFA Sale. As set forth below, Movants have a compelling interest in seeking pre-sale relief, and each of the points raised by the Debtors is either unfounded or can be tempered by Movants' proposed mechanisms for tailoring the number of plants at issue and proceeding expeditiously in district court.

A.  The most expeditious and economical route to resolving Movants' antitrust claim is to allow the claim to be assessed by a district court before the DFA Sale is consummated.

   i.  *If raised in this Court in the first instance, Movants' antitrust claims would be subject to mandatory withdrawal.*

12.  As set forth in the Motion, allowing Movants to proceed directly to district court eliminates the need for proceedings before this Court that would still result in mandatory withdrawal of the reference. In the Objection, the Debtors do not and cannot contest that Movants' antitrust claims are not core proceedings. As a result, this Court lacks the authority to enter a final order on those claims absent the consent of the parties. *See generally Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015). "A proceeding is core if it either arises under the Bankruptcy Code or 'would have no existence outside of the bankruptcy' proceeding." *In re White-Robinson*, 777 F.3d 792, 795 (5th Cir. 2015). Movants' antitrust claims certainly do not arise under the Bankruptcy Code, nor can there be any argument that Movants' antitrust claims would have no existence outside of the bankruptcy proceeding. Movants do not consent to this Court entering a final order or judgment on their claims. Therefore, at best, this Court could issue proposed findings of fact and conclusions of law to the district court. That process will take time—time Movants and the Debtors do not have at this juncture.

13.  As to whether mandatory withdrawal of the reference would be required for Movants' antitrust claims, Movants' draft complaint sets forth the specific facts and legal arguments underpinning its claim that DFA's acquisition of the Carolinas facilities will violate Section 7 of the Clayton Act. Movants are not seeking a ruling on a discrete point of antitrust law as part of resolution a larger matter, such as plan confirmation.[5] Rather, Movants are seeking a full hearing on the merits of their claims, which will necessarily include, among other things, a

---

[5]   *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 177-78 (Bankr. D.N.J. 2010) (determining whether proposed plan would be subject to antitrust review).

determination of how the DOJ/FTC vertical merger guidelines should be applied to these complex facts, a factual investigation of the milk supply conditions in the Carolinas, and a determination of the viability of Movants' proposed geographic and product markets. *See* Objection ¶¶ 43-49, 53-54. Indeed, the Debtors' six-page discussion of the merits of Movants' antitrust claims itself shows the material and substantial consideration of antitrust law that adjudicating Movants' claims will entail.

14.     The cases cited by the Debtors do not change the conclusion that mandatory withdrawal would be necessary here. In *In re National Gypsum Co.*, the district court was satisfied that the matter would entail material and substantial consideration of federal law due to the nature of the claims and defenses themselves and did in fact withdraw the reference.[6] The cases of *In re Harris-Nutall* and *Dow Jones/Group W Television Co. v. Nat'l Broadcasting Co.* stand for the proposition that withdrawal of the reference is not necessary just because the court will be required to apply a straightforward federal law to new facts.[7] That is not the case here, as the facts will be heavily contested, and the court will called upon to determine complex legal questions, including reviewing contested economic analyses to determine the relevant product and geographic market, Motion, Exh. A ¶¶ 9-26, and applying facts and expert economic opinions to reach a legal conclusion on whether anticompetitive effects are likely, *id.* ¶¶ 94-119. The Debtors correctly assert that not every antitrust claim automatically triggers mandatory withdrawal, but Movants' claims require more than a "rote application' of established antitrust law," the very reason the court

---

[6]     145 B.R. 539, 542 (N.D. Tex. 1992) (holding that patent law claims "necessarily entailed material and substantial consideration of non-Code federal law" and antitrust defenses had "more than a de minimis effect on interstate commerce").

[7]     *See In re Harris-Nutall*, No. 14–35300, 2016 Bankr. LEXIS 4623, at *11 (N.D. Tex. May 19, 2016); *Dow Jones/Grp. W. Tel. Co. v. Nat'l Broad. Co.*, 127 B.R. 3, 4 (S.D.N.Y. 1991)

in *Lifemark Hosps. Of Louisiana, Inc. v. Liljeberg Enterprises, Inc*., withdrew the reference.[8] Finally, while the court in *In re AMR Corp.* did address and try antitrust issues, the plaintiffs in that case had expressly consented to the bankruptcy court doing so.[9]

15.     Since at a minimum, this Court lacks the authority to enter a final order or judgment on Movants' claims, and withdrawal of the reference would be mandatory, Movants should not be forced to first commence their action in this Court and then file a motion to withdraw the reference. Such a course would waste valuable judicial resources and would not promote the expeditious and economical resolution of Movants' claims.

16.     The Debtors argue that lifting the stay would force them to manage a complex litigation. Objection ¶ 60. However, it is not lifting they stay that will force the complex litigation; it is the Debtors' choice to pursue a sale in violation of antitrust law that forces that result. Now that the Debtors have made that choice, the most expeditious and economical way to resolve Movants' claims is to have them heard in the first instance in a court that can render a final verdict.

ii.     *A pre-sale challenge is substantially quicker, more economical, and easier to administrate than a challenge to a consummated acquisition.*

17.     Were this Court to force Movants into a post-sale challenge, it is likely that the parties would expend years and millions of dollars adjudicating and appealing Movants' claims. To the best of counsel's knowledge, in the entire history of the Clayton Act, no private party has ever succeeded in obtaining and enforcing equitable relief unwinding a consummated merger. However, the one case that has come close reveals how long the path of justice will be. In *Steves*

---

[8]     161 B.R. 21, 25 (E.D. La. 1993).

[9]     *In re AMR Corp.* 506 B.R. 368, 375 (Bankr. S.D.N.Y. 2014) ("At that time, Plaintiffs' counsel represented to the Court that they preferred to try their antitrust case in the Bankruptcy Court, rather than to move forward with their pending motion to withdraw the reference in the District Court. ('[C]ertainly it would be my preference to try the case before Your Honor'); ('[W]e will withdraw [the motion to withdraw the reference].'). Plaintiffs in fact withdrew that motion.") (internal citations omitted).

*and Sons, Inc. v. JELD-WEN, Inc.*, Case No. 3:16-cv-545 (E.D. Va.), which proceeded in the so-called "rocket docket" of the Eastern District of Virginia, the post-closing challenge was initiated in the fall of 2015, a jury found the merger unlawful in February 2018, the court ordered divestiture in March 2018, and the court entered an Amended Final Judgment ordering divestiture in March 2019, but stayed the order pending an appeal which has yet to be argued. *See* Case No. 19-1397 (4th Cir.). In other words, four years have passed and the anticompetitive merger has yet to be unwound.[10] What's more, Steves has been forced to bring another lawsuit against JELD-WEN for allegedly continuing to leverage the anticompetitive merger to harm Steves and competition during the stay and appeal of the divestiture order. *See Steves and Sons, Inc. v. JELD-WEN, Inc.*, Case No. 3:20-cv-98 (E.D. Va.).

18.     Moreover, in the event that Movants are left no choice but to file a post-sale Section 7 challenge and request for injunctive relief, the court would be put in the undesirable position of devising an order that prescribes the conditions under which the DFA plants at issue can operate and buy and sell milk during the pendency of the litigation. And DFA will undoubtedly tout the difficulty of post-acquisition remedies in defending against Movants' antitrust claim. It is much more preferable, and in the interest of judicial economy, for the parties themselves to negotiate pre-sale as to how to account for pending litigation.

19.     Here, Movants have already devised an expedited schedule whereby they can fully brief and argue their preliminary injunction request before the June 1, 2020 outside closing date for the DFA Sale. Movants plan to file in the U.S. District Court for the Middle District of North

---

[10]   In a press release addressing the October 2018 decision, JELD-WEN highlighted that the appeals process could delay divestiture by 15 to 36 months, thereby underscoring the manner in which post-merger relief is not ideal. Press Release, JELD-WEN Announces Final Ruling in *Steves and Sons* Litigation (Dec. 15, 2018), *available at* https://www.businesswire.com/news/home/20181215005036/en/JELD-WEN-Announces-Final-Ruling-Steves-Sons-Litigation (last visited April 27, 2020).

Carolina, providing advance notice to allow the Clerk's office to assign the case accordingly. District court judges therein normally grant or deny motions for temporary restraining orders on the papers. Movants also plan to seek a mandatory meet and confer within the next few days to discuss an expedited schedule and preliminary injunction hearing date, which, under the federal rules, must occur before a fourteen-day restraining order expires. In any event, Movants are prepared to move quickly and permit the district court to rule on injunctive relief safely within the DFA Sale's closing date.

20.     The Debtors' argument that Movants have delayed exercising their rights ignores the fact that Movants have registered their objections at every opportunity during the sale process. By this point, Movants' antitrust objections can hardly be a surprise to anyone, considering:

- On March 9, both MDVA and Food Lion filed objections to the Sale Motion pointing out the antitrust risks of the DFA Sale and asking that the bid procedures be modified to require DFA to allocate its purchase price among the different assets to reduce this risk. Docket Nos. 1058 and 1065.

- At the March 12 bid procedures hearing, counsel for both MDVA and Food Lion reiterated these concerns. Bid Procedures H'rg Tr. at 41:7-9, 83:7-84:9. Counsel for Food Lion further raised the prospect of pursuing Food Lion's private rights of action to enjoin the sale. *Id.* 86:12-88:5. The Court required a memo on the subject of a private party's right to file suit under the Clayton Act.

- On March 20, Food Lion filed a memo expressly advising the Court of its right to file suit under 15 U.S.C. § 26, its intent to cooperate with the United States' antitrust review and its "independent right to challenge the proposed [e.g. not yet consummated] acquisition in Federal District Court under the Clayton Act." Docket No. 1186, at 3.

- Throughout March and April, Movants also cooperated with the U.S. Department of Justice's antitrust review of the proposed DFA Sale.

- On April 1, the day after the Debtors filed with the Court notice that DFA was the winning bidder to purchase forty-four of the Debtors' plants, Food Lion and MDVA filed their respective objections to the proposed sale, once again raising antitrust concerns with respect to the Carolinas Facilities. Docket Nos. 1406, 1415.

- At the April 3 sale order hearing, counsel for MDVA argued that the Debtors' acceptance of DFA's bid for High Point, over MDVA's $18 million bid, was an improper exercise of "business judgment" because DFA's bid posed a risk of antitrust claims "that [[Food Lion]

and others have highlighted" that could "invite[] potential delay of the very type that the Court, and I think all the parties are trying to avoid in this very exigent set of times." Sale Order H'rg Tr. at 59:23-60:24. At the same hearing, Movants requested language in the sale order preserving their right to bring an antitrust claim.

- On April 5, the sale order was entered, containing paragraph 37 preserving Movants' right to file an antitrust suit. *See* ECF No. 1572.

- On April 20, Movants filed their emergency motion for relief from the automatic stay and attached their draft antitrust complaint. The parties had originally secured a hearing date of April 22 but agreed to the Debtors' request to postpone that hearing to April 28.

21.     Far from delaying or sleeping on their rights, Movants have zealously pursued their rights throughout these proceedings. Rather than act hastily and rashly, Movants have allowed the sale process to proceed, while preserving their objections at every juncture, in the hope that the anticompetitive harms attendant with the DFA Sale would not come to pass. It is only now that the DFA Sale has been approved and is scheduled to close and no other avenues remain that Movants are seeking the remedy of an injunction. In light of this, Movants now ask that the Court allow them to proceed along this extraordinary path in the most efficient and economical way possible: lifting the stay to allow Movants to commence a pre-acquisition challenge under Section 7 of the Clayton Act in a district court.

B.     <u>Permitting the DFA Sale to close on its current terms will cause profound and indelible harm to Movants and the milk supply chain, while the harms alleged by the Debtors can each be avoided or significantly tempered.</u>

22.     The balancing of harm to the parties weighs heavily in favor of granting Movants' requested relief from the automatic stay. If Movants are unable to obtain preliminary injunctive relief, the extensive antitrust injuries alleged in their draft complaint will quickly come to fruition. Conversely, the harms alleged by the Debtors—to the extent this Court finds them valid—are of the Debtors and DFA's own making, and each can be cured or tempered by Movants' narrow tailoring of their requested relief and proposed expediency in district court.

      *i.*      *Harms to Food Lion, MDVA, and the milk supply chain*

    23.    First, once the sale becomes final, there is a high likelihood that many non-DFA

farmers will leave their cooperatives to join DFA.[11] *See Tri-State Generation & Transmission*

*Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th Cir. 1986) (preliminarily

enjoining asset sale of electric power supply cooperative that would incite "domino effect" of other

cooperatives selling their assets to obtain lower utility rates, which might occur "before an ultimate

decision on the merits that Shoshone, as well as these others, may not legally sell"). Farmers across

the nation are already leaving MDVA and joining the more dominant DFA, due to DFA's enhanced

market power as a result of its prospective purchase of most of the Debtors' plants. *See* Motion,

Exh. A, ¶¶ 62-64. MDVA saw a similar migration in 2017, when DFA purchased Cumberland

Dairy, a former independent processor located in New Jersey, with whom MDVA had previously

enjoyed a profitable and mutually beneficial relationship that included the sale of bulk raw milk

and a successful co-packing partnership. Almost immediately following DFA's takeover of the

facility, MDVA lost all of its bulk raw milk business as Cumberland quickly switched to DFA

farmers for their milk supply. *Id.* ¶ 121.

    24.    Permitting the DFA Sale to close will do two things: it will solidify DFA's

exclusive relationship with the Debtors' Carolina processing plants, at least until the sale's merits

undergo examination, and it will force non-DFA farmers to make a choice. They can either stick

with their cooperatives and risk the continued lack of access to DFA's plants until this litigation is

resolved, or they can switch to DFA and enjoy unfettered access to the most conveniently-located

---

[11] Movants make this and similar factual assertions in the form of a proffer. For the purposes of this Court's decision whether to lift the automatic stay, Movants proffer that, if permitted to move for a TRO in district court, they could prove these facts via declaration or other means, under the familiar "likelihood of success on the merits" standard. If permitted to make such a filing, Movants will immediately provide to the district court declarations of an expert economist as well as fact witnesses. Movants respectfully submit that a fact-finding inquiry into current and future competitive conditions is not properly before this Court.

plants. And even if Movants are successful in the underlying suit, there may be little incentive for farmers to switch *back* to the cooperative they left. MDVA and other cooperatives will be crippled by the initial exodus, and DFA will continue to fortify its raw milk, and then milk processing, monopoly. This immediate harm will in turn produce long-term effects in the raw and processed milk markets in and around the Carolinas. *See In re Microsoft Corp. Antitrust Litig.,* 333 F.3d 517, 531 (4th Cir. 2003) (explaining that "the lingering effects of an identified market distortion resulting from anticompetitive conduct" could potentially "provide the predicate for a conclusion that a party is presently suffering irreparable harm").

25.     Second, allowing the DFA Sale to close will impossibly "scramble the eggs" such that divestiture after the fact is less likely to return the parties to the status quo. The right to challenge an acquisition before it closes is a cornerstone of the U.S. antitrust system. First, the antitrust laws recognize that anticompetitive market conditions harm the economy and consumers and should be rooted out where possible. In this case, because the buyer is DFA, on day one following the closing of the DFA Sale, anticompetitive conditions will exist in the marketplace. If any other buyer owned the Carolinas Facilities, that buyer would have an incentive to purchase raw milk at the lowest price, from the seller with the best service, etc. But with DFA as the buyer, those plants will be forced to buy raw milk from DFA, thereby perpetuating the anticompetitive conditions that have plagued the milk industry for two decades. *See* Motion, Exh. A, ¶¶ 106-114. These conditions will have an immediate, profound, and potentially fatal effect on MDVA, and result in an even further deterioration of competition. If Movants are not allowed their day in court pre-merger, there is a serious risk that these anticompetitive conditions will cause irreparable harm to both Movants, hundreds of dairy farmers, and millions of consumers for every day that post-closing litigation wends its way through the courts.

26.     Traditional principles of equity further counsel in favor of pre-closing adjudication. This principle is rooted in the express language of 15 U.S.C. § 26, which allows a plaintiff to ask for a "preliminary injunction" under the "rules governing" equitable proceedings. It is of course a fundamental principle of equity that it is far preferable to preserve the status quo (here, prevent the closing) than for a court to take on the difficult task of ordering parties to engage in new and different actions or business practices (here, divest a plant). *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 605 (1966).

27.     In the merger context, courts have voiced a strong preference for enjoining a merger and requiring corrective action prior to an acquisition being consummated, rather than trying to "unscramble the eggs" after the merger is approved. *See id.* at 606 n.5 ("If consummation of the merger is not restrained, the restoration of Bowman as an effective and viable competitor will obviously by impossible by the time a final order is entered. This is not unusual."); *F.T.C. v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1034 (D.C. Cir. 2008) (explaining that "the whole point of a preliminary injunction is to avoid the need for intrusive relief later, since even with the considerable flexibility of equitable relief, the difficulty of unscrambling merged assets often precludes an effective order of divestiture" (internal quotation marks, alterations, and citations omitted)); *Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 261 (2d Cir.), amended, 890 F.2d 569 (2d Cir. 1989) ("A preliminary injunction is therefore the remedy of choice for preventing an unlawful merger.").[12] This is because, after closing, "parties [may] have commingled, sold, or closed assets; integrated or dismissed employees . . . or shared confidential information," making

---

[12]     *See also Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1, 41-42 (1977) ("[I]n corporate control contests the stage of preliminary injunctive relief, rather than post-contest lawsuits, is the time when relief can best be given." (internal quotation marks and citations omitted)); *United States v. Crescent Amusement Co.*, 323 U.S. 173, 185 (1944) ("[W]here businesses have been merged or purchased and closed out it is commonly impossible to turn back the clock.").

it "particularly difficult to restore the pre-merger state of competition." *F.T.C. v. Tronox Ltd.*, 332 F. Supp. 3d 187, 217 (D.D.C. 2018) (citing Fed. Trade Comm'n, *The FTC's Merger Remedies 2006-2012* 18 (2017)).

28.     There is no reason to believe that the theoretical prospect of post-sale litigation will remedy the harm to competition before it becomes irreparable. Certainly that has never happened in the past. The *JELD-WEN* case discussed above vividly documents the good reasons for addressing antitrust issues pre-closing. There, the Department of Justice declined to challenge a merger pre-closing, a customer initiated a post-closing challenge in the fall of 2015, the court entered an Amended Final Judgment ordering divestiture in March 2019, but stayed the order pending an appeal which has yet to be argued. On appeal, the defendant is arguing that the post-closing relief sought is "unprecedented in the extreme," will require the court to deal with the "costs and complexities of unwinding a merger," and that doing so will harm not only the defendant but also its employees and other third parties. *Steves and Sons, Inc. v. JELD-WEN, Inc.*, No. 19-1397 (4th Cir.), Entry No. 35, at 1, 44-47, 52 (filed June 10, 2019).[13] Movants would surely hear similar arguments from DFA and the Debtors if those two have their way and the antitrust claims are pushed off to a post-closing challenge.

29.     Here, there can be little doubt that a "scrambling of the eggs" will take place immediately after DFA consummates the DFA Sale. MDVA farmers will switch to DFA and become contractually bound as to where they can sell their milk. The High Point plant will be integrated into DFA's operations and, currently operating at 50% of capacity, is at risk of being

---

[13]     During this almost four years of litigation, competitive conditions in the industry have remained so poor that the plaintiff has had to file a second post-closing lawsuit and move for an injunction because JELD-WEN has allegedly derived another method by which to wield its ill-gotten competitive advantage in spite of the divestiture order. *See* Compl. (Dkt. No. 1), 3:20-cv-98 (E.D. Va.) (alleging that JELD-WEN is manipulating supply in order to gain a competitive advantage).

closed. If DFA closes or sells any of the Debtors' assets, the dairy industry will face the "particularly difficult" situation contemplated in *Tronox*, 332 F. Supp. 3d at 217. *See also F.T.C. v. Dean Foods Co.,* 384 U.S. 597, 607 (1966) ("Administrative experience shows that the Commission's inability to unscramble merged assets frequently prevents entry of an effective order of divestiture.");[14] *Phototron Corp. v. Eastman Kodak Co.*, 687 F. Supp. 1061, 1071 (N.D. Tex. 1988), *rev'd on other grounds*, 842 F.2d 95 (5th Cir. 1988) ("[P]hysical assets sold, and commercial arrangements permanently altered … [are] the sort of 'scrambled eggs' that cannot be 'unscrambled' through monetary damages."). There also is the very real possibility of the loss of the Debtors' employees in the Carolinas—either due to layoffs or on their own volition because of the uncertainty surrounding the plants' future—and their accompanying years of experience. To attempt to "unscramble the eggs" will fall far short of restoring the parties to the status quo.

    *ii.*      *Alleged harm to the Debtors*

30.     DFA and the Debtors shrouded many aspects of the Debtors' bankruptcy filing and the bidding process in secrecy, making it impossible to weigh the equities by the light of day. *See* Objection of Ad Hoc Group of Bondholders at 6-12 [Docket No. 1069]. On the same day that they commenced these Chapter 11 proceedings, the Debtors announced that they were in "advanced

---

[14]   A litany of cases cite this proposition. *See FTC v. Swedish Match N. Am., Inc.*, 131 F. Supp. 2d 151, 173 (D.D.C. 2000) (noting that the "absence of an injunction will also make it impossible to accomplish full relief"); *United States v. Ivaco, Inc.*, 704 F. Supp. 1409, 1429 (W.D. Mich. 1989) ("If an injunction is denied and the transaction is later found to violate the Act, then the remedy would be a divestiture of acquired assets" but "[t]hat remedy is typically rejected by the courts as ineffective," as it "would not effectively remedy the injury to competition threatened by this transaction."); *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*, 600 F. Supp. 1326, 1332 (E.D. Mich. 1985) ("If preliminary relief is not awarded and the merger is subsequently found to be unlawful, it would be extremely difficult, if at all possible, to remedy effectively the unlawful merger."); *Consol. Gold Fields, PLC v. Anglo Am. Corp. of S. Afr. Ltd.*, 698 F. Supp. 487, 503 (S.D.N.Y. 1988) ("Once a [merger] has been consummated, it becomes virtually impossible to 'unscramble the eggs.'" (quoting *Christian Schmidt Brewing Co.*, 600 F. Supp. at 1332)), *aff'd in part, rev'd in part on other grounds*, 871 F.2d 252, 261 (2d Cir. 1989) (stating that a preliminary junction is the "remedy of choice" for an unlawful merger). *See also* IVA Phillip E. Areeda and Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 990c1 (2006) ("Of all the forms of equitable relief a simple injunction prior to consummation of the merger transaction is the least disruptive to all concerned. Any competitive injuries that might result from the merger have not yet occurred.").

discussions with DFA regarding a potential sale of substantially all assets of the Company." *Id.* at 8. In the ensuing months, the Debtors largely ignored the Ad Hoc Group of Bondholders' efforts to engage in discussions for rescue financing and DIP financing, and failed to provide timely basic diligence to enable this group to finalize a restructuring proposal. *Id.* at 7, 10-12.

31.     In addition, DFA and the Debtors fought tooth and nail, and succeeded, to allow DFA to bid without being required to allocate values to individual assets of the Debtors during the bidding process, thereby allowing it to structure its bid in such a manner that the Court could not evaluate whether the sale of any individual assets were in the best interest of creditors or to allow parties to raise non-bankruptcy objections to the sale of individual assets. As set forth in their draft complaint, Movants believe that DFA and the Debtors took each of these steps for anticompetitive reasons. Yet, incredibly, the Debtors now point to the *repercussions* of these steps as their evidence of the harm that result if Movants are allowed to pursue their antitrust claims in district court.

32.     The Debtors' first and loudest claim is that, if Movants are granted relief to pursue their antitrust claims in district court, the Debtors will be forced to shutter their plants and lay off their workers, resulting in disruption to the milk supply chain. As an initial matter, Movants point out that the a group of noteholders has presented this Court with a "Plan B" Borden-Dean merger in the event that the DFA Sale falls through. These noteholders made a submission on April 23rd "to inform the Court that—as a result of the progress made to date on the Borden-Dean Merger— the fate of Dean Foods, its employees, and the national milk market do not depend on the DFA and Prairie Farms Asset Sales." Noteholder Response to Motion, at 3 [Docket No. 1750]. Movants support these noteholders' request for a status conference on May 4th to evaluate this option.

33.     But putting aside the "Plan B" merger, DFA and the Debtors' current predicament is one of their own making, and ***it is still within their power to avoid***. DFA and the Debtors set a

June 1, 2020 outside closing date for the DFA Sale, and as described above, Movants fully intend to resolve their request for preliminary injunctive relief by that point. If a district court finds that Movants are unlikely to succeed on the merits, a preliminary injunction will not issue and DFA and the Debtors can close the entire DFA Sale on schedule. On the other hand, if a district court finds a likelihood of success on the merits, the parties could *still* close on their transaction on schedule if DFA were willing to disclose its valuation of individual assets and either (1) hold separate the Carolinas Facilities; or (2) negotiate a partial sale that accounts for Movants' claims and places the Carolinas Facilities values in escrow.[15] It is DFA's "all-or-nothing" approach to this sale—not Movants' claims—that is binding the Debtors' hands.[16]

34. Further, as set forth above, Movants believe that more harm will befall the Debtors' current employees and the COVID-19 milk supply chain if the DFA Sale is consummated as

---

[15] As they prepared their and associated TRO papers in a highly compressed time frame, Movants have sought every opportunity to find a way to address the significant antitrust concerns and associated harm to the dairy industry in the Carolinas created by the proposed transaction while, at the same time, addressing the concerns of DFA and the Debtors. For example, if the parties could agree to a "hold separate" arrangement for the plants in the Carolinas and Movants could be assured that DFA would not later claim that it was not feasible to divest those plants if Movants are successful with their antitrust lawsuit, Movants would consider withdrawing their motion and allowing the transaction to close as scheduled. A "hold separate" and associated interim remedies—a common solution to the very predicament presented here—essentially preserves the status quo pending litigation while also allowing the transaction to close and could thus possibly strike the right balance of everyone's interests here. If the stay is lifted (or if DFA would engage in discussions prior to the stay being lifted), Movants believe that this type of agreement could be negotiated expeditiously prior to closing. To that end, Movants have sent the e mail attached here as **Exhibit B** to counsel for the Debtors and DFA and requested an oral meet and confer to consider ways to resolve the parties' dispute over the relief requested in the motion. Consistent with its "all or nothing" approach to this proceeding, however, DFA has not exhibited any willingness to consider alternative forms of relief that may address each side's concerns. Nonetheless, if the Court were interested in exploring alternatives to a simple lifting or denial of the stay to help balance the various exigencies and interests at stake with the Motion, Movants would be happy to discuss with the Court whether they can make any commitments in this regard that would address any concerns the Court may have regarding the propriety of stay relief.

[16] The Objection gives the Court the impression that, if it grants relief from the automatic stay, such an order would provide DFA with the right to terminate the APA. That is patently false. Section 12.01 of the APA lists the specific instances in which DFA may terminate the APA, including (a) DFA is not the successful bidder, *see* § 12.01(b)(i); (b) the failure of the Debtors to close by the Outside Date, currently June 1, 2020, *see* § 12.01(b)(ii); or (c) the entry of a Final Order by a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the closing, *See* § 12.01(b)(iii). DFA would not have the right to terminate if this Court were to modify the automatic stay to allow the Movants to file the antitrust action and seek a TRO.

planned, than if it is adjusted to account for Movants' antitrust claims. DFA has not disclosed its business plans with respect to the Carolinas Facilities, but Movants and the Debtors' employees anticipate plant consolidations and layoffs in the wake of the merger. Indeed, Movants' draft complaint alleges that DFA's valuation of the Carolinas Facilities—two of which are only twenty miles apart, and one of which is operating at only 50% capacity—is based in part on DFA's plan to stifle competition in the region, not necessarily on their potential as revenue generators.

35.     The Debtors' second claim of harm—that Movants' requested relief will "blow up" the DFA Sale, DFA will walk away, and the Debtors will be forced to return to market with their plants—also rings hollow. Again, if these events happen, it will be as a result of DFA's inexplicable intransigence with respect to the Debtors' assets. Because Movants challenge only the effects of the DFA Sale in the Carolinas (where they are market participants), Movants have narrowly tailored the preliminary *and* permanent relief sought to relate only to the Carolinas Facilities. As discussed above, multiple avenues exist for executing on the DFA Sale while recognizing the pendency of Movants' antitrust claims. Moreover, Movants have proposed to the Debtors and DFA a timeline under which the preliminary injunction motion can be resolved before the outside closing date for the DFA Sale. The balancing of harm to the parties comes down strongly on the side of granting Movants' requested relief from the automatic stay.

C.     Allowing Movants to pursue their antitrust claims in district court will likely result in a complete resolution of the issues, and will not unduly interfere with administration of the bankruptcy estate.

36.     Also weighing in Movants' favor is the fact that the issues raised in Movants' draft complaint will likely be wholly resolved if Movants are given the opportunity to adjudicate their antitrust claims in district court. If the district court returns a favorable result for Movants, they will obtain the discrete remedy described above and have no need to return to bankruptcy court. If the district court rules in favor of the Debtors and DFA, Movants' only reason to return to

bankruptcy court will be to ensure that the "Anti-trust Enforcement" provision remains in any final order, should the effects of the sale warrant the extremely high hurdle of a post-sale Section 7 challenge. The Debtors are mistaken that, if a district court enjoins part of the sale, they will have to remarket whatever assets are enjoined and come back to this Court for approval of those sales. The Court has already authorized a sale to the backup bidder for the main facility that Movants are concerned about—High Point, North Carolina—so there would be no need to return to this court for approval of that divestiture.

37.     With respect to the potential for the proposed preliminary injunction proceedings to interfere with administration of the bankruptcy estate, as set forth above, Movants have tailored the relief they seek so that the vast majority of the DFA Sale can proceed as planned and on schedule. Movants are also amenable to negotiating terms by which DFA and the Debtors can proceed with the entire DFA Sale and either "hold separate" the High Point plant or place the Carolinas Facilities monies in escrow until Movants' antitrust claims are resolved. But, in light of the gravity of the anticompetitive effects and injuries alleged in Movants' complaint, it would be more detrimental to the bankruptcy estate for the DFA Sale to close in violation of antitrust laws. The Debtors should not be given pass simply because they would need to expend a modest amount of time and resources to bring their sale plans into compliance with the law.

38.     Finally, the Debtors argue that the determination of whether to lift the automatic stay "also may involve an evaluation of the movants' likelihood of success in the underlying or contemplated action." Objection, ¶ 19. Although this is not one of the twelve "cause" factors, and although Movants believe this determination is more suitable for the preliminary injunction stage, the passing consideration of the merits in *In re Piperi* has certainly been met here. *See* 133 B.R. 846, 849 (S.D. Tex. Bankr. 1990) ("While the merits of the state court case were not addressed at

length, [movant] testified to his view that the case was a strong one in that the transactions he anticipated proving were well documented. His testimony was undisturbed on cross-examination and unchallenged by controverting testimony. For purposes of a determination in the context of an 11 U.S.C. § 362 motion, movant has shown a reasonable likelihood of success."). And notably, in both cases cited by the Debtors on this point, relief from the automatic stay was granted. Movants urge this Court to reach the same result here.

## CONCLUSION

39.     For the reasons set forth above and in their emergency motion, Movants respectfully request that the Court grant the Motion and modify the automatic stay to allow Movants to commence an antitrust action in district court.

Dated: April 27, 2020
        Houston, Texas

**HUNTON ANDREWS KURTH, LLP**

/s/ Gregory G. Hesse
Gregory G. Hesse
(Texas Bar No. 09549419)
1445 Ross Avenue, Suite 3700
Dallas, Texas  75202
Tel:    214-979-3000
Fax:    214-880-0011
Email: ghesse@HuntonAK.com

Philip M. Guffy
(Texas Bar No. 24113705)
600 Travis Street, Suite 4200
Houston, Texas  77002
Tel:    713-220-4200
Fax:    713-220-4285
Email: pguffy@HuntonAK.com

*Counsel for Food Lion LLC*

**O'CONNORWECHSLER PLLC**

/s/ Annie E. Catmull
Annie E. Catmull
State Bar No. 00794932
4400 Post Oak Parkway
Suite 2360
Houston, Texas 77027
Tel.: (281) 814-5977
aecatmull@o-w-law.com

-and-

**TROUTMAN SANDERS LLP**

/s/ Richard E. Hagerty
Richard E. Hagerty (admitted *pro hac vice*)
VSB No. 47673
401 9th Street, N.W.,
Suite 1000
Washington, D.C. 20004
Tel.: (202) 274-1910
richard.hagerty@troutman.com

*Attorneys for MDVA*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on April 27, 2020, a true and correct copy of the foregoing document was served via the Court's CM/ECF notification system on the parties registered to receive electronic notices in this case.

By:     <u>/s/ *Gregory G. Hesse*      </u>
           Gregory G. Hesse