**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN CONDITIONALLY APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THE DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| _____ ) | | |
| In re: | ) | Chapter 11 |
| | ) | |
| SOUTHERN FOODS GROUP, LLC, *et al.*, | ) | Case No. 19-36313 (DRJ) |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |
| _____ ) | | |

## DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION OF SOUTHERN FOODS GROUP, LLC, DEAN FOODS COMPANY, AND THEIR DEBTOR AFFILIATES

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: Southern Foods Group, LLC (1364); Dean Foods Company (9681); Alta-Dena Certified Dairy, LLC (1347); Berkeley Farms, LLC (8965); Cascade Equity Realty, LLC (3940); Country Fresh, LLC (6303); Dairy Information Systems Holdings, LLC (9144); Dairy Information Systems, LLC (0009); Dean Dairy Holdings, LLC (9188); Dean East II, LLC (9192); Dean East, LLC (8751); Dean Foods North Central, LLC (7858); Dean Foods of Wisconsin, LLC (2504); Dean Holding Company (8390); Dean Intellectual Property Services II, Inc. (3512); Dean International Holding Company (9785); Dean Management, LLC (7782); Dean Puerto Rico Holdings, LLC (6832); Dean Services, LLC (2168); Dean Transportation, Inc. (8896); Dean West II, LLC (9190); Dean West, LLC (8753); DFC Aviation Services, LLC (1600); DFC Energy Partners, LLC (3889); DFC Ventures, LLC (4213); DGI Ventures, Inc. (6766); DIPS Limited Partner II (7167); Franklin Holdings, Inc. (8114); Fresh Dairy Delivery, LLC (2314); Friendly's Ice Cream Holdings Corp. (7609); Friendly's Manufacturing and Retail, LLC (9828); Garelick Farms, LLC (3221); Mayfield Dairy Farms, LLC (3008); Midwest Ice Cream Company, LLC (0130); Model Dairy, LLC (7981); Reiter Dairy, LLC (3675); Sampson Ventures, LLC (7714); Shenandoah's Pride, LLC (2858); Steve's Ice Cream, LLC (6807); Suiza Dairy Group, LLC (2039); Tuscan/Lehigh Dairies, Inc. (6774); Uncle Matt's Organic, Inc. (0079); and Verifine Dairy Products of Sheboygan, LLC (7200). The debtors' mailing address is 2711 North Haskell Avenue, Suite 3400, Dallas, TX 75204.

**DAVIS POLK & WARDWELL LLP**

Brian M. Resnick (admitted *pro hac vice*)
Steven Z. Szanzer (admitted *pro hac vice*)
Nate Sokol (admitted *pro hac vice*)
Omer Netzer (admitted *pro hac vice*)
450 Lexington Avenue
New York, New York 10017
Tel.: (212) 450-4000
Fax: (212) 701-5800
brian.resnick@davispolk.com
steven.szanzer@davispolk.com
nathaniel.sokol@davispolk.com
omer.netzer@davispolk.com

**NORTON ROSE FULBRIGHT US LLP**

William R. Greendyke (SBT 08390450)
Jason L. Boland (SBT 24040542)
Robert B. Bruner (SBT 24062637)
Julie Goodrich Harrison (SBT 24092434)
1301 McKinney Street, Suite 5100
Houston, Texas 77010-3095
Tel.: (713) 651-5151
Fax: (713) 651-5246
william.greendyke@nortonrosefulbright.com
jason.boland@nortonrosefulbright.com
bob.bruner@nortonrosefulbright.com
julie.harrison@nortonrosefulbright.com

*Counsel to the Debtors and Debtors in Possession*

Dated: [●]
        Houston, Texas

## PRELIMINARY STATEMENT[2]

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE DEBTORS' PLAN OF LIQUIDATION AND CERTAIN OTHER DOCUMENTS AND INFORMATION.  THE FINANCIAL INFORMATION INCLUDED HEREIN IS FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW AND WHETHER TO VOTE ON THE PLAN.  THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE.  THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS THAT ARE ATTACHED HERETO ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS.   IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR SUCH OTHER PLAN-RELATED DOCUMENTS AND INFORMATION, THE PLAN OR SUCH OTHER PLAN-RELATED DOCUMENTS AND INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.

THE STATEMENTS AND INFORMATION CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN SINCE THE DATE HEREOF.  EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE CASTING A BALLOT.  THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  ANY PERSONS DESIRING ANY SUCH ADVICE OR OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

ALTHOUGH THE DEBTORS HAVE ATTEMPTED TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT, EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED.

THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT HAVE BEEN PREPARED BY THE MANAGEMENT OF THE DEBTORS AND THEIR FINANCIAL ADVISORS.  THE FINANCIAL INFORMATION, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, IS NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, ALTHOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Joint Chapter 11 Plan of Liquidation of Southern Foods Groups, LLC, Dean Foods Company, and Their Debtor Affiliates* (including all exhibits and schedules attached thereto, and as may be amended, altered, modified, or supplemented from time to time, the "**Plan**"); *provided*, that capitalized terms used but not otherwise defined herein or in the Plan, but are defined in title 11 of the United States Code (the "**Bankruptcy Code**") or the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), shall have the meanings ascribed to such terms in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION OR THE ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL INFORMATION WAS PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED AND/OR MAY HAVE BEEN UNANTICIPATED AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE FINANCIAL INFORMATION, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATION OR ACTIONS, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED BY ANY PARTY AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR WILL IT BE CONSTRUED TO CONSTITUTE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS IT RELATES TO THE HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

SEE ARTICLE VIII OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE PLAN.

# TABLE OF CONTENTS

PAGE

ARTICLE I

INTRODUCTION ............................................................................................................................1

A.      Purpose of the Disclosure Statement ...............................................................1

B.      Disclosure Statement Enclosures......................................................................2

C.      Confirmation of the Plan ..................................................................................3

D.      Treatment and Classification of Claims and Interests; Impairment .................3

E.      Releases, Exculpations, and Injunctions ..........................................................5

F.      Voting Procedures and Voting Deadline...........................................................6

G.      Confirmation Hearing.......................................................................................7

ARTICLE II

GENERAL INFORMATION REGARDING THE DEBTORS...................................................................7

A.      The Debtors' Businesses, Structure, Management, and Employees..................7

B.      Debtors' Corporate Structure .........................................................................15

C.      The Debtors' Prepetition Capital Structure .....................................................15

D.      Summary of Events Leading to the Chapter 11 Filings..................................18

ARTICLE III

THE CHAPTER 11 CASES .........................................................................................................22

A.      First and Second Day Motions .......................................................................22

B.      Professional Advisors.....................................................................................30

C.      Other Key Filings in the Chapter 11 Cases ....................................................32

D.      Sale Process....................................................................................................39

E.      Disclosure Statement Hearing and Confirmation Hearing .............................44

ARTICLE IV

SUMMARY OF THE PLAN .........................................................................................................45

A.      Administrative Claims, Professional Fee Claims, DIP Claims, Securitization Facility Claims, Priority Tax Claims, and U.S. Trustee Fees.....................................................46

B.      Classification and Treatment of Claims and Interests.....................................51

C.      Implementation of the Plan ..........................................................................58

D.      Provisions Regarding the Liquidating Trustee ...........................................66

E.      Provisions Governing Distributions.............................................................69

F.      Disputed Claims............................................................................................74

G.      Treatment of Executory Contracts and Unexpired Leases .............................78

H.      Effect of Confirmation of the Plan ...............................................................81

I.      Condition Precedent to Effective Date of Plan............................................89

J.      Modifications, Revocation, or Withdrawal of Plan......................................90

K.      Retention of Jurisdiction.............................................................................91

L.      Miscellaneous Provisions ...........................................................................93

## ARTICLE V

VOTING REQUIREMENTS; ACCEPTANCE AND CONFIRMATION OF THE PLAN................................96

A.      General.........................................................................................................96

B.      Parties in Interest Entitled To Vote ............................................................97

C.      Classes Impaired and Entitled To Vote Under the Plan ...................................97

D.      Voting Procedures and Requirements...........................................................98

E.      Acceptance of Plan......................................................................................101

F.      Confirmation Without Necessary Acceptances; Cramdown.........................102

G.      Classification ..............................................................................................103

## ARTICLE VI

FEASIBILITY AND BEST INTERESTS OF CREDITORS....................................................103

A.      Best Interests Test.......................................................................................103

B.      Liquidation Analysis ..................................................................................104

C.      Application of the Best Interests Test........................................................105

D.      Feasibility ..................................................................................................105

## ARTICLE VII

EFFECT OF CONFIRMATION ...............................................................................105

A.      Binding Effect of Confirmation .................................................................105

B.      Good Faith..................................................................................................106

ARTICLE VIII

CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING..................................................106

A.      Certain Bankruptcy Considerations ..........................................................................106

B.      The Debtors May Be Unable To Liquidate  the Remaining  Assets in a Timely
        Fashion or at a Good Price ..........................................................................................109

ARTICLE IX

CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ........................................109

A.      General ........................................................................................................................109

B.      Consequences to the Debtors .....................................................................................111

C.      Consequences to Holders of Certain Claims .............................................................112

D.      Tax Treatment of Liquidating Trust and Holders of Liquidating Trust Interests ...........114

E.      Withholding on Distributions and Information Reporting...........................................117

F.      Importance of Obtaining Professional Advice............................................................117

ARTICLE X

RECOMMENDATION ...................................................................................................................118

## Appendices

Appendix A      Debtors' Joint Plan of Liquidation
Appendix B      Liquidation  Analysis
Appendix C      Debtors' Corporate Organizational  Structure

# ARTICLE I

# INTRODUCTION

## A.      Purpose of the Disclosure Statement

On November 12, 2019 (the "**Petition Date**"), Southern Foods Group, LLC, Dean Foods Company ("**Dean Foods**" or the "**Company**"), and their debtor affiliates (collectively, the "**Debtors**"), each of which is a debtor and debtor in possession, filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"). The Debtors' chapter 11 cases are being jointly administered under the caption *In re Southern Foods Group, LLC*, Case No. 19-36313 (the "**Chapter 11 Cases**"). The Debtors have continued in possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner in the Chapter 11 Cases. On November 22, 2019, the office of the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") appointed an Official Committee of Unsecured Creditors (the "**Creditors' Committee**"). *See Notice of Appointment of Committee of Unsecured Creditors* [D.I. 288]. The Debtors submit this disclosure statement (as may be amended, altered, modified, revised, or supplemented from time to time, the "**Disclosure Statement**") in connection with the solicitation of votes on the *Joint Chapter 11 Plan of Liquidation of Southern Foods Group, LLC, Dean Foods Company, and Their Debtor Affiliates* (the "**Plan**") attached hereto as Appendix A.

The Plan contemplates the liquidation and dissolution of the Debtors and the resolution of all outstanding Claims and Interests. After an exhaustive marketing and sale process, the Bankruptcy Court entered various sale orders [D.I. 1572, 1584–1585, 1594–1595, 1835] (the "**Sale Orders**") approving seven sale transactions (the "**Sale Transactions**") with six different buyers for substantially all of the Debtors' assets. The Sale Transactions included sales with and for the following:  Dairy Farmers of America Inc. ("**DFA**"), acquiring 44 plants; Prairie Farms Dairy, Inc. ("**Prairie Farms**") acquiring eight plants; Mana Saves McArthur, LLC ("**Mana**") acquiring the Miami, Florida plant; Producers Dairy Foods, Inc. ("**Producers**") acquiring the Reno, Nevada plant and the "Berkeley Farms" trademark and related intellectual property; Harmoni, Inc. ("**Harmoni**") acquiring all assets, rights, and properties in connection with the "Uncle Matt's Organic" branded juice products and popsicles; and Logix Capital, LLC ("**Logix**"), through MGD Acquisition, LLC, acquiring the Hilo facility and related distribution branches on the Big Island, Kauai and Maui as well as the use of the Meadow Gold Hawaii brand name. The Debtors closed all of the Sale Transactions between April 30, 2020 and May 5, 2020 for an aggregate sales price of approximately $545 million, which includes approximately $104.7 million in cure cost obligations assumed by Dairy Farmers of America Inc., plus certain other liabilities assumed by the various purchasers in the respective Sale Transactions. The Sale Transactions left the Debtors without a stand-alone operating business, and the Debtors have already begun the process of winding down the remainder of the Estates.

The Plan is the outcome of extensive negotiations among the Debtors and certain of their key stakeholders—including the Creditors' Committee (as defined herein)—and certain other interested parties. The Debtors believe that the Plan is reflective of these good faith negotiations

and will treat Holders of Claims and Interests in an economic and fair manner. As discussed further in Article IV.A of this Disclosure Statement, in developing the Plan, the Debtors considered various issues relating to how the distributable value should be allocated among the creditors of the various Debtors, including, without limitation, (1) the value of the Estates on an entity-by-entity basis and the proper method of determining such value, (2) the value of any unencumbered assets after giving effect to the funding of the Professional Fee Escrow Account and the Convenience Claims Pool, (3) the projected recoveries of Holders of Claims on an entity-by-entity basis, (4) the nature and treatment of Intercompany Claims, and (5) the timing and certainty of certain recoveries to the Estates during the liquidation and wind-down process. The Debtors believe that the Plan strikes a fair and equitable balance between these competing factors and appropriately distributes value among their stakeholders in accordance with the Bankruptcy Code's priority scheme and the good faith compromise and settlement of certain claims and controversies among the Debtors and key stakeholders.

The Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against the Debtors in connection with (1) the solicitation of votes on the Plan and (2) a hearing to consider confirmation of the Plan.

The purpose of this Disclosure Statement is to describe the Plan and its provisions and to provide adequate information, as required under section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors who will have the right to vote on the Plan so they can make informed decisions in doing so. Holders of Claims entitled to vote to accept or reject the Plan will receive a Ballot together with this Disclosure Statement to enable them to vote on the Plan in accordance with the voting instructions and make any other elections or representations required pursuant to the Plan.

This Disclosure Statement includes, among other things, (1) information pertaining to the Debtors' prepetition business operations and financial history and (2) the events leading up to the Chapter 11 Cases. In addition, this Disclosure Statement includes an overview of the Plan (which overview sets forth certain terms and provisions of the Plan), the effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan. This Disclosure Statement also discusses the confirmation process and the procedures for voting, which procedures must be followed by the Holders of Claims entitled to vote under the Plan in order for their votes to be counted.

**B.      Disclosure Statement Enclosures**

Accompanying this Disclosure Statement is a Ballot for voting to accept or reject the Plan and to make any other elections or representations required pursuant to the Plan if you are the record holder of a Claim in a Class entitled to vote on the Plan (each, a "**Voting Class**"). **In addition, enclosed with this Disclosure Statement is a letter from the Creditors' Committee recommending that all Holders of Impaired Claims to vote to ACCEPT the Plan and to complete and submit their Ballots so that they will be RECEIVED by the Claims and Solicitation Agent on or before the Voting Deadline**.

### C.      Confirmation of the Plan

#### 1.      *Requirements*

The requirements for confirmation of the Plan are set forth in section 1129 of the Bankruptcy Code. The requirements for approval of the Disclosure Statement are set forth in section 1125 of the Bankruptcy Code.

#### 2.      *Confirmation of the Plan*

To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of section 1129 of the Bankruptcy Code.

#### 3.      *Only Impaired Classes Vote*

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the applicable holder's legal, equitable, or contractual rights are modified under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, Holders of Claims in Classes 3, 4, 5, and 6 are Impaired and are entitled to vote on the Plan.

Under the Plan, Holders of Claims or Interests in Classes 1 and 2 are Unimpaired and, therefore, deemed to accept the Plan.

Under the Plan, Holders of Claims or Interests in Classes 8 and 9 are Impaired and will not receive or retain any property under the Plan on account of their Claims or Interests in such Classes and, therefore, are (a) not entitled to vote on the Plan and (b) deemed to reject the Plan.

Under the Plan, Holders of Claims or Interests in Classes 7 and 10 are either (a) Unimpaired, and therefore, deemed to accept the Plan, or (b) Impaired and not receiving any distribution under the Plan, and therefore, deemed to have rejected the Plan. Therefore, no Holder of Claims or Interests in Class 7 or 10 is entitled to vote on the Plan.

ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 3, 4, 5, and 6.

### D.      Treatment and Classification of Claims and Interests; Impairment

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Interests are classified for all purposes, including, without express or implied limitation, voting, confirmation, and distribution pursuant to the Plan, as set forth herein. A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the

description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date. Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the official claims register without a claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as otherwise specifically provided for in the Plan, the Confirmation Order, or other order of the Bankruptcy Court, or as required by applicable non-bankruptcy law, in no event shall any Holder of an Allowed Claim be entitled to receive payments that in the aggregate exceed the Allowed amount of such Holder's Claim. For the purpose of classification and treatment under the Plan, any Claim in respect of which multiple Debtors are jointly liable shall be treated as a separate Claim against each of the jointly liable Debtors.

### Summary of Classification and Treatment of Claims against and Interests in the Debtors

THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE SUBJECT TO CHANGE.

The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including those related to the claims reconciliation process. Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual distribution received by Holders of Allowed Claims. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimates as of the date hereof only. In addition to the cautionary notes contained elsewhere in the Disclosure Statement, it is underscored that the Debtors make no representation as to the accuracy of these recovery estimates. The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation, and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. For a summary of the treatment of each Class of Claims and Interests, see Article IV, "Summary of the Plan," below.

| Class | Claim or Interest | Status | Voting Rights | Projected Recovery Under the Plan | Estimated Allowed Claims |
|---|---|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Deemed to Accept | 100% | $4,000,000 |
| 2 | Other Priority Claims | Unimpaired | Deemed to Accept | N/A | $0 |

| Class | Claim or Interest | Status | Voting Rights | Projected Recovery Under the Plan | Estimated Allowed Claims |
|---|---|---|---|---|---|
| 3 | Senior Notes Claims | Impaired | Entitled to Vote | 1% - 4% | $707,000,000 |
| 4 | Control Group Liability Pension Claims | Impaired | Entitled to Vote | 2% - 5% | $618,000,000 |
| 5 | Convenience Claims | Impaired | Entitled to Vote | <1% | $15,000,000 |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote | <1% | $363,000,000 |
| 7 | Prepetition Intercompany Claims | Unimpaired or Impaired | Deemed to Accept or Presumed to Reject | N/A | N/A |
| 8 | Section 510(b) Claims | Impaired | Presumed to Reject | 0% | N/A |
| 9 | Existing Interests | Impaired | Presumed to Reject | 0% | N/A |
| 10 | Intercompany Interests | Unimpaired or Impaired | Deemed to Accept or Presumed to Reject | N/A | N/A |

If a controversy arises regarding whether any Claim is properly classified under the Plan, the Bankruptcy Court shall, upon proper motion and notice, determine such controversy at the Confirmation Hearing. If the Bankruptcy Court finds that the classification of any Claim is improper, then such Claim shall be reclassified and the Ballot previously cast by the Holder of such Claim shall be counted in, and the Claim shall receive the treatment prescribed in, the Class in which the Bankruptcy Court determines such Claim should have been classified, without the necessity of resoliciting any votes on the Plan.

## E.    Releases, Exculpations, and Injunctions

The Plan contains certain releases, exculpations, and injunctions (as described more fully in Article IX of the Plan), including releases between the Debtors, on the one hand, and certain Released Parties on the other hand. The Releasing Parties under the Plan include the following: (1) the Debtors and the Debtors' Estates; (2) Liquidating Debtors; (3) the Liquidating Trustee; (4) the Liquidating Trust Advisory Board and its members; (5) the DIP Agent; (6) each DIP Secured Party; (7) each Securitization Party; (8) each Prepetition Secured Party; (9) the Creditors' Committee and its members; (10) the Senior Notes Indenture Trustee; (11) each Holder of a Claim entitled to vote to accept or reject the Plan that does not affirmatively elect to "opt out" of being a Releasing Party by checking the appropriate box on such Holder's timely submitted Ballot to indicate that such Holder elects to opt out of the Plan's release, exculpation, and injunction provisions; (12) each Holder of a Claim that is Unimpaired and presumed to accept the Plan that

does not affirmatively elect to "opt out" of being a Releasing Party by checking the appropriate box on such Holder's timely submitted Non-Voting Opt Out Form to indicate that such Holder elects to opt out of the Plan's release, exculpation, and injunction provisions; (13) each Holder of a Claim that is deemed to reject the Plan that does not affirmatively elect to "opt out" of being a Releasing Party by checking the appropriate box on such Holder's timely submitted Non-Voting Opt Out Form to indicate that such Holder elects to opt out of the Plan's release, exculpation, and injunction provisions; (14) each Securitization Entity; and (15) with respect to each of the foregoing Persons in clauses (1) through (14), such Persons' predecessors, successors, assigns, subsidiaries, Affiliates, managed accounts and funds, and all of their respective current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, investment managers, investment advisors, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees. The release, exculpation, and injunction provisions in Article IX of the Plan are integral to the Plan and the consensual and orderly wind-down and liquidation of the Estates.

## F.      Voting Procedures and Voting Deadline

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan and make any other elections or representations required pursuant to the Plan. To ensure your vote is counted, you must complete, date, sign, and promptly mail the Ballot enclosed with the notice or complete your Ballot using the online portal maintained by the Claims and Solicitation Agent, in each case indicating your decision to accept or reject the Plan in the boxes provided.

The Ballot contains an election for a Holder voting on the Plan, or a Holder abstaining from voting on the Plan, to opt out of the third-party release, exculpation, and injunction provisions contained in Article IX of the Plan. Holders of Claims who are deemed to accept or reject the Plan and, therefore, are not entitled to vote, will receive a Notice of Non-Voting Status and may opt out of the third-party release, exculpation, and injunction provisions contained in Article IX of the Plan by checking the appropriate box on such Holder's timely submitted Non-Voting Opt Out Form to indicate that such Holder elects to opt out of the Plan's release, exculpation, and injunction provisions. Each Holder of a Claim that does not timely make the opt-out election on its Ballot or Non-Voting Opt Out Form, as applicable, will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all claims and causes of action against the Released Parties.

TO BE COUNTED, YOUR BALLOT INDICATING YOUR ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY THE CLAIMS AND SOLICITATION AGENT NO LATER THAN 4:00 P.M. (PREVAILING CENTRAL TIME) ON **MARCH 5, 2021** (THE "**VOTING DEADLINE**").

In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class that actually voted on the Plan must vote to accept the Plan. At least one Voting Class, excluding the votes of insiders, must actually vote to accept the Plan.

YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT ENCLOSED WITH THE NOTICE OR COMPLETE YOUR BALLOT USING THE ONLINE PORTAL MAINTAINED BY THE CLAIMS AND SOLICITATION AGENT. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY AND TO IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE HOLDER. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE DISCLOSURE STATEMENT, THE PLAN, OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE CLAIMS AND SOLICITATION AGENT AT (833) 935-1362 (TOLL-FREE) OR (503) 597-7660 (IF CALLING FROM OUTSIDE THE U.S. OR CANADA). THE CLAIMS AND SOLICITATION AGENT IS NOT AUTHORIZED TO PROVIDE LEGAL ADVICE AND WILL NOT PROVIDE ANY SUCH ADVICE.

## G.      Confirmation Hearing

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan (the "**Confirmation Hearing**"). The Confirmation Hearing will take place on [●], 2021 at __:__ _.m. (prevailing Central Time). Parties in interest will have the opportunity to object to the confirmation of the Plan at the Confirmation Hearing.

THE DEBTORS AND THE CREDITORS' COMMITTEE URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.

## ARTICLE II

## GENERAL INFORMATION REGARDING THE DEBTORS

## A.      The Debtors' Businesses, Structure, Management, and Employees

### 1.      Overview

With a history dating to 1925, Dean Foods Company ("**Dean Foods**") is a leading food and beverage company and the largest processor and direct-to-store distributor of fresh fluid milk and other dairy and dairy case products in the United States. Dean Foods or a predecessor has been a public company since 1961 and listed on the New York Stock Exchange ("**NYSE**") since 1981. Dean Foods manufactures, markets, and distributes a wide variety of branded and private label dairy and dairy case products, including fluid milk, ice cream, cultured dairy products, creamers, ice cream mix, and other dairy products to retailers, distributors, foodservice outlets, educational institutions, and governmental entities across the United States.

Dean Foods sells its products under national, regional and local proprietary or licensed brands. Products not sold under these brands are sold under a variety of private labels. Dean Foods sells its products primarily on a local or regional basis through its local and regional sales forces, although some national customer relationships are coordinated by a centralized corporate sales department. Dean Foods' largest customer is Walmart Inc. ("**Walmart**"), including its

subsidiaries such as Sam's Club, which accounted for approximately 15.3% of net sales for the year ended December 31, 2019.

Dean Foods brands include *DairyPure®*, the country's largest fresh, white milk national brand, and *TruMoo®*, the leading national flavored milk brand. As of December 31, 2019, Dean Foods' national, local and regional proprietary and licensed brands included the following:

| | | |
|---|---|---|
| Alta Dena® | Jilbert™ | Pog® (licensed brand) |
| Arctic Splash® | Knudsen® (licensed brand) | Price's™ |
| Barber's Dairy® | LAND O LAKES® (licensed brand) | Purity™ |
| Berkeley Farms® | Land-O-Sun & design® | ReadyLeaf® |
| Broughton™ | Lehigh Valley Dairy Farms® | Reiter™ |
| Brown Cow® | Louis Trauth Dairy Inc.® | Robinson™ |
| Brown's Dairy® | Mayfield® | Schepps® |
| Chug® | McArthur® | Sonora™ |
| Country Fresh™ | Meadow Brook® | Steve's® |
| Country Love® | Meadow Gold® | Stroh's® |
| Creamland™ | Model Dairy® | Swiss Dairy™ |
| DairyPure® | Morning Glory® | Swiss Premium™ |
| Dean's® | Nature's Pride® | TruMoo® |
| Fieldcrest® | Nurture® | T.G. Lee® |
| Friendly's® | Nutty Buddy® | Turtle Tracks® |
| Fruit Rush® | Oak Farms® | Tuscan® |
| Gandy's™ | Orchard Pure® | Uncle Matt's Organic® |
| Garelick Farms® | Organic Valley® (licensed by joint venture) | Viva® |
| Good Karma® | Over the Moon® | |
| Hygeia® | PET® (licensed brand) | |

Prior to commencement of the Sale Transactions, Dean Foods operated 56 manufacturing facilities (each a "**Facility**") in 29 states located largely based on customer needs and other market factors, with distribution capabilities across all 50 states. Due to the perishable nature of the Debtors' products, they delivered the majority of their products directly to their customers' locations in refrigerated trucks or trailers that they own or lease. This form of delivery is called a "direct-to-store delivery" or "DSD" system. The Debtors believe they have one of the most extensive refrigerated DSD systems in the United States.

The primary raw material used in Dean Foods' products is conventional raw milk (which contains both raw skim milk and butterfat) that is purchased primarily from farmers' cooperatives, as well as from independent farmers. The federal government and certain state governments set minimum prices for raw skim milk and butterfat on a monthly basis. Another significant raw material used by Dean Foods is resin, which is a fossil fuel-based product used to make plastic bottles. The price of resin fluctuates based on changes in crude oil and natural gas prices. Other raw materials and commodities used by Dean Foods include diesel fuel, used to operate its extensive DSD system, and juice concentrates and sweeteners used in its other products. Dean Foods generally increases or decreases the prices of its private label fluid dairy products on a

monthly basis in correlation with fluctuations in the costs of raw materials, packaging supplies and delivery costs.  Dean Foods manages the pricing of its branded fluid milk products on a longer-term basis, balancing consumer demand with net price realization but, in some cases, is subject to the terms of sales agreements with respect to the means and/or timing of price increases.

In 2019, Dean Foods' reported consolidated net sales of approximately $7.329 billion, gross profit of approximately $1.440 billion, and operating income of approximately $(399.7) million.

The fluid milk industry remains highly competitive with a rapidly-changing industry landscape and a dynamic retail environment.  Within private label fluid milk, competition for volume has increased significantly.   In addition, retailers continue to aggressively price their private label products, which Dean Foods believes negatively impacts its branded product sales, resulting in compressed margins.

Dean Foods has several competitors in each of its major product and geographic markets. Competition between dairy processors for shelf-space with retailers is based primarily on price, service, quality and the expected or historical sales performance of the product compared to its competitors' products.   In some cases Dean Foods pays fees to customers for shelf-space. Competition for consumer sales is based on a variety of factors such as price, taste preference, quality and brand recognition.   Dairy products also compete with many other beverages and nutritional products for consumer sales.  Additionally, Dean Foods faces competitive pressures from vertically integrated retailers, discount supermarket chains, dairy cooperatives and other processors, and online and delivery grocery retailers.

Aggregate 2019 sales[1] were divided by product line as follows:  fluid milk – 67%; ice cream (including ice cream, ice cream mix and ice cream novelties) – 15%; fresh cream (including half-and-half and whipping cream) – 6%; ESL and ESL creamers (including creamers and other extended shelf-life fluids) – 3%; cultured – 4%; other beverages (including fruit juice, fruit flavored drinks, iced tea, water, and flax-based beverages) – 4%; and other (including items for resale such as butter, cheese, eggs and milkshakes) – 1%.  50% of those sales derived from company brands (including all national, regional and local brands), and 50% from private label products.

Dean Foods is a national supplier to restaurant chains such as Wendy's, McDonald's, Darden, Panera, Taco Bell, Starbucks, and Waffle House, large format retailers such as Walmart, Target, and Publix, small format convenience stores and pharmacies like Dollar General, CVS, and Walgreens, contract management companies such as Aramark, Sodexo, and Compass, and approximately 30,000 schools.  Historically, Dean Foods made approximately 240,000 total weekly deliveries to large format retailers, small format retailers, food service businesses, and schools during the school year. For the trailing twelve months ending in July, 2019, Dean Foods produced 2.2 billion gallons of milk and other dairy products.

---

[1] These figures exclude sales of excess raw materials of $380.3 million and sales of other bulk commodities of $127.5 million.

### 2.    *Management*

The Debtors' management team has been composed of highly capable and experienced professionals.  Information regarding the Debtors' officers is as follows:

| Name | Position |
| --- | --- |
| Eric Beringause | President and Chief Executive Officer |
| Gary Rahlfs | Senior Vice President and Chief Financial Officer |
| Brian Riley | Senior Vice President, Operations |
| Tom Murray | Senior Vice President and Chief Commercial Officer |
| Greg Wolljung | Senior Vice President, Logistics |
| David Bernard | Senior Vice President, Chief Information Officer |
| Kristy Waterman | Senior Vice President, General Counsel, Corporate Secretary and Government Affairs |

*Eric Beringause*.  Eric Beringause has served as Dean Foods' President and Chief Executive Officer and as a member of the board of directors (the "**Board**"), since July 29, 2019.  Mr. Beringause has significant experience in a broad range of food and consumer products companies.  He served as the Chief Executive Officer of Gehl Foods, LLC from March 2015 to August 2018 and as Chief Executive Officer of Advanced Refreshment LLC from 2011 to 2014.  He also served as President & Chief Executive Officer of Sturm Foods, Inc. from 2008 to 2011.  Mr. Beringause serves on the Management Board of CP Kelco, a leading global producer of specialty hydrocolloid solutions, and on the Board of Trustees at Vassar College.  Mr. Beringause holds a B.A. from Vassar College and an M.B.A. from Cornell University.

*Gary Rahlfs*.  Gary Rahlfs was appointed to serve as the Company's Interim Chief Financial Officer, effective September 24, 2019.  He joined Dean Foods Company in May 2019 as Senior Vice President, Finance & Strategy, and continues to serve in that role.  From March 2018 to May 2019, Mr. Rahlfs served as the Chief Financial Officer/Vice Chancellor for Finance at the University of North Texas.  From 1994 until February 2017, Mr. Rahlfs was employed at PepsiCo, Inc., where he held several positions, including Vice President Finance, Global Groups for PepsiCo, Chief Financial Officer – PepsiCo Foods Canada, and Vice President Sales Finance – Frito-Lay US-South Division.  Mr. Rahlfs holds a B.B.A. from West Texas A&M University and an M.B.A. from The University of Texas at Austin.

*Brian Riley*.  Brian Riley has served as Dean Foods' Senior Vice President, Operations since August 2019, and in that role leads the Fluid and Ice Cream Operations, as well as the Environmental, Health and Safety, and Sustainability functions.  Since joining Dean Foods in 1991, Mr. Riley has served in numerous roles, most recently as Vice President, Fluid Operations (March 2019 to August 2019), Vice President, Operations – Ice Cream Supply Chain (August 2017 to March 2019), and as Vice President, Supply Chain Optimization (August 2015 to August 2017).

*Tom Murray*.  Tom Murray was appointed to serve as Dean Foods' Senior Vice President and Chief Commercial Officer, effective November 4, 2019, and leads Dean Foods' sales functions across all business divisions.  Since joining Dean Foods in 1993, Mr. Murray has served in

numerous roles, most recently serving as Senior Vice President, Group Sales (March 2018 to November 2019), Senior Vice President, North Region (September 2014 to March 2018), Senior Vice President, West Region (May 2013 to September 2014), Group Vice President – Pacific Region (September 2010 to May 2013), Vice President, West (May 2007 to September 2010). He also served as a General Manager of Dean Foods' operating locations in California and Idaho from 1992 through 2002.

*Greg Wolljung*. Greg Wolljung joined Dean Foods in July 2018 as Senior Vice President, Logistics and is responsible for all transportation and logistics operations for Dean Foods' nationwide distribution network. Prior to joining Dean Foods, Mr. Wolljung served as Senior Vice President for the Winebow Group, a national importer and distributor of fine wine and spirits, from October 2017 to July 2018, and served as Vice President, Supply Chain of Snyders-Lance, Inc., a manufacturer and distributor of snack foods, from January 2010 to June 2017 and as its Vice President, Service & Distribution April 2006 to January 2010. Prior to that, he held positions of increasing responsibility with Frito-Lay, PepsiCo (1983 to 2006) where he last served as Division Logistics Manager for its North Central and Northeast network operations from 2001 to 2006.

*David Bernard*. David Bernard joined Dean Foods in July 2017 as Senior Vice President, Chief Information Officer (CIO) and is responsible for the Company's information technology solutions and innovation. He joined Dean Foods from PepsiCo, where he most recently served as a member of its Global Executive IT Leadership Team and led the Global Research and Development and Sustainability IT Business Engagement Team from 2014 to 2017. During his 21-year tenure with PepsiCo, Mr. Bernard served in a number of information technology and innovation leadership roles, including CIO Frito Lay Canada, CIO PepsiCo UK & Ireland, CIO Power of One Sales and Global Marketing, and Global Innovation Strategy and Services. He was a member of the CIO IT Leadership Team for PepsiCo's Global Functions (2010 to 2017), PepsiCo International (2007 to 2010), and Frito Lay North America (2001 to 2007), and served on the Finance Leadership Team for Frito Lay International (1995 to 2001). Mr. Bernard currently serves as a Board Member of Toronto-based B.E.S.T. Investment Counsel Limited, a privately-held investment firm which is the manager and investment advisor of B.E.S.T. Total Return Fund Inc. He is a former member of the Board of Directors of Aidmatrix Foundation, Inc., a supply chain software developer for non-profits and humanitarian and disaster relief organizations.

*Kristy Waterman*. Kristy Waterman was appointed as Senior Vice President, General Counsel, Corporate Secretary and Government Affairs of Dean Foods effective September 2019. In this role, she is responsible for all aspects of Dean Foods' legal and regulatory matters. Ms. Waterman joined Dean Foods in May 2014 as Vice President, Chief Counsel, Corporate & Securities and was promoted to Vice President, Deputy General Counsel in April 2018. Prior to joining Dean Foods, Ms. Waterman worked in the Dallas office of the global law firm Norton Rose Fulbright. Ms. Waterman received a B.S. from University of Texas and her law degree from St. Mary's University School of Law.

Following the consummation of the Sale Transactions, between May 1, 2020 and May 6, 2020, each of Eric Beringause, David Bernard, Thomas N. Murray, Brian K. Riley, Kristy N. Waterman, and Gregory Wolljung resigned from their respective senior management positions with the Company and its subsidiaries. On December 31, 2020, Jeff Dawson resigned from his position of Chief Accounting Officer and Senior Vice President. After giving effect to the

foregoing resignations, the remaining member of the Company's executive management team is Gary W. Rahlfs, Chief Financial Officer and Senior Vice President.

### 3.      Board of Directors

The Board has been composed of highly capable and experienced individuals. Information regarding the Board members is as follows:

*Eric Beringause.* Eric Beringause has served as Dean Foods' President and Chief Executive Officer and as a member of the Board, since July 29, 2019. Mr. Beringause has significant experience in a broad range of food and consumer products companies. He served as the Chief Executive Officer of Gehl Foods, LLC from March 2015 to August 2018 and as Chief Executive Officer of Advanced Refreshment LLC from 2011 to 2014. He also served as President & Chief Executive Officer of Sturm Foods, Inc. from 2008 to 2011. Mr. Beringause serves on the Management Board of CP Kelco, a leading global producer of specialty hydrocolloid solutions, and on the Board of Trustees at Vassar College. Mr. Beringause holds a B.A. from Vassar College and an M.B.A. from Cornell University.

*Janet Hill.* Ms. Hill currently serves as principal at Hill Family Advisors and has served in such position since 2010. Prior to that, Ms. Hill served as Vice President of Alexander & Associates, a corporate consulting firm which she owned, from 1981 until her retirement in 2010. In addition to serving on Dean Foods' Board, Ms. Hill also serves on the Boards of Directors of Carlyle Group Management L.L.C., the general partner of The Carlyle Group L.P.; Esquire Financial Holdings, Inc., where she serves on the Corporate Governance and Nominating Committee and on the board of its subsidiary, Esquire Bank, N.A.; Echo 360, Inc., a private company that is a global leader in active and distance learning solutions for higher education; and Green4U Technologies, Inc., a private company engaged in the design and manufacture of electric vehicles. She also serves as a trustee of Duke University and serves on the boards of the following nonprofit entities: Knight Commission on Intercollegiate Athletics, Kennedy Center, and Wolf Trap Foundation for the Performing Arts. From September 2008 until March 2017, Ms. Hill served as a director of The Wendy's Company, where she served on its Compensation Committee, and, from 2005 until its merger with a subsidiary of Softbank Corp. in July 2013, she served on the Board of Directors of Sprint Nextel Corporation, where she served on the Compensation and Nominating/Corporate Governance committees. Ms. Hill brings valuable insight to the Board as a human resources and corporate governance specialist, having cofounded Alexander & Associates where she provided corporate planning advice and analysis to directors, executives and managers in the areas of human resource planning, corporate responsibility, corporate communications and government consultation. In addition, Ms. Hill has extensive experience serving as a director on several other Boards of Directors over the past 20 years, including Nextel, Sprint Nextel Corporation, Wendy's, and Wendy's/Arby's Group, Inc.

*J. Wayne Mailloux.* Mr. Mailloux is currently active in entrepreneurial activities in the trucking and spirits businesses. Until January 2014, Mr. Mailloux served as the secretary and Chairman of the Board of Directors of SCQuARE International USA Inc., a private company formed in 2012 that provides consulting services to companies across a broad spectrum of industries. He was a Senior Vice President of PepsiCo, Inc. from 2000 through 2004. Mr. Mailloux joined PepsiCo in 1986 and held several senior executive positions, including

-12-

President, Pepsi Cola Europe/Africa Beverages from 1996 through 2000, President, Pepsi Cola Europe Beverage Group from 1994 through 1996 and President, Pepsi Cola Canada Beverages from 1989 through 1994. Mr. Mailloux is also a member of the Board of Directors of Beso del Sol, Inc., a privately held maker of alcoholic beverages. Mr. Mailloux's 18-year career with PepsiCo spanned a wide variety of senior management roles and included extensive general management, sales and marketing experience in both company operations and franchise environments globally. Mr. Mailloux also previously served on the Board of Directors of Ault Dairies Inc., then Canada's largest dairy, prior to its acquisition by Parmalat. His experience in the beverage industry, combined with his global business experience, make him well-qualified to advise the Company.

*Helen E. McCluskey.* Ms. McCluskey was President, Chief Executive Officer and a member of the Board of Directors of The Warnaco Group, Inc. from February 2012 until its acquisition in February 2013 by PVH Corporation. She served as a director of PVH Corporation from February 2013 until June 2014. Ms. McCluskey joined The Warnaco Group, Inc. in July 2004, serving as its Chief Operating Officer from September 2010 to February 2012 and as Group President from July 2004 to September 2010. Prior to joining The Warnaco Group, Inc., Ms. McCluskey held various positions of increasing responsibility with Firestone Tire & Rubber Company (1977 to 1983), Playtex Apparel, Inc. (1983 to 2001) (which was acquired by Sara Lee Corporation in 1991) and Liz Claiborne Inc. (2001 to 2004). During her 18-year tenure with Sara Lee Corporation's intimate apparel units, she held executive positions in marketing, operations and general management, including President of Playtex Apparel from 1999 to 2001. Ms. McCluskey has served as a member of the Board of Directors of Avon Products, Inc. since July 2014 and is a member of its Compensation and Management Development Committee and, since August 2013, has served as a director of Signet Jewelers Limited and as a member of its Audit Committee and Nomination and Corporate Governance Committee. With her broad background in strategy, business planning and operations derived from her career in consumer businesses, Ms. McCluskey brings valuable skills and insight to the Company. Her experience as a Chief Executive Officer of a global public company provides her with significant expertise in global business matters, corporate leadership and management, allowing her to bring valuable insight to the management of the Company's strategic direction and growth. Additionally, having built women's brands globally, she contributes a valuable blend of branding, merchandising, and marketing expertise to the Company.

*John R. Muse.* Mr. Muse retired as Chairman of a private equity firm, Kainos Capital, LLC (formerly known as HM Capital Partners LLC and prior to that known as Hicks, Muse, Tate & Furst Incorporated, which he cofounded in 1989) effective January 2017. Since January 2017, he has served as a director of Nexstar Media Group, one of the nation's largest multimedia companies. He also served as a director of Media General, Inc. from December 2014 until its acquisition by Nexstar Media Group in January 2017. Mr. Muse serves as Chairman of Lucchese Boot Company, Inc., a privately held boot manufacturer, and as the Chairman of Free Flow Wines, LLC, a privately held packaging and logistics company serving the wine on tap industry. Mr. Muse also serves on the Board of Advisors of the UCLA Anderson School of Management and the Board of the Woodall Rodgers (Klyde Warren) Park Foundation. Mr. Muse was also a member of the Board of Directors of The Morningstar Group Inc. prior to Dean Foods' acquisition of that company in November 1997. Mr. Muse has more than 30 years of experience in private equity and investment

banking, including experience in the food and beverage, energy and media sectors. In addition to his industry knowledge, Mr. Muse has extensive knowledge of acquisitions, capital markets and finance, which is invaluable to the Board's strategic planning for the Company's capital and liquidity needs.

*B. Craig Owens.* Mr. Owens was the Chief Financial Officer, Chief Administrative Officer and Senior Vice President of Campbell Soup Company from 2008 until his retirement in April 2014. From 2001 to 2008, Mr. Owens served as the Chief Financial Officer and Executive Vice President of Delhaize Group, an international food retailer headquartered in Belgium. Prior to that, he was employed by The CocaCola Company and its key franchisees from 1981 to 2001 and served in various management roles of increasing importance, including as Finance Director (CFO) for CocaCola Beverages plc from 1998 to 2000. Mr. Owens has served on the Board of Directors of J.C. Penney Company, Inc. since October 2014, where he is a member of its Finance and Planning Committee and serves as chair of its Audit Committee, and as a director of Aptar Group, Inc., a leading global supplier of dispensing systems, since February 2018. From December 2011 through August 2015, he served as a director of Pall Corporation and chaired its Audit Committee from January 2013 through August 2015. Additionally, Mr. Owens has served as a director of United States Cold Storage, Inc., a private company, since June 2014, and, since 2013, has served on the Board of Trustees of Washington & Lee University. Mr. Owens has extensive experience in the consumer food and beverage industries and considerable knowledge of the retail industry. He brings significant financial expertise to the Board, including all aspects of financial reporting, accounting, corporate finance and capital markets, as well as significant experience in strategic planning, business integration and operations, and in managing supply chain organizations.

*Jim L. Turner.* Mr. Turner has served as the Non-Executive Chairman of the Board since August 2015. He serves as Principal of JLT Beverages L.P., a position he has held since 1996, and, since January 2015, has served as the Owner/CEO of JLT Automotive Inc., a group of new automobile dealerships. Prior, Mr. Turner served as President and Chief Executive Officer of Dr. Pepper/Seven Up Bottling Group, Inc. from its formation in 1999 through June 2005 when he sold his interest in that company. Prior to that, Mr. Turner served as Owner/Chairman of the Board and Chief Executive Officer of the Turner Beverage Group, the largest privately owned independent bottler in the United States. Mr. Turner was a member of the Board of Directors of The Morningstar Group Inc. prior to Dean Foods' acquisition of that company in November 1997. Mr. Turner has served on the Board of Trustees of Baylor Scott & White Holdings, the largest not-for-profit healthcare system in the State of Texas, since September 2013 and has served as its Chair since July 2015. He also serves as Chair of its Executive Committee. Mr. Turner previously served as the Chair of the Board of Trustees of Baylor Health Care System until its merger with Scott & White Healthcare in September, 2013. Mr. Turner also serves on the Boards of Directors of Crown Holdings, Inc., a manufacturer of consumer packaging products, where he serves on the Governance and Compensation Committees; Comstock Resources, Inc., an energy company engaged in oil and gas exploration and development, where he serves on the Compensation Committee; and INSURICA, a full service insurance agency. In addition, Mr. Turner is a member of the Texas Rangers Baseball Club ownership group. Mr. Turner's ownership and chairman/CEO experience with various businesses, especially beverage and bottling companies, translates well into the Company's profile as a leading food and beverage company. In addition, Mr. Turner's varied board experiences, including with Morningstar and other consumer packaged goods

companies, offer helpful insight into both the challenges and growth opportunities facing the business.

Following the consummation of the Sale Transactions, between May 1, 2020 and May 6, 2020, each of Janet Hill, J. Wayne Mailloux, Helen McCluskey, John R. Muse, and B. Craig Owens resigned from the Board and any committees of the Board on which they served. After giving effect to the foregoing resignations, the remaining members of the Board are Chairman Jim L. Turner and Eric Beringause.

### 4. *The Debtors' Employees*

As of December 31, 2019, Dean Foods had approximately 14,500 employees in active status, working in both full-time and part-time positions, including those related to milk and dairy products production, operations and logistics, sales, accounting and finance, administration, human resources, and information technology. Approximately 39% of the employees participated in at least one of a multitude of collective bargaining agreements with the Debtors of varying duration and terms (the "**CBAs**"). The Debtors maintained headquarters in Dallas, Texas, where the majority of their corporate and administrative employees resided, but they also had employees located across all 50 states.

### B. Debtors' Corporate Structure

Dean Foods Company was incorporated in Delaware in 1994 and is headquartered in leased premises at 2711 North Haskell Avenue, Suite 3400, Dallas, Texas 75204. The common equity of Dean Foods Company was traded publicly on the New York Stock Exchange under the ticker symbol "DF."

Dean Foods Company is the ultimate parent for 56 direct or indirect subsidiaries, including partial interests in four joint ventures. The corporate tree is primarily organized in two branches, stemming from the April 5, 2001 merger of Dean Foods Company and Suiza Foods Corporation. Dean Foods Company's debtor subsidiaries are each wholly owned, directly or indirectly, by the Dean Foods Company. A chart showing the organizational structure of the Debtors is attached hereto as Appendix C.

### C. The Debtors' Prepetition Capital Structure

As of the Petition Date, the Debtors had approximately $189 million in secured indebtedness under the Prepetition Revolving Credit Facility.[2] Certain of the Debtors were party to a $450 million prepetition receivables facility (the "**Securitization Facility**"), pursuant to which the Debtors sell trade receivables to two non-Debtor wholly owned, bankruptcy remote special purpose vehicle subsidiaries, which was a significant source of liquidity for the Debtors.

---

[2] "**Prepetition Revolving Credit Facility**" herein refers to that certain senior secured revolving credit facility pursuant to that certain credit agreement, dated as of February 22, 2019 (as amended, amended and restated, supplemented, or otherwise modified from the Petition Date, the "**Prepetition Credit Agreement**"), among the Dean Foods Company, each lender party thereto from time to time (the "**Prepetition Revolving Lenders**"), and Coöperatieve Rabobank U.A., New York Branch ("**Rabobank**"), as administrative agent.

Additionally, the Debtors had approximately $700 million in aggregate principal amount of senior unsecured notes (the "**2023 Notes**"). These and other amounts are summarized in the following table and detailed below.[3]

| Obligation | Priority Against Debtors | Loans Outstanding[4] | Letters of Credit Outstanding |
|---|---|---|---|
| Prepetition Revolving Credit Facility | Secured | $188.8 million | $0.0 |
| Securitization Facility | Secured / True Sale | $180 million | $195.2 million |
| 2023 Notes | Senior Unsecured | $700 million | N/A |

### 1. *Prepetition Revolving Credit Facility*

On February 22, 2019, the Dean Foods Company, as borrower, and certain of the other Debtors, as guarantors, entered the Prepetition Credit Agreement with Rabobank as administrative agent and collateral agent, and the Prepetition Lenders, pursuant to which the Prepetition Lenders provided a senior secured revolving borrowing base credit facility with a maximum facility amount of up to $265 million. On August 27, 2019 Dean Foods exercised its right to increase the aggregate principal amount of the commitments under the Prepetition Credit Agreement to $350 million. A portion of the Prepetition Revolving Credit Facility was available for the issuance of up to $25 million of standby letters of credit although no letters of credit were outstanding as of the Petition Date. Loans outstanding under the Prepetition Revolving Credit Facility bore interest, at Borrowers' option, at either: (i) the Base Rate (as defined in the Prepetition Revolving Credit Agreement) or (ii) the Adjusted Eurodollar Rate (as defined in the Prepetition Revolving Credit Agreement), plus a margin ranging between 1.25% and 1.75% (in the case of Base Rate loans) or 2.25% and 2.75% (in the case of Eurodollar Rate loans), in each case based on Dean Foods' total net leverage ratio at such time. The obligations under the Prepetition Revolving Credit Facility were guaranteed by the Company's material domestic restricted subsidiaries. The Prepetition Revolving Credit Facility was secured by first priority liens on, and security interests in, substantially all present and future assets of the Company and its material domestic restricted subsidiaries (other than Excluded Property (as defined in the Prepetition Credit Agreement)).

As of the Petition Date, Dean Foods had $188.8 million outstanding borrowings under the Prepetition Revolving Credit Facility. As described in more detail in Article III.A.1 hereof, upon entry of the Final DIP Order (as defined herein), the aggregate principal amount of the loans outstanding under the Prepetition Revolving Credit Facility as of the Petition Date were rolled-up as DIP Term Loans under the DIP Facility, and all remaining accrued and unpaid interest and fees

---

[3] The table is for illustration and summary purposes only. The Debtors do not admit to the validity, priority and/or allowance of any claim, lien or interest in property and reserve rights in relation to such issues.

[4] The amounts tabulated above reflect the outstanding principal amounts owed, and do not include accrued and unpaid interest, fees, premiums or other related claims.

owing by the Company under the Prepetition Revolving Credit Facility were paid, in each case subject to the terms of the Final DIP Order.

The assets securing the Prepetition Revolving Credit Facility also secured designated hedges entered into with certain lenders or their affiliates. As of November 11, 2019, the aggregate notional amount of all such secured hedges was $33.6 million.

### 2. Securitization Facility

As one means of financing their business, certain of the Debtors entered into the Receivables Agreements,[5] which provided it with a $450 million receivables securitization facility (the "**Securitization Facility**") pursuant to which certain Debtors sold their accounts receivables and related assets to Dairy Group Receivables, L.P. and Dairy Group Receivables II, L.P. (collectively, the "**AR Subsidiaries**"), two wholly owned, bankruptcy-remote entities. The AR Subsidiaries then transferred such accounts receivables and related assets to third-party asset-backed commercial paper conduits sponsored by major financial institutions.

As of November 8, 2019, an aggregate of $180 million in loans and $195.2 in undrawn letters of credit were outstanding under the Securitization facility, and the remaining available borrowing capacity was $5.4 million. The Securitization Facility bore interest at a variable rate based upon either (i) the weighted average cost related to the issuance of commercial paper or (ii) either (a) the one-month LIBO Rate (as defined in the Receivables Purchase Agreement) or (b) the Alternative Base Rate (as defined in the Receivables Purchase Agreement), plus an applicable margin of 3%. As of close of business on November 8, 2019, the applicable all-in interest rate under the Securitization Facility was equal to 3.72%. As described in more detail in Article III.A.2. hereof, the Securitization Facility was amended and reinstated as of November 14, 2019 pursuant to the Amended Transaction Documents (as defined herein).

### 3. Prepetition Senior Unsecured Notes

On February 25, 2015, Dean Foods issued the 2023 Notes, $700 million in aggregate principal amount of 6.50% senior notes due 2023 at an issue price of 100% of the principal amount of the 2023 Notes in a private placement for resale to "qualified institutional buyers" as defined in Rule 144A under the Securities Act of 1933, as amended (the "**Securities Act**"), and in offshore transactions pursuant to Regulation S under the Securities Act. The 2023 Notes are senior unsecured obligations. The 2023 Notes are fully and unconditionally guaranteed on a senior

---

[5] "**Receivables Agreements**" herein refers to (i) (a) that certain Amended and Restated Dean Receivables Sale Agreement, dated as of June 12, 2014, by and among Alta-Dena Certified Dairy, Inc., Berkeley Farms, Inc., Dean Dairy Holdings, LLC, Dean East II, LLC, Dean Foods North Central, Inc., Dean West II, LLC, Mayfield Dairy Farms, Inc., Midwest Ice Cream Company, LLC, Reiter Dairy, Inc., Verifine Dairy Products Corporation of Sheboygan, LLC, and Dairy Group Receivables II, L.P.; and (b) that certain Second Amended and Restated Receivables Sale Agreement, dated as of June 12, 2014, by and among Country Fresh, LLC, Dean East, LLC, Dean West, LLC, Garelick Farms, LLC, Model Dairy, LLC, Shenandoah's Pride, LLC, Southern Foods Group, LLC, Suiza Dairy Group, LLC, Tuscan/Lehigh Dairies, LLC and Dairy Group Receivables, L.P. (as amended, restated, supplemented, or otherwise modified from time to time); and (ii) that certain Receivables Purchase Agreement dated as of February 22, 2019 among Dairy Group Receivables, L.P. and Dairy Group Receivables II, L.P., as Sellers, the Servicers, the Purchasers, PNC Bank, National Association, as LC Bank and Co-Agent, and Coöperatieve Rabobank U.A., New York Branch, as Agent (as amended, restated, supplemented, or otherwise modified from time to time).

unsecured basis, jointly and severally, by the same subsidiaries that guarantee Dean Foods' obligations under the Prepetition Credit Facility. The 2023 Notes mature on March 15, 2023 and bear interest at an annual rate of 6.50%, which is payable semi-annually in arrears in March and September of each year. The carrying value under the 2023 Notes at December 31, 2018 was $695.4 million, net of unamortized debt issuance costs of $4.6 million.

### 4.   Surety Bonds and Self-Bonding

Federal and state laws and certain vendors require the Debtors to assure payment of certain obligations related to, among other things, milk purchases, federal and state workers' compensation programs, self-insurance programs, utility service, and other license, permit and financial guarantees as required by statutory regulations for the Debtors' day-to-day business operations. The Debtors satisfy these requirements by obtaining surety bonds from a syndicate of five third-party surety providers. As of the Petition Date, the Debtors had approximately $100 million in outstanding third-party commercial surety bonds.

## D.   Summary of Events Leading to the Chapter 11 Filings

A host of both industry trends and company specific events combined to drive the Debtors to seek chapter 11 relief. The section below describes both major trends and certain Dean Foods specific events over the last two years, as well as the immediate catalysts motivating the filing.

### 1.   Negative Industry Trends

**Category declines**. While milk remains a household item in the U.S., people are simply drinking less of it. For the past 10 years, demand has fallen approximately 2% year-over-year in North America. Aside from the direct negative impact on sales for the core fluid milk business, declining category trends also drive cost deleveraging which hurts margins. Delivered cost per gallon rose approximately 20.7% between 2013 and 2018 as a result of volume deleverage. Dean Foods suffered a full year 2018 year-over-year decline in fluid milk volume of 5.8% following a 2017 year-over-year decline of 4.2%. Moreover, Dean Foods' volume declines continue to outpace the overall category; while category volumes declined by approximately 4%[6] year-over-year through the end of September, 2019, Dean Foods experienced declines of over 11.4%. Shrinking consumption of fluid milk and slim margins have made things very difficult for conventional milk processors like Dean Foods.

**Changing consumer tastes and increased product competition.** The decline in dairy sales has occurred in conjunction with the rise of oat, nut, soy, and other alternative "milk" products at retailers and food service locations across the country. Options like almond, soy, rice, coconut, and hemp beverages are beginning to demand more and more space on grocery store shelves as consumers have grown to embrace new flavors and alternative diets. Sales of nut and plant beverages grew by 9% in 2018 and had sales of $1.6 billion, according to the Plant Based Foods Association.

---

[6] Third quarter IRI calculated through the week ending September 29, 2019.

**Raw Milk Price Increases**. Prices for conventional raw milk during the third quarter of 2019 were approximately 19.3% higher than year-ago levels and increased approximately 7.5% sequentially from the second quarter of 2019. Dean Foods expects further raw milk inflation in the fourth quarter of 2019 and is currently projecting full-year dairy commodity inflation. Commodity price changes primarily impact Dean Foods' branded business as the changes in raw milk costs are essentially a pass-through cost on our private label products.

**Consolidation leads to compressed margins**. Consolidation in the retail sector has meant that a few retailers and supermarket chains have considerable buying power. This trend combined with the growth of budget retailers and store label products has translated to increasing pressure on already thin margins.

**Competitors on both ends of value chain vertically integrating leads to margin compression.** Many of Dean Foods' large format retail customers are vertically integrated – meaning they have bought or built processing assets to compete with Dean Foods. Retailers that are vertically integrated typically re-dedicate key shelf-space that was formerly occupied by Dean Foods' branded products for their private label products. In addition to the competitive pressures from retail customers, many of Dean Foods' dairy cooperative suppliers have acquired processing assets. By expanding up and down the value chains, these retailers and cooperatives enjoy the benefits of broader profit pools than Dean Foods can access simply by operating in the processing space. Notably there is only one stand-alone processing company of a similar scale to Dean Foods currently operating, and it also filed for chapter 11 relief less than two months after the Petition Date.



Integration across multiple components of the value chain creates synergies and access to more profit pools.

**Use of private label milk as loss-leader has driven portfolio shifts and additional margin compression**. Through 2018 and 2019, Dean Foods experienced an accelerated shift from branded to private label milk products. During that period, retailers aggressively priced their private label milk to drive foot traffic, which has been increasing the price gap between branded and private label milk. This negatively affects Dean Foods' branded product sales as customers trade down to private label products, causing further margin compression. As retailers continue

to invest in private-label milk to drive foot traffic, private-label margin over milk contracted to a historic low of $1.26 in June, before falling even further to $1.24 in September.

**Fuel, Resin and External Freight Costs**. Dean Foods purchases diesel fuel to operate its extensive DSD system, and incurs fuel surcharge expense related to the products we deliver through third-party carriers. Resin, a fossil fuel-based product, is another significant raw material input for Dean Foods and is used to produce plastic bottles. Sustained, national driver shortages over the past few years have also added to freight costs by increasing the wage, overtime and temp employee costs.

### 2. *Events Specific to Dean Foods*

**Customer and Cost Initiative; Core Customer Volume Losses**. In early 2018, Walmart, which including its subsidiaries accounted for approximately 17.5% of Dean Foods' net sales for the year ended December 31, 2017, opened a large dairy manufacturing plant in Indiana that resulted in a loss to Dean Foods of approximately 100 million gallons of fluid milk in annualized sales volume. Dean Foods lost an additional nearly 40 million gallons of annualized fluid milk sales from another major customer further exacerbating the effects of volume deleverage.

In turn, Dean Foods initiated certain cost savings and strategic initiatives, and attempted to manage the lost volumes by consolidating seven plants in just eight weeks, anticipating that the shifts would drive a reduction in Dean Foods' fixed costs and remove unneeded capacity. However, these rapid closures and consolidations resulted in higher than expected costs including freight, labor, and product loss, offsetting anticipated productivity gains for the year from the plant consolidations and related initiatives.

**Covenant Defaults and Refinancings**. Following the significant volume declines in 2018 and higher than expected transitory costs associated with the plant consolidations, on January 17, 2019, Dean Foods negotiated a waiver of certain leverage related financial covenants in the senior secured revolving credit facility and receivables securitization facility then outstanding. This was followed shortly on February 22 by entry into an amended and restated receivables purchase agreement governing the receivables securitization facility and replacement of the prior senior secured revolving credit facility with the Prepetition Revolving Credit Facility with Rabobank as administrative agent to, among other things, (a) extend the liquidity termination date to February 22, 2022 and (b) replace the leverage ratio and the interest coverage ratio covenant with a springing fixed charge coverage ratio covenant that requires Dean Foods to maintain a fixed charge coverage ratio of at least 1.05 to 1.00 at any time that its liquidity is less than 50% of the borrowing base under the credit facility. Notably, the prior revolving facility had a borrowing base of $450 million as compared to initially available borrowing base of $175 million for the Prepetition Revolving Credit Facility. Accessibility in both cases was subject to compliance with financial covenants.

Liquidity remained tight, and in February 2019, Dean Foods' board of directors suspended Dean Foods' dividend payments. No dividends were paid in the first nine months of 2019. Although $197.1 million remained authorized for share repurchases under the previously established program, Dean Foods has made no share repurchases since prior to 2017.

On June 28, 2019, Dean Foods returned to its Prepetition Revolving Lenders and elected to appraise additional real estate for inclusion in the borrowing base under the Prepetition Revolving Credit Agreement in order to increase the borrowing base from $175 million to the facility maximum of $265 million.

On August 27, 2019, Dean Foods entered into further supplements to the Credit Agreement pursuant to which Dean Foods elected to exercise its rights to increase the aggregate principal amount of the commitments under the Credit Agreement by $85 million to an aggregate principal amount of $350 million. However, due to the fixed charge coverage ratio financial covenant, and despite the increased commitment, Dean Foods only had access to roughly half of the upsized $350 million Prepetition Revolving Credit Facility.

**Further Strategic Initiatives.** Dean Foods began 2019 with a new slate of operational objectives and margin improvement initiatives, involving pricing, delivery fees, and cost control programs, that had varying levels of success. However, some of these initiatives ultimately resulted in further customer loss.

In February 2019, the Debtors retained Evercore to assist with a broad evaluation of potential strategic alternatives, including the disposition of certain assets, the formation of new joint ventures, strategic business combinations, sale of the enterprise, or other options to re-energize the Debtors' stand-alone business. It was ultimately determined that these options could not be pursued for a variety of reasons, including that potential contingent liabilities that Dean Foods faces related to the underfunded status of certain multi-employer pension plans in which is participates. In particular and by far the most significant, Dean Foods faced a substantial potential, contingent liability in the event of its withdrawal from the Central States, Southeast and Southwest Areas Pension. Such potential liabilities significantly impaired Dean Foods' ability to pursue any strategic transactions with third parties outside of a bankruptcy proceeding.

In August 2019, as Dean Foods reported its second quarter results it reduced its internal full year adjusted operating income forecast and reported that it would be a net user of cash for the full year 2019. Eric Beringause, the former president and chief executive officer joined Dean Foods on July 29, 2019, and engaged in a renewed effort to evaluate Dean Foods' business plan and strategy.

Through September and October 2019 cash losses continued to mount and the Debtors' liquidity diminished. By early October, 2019, the Debtors saw a sharp decline in preliminary third quarter 2019 results and realized they faced a financial outlook that was deteriorating significantly more rapidly than prior forecasts. The Debtors retained Alvarez & Marsal North America, LLC ("**A&M**"), to assist in the analysis of their general liquidity needs, and Davis Polk & Wardwell LLP ("**Davis Polk**") to explore potential options to raise further capital, or refinance their existing debt in or outside of chapter 11.

Continuing performance declines and the results of their advisors' analysis led the Debtors to determine that it would be necessary to seek chapter 11 relief in order to manage liquidity and prevent potentially ruinous customer flight. Dean Foods anticipated negative cash flows from operations for the fourth quarter 2019. The Debtors provide their customers with a critical daily staple product. Dean Foods' customers would not accept risk of instability in their supply, and

were expected to rapidly seek a replacement vendor in the event of any shortfall of the Debtors' fulfillment. Accordingly, the Debtors and their advisors concluded that seeking the protections of chapter 11 was the only option for obtaining the necessary funding to sustain operations and preventing any disruption with their vendors and customers.

# ARTICLE III

# THE CHAPTER 11 CASES

On the Petition Date, the Debtors filed voluntary petitions for relief under the Bankruptcy Code. The Chapter 11 Cases are being jointly administered under the caption *In re Southern Foods Group, LLC*, Case No. 19-36313. The Debtors have continued in possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On November 22, 2019, the U.S. Trustee appointed the Creditors' Committee. *See Notice of Appointment of Committee of Unsecured Creditors* [D.I. 288]. The members of the Creditors' Committee include the following parties: (A) Central States, Southeast and Southwest Areas Pension and Health and Welfare Fund; (B) The Bank of New York Mellon Trust Company, N.C.; (C) Pension Benefit Guaranty Corporation (the "**PBGC**"); (D) Land O'Lakes, Inc.; (E) California Dairies Inc.; and (F) Select Milk Producers, Inc.

No request has been made for the appointment of a trustee or examiner in the Chapter 11 Cases.

## A.     First and Second Day Motions

On the Petition Date, the Debtors filed a number of "first day" motions designed to ease the Debtors' transition into chapter 11, maximize the value of the Debtors' assets, and minimize the effects of the commencement of the Chapter 11 Cases. Some of these motions were granted on an interim basis following the first day hearing on November 13, 2019, and then on a final basis following the second day hearing held December 20, 2019. Capitalized terms that are used in this Article III.A but not otherwise defined in this Disclosure Statement shall have the meanings ascribed to them in the relevant motions. These motions included, among others:

### *1.     DIP Financing*

On the Petition Date, the Debtors filed the *Emergency Motion of Debtors for Entry of Interim and Final Orders, Pursuant to 11 U.S.C §§ 105, 361, 362, 363, 364, 503, 506, 507 and 552 (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Post-Petition Financing, and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Claims, (III) Providing Adequate Protection to Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [D.I. 72] (the "**DIP Motion**"). Pursuant to the DIP Motion, the Debtors sought entry of an order authorizing, among other things, the Debtors to obtain senior secured, superpriority debtor-in-possession financing on the terms set forth in a contemplated Senior Secured Superpriority Debtor-in-Possession Credit Agreement (the "**DIP Credit Agreement**") and use cash collateral.

On November 14, 2019, the Bankruptcy Court entered an order approving, on an interim basis, the financing to be provided pursuant to the DIP Credit Agreement [D.I. 133]. On November 14, 2019, the DIP Credit Agreement was entered into by and among Dean Foods Company, as borrower, the lenders from time to time party thereto (the "**DIP Lenders**") and Coöperatieve Rabobank U.A., New York Branch, as administrative agent and collateral agent for the DIP Lenders (in such capacities, the "**DIP Agent**"). The DIP Credit Agreement provided for a senior secured, superpriority debtor-in-possession credit facility in the aggregate principal amount of up to $425 million (the "**DIP Facility**") consisting of a new money revolving loan facility in an aggregate principal amount of approximately $236.2 million in the form of revolving loans, including a letter of credit sub-limit of $25 million. The DIP Facility also consisted of term loans (the "**DIP Term Loans**") in an aggregate principal amount equal to the principal amount of all loans under the Prepetition Revolving Credit Facility outstanding as of the Petition Date, which were, upon entry of the Final DIP Order, rolled-up on a dollar-for-dollar basis and refinanced as (and deemed to be) the DIP Term Loans. In addition, upon entry of the Final Order, all remaining accrued and unpaid interest and fees owing by the Debtors under the Prepetition Revolving Credit Facility and any professional and advisory fees required to be paid in connection therewith were paid. On December 23, 2019, the Bankruptcy Court entered an order approving the DIP Motion on a final basis [D.I. 608] (the "**Final DIP Order**"). The DIP Obligations under the DIP Facility and as defined in the Final DIP Order constituted superpriority administrative expenses and were secured by senior priming liens on, and security interests in, substantially all present and future assets of Dean Foods and its restricted subsidiaries (other than Excluded Property (as defined in the DIP Credit Agreement)), including the equity of the AR Subsidiaries.

On February 10, 2020, the Company entered into the first amendment to the DIP Credit Agreement to extend several of the milestone dates set forth in the DIP Credit Agreement (the "**First DIP Amendment**"), including extending from February 10, 2020 to February 24, 2020 the date by which the Debtors must elect whether they intend to pursue a sale of their assets under section 363 of Bankruptcy Code or a plan of reorganization, and if they elect a sale, to file a motion seeking approval thereof. On March 27, 2020, the Company entered into the second amendment to the DIP Credit Agreement (the "**Second DIP Amendment**") to modify certain of the milestone dates set forth in the DIP Credit Agreement, including modifying the deadline for an order to be entered approving the sale of the Debtors' assets under section 363 of the Bankruptcy Code (other than a minority of certain bid assets) to April 10, 2020 (from May 20, 2020).

In addition, the Debtors also sought, and the Bankruptcy Court entered on April 30, 2020, an order authorizing the Debtors to amend the DIP Credit Agreement to, among other things, revise the mandatory prepayment provisions to facilitate the consummation of the Sale Transactions, the orderly wind-down of the Estates, and the liquidation of any remaining assets not included in the Sale Transactions [D.I. 1897] (the "**DIP Amendment Order**"). Pursuant to the DIP Amendment Order, on May 1, 2020, the Company entered into the third amendment to the DIP Credit Agreement, pursuant to which the DIP Lenders agreed to (a) waive certain events of default under the DIP Credit Agreement expected to occur as a result of the consummation of the Sale Transactions, (b) permit less than all of the net cash proceeds of the Sale Transactions to be immediately applied to the prepayment of the obligations under the DIP Facility, and (c) facilitate a phased repayment of such obligations with future asset sale proceeds and other anticipated cash receipts prior to the amended scheduled maturity date of July 31, 2020, in each case, for the

primary purpose of facilitating an orderly wind down of the Debtors' estates and repayment of the DIP Facility and the satisfaction in full of all DIP Obligations thereunder.

### 2. Securitization

On the Petition Date, the Debtors filed the *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Certain Debtors to Continue Selling Receivables and Related Rights Pursuant to a Securitization Facility, (II) Modifying the Automatic Stay, and (III) Granting Related Relief* [D.I. 75] (the "**Securitization Motion**"). Pursuant to the Securitization Motion, the Debtors sought entry of an order authorizing, among other things, certain of the Debtors to enter into amendments and restatements of the Receivables Agreements and continue selling and servicing accounts receivable pursuant to the Securitization Facility, which was reduced in total facility size from $450 million to $425 million.

On November 13, 2019, the Bankruptcy Court granted the relief requested in the Securitization Motion on an interim basis [D.I. 110]. On November 14, 2019, the parties entered into that certain Ninth Amended and Restated Receivables Purchase Agreement, by and among the AR Subsidiaries, as sellers, the servicers party thereto, the companies and financial institutions party thereto (the "**Securitization Purchasers**") and Rabobank, as LC Bank and agent for the Securitization Purchasers (the "**A&R Receivables Purchase Agreement**," and the facility governed thereby, the "**A&R Receivables Securitization Facility**"). The A&R Receivables Securitization Facility, among other things, (a) modifies certain covenants, representations, events of default and cross defaults arising as a result of the commencement of the Chapter 11 Cases, (b) modifies the other rights and obligations of the parties to the facility in order to give effect to, and in certain instances be subject to, orders of the Bankruptcy Court from time to time, (c) reduces the total size of the facility from $450 million to $425 million, with a corresponding reduction to availability thereunder, (d) modifies certain pricing terms and fees payable under the facility, (e) makes certain other amendments, including in order to give effect to future issuances of letters of credit, and (f) grants superpriority Administrative Claim status to certain indemnification, performance guaranty and other obligations of certain of the Debtors under the Receivables Agreements (as amended and restated, the "**Amended Transaction Documents**"). On December 20, 2019, the Bankruptcy Court granted the relief requested in the Securitization Motion on a final basis [D.I. 576].

On December 16, 2019, the Debtors entered into an amendment to the A&R Receivables Purchase Agreement to facilitate the termination of certain deposit accounts. On February 10, 2020, the AR Subsidiaries entered into an amendment to the A&R Receivables Purchase Agreement, whereby the Securitization Purchasers under the A&R Receivables Purchase Agreement agreed to give effect to the First DIP Amendment for purposes of the AR Subsidiaries' compliance with the covenants under the A&R Receivables Purchase Agreement. On March 27, 2020, the AR Subsidiaries also entered into a further amendment to the A&R Receivables Purchase Agreement, whereby the Securitization Purchasers under the A&R Receivables Purchase Agreement agreed to give effect to the Second DIP Amendment for purposes of the AR Subsidiaries' compliance with the covenants under the A&R Receivables Purchase Agreement. On May 1, 2020, certain of the Debtors and the AR Subsidiaries also entered into amendments to the Amended Transaction Documents, pursuant to which the Securitization Purchasers agreed to a mechanism for an orderly wind down of the A&R Receivables Securitization Facility, including

a temporary forbearance in respect of certain amortization events expected to occur as a result of the consummation of the Sale Transactions.

### 3.      Joint Administration

On the Petition Date, the Debtors filed the *Emergency Motion of Debtors for Entry of an Order Directing Joint Administration of Chapter 11 Cases* [D.I. 2] (the "**Joint Administration Motion**"). Through the Joint Administration Motion, the Debtors sought entry of an order directing joint administration of the Chapter 11 Cases for procedural purposes only.

The Bankruptcy Court granted the relief requested in the Joint Administration Motion on a final basis on November 12, 2019 [D.I. 9].

### 4.      Schedules Extension

On the Petition Date, the Debtors filed the *Emergency Motion of Debtors for Extension of Time To File (I) Schedules of Assets and Liabilities, (II) Schedules of Current Income and Expenditures, (III) Schedules of Executory Contracts and Unexpired Leases, and (IV) Statements of Financial Affairs* [D.I. 14] (the "**Extension of Schedules Motion**"). Pursuant to the Extension of Schedules Motion, the Debtors sought entry of an order extending the deadline by which the Debtors must file their (a) schedules of assets and liabilities, (b) schedules of current income and expenditures, (c) schedules of executory contracts and unexpired leases, and (d) statements of financial affairs by 60 days, for a total of 74 days from the Petition Date, through and including January 24, 2020, without prejudice to the Debtors' ability to request additional extensions for cause shown.

The Bankruptcy Court granted the relief requested in the Extension of Schedules Motion on a final basis on November 13, 2019 [D.I. 119].

### 5.      Cash Management

On the Petition Date, the Debtors filed the *Emergency Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) Debtors to Continue to Maintain Existing Cash Management System, Bank Accounts, and Business Forms and (II) Financial Institutions to Honor and Process Related Checks and Transfers* [D.I. 8] (the "**Cash Management Motion**"). Pursuant to the Cash Management Motion, the Debtors sought entry of interim and final orders (a) authorizing, but not directing, the Debtors to (i) continue to operate the Cash Management System, (ii) maintain their existing Bank Accounts located at the Banks, and (iii) maintain the Debtors' existing business forms, (b) waiving the requirements of section 345(b) of the Bankruptcy Code on an interim basis, and (c) authorizing the Debtors' financial institutions to receive, process, honor, and pay all checks or wire transfers used by the Debtors to pay for the foregoing.

The Bankruptcy Court granted the relief requested in the Cash Management Motion on an interim basis on November 13, 2019 [D.I. 107] and on a final basis on December 20, 2019 [D.I. 575].

### 6.     Wages and Benefits

On the Petition Date, the Debtors filed the *Emergency Motion of Debtors for Entry of an Order Authorizing (I) Debtors To (A) Pay Prepetition Employee Obligations and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Current and Former Employees To Proceed With Outstanding Workers' Compensation Claims, and (III) Financial Institutions To Honor and Process Related Checks and Transfers* [D.I. 10] (the "**Wages and Benefits Motion**").  Pursuant to the Wages and Benefits Motion, the Debtors sought entry of an order (a) authorizing, but not requiring, the Debtors to (i) pay or cause to be paid, in their sole discretion, all or a portion of the amounts owing (and associated costs) under or related to Prepetition Employee Obligations and (ii) unless otherwise set forth therein, continue, in their sole discretion, their Employee Programs, as applicable, as those Employee Programs were in effect as of the Petition Date and as may be modified, terminated, amended, or supplemented from time to time by the Debtors, and to make payments pursuant to the Employee Programs in the ordinary course of business, as well as to pay related administrative obligations, (b) permitting current and former Employees holding claims under the Workers' Compensation Program to proceed with such claims in the appropriate judicial or administrative fora, and (c) authorizing the Debtors' financial institutions to receive, process, honor, and pay all checks or wire transfers used by Debtors to pay the foregoing.

The Bankruptcy Court granted the relief requested in the Wages and Benefits Motion on a final basis on November 13, 2019 [D.I. 108].

### 7.     Insurance

On the Petition Date, the Debtors filed the *Emergency Motion of Debtors for Entry of an Order Authorizing (I) Debtors to Continue and Renew Their Liability, Property, Casualty, Surety Bond, and Other Insurance Programs and Honor All Obligations in Respect Thereof and (II) Financial Institutions to Honor and Process Related Checks and Transfers* [D.I. 21] (the "**Insurance Motion**").  Pursuant to the Insurance Motion, the Debtors sought entry of an order (a) authorizing, but not directing, the Debtors to maintain, continue, and renew, in their sole discretion, their various Insurance Programs through several Insurance Carriers on an uninterrupted basis and in accordance with the same practices and procedures as were in effect before the Petition Date and (b) authorizing the Debtors' financial institutions to receive, process, honor, and pay checks or wire transfers used by the Debtors to pay the foregoing.  This would include (y) paying all Insurance Obligations arising under the Insurance Programs, including, but not limited to, any Brokers' Fees, whether due and payable before, on, or after the Petition Date and (z) renewing or obtaining new insurance policies as needed in the ordinary course of business.

The Bankruptcy Court granted the relief requested in the Insurance Motion on a final basis on November 13, 2019 [D.I. 118].

### 8.     Utilities

On the Petition Date, the Debtors filed the *Emergency Motion of Debtors for Entry of an Order (I) Prohibiting Utilities From Altering, Refusing or Discontinuing Service, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for*

*Determining Requests for Additional Adequate Assurance* [D.I. 16] (the "**Utilities Motion**"). Pursuant to the Utilities Motion, the Debtors sought entry of an order (a) prohibiting the Utilities from altering, refusing, or discontinuing any Utility Services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance, (b) determining that the Debtors' proposed offer of deposits, as set forth therein, provides the Utilities with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, and (c) approving procedures for resolving requests by Utilities for additional or different assurances beyond those set forth in the Utilities Motion.

The Bankruptcy Court granted the relief requested in the Utilities Motion on a final basis on November 13, 2019 [D.I. 117].

### 9. Taxes

On the Petition Date, the Debtors filed the *Emergency Motion of Debtors for Entry of a Final Order Authorizing (i) Debtors to Pay Certain Prepetition Taxes, Governmental Assessments, and Fees and (ii) Financial Institutions to Honor and Process Related Checks and Transfers* [D.I. 23] (the "**Taxes Motion**"). Pursuant to the Taxes Motion, the Debtors sought entry of an order (a) authorizing, but not directing, the Debtors to pay, in their sole discretion, Covered Taxes and Fees, whether asserted prior to, on, or after the Petition Date and (b) authorizing the Debtors' financial institutions to receive, process, honor, and pay checks or wire transfers used by the Debtors to pay the foregoing.

The Bankruptcy Court granted the relief requested in the Taxes Motion on a final basis on November 13, 2019 [D.I. 120].

### 10. Customer Obligations

On the Petition Date, the Debtors filed the *Emergency Motion of Debtors for Entry of an Order Authorizing (I) the Debtors to Honor Prepetition Obligations to Customers and Otherwise Continue Customer Practices and (II) Financial Institutions to Honor and Process Related Checks and Transfers* [D.I. 70] (the "**Customer Obligations Motion**"). Pursuant to the Customer Obligations Motion, the Debtors sought entry of an order (a) authorizing, but not directing, the Debtors, in their sole discretion to (i) fulfill and honor the Customer Obligations as they deem appropriate and (ii) continue, renew, replace, implement new, and terminate any existing Customer practices as they deem appropriate, in the ordinary course of business without further application to the Bankruptcy Court and (b) authorizing and directing all applicable banks and other financial institutions to receive, process, honor, and pay any and all checks drawn on the Debtors' general disbursement accounts and other transfers to the extent those checks and transfers relate to any of the foregoing.

The Bankruptcy Court granted the relief requested in the Customer Obligations Motion on a final basis on November 13, 2019 [D.I. 115].

### 11.     Automatic Stay

On the Petition Date, the Debtors filed the *Emergency Motion of Debtors for Entry of a Standing Order Confirming the Statutory Protections of the Bankruptcy Code* [D.I. 24] (the "**Automatic Stay Motion**"). Pursuant to the Automatic Stay Motion, the Debtors sought entry of an order (a) confirming the application of (i) the automatic stay provisions of section 362 of the Bankruptcy Code, (ii) the anti-termination and anti-modification provisions of section 365 of the Bankruptcy Code, (iii) the anti-discrimination provisions of section 525 of the Bankruptcy Code, and (iv) the anti-transfer provisions of section 541 of the Bankruptcy Code, and (b) approving the form and manner of notice related thereto.

The Bankruptcy Court granted the relief requested in the Automatic Stay Motion on a final basis on November 13, 2019 [D.I. 88].

### 12.     Hedging

On the Petition Date, the Debtors filed the *Emergency Motion of Debtors for Entry of (I) Interim and Final Orders Authorizing Debtors To (A) Continue Performing Under Their Prepetition Hedging Agreements and (B) Enter Into and Perform Under New Post-Petition Hedging Agreements, (II) Interim and Final Orders Modifying Automatic Stay, and (III) A Final Order Authorizing Debtors To Assume Prepetition Hedging Agreements* [D.I. 45] (the "**Hedging Motion**"). Pursuant to the Hedging Motion, and consistent with industry practice and the Hedge Practices, the Debtors sought entry of an order authorizing the Debtors to (a) continue to perform under a financial derivative contract with the Prepetition Hedge Counterparties entered into prior to the Petition Date in the ordinary course of business to hedge the Debtors' exposure to commodity price risks in the Commodities markets, (b) enter into and perform under Post-Petition Hedging Agreements in the ordinary course of business to hedge the Debtors' exposure to commodity price risks in the Commodities market and minimize the impact of floating interest rates on their businesses, (c) honor, pay, or otherwise satisfy the Hedging Obligations as they come due in the ordinary course, (d) modify the automatic stay provisions of section 362 of the Bankruptcy Code, solely to the extent necessary, to permit the Hedge Counterparties to exercise and enforce their rights and remedies under the Hedging Agreements, including upon the occurrence of an event of default or termination event under the Hedging Agreements, and (e) assume the Prepetition Hedging Agreements under section 365 of the Bankruptcy Code.

The Bankruptcy Court granted the relief requested in the Hedging Motion on a final basis on November 13, 2019 [D.I. 116].

### 13.     Notification Procedures

On the Petition Date, the Debtors filed the *Emergency Motion of Debtors for Entry of a Standing Order Confirming the Statutory Protections of the Bankruptcy Code* [D.I. 41] (the "**NOL Motion**"). Pursuant to the NOL Motion, the Debtors sought entry of interim and final orders authorizing the Debtors to (a) establish and implement restrictions and notification requirements regarding the Tax Ownership and certain transfers of Stock, (b) establish "sell-down" procedures with respect to Covered Claims that could be implemented if the Debtors elect to reorganize, and (c) notify Holders of Stock and Covered Claims of the court-ordered procedures.

The Debtors also sought approval of the form of notice attached thereto to notify Holders of Stock and Covered Claims whose actions could adversely affect the Debtors' tax assets that the procedures had been established by order of the Bankruptcy Court.

The Bankruptcy Court granted the relief requested in the NOL Motion on a final basis on November 13, 2019 [D.I. 122].

### 14. *Lienholders*

On the Petition Date, the Debtors filed the *Emergency Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) Debtors to Pay Certain Prepetition Claims of Lien Claimants and (II) Financial Institutions to Honor and Process Related Checks and Transfers* [D.I. 11] (the "**Lienholders Motion**"). Pursuant to the Lienholders Motion, the Debtors sought entry of interim and final orders (a) authorizing, but not directing, the Debtors to pay, in their sole discretion, all or a portion of the Lienholder Claims and (b) authorizing the Debtors' financial institutions to receive, process, honor, and pay checks or wire transfers used by the Debtors to pay the foregoing.

The Bankruptcy Court granted the relief requested in the Lienholders Motion on a final basis on November 14, 2019 [D.I. 132].

### 15. *Critical Vendors*

On the Petition Date, the Debtors filed the *Emergency Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) Debtors To Pay Prepetition Critical Vendor Claims and 503(b)(9) Claims in the Ordinary Course of Business, (II) Debtors to Return Goods, and (III) Financial Institutions To Honor and Process Related Checks and Transfers* [D.I. 28] (the "**Critical Vendors Motion**"). Pursuant to the Critical Vendors Motion, the Debtors sought entry of interim and final orders (a) establishing procedures pursuant to which the Debtors might engage in discussions with counterparties that might qualify as Critical Vendors regarding the validity and amount of their respective claims and to determine whether any such counterparties were Critical Vendors, (b) authorizing, but not directing, the Debtors to pay, in their sole discretion, prepetition obligations related to Critical Vendors and valid claims of vendors under section 503(b)(9) of the Bankruptcy Code in the ordinary course of business, (c) authorizing the Debtors, in their sole discretion, under section 546(h) of the Bankruptcy Code, to return Goods purchased from Vendors by the Debtors prior to the Petition Date for credit against such Vendors' prepetition claims, and (d) authorizing the Debtors' financial institutions to receive, process, honor, and pay checks or wire transfers used by the Debtors to pay the foregoing.

The Bankruptcy Court granted the relief requested in the Critical Vendors Motion on a final basis on November 13, 2019 [D.I. 121].

B.     **Professional Advisors**

The Debtors' retained the following professional advisors:

- On November 13, 2019, the Debtors filed the *Emergency Application of Debtors for Entry of an Order Authorizing Debtors To Employ and Retain Epiq Corporate Restructuring, LLC as Claims, Noticing, Solicitation, and Administrative Agent for Debtors Nunc Pro Tunc to the Petition Date* [D.I. 83] (the "**Epiq Retention Application**").  On November 14, 2019, the Bankruptcy Court entered an order approving the Epiq Retention Application [D.I. 130].

- On November 27, 2019, the Debtors filed the *Application of Debtors for Authority To Employ and Retain Davis Polk & Wardwell LLP as Attorneys for the Debtors Nunc Pro Tunc to The Petition Date* [D.I. 340] (the "**Davis Polk Retention Application**").  On December 9, 2019, the Bankruptcy Court entered an order approving the Davis Polk Retention Application [D.I. 474] and, on January 15, 2020, the Bankruptcy Court entered an amended order approving the Davis Polk Retention Application [D.I. 701].

- On December 12, 2019, the Debtors filed the *Application of Debtors for Entry of an Order Pursuant to 11 U.S.C. §§ 327(a), 330, And 1107(b), Fed. R. Bankr. P. 2014 and 2016, and Bankruptcy Local Rule 2014-1, Authorizing Retention and Employment of Norton Rose Fulbright US LLP as Co-Counsel to the Debtors, Nunc Pro Tunc to the Petition Date* [D.I. 509] (the "**Norton Rose Retention Application**").  On February 20, 2020, the Bankruptcy Court entered an order approving the Norton Rose Retention Application [D.I. 961].

- On November 27, 2019, the Debtors filed the *Application of Debtors for Authority To Employ and Retain Evercore Group L.L.C. as Investment Banker for the Debtors Nunc Pro Tunc to the Petition Date* [D.I. 338] (the "**Evercore Retention Application**").  On December 6, 2019, the Bankruptcy Court entered an order approving the Evercore Retention Application [D.I. 470] and, on February 20, 2020, the Bankruptcy Court entered an amended order approving the Evercore Retention Application [D.I. 964].

- On November 27, 2019, the Debtors filed the *Application of Debtors for Authority To Employ and Retain Alvarez & Marsal North America, LLC as Financial Advisor for the Debtors Nunc Pro Tunc to the Petition Date* [D.I. 339] (the "**A&M Retention Application**").  On December 6, 2019, the Bankruptcy Court entered an order approving the A&M Retention Application [D.I. 471] and, on January 15, 2020, the Bankruptcy Court entered an amended order approving the A&M Retention Application [D.I. 702].

- On January 16, 2020, the Debtors filed the *Application of Debtors for Authority To Employ and Retain Deloitte & Touche LLP as Independent Auditor for the Debtors Nunc Pro Tunc to the Petition Date* [D.I. 710] (the "**Deloitte Retention Application**").  On February 2, 2020, the Bankruptcy Court entered an order

approving the Deloitte Retention Application [D.I. 870] and, on February 20, 2020, the Bankruptcy Court entered an amended order approving the Deloitte Retention Application [D.I. 963].

- On December 12, 2019, the Debtors filed the *Application of Debtors for Authority To Employ and Retain PricewaterhouseCoopers LLP as Tax Services and Internal Audit Provider for the Debtors Nunc Pro Tunc to the Petition Date* [D.I. 512] (the "**PWC Retention Application**") and, on March 2, 2020, the Debtors filed the *Supplemental Application of Debtors for Authority To Employ and Retain PricewaterhouseCoopers LLP to Provide Additional Services to the Debtors Nunc Pro Tunc to the Supplemental Engagement Date* [D.I. 1031] (the "**Supplemental PWC Retention Application**"). On February 20, 2020, the Bankruptcy Court entered an order approving the PWC Retention Application [D.I. 962] and, on March 30, 2020, the Bankruptcy Court entered an order approving the Supplemental PWC Retention Application [D.I. 1395]. On January 8, 2021, the Debtors filed the *Second Supplemental Application of Debtors for Authority To Employ and Retain PricewaterhouseCoopers LLP to Provide Additional Services to the Debtors Nunc Pro Tunc to the Supplemental Tax Engagement Date and AUP Engagement Date* [D.I. 3323] (the "**Second Supplemental PWC Retention Application**").

- On March 26, 2020, the Debtors filed the *Application of Debtors for Authority To Employ and Retain Ernst & Young LLP as Transaction Advisory Services Provider for the Debtors Nunc Pro Tunc to January 27, 2020* [D.I. 1230] (the "**E&Y Retention Application**"). On June 3, 2020, the Bankruptcy Court entered an order approving the E&Y Retention Application [D.I. 2230].

- On August 7, 2020, the Debtors filed the *Application of Debtors for Authority To Employ and Retain ASK LLP as Special Counsel To Pursue Avoidance Actions Nunc Pro Tunc to July 18, 2020* [D.I. 2802] (the "**ASK LLP Retention Application**"). On September 1, 2020, the Bankruptcy Court entered an order approving the ASK LLP Retention Application [D.I. 2898].

- The Bankruptcy Court approved procedures for the Debtors to retain and employ certain professionals utilized by the Debtors in the ordinary course of business pursuant to an order entered on December 20, 2019 [D.I. 577].

The Creditors' Committee retained the following professional advisors:

- On January 2, 2020, the Creditors' Committee filed the *Application of the Official Committee of Unsecured Creditors of Southern Foods Group, LLC, et al. To Retain and Employ Akin Gump Strauss Hauer & Feld LLP as Counsel, Effective Nunc Pro Tunc to December 3, 2019* [D.I. 632] (the "**Akin Gump Retention Application**"). On February 19, 2020, the Bankruptcy Court entered an order approving the Akin

Gump Retention Application [D.I. 958].

- On January 3, 2020, the Creditors' Committee filed the *Application for Entry of an Order Authorizing the Retention and Employment of Berkeley Research Group, LLC as Financial Advisor to the Official Committee of Unsecured Creditors Nunc Pro Tunc to December 6, 2019* [D.I. 637] (the "**BRG Retention Application**"). On January 13, 2020, the Bankruptcy Court entered an order approving the BRG Retention Application [D.I. 683] and, on March 4, 2020, the Bankruptcy Court entered an amended order approving the BRG Retention Application [D.I. 1040].

- On January 3, 2020, the Creditors' Committee filed the *Application for Entry of an Order Authorizing the Retention and Employment of Miller Buckfire & Co. LLC and Stifel, Nicolaus & Co., Inc. as Investment Banker to the Official Committee of Unsecured Creditors Nunc Pro Tunc to December 6, 2019* [D.I. 638] (the "**Miller Buckfire Retention Application**"). On March 19, 2020, the Bankruptcy Court entered an order approving the Miller Buckfire Retention Application [D.I. 1174].

## C.   Other Key Filings in the Chapter 11 Cases[7]

### 1.   Schedules and Statements of Financial Affairs

On January 24, 2020, all of the Debtors filed their respective Schedules of Assets and Liabilities [D.I. 757–799] and Statements of Financial Affairs [D.I. 800–829, 831–832, 834–844].

### 2.   De Minimis Assets

On November 27, 2019, the Debtors filed the *Debtors' Motion for Approval of Procedures for (I) the Sale of De Minimis Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (II) the Abandonment of Certain of the Debtors' Property* [D.I. 341] (the "**De Minimis Asset Sale Motion**"). Pursuant to the De Minimis Asset Sale Motion, the Debtors sought entry of an order authorizing the Debtors to (a) establish Procedures to (i) sell free and clear of all liens, claims, interests, and encumbrances certain obsolete, surplus, burdensome, or otherwise expendable assets having a Sale Price of $12,000,000 or less where such sale is arguably outside the ordinary course of the Debtors' businesses, and (ii) abandon any *de minimis* assets where a sale cannot be consummated at a price greater than the costs of such sale (taking into account costs of, among other things, interim storage, shipping, and marketing), and (b) pay reasonable and necessary fees and expenses (if any) incurred in connection with the sale or abandonment of De Minimis Assets, including, but not limited to, commission fees to agents, brokers, auctioneers, and liquidators.

On December 20, 2019, the Bankruptcy Court entered the order approving the De Minimis Asset Sale Motion [D.I. 578] (the "**De Minimis Asset Sale Order**"). The "De Minimis Asset Sale Order provides, among other things, that if the Sale Price for the sale of a De Minimis Asset is greater than $6,000,000, the Debtors shall file a motion with the Bankruptcy Court requesting approval of such sale pursuant to section 363 of the Bankruptcy Code. If the Sale Price for the

---

[7] Capitalized terms that are used in this Article III.C but not otherwise defined in this Disclosure Statement shall have the meanings ascribed to them in the relevant motions or orders, as applicable.

sale of a De Minimis Asset is greater than $500,000 and less than or equal to $6,000,000, the Debtors must, among other things, file a notice with the Bankruptcy Court. If the Sale Price of a De Minimis Asset is less than or equal to $500,000, the Debtors must, among other things, serve written notice to the Notice Parties. Additionally, if the estimated gross proceeds of the De Minimis Asset to be abandoned are greater than $2,500,000, the Debtors shall file a motion with the Bankruptcy Court requesting approval of the abandonment pursuant to section 554 of the Bankruptcy Code. If the estimated gross proceeds of the De Minimis Asset to be abandoned are greater than $500,000 but less than $2,500,000, the Debtors must, among other things, file a notice with the Bankruptcy Court. If the estimated gross proceeds of the De Minimis Asset to be abandoned are less than or equal to $500,000, the Debtors must, among other things, serve written notice to the Notice Parties.

As of the date hereof, pursuant to the De Minimis Asset Sale Order, the Debtors filed with the Bankruptcy Court nine omnibus notices for the sale of De Minimis Asset [D.I. 848, 1724, 1858, 2106, 2019, 2160, 2546, 2572, and 2679].

### 3. *Non-Core Assets*

On November 27, 2019, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Authorizing the (A) Sales of Certain Discrete Non-Core Assets and (B) Payment of Related Commissions and (II) Granting Related Relief* [D.I. 342] (the "**Non-Core Asset Sale Motion**"). Pursuant to the Non-Core Asset Sale Motion, the Debtors sought entry of an order authorizing the Debtors to (a) sell the Assets to the Purchasers pursuant to the Prepetition Sale Agreement and (b) pay the Broker Commissions in connection with such sales. On December 20, 2019, the Bankruptcy Court entered the order approving the Non-Core Asset Sale Motion [D.I. 579] (the "**Non-Core Asset Sale Order**").

### 4. *Bonded-State Milk Vendors*

On December 16, 2019, the Debtors filed the *Expedited Motion of Debtors for Entry of an Order Authorizing (I) Debtors to Pay Amounts Owed to Milk Vendors Covered by State-Mandated Surety Bonds and (II) Financial Institutions to Honor and Process Related Checks and Transfers* [D.I. 526] (the "**Bonded-State Milk Vendors Motion**"). Pursuant to the Bonded-State Milk Vendors Motion, the Debtors sought entry of an order (a) authorizing, but not directing, the Debtors to pay, in their sole discretion, the Bonded Claim and (b) authorizing the Debtors' financial institution to receive, process, honor, and pay checks or wire transfers used by the Debtors to pay the foregoing. On December 20, 2019, the Bankruptcy Court entered an order approving the Bonded-State Milk Vendors Motion [D.I. 574] (the "**Bonded-State Milk Vendors Order**"). Pursuant to the Bonded-State Milk Vendors Order, the Debtors were authorized, but not directed, to pay all or part of, in their sole discretion, the Bonded Claims.

### 5. *Bar Date*

On January 24, 2020, the Debtors filed the *Motion of Debtors for Entry of an Order Establishing Deadlines and Procedures for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [D.I. 850] (the "**Bar Date Motion**"). Pursuant to the Bar Date Motion, the Debtors sought entry of an order (a) establishing deadlines and procedures for filing Proofs of

Claim in the Chapter 11 Cases, (b) approving the Bar Date Notice, in substantially the form attached thereto, (c) approving the manner of filing Proofs of Claim and the Customized Proof of Claim Form attached thereto, and (d) approving the proposed manner and sufficiency of service and publication of the Bar Date Notice. On February 19, 2020, the Bankruptcy Court entered an order approving the Bar Date Motion [D.I. 943] (the "**Bar Date Order**"). Pursuant to the Bar Date Order, the deadline for creditors to file proofs of claim against any of the Debtors was March 27, 2020 at 5:00 p.m. (prevailing Central Time). Solely with respect to governmental units, the deadline to file a proof of claim against the Debtors was May 11, 2020 at 5:00 p.m. (prevailing Central Time).

### 6.   Compensation Plans

On January 24, 2020, the Debtors filed the *Motion of Debtors for Entry of an Order Authorizing Implementation of Non-Insider (I) Key Employee Retention Plan and (II) 2020 Short Term Incentive Plan* [D.I. 851] (the "**Compensation Plans Motion**"). Pursuant to the Compensation Plans Motion, the Debtors sought entry of an order approving and authorizing the Debtors to implement their proposed non-insider key employee retention plan (the "**Proposed KERP**") and their proposed non-insider 2020 short term incentive plan (the "**Proposed STIP**" and, together with the Proposed KERP, the "**Compensation Plans**"). On February 19, 2020, the Bankruptcy Court entered an order approving the Compensation Plans Motion [D.I. 960] (the "**Compensation Plans Order**"). Pursuant to the Compensation Plans Order, the Debtors were authorized to provide retention awards to certain key employees with high business impact and retention risks as well as a discretionary pool from which the Debtors may make awards in connection with new hires, promotions, and job changes in order to enhance the Debtors' ability to attract, retain, and incentivize the employees necessary to maximize the value of the business during its restructuring.

### 7.   Civil Action Removal Extension

On February 7, 2020, the Debtors filed the *Motion of Debtors for Entry of an Order Extending the Deadline by which the Debtors May Remove Civil Actions* [D.I. 892] (the "**Civil Action Removal Extension Motion**"). Pursuant to the Civil Action Removal Extension Motion, the Debtors sought entry of an order granting a 120-day extension of the 90-day period, set to expire February 10, 2020, during which the Debtors may file notices of removal under Bankruptcy Rule 9027(a)(2) and an extension of the period during which the Debtors may file notices of removal under Bankruptcy Rule 9027(a)(3) through and including June 9, 2020. On February 11, 2020, the Bankruptcy Court entered an order approving the Civil Action Removal Extension Motion [D.I. 949] (the "**Civil Action Removal Extension Order**"). Pursuant to the Civil Action Removal Extension Order, the removal deadline was extended through and including June 9, 2020.

### 8.   Deadline to Assume or Reject Unexpired Leases of Nonresidential Real Property

On March 11, 2020, the Debtors filed the *Motion of Debtors for Entry of an Order Extending the Deadline to Assume or Reject Unexpired Leases of Nonresidential Real Property* [D.I. 1109] (the "**Leases Assumption/Rejection Deadline Extension Motion**"). Pursuant to the Leases Assumption/Rejection Deadline Extension Motion, the Debtors sought the entry of an order

granting a 90-day extension to assume or reject unexpired leases of nonresidential real property through and including June 9, 2020. On April 14, 2020, the Bankruptcy Court entered an order approving the Leases Assumption/Rejection Deadline Extension Motion [D.I. 1654] (the "**Leases Assumption/Rejection Deadline Extension Order**"). Pursuant to the Leases Assumption/Rejection Deadline Extension Order, the time within which the Debtors may assume or reject the Unexpired Leases, pursuant to section 365(d)(4) of the Bankruptcy Code, was extended an additional 90 days through and including June 9, 2020. Thereafter, the Debtors reached agreement with individual landlords to extend further the time within which the Debtors may assume or reject certain Unexpired Leases.

### 9.    *Plan Exclusivity Extension*

On March 11, 2020, the Debtors filed the *Motion of Debtors for Entry of an Order Extending the Exclusive Periods Within Which To File a Chapter 11 Plan and Solicit Acceptances Thereof* [D.I. 1110] (the "**First Exclusive Periods Extension Motion**"). Pursuant to the First Exclusive Periods Extension Motion, the Debtors sought the entry of an order extending the Debtors' exclusive periods to (a) file a chapter 11 plan (the "**Exclusive Filing Period**") by 90 days through and including June 10, 2020 and (b) solicit votes thereon (the "**Exclusive Solicitation Period**") by 90 days through and including August 9, 2020. On April 22, 2020, the Bankruptcy Court entered an order approving the First Plan Exclusivity Extension Motion [D.I. 1726] (the "**First Plan Exclusivity Extension Order**"). Pursuant to the First Plan Exclusivity Extension Order, the Exclusive Filing Period was extended by 75 days through and including May 25, 2020, and the Exclusive Solicitation Period was extended through and including July 24, 2020.

On May 22, 2020, the Debtors filed the *Second Motion of Debtors for Entry of an Order Extending the Exclusive Periods Within Which To File a Chapter 11 Plan and Solicit Acceptances Thereof* [D.I. 2137] (the "**Second Exclusive Periods Extension Motion**"). Pursuant to the Second Exclusive Periods Extension Motion, the Debtors sought entry of an order further extending (a) the Exclusive Filing Period by 70 days through and including August 3, 2020 and (b) the Exclusive Solicitation Period by 70 days through and including October 2, 2020. On June 23, 2020, the Bankruptcy Court entered an order approving the Second Plan Exclusivity Extension Motion [D.I. 2436] (the "**Second Plan Exclusivity Extension Order**"). Pursuant to the Second Plan Exclusivity Extension Order, the Exclusive Filing Period was initially extended by 45 days through and including July 9, 2020, and the Exclusive Solicitation Period was initially extended through and including September 7, 2020. On July 8, 2020, in accordance with Second Plan Exclusivity Extension Order, the Creditors' Committee provided written consent to the Debtors for the extension of the Exclusive Filing Period and Exclusive Solicitation Period. As a result, pursuant to the Second Plan Exclusivity Extension Order, the Exclusive Filing Period was extended for an additional 25 days, through and including August 3, 2020, and the Exclusive Solicitation Period was extended for an additional 25 days, through and including October 2, 2020. On July 8, 2020, the Debtors filed a notice detailing such extensions [D.I. 2584].

On August 2, 2020, the Debtors filed the *Third Motion of Debtors for Entry of an Order Extending the Exclusive Periods Within Which To File a Chapter 11 Plan and Solicit Acceptances Thereof* [D.I. 2785] (the "**Third Exclusive Periods Extension Motion**"). On August 31, 2020, the Bankruptcy Court entered an order approving the Third Plan Exclusivity Extension Motion [D.I. 2895] (the "**Third Plan Exclusivity Extension Order**"). Pursuant to the Third Plan

Exclusivity Extension Order, the Exclusive Filing Period was initially extended by 45 days through and including September 17, 2020, and the Exclusive Solicitation Period was initially extended through and including November 16, 2020.  On September 17, 2020, in accordance with Third Plan Exclusivity Extension Order, the Creditors' Committee provided written consent to the Debtors for the extension of the Exclusive Filing Period and Exclusive Solicitation Period.  As a result, pursuant to the Third Plan Exclusivity Extension Order, the Exclusive Filing Period was extended for an additional 25 days, through and including October 12, 2020, and the Exclusive Solicitation Period was extended for an additional 25 days, through and including December 11, 2020.  On September 17, 2020, the Debtors filed a notice detailing such extensions [D.I. 2998].

On October 12, 2020, the Debtors filed the *Fourth Motion of Debtors for Entry of an Order Extending the Exclusive Periods Within Which To File a Chapter 11 Plan and Solicit Acceptances Thereof* [D.I. 3094] (the "**Fourth Exclusive Periods Extension Motion**").  On November 12, 2020, the Bankruptcy Court entered an order approving the Fourth Plan Exclusivity Extension Motion [D.I. 3193] (the "**Fourth Plan Exclusivity Extension Order**").  Pursuant to the Fourth Plan Exclusivity Extension Order, the Exclusive Filing Period was extended by 45 days through and including November 26, 2020, and the Exclusive Solicitation Period was extended through and including January 25, 2021.  On November 25, 2020, in accordance with Fourth Plan Exclusivity Extension Order, the Creditors' Committee provided written consent to the Debtors for the extension of the Exclusive Filing Period and Exclusive Solicitation Period.  As a result, pursuant to the Fourth Plan Exclusivity Extension Order, the Exclusive Filing Period was extended for an additional 25 days, through and including December 21, 2020, and the Exclusive Solicitation Period was extended for an additional 25 days, through and including February 19, 2021.  On November 25, 2020, the Debtors filed a notice detailing such extensions [D.I. 3227].

On December 21, 2020, the Debtors filed the *Fifth Motion of Debtors for Entry of an Order Extending the Exclusive Periods Within Which To File a Chapter 11 Plan and Solicit Acceptances Thereof* [D.I. 3291] (the "**Fifth Exclusive Periods Extension Motion**").  On January 15, 2021, the Bankruptcy Court entered an order approving the Fifth Plan Exclusivity Extension Motion [D.I. 3364] (the "**Fifth Plan Exclusivity Extension Order**").  Pursuant to the Fifth Plan Exclusivity Extension Order, (a) the Exclusive Filing Period by 45 days through and including February 4, 2021 and the Exclusive Solicitation Period by 45 days through and including April 5, 2021 and (b) upon the written consent of the Creditors' Committee to extend the Exclusive Filing Period and Exclusive Solicitation Period (which consent shall not be unreasonably withheld), (i) the Exclusive Filing Period shall automatically extend for an additional 46 days, for a total extension of 91 days, through and including March 22, 2021 and (ii) the Exclusive Solicitation Period shall automatically extend for an additional 46 days, for a total extension of 91 days, through and including May 21, 2021.

### 10.    *Collective Bargaining Agreements*

In connection with the Sale Transactions and closures of certain of the Debtors' operations, the Debtors sought and the Bankruptcy Court entered various orders authorizing the Debtors to reject or modify certain of their collective bargaining agreements (the "**CBAs**") or implement the terms of new CBAs with the unions.

On April 4, 2020, the Debtors filed the *Motion of Debtors for Entry of an Order Authorizing, but not Directing, the Debtors (I) to Reject Certain Collective Bargaining Agreements, (II) to Implement the Debtors' Proposals, and (III) to Terminate Certain Retiree Benefits* [D.I. 1562] (the "**First 1113/1114 Motion**"). Pursuant to the First 1113/1114 Motion, the Debtors sought the entry of an order authorizing, but not directing, the Debtors to (a) reject 69 collective bargaining agreements listed on Exhibit 1 attached thereto, (b) terminate the Retiree Benefits, and (c) implement the terms of the Current Proposal. The First 1113/1114 Motion addressed the Debtors' CBAs with the unions and Retiree Benefits that were affected by the Sale Transactions with DFA, Prairie Farms, and Producers, as well as several CBAs and Retiree Benefits that were affected by the Debtors' planned shutdown of their Hayward facilities. On April 14, 2020 and on April 23, 2020, the Bankruptcy Court entered orders approving the First 1113/1114 Motion [D.I. 1638, 1778], pursuant to which the Debtors were, among other things, authorized, but not directed, to reject the CBAs identified in the respective charts annexed thereto. Additionally, on April 24, 2020, the Bankruptcy Court entered an order causing the First 1113/1114 Motion to be withdrawn insofar as it sought relief as to the unions set out in Exhibit 1 attached thereto and authorizing the Debtors to, among other things, assume certain new CBAs [D.I. 1770].

On April 24, 2020, the Debtors filed *Motion of Debtors for Entry of an Order Authorizing, but not Directing, the Debtors (I) to Reject Certain Collective Bargaining Agreements, (II) to Implement the Debtors' Proposals, and (III) to Terminate Certain Retiree Benefits* [D.I. 1781] (the "**Second 1113/1114 Motion**"). Pursuant to the Second 1113/1114 Motion, the Debtors sought entry of an order authorizing, but not directing, the Debtors to (a) reject three CBAs as listed on Exhibit 1 attached thereto, which are all under the unions affected by the Logix Transaction, (b) terminate the Retiree Benefits, and (c) implement the terms of the Current Proposals. On April 28, 2020 and May 4, 2020, the Bankruptcy Court entered orders approving the Second 1113/1114 Motion [D.I. 1836, 1933].

On April 28, 2020, the Debtors filed *Motion of Debtors for Entry of an Order Authorizing the Debtors (I) to Reject Certain Collective Bargaining Agreements and (II) to Terminate Certain Retiree Benefits* [D.I. 1838] (the "**Third 1113/1114 Motion**"). The Third 1113/1114 Motion addressed CBAs with the unions and Retiree Benefits associated with certain of the residual facilities not part of the Sale Transactions that were required to be shut down, as well as several of the Debtors' Retiree Benefit obligations for non-union beneficiaries. Pursuant to the Third 1113/1114 Motion, the Debtors sought entry of an order authorizing the Debtors to (a) reject four CBAs applicable to the facilities that are being shut down, which CBAs are listed on Exhibit 1 attached thereto, (b) terminate any Retiree Benefits under the same CBAs, and (c) terminate Retiree Benefits for certain non-union beneficiaries. After a hearing on May 8, 2020, the Bankruptcy Court entered an order approving the Third 1113/1114 Motion and requiring the Debtors to submit a separate order as to several parties, including several creditors associated with the International Union of Operating Engineers, Stationary Engineers Local 39, as stated on the record [D.I. 1986], and on May 15, 2020, the Bankruptcy Court entered the separate order [D.I. 2029]. On June 10, 2020, the Debtors and the Stationary Engineers Local 39 Claimants, as defined in the *Stipulation and Agreed Order Regarding Motion for Payment of Administrative Claims* [D.I. 2285], jointly filed a proposed stipulation to resolve the Stationary Engineers Local 39 Claimants' *Motion for Payment of Administrative Claims* [D.I. 2133]. On June 22, 2020, the Bankruptcy Court entered the agreed order [D.I. 2427].

### 11.     Non-Union Retiree Benefits

On April 30, 2020, the Debtors filed *Motion of Debtors for Entry of an Order Authorizing the Debtors to Terminate the Sabatte Family Plan* [D.I. 1881] (the "**1114 Sabatte Motion**").  The 1114 Sabatte Motion sought to terminate the Debtors' non-union Retiree Benefit obligations for the Sabatte Family Creditors.  On May 15, 2020, the Bankruptcy Court entered an order approving the 1114 Sabatte Motion [D.I. 2030].

### 12.     Equity Committee

On February 10, 2020, an ad hoc group of equity shareholders comprising four individuals (the "**Ad Hoc Group of Equity Shareholders**") filed the *Motion of an Order Appointing an Equity Committee* [D.I. 896] (the "**Equity Committee Motion**").  Pursuant to the Equity Committee Motion, the Ad Hoc Group of Equity Shareholders sought entry of an order appointing an official committee to represent the equity shareholders of the Debtors.  On February 24, 2020, the Ad Hoc Group of Equity Shareholders withdrew the Equity Committee Motion and waived all rights to a hearing thereon [D.I. 990].

### 13.     Administrative Expense Claims Protocols

On July 21, 2020, the Bankruptcy Court entered the *Order Authorizing Administrative Expense Claims Protocols* [D.I. 2724] (the "**Administrative Claims Protocols Order**"), among other things, (a) authorizing a protocol pursuant to which the Debtors could file notices confirming the reconciled and allowed amounts of asserted administrative expense claims against the Debtors in the Chapter 11 Cases (the "**Allowance Protocol**"), (b) ordering that administrative expense claims listed on a notice filed in accordance with the Allowance Protocol be allowed as administrative expense claims against the Debtors in the Chapter 11 Cases pursuant to section 503 of the Bankruptcy Code (subject to section 502(d) of the Bankruptcy Code, to the extent applicable and without prejudice to the rights of any Claimant to argue that section 502(d) of the Bankruptcy Code is inapplicable to its administrative expense claim), and (c) authorizing the Debtors to utilize a consensual discount program (the "**Discount Program**" and, together with the Allowance Protocol, the "**Protocols**") to make accelerated distributions to Holders of Administrative Claims (other than (i) a Holder of an Other Administrative Claim, (ii) a Holder of a Claim arising under section 365 of the Bankruptcy Code, and (iii) except as otherwise determined by the Debtors with the consent of the Creditors' Committee or pursuant to further order of the Bankruptcy Court, Dairy Farmers of America Inc.) on account of their Allowed and reconciled Administrative Claims in exchange for irrevocably reducing the amount of their Allowed and reconciled claims by 20%.

In order to assist eligible Holders of Administrative Claims in determining whether or not to participate in the Discount Program, the Debtors (a) filed notices attaching slides [D.I. 2617-3 and 2708-1] illustrating, among other things, (i) estimated ranges for total sale and asset recoveries, post-petition claims, and wind down costs and (ii) an estimated timeline for the monetization of various assets and (b) hosted, on July 21, 2020, a telephonic conference in which the Debtors presented the foregoing illustrative slides and responded to questions with respect to their waterfall analysis and the Protocols in general.

On August 19, 2020, the Bankruptcy Court held a hearing to address any unresolved complaints relating to the implementation of the Protocols by the Debtors, including, but not limited to, complaints regarding the process for the reconciliation of Administrative Claims. On August 20, 2020, the Debtors filed the *Notice of Extended Deadline To Opt-In to the Administrative Claims Consent Program* [D.I. 2839], pursuant to which the Debtors extended the deadline to opt-in to the Discount Program. On November 30, 2020, the Debtors filed the *Notice of Further Extended Deadline To Opt-In to the Administrative Claims Consent Program* [D.I. 3233], pursuant to which the Debtors further extended the deadline to opt-in to the Discount Program until the date upon which the Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

Between August 5, 2020 and the date hereof, the Debtors (a) filed 23 notices confirming the reconciled and Allowed amounts of asserted Administrative Claims in accordance with the Allowance Protocol [D.I. 2794, 2814, 2829, 2857, 2912, 2953, 2994, 3027, 3080, 3101, 3129, 3141, 3161, 3186, 3219, 3238, 3255, 3283, 3302, 3313, 3357, 3384, and 3396] and (b) paid all Settled Administrative Claims Payouts to Holders of reconciled and Allowed Administrative Claims that opted-in to the Discount Program.

### 14. Avoidance Actions

On August 31, 2020, the Bankruptcy Court entered the Order Authorizing Settlement Procedures for Certain Avoidance Actions Held by Debtors [D.I. 2905] authorizing the Debtors, in consultation with the Creditors' Committee, to settle certain avoidance causes of action pursuant to the Settlement Procedures (as defined therein). On September 1, 2020, the Bankruptcy Court entered an order approving the Debtors' retention of ASK LLP as special counsel to pursue avoidance actions [D.I. 2898]. As of the date hereof, the Debtors distributed approximately 2,500 preference notices to parties that allegedly received transfers from one or more Debtors during the prepetition preference period. As of the date hereof, the Debtors have settled or otherwise resolved approximately 750 alleged preference claims and continue to work with parties to resolve their respective claims. If the Debtors are unable to resolve such claims, the Debtors are prepared to file and prosecute avoidance causes of action in connection with such claims.

## D. Sale Process[8]

### 1. Marketing Process

Evercore Group L.L.C. ("**Evercore**") was first engaged as investment banker to the Debtors in February 2019. The Debtors initially retained Evercore to assist with a broad evaluation of potential strategic alternatives, including a sale of the enterprise, strategic business combinations, the disposition of certain assets, the formation of new joint ventures, and other options to re-energize the Debtors' stand-alone business. It was ultimately determined that these options could not be pursued for a variety of reasons, including the existence of potential contingent liabilities that the Debtors faced related to the underfunded status of certain multi-

---

[8] Capitalized terms used in this section but not otherwise defined in this section shall have the meanings ascribed to such terms in the Sale Motion, the Bid Procedures Order, the relevant Sale Order, or the relevant APA, as applicable (each as defined herein).

employer pension plans in which the Debtors participated.  Such potential liabilities significantly impaired the Debtors' ability to pursue any strategic transactions with third parties outside of a bankruptcy proceeding.

By early October 2019, the Debtors saw a sharp decline in their third quarter 2019 results and realized that they faced a financial outlook that was deteriorating more rapidly than prior forecasts. Evercore explored a variety of potential out-of-court financing transactions, which led to discussions with a number of potential lenders, including certain Holders of the Debtors' prepetition senior unsecured notes. Ultimately, however, the Debtors concluded, in consultation with Evercore and other advisors, that such an out-of-court transaction was not actionable under the circumstances. Accordingly, the Debtors commenced the Chapter 11 Cases in order to manage liquidity, prevent potentially ruinous customer and vendor flights, and pursue the consummation of one or more sale transactions or a plan of reorganization through a court-supervised process.

To that end, in October 2019, Evercore and the Debtors engaged in negotiations and discussions with DFA. As the Debtors' long-time commercial partner and raw milk vendor, DFA was considered likely to be able to contribute significant value to the Debtors' businesses and negotiate and reach a sale agreement with the Debtors prior to the Petition Date. Although the Debtors and DFA did not enter into a stalking horse agreement by the Petition Date, the discussions were significantly advanced such that the Debtors were able to publicly announce on November 12, 2019 that they were engaged in advanced discussions with DFA with regard to its role as a potential stalking horse bidder for the purchase of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code.

After the Petition Date, Evercore expanded the marketing process for the Bid Assets. Evercore communicated with dozens of additional potential strategic and financial buyers while continuing to engage with DFA to explore a sale of the Bid Assets through the Chapter 11 Cases. Over the course of approximately three months and through the filing of the Sale Motion (as defined below), Evercore contacted and/or received inbound interests from nearly 100 entities, including 55 potential strategic buyers (among which were 18 regional dairy companies) and 44 potential financial buyers.  Based on discussions with these entities, Evercore provided approximately 38 parties with confidential information regarding the Debtors' businesses after such parties executed non-disclosure agreements with the Debtors.  Several of these parties, including the Stalking Horse Bidder (as defined below), expressed interest in considering a transaction with the Debtors and were granted access to a data room containing additional confidential information regarding the Bid Assets. Evercore provided additional details to these parties, including access to confidential diligence materials.

Throughout this time and in parallel to the marketing process, the Debtors and their advisors worked extensively with an ad hoc group of noteholders (the "**Ad Hoc Group**") and their advisors regarding their possible funding of a stand-alone plan of reorganization.

Following a competitive process and arm's length negotiations, the Debtors secured a bid (the "**Stalking Horse Bid**") from DFA, pursuant to which DFA proposed to serve as the stalking horse bidder (the "**Stalking Horse Bidder**") in a transaction to purchase substantially all of the Bid Assets for an aggregate purchase price (subject to certain adjustments) of $425 million along with the assumption of certain liabilities (such group of Bid Assets, the "**Stalking Horse Assets**")

on the terms and conditions set forth in the Asset Purchase Agreement, dated as of February 16, 2020, by and among the Debtors and the Stalking Horse Bidder attached as Exhibit A to the Debtors' *Notice of Filing of Stalking Horse Asset Purchase Agreement* [D.I. 935] (the "**Stalking Horse Agreement**").

### 2. Bidding Procedures

On February 17, 2020, the Debtors filed with the Bankruptcy Court the *Motion of Debtors for Entry of Orders (I)(a) Approving Bidding Procedures for Sale of Debtors' Assets, (b) Approving the Designation of Dairy Farmers of America, Inc. as the Stalking Horse Bidder for Substantially All of Debtors' Assets, (c) Authorizing and Approving Entry into the Stalking Horse Asset Purchase Agreement, (d) Approving Bid Protections, (e) Scheduling Auction for, and Hearing To Approve, Sale of Debtors' Assets, (f) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, (g) Approving Assumption and Assignment Procedures, and (h) Granting Related Relief and (II)(a) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (b) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (c) Granting Related Relief* [D.I. 925] (the "**Sale Motion**"). Pursuant to the Sale Motion, the Debtors sought entry of (a) an order (i) authorizing and approving the Bidding Procedures in connection with the sale of the Bid Assets, (ii) authorizing and approving the Debtors' entry into the Stalking Horse Agreement with DFA, (iii) approving certain Bid Protections in favor of the Stalking Horse Bidder in connection with the Stalking Horse Agreement and in accordance with the terms and conditions set forth in the Bidding Procedures, (iv) scheduling an Auction, (v) scheduling a Sale Hearing, (vi) authorizing and approving the (A) Sale Notice, (B) Potential Assumption and Assignment Notice, and (C) Proposed Assumption and Assignment Notice, (vii) authorizing and approving the Assumption and Assignment Procedures, and (viii) granting related relief, and (b) an order authorizing and approving (i) the sale of the Bid Assets free and clear of all liens, claims, interests, and encumbrances, except certain permitted encumbrances as determined by the Debtors and any purchaser of the Bid Assets, (ii) the assumption and assignment of the Proposed Assumed Contracts, and (iii) granting related relief.

Various parties, including the Creditors' Committee and the Ad Hoc Group, filed objections to the Sale Motion. In response, on March 12, 2020, the Debtors filed *Debtors' Reply in Support of Motion of Debtors for Entry of Orders (I)(a) Approving Bidding Procedures for Sale of Debtors' Assets, (b) Approving the Designation of Dairy Farmers of America, Inc. as the Stalking Horse Bidder for Substantially All of Debtors' Assets, (c) Authorizing and Approving Entry into the Stalking Horse Asset Purchase Agreement, (d) Approving Bid Protections, (e) Scheduling Auction for, and Hearing To Approve, Sale of Debtors' Assets, (f) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, (g) Approving Assumption and Assignment Procedures, and (h) Granting Related Relief and (II)(a) Approving Sale of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (b) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (c) Granting Related Relief* [D.I. 1117].

On March 12, 2020, the Debtors appeared before the Bankruptcy Court to argue the Sale Motion and seek approval of DFA as a Stalking Horse Bidder. By this time, the COVID-19 pandemic had begun to impact the Debtors' liquidity and operations, changing their views of a feasible sale timeline. The Bankruptcy Court also expressed certain concerns regarding the sale

process. As a result, the Bankruptcy Court and other parties in interest discussed on the record a potential accelerated bidding process and sale timeline and the Bankruptcy Court adjourned the hearing on the Sale Motion for one week to March 19, 2020 to allow parties to confer further.

Following that hearing, the Debtors conferred extensively with the Creditors' Committee, the DIP Agent, and the Ad Hoc Group (and/or their respective advisors) in an effort to obtain consensus on further changes to the Bidding Procedures. In connection with these discussions, the parties determined to proceed on the accelerated timeline discussed in the Bankruptcy Court without DFA being designated as a Stalking Horse Bidder. Accordingly, on March 18, 2020, the Debtors filed *Debtors' Notice of Modified Proposed Bidding Procedures Order and Supplemental Reply* [D.I. 1167] and withdrew their request for approval of DFA as a Stalking Horse Bidder and any approval or authorization of the Stalking Horse Agreement or Bid Protections. On March 19, 2020, the Bankruptcy Court entered an order approving the new timeline and modified Bidding Procedures [D.I. 1178] (the "**Bidding Procedures Order**"). The Debtors and their advisors proceeded with the sale and marking process, and between the Petition Date and Bid Deadline, the Debtors and Evercore communicated with 186 entities, ranging from potential strategic buyers (93, including 54 regional dairy companies) to potential financial buyers (93, including 50 real estate investors).

Up through the Bid Deadline, the Debtors continued to enthusiastically support the efforts of the Ad Hoc Group to develop a plan of restructuring, and the Bidding Procedures Order specifically provided for their right to submit such a plan as a Qualified Bid.

### 3. The Sale

After an exhaustive marketing and sale process, the Debtors filed the *Notice of Bids* [D.I. 1271], *Supplemental Notice of Bid* [D.I. 1321], *Notice of Bid Results* [D.I. 1270], and *Supplemental Notice of Bid Results* [D.I. 1463] pursuant to the Bidding Procedures Order and identified the following six parties as the Successful Bidders for substantially all of the Debtors' assets: DFA acquiring 44 plants; Prairie Farms acquiring eight plants; Mana acquiring the Miami, Florida plant; Producers acquiring the Reno, Nevada plant and the "Berkeley Farms" trademark and related intellectual property; Harmoni acquiring all assets, rights, and properties in connection with the "Uncle Matt's Organic" branded juice products and popsicles; and Industrial Realty Group, LLC ("**IRG**") acquiring two Hawaii plants, in each case plus additional related assets.

On April 3, 2020, the Bankruptcy Court held a hearing in connection with the proposed sales (the "**Sale Hearing**") and approved the proposed sale transactions with the Successful Bidders, subject to the entry of final agreed orders. Over the course of the next week, the Bankruptcy Court entered various orders [D.I. 1572, 1583–1585, 1594–1595] approving the proposed sale transactions with the Successful Bidders.

Following the entry of the Sale Order (the "**IRG Sale Order**") relating to IRG's sale transaction (the "**IRG Sale Transaction**"), the IRG Sale Transaction terminated and, after much consideration, the Debtors and their advisors determined, in consultation with the Creditors' Committee and the DIP Agent, that it was in the best interests of the Debtors and their estates to retain and remarket the Hawaii assets.

After the termination of the IRG Sale Transaction, Logix presented a proposal to, and reached agreement with, the Debtors to purchase the Hilo facility and related distribution branches on the Big Island, Kauai and Maui as well as the use of the Meadow Gold Hawaii brand name for $7.0 million in cash (the "**Logix Sale Transaction**"). Pursuant to the Logix Sale Transaction, a substantial portion of the Debtors' operations and jobs on the Hawaii islands would be preserved and the Debtors would receive a fair price for the assets, while still retaining ownership of very desirable property located in Oahu for later sale.

On April 22, 2020, the Debtors filed the *Emergency Motion of Debtors for Entry of an Order (A) Authorizing Sale of Certain of the Debtors' Hawaii Assets to Logix Capital, LLC and Affiliates Free and Clear of All Claims, Liens, Interests, and Encumbrances, (B) Authorizing the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement and Related Documents, (C) Vacating that Certain Order Authorizing the Sale of the Debtors' Hawaii Assets to Industrial Realty Group, LLC, and (D) Granting Related Relief* [D.I. 1743] (the "**Logix Sale Motion**"). Pursuant to the Logix Sale Motion, the Debtors sought entry of an order (a) authorizing the Debtors to (i) sell the Assets to Logix and its affiliates pursuant to the Asset Purchase Agreement attached thereto and (ii) assume and assign the Desire 365 Contracts (as defined in the Logix Sale Motion) to Logix or its designee and (b) vacating the IRG Sale Order. On April 28, 2020, the Bankruptcy Court entered an order approving the Logix Sale Motion [D.I. 1835].

The Debtors closed all of the Sale Transactions between April 30, 2020 and May 5, 2020 for an aggregate sale price of approximately $545 million, which includes approximately $104.7 million in cure cost obligations assumed by DFA, plus certain other liabilities assumed by purchasers in the respective Sale Transactions.

On July 10, 2020, the Debtors filed the *Emergency Motion of Debtors for Entry of an Order (A) Authorizing the Sale of the Debtors' Hayward Property to DPIF3 Acquisition Co LLC Free and Clear of All Claims, Liens, Interests, and Encumbrances, (B) Authorizing the Debtors To Enter into and Perform Their Obligations Under the Purchase Agreement and Related Documents, and (C) Granting Related Relief* [D.I. 2611] (the "**Hayward Sale Motion**"). Pursuant to the Hayward Sale Motion, the Debtors sought entry of an order authorizing the Debtors to sell the Hayward Property to DPIF3 Acquisition Co LLC for $48,250,000 pursuant to the Purchase Agreement attached thereto. On July 22, 2020, the Bankruptcy Court entered an order approving the Hayward Sale Motion [D.I. 2734] and, on September 14, 2020, the Debtors closed the sale of the Hayward Property.

On January 19, 2021, the Debtors filed the *Motion of Debtors for Entry of an Order (A) Authorizing the Sale of the Debtors' Honolulu Property to Twenty Lake Management, LLC Free and Clear of All Claims, Liens, Interests, and Encumbrances, (B) Authorizing the Debtors to Enter Into and Perform Their Obligations Under the Purchase Agreement and Related Documents, and (C) Granting Related Relief* [D.I. 3379] (the "**Honolulu Sale Motion**"). Pursuant to the Honolulu Sale Motion, the Debtors seek entry of an order authorizing the Debtors to sell the Honolulu Property to Twenty Lake Management, LLC for $23,900,000 pursuant to the Purchase Agreement attached thereto.

### 4.      *Assumption and Assignment Procedures*

In connection with the Sale Transactions, the Debtors anticipated that they would assume and assign to the Successful Bidders (or their designated assignee(s)) certain of the Assumed Contracts and Assumed Leases (each as defined in the Sale Motion) pursuant to section 365(b) of the Bankruptcy Code. Accordingly, through the Sale Motion, the Debtors sought approval of the proposed Assumption and Assignment Procedures set forth in the Sale Motion, which were designed to, among other things, (a) outline the process by which the Debtors will serve notice to all Counterparties (as defined in the Sale Motion) regarding the potential assumption and assignment, related Cure Costs (as defined in the Sale Motion), if any, and information regarding the Successful Bidder's adequate assurance of future performance and (b) establish objection and other relevant deadlines and the manner for resolving disputes relating to assumption and assignment of the Assumed Contracts and Assumed Leases. The Assumption and Assignment Procedures are set forth in detail in the Sale Motion and were approved (as modified) in the Bidding Procedures Order.

On March 19, 2020, the Debtors filed *Notice of Potential Assumption and Assignment of Executory Contracts or Unexpired Leases and Cure Costs* [D.I. 1183]. On April 1, 2020, the Debtors filed *Notice Regarding Proposed Assumption and Assignment of Executory Contracts or Unexpired Leases and Cure Costs* [D.I. 1436], pursuant to which the Debtors announced that the Debtors will not seek relief from the Bankruptcy Court to assume or assign any contract or lease during the Sale Hearing, and such relief will be adjourned to a later determined date. Pursuant to the Sale Orders, the Debtors shall file the Proposed Assumed Contracts Schedule as soon as reasonably practicable after the entry of the Sale Orders. Each counterparty to a contract or lease set forth in the Proposed Assumed Contracts Schedule will have seven calendar days to object to the ability of a Successful Bidder to provide adequate assurance of future performance in the manner set forth in the Sale Orders.

In accordance with the Sale Orders, the Debtors filed and served upon each non-Debtor counterparty to an executory contract or unexpired lease proposed for assumption and assignment under section 365 of the Bankruptcy Code notices of proposed and final assumption and assignment of executory contracts and unexpired leases for all Sale Transactions [D.I. 1740, 1741, 1742, 1761, 1762, 1771, 1843, 1859, 2212, 2242, 3128, 3285, 3286, 3287, and 3288]. Between May 1 and June 25, 2020, the Bankruptcy Court entered various orders authorizing the assumption and assignment of executory contracts and unexpired leases [D.I. 1899, 1944, 1948, 1949, 2037, and 2467].

## E.      **Disclosure Statement Hearing and Confirmation Hearing**

On November 30, 2020, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Approving the Disclosure Statement, (II) Establishing Procedures for the Solicitation and Tabulation of Votes to Accept or Reject the Plan, (III) Approving the Forms of Ballots and Solicitation Materials, (IV) Establishing the Voting Record Date, (V) Fixing the Date, Time, and Place for the Confirmation Hearing and the Deadline for Filing Objections Thereto, (VI) Approving Related Notice Procedures, and (VII) Granting Related Relief* [D.I. 3229] (the "**Solicitation Motion**"). The hearing to consider the Solicitation Motion was held on January 29, 2021 at 1:30 p.m. (prevailing Central Time), after which the Bankruptcy Court entered an order

(the "**Solicitation Order**") approving the relief requested, including, among other things, approving the Disclosure Statement and the solicitation and tabulation procedures and scheduling the Confirmation Hearing to consider confirmation of the Plan.

The Confirmation Hearing will be held on [●], 2021 at __:__ _.m. (prevailing Central Time). The deadline to object to the confirmation of the Plan is March 5, 2021 at 4:00 p.m. (prevailing Central Time). The Debtors anticipate that notice of the Confirmation Hearing will be mailed to all known Holders of Claims and Interests at least 28 days before the date by which objections must be filed with the Bankruptcy Court.[9]

## ARTICLE IV

## SUMMARY OF THE PLAN

The Debtors and the Creditors' Committee believe that the Plan provides the best and most prompt possible recovery to Holders of Claims. The Debtors and the Creditors' Committee believe that (a) through the Plan, Holders of Allowed Claims will obtain a recovery from the Estates equal to or greater than the recovery that they would receive if the Debtors' assets were liquidated under chapter 7 of the Bankruptcy Code and (b) consummation of the Plan will maximize the recovery of the Holders of Allowed Claims.

The consummation of a plan is the principal objective of a chapter 11 case. A plan sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a plan makes the plan binding upon the debtor and any creditor of, or equity holder in, the debtor, whether or not such creditor or equity holder (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, a confirmation order discharges the debtor from any debt that arose prior to the effective date of the plan and substitutes therefor the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual, and equitable rights of the holders of claims or interests in certain classes are to remain unaltered by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan. Accordingly, a debtor need not solicit votes from the holders of claims or interests in such classes. A chapter 11 plan may also specify that certain classes will not receive any distribution of property or retain any claim against a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan. Any classes that are receiving a distribution of property under the plan but are not unimpaired will be solicited to vote to accept or reject the plan.

Prior to soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and

---

[9] Holders of Interests in Class 9 that have requested to receive notices with respect to such Interests from their bank, broker, or other nominee, or such firm's agent, in electronic form only shall only receive electronic transmission of the Non-Voting Status Notice and Confirmation Hearing Notice, unless any such Holder contacts the Claim and Solicitation Agent for a paper copy.

in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan. To satisfy the requirements of section 1125 of the Bankruptcy Code, the Debtors are submitting this Disclosure Statement to Holders of Claims against the Debtors who are entitled to vote to accept or reject the Plan.

THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN. THIS SECTION IS QUALIFIED IN ITS ENTIRETY BY AND IS SUBJECT TO THE PLAN, AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN. REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS. UPON OCCURRENCE OF THE EFFECTIVE DATE, THE PLAN AND ALL SUCH DOCUMENTS WILL BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS AND THEIR ESTATES AND ALL OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

STATEMENTS AS TO THE RATIONALE UNDERLYING THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN ARE NOT INTENDED TO, AND SHALL NOT, WAIVE, COMPROMISE, OR LIMIT ANY RIGHTS, CLAIMS, OR CAUSES OF ACTION IN THE EVENT THE PLAN IS NOT CONFIRMED.

## A.   Administrative Claims, Professional Fee Claims, DIP Claims, Securitization Facility Claims, Priority Tax Claims, and U.S. Trustee Fees

All Claims and Interests (except Administrative Claims, Professional Fee Claims, DIP Claims, Securitization Facility Claims, Priority Tax Claims, and U.S. Trustee Fees) are placed in the Classes set forth in Article III of the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Professional Fee Claims, DIP Claims, Securitization Facility Claims, Priority Tax Claims, and U.S. Trustee Fees have not been classified, and the Holders thereof are not entitled to vote on the Plan. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.

### 1.       Treatment of the DIP Claims

In accordance with the DIP Order, all DIP Claims are Allowed Claims for all purposes under the Plan. Unless such Claim has already been paid during the Chapter 11 Cases, on the Effective Date or as soon thereafter as reasonably practicable, each Holder of an Allowed DIP Claim shall receive, in full satisfaction of its Allowed DIP Claim, payment in full in Cash or such other treatment acceptable to such Holder, in each case that results in Full Satisfaction (as defined in the DIP Credit Agreement). In addition, on the Effective Date or as soon thereafter as reasonably practicable, any outstanding fees and expenses incurred by the advisors to the DIP Agent and counsel to each of the DIP Lenders, as required under the DIP Order, shall be paid in Cash in full.

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the DIP Facility and the DIP Loan Documents shall continue in full force and effect after the Effective Date with respect to any obligations thereunder, as applicable, including, but not limited to, those provisions relating to the rights of the DIP Agent and the other DIP Secured Parties to expense reimbursement, indemnification, and other similar amounts (either from the Debtors, the Liquidating Debtors, or the DIP Lenders) and any provisions that may survive termination or maturity of the DIP Facility in accordance with the terms thereof.

After the Effective Date, the Liquidating Trust shall continue to reimburse the DIP Agent for the reasonable fees and expenses (including reasonable and documented legal fees and expenses) incurred by the DIP Agent after the Effective Date to the extent that such obligation survives termination or maturity of the DIP Facility in accordance with the terms thereof. The Liquidating Trust shall pay all of the amounts that may become payable to the DIP Agent and other DIP Secured Parties, as applicable, under any of the foregoing provisions in Article II.A.2 of the Plan and in accordance with the terms of the DIP Loan Documents and the DIP Order.

### 2.       Treatment of the Securitization Facility Claims

In accordance with the Securitization Order, all Securitization Facility Claims are Allowed Claims for all purposes under the Plan. Unless such Claim has already been paid during the Chapter 11 Cases, on the Effective Date or as soon thereafter as reasonably practicable, each Holder of an Allowed Securitization Facility Claim shall receive, in full satisfaction of its Allowed Securitization Facility Claim, payment in full in Cash or such other treatment acceptable to such Holder. In addition, on the Effective Date or as soon thereafter as reasonably practicable, all fees and expenses incurred by the advisors to the Securitization Parties, as required under the Securitization Order, shall be paid in Cash in full.

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the Securitization Facility and the Securitization Facility Documents shall continue in full force and effect after the Effective Date with respect to any obligations thereunder, as applicable, including, but not limited to, those provisions relating to the rights of the Securitization Agent and the other Securitization Parties to expense reimbursement, indemnification, and other similar amounts (either from the Debtors, the Liquidating Debtors, or the Purchasers (as defined in the Securitization Order)), and any provisions that may survive termination or maturity of the Securitization Facility in accordance with the terms thereof.

After the Effective Date, the Liquidating Trust shall continue to reimburse the Securitization Agent for the reasonable fees and expenses (including reasonable and documented legal fees and expenses) incurred by the Securitization Agent after the Effective Date to the extent that such obligation survives termination or maturity of the Securitization Facility in accordance with the terms thereof. The Liquidating Trust shall pay all of the amounts that may become payable to the Securitization Agent and the other Securitization Parties, as applicable, under any of the foregoing provisions in Article II.B.2 of the Plan and in accordance with the terms of the Securitization Facility Documents and the Securitization Order.

### 3. *Administrative Claims Bar Date; Filing of Administrative Claims*

A notice setting forth the Administrative Claims Bar Date shall be (i) Filed on the Bankruptcy Court's docket and served with the notice of the Effective Date and (ii) posted on the Debtors' Case Information Website. No other notice of the Administrative Claims Bar Date will be provided.

All requests for payment of Administrative Claims that accrued on or before the Effective Date (other than Other Administrative Claims, which are subject to the provisions in Article II of the Plan) must be Filed with the Claims and Solicitation Agent and served on counsel for the Debtors and Liquidating Debtors, counsel for the Creditors' Committee, and the Liquidating Trustee by the Administrative Claims Bar Date. Any requests for payment of Administrative Claims pursuant to Article II of the Plan that are not properly Filed and served by the Administrative Claims Bar Date shall be disallowed automatically without the need for any objection from the Debtors, the Liquidating Debtors, or the Liquidating Trustee or any action by the Bankruptcy Court. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Liquidating Debtors, the Liquidating Trust, the Liquidating Trustee, or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date.

The Debtors (with the consent of the Creditors' Committee, which consent shall not be unreasonably withheld), the Liquidating Debtors, and the Liquidating Trustee (as applicable) shall have exclusive authority to settle Administrative Claims without further Bankruptcy Court approval.

Unless the Debtors, the Liquidating Debtors, the Creditors' Committee, or the Liquidating Trustee object to a timely Filed and properly served Administrative Claim by the Claims Objection Deadline, such Administrative Claim shall be deemed Allowed in the amount requested. If the Debtors, the Liquidating Debtors, the Creditors' Committee, or the Liquidating Trustee object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court shall determine whether such Administrative Claim should be Allowed and, if so, in what amount.

**Notwithstanding the foregoing, requests for payment of Administrative Claims need not be Filed for Administrative Claims that (i) previously have been Allowed by Final Order of the Bankruptcy Court or pursuant to the Plan, (ii) the Debtors or Liquidating Debtors**

**(with the consent of the Creditors' Committee, which consent shall not be unreasonably withheld) have otherwise agreed in writing do not require such a filing, (iii) are set forth in the Debtors' or Liquidating Debtors' books and records, (iv) are listed on a Reconciliation Notice Filed by the Debtors, or (v) arise pursuant to 28 U.S.C. § 1930.**

### 4.    *Treatment of Administrative Claims and Priority Tax Claims*

Except with respect to Other Administrative Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or to the extent that a Holder of an Allowed Administrative Claim agrees to less favorable treatment, each Holder of an Allowed Administrative Claim that has elected (by no later than the Opt-In Deadline) to participate in the Administrative Claims Consent Program in accordance with the Administrative Claims Protocols Order shall receive, prior to any distributions made on account of any Non-Settled Administrative Claims, payment in full in Cash in an amount equal to its Settled Administrative Claim Payout within ten business days after (a) such Holder submits its Opt-In Form and (b) such Holder's Reconciled Claim is listed on a Filed Reconciliation Notice.

Subject to Article II.D.1 of the Plan and the Administrative Claims Protocols Order, on the applicable Distribution Date(s), Holders of Allowed Administrative Claims that are not Other Administrative Claims and that did not timely affirmatively opt into the Administrative Claims Consent Program (the "Non-Settled Administrative Claims") shall receive payment in full in Cash in an aggregate amount equal to the Allowed amount of such Holder's Non-Settled Administrative Claim; provided, however, that Holders of Allowed Post-petition Intercompany Claims shall receive distributions from the Liquidating Trust only following the payment in full of all other Allowed Administrative Claims. The failure to object to Article II.D.2 of the Plan by the objection deadline for Confirmation by a Holder of a Non-Settled Administrative Claim shall be deemed to be such Holder's consent, pursuant to section 1129(a)(9) of the Bankruptcy Code, to be paid in accordance with the Plan following the Effective Date.

Except to the extent that a Priority Tax Claim has already been paid during the Chapter 11 Cases or to the extent that a Holder of a Priority Tax Claim agrees to less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive, on the applicable Distribution Date, payment in full in Cash in an amount equal to such Holder's Allowed Priority Tax Claim. The failure to object to Confirmation by a Holder of an Allowed Priority Tax Claim shall be deemed to be such Holder's consent, pursuant to section 1129(a)(9) of the Bankruptcy Code, to be paid in accordance with the Plan following the Effective Date.

Any payments made on account of Allowed Administrative Claims (other than DIP Claims, Securitization Facility Claims, Professional Fee Claims, and Opt-In Settled Administrative Claims, each of which shall be satisfied in accordance with Article II of the Plan) and of Allowed Priority Tax Claims shall be paid from the Wind-Down Account. Allowed Professional Fee Claims shall be paid from (i) first the Professional Fee Escrow Account and (ii) if the Professional Fee Escrow Account is insufficient to pay the full amount of Allowed Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims shall be paid by the Liquidating Trust from the Wind-Down Account without any further action or order of the Bankruptcy Court pursuant to the priorities set forth in Article **Error! Reference source not found.** of the Plan.

5.      *Filing of Professional Fee Claims; Treatment of Professional Fee Claims*

Except to the extent that the applicable Holder of an Allowed Professional Fee Claim agrees to such other less favorable treatment with the Debtors, the Creditors' Committee (which consent shall not be unreasonably withheld) the Liquidating Debtors or the Liquidating Trustee, as applicable, each Holder of a Professional Fee Claim shall be paid in full in Cash pursuant to the provisions of Article II.E of the Plan.

(i)      Fee Applications

All requests for payment of Professional Fee Claims must be Filed with the Bankruptcy Court by the date that is no later than 45 calendar days after the Effective Date; *provided*, that if any Professional is unable to File its own request with the Bankruptcy Court, such Professional may deliver an original, executed copy, and an electronic copy to the Debtors' attorneys and the Liquidating Debtors at least three Business Days before the deadline, and the Debtors' attorneys shall File such request with the Bankruptcy Court. The objection deadline relating to a request for payment of Professional Fee Claims shall be 4:00 p.m. (prevailing Central Time) on the date that is 20 calendar days after the Filing of such request. Distributions on account of Allowed Professional Fee Claims shall be made as soon as reasonably practicable after such Claims become Allowed.

(ii)      Post-Confirmation Date Fees

On the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors, the Liquidating Debtors, or the Liquidating Trustee may employ and pay all professionals without any further notice to, action by, or order or approval of the Bankruptcy Court or any other party; *provided*, *however*, that each Professional shall provide, during the period from the Confirmation Date to the Effective Date, its fee and expense statements or invoices, in summary form, which shall not be required to contain time entries but shall include the number of hours billed by the applicable Professional (except for financial advisors compensated on other than an hourly basis) and a summary statement of services provided and the expenses incurred (which summary may be redacted or modified to the extent necessary to delete any information subject to the attorney-client or other privilege, any information constituting attorney work product, or any other confidential or otherwise sensitive information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine) to the counsel to the Creditors' Committee contemporaneously with the delivery of such fee and expense statements or invoices to the Debtors and the Liquidating Trustee. The Debtors shall pay in Cash all such fees and expenses of any Professional, within ten days of presentment of such statements or invoices, if no written objections to the reasonableness of the fees and expenses charged in any such statement or invoice (or portion thereof) is made by the Debtors, the Liquidating Trustee, or the Creditors' Committee. Any objection raised by the Debtors, the Liquidating Trustee, or the Creditors' Committee with respect to such fee and expense statements or invoices may be made only on the basis of "reasonableness" and shall specify in writing the amount of the contested fees and expenses and the detailed basis for such objection. To the extent an objection only contests a portion of an invoice, the undisputed portion thereof shall be promptly paid. If any such objection to payment

of an invoice (or any portion thereof) is not otherwise resolved between the Debtors, the Liquidating Trustee, the Creditors' Committee, and the issuer of the invoice, either party may submit such dispute to the Bankruptcy Court for a determination as to the reasonableness of the relevant disputed fees and expenses set forth in the invoice.

(iii)    Professional Fee Escrow Account

Within ten business days following the Confirmation Date, the Debtors shall fund the Professional Fee Escrow Account with Cash in an amount equal to the Debtors' good faith estimate of the Professional Fee Claims. To receive payment for unbilled fees and expenses incurred through the Effective Date, all Professionals shall (a) estimate their accrued Professional Fee Claims prior to and as of the Effective Date and (b) estimate for their expected fees and expenses for professional services to be rendered or costs to be incurred on account of the Chapter 11 Cases following the Effective Date and shall deliver such estimates to the Debtors on or before the Effective Date. Funds held in the Professional Fee Escrow Account shall revert to the Wind-Down Account only after all Allowed Professional Fee Claims have been paid in full and following satisfaction of the DIP Claims and the Securitization Facility Claims. Fees owing to the applicable Holder of a Professional Fee Claim shall be paid in Cash to such Holder from funds held in the Professional Fee Escrow Account when such Claims are Allowed by an order of the Bankruptcy Court or authorized to be paid under the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [D.I. 580]; *provided*, that the Liquidating Debtors' obligations with respect to Professional Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Professional Fee Escrow Account. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of accrued Professional Fee Claims, the Holders of Professional Fee Claims shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.D.4 of the Plan, including from the Liquidating Trust Assets. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates, the Debtors, the Liquidating Debtors, or the Liquidating Trust. No Liens, Claims, or interests shall encumber the Professional Fee Escrow Account in any way.

**6.    *Payment of Statutory Fees***

On the Effective Date or as soon thereafter as reasonably practicable, the Liquidating Debtors shall pay all U.S. Trustee Fees that are due and owing on the Effective Date. Following the Effective Date, the Liquidating Trust shall pay the U.S. Trustee Fees for each quarter (including any fraction thereof) until the first to occur of the Chapter 11 Cases being converted, dismissed, or closed.

**B.    Classification and Treatment of Claims and Interests**

**1.    *Summary***

The Plan groups the Debtors together solely for the purposes of describing treatment under the Plan, confirmation of the Plan, and making distributions in accordance with the Plan in respect of Claims against, and Interests in, the Debtors under the Plan. Notwithstanding such groupings, the Plan constitutes a separate chapter 11 plan of liquidation for each Debtor. The Plan is not

premised upon, and will not cause, the substantive consolidation of any of the Debtors. For brevity and convenience, the classification and treatment of Claims and Interests have been arranged into one chart. Such classification shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets. Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

The following table designates the Classes of Claims and Interests and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan and (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code or deemed to accept or reject the Plan. Below is a chart assigning each Class a number for purposes of identifying each separate Class.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 2 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 3 | Senior Notes Claims | Impaired | Entitled to Vote |
| 4 | Control Group Liability Pension Claims | Impaired | Entitled to Vote |
| 5 | Convenience Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Prepetition Intercompany Claims | Unimpaired or Impaired | Deemed to Accept or Presumed to Reject |
| 8 | Section 510(b) Claims | Impaired | Presumed to Reject |
| 9 | Existing Interests | Impaired | Presumed to Reject |
| 10 | Intercompany Interests | Unimpaired or Impaired | Deemed to Accept or Presumed to Reject |

### 2. *Classification and Treatment of Claims and Interests*

To the extent a Class contains Allowed Claims or Allowed Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below:

(i)     Class 1 – Other Secured Claims

*Classification*: Class 1 consists of all Other Secured Claims.

*Treatment*: To the extent not otherwise paid in full from the Sale Proceeds or to the extent that a Holder of an Allowed Other Secured Claim agrees to such other treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors (with the consent of the

Creditors' Committee, which consent shall not be unreasonably withheld), the Liquidating Debtors, or the Liquidating Trustee, each such Holder shall receive payment in full in Cash, payable on the later of (a) the Effective Date and (b) the date that is 30 Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter.

*Voting*: Class 1 is Unimpaired by the Plan. Each Holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. No Holder of an Allowed Other Secured Claim is entitled to vote to accept or reject the Plan.

(ii)     Class 2 – Other Priority Claims

*Classification*: Class 2 consists of all Other Priority Claims.

*Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to such other treatment, in full and final satisfaction of such Allowed Other Priority Claim, each such Holder shall receive, on the applicable Distribution Date, payment in full in Cash. The failure to object to Confirmation by a Holder of an Allowed Other Priority Claim shall be deemed to be such Holder's consent to receive treatment for such Claim that is different from that set forth in section 1129(a)(9) of the Bankruptcy Code.

*Voting*: Class 2 is Unimpaired by the Plan. Each Holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. No Holder of an Allowed Other Priority Claim is entitled to vote to accept or reject the Plan.

(iii)    Class 3 – Senior Notes Claims

*Classification*: Class 3 consists of all Senior Notes Claims.

*Treatment*: In full and final satisfaction of Senior Notes Claims, each Holder of an Allowed Senior Notes Claim shall receive, on the applicable Distribution Date, its Pro Rata share of the Liquidating Trust Assets (along with Holders of Allowed Control Group Liability Pension Claims and Holders of Allowed General Unsecured Claims) after the satisfaction in full of all Allowed Claims that are senior in priority pursuant to the Bankruptcy Code.

*Voting*: Class 3 is Impaired by the Plan. Each Holder of an Allowed Senior Notes Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

(iv)     Class 4 – Control Group Liability Pension Claims

*Classification*:  Class 4 consists of all Control Group Liability Pension Claims.

*Treatment*:  In full and final satisfaction of Allowed Control Group Liability Pension Claims, each Holder of an Allowed Control Group Liability Pension Claim shall receive, on the applicable Distribution Date, its Pro Rata share of the Liquidating Trust Assets (along with Holders of Allowed Senior Notes Claims and Holders of Allowed General Unsecured Claims) after the satisfaction in full of all Allowed Claims that are senior in priority pursuant to the Bankruptcy Code.

*Voting*:  Class 4 is Impaired by the Plan.  Each Holder of an Allowed Control Group Liability Pension Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

(v)     Class 5 – Convenience Claims

*Classification*: Class 5 consists of all Convenience Claims.

*Treatment*:    On the Effective Date, in full and final satisfaction of Convenience Claims, each Holder of an Allowed Convenience Claim shall receive payment in Cash in an amount equal to its Pro Rata share of the Convenience Claims Pool.  Allowed Convenience Claims shall not include interest from and after the Petition Date nor include any penalty on such Claim.  Class 5 initially shall consist of all Claims that would otherwise be General Unsecured Claims and Allowed in the Convenience Claim Amount or less.  Payment to Class 5 is in lieu of any treatment as a Holder of a Class 6 Claim.  Any Holder of a General Unsecured Claim above the Convenience Claim Amount electing treatment as a Convenience Claim must affirmatively do so on its Class 6 Ballot.

*Voting*:  Class 5 is Impaired by the Plan.  Each Holder of an Allowed Convenience Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

(vi)    Class 6 – General Unsecured Claims

*Classification*: Class 6 consists of all General Unsecured Claims.

*Treatment*: In full and final satisfaction of General Unsecured Claims, each Holder of an Allowed General Unsecured Claim shall receive, on the applicable Distribution Date, its Pro Rata share of the Liquidating Trust Assets (along with Holders of Allowed Senior Notes Claims and Holders of Allowed Control Group Liability Pension Claims) after the satisfaction in full of all Allowed Claims that are senior in priority pursuant to the Bankruptcy Code.

*Voting*: Class 6 is Impaired by the Plan. Each Holder of an Allowed General Unsecured Claim as of the Voting Record Date is entitled to vote to accept or reject the Plan.

(vii)     Class 7 – Prepetition Intercompany Claims

*Classification*: Class 7 consists of all Prepetition Intercompany Claims.

*Treatment*: All Prepetition Intercompany Claims will be adjusted, reinstated, or discharged in the Debtors' (with the consent of the Creditors' Committee, which consent shall not be unreasonably withheld), Liquidating Debtors', and Liquidating Trustee's discretion, as applicable.

*Voting*: Class 7 is either (a) Unimpaired, in which case the Holders of Allowed Prepetition Intercompany Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or (b) Impaired and not receiving any distribution under the Plan, in which case the Holders of such Allowed Prepetition Intercompany Claims are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, no Holder of an Allowed Prepetition Intercompany Claim is entitled to vote to accept or reject the Plan.

(viii)    Class 8 – Section 510(b) Claims

*Classification*: Class 8 consists of all Section 510(b) Claims.

*Treatment*: All Section 510(b) Claims shall be cancelled, released, and extinguished as of the Effective Date, and Holders of Section 510(b) Claims shall not receive any distribution under the Plan on account of such Section 510(b) Claims.

*Voting*: Class 8 is Impaired by the Plan. Each Holder of a Section 510(b) Claim is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. No Holder of a Section 510(b) Claim is entitled to vote to accept or reject the Plan.

(ix)      Class 9 – Existing Interests

*Classification*: Class 9 consists of all Existing Interests.

*Treatment*: All Existing Interests shall be cancelled, released, and extinguished as of the Effective Date, and Holders of Existing Interests shall not receive any distribution under the Plan on account of such Existing Interests.

*Voting*: Class 9 is Impaired by the Plan. Each Holder of an Existing Interest is deemed to have rejected the Plan pursuant to section 1126(g) of the

Bankruptcy Code. No Holder of an Existing Interest is entitled to vote to accept or reject the Plan.

(x)     Class 10 – Intercompany Interests

*Classification*: Class 10 consists of all Intercompany Interests.

*Treatment*: All Allowed Intercompany Interests shall either be, in the Debtors', Liquidating Debtors' (with the consent of the Creditors' Committee, which consent shall not be unreasonably withheld), and Liquidating Trustee's discretion, as applicable, (a) cancelled (or otherwise eliminated) and shall receive no distribution under the Plan or (b) reinstated.

*Voting*: Class 10 is either (a) Unimpaired, in which case the Holders of Allowed Intercompany Interests are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or (b) Impaired and receiving no distribution under the Plan, in which case the Holders of such Allowed Intercompany Interests are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, no Holder of an Allowed Intercompany Interest is entitled to vote to accept or reject the Plan.

### 3.     *Special Provision Governing Unimpaired Claims and Interests*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims or Interests, including, without limitation, all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims or Interests.

### 4.     *Acceptance or Rejection of the Plan*

(i)     Voting Classes Under Plan

Under the Plan, Classes 3, 4, 5, and 6 are Impaired, and each Holder of a Claim as of the Voting Record Date in such Classes is entitled to vote to accept or reject the Plan.

(ii)     Acceptance of the Plan by Impaired Classes of Claims

Pursuant to section 1126(c) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class that actually voted on the Plan have voted to accept the Plan.

(iii)     Presumed Acceptance of the Plan

Under the Plan, (a) Classes 1 and 2 are Unimpaired, (b) the Holders of Claims in such Classes are conclusively presumed to have accepted the Plan, and (c) such Holders are not entitled to vote to accept or reject the Plan and the votes of such Holders shall not be solicited.

(iv)      Presumed Rejection of the Plan

Under the Plan, (a) Classes 8 and 9 are Impaired, and (b) the Holders of Claims or Interests in such Classes are deemed to have rejected the Plan and shall receive no distributions under the Plan on account of their Claims or Interests, and (c) such Holders are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited.

(v)      Presumed Acceptance or Rejection of the Plan

Under the Plan, Classes 7 and 10 are either (a) Unimpaired, and the Holders of Claims or Interests in such Classes are conclusively presumed to have accepted the Plan, or (b) Impaired, and the Holders of Claims or Interests in such Classes shall receive no distributions under the Plan on account of their Claims or Interests, and therefore are deemed to have rejected the Plan. In either (a) or (b), as applicable, such Holders are not entitled to vote to accept or reject the Plan and the votes of such Holders shall not be solicited.

(vi)      Presumed Acceptance by Voting Classes with No Votes

If a Class contains Claims eligible to vote on the Plan, and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by such Class.

5.      *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not contain a Holder of an Allowed Claim or Allowed Interest, or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the Confirmation Hearing Date, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

6.      *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

7.      *Modification and Severability as to Debtors; Reservation of Rights*

Subject to Article VIII of the Plan, the Debtors reserve the right to modify (with the consent of the Creditors' Committee (which consent shall not be unreasonably withheld) and the DIP Agent and the Securitization Agent, as applicable, but only if such modification adversely affects, directly or indirectly, any of the DIP Agent, the DIP Secured Parties, the Securitization Parties, or the Prepetition Secured Parties (which consent shall not be unreasonably withheld)) or withdraw the Plan in its entirety or in part, for any reason, including, without limitation, if the Plan as it applies to any particular Debtor is not confirmed. In addition, and also subject to Article VIII of the Plan, should the Plan fail to be accepted by the requisite number and amount of Claims voting,

as required to satisfy section 1129 of the Bankruptcy Code, and notwithstanding any other provision of the Plan to the contrary, the Debtors reserve the right to reclassify Claims or otherwise amend or modify (with the consent of the Creditors' Committee, which consent shall not be unreasonably withheld) or withdraw the Plan in its entirety, in part or as to a particular Debtor. Without limiting the foregoing, if the Debtors withdraw the Plan as to any particular Debtor because the Plan as to such Debtor fails to be accepted by the requisite number and amount of Claims voting or due to the Bankruptcy Court, for any reason, denying Confirmation as to such Debtor, then at the option of such Debtor (with the consent of the Creditors' Committee, which consent shall not be unreasonably withheld), (i) the Chapter 11 Case for such Debtor may be dismissed or (ii) such Debtor's assets may be sold to another Debtor, such sale to be effective at or before the Effective Date of the Plan of the Debtor transferee, and the sale price shall be paid to the seller in Cash and shall be in an amount equal to the fair value of such assets as proposed by the Debtors, with the consent of the Creditors' Committee, which consent shall not be unreasonably withheld, and approved by the Bankruptcy Court.

## C.      Implementation of the Plan

### 1.      *Liquidating Trust*

(i)      Creation of Liquidating Trust. On the Effective Date, in furtherance of the liquidation of the Liquidating Debtors, a liquidating trust (the "**Liquidating Trust**") shall be established for the benefit of the Liquidating Trust Beneficiaries. The Liquidating Trustee shall execute the Liquidating Trust Agreement on behalf of the Liquidating Debtors and shall take all other steps necessary to establish the Liquidating Trust pursuant to the Liquidating Trust Agreement and consistent with the Plan. The form of the Liquidating Trust Agreement shall be approved by the Liquidating Trustee or the Liquidating Debtors, as applicable, and included in the Plan Supplement and approved pursuant to the Plan. The powers, authority, responsibilities, and duties of the Liquidating Trust and the Liquidating Trustee are set forth in and shall be governed by the Plan and the Liquidating Trust Agreement. The Liquidating Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including, without limitation, any and all provisions necessary to ensure the continued treatment of the Liquidating Trust as a grantor trust and the Liquidating Trust Beneficiaries as the grantors and owners thereof for federal income tax purposes. The Liquidating Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated in the Plan, but only to the extent that such powers, duties, and authorities are for the primary purpose of receiving all assets of the Estates, continuing the wind-down of such Estates in a commercially reasonable but expeditious manner, and distributing any such assets pursuant to the Plan, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust, and without effect to its status as a "liquidating trust" for United States federal income tax purposes. In the event of any inconsistency between the Plan and the Liquidating Trust Agreement (as such conflict relates to anything other than the establishment of a Liquidating Trust or the assets to be transferred to the Liquidating Trust) the Liquidating Trust Agreement shall control.

(ii)      Vesting of Assets. Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan or in the Confirmation Order, upon the Effective Date, pursuant to sections 1141(b) and (c) of the

Bankruptcy Code, all property (including all interests, rights, and privileges related thereto, and including, for the avoidance of doubt, all Causes of Action) of each of the Debtors shall immediately vest in the Liquidating Trust free and clear of all Claims, Liens, encumbrances, charges, and other interests. All Claims, Liens, encumbrances, charges, and other interests shall be deemed fully released as of the Effective Date, except as otherwise provided in the Plan or the Confirmation Order.

(iii)     Transfers to the Liquidating Trust. On the Effective Date, the Debtors and their Estates shall transfer, and shall be deemed to have irrevocably transferred, to the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries all title and interest in all of the Liquidating Trust Assets, which transfer shall be free and clear of Claims, Liens, encumbrances, charges, other interests, and contractually imposed restrictions except as otherwise provided in the Plan. The Debtors, the Liquidating Trustee, the Liquidating Trust Beneficiaries, and any party under the control of such parties will execute any documents or other instruments and shall take all other steps as necessary to cause title to the Liquidating Trust Assets to be transferred to the Liquidating Trust. Upon the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Debtors shall have no interest in, or with respect to, the Liquidating Trust Assets or the Liquidating Trust. Upon delivery of the Liquidating Trust Assets to the Liquidating Trust, the Debtors and their predecessors, successors, and assigns shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust in accordance with Article IV.B of the Plan. Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Liquidating Trust Assets to the Liquidating Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code. In connection with the transfer of such assets, any attorney client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Liquidating Trust shall vest in the Liquidating Trust and its representatives, and the Debtors and the Liquidating Trustee are directed to take all necessary actions to effectuate the transfer of such privileges.

(iv)     Purpose of the Liquidating Trust. The Liquidating Trust shall be established for the sole purpose of liquidating and administering the Liquidating Trust Assets and making distributions on account thereof as provided for under the Plan and the Liquidating Trust Agreement, and shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulations section 301.7701-4(d) and generally in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code, consistent with the terms of the Plan; provided, that, subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee (a) may timely elect to treat any portion of the Liquidating Trust allocable to disputed claims as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9 and (b) to the extent permitted by applicable law, shall report consistently for state and local income tax purposes. To the extent the Liquidating Trustee makes such an election, all parties, including the Liquidating Trustee and any Liquidating Trust Beneficiaries, shall report consistently for U.S. federal, state, and local income tax purposes. The Liquidating Trustee shall file all income

tax returns with respect to any income attributable to a disputed ownership fund and shall pay the U.S. federal, state, and local income taxes attributable to such disputed ownership fund based on the items of income, deduction, credit, or loss allocable thereto.  Any taxes imposed on any disputed ownership fund or its assets will be paid out of the assets of the disputed ownership fund (including any assets of the Liquidating Trust allocable to disputed claims) and any subsequent distributions in respect of the allowance or disallowance of such claims will be reduced accordingly.  In the event, and to the extent, that any Cash in any disputed ownership fund is insufficient to pay the portion of any taxes attributable to taxable income arising from assets of the disputed ownership fund, assets of the disputed ownership fund (including those otherwise distributable) may be sold to pay such taxes.

(v)      <u>Administration of the Liquidating Trust</u>

The Liquidating Trust shall be administered by the Liquidating Trustee pursuant to the Liquidating Trust Agreement and the Plan.  In the event of any inconsistency between the Plan and the Liquidating Trust Agreement as such conflict relates to anything other than the establishment of a Liquidating Trust or the assets to be transferred to the Liquidating Trust, the Liquidating Trust Agreement shall control.

On or prior to the Plan Supplement Date, the Debtors shall File a list of the proposed initial members of the Liquidating Trust Advisory Board.  Each proposed member of the Liquidating Trust Advisory Board shall complete and File with the Bankruptcy Court, by no later than the Effective Date, a sworn affidavit stating that such member does not have any conflict of interest in connection with serving on the Liquidating Trust Advisory Board and is not party to any separate formal or informal agreement or arrangement regarding the Liquidating Trust Advisory Board's selection of advisors.  On the Effective Date, the Liquidating Trust Advisory Board will be appointed in accordance with the terms of the Liquidating Trust Agreement.  The rights, responsibilities, and duties of the Liquidating Trust Advisory Board are set forth in the Liquidating Trust Agreement.  Notwithstanding anything contained in the Plan or the Liquidating Trust Agreement, the Liquidating Trust Advisory Board shall always act consistently with, and not contrary to, the purpose of the Liquidating Trust as set forth in the Plan.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), and except to the extent that an election is made to treat a portion of the Liquidating Trust as a disputed ownership fund, the Debtors, the Liquidating Debtors, the Liquidating Trustee, and Holders of Administrative Claims, Priority Claims, Other Secured Claims, Senior Notes Claims, Control Group Liability Pension Claims, and General Unsecured Claims shall treat, for United States federal income tax purposes, the transfer of assets to the Liquidating Trust as (a) a transfer of the Assets (subject to obligations relating to those Assets, if any) directly to such Holders of Claims, followed by (b) the transfer by such Holders to the Liquidating Trust of the Assets in exchange for interests in the Liquidating Trust.  Accordingly, such Holders shall be treated for U.S. federal income tax purposes (y) as direct recipients of an undivided interest in the Assets transferred to the Liquidating Trust and as having immediately contributed such Assets to the Liquidating Trust and, thereafter, and (z) as the grantors and deemed owners of the Liquidating Trust and, thus, the direct owners of an undivided interest in the Assets held by the

-60-

Liquidating Trust. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

The Liquidating Trustee is hereby appointed in such instance (with respect to the Debtors and Liquidating Debtors) and following the Effective Date (with respect to the Liquidating Trust), pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, to prepare and file (or cause to be prepared and filed), on behalf of the Debtors, the Liquidating Debtors, and the Liquidating Trust, all tax returns, reports and statements required to be filed or that the Liquidating Trustee otherwise deems appropriate, including the filing of amended tax returns or requests for refunds for all taxable periods ended on or before the dissolution of the Debtors, and to handle all of the Debtors', Liquidating Debtors', and Liquidating Trust's tax matters, including, without limitation, the handling of tax audits, claims, defenses, and proceedings. The Liquidating Trustee shall file (or cause to be filed) tax returns, reports, and statements for the Liquidating Trust treating the Liquidating Trust as a grantor trust pursuant to Treas. Regs. §1.671-4(a) and in accordance with Article IV.A of the Plan.

Assets deemed transferred to Liquidating Trust Beneficiaries pursuant to Article IVC.1(ii) and Article 0 of the Plan, and allocations of any Liquidating Trust taxable income among Liquidating Trust Beneficiaries (except to the extent that an election is made to treat a portion of the Liquidating Trust as a disputed ownership fund), shall be determined by reference to the manner in which an amount of Cash representing such Assets or taxable income, as the case may be, would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all of the Liquidating Trust Assets (valued at their tax book value, except to the extent that an election is made to treat a portion of the Liquidating Trust as a disputed ownership fund) to the Liquidating Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, any taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets for purpose of this paragraph shall equal their fair market value on the date the Liquidating Trust Assets are transferred to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after the Liquidating Trust Assets are transferred to the Liquidating Trust, but in no event later than 120 days thereafter, the Liquidating Trust shall make a good faith valuation of the Liquidating Trust Assets and such valuation shall be used consistently by all parties for all U.S. federal income tax purposes. The Liquidating Trust shall also file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidating Trust that are required by any Government Unit. In connection with the preparation of the valuation contemplated hereby and by the Plan, the Liquidating Trust shall be entitled to retain such professionals and advisors as the Liquidating Trust shall determine to be appropriate or necessary, subject to the approval of the Liquidating Trust Advisory Board, and the Liquidating Trustee shall take such other actions in connection therewith as it determines to be appropriate or necessary, subject to certain approvals. Such valuation shall be used consistently by such parties for all United States federal income tax purposes.

(vi) <u>Tax Authority of Trustee; Expedited Tax Determination</u>. The Liquidating Trustee shall have the same authority and responsibility in respect of all taxes of the Debtors (including as the common parent or other agent of any consolidated, combined, or unitary tax group of which any of the Debtors was the agent) and, to the same extent, as if the Liquidating Trustee were the Debtors. The Liquidating Trustee may request an expedited determination of taxes of the Liquidating Trust or of the Debtors or Liquidating Debtors, under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, such Liquidating Trust or the Debtors or Liquidating Debtors for all taxable periods through the dissolution of such Liquidating Trust.

(vii) <u>Dissolution of Liquidating Trust</u>

The Liquidating Trust shall be dissolved in accordance with Article IV.C.1(d) of the Plan and at such time as (a) all of the Liquidating Trust Assets have been distributed pursuant to the Plan and the Liquidating Trust Agreement, (b) the Liquidating Trustee (with any required approvals) determines that the administration of any remaining Liquidating Trust Assets is not likely to yield sufficient additional Liquidating Trust proceeds to justify further pursuit, or (c) all distributions required to be made by the Liquidating Trustee under the Plan and the Liquidating Trust Agreement have been made; provided, that in no event shall the Liquidating Trust be dissolved later than five years from the creation of such Liquidating Trust pursuant to Article IV.A of the Plan unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary of such creation (or within the six-month period prior to the end of any extension period), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Liquidating Trustee that any further extension would not adversely affect the status of the trust as a Liquidating Trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets. Notwithstanding the foregoing proviso, in the event that the Liquidating Trustee fails to satisfy all conditions of the proviso prior to the expiration of the initial five year period or any extension, it may cure and avoid dissolution of the Liquidating Trust retroactively as of such date if (a) the Bankruptcy Court determines that such relief is appropriate to satisfy the purposes of the Liquidating Trust and (b) the Liquidating Trustee has continued to satisfy the requirements of Section 6.3(a) of the Liquidating Trust Agreement; *provided, however*, in no case shall the term of the Liquidating Trust extend more than three years beyond the original term without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Liquidating Trustee that any further extension would not adversely affect the status of the trust as a Liquidating Trust for United States federal income tax purposes.

If at any time the Liquidating Trustee (with any required approvals) determines, in reliance upon such professionals as the Liquidating Trust may retain, that the expense of administering the Liquidating Trust so as to make a final distribution to Liquidating Trust Beneficiaries is likely to exceed the value of the assets remaining in such Liquidating Trust, the Liquidating Trustee may apply to the Bankruptcy Court for authority to (a) reserve any amount necessary to dissolve such Liquidating Trust, (b) donate any balance to a charitable organization (1) described in section 501(c)(3) of the Tax Code, (2) exempt from United States federal income tax under section 501(a) of the Tax Code, (3) not a "private foundation," as defined in section 509(a) of the Tax Code, and

(4) that is unrelated to the Debtors, the Liquidating Trust, and any insider of the Liquidating Trustee, and (c) dissolve the Liquidating Trust.

### 2. Corporate Action

#### (i) Merger and Dissolution of Debtors

Immediately following the occurrence of the Confirmation Date, the respective boards of directors and managers, as applicable, of each of the Debtors shall be terminated and the members of each of the boards of directors and managers, as applicable, of the Debtors shall be deemed to have resigned

Each of the Debtors shall continue to exist as Liquidating Debtors after the Effective Date in accordance with the respective laws of the state under which each such Debtor was formed and pursuant to their respective certificates of incorporation, bylaws, articles of formation, operating agreements, and other organizational documents in effect prior to the Effective Date, except to the extent such organizational documents are amended under the Plan, for the limited purposes of liquidating all of the assets of the Estates and making distributions in accordance with the Plan.

On such date as determined by the Liquidating Trustee (the "**Merger Date**") on or before the Effective Date, and without the need for a further order of the Bankruptcy Court, any other or further actions to be taken by or on behalf of the Debtors, or any payments to be made in connection therewith, (a) each Subsidiary Debtor, other than Dean Holding Company, shall be merged with and into its immediate parent, and (b) such parent Subsidiary Debtor shall then be merged with its immediate parent, as applicable; *provided*, that Dean Holding Company shall not be merged or dissolved prior to the date on which Liquidating DFC is dissolved; *provided*, *further*, that each of the Debtors and the Liquidating Trustee may execute and file documents, and take all other actions as they deem appropriate, relating to the allowance of, and to effect the prompt merger of, the Subsidiary Debtors as provided in the Plan without the payment of any fee, tax, or charge and without the need for the filing of reports or certificates.

Moreover, on and after the first day following the Merger Date, the Subsidiary Debtors (a) shall be deemed to have withdrawn their business operations from any state in which they were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal and (b) shall not be liable in any manner to any taxing or other authority for franchise, business, license, or similar taxes accruing on or after the Merger Date.

As soon as practicable after the Liquidating Trustee exhausts substantially all of the Liquidating Trust Assets by making the Final Distribution of Cash under the Plan (and in accordance with Article IV.B.7 of the Plan), the Liquidating Trustee shall, at the expense of the Estates, (a) provide for the retention and storage of the Debtors' and Liquidating Debtors' books and records that shall have been delivered to or created by the Liquidating Trustee until such time as all such books and records are no longer required to be retained under applicable law, and File a certificate informing the Bankruptcy Court of the location at which such books and records are being stored, (b) File a motion for entry of a final decree closing Liquidating DFC's Chapter 11 Case and any other Chapter 11 Case that has not been already closed and stating that the assets of

the Estates and the Liquidating Trust have been exhausted and final distributions of Cash have been made under the Plan, (c) file the necessary paperwork in the State of Delaware to effectuate the dissolution of the Liquidating Debtors in accordance with the laws of such jurisdiction, and (d) resign as the sole officer, director, and manager, as applicable, of the Liquidating Debtors. Upon the Bankruptcy Court entry of an order granting the motion described in clause (b) of the preceding sentence, the Liquidating Debtors and the Liquidating Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Liquidating Debtors or payments to be made in connection therewith, and Liquidating DFC's Chapter 11 Case shall be closed on the day in which the Bankruptcy Court has entered such order.

<blockquote>(ii)  Certificate of Incorporation and Bylaws</blockquote>

Upon the Effective Date, the certificate and articles of incorporation and bylaws of the Liquidating Debtors shall be deemed amended as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code and shall include, among other things, a provision (a) prohibiting the issuance of nonvoting equity securities in accordance with section 1123(a)(6) of the Bankruptcy Code and (b) limiting the activities of the Liquidating Debtors to matters authorized under the Plan.

<blockquote>(iii)  No Further Action</blockquote>

Each of the matters provided for under the Plan involving the corporate structure of the Debtors or the Liquidating Trust, or corporate action to be taken by or required of the Debtors or the Liquidating Trust, shall, as of the Effective Date, be deemed to have occurred (unless contemplated hereunder to occur after the Effective Date) and be effective as provided in the Plan, and shall be authorized and approved in all respects without any requirement of further action by any Person, including, but not limited to, the Liquidating Trustee, Holders of Claims or Interests against or in the Debtors, or directors or officers of the Debtors.

<blockquote>(iv)  Effectuating Documents</blockquote>

Prior to the Effective Date, the Liquidating Trustee or any appropriate officer of the Debtors shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

<blockquote>**3.  *Cancellation of Existing Securities and Related Agreements and the Senior Notes Indenture***</blockquote>

On the Effective Date, except as otherwise specifically provided for in the Plan, all rights of any Holder of Claims or Interests, including options or warrants to purchase Interests or obligating the Debtors to issue, transfer, or sell Interests of the Debtors, shall be cancelled. Except for purposes of evidencing the right to a distribution pursuant to the Plan, each record Holder of Senior Notes shall be deemed to have surrendered its Senior Notes or other documentation underlying each Senior Notes Claim, and all such surrendered Senior Notes and other documentation shall be deemed to be cancelled as to the Debtors pursuant to the Plan, except to

the extent otherwise provided therein.

The Senior Notes Indenture shall terminate as of the Effective Date, except as necessary to (i) enforce the rights, claims, and interests of the Senior Notes Indenture Trustee vis-à-vis any parties other than the Debtors, (ii) allow the Senior Notes Indenture Trustee to receive distributions under the Plan and to distribute them to the Holders of the Senior Notes in accordance with the terms of the Senior Notes Indenture, (iii) permit the Senior Notes Indenture Trustee to appear before the Bankruptcy Court or any other court of competent jurisdiction after the Effective Date, and (iv) permit the Senior Notes Indenture Trustee to perform any functions that are necessary to effectuate the foregoing.

### 4.     Accounts and Reserves

(i)     Professional Fee Escrow Account

Before the Effective Date, the Debtors shall fund the Professional Fee Escrow Account in accordance with Article II.E.3 of the Plan.

(ii)     Disputed Claims Reserve

On the Initial Distribution Date or as soon thereafter as is reasonably practicable, the Liquidating Trustee shall be authorized, but not directed, to establish, fund with Cash, and manage the Disputed Claims Reserve in accordance with Article VII.D.2 of the Plan.

(iii)     Wind-Down Account

Following the satisfaction of all DIP Claims, Securitization Facility Claims, and the Opt-In Settled Administrative Claims and the funding of the Professional Fee Escrow Account and the Convenience Claims Pool, each in accordance with the terms and conditions set forth in the Plan, the Liquidating Debtors or the Liquidating Trustee shall create, and fund with Cash from the Liquidating Trust Assets, the Wind-Down Account to (a) fund the Wind-Down Budget, including the fees and expenses of the Liquidating Trust Professionals and (b) pay Allowed Non-Settled Administrative Claims, Allowed Priority Claims, Allowed Other Secured Claims, Allowed Senior Notes Claims, Allowed Control Group Liability Pension Claims, and Allowed General Unsecured Claims in accordance with the terms and conditions set forth in the Plan, as well as, if the Liquidating Trustee determines in its sole discretion to do so, fund the Disputed Claims Reserve. Any recovery of proceeds from the Liquidating Trust Assets, including any Retained Causes of Action, shall be deposited by the Liquidating Trustee into the Wind-Down Account. From time to time, the Liquidating Trustee shall determine whether the Cash in the Wind-Down Account exceeds the amount of Cash needed to fund the Wind-Down Budget and, at such time and in its sole discretion, may distribute on a Distribution Date any such excess Cash in accordance with the priorities set forth in Article III of the Plan.

(iv)     Other Reserves and Modifications to Reserves

Subject to and in accordance with the provisions of the Liquidating Trust Agreement and the Wind-Down Budget, the Liquidating Trustee may establish and administer any other necessary

reserves that may be required under the Plan or Liquidating Trust Agreement. Notwithstanding anything to the contrary contained in the Plan, the Liquidating Trustee may make transfers of Cash between the accounts and reserves established hereunder to satisfy Claims and other obligations in accordance with the Plan and the Wind-Down Budget.

### 5.  *Privilege Matters*

On the Effective Date, any attorney-client privilege, work-product privilege, or other privilege or immunity relating to any Claim or Cause of Action and/or attaching to any documents or communications (whether written or oral) shall be transferred to and shall vest in the Liquidating Debtors, the Liquidating Trustee, and the Liquidating Trust, and the Debtors, the Liquidating Debtors, the Liquidating Trustee, and the Liquidating Trust are authorized to take all necessary actions to effectuate the transfer of such privileges.

## D.  **Provisions Regarding the Liquidating Trustee**

### 1.  *Appointment of the Liquidating Trustee*

Immediately upon the occurrence of the Confirmation Date, the Liquidating Trustee shall be appointed to serve as the sole officer, director, or manager of each of the Liquidating Debtors. Upon the occurrence of the Effective Date, the Liquidating Trustee shall also be deemed appointed to serve as the trustee and administrator of the Liquidating Trust established pursuant to Article **Error! Reference source not found.** of the Plan and the Liquidating Trust Agreement. The Liquidating Trustee, subject to the terms and conditions of the Plan, the Confirmation Order, and the Liquidating Trust Agreement, shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors shall File a notice prior to the Confirmation Hearing designating the Person selected as the Liquidating Trustee. The appointment of the Liquidating Trustee shall be approved in the Confirmation Order and such appointment shall be effective in accordance with the terms of Article V.A of the Plan. The Liquidating Trustee shall have and perform all of the duties, responsibilities, rights, and obligations set forth in the Plan and the Liquidating Trust Agreement, as applicable. The initial Liquidating Trustee shall serve in such capacities, pursuant to the Liquidating Trust Agreement and the Plan, until the resignation or discharge and the appointment of a successor Liquidating Trustee in accordance with the Liquidating Trust Agreement and the Plan.

### 2.  **The Liquidating Trust Agreement**

On the Effective Date (or as soon as reasonably practicable thereafter), the Debtors shall execute a Liquidating Trust Agreement in substantially the same form as set forth in the Plan Supplement. Any nonmaterial modifications to the Liquidating Trust Agreement made by the Debtors, with the consent of the Creditors' Committee (which consent shall not be unreasonably withheld), will be ratified. The Liquidating Trust Agreement will contain provisions permitting the amendment or modification of the Liquidating Trust Agreement necessary to implement the provisions of the Plan.

3. **Rights, Powers, and Duties of the Liquidating Debtors and the Liquidating Trustee**

The Liquidating Trustee and the Liquidating Debtors shall retain and have all the rights, powers, and duties necessary to carry out its responsibilities under the Plan. Such rights, powers, and duties, which shall be exercisable by the Liquidating Trustee on behalf of itself, the Liquidating Debtors, and the Estates pursuant to the Plan and the Liquidating Trust Agreement, shall include, among other things, (i) investigating and, if appropriate, pursuing Causes of Action, (ii) administering and pursuing the Liquidating Trust Assets, including, without limitation, objecting to and defending against all Claims against the Debtors (including, without limitation, Administrative Claims and Priority Tax Claims), (iii) resolving all Disputed Claims and any Claim objections pending as of the Confirmation Date, and (iv) making distributions to Holders of Allowed Claims as provided for in the Plan. To the extent that the Liquidating Trustee deems necessary or appropriate, the Liquidating Trustee shall be automatically substituted or supplemented as a real party in interest in any objection to a Claim or any litigation commenced prior to the Effective Date by the Debtors.

Prior to the Effective Date, the Liquidating Trustee (on behalf of the Debtors) shall File monthly reports in a form reasonably acceptable to the U.S. Trustee. On and after the Effective Date, the Liquidating Trustee (on behalf of the Liquidating Debtors) shall File quarterly reports in a form reasonably acceptable to the United States Trustee.

4. **Compensation of the Liquidating Trustee**

During the period from the Confirmation Date to the Effective Date, the Liquidating Trustee shall submit its fee and expense statements or invoices, in summary form, which shall not be required to contain time entries but shall include a summary statement of services provided and the expenses incurred (which summary may be redacted or modified to the extent necessary to delete any information subject to the attorney-client or other privilege, any information constituting attorney work product, or any other confidential or otherwise sensitive information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine) to each the counsel to the Debtors and the counsel to the Creditors' Committee. The Debtors shall (without any further notice to, action by, or order or approval of the Bankruptcy Court or any other party) pay in Cash all such fees and expenses of the Liquidating Trustee, within ten days of presentment of such invoices or invoices, if no written objections to the reasonableness of the fees and expenses charged in any such statement or invoice (or portion thereof) is made by either the counsel to the Debtors or the counsel to the Creditors' Committee. Any objection raised by the counsel to the Debtors or the counsel to the Creditors' Committee with respect to such fee and expense statements or invoices may be made only on the basis of "reasonableness" and shall specify in writing the amount of the contested fees and expenses and the detailed basis for such objection. To the extent an objection only contests a portion of an invoice, the undisputed portion thereof shall be promptly paid. If any such objection to payment of an invoice (or any portion thereof) is not otherwise resolved between the Liquidating Trustee, the counsel to the Debtors, and the counsel to the Creditors' Committee, either party may submit such dispute to the Bankruptcy Court for a determination as to the reasonableness of the relevant disputed fees and expenses set forth in the invoice.

From and after the Effective Date, the Liquidating Trustee shall be paid in accordance with the terms and conditions of the Liquidating Trust Agreement and solely from the Wind-Down Account (with no recourse to any Released Party). Liquidating Trust Professionals shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred from the Wind-Down Account subject to the Wind-Down Budget. The payment of the fees and expenses of the Liquidating Trustee and the Liquidating Trust Professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court; *provided*, that any disputes related to such fees and expenses shall be brought before the Bankruptcy Court.

### 5.    *Indemnification*

The Liquidating Debtors shall indemnify and hold harmless (i) the Liquidating Trustee (solely in its capacity as such and in its capacity as officer and director of the Liquidating Debtors) and (ii) the Liquidating Trust Professionals ((i) and (ii) collectively, the "**Indemnified Parties**"), from and against and with respect to any and all liabilities, losses, damages, claims, costs, and expenses, including, but not limited to, attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than actions or omissions resulting from such Indemnified Party's bad faith, willful misconduct (including, without limitation, actual fraud), or gross negligence, with respect to the Liquidating Debtors or the implementation or administration of the Plan or Liquidating Trust Agreement. To the extent that an Indemnified Party asserts a claim for indemnification as provided above, (i) any payment on account of such claim shall be paid solely from the Wind-Down Account and (ii) the legal fees and related costs incurred by counsel to the Liquidating Trustee in monitoring and participating in the defense of such claims giving rise to the asserted right of indemnification shall be advanced to such Indemnified Party (and such Indemnified Party undertakes to repay such amounts if it ultimately shall be determined that such Indemnified Party is not entitled to be indemnified therefore) out of the Wind-Down Account or any insurance purchased using the Wind-Down Account. The indemnification provisions of the Liquidating Trust Agreement shall remain available to, and be binding upon, any former Liquidating Trustee or the estate of any decedent of the Liquidating Trustee and shall survive the termination of the Liquidating Trust Agreement.

### 6.    *Insurance*

The Liquidating Trustee shall be authorized to obtain and pay for, out of the Debtors' Assets and, after the Effective Date, out of the Wind-Down Account, all reasonably necessary insurance coverage for itself, its agents, representatives, employees, or independent contractors, and the Liquidating Debtors, including, but not limited to, coverage with respect to (i) any property that is or may in the future become the property of the Liquidating Debtors or their Estates and (ii) the liabilities, duties, and obligations of the Liquidating Trustee and its agents, representatives, employees, or independent contractors under the Liquidating Trust Agreement (in the form of an errors and omissions policy or otherwise), the latter of which insurance coverage may remain in effect for a reasonable period of time as determined by the Liquidating Trustee after the termination of the Liquidating Trust Agreement.

### E.     Provisions Governing Distributions

#### 1.     *Disbursing Agent*

The Debtors, the Liquidating Debtors, or the Liquidating Trustee, as applicable, may retain and direct a Disbursing Agent to assist with the distributions to be made under the Plan. The Disbursing Agent shall make all distributions required under the Plan, except as to a Holder of a Claim whose distribution is to be administered by a Servicer, which distributions shall be deposited with the appropriate Servicer for distribution to such Holder of a Claim in accordance with the provisions of the Plan and the terms of the governing agreement. Distributions on account of such Claims shall be deemed completed upon delivery to the appropriate Servicer; *provided*, that if any Servicer is unable to make or consents to the Disbursing Agent making such distributions, the Disbursing Agent, with such Servicer's cooperation, shall make such distributions to the extent reasonably practicable. The Senior Notes Indenture Trustee will be considered a Servicer for the applicable Senior Notes Claims; *provided*, *however*, that for the avoidance of doubt, the Senior Notes Indenture Trustee will not be considered a Servicer, or be responsible, for any non-DTC eligible distributions.

Except as otherwise set forth in the Plan, the Liquidating Debtors shall be authorized, without further Bankruptcy Court approval, to reimburse any Servicer for its reasonable, documented, actual, and customary out-of-pocket expenses incurred in providing post-Confirmation services directly related to distributions pursuant to the Plan.

If the Disbursing Agent is an independent third party designated to serve in such capacity, the Liquidating Trustee shall be permitted to provide to such Disbursing Agent from the Wind-Down Account, without further Bankruptcy Court approval, reasonable compensation for distribution services rendered pursuant to the Plan and reimbursement of reasonable, actual, and documented out-of-pocket expenses incurred in providing post-Confirmation services directly related to distributions pursuant to the Plan.

#### 2.     *Timing and Delivery of Distributions*

##### (i)     Timing

Subject to any reserves or holdbacks established pursuant to the Plan, and taking into account the matters set forth in Article VI.C and Article III of the Plan, on the appropriate Distribution Date or as soon as practicable thereafter, Holders of Allowed Claims shall receive the distributions from the Liquidating Trust provided for Allowed Claims in the applicable Classes as of such date.

If and to the extent there are Disputed Claims as of the Effective Date, distributions on account of such Disputed Claims (which will only be made if and when they become Allowed Claims) shall be made pursuant to the provisions set forth in the Plan with respect to the treatment of Allowed Claims on or as soon as reasonably practicable after the next Distribution Date that is at least 20 calendar days after each such Claim is Allowed; *provided*, that distributions on account of the Claims set forth in Article III of the Plan shall be made as set forth therein and Professional Fee Claims shall be made as soon as reasonably practicable after such Claims are Allowed by the

Bankruptcy Court or as provided in any other applicable order of the Bankruptcy Court. Because of the size and complexities of the Chapter 11 Cases, the Debtors at the present time cannot accurately predict the timing of the Final Distribution Date.

(ii)     De Minimis Distributions

Notwithstanding any other provision of the Plan, none of the Liquidating Debtors, any Servicer, nor any Disbursing Agent shall be required to make any distributions to Holders of Allowed Claims aggregating less than $100.00. Cash that otherwise would be payable under the Plan to Holders of Allowed Claims but for Article VI.B.2 of the Plan shall be available for distributions to Holders of other Allowed Claims.

Notwithstanding any other provision of the Plan, none of the Liquidating Debtors, any Servicer, nor any Disbursing Agent shall have any obligation to make any distributions on any Interim Distribution Date unless the sum of all distributions authorized to be made to all Holders of Allowed Claims on such Interim Distribution Date exceeds $10,000 in value.

(iii)    Delivery of Distributions—Allowed Claims

Distributions shall only be made to the record Holders of Allowed Claims as of the Distribution Record Date. On the Distribution Record Date, at the close of business for the relevant register, all registers maintained by the Debtors, the Liquidating Debtors, the Liquidating Trustee, any Servicers, the Disbursing Agent, the Senior Notes Indenture Trustee, and each of the foregoing's respective agents, successors, and assigns shall be deemed closed for purposes of determining whether a Holder of such a Claim is a record Holder entitled to distributions under the Plan. The Debtors, the Liquidating Debtors, the Liquidating Trustee, any Servicer, the Disbursing Agent, the Senior Notes Indenture Trustee, and each of the foregoing's respective agents, successors, and assigns shall have no obligation to recognize, for purposes of distributions pursuant to, or in any way arising from, the Plan (or for any other purpose), any Claims that are transferred after the Distribution Record Date. Instead, the foregoing parties shall be entitled to recognize only those record Holders set forth in the registers as of the Distribution Record Date, irrespective of the number of distributions made under the Plan or the date of such distributions. Furthermore, if a Claim is transferred 20 or fewer calendar days before the Distribution Record Date, the Disbursing Agent or applicable Servicer, as applicable, shall make distributions to the transferee only if the transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

If any dispute arises as to the identity of a Holder of an Allowed Claim that is entitled to receive a distribution pursuant to the Plan, the Disbursing Agent or applicable Servicer may, in lieu of making such distribution to such person, make the distribution into an escrow account until the disposition thereof is determined by Final Order or by written agreement among the interested parties to such dispute.

Subject to Bankruptcy Rule 9010, a distribution to a Holder of an Allowed Claim may be made by the Disbursing Agent in its sole discretion to (a) the address set forth on the first page of the Proof of Claim Filed by such Holder (or at the last known address of such Holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address), (b) the

last known address of such Holder on the books and records of the Debtors or their agents after the date of any related Proof of Claim, (c) the address set forth in any written notice of an address change delivered to the Disbursing Agent, (d) the address set forth on the Schedules, if no Proof of Claim has been Filed and the Disbursing Agent has not received a written notice of an address change, (e) in the case of a Holder whose Claim is governed by an agreement and administered by a Servicer or other agent, the address contained in the official records of such Entity, or (f) the address of any counsel that has appeared in the Chapter 11 Cases on such Holder's behalf. In the case of a Holder whose Claim is governed by an agreement and administered by a Servicer, the applicable Servicer shall make the distribution to the address contained in the official records of such Servicer.

(iv)      Delivery of Distributions—Allowed Senior Notes Claims; Surrender of Cancelled Instruments or Securities

Subject to the provisions of Article VII.B of the Plan, all distributions to Holders of Allowed Senior Notes Claims shall be deemed completed when made to (a) the Senior Notes Indenture Trustee or (b) if agreed to by the Debtors and the Senior Notes Indenture Trustee, through the facilities of DTC. The Senior Notes Indenture Trustee or DTC, as applicable, shall hold or direct such distributions for the benefit of the Holders of Senior Notes to the extent such Senior Notes give rise to Allowed Notes Claims. As soon as practicable in accordance with the requirements set forth in Article VI.B.4 of the Plan, the Senior Notes Indenture Trustee or DTC, as applicable, shall arrange for the delivery of such distributions to or on behalf of such Holders.

For the avoidance of doubt, the Senior Notes Indenture Trustee shall not bear any responsibility or liability for any distributions made hereunder by the Disbursing Agent or DTC. The Liquidating Debtors shall reimburse the Senior Notes Indenture Trustee for any reasonable and documented fees and expenses (including the reasonable and documented fees and expenses of its counsel and agents) incurred prior to or after the Effective Date; provided that the Liquidating Debtors shall reimburse the Senior Notes Indenture Trustee for reasonable and documented fees and expenses incurred after the Effective Date solely in connection with the implementation of the Plan, including, but not limited to, making distributions pursuant to and in accordance with the Plan.

### 3.      *Manner of Payment Under the Plan*

At the Disbursing Agent's option, any Cash payment may be made by check, wire transfer, or any other customary payment method. In the case of foreign creditors, Cash payments may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular jurisdiction.

### 4.      *Allocation of Plan Distributions Between Principal and Interest*

To the extent that any Claim entitled to a distribution under the Plan is based upon any obligation or instrument that is treated for U.S. federal income tax purposes as indebtedness of any Debtor and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

5.    **Compliance Matters**

In connection with the Plan, each Debtor, each Liquidating Debtor, the Disbursing Agent, the Liquidating Trust, and the Liquidating Trustee, as applicable, shall comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Allowed Claims and distributions hereunder shall be subject to any such withholding and reporting requirements. In connection with the Plan and all distributions thereunder, the Disbursing Agent or the Liquidating Trustee, as applicable, on behalf of the Liquidating Debtors, is authorized to take any and all actions that may be necessary or appropriate to comply with the foregoing requirements, including, without limitation, liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes or establishing any other mechanisms that the Debtors (with the consent of the Creditors' Committee, which consent shall not be unreasonably withheld), the Liquidating Debtors, the Disbursing Agent, the Liquidating Trust, or the Liquidating Trustee, as applicable, believe are reasonable and appropriate, and all Allowed Claims and distributions hereunder shall be subject to any such withholding and reporting requirements. All Holders of Claims shall be required to provide any information necessary to allow the Liquidating Trustee to comply with all withholding, payment, and reporting requirements with respect to such taxes. The Disbursing Agent or the Liquidating Trustee, as applicable, reserves the right to withhold the full amount required by law on any distribution on account of any Holder of an Allowed Claim that fails to timely provide to the Disbursing Agent or the Liquidating Trustee, the required information. The Debtors, the Liquidating Debtors, the Liquidating Trust, the Liquidating Trustee, and the Disbursing Agent, as applicable, reserve the right to allocate and distribute all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, Liens, and similar encumbrances.

6.    **Foreign Currency Exchange Rate**

As of the Effective Date, any Claim asserted in a currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate on the Petition Date, as quoted at 4:00 p.m. (prevailing Central Time), midrange spot rate of exchange for the applicable currency as published in the *Wall Street Journal*, National Edition, on the day after the Petition Date.

7.    **Fractional Dollars**

Notwithstanding any other provision of the Plan, the Disbursing Agent shall not be required to make distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment shall reflect a rounding of such fraction down to the nearest whole dollar.

8.    **Undeliverable or Non-Negotiated Distributions**

If any distribution is returned as undeliverable or is otherwise unclaimed, no further distributions to the applicable Holder of an Allowed Claim shall be made unless and until the Disbursing Agent or appropriate Servicer is notified in writing of such Holder's then-current

address, at which time the undelivered distribution shall be made to such Holder without interest or dividends.  Undeliverable distributions shall be returned to Liquidating DFC until such distributions are claimed.  Any Holder of an Allowed Claim that does not claim an undeliverable or unclaimed distribution within 90 calendar days after the date such distribution was returned undeliverable shall be deemed to have forfeited its Claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed distribution against the Debtors and their Estates, the Liquidating Debtors, the Liquidating Trustee, the Disbursing Agent, and each of the foregoing's respective agents, attorneys, representatives, employees, or independent contractors and/or any of its or their property.  All title to and all beneficial interests in the Cash relating to such undeliverable or unclaimed distribution, including any dividends or interest attributable thereto, shall revert to the Liquidating Debtors and such Cash shall be deposited in the Wind-Down Account for distribution in accordance with the Plan.  The reversion of such Cash shall be free of any restrictions thereon notwithstanding any federal or state escheat laws to the contrary.  Nothing contained in the Plan or the Liquidating Trust Agreement shall require the Debtors, the Liquidating Debtors, the Liquidating Trustee, or any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

Checks issued on account of Allowed Claims shall be null and void if not negotiated within 120 calendar days from and after the date of issuance thereof.  Requests for reissuance of any check must be made directly and in writing to the Disbursing Agent by the Holder of the relevant Allowed Claim within such 120-calendar-day period.  Nothing contained in the Plan or the Liquidating Trust Agreement shall require the Debtors, the Liquidating Debtors, the Liquidating Trustee, or any Disbursing Agent to attempt to issue a new check following such 120-calendar-day period.  After such 120-calendar-day period, the relevant Allowed Claim (and any Claim for reissuance of the original check) shall be automatically discharged and forever barred, and all title to and all beneficial interests in the Cash represented by any such non-negotiated check, including any dividends or interest attributable thereto, shall revert to the Liquidating Debtors and such Cash shall be deposited in the Wind-Down Account for distribution in accordance with the Plan.  The reversion of such Cash shall be free of any restrictions thereon notwithstanding any federal or state escheat laws to the contrary.

### 9.     *Claims Paid by Third Parties*

To the extent a Holder of an Allowed Claim receives a distribution on account of a Claim and also receives payment from a party that is not a Debtor or a Liquidating Debtor on account of such Claim, such Holder shall, within 30 calendar days of receipt thereof, repay, and/or return the distribution to the applicable Liquidating Debtor, to the extent that the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of the Claim as of the date of any such distribution under the Plan.

A Claim may be adjusted or expunged on the Claims Register without a claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court to the extent that a Holder receives payment in full or in part on account of such Claim; *provided*, that, to the extent the non-Debtor party making the payment is subrogated to the Holder's Claim, the non-Debtor party shall have a 30-calendar-day grace period following payment in full to notify the Claims and Solicitation Agent and the Liquidating Trustee of such subrogation rights.

### 10.    *Claims Payable by Third Parties*

To the extent that one or more of the Debtors' Insurers satisfies any Claim in full or in part, then immediately upon such Insurers' satisfaction, such Claim may be expunged (to the extent of such satisfaction) on the Claims Register without a claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that a Debtor or any Entity may hold against any other non-Debtor Entity (including Insurers) under any Insurance Contract(s), nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any defenses, including coverage defenses, held by such Insurers under any such Insurance Contract(s).

## F.    **Disputed Claims**

### 1.    *Objections to Claims*

If a Holder of a Claim elects to File or submit a Proof of Claim in the Chapter 11 Cases, such Holder shall be deemed to have consented to the jurisdiction of the Bankruptcy Court for all purposes with respect to the Claim.

Before the Effective Date, any party in interest may object to Claims. After the Effective Date, the Liquidating Trustee shall have the sole authority to object to all Claims against the Debtors; *provided*, that the Liquidating Trustee shall not be entitled to object to any Claim that has been expressly Allowed by Final Order or under the Plan. In the event that any objection Filed by the Debtors or the Creditors' Committee remains pending as of the Effective Date, the Liquidating Trustee or the Creditors' Committee shall be deemed substituted for the Debtors as the objecting party. Any objections to Claims shall be Filed on the Bankruptcy Court's docket on or before the Claims Objection Deadline.

Except as otherwise provided in the Plan or otherwise approved by the Bankruptcy Court, all Proofs of Claim Filed after the Bar Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against the Liquidating Trust or any Liquidating Debtor, without the need for any objection by the Liquidating Debtors or the Liquidating Trustee or any further notice to or action, order, or approval of the Bankruptcy Court.

Claims objections Filed before, on, or after the Effective Date shall be Filed, served, and administered in accordance with the Local Rules with notice to the parties listed in Article XIII.J of the Plan; *provided*, that on and after the Effective Date, Filings and notices need only be served on the relevant claimants.

The Liquidating Trustee shall be entitled to assert all of the Debtors', the Liquidating Debtors', and the Liquidating Trust's rights, claims, defenses, offsets, rights of recoupment, setoffs, rights of disallowance, subrogation, recharacterization, and/or equitable subordination and counterclaims with respect to Claims.

### 2.    *Resolution of Disputed Claims*

On and after the Effective Date, the Liquidating Trustee shall have the sole authority to litigate, compromise, settle, otherwise resolve, or withdraw any objections to all Claims, to compromise and settle any such Claims, and to administer and adjust the Claims Register to reflect any such settlement or compromise, in each case without notice to or approval by the Bankruptcy Court or any other party.

### 3. Estimation of Claims and Interests

The Debtors (with the consent of the Creditors' Committee, which consent shall not unreasonably be withheld), the Liquidating Debtors, or the Liquidating Trustee, as applicable, may, in their sole discretion, determine, resolve, and otherwise adjudicate all Contingent Claims, Unliquidated Claims, and Disputed Claims in the Bankruptcy Court or such other court of the Debtors' (with the consent of the Creditors' Committee, which consent may not unreasonably be withheld), the Liquidating Debtors', or the Liquidating Trustee's, as applicable, choice having jurisdiction over the validity, nature, or amount thereof. The Debtors (with the consent of the Creditors' Committee, which consent may not unreasonably be withheld), the Liquidating Debtors, or the Liquidating Trustee, as applicable, may at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any reason or purpose, regardless of whether any of the Debtors, the Liquidating Debtors, or the Liquidating Trustee has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim, or Disputed Claim, that estimated amount shall constitute the maximum limitation on such Claim, and the Debtors (with the consent of the Creditors' Committee, which consent may not unreasonably be withheld), the Liquidating Debtors, or the Liquidating Trustee, as applicable, may pursue supplementary proceedings to object to the ultimate allowance of such Claim; *provided*, that such limitation shall not apply to Claims requested by the Debtors to be estimated for voting purposes only.

All of the aforementioned objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such Claim unless the Holder of such Claim has Filed a motion requesting the right to seek such reconsideration on or before 20 calendar days after the date such Claim is estimated by the Bankruptcy Court.

### 4. Payments and Distributions for Disputed Claims

(i)     No Distributions Pending Allowance or Settlement of Causes of Action

Notwithstanding any other provision in the Plan or the Liquidating Trust Agreement, no payments or distributions shall be made (a) for a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order

and the Disputed Claim has become an Allowed Claim, (b) to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order and the Disputed Claim has become an Allowed Claim, or (c) to a specific Holder of an Allowed Claim if such Holder is or may be liable to the Debtors or the Liquidating Debtors on account of a Cause of Action unless and until such Cause of Action (to the extent applicable and without prejudice to the rights of any Holder of an Allowed Administrative Claim to argue that section 502(d) of the Bankruptcy Code is inapplicable to its Administrative Claim) has been settled or withdrawn or has been determined by Final Order of the Bankruptcy Court or such other court having jurisdiction over the matter. Following any such settlement or determination in clause (c) of the preceding sentence where the Holder of a Claim is liable to the Debtors or the Liquidating Debtors on account of any Cause of Action, any such payment or distribution to such Holder may be offset against the liability such Holder has to the Debtors or the Liquidating Debtors.

(ii)     Disputed Claims Reserve

On the Initial Distribution Date or as soon thereafter as is reasonably practicable, the Liquidating Trustee shall be authorized, but not directed, to establish a Disputed Claims Reserve, which shall be administered by the Liquidating Trustee.

The Liquidating Trustee shall hold Cash in the Disputed Claims Reserve in trust for the benefit of Holders of Claims ultimately determined to be Allowed after the Effective Date. The Disbursing Agent shall distribute such amounts (net of any expenses, including any taxes relating thereto), as provided in the Plan, as such Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the Effective Date under Article III of the Plan solely to the extent of the amounts available in the applicable Disputed Claims Reserve.

The Liquidating Trustee may adjust the Disputed Claims Reserve to reflect all earnings thereon (net of any expenses relating thereto, such expenses including any taxes imposed thereon or otherwise payable by the reserve), to be distributed on the Interim Distribution Dates, as required by the Plan. The Disbursing Agent shall hold in the Disputed Claims Reserve all dividends, payments, and other distributions made on account of, as well as any obligations arising from, the property held in the Disputed Claims Reserve, to the extent that such property continues to be so held at the time such distributions are made or such obligations arise. The taxes imposed on the Disputed Claims Reserve (if any) shall be paid by the Disbursing Agent from the property held in the Disputed Claims Reserve, and the Debtors, the Liquidating Debtors, and the Liquidating Trustee shall have no liability for such taxes.

After any reasonable determination by the Liquidating Trustee that the Disputed Claims Reserve should be adjusted downward in accordance with Article VII.D of the Plan, the Disbursing Agent shall either, at the direction of the Liquidating Trustee, (a) effect a distribution in the amount of such adjustment as required by the Plan, and any date of such distribution shall be an Interim Distribution Date or (b) transfer Cash in the amount of such adjustment to the Wind-Down Account.

After all Disputed Claims have become either Allowed Claims or Disallowed Claims, and all distributions required pursuant to Article VII.D of the Plan have been made, the Disbursing Agent shall, at the direction of the Liquidating Trustee, either (a) effect a final distribution of the Cash remaining (if any) in the Disputed Claims Reserve in accordance with the priorities set forth in Article III of the Plan or (b) transfer the remaining Cash to the Wind-Down Account.

The Liquidating Trustee may (a) make an election pursuant to United States Treasury Regulations section 1.468B-9 to treat the Disputed Claims Reserve as a "disputed ownership fund" within the meaning of that section and (b) allocate taxable income or loss to the Disputed Claims Reserve with respect to any taxable year that would have been allocated to the Holders of Disputed Claims had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are Disputed Claims). The affected Holders of the Disputed Claims shall be bound by such election, if made by the Liquidating Trustee. For federal income tax purposes and, to the extent permitted by applicable law, state, and local income tax purposes, absent definitive guidance from the IRS or a contrary determination by a court of competent jurisdiction, the Liquidating Trustee shall report consistently with the foregoing characterization. All affected Holders of Disputed Claims shall report, for income tax purposes, consistently with the foregoing.

(iii)    Distributions After Allowance

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the Disbursing Agent will, out of the Disputed Claims Reserve, distribute to the Holder thereof the distribution, if any, to which such Holder is entitled under the Plan in accordance with Article VI.B.1 of the Plan. Subject to Article VII.F of the Plan, all distributions made under Article VII.D.3 of the Plan on account of Allowed Claims will be made together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property, then held in the Disputed Claims Reserve as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Allowed Claim Holders included in the applicable class under the Plan.

### 5. *No Amendments to Claims*

A Claim may be amended before the Confirmation Date only as agreed upon by the Debtors (with the consent of the Creditors' Committee, which consent may not unreasonably be withheld) and the Holder of such Claim or as otherwise permitted by the Bankruptcy Court, the Bankruptcy Rules, the Local Rules, or applicable non-bankruptcy law. On or after the Confirmation Date, the Holder of a Claim (other than an Administrative Claim or a Professional Fee Claim) must obtain prior authorization from the Bankruptcy Court, the Debtors (with the consent of the Creditors' Committee, which consent may not unreasonably be withheld), or Liquidating Debtors to amend a Claim.

### 6. *No Interest*

Other than as provided by section 506(b) of the Bankruptcy Code or as specifically provided for in the DIP Order, the Securitization Order, the Plan, or the Confirmation Order, post-petition interest shall not accrue or be paid on Claims and no Holder of a Claim shall be entitled

to interest accruing on or after the Petition Date on any Claim or right.  Additionally,  and without limiting  the foregoing,  interest shall not accrue or be paid on any Claim or Disputed Claim for the period from and after the Effective Date; *provided*, that, nothing  in Article VII.F of the Plan shall limit  any rights of any Governmental  Unit to interest under section 503, 506(b), 1129(a)(9)(A), or 1129(a)(9)(C) of the Bankruptcy Code or as otherwise provided  for under applicable  law.

## G.    Treatment of Executory Contracts and Unexpired Leases

### 1.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

#### (i)    Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided  in  the Plan, each Executory Contract and Unexpired Lease shall be deemed automatically  rejected, pursuant to sections 365 and 1123 of the Bankruptcy Code, as of the Effective Date unless  any such Executory Contract or Unexpired  Lease (a) has been previously  assumed, assumed and assigned,  or rejected by the Debtors by Final  Order of the Bankruptcy Court, (b) is the subject of a motion to assume, assume and assign,  or reject pending as of the Effective Date, (c) is an Intercompany Contract, (d) is an Insurance Contract, or (e) is otherwise assumed, or assumed and assigned, pursuant to the terms in the Plan.

The Confirmation  Order shall constitute  an order of the Bankruptcy Court approving  such rejections  pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Non-Debtor  parties to Executory Contracts or Unexpired  Leases that are rejected as of the Effective Date shall have the right to assert a Claim on account of the rejection of such Executory Contracts or Unexpired Leases, including  under section 502(g) of the Bankruptcy Code; *provided*, however, that the non-Debtor parties must comply  with Article VIII.C of the Plan.

#### (ii)    Assumption of D&O Liability  Insurance Policies

As of the Effective Date, the Liquidating  Debtors shall be deemed to have assumed all of the Debtors' D&O Liability  Insurance Policies pursuant to sections 105 and 365(a) of the Bankruptcy Code.  Entry of the Confirmation  Order shall constitute  the Bankruptcy Court's approval of the Liquidating  Debtors' foregoing assumption of each of the D&O Liability  Insurance Policies. Notwithstanding  anything  to the contrary contained in the Plan, confirmation  of the Plan shall not discharge, release, impair, alter, amend, or otherwise modify  any advancement, indemnity, or other obligations  of any party under the D&O Liability  Insurance Policies.

After the Effective Date, none of the Liquidating  Debtors shall terminate or otherwise reduce the coverage under any of the D&O Liability  Insurance Policies with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled, subject to the terms and conditions of the D&O Liability  Insurance Policies, to the full benefits of any such policy  from the applicable insurers for the full  term of such policy  regardless of whether such directors and officers remain in such positions  after the Effective Date.

On or before the Effective Date, the Debtors shall purchase and/or maintain  directors', officers', and employee liability  tail coverage for the six-year period following  the Effective Date

on terms no less favorable than the Debtors' existing director, officer, and employee coverage and with an aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under the existing director, officer, and employee coverage upon placement. From and after the Effective Date, reasonable directors' and officers' insurance policies shall remain in place in the ordinary course.

### 2.     Assumption of Certain Indemnification Obligations

Each Indemnification Obligation to a current or former director, officer, manager, or employee who was employed by any of the Debtors in such capacity on or prior to the Effective Date (including, for the avoidance of doubt, the members of the board of directors, board of managers, or equivalent body of each Debtor at any time) shall be deemed assumed effective as of the Effective Date. Each Indemnification Obligation that is deemed assumed pursuant to the Plan shall (i) remain in full force and effect, (ii) not be modified, reduced, discharged, impaired, or otherwise affected in any way, (iii) be deemed and treated as an executory contract pursuant to sections 365 and 1123 of the Bankruptcy Code regardless of whether or not Proofs of Claim have been Filed with respect to such obligations, and (iv) survive unaffected irrespective of whether such indemnification is owed for an act or event occurring before, on, or after the Petition Date.

Any obligations of the Debtors (whether pursuant to their corporate charters, bylaws, certificates of incorporation, other organizational documents, board resolutions, indemnification agreements, employment contracts, policy of providing employee indemnification, applicable state law, specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against such Persons or agreements, including amendments, or otherwise) entered into at any time prior to the Effective Date to indemnify, reimburse, or limit the liability of the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, in each case, based upon any act or omission related to such Persons' service with, for, or on behalf of the Debtors prior to the Effective Date with respect to all present and future actions, suits, and proceedings relating to the Debtors shall survive Confirmation and, except as set forth in the Plan, remain unaffected thereby, and shall not be discharged, irrespective of whether such defense, indemnification, reimbursement, or limitation of liability accrued or is owed in connection with an occurrence before or after the Petition Date; *provided*, that all obligations under Article VIII.B of the Plan shall be limited solely to recovery available under applicable Insurance Contracts and, neither the Liquidating Debtors, the Liquidating Trustee, the Liquidating Trust, nor any of their assets (other than the Insurance Contracts) shall be liable for any such obligations. Any Claim based on the Debtors' obligations set forth in Article VIII.B of the Plan shall not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code. This provision for Indemnification Obligations shall not apply to or cover any Causes of Action against a Person that result in a Final Order determining that such Person seeking indemnification is liable for fraud, willful misconduct, gross negligence, bad faith, self-dealing, or breach of the duty of loyalty.

Notwithstanding anything to the contrary in the Plan, the Plan Documents, the Disclosure Statement, the Confirmation Order, any bar date notice or claim objection, any other document related to any of the foregoing, or any other order of the Bankruptcy Court (including, without limitation, any provision that purports to be preemptory or supervening, grants an injunction,

discharge, or release, requires any party to opt out of any releases, or confers Bankruptcy Court jurisdiction):

(i)        nothing alters the rights and obligations of the Debtors (or after the Effective Date, of the Liquidating Debtors, as successor in interest to the Debtors) and the Insurers under any Insurance Contracts except that, on and after the Effective Date, the Insurance Contracts shall vest unaltered in their entirety in the Liquidating Debtors and the Liquidating Debtors shall become and remain liable in full for all obligations under the Insurance Contracts regardless of whether such rights or obligations arise or become due before or after the Effective Date;

(ii)       nothing modifies the terms and conditions of any Insurance Contracts, including the insurance coverage provided thereunder and any liability and obligation to pay or reimburse losses and expenses within the deductibles; and

(iii)      nothing releases, discharges, modifies, or otherwise alters any Insurers' security interests in or liens on all accounts, letters of credit, paid loss deposit funds, cash, and other collateral and security provided in connection with the Insurance Contracts.

For the avoidance of doubt, all rights and obligations under the Insurance Contracts shall be determined under the applicable Insurance Contracts and applicable non-bankruptcy law without the requirement or need for any Insurer to File any Proofs of Claim or Administrative Claims or object to any cure amount.

### 3.        Rejection Claims

Any Rejection Claim must be Filed with the Claims and Solicitation Agent by the Rejection Bar Date. Any Rejection Claim for which a Proof of Claim is not properly and timely Filed and served by the Rejection Bar Date shall be forever barred and shall not be enforceable against the Debtors, the Liquidating Debtors, or their respective Estates or properties. The Debtors or the Liquidating Debtors may contest any Rejection Claim in accordance with Article VI of the Plan. Any Allowed Rejection Claim shall be classified as a General Unsecured Claim.

### 4.        Modifications, Amendments, Supplements, Restatements, or Other Agreements

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases and actions taken in accordance therewith (i) do not alter in any way the prepetition nature of the Executory Contracts and Unexpired Leases, or the validity, priority, or amount of any Claims that may arise under the same, (ii) are not and do not create post-petition contracts or leases, (iii) do not elevate to administrative expense priority any Claims of the counterparties to the Executory Contracts and Unexpired Leases against any of the Debtors, and (iv) do not entitle any Entity to a Claim under any section of the Bankruptcy Code on account of the difference between the terms of any prepetition Executory Contracts and Unexpired Leases and subsequent modifications, amendments, supplements, or restatements.

### H.      Effect of Confirmation of the Plan

#### 1.      Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan or the Confirmation Order, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, discharged, and compromised, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Liquidating Debtors, as applicable, and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Liquidating Debtors and their successors and assigns. The Liquidating Debtors shall be authorized to File any necessary or desirable documents to evidence such release in the name of the party secured by such pre-Effective Date mortgages, deeds of trust, Liens, pledges, or other security interests.

#### 2.      Releases

The releases of Claims and Causes of Action described in the Plan, including releases by the Debtors and by Holders of Claims, constitute good faith compromises and settlements of the matters covered thereby and are consensual.  Such compromises and settlements are made in exchange for consideration and are in the best interest of Holders of Claims, are fair, equitable, reasonable, and are integral elements of the resolution of the Chapter 11 Cases in accordance with the Plan.  Each of the release, indemnification, and exculpation provisions set forth in the Plan (i) is within the jurisdiction of the Bankruptcy Court under sections 1334(a), 1334(b), and 1334(e) of title 28 of the United States Code, (ii) is an essential means of implementing the Plan, (iii) is an integral and non-severable element of the transactions incorporated into the Plan, (iv) confers a material benefit on, and is in the best interests of, the Debtors, their Estates, and their Creditors, (v) is important to the overall objectives of the Plan to finally resolve all Claims among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors, (vi) is fair, equitable, and reasonable and in exchange for good and valuable consideration, and (vii) is consistent with sections 105, 1123, 1129, and other applicable provisions of the Bankruptcy Code.

#### 3.      Term of Injunction or Stays

**Unless otherwise provided in the Plan, any injunction or stay arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code or otherwise that is in existence on the Confirmation Date shall remain in full force and effect until the later of (i) the Effective Date or (ii) the date indicated in the order providing for such injunction or stay.**

#### 4.      Exculpation

**Except as otherwise specifically provided in the Plan or the Confirmation Order, none**

of the Exculpated Parties shall have or incur any liability for any act or omission in connection with, related to, or arising out of the Chapter 11 Cases, the negotiation of any settlement or agreement, contract, instrument, the Disclosure Statement, release, or document created or entered into in connection with the Plan or in the Chapter 11 Cases (including the Plan Supplement and, in each case, any documents and related prepetition transactions related thereto), the pursuit of confirmation and consummation of the Plan, the preparation and distribution of the Plan, the Plan Documents, the DIP Loan Documents, the DIP Facility, the Securitization Facility Documents, the Securitization Facility, the offer, issuance, and distribution of any securities issued or to be issued under or in connection with the Plan, any other prepetition or post-petition act taken or omitted to be taken in connection with or in contemplation of the liquidation of the Debtors or the administration of the Plan or the property to be distributed under the Plan, except for any act or omission that is determined in a Final Order to have constituted willful misconduct (including, without limitation, actual fraud) or gross negligence. Each Exculpated Party shall be entitled to reasonably rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the Plan. The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

5.     *Release by the Debtors*

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Confirmation Order, on and after the Effective Date, for good and valuable consideration, including their cooperation and contributions to the Chapter 11 Cases, the Released Parties shall be deemed released by the Debtors, the Liquidating Debtors, their Estates, the Securitization Entities, the Liquidating Trust, and the Liquidating Trustee from any and all Claims, obligations, debts, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state laws, or otherwise, including Avoidance Actions, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise that the Debtors, the Liquidating Debtors, their Estates, the Securitization Entities, the Liquidating Trust, and the Liquidating Trustee and their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity or that any Holder of a Claim or Interest or other Entity would have been legally entitled to assert derivatively for or on behalf of the Debtors, the Liquidating Debtors, their Estates, the Securitization Entities, the Liquidating Trust, or the Liquidating Trustee, or their Affiliates, based on, relating to, or in any manner arising from, in whole or in part:

(i)     the Debtors, the Liquidating Debtors, the Securitization Entities, the Liquidating Trustee, the Liquidating Trust, the Chapter 11 Cases, the Debtors' in- or

out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or Filing of the Plan Documents;

(ii) any Plan Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan;

(iii) the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, or the business or contractual arrangements between the Debtors and any Released Party (excluding any assumed executory contract or lease);

(iv) the negotiation, formulation, preparation, or performance of or under the Plan, the Disclosure Statement, the Plan Supplement, the Liquidating Trust Agreement, the DIP Facility, the Securitization Facility, the DIP Loan Documents, the Securitization Facility Documents, or, in each case, related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a Final Order to have constituted willful misconduct (including, without limitation, actual fraud) or gross negligence; *provided*, that if any Released Party directly or indirectly brings or asserts any Claim or Cause of Action that has been released or is contemplated to be released pursuant to the Plan in any way arising out of or related to any document or transaction that was in existence prior to the Effective Date against any other Released Party, and such Released Party does not abandon such Claim or Cause of Action upon request, then the release set forth in the Plan shall automatically and retroactively be null and void ab initio with respect to the Released Party bringing or asserting such Claim or Cause of Action; *provided*, *further*, that the immediately preceding proviso shall not apply to (a) any action by a Released Party in the Bankruptcy Court (or any other court determined to have competent jurisdiction), including any appeal therefrom, to prosecute the amount, priority, or secured status of any prepetition or ordinary course Administrative Claim against the Debtors or (b) any release or indemnification provided for in any settlement or granted under any other court order; *provided*, that, in the case of (a) and (b), the Debtors shall retain all defenses related to any such action. Notwithstanding anything contained in the Plan to the contrary, the foregoing release shall not release any obligation of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

Notwithstanding anything contained in the Plan to the contrary, the foregoing release shall not release (i) any financial obligation of any party under the Securitization Facility or the Securitization Facility Documents (including any obligations of any Released Party to

remit collections or any other proceeds of receivables to each applicable Releasing Party solely in accordance with the terms of the Securitization Facility Documents) or (ii) any obligation under the DIP Loan Documents or the Securitization Facility Documents of any Released Party that by their express written terms survive the termination thereof and repayment in full in cash of the indebtedness and other obligations arising thereunder (including, to the extent applicable, any obligation of the DIP Agent or any Securitization Party to return any collateral or any other assets to a Debtor, in each case, without recourse or warranty, in accordance with the express written terms of the DIP Loan Documents or Securitization Facility Documents, as applicable).

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute its finding that each release described in the Plan is (i) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement, and compromise of such Claims, (ii) in the best interests of the Debtors and all Holders of Claims, (iii) fair, equitable, and reasonable, (iv) given and made after due notice and opportunity for hearing, and (v) subject to the occurrence of the Effective Date, a bar to the Debtors or the Liquidating Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

### 6.    *Voluntary Releases by the Releasing Parties*

Except as otherwise specifically provided in the Plan or the Confirmation Order, on and after the Effective Date, for good and valuable consideration, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released the Released Parties from any and all Claims, Interests, obligations, debts, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state laws, or otherwise, including Avoidance Actions, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based on, relating to, or in any manner arising from, in whole or in part:

(i)    the Debtors, the Liquidating Debtors, the Liquidating Trustee, the Chapter 11 Cases, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or Filing of the Plan Documents;

(ii)    any Plan Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan;

(iii)    the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party excluding any assumed executory contract or lease, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases;

(iv)    the negotiation, formulation, preparation, or performance of or under the Plan, the Disclosure Statement, the Plan Supplement, the Liquidating Trust Agreement, the DIP Facility, the Securitization Facility, the DIP Loan Documents, the Securitization Facility Documents, or, in each case, related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a Final Order to have constituted willful misconduct (including, without limitation, actual fraud or gross negligence; *provided*, that if any Released Party directly or indirectly brings or asserts any Claim or Cause of Action that has been released or is contemplated to be released pursuant to the Plan in any way arising out of or related to any document or transaction that was in existence prior to the Effective Date against any other Released Party, and such Released Party does not abandon such Claim or Cause of Action upon request, then the release set forth in the Plan shall automatically and retroactively be null and void ab initio with respect to the Released Party bringing or asserting such Claim or Cause of Action; *provided*, *further*, that the immediately preceding proviso shall not apply to (a) any action by a Released Party in the Bankruptcy Court (or any other court determined to have competent jurisdiction), including any appeal therefrom, to prosecute the amount, priority, or secured status of any prepetition or ordinary course Administrative Claim against the Debtors or (b) any release or indemnification provided for in any settlement or granted under any other court order; *provided*, that, in the case of (a) and (b), the Debtors shall retain all defenses related to any such action. Notwithstanding anything contained in the Plan to the contrary, the foregoing release shall not release any obligation of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

Notwithstanding anything to the contrary in the Plan, any Claim arising under Title I of ERISA for breach of fiduciary duty or relating to a prohibited transaction with respect to the Dean Foods Consolidated Pension Plan shall not be discharged, released, or enjoined; *provided*, *however*, that any such Claim against the Debtors shall be treated solely as a General Unsecured Claim

Notwithstanding any other provisions of the Plan (including, but not limited to, Article IX of the Plan), the Confirmation Order, or the Liquidating Trust Agreement, all claims or liabilities (including, but not limited to, any liability or claim for withdrawal liability under 29 U.S.C. §§ 1383, 1385, and 1392) against any non-Debtor by CSPF shall (i) be left Unimpaired, (ii) not be discharged or released, and (iii) continue unaltered as if the Chapter 11 Cases had not been commenced. Further, notwithstanding any other provisions

of the Plan (including, but not limited to, Article IX of the Plan), the Confirmation Order, or the Liquidating Trust Agreement, CSPF shall not be enjoined from asserting any claims against any non-Debtor, and no claims of CSPF against any non-Debtor shall be exculpated or released to any extent. Also, CSPF's right to accelerate withdrawal liability payments upon an event of default pursuant to 29 U.S.C. § 1399(c)(5) and CSPF's plan document is not Impaired or otherwise affected by any provisions of the Plan, the Confirmation Order, or the Liquidating Trust Agreement. Notwithstanding the preceding two sentences, Article IX.F.3 of the Plan shall not impact the releases set forth in Article IX.F.1 of the Plan with respect to any of the following Entities, but in each case solely in its capacity as such: (a) the Debtors, the Debtors' Estates, the Liquidating Debtors, the Liquidating Debtors' Estates, and all of their respective current and former officers and directors, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, investment managers, investment advisors, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees; (b) the Liquidating Trustee; (c) the Liquidating Trust Advisory Board and its members; (d) the DIP Agent; (e) each DIP Secured Party; (f) each Securitization Party; (g) each Prepetition Secured Party; (h) the Creditors' Committee and its members; (i) the Senior Notes Indenture Trustee; and (j) with respect to each of the foregoing Entities in clauses (a) through (i), such Entities' predecessors, successors, assigns, managed accounts and funds, and all of their respective current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, investment managers, investment advisors, management companies, fund advisors, and other professionals (but, in all cases, only in their capacity as such), and such Entities' respective heirs, executors, estates, and nominees (but, in all cases, only in their capacity as such). For avoidance of doubt, the foregoing sentence shall in no way limit or eliminate CSPF's rights to seek and obtain relief from any non- Debtor entity or unincorporated trade or business on the basis that it is or was a trade or business under common control with one or more Debtors within the meaning of 29 U.S.C. § 1301(b)(1) and the regulations promulgated pursuant thereto.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute its finding that each release described in the Plan is (i) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement, and compromise of such Claims, (ii) in the best interests of the Debtors and all Holders of Claims, (iii) fair, equitable, and reasonable, (iv) given and made after due notice and opportunity for hearing, and (v) subject to the occurrence of the Effective Date, a bar to the Releasing Party asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or its property.

7.    *Injunction*

Except as otherwise specifically provided in the Plan, the Confirmation Order, or any Final Order entered by the Bankruptcy Court in the Chapter 11 Cases, or any Final Order

entered by the Bankruptcy Court, all Persons or Entities who have held, hold, or may hold Claims or Interests that arose prior to the Effective Date, and all other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, representatives, and Affiliates, are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Interest, against the Debtors, the Liquidating Trust, the Liquidating Debtors, or property or interest in property of the Debtors, the Liquidating Trust, or the Liquidating Debtors, other than to enforce any right to a distribution pursuant to the Plan, (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree or order against the Debtors, the Liquidating Trust, the Liquidating Debtors, or property or interest in property of the Debtors, the Liquidating Trust, or the Liquidating Debtors, other than to enforce any right to a distribution pursuant to the Plan, (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against the Debtors, the Liquidating Trust, the Liquidating Debtors, or property or interests in property of the Debtors, the Liquidating Trust, or the Liquidating Debtors other than to enforce any right to a distribution pursuant to the Plan, (iv) asserting any right of setoff or subrogation of any kind against any obligation due from the Debtors, the Liquidating Trust, or the Liquidating Debtors, or against the property or interests in property of the Debtors, the Liquidating Trust, or the Liquidating Debtors, with respect to any such Claim or Interest, except to the extent a right to setoff is asserted with respect to a Proof of Claim timely filed by the applicable Claims Bar Date explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise, and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such claims or interests released or settled pursuant to the Plan.  Such injunction shall extend to any successors or assignees of the Debtors, the Liquidating Trust, and the Liquidating Debtors and their respective properties and interest in properties.

8.    *Setoff and Recoupment*

The Debtors and the Liquidating Debtors may, but shall not be required to, set off or recoup (to the extent applicable and without prejudice to the rights of any Holder of an Allowed Administrative Claim to argue that section 502(d) of the Bankruptcy Code is inapplicable to its Administrative Claim) against any Claim and any Cash distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature that the Debtors may have against the Holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; *provided*, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim shall constitute a waiver, abandonment, or release by the Debtors or the Liquidating Debtors of any such claims, rights, and Causes of Action that the Debtors or the Liquidating Debtors may have against the Holder of such Claim.

9.    *Preservation of Causes of Action*

Except as expressly set forth in the Plan, the Confirmation Order, the DIP Order, or the Securitization Order, nothing contained in the Plan or the Confirmation Order shall be deemed to

be a waiver or relinquishment of any rights or Causes of Action that the Debtors, the Liquidating Debtors, the Estates, the Liquidating Trust, or the Liquidating Trustee may have, or that the Debtors, the Liquidating Debtors, Liquidating Trust, or the Liquidating Trustee may choose to assert on behalf of their respective Estates, as applicable, under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, (i) any and all Causes of Action or claims against any Person or Entity, to the extent such Person or Entity asserts a cross-claim, counterclaim, and/or claim for setoff that seeks affirmative relief against the Debtors, the Liquidating Debtors, their officers, directors, or representatives, or (ii) the turnover of any property of the Estates to the Debtors.

Except as set forth in Plan, the Confirmation Order, the DIP Order, or the Securitization Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtors had immediately prior to the Petition Date or the Effective Date against or regarding any Claim left Unimpaired by the Plan. Except as set forth in Plan, the Confirmation Order, the DIP Order, or the Securitization Order, the Liquidating Debtors, the Liquidating Trust, and the Liquidating Trustee shall have, retain, reserve, and be entitled to commence, assert, and pursue all such rights and Causes of Action as fully as if the Chapter 11 Cases had not been commenced, and all of the Liquidating Debtors' legal and equitable rights respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

Except as set forth in the Plan, the Confirmation Order, the DIP Order, or the Securitization Order, nothing contained in the Plan or the Confirmation Order shall be deemed to release any post-Effective Date obligations of any party under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### 10.    *Compromise and Settlement of Claims and Controversies*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Causes of Action, and controversies relating to the contractual, legal, and subordination rights that a Holder of an Allowed Claim may have against any Debtor, or any distribution to be made on account of such an Allowed Claim. Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the benefits provided under the Plan and as a mechanism to effect a fair distribution of value to the Debtors' constituencies (except as set forth in the Plan), the provisions of the Plan shall also constitute a good faith compromise of all Claims, Causes of Action, and controversies by any Debtor against any other Debtor. In each case, the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, their Estates, and the Holders of such Claims and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice or action, order, or approval of the Bankruptcy Court, the Debtors may compromise and settle Claims and Causes of Action against other Entities and after the Effective Date, such right shall pass to the Liquidating Debtors and the Liquidating Trustee.

I.      **Condition Precedent to Effective Date of Plan**

   *1.      Conditions to Effectiveness*

   The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied on or prior to the Effective Date or waived in accordance with Article X.B of the Plan:

   (i)      the Confirmation Order, in form and substance reasonably acceptable to the Debtors, the Creditors' Committee, the DIP Agent, and the Securitization Agent shall have been entered and shall not be subject to a stay nor have been rescinded, vacated, or reversed on appeal;

   (ii)      the Debtors shall have sufficient Cash-on-hand to satisfy any outstanding DIP Claims and Securitization Facility Claims in accordance with Articles II.A and II.B of the Plan, respectively, of the Plan;

   (iii)      the Debtors shall have satisfied in full their obligations in connection with the Settled Administrative Claims Payout;

   (iv)      the Professional Fee Escrow Account shall have been funded in Cash in full;

   (v)      the Liquidating Trust Agreement shall have been executed by the parties thereto, the Liquidating Trustee shall have been appointed and assumed its rights and responsibilities under the Plan and the Liquidating Trust Agreement, as applicable, and the Liquidating Trust shall have been established in accordance with the terms of the Liquidating Trust Agreement; and

   (vii)      all documents and agreements necessary to implement the Plan, including the Plan Supplement, shall be in form and substance reasonably acceptable to the Debtors and the Creditors' Committee and shall have been executed.

   *2.      Waiver of Conditions to Effectiveness*

   The Debtors, with the consent of the Creditors' Committee (which consent shall not be unreasonably withheld) may waive any of the conditions set forth in Article X.A of the Plan at any time, without any notice to other parties in interest or the Bankruptcy Court and without any formal action other than proceeding to confirm and/or consummate the Plan; *provided, however,* that the Debtors may waive conditions 1 or 2 set forth in Article X.A of the Plan only with the consent of the DIP Agent and the Securitization Agent (which consent shall not be unreasonably withheld). The failure to satisfy any condition before the Confirmation Date or the Effective Date may be asserted by the Debtors as a reason not to seek Confirmation or declare an Effective Date, regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors, in their sole discretion). The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

**J.**     **Modifications, Revocation, or Withdrawal of Plan**

*1.*     *Plan Modifications*

Subject to certain restrictions and requirements set forth in section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, the Debtors may alter, amend, or modify the Plan, including the Plan Supplement, without additional disclosure pursuant to section 1125 of the Bankruptcy Code prior to the Confirmation Date; provided, that any such alteration, amendment, or modification shall be reasonably acceptable to (i) the Creditors' Committee and (ii) the DIP Agent and the Securitization Agent, as applicable, but only if such alteration, amendment, or modification adversely affects, directly or indirectly, any of the DIP Agent, the DIP Secured Parties, the Securitization Parties, or the Prepetition Secured Parties; *provided further, however,* that the Debtors may alter, amend, or modify conditions 1 or 2 set forth in Article X.A of the Plan only with the consent of the DIP Agent and the Securitization Agent (which consent shall not be unreasonably withheld). After the Confirmation Date and before substantial consummation of the Plan, the Debtors may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, including the Plan Supplement or the Confirmation Order, relating to such matters as may be necessary to carry out the purposes and effects of the Plan.

After the Confirmation Date but before the Effective Date, the Debtors, with the consent of the Creditors' Committee (which consent may not be unreasonably withheld), may make appropriate technical adjustments and modifications to the Plan, including the Plan Supplement, without further order or approval of the Bankruptcy Court; *provided,* that such adjustments and modifications do not materially and adversely affect the treatment of Holders or their Claims or Interests.

*2.*     *Revocation or Withdrawal of the Plan and Effects of Nonoccurrence of Confirmation or Effective Date*

The Debtors reserve the right to revoke, withdraw, or delay consideration of the Plan as to any or all of the Debtors prior to the Confirmation Date, either entirely or as to any one or more of the Debtors, and to File subsequent plans. If the Plan is revoked, withdrawn, or delayed as to fewer than all of the Debtors, such revocation, withdrawal, or delay shall not affect the enforceability of the Plan as it relates to the Debtors for which the Plan is not revoked, withdrawn, or delayed. If the Debtors revoke or withdraw the Plan in its entirety or as to any of the Debtors, or if the Confirmation Date or the Effective Date does not occur, then, absent further order of the Bankruptcy Court and as to all or such Debtors, as applicable , (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases affected by the Plan, and any document or agreement executed pursuant hereto, shall be deemed null and void, and (iii) nothing contained in the Plan or Confirmation Order, and no acts taken in preparation for consummation of the Plan, shall (a) constitute or be deemed to constitute a waiver or release of any Claims or Interests, (b) prejudice in any manner the rights of such Debtors or any other Person or Entity (including, but not limited to, the

application of res judicata or collateral estoppel), or (c) constitute an admission of any sort by the Debtors or any other Person or Entity.

If the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction over any request to extend the deadline for assuming or rejecting Executory Contracts or Unexpired Leases.

## K.     Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

(i)      hear and determine all matters relating to the assumption or rejection of Executory Contracts or Unexpired Leases, including whether a contract or lease is or was executory or expired, and the allowance of Claims resulting therefrom;

(ii)      hear and determine any motion, adversary proceeding, application, contested matter, or other matter pending on the Effective Date;

(iii)      hear and determine all matters relating to the allowance, disallowance, liquidation, classification, priority, or estimation of any Claim;

(iv)      ensure that distributions to Holders of Allowed Claims are accomplished as provided in the Plan;

(v)      hear and determine all applications for compensation and reimbursement of Professional Fee Claims;

(vi)      hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(vii)      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any Plan Document, any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(ix)      issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, any Plan Document, or any other order of the Bankruptcy Court;

(x)     issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases, and (b) the Plan, the Confirmation Order, the Plan Documents, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan;

(xi)    enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(xii)   hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of tax under section 505(b) of the Bankruptcy Code);

(xiii)  hear and determine any other matters related to the Plan and not inconsistent with the Bankruptcy Code;

(xiv)   determine any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Confirmation Order, any of the Plan Documents, or any other contract, instrument, release, or other agreement or document related to the Plan, the Disclosure Statement, or the Plan Supplement; provided, that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan Supplement shall be governed in accordance with the provisions of such documents;

(xv)    recover all assets of the Debtors and property of the Debtors' Estates, which shall be for the benefit of the Liquidating Debtors and the Liquidating Trust, wherever located;

(xvi)   hear and determine any rights, claims, or Causes of Action held by or accruing to the Debtors, the Liquidating Debtors, or the Liquidating Trust pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

(xvii)  hear and determine all matters relating to the establishment and administration of the Liquidating Trust and the implementation, interpretation, and enforcement of the Liquidating Trust Agreement;

(xviii) enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Person or Entity;

(xix)   hear any other matter not inconsistent with the Bankruptcy Code; and

(xx)    enter a final decree closing the Chapter 11 Cases.

Unless otherwise specifically provided in the Plan or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have jurisdiction to hear and determine disputes concerning Claims that arose prior to the Effective Date.

## L.     Miscellaneous Provisions

### 1.     Exemption from Transfer Taxes and Recording Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer of property pursuant to or in connection with the Plan shall not be subject to any document recording tax, stamp tax, transfer tax, conveyance fee, intangibles or similar tax, sales tax, use tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment in the United States. The Confirmation Order shall direct the appropriate federal, state, or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 2.     Payment of Statutory Fees

All fees payable pursuant to section 1930(a) of title 28 of the United States Code and/or section 3717 of title 31 of the United States Code, as determined by the Bankruptcy Court, shall be paid for each quarter (including any fraction thereof) by each and every Debtor or Liquidating Debtor, as applicable, until the earlier of the time that a particular case is converted, dismissed, or closed.

### 3.     Dissolution of the Creditors' Committee

On the Effective Date, the Creditors' Committee shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purposes of (a) prosecuting requests for payment of Professional Fee Claims for services and reimbursement of expenses incurred prior to the Effective Date by the Creditors' Committee and its Professionals and (b) appearing in connection with any appeals taken of the Confirmation Order. The Liquidated Debtors, the Liquidating Trust, and the Liquidating Trustee shall no longer be responsible for paying any fees or expenses incurred by the members of, or advisors to, the Creditors' Committee after the Effective Date except for matters related to Professional Fees Claims.

### 4.     Plan Supplement

Draft forms of certain Plan Documents and certain other documents, agreements, instruments, schedules, and exhibits specified in the Plan shall, where expressly so provided for in the Plan, be contained in the Plan Supplement and Filed from time to time, which shall be in form and substance reasonably acceptable to the Debtors and the Creditors' Committee. Unless otherwise expressly provided in the Plan, the Debtors (a) shall File the Plan Supplement no later than five days before the Confirmation Hearing or such later date as may be approved by the

Bankruptcy Court on notice to parties in interest and (b) may alter, modify, or amend any Plan Supplement document in accordance with Article XI of the Plan.

### 5. No Admission

Other than as expressly provided under the Plan or the Confirmation Order, nothing in the Plan or Disclosure Statement or any document or pleading Filed in connection therewith shall constitute or be deemed to constitute an admission that any of the Debtors are subject to or liable for any Claim.

### 6. Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 7. Section 1125 of the Bankruptcy Code

As of, and subject to the occurrence of, the Confirmation Date, the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125(a) and 1125(e) of the Bankruptcy Code and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation.

### 8. Nonseverability

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors (with the consent of the Creditors' Committee, which consent may not unreasonably be withheld), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; *provided*, that any such alteration or interpretation shall be reasonably acceptable to the Debtors and the Creditors' Committee, as well as the DIP Agent and the Securitization Agent, as applicable, but only if such alteration or interpretation adversely affects, directly or indirectly, any of the DIP Agent, the DIP Secured Parties, the Securitization Parties, or the Prepetition Secured Parties. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms, (ii) integral to the Plan and may not be deleted or modified without the consent of the Debtors and the Creditors' Committee (in each case, which consent shall not be unreasonably withheld), as well as the DIP Agent and the Securitization Agent, as applicable, but only if such alteration or interpretation adversely affects, directly or indirectly, any of the DIP Agent, the DIP Secured Parties, the Securitization Parties, or the Prepetition Secured Parties (which consent shall not be unreasonably withheld), and (iii) nonseverable and mutually dependent.

### 9. Binding Effect

Upon the occurrence of the Effective Date, the Plan shall be binding upon and inure to the benefit of the Debtors, the Liquidating Debtors, all present and former Holders of Claims or Interests (whether or not such Holders shall receive or retain any property or interest in property under the Plan), and their respective heirs, executors, administrators, successors, and assigns, including, but not limited to, the Liquidating Debtors, the Liquidating Trustee, and all other parties in interest in the Chapter 11 Cases.

*10.    Service of Documents*

To be effective, any notice, request, or demand to or upon, as applicable, the Debtors, the Liquidating Debtors, the Liquidating Trustee, the Liquidating Trust, or the Creditors' Committee must be in writing and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually received and confirmed by the relevant party as follows:

If to the Debtors:

**Davis Polk & Wardwell LLP**
450 Lexington Avenue
New York, New York 10017
Attention: Brian M. Resnick (brian.resnick@davispolk.com)
Steven Z. Szanzer (steven.szanzer@davispolk.com)
Nate Sokol (nathaniel.sokol@davispolk.com)
Omer Netzer (omer.netzer@davispolk.com)
Tel.: (212) 450-4000
Fax: (212) 701-5800

-and-

**Norton Rose Fulbright US LLP**
1301 McKinney Street, Suite 5100
Houston, Texas 77010-3095
Attention: William R. Greendyke (william.greendyke@nortonrosefulbright.com)
Jason L. Boland (jason.boland@nortonrosefulbright.com)
Robert B. Bruner (bob.bruner@nortonrosefulbright.com)
Julie Goodrich Harrison (julie.harrison@nortonrosefulbright.com)
Tel.: (713) 651-5151
Fax: (713) 651-5246

If to the Liquidating Debtors/Liquidating Trustee/Liquidating Trust:

[                              ]

If to the Creditors' Committee:

**Akin Gump Strauss Hauer & Feld LLP**
Attention: Marty L. Brimmage, Jr. (mbrimmage@akingump.com)
Lacy M. Lawrence (llawrence@akingump.com)
1700 Pacific Avenue, Suite 4100

Dallas, Texas 75201
Tel.: (214) 969-2800
Fax: (214) 969-4343

-and-

Ira S. Dizengoff  (idizengoff@akingump.com)
Philip  C. Dublin  (pdublin@akingump.com)
Meredith  A. Lahaie (mlahaie@akingump.com)
Julie  A. Thompson  (julie.thompson@akingump.com)

One Bryant Park
New York, New York 10036
Tel.: (212) 872-1000
Fax: (212) 872-1002

After the Effective Date, the Liquidating  Debtors are authorized  to limit  the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities  who have Filed  a renewed request to receive documents pursuant to Bankruptcy Rule 2002.

### 11.    *Waiver or Estoppel*

**Each Holder of a Claim or an Interest shall be deemed to have  waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority,  Secured, or not subordinated by virtue of an agreement made with  the Debtors or their counsel or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.**

### 12.    *Conflicts*

Except as set forth in the Plan, to the extent that any provision  of the Disclosure Statement, the Plan Supplement,  or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits,  schedules, appendices, supplements,  or amendments to any of the foregoing), conflicts  with or is in any way inconsistent  with any provision  of the Plan, unless otherwise ordered by the Bankruptcy Court, the nonexhibit  or nondocument  portion  of the Plan shall  govern and control.

## ARTICLE V

## VOTING REQUIREMENTS; ACCEPTANCE AND CONFIRMATION OF THE PLAN

### A.    General

The following  is a brief summary of the Plan confirmation  process.  Holders of Claims are encouraged to review the relevant provisions  of the Bankruptcy Code and/or consult  their own attorneys.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

Section 1129 of the Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtors, including that (1) the Plan has classified Claims in a permissible manner, (2) the Plan complies with applicable provisions of the Bankruptcy Code, (3) the Plan has been proposed in good faith and not by any means forbidden by law, (4) the disclosure required by section 1125 of the Bankruptcy Code has been made, (5) the Plan has been accepted by the requisite votes of Holders of Claims (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code), (6) the Plan is feasible and confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors unless such liquidation or reorganization is proposed in the Plan, (7) the Plan is in the "best interests" of all Holders of Claims in an impaired Class by providing to such holders on account of their Claims property of a value, as of the Effective Date, that is not less than the amount that such holders would receive or retain in a chapter 7 liquidation, unless each holder of a Claim in such Class has accepted the Plan, and (8) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date. The Debtors believe that the Plan satisfies section 1129 of the Bankruptcy Code.

**B.      Parties in Interest Entitled To Vote**

Pursuant to the Bankruptcy Code, only Classes of Claims that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan. A Class is impaired if the legal, equitable, or contractual rights to which the Claims of that Class entitled the Holders of such Claims are modified, other than by curing defaults and reinstating the Claims. Classes that are not impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan. In addition, Classes that receive no distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan.

**C.      Classes Impaired and Entitled To Vote Under the Plan**

The following Classes are Impaired under the Plan and entitled to vote on the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 3 | Senior Notes Claims | Impaired | Entitled to Vote |
| 4 | Control Group Liability Pension Claims | Impaired | Entitled to Vote |
| 5 | Convenience Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |

In general, if a claim or interest is Unimpaired under a plan, section 1126(f) of the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan, and thus, the holders of claims or interests in such Unimpaired classes are not entitled to vote on the plan. Because Classes 1 and 2 are Unimpaired under the Plan, the Holders of Claims in these Classes are not entitled to vote.

In general, if the holder of an Impaired claim or Impaired interest will not receive any distribution under a plan in respect of such claim or interest, section 1126(g) of the Bankruptcy Code deems the holder of such claim or interest to have rejected the plan, and thus, the holders of claims or interests in such classes are not entitled to vote on the plan. The Holders of Claims and Interests in Classes 8 and 9 are conclusively presumed to have rejected the Plan and are, therefore, not entitled to vote.

Moreover, under the Plan, Classes 7 and 10 are either (1) Unimpaired, and the Holders of Claims or Interests in such Classes are conclusively presumed to have accepted the Plan, or (2) Impaired, and the Holders of Claims or Interests in such Classes shall receive no distributions under the Plan on account of their Claims or Interests, and therefore are deemed to have rejected the Plan. In either (1) or (2), as applicable, such Holders are not entitled to vote to accept or reject the Plan and the votes of such Holders shall not be solicited.

**D.      Voting Procedures and Requirements**

The Bankruptcy Court can confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code. One of these technical requirements is that the Bankruptcy Court find, among other things, that the Plan has been accepted by the requisite votes of all Classes of impaired Claims and Interests unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more such Classes.

If you have any questions about (1) the procedures for voting your Claim or with respect to the packet of materials that you have received or (2) the amount of your Claim, please contact the Debtors' Claims and Solicitation Agent at (833) 935-1362 (toll-free) or (503) 597-7660 (if calling from outside the U.S. or Canada). If you wish to obtain (at no charge) an additional copy of the Plan, this Disclosure Statement, or other solicitation documents, you can obtain them from the Debtors' Case Information Website located at *https://dm.epiq11.com/case/southernfoods* or by requesting a copy from the Debtors' Claims and Solicitation Agent, which can be reached at (833) 935-1362 (toll-free) or (503) 597-7660 (if calling from outside the U.S. or Canada) or by email at deaninfo@epiqglobal.com.

*1.      Ballots*

The record date for purposes of determining which Holders of Claims are entitled to receive solicitation packages and, where applicable, vote on the Plan shall be January 22, 2021 (the "**Voting Record Date**"). Accordingly, only Holders of record as of the Voting Record Date that are otherwise entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

In voting for or against the Plan, please use (a) only the Ballot sent to you with this Disclosure Statement or (b) the online electronic ballot portal. If you are a Holder of a Claim in Classes 3, 4, 5, or 6 and did not receive a Ballot, if your Ballot is damaged or lost, or if you have any questions concerning voting procedures, please contact the Claims and Solicitation Agent at (833) 935-1362 (toll-free) or (503) 597-7660 (if calling from outside the U.S. or Canada) or by email at tabulation@epiqglobal.com and reference "Southern Foods" in the subject line.

Item 3 on the Ballot titled "Important Information Regarding Releases, Exculpations, and Injunctions" contains an election. Checking the "opt out" box in Item 3 shall constitute an election to not grant the third-party releases or consent to the exculpation and injunction provisions contained in Article IX of the Plan. If you (a) vote to accept or reject the Plan but do not check the opt out box or (b) abstain from voting on the Plan and do not check the opt out box, you will be deemed to have granted the third-party releases and consented to the exculpation and injunction provisions contained in Article IX of the Plan.

If you are a Holder of Claim in Class 6 General Unsecured Claim, you will receive a Class 6 Ballot. Item 4 on the Class 6 Ballot titled "Convenience Claim Election" contains an election. Checking the "opt in" box in Item 4 shall constitute an election to reduce the amount of your General Unsecured Claim to the Convenience Claim Amount and be treated as a Holder of Class 5 Convenience Claim under the Plan. In making this election, you acknowledge that treatment as a Holder of Class 5 Convenience Claim is in lieu of any treatment you may have received as a Holder of Class 6 General Unsecured Claim.

## 2.   Submitting Ballots

If you are entitled to vote to accept or reject the Plan, you should read carefully, complete, and submit your Ballot in accordance with the instructions set forth in your Ballot and the Solicitation Order.

Holders of Senior Notes Claims who hold their position through a broker, bank, or other nominee or an agent of a broker, bank, or other nominee should carefully review the voting instructions contained on their Beneficial Holder Ballot (as defined in the Solicitation Motion) and provided by their Nominee.

Except as otherwise ordered by the Bankruptcy Court, any Ballots received after the Voting Deadline will not be counted absent the consent of the Debtors (in their sole discretion). No Ballot should be sent to the Debtors, their agents (other than the Claims and Solicitation Agent), any administrative agent (unless specifically instructed to do so), or the Debtors' financial or legal advisors, and if so sent the Ballot will not be counted. If no Holders of Claims in a particular Class that is entitled to vote on the Plan vote to accept or reject the Plan, then such Class shall be deemed to accept the Plan.

## 3.   Voting

If the Debtors have served an objection or request for estimation as to a Claim at least ten calendar days before the Voting Deadline, such Claim is temporarily disallowed for voting purposes only and not for purposes of allowance or distribution, except to the extent and manner as set forth in such objection.

## 4.   Notice of Non-Voting Status

Holders of Claims or Interests not entitled to vote to accept or reject the Plan will receive a Notice of Non-Voting Status which will provide such Holder with information regarding (a) how to obtain copies of this Disclosure Statement, the Plan, and other documents, (b) the Confirmation Hearing, (c) the deadline to object to the confirmation of the Plan (the "**Plan Objection Deadline**"),

-99-

and (d) the releases, exculpations, and injunctions provided for in Article IX of the Plan. The Notice of Non-Voting Status will also include a Non-Voting Opt Out Form that allows Holders of Claims who are deemed to accept or reject the Plan to opt out of the third-party release, exculpation, and injunction provisions contained in Article IX of the Plan by checking the appropriate box on such Holder's timely submitted Non-Voting Opt Out Form to indicate that such Holder elects to opt out of the Plan's release, exculpation, and injunction provisions.

The Debtors shall mail or cause to be mailed by first-class mail to Holders of Claims and Interests in Classes 1, 2, 8, and 9 a copy of the Notice of Non-Voting Status. In addition, all parties in interest may obtain copies of the Disclosure Statement and the Plan free of charge upon request to the Claims and Solicitation Agent via email at deaninfo@epiqglobal.com or via telephone at (833) 935-1362 (toll-free) or (503) 597-7660 (if calling from outside the U.S. or Canada).

If you are a Holder of a Claim in Class 1, 2, or 8 and elect to opt out of the third-party release, exculpation, and injunction provisions contained in Article IX of the Plan, please complete and submit the Non-Voting Opt Out Form by the Voting Deadline. If you are a Holder of a Claim in Class 1, 2, or 8 and did not receive a Notice of Non-Voting Status and/or Non-Voting Opt Out Form, if your Notice of Non-Voting Status and/or Non-Voting Opt Out Form is damaged or lost, or if you have any questions concerning the election procedures, please contact the Claims and Solicitation Agent at (833) 935-1362 (toll-free) or (503) 597-7660 (if calling from outside the U.S. or Canada) or by email at tabulation@epiqglobal.com and reference "Southern Foods" in the subject line.

### 5.    *Releases, Exculpations, and Injunctions Provisions Under the Plan*

The Plan contains certain releases, exculpations, and injunctions (as described more fully in Article IX of the Plan), including releases between the Debtors, on the one hand, and certain Releasing Parties on the other hand. The Releasing Parties under the Plan include the following: (a) the Debtors and the Debtors' Estates; (b) the Liquidating Debtors; (c) the Liquidating Trustee; (d) the Liquidating Trust Advisory Board and its members; (e) the DIP Agent; (f) each DIP Secured Party; (g) each Securitization Party; (h) each Prepetition Secured Party; (i) the Creditors' Committee and its members; (j) the Senior Notes Indenture Trustee; (k) each Holder of a Claim entitled to vote to accept or reject the Plan that does not affirmatively elect to "opt out" of being a Releasing Party by checking the appropriate box on such Holder's timely submitted Ballot to indicate that such Holder elects to opt out of the Plan's release, exculpation, and injunction provisions; (l) each Holder of a Claim that is Unimpaired and presumed to accept the Plan that does not affirmatively elect to "opt out" of being a Releasing Party by checking the appropriate box on such Holder's timely submitted Non-Voting Opt Out Form to indicate that such Holder elects to opt out of the Plan's release, exculpation, and injunction provisions; (m) each Holder of a Claim that is deemed to reject the Plan that does not affirmatively elect to "opt out" of being a Releasing Party by checking the appropriate box on such Holder's timely submitted Non-Voting Opt Out Form to indicate that such Holder elects to opt out of the Plan's release, exculpation, and injunction provisions; (n) each Securitization Entity; and (o) with respect to each of the foregoing Persons in clauses (a) through (n), such Persons' predecessors, successors, assigns, subsidiaries, Affiliates, managed accounts and funds, and all of their respective current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants,

representatives, investment managers, investment advisors, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees. The release, exculpation, and injunction provisions in Article IX of the Plan are integral to the Plan and the consensual and orderly wind-down and liquidation of the Estates.

Item 3 on the Ballot titled "Important Information Regarding Releases, Exculpations, and Injunctions" contains an election. Checking the "opt out" box in Item 3 shall constitute an election to not grant the third-party releases or consent to the exculpation and injunction provisions contained in Article IX of the Plan. If you (a) vote to accept or reject the Plan but do not check the opt out box or (b) abstain from voting on the Plan and do not check the opt out box, you will be deemed to have granted the third-party releases and consented to the exculpation and injunction provisions contained in Article IX of the Plan.

If you are a Holder of a Claim deemed to accept or reject the Plan, and therefore, not entitled to vote to accept or reject the Plan, you will receive a Notice of Non-Voting Status and may elect to opt out of being a Releasing Party by timely completing and submitting a Non-Voting Opt Out Form. If you do not timely submit the Non-Voting Opt Out Form, you will be deemed to have granted such third-party releases and consented to the exculpation and injunction provisions contained in Article IX of the Plan. However, Holders of Interests in Class 9 shall not be a Releasing Party under the Plan and, therefore, such Holders shall not be deemed to have granted the releases or consented to the exculpation and injunction provisions set forth in Article IX of the Plan.

## E.     Acceptance of Plan

As a condition to confirmation of a plan, the Bankruptcy Code requires that each class of Impaired claims votes to accept the plan, except under certain circumstances. See "Confirmation Without Necessary Acceptances; Cramdown" below. A class of claims or interests that is unimpaired under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is impaired unless the plan (1) leaves unaltered the legal, equitable, and contractual rights to which the claim or interest entitles the holder of such claim or interest or (2) cures any default, reinstates the original terms of the obligation, and does not otherwise alter the legal, equitable, or contractual rights to which the claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by an impaired class as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class; only those holders that are eligible to vote and that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met. Thus, a class of claims will have voted to accept a plan only if two-thirds in amount and a majority in number that actually vote cast their ballots in favor of acceptance. Under section 1126(d) of the Bankruptcy Code, a class of interests has accepted a plan if holders of such interests holding at least two-thirds in amount that actually vote have voted to accept the plan.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or interest in an impaired class or that the plan otherwise be found by a court to be in the best interests of each holder of a claim or interest in such

class.  See "Best Interests Test" below.  Moreover, each impaired class must accept the plan for the plan to be confirmed without application of the "fair and equitable" and "unfair discrimination" tests set forth in section 1129(b) of the Bankruptcy Code discussed below.  See "Confirmation Without Necessary Acceptances; Cramdown" below.

## F.    Confirmation Without Necessary Acceptances; Cramdown

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan.  A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code.  Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (1) "does not discriminate unfairly" and (2) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests.  Here, because Holders of Claims or Interests in Classes 7, 8, and 9 (and possibly 10) are deemed to reject the Plan, the Debtors will seek confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code.  The Debtors believe that such requirements are satisfied, as no Holder of a Claim or Interest junior to those Classes will receive any property under the Plan.

A plan "does not discriminate unfairly" if (1) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (2) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests.  The Debtors believe that, under the Plan, all Impaired Classes of Claims and Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Interests that are similarly situated, if any, and no class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class.  Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any impaired Class of Claims or Interests.

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable."  In order to determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors, and equity holders, as follows:

(1)    Secured Creditors.  Either (a) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (b) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (c) subject to section 363(k) of the Bankruptcy Code, the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (a) or (b) above.

(2)    Unsecured Creditors.  Either (a) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its

allowed claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(3)     Equity Interests. Either (a) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (b) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Debtors believe that the distributions provided under the Plan satisfy the "fair and equitable" standard, where required.

## G.     Classification

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims (excluding Administrative Claims) against, and equity interests in, a debtor into separate classes based upon their legal nature. Pursuant to section 1122 of the Bankruptcy Code, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Debtors believe that the Plan classifies all Claims and Interests in compliance with the provisions of the Bankruptcy Code because valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan. Accordingly, the classification of Claims and Interests in the Plan complies with section 1122 of the Bankruptcy Code.

## ARTICLE VI

## FEASIBILITY AND BEST INTERESTS OF CREDITORS

## A.     Best Interests Test

As noted above, even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code (the "**Best Interests Test**").

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor were liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to chapter 7 cases under the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs,

expenses, and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

**B.     Liquidation Analysis**

Amounts that Holders of Claims or Interests in Impaired Classes would receive in a hypothetical chapter 7 liquidation are discussed in the liquidation analysis of the Debtors prepared by the Debtors' management with the assistance of its advisors (the "**Liquidation Analysis**"), which is attached hereto as <u>Appendix B</u>.

As described in <u>Appendix B</u>, the Debtors developed the Liquidation Analysis based on forecasted values as of February 28, 2021, unless otherwise noted in the Liquidation Analysis. The recoveries may change based on further refinements of Allowed Claims and as the Debtors' claims objection and reconciliation process progresses.

As described in the Liquidation Analysis, underlying the analysis is a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management and advisors, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management or a chapter 7 trustee. The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change. Accordingly, the values reflected in the Liquidation Analysis might not be realized if the Debtors were, in fact, to undergo a liquidation.

This Liquidation Analysis is solely for the purposes of (1) providing "adequate information" under section 1125 of the Bankruptcy Code to enable the Holders of Claims entitled to vote under the Plan to make an informed judgment about the Plan and (2) providing the Bankruptcy Court with appropriate support for the satisfaction of the "Best Interests Test," pursuant to section 1129(a)(7) of the Bankruptcy Code, and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtors or any of their Affiliates.

Events and circumstances occurring subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed, or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. The Debtors and Liquidating Debtors do not intend to and do not undertake any obligation to update or otherwise revise the Liquidation Analysis to reflect events or circumstances existing or arising after the date the Liquidation Analysis is initially filed or to reflect the occurrence of unanticipated events. Therefore, the Liquidation Analysis may not be relied upon as a guarantee or other assurance of the actual results that will occur.

In deciding whether to vote to accept or reject the Plan, Holders of Claims must make their own determinations as to the reasonableness of any assumptions underlying the Liquidation Analysis and the reliability of the Liquidation Analysis.

## C.        Application of the Best Interests Test

Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan. However, the Debtors believe that in a chapter 7 liquidation, there would be additional costs and expenses that the Estates would incur as a result of liquidating the Estates in a chapter 7 case. Substantially all of the Debtors' businesses have been liquidated through the various Sale Transactions discussed above, and the Plan effects a wind-down and liquidation of the remaining assets of the Estates. Liquidating the Estates under the Plan would provide Holders of Claims with larger, more timely recovery due to the potential for delay and additional costs that would result from converting to a chapter 7 case at this stage of the Chapter 11 Cases.

As set forth in the Liquidation Analysis, costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee. The Debtors believe such costs would exceed the amount of expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtors. Conversion also would likely delay the liquidation process and ultimately distribution to creditors. The Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for professionals) that are allowed in the chapter 7 cases.

Accordingly, the Debtors believe that, based on the Liquidation Analysis, the Plan meets the Best Interests Test. As the Plan and Appendix B indicate, Confirmation of the Plan will provide each Holder of an Allowed Claim with an equal or greater recovery than the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code.

## D.        Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successors to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan. Inasmuch as the Debtors are being liquidated and the Plan provides for the distribution of all of the proceeds of that liquidation to Holders of Claims that are Allowed as of the Effective Date, the Debtors maintain that the Plan is effectively exempted from the feasibility requirements in accordance with the express terms of section 1129(a)(11) of the Bankruptcy Code.

## ARTICLE VII

## EFFECT OF CONFIRMATION

## A.        Binding Effect of Confirmation

Confirmation will bind the Debtors and all Holders of Claims and Interests to the provisions of the Plan, whether or not the Claim or Interest of any such Holder is Impaired under the Plan and whether or not any such Holder of a Claim or Interest has accepted the Plan. Confirmation will have the effect of converting all Claims into rights to receive the treatment specified in the Plan and cancelling all Interests in the Debtors.

**B.      Good Faith**

Confirmation of the Plan will constitute a finding that (1) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code and (2) all solicitations of acceptances or rejections of the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

## ARTICLE VIII

### CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

**A.      Certain Bankruptcy Considerations**

**1.      *The Plan May Not Be Accepted***

The Debtors can make no assurances that the requisite acceptances to the Plan will be received, and the Debtors may need to obtain acceptances to an alternative plan of liquidation for the Debtors, or otherwise, that may not have the support of the Holders, and/or may be required to liquidate the Estates under chapter 7 or chapter 11 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative plan would be similar to or as favorable to Holders as those proposed in the Plan.

**2.      *The Plan May Not Be Confirmed***

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan.  Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met.  Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes.  If the Plan is not confirmed, it is unclear what distributions Holders of Claims ultimately would receive with respect to their Claims in a subsequent plan of liquidation.

**3.      *Parties in Interest May Object to the Plan's Classification of Claims and Interests***

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Interests in, the Debtors.  The Bankruptcy Code also provides that the Plan may place a Claim or

Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek (a) to modify the Plan to provide for whatever classification might be required for confirmation and (b) to use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim agrees to a less favorable treatment of its Claim. The Debtors believe that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

### 4. The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 5. Nonconsensual Confirmation

In the event that any Impaired Class of Claims or Interests does not vote to accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan if at least one Impaired Class has accepted the Plan, and, as to each Impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Impaired Class(es). The Debtor believes that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the

Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation may result in, among other things, increased expenses relating to professional compensation.

### 6. Failure To Consummate the Plan

The Plan provides for certain conditions that must be satisfied (or waived) prior to Confirmation and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of the Plan, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Effective Date will occur.

### 7. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or a Debtor, the Bankruptcy Court may convert such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of the additional administrative expenses involved in the appointment of a chapter 7 trustee and professionals employed by the chapter 7 trustee.

### 8. Plan Releases May Not Be Approved

There can be no assurance that the third-party release, exculpation, and injunction provisions, as provided in Article IX of the Plan, will be granted. Failure of the Bankruptcy Court to grant such relief may result in a plan of liquidation that differs from the Plan or the Plan not being confirmed.

### 9. Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims under the Plan

There can be no assurance that the estimated Claim amounts set forth in this Disclosure Statement are correct, and the actual Allowed amounts of Claims may differ from these estimates. These estimated amounts are based on certain assumptions with respect to a variety of factors. Should these underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated herein. Because certain distributions under the Plan are linked to the amount and value of Allowed Claims, any material increase in the amount of Allowed Claims over the amounts estimated by the Debtors would materially reduce the recovery to certain Holders of Allowed Claims under the Plan.

### 10. Certain Tax Implications of the Plan

There are a number of material income tax considerations, risks, and uncertainties associated with the Plan. Holders of Claims and other interested parties should read carefully the discussion of certain U.S. federal income tax consequences of the Plan set forth in Article IX herein.

### 11. *Costs of Administering the Estates*

Liquidation of the Estates' remaining assets and the disbursement of the proceeds of such liquidation will require certain administrative costs that may vary based on a variety of factors. Such administrative costs cannot be predicted with certainty and may affect recoveries under the Plan.

### B. The Debtors May Be Unable To Liquidate the Remaining Assets in a Timely Fashion or at a Good Price

The World Health Organization has declared the outbreak of COVID-19, or coronavirus, which began in December 2019, a pandemic and the U.S. federal government has declared it a national emergency. The global spread of COVID-19 has already created significant volatility, uncertainty and economic disruption. While the full impact of this outbreak is not yet known, the Debtors are closely monitoring the spread of COVID-19 and continually assessing its potential effects on the Chapter 11 Cases, including the liquidation of the remaining assets of the Estates.

The extent to which the liquidation of the remaining assets of the Estate are affected by COVID-19 will largely depend on future developments which cannot be accurately predicted, including, but not limited to, the duration and scope of the pandemic, governmental and business responses to the pandemic and the impact on the global economy and the ability of the Debtors to successfully wind-down certain facilities and provide on-site tours to prospective purchasers of the remaining assets, particularly as a result of the Debtors' employees working remotely and/or the closure of certain offices and facilities. While these factors are uncertain, the COVID-19 pandemic or the perception of its effects could have a material adverse effect on the liquidation of the remaining assets of the Estates.

Due to disruptions caused by COVID-19 and other factors that are beyond the Debtors' control, the Debtors can make no assurances that the remaining assets of the Estates will be liquidated in a timely fashion or that the assets will be sold at the optimal price. As a result, Holders of Claims might not receive its expected recoveries under the Plan.

### ARTICLE IX

### CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A. General

The following discussion summarizes certain material U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain Holders of Allowed Claims. This summary does not address the federal income tax consequences to (1) Holders of Claims who are deemed to have rejected the Plan in accordance with the provisions of section 1126(g) of the Bankruptcy Code (*e.g.*, Holders of Existing Interests), (2) Holders whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan (*e.g.*, Other Secured Claims, Priority Tax Claims, and Other Priority Claims), (3) Holders of Control Group Liability Pension Claims (including Administrative Claims, if any, held by such Holders), or (4) purchasers of Claims following the Effective Date. Thus, this summary addresses certain federal income tax

consequences to certain Holders of Allowed Senior Notes Claims, Convenience Claims, and General Unsecured Claims (collectively, the "**Relevant Claims**").

This summary is based on the Internal Revenue Code ("**IRC**"), existing and proposed Treasury Regulations, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service ("**IRS**") as in effect on the date of this Disclosure Statement, all of which are subject to change, possibly on a retroactive basis. Any such change could significantly affect the U.S. federal income tax consequences described below. The tax consequences described herein are uncertain. The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the Plan.

This discussion does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (*e.g.*, foreign taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, banks, and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement, and other tax-deferred accounts, Holders that are, or hold Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on unearned income, persons who use the accrual method of accounting and report income on an "applicable financial statement," and persons holding Claims that are part of a straddle, hedging, constructive sale, or conversion transaction). In addition, this discussion does not address U.S. federal taxes other than income taxes, nor does it address the Foreign Account Tax Compliance Act. Creditors who are non-U.S. Holders should consult their own tax advisors with respect to the tax consequences of the Plan applicable to them.

This discussion assumes that the Holder has not taken a bad debt deduction with respect to a Claim (or any portion thereof) in the current or any prior year and such Claim did not become completely or partially worthless in a prior taxable year. Additionally, this discussion assumes that (1) the various debt and other arrangements to which any of the Debtors is a party will be respected for U.S. federal income tax purposes in accordance with their form and (2) except where otherwise indicated, the Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the IRC.

The following discussion generally assumes that the Plan will be treated as a plan of liquidation of the Debtors for U.S. federal income tax purposes, and that all distributions to Holders of Claims will be taxed accordingly.

**ACCORDINGLY, THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR FOR ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.**

## B.     Consequences to the Debtors

As discussed in more detail below, the Debtors expect that the affiliated group of corporations that files a consolidated U.S. federal income tax return with Dean Foods as the common parent (the "**Dean Foods Tax Group**") will have sufficient remaining consolidated net operating losses and other tax attributes to offset any material U.S. federal income tax liability arising from the Sale Transactions, the disposition of other assets of the Debtors prior to the Effective Date, the transfer of any remaining assets of the Debtors to the Liquidating Trust, and the liquidation or dissolution of the Debtors ("**Requisite NOLs**"). This result could change if asset values on the Effective Date were to differ materially from current estimates.

The Dean Foods Tax Group's ability to utilize Requisite NOLs could be subject to limitation if the Dean Foods Tax Group underwent or were to undergo an ownership change within the meaning of section 382 of the IRC. To prevent an ownership change, the Debtors filed the NOL Motion and obtained interim and final orders imposing certain restrictions with respect to trading Stock (as discussed above in Article III.A.13). The Debtors believe that the Requisite NOLs have not been subject to limitation by reason of an ownership change for section 382 purposes and do not expect that such an ownership change will occur prior to the Effective Date.

The amount of any NOLs and other tax attributes, as well as the application of any limitations, remain subject to review and adjustment by the IRS.

### 1.     Transfer of Assets to Liquidating Trust and Dissolution of the Debtors

Pursuant to the Plan, on the Effective Date, in furtherance of the liquidation of the Debtors, the Liquidating Trust will be established for the benefit of the Liquidating Trust Beneficiaries, and the Debtors and their Estates will transfer to the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries all title and interest in all of the Liquidating Trust Assets. The Plan further provides that, on or before the Effective Date, (i) each Subsidiary Debtor, other than Dean Holding Company, will be merged with and into its immediate parent, and (ii) such parent Subsidiary Debtor will then be merged with its immediate parent, as applicable, and that Dean Holding Company will not be merged or dissolved prior to the date on which Liquidating DFC is dissolved.

The Debtors' transfer of assets to the Liquidating Trust generally will be treated for tax purposes as equivalent to a sale of the assets at fair market value. *See* Section D. Tax Treatment of Liquidating Trust and Holders of Liquidating Trust Interests. This treatment will result in the recognition of gain or loss by the Debtors, depending in part on the value of such assets on the date of such transfer to the Liquidating Trust relative to the Debtors' adjusted tax basis in such assets. Based on current estimates, the Debtors expect to have sufficient available net operating losses and/or other tax attributes to avoid any material U.S. federal income tax liability upon the transfer of assets to the Liquidating Trust. Based on current estimates, the Debtors further expect that the merger or dissolution of the Subsidiary Debtors, Dean Holding Company, and Liquidating DFC will not give rise to any material U.S. federal income tax liability. These results could change if asset values on the Effective Date were to differ materially from current estimates.

## 2. *Cancellation of Debt Income*

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("**CODI**") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of CODI, in general, is the excess of (i) the adjusted issue price of the indebtedness satisfied, over (ii) the fair market value of any consideration given in satisfaction of such indebtedness at the time of the exchange. Under section 108 of the IRC, a taxpayer is not required to include CODI in gross income (i) if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case or (ii) to the extent that the taxpayer is insolvent immediately before the discharge. Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of CODI that it excluded from gross income. In general, tax attributes will be reduced in the following order: (i) net operating losses ("**NOLs**"); (ii) most tax credits; (iii) capital loss carryovers; (iv) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (v) passive activity loss and credit carryovers; and (vi) foreign tax credits. Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC. In general, any reduction in tax attributes under the CODI rules does not occur until the end of the tax year after such attributes have been applied to determine the tax for the year or, in the case of asset basis reduction, the first day of the taxable year following the tax year in which the CODI occurs.

The Debtors expect that (i) all of their assets will be transferred to the Liquidating Trust in 2021, prior to the end of the 2021 taxable year, and (ii) they will have sufficient available net operating losses and/or other tax attributes to avoid any material U.S. federal income tax liability upon the transfer of assets to the Liquidating Trust. As noted above, this result could change if asset values on the Effective Date were to differ materially from current estimates. Substantially all of any remaining NOLs and other tax attributes are expected to be reduced to zero as a result of the CODI rules.

## C. Consequences to Holders of Certain Claims

Pursuant to the Plan, each Holder of a Convenience Claim will be entitled to a distribution of Cash on the Effective Date. Each Holder of other Classes of Allowed Relevant Claims will receive, in full and final satisfaction of its applicable claim, an interest in the Liquidating Trust representing such Holder's right to receive its Pro Rata share of certain Liquidating Trust Assets. As discussed below, each Holder of a Relevant Claim that receives a beneficial interest in the Liquidating Trust will be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, an undivided interest in the Liquidating Trust Assets consistent with its economic rights in the trust. *See* Section D. Tax Treatment of the Liquidating Trust and Holders of Liquidating Trust Interests.

### 1. *Realization and Recognition of Gain or Loss*

In general, a Holder of a Relevant Claim will recognize gain or loss on the Effective Date with respect to its Relevant Claim in an amount equal to the difference between (i) the sum of the amount of any Cash distributed on the Effective Date and/or the fair market value of its undivided interest in the Liquidating Trust Assets consistent with its economic rights in the trust received in

respect of its Claim (other than any consideration attributable to a Relevant Claim for accrued but unpaid interest or original issue discount ("**OID**")) and (ii) the adjusted tax basis of the Relevant Claim exchanged therefor. Pursuant to the Plan, the Liquidating Trustee will in good faith value the assets transferred to the Liquidating Trust, and all parties to the Liquidating Trust (including Holders of Relevant Claims receiving interests in the Liquidating Trust) must consistently use such valuation for all U.S. federal income tax purposes. As discussed below, the amount of Cash or other property received in respect of a Relevant Claim for accrued but unpaid interest will be taxed as ordinary income, except to the extent previously included in income by a Holder under its method of accounting. *See* Section C.2. Distributions in Respect of Accrued Interest or OID.

In the event of the subsequent disallowance of any Disputed Claim or the reallocation of undeliverable distributions, it is possible that a Holder of a previously Allowed Claim may receive additional distributions in respect of its Claim. Accordingly, it is possible that the recognition of any loss realized by a Holder with respect to a Relevant Claim may be deferred until all Relevant Claims are Allowed or Disallowed. Alternatively, it is possible that a Holder will have additional gain in respect of any additional distributions received. *See also* Section D.3. Tax Treatment of the Liquidating Trust and Holders of Liquidating Trust Interests – Tax Reporting for Assets Allocable to Disputed Claims.

Any gain or loss recognized with respect to a Relevant Claim may be long-term capital gain or loss if the Relevant Claim disposed of is a capital asset in the hands of the Holder and has been held for more than one year. Each Holder of a Relevant Claim should consult its tax advisor to determine whether gain or loss recognized by such Holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder. The character of any gain or loss depends on, among other things, the origin of the Holder's Relevant Claim, when the Holder receives payment in respect of such Relevant Claim, whether the Holder reports income using the accrual or cash method of tax accounting, whether the Holder acquired its Relevant Claim at a discount, whether the Holder has taken a bad debt deduction with respect to such Relevant Claim, and/or whether (as intended and herein assumed) the Plan implements the liquidation of the Debtors for U.S. federal income tax purposes.

A Holder's aggregate tax basis in its undivided interest in the Liquidating Trust Assets will equal the fair market value of such interest, increased by its share of the Debtors' liabilities to which such assets remain subject upon transfer to the Liquidating Trust (if any), and a Holder's holding period generally will begin the day following establishment of the Liquidating Trust.

The market discount provisions of the IRC may apply to Holders of certain Relevant Claims. A Holder that purchases its Relevant Claim from a prior Holder will be considered to have purchased such Relevant Claim with "market discount" if the Holder's basis in its Relevant Claim is less than (i) the stated redemption price at maturity of such Relevant Claim or (ii) in the case of a Relevant Claim issued with OID, its "revised issue price," by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity). Assuming that such Holder has not made an election to accrue the market discount into income on a current basis, any gain recognized pursuant to the Plan may be characterized as ordinary income.

## 2.    *Distributions in Respect of Accrued Interest or OID*

In general, to the extent any amount received (whether stock, Cash, or other property) by a holder of a debt instrument is received in satisfaction of accrued interest or OID accrued during its holding period, such amount will be taxable to the holder as ordinary interest income (if not previously included in the holder's gross income under the holder's normal method of accounting). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest or OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled, in the case of a tax-free exchange, that a holder could not claim an ordinary deduction with respect to any accrued OID. It is unclear whether the same result would be obtained in the case of a taxable transaction.

Pursuant to Article VI.D of the Plan, distributions with respect to a Claim will be allocated first to the principal portion of such Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Claim, if any. However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes. You are urged to consult your own tax advisor regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest (including OID) and the character of any loss claimed with respect to accrued but unpaid interest (including OID) previously included in gross income for U.S. federal income tax purposes.

## D.    **Tax Treatment of Liquidating Trust and Holders of Liquidating Trust Interests**

### 1.    *Classification of the Liquidating Trust*

The Liquidating Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes (other than in respect of any portion of the Liquidating Trust Assets allocable to, or retained on account of, Disputed Claims, as discussed below). In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (*i.e.*, a pass through entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Liquidating Trust will be structured with the intention of generally complying with such general criteria.

Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Liquidating Trustee, and Holders of interests in the Liquidating Trust) shall treat the transfer of Liquidating Trust Assets to the Liquidating Trust as (i) a transfer of the Liquidating Trust Assets (subject to any obligations relating to those assets) directly to Holders of interests in the Liquidating Trust (other than to the extent Liquidating Trust Assets are allocable to Disputed Claims), followed by (ii) the transfer by such beneficiaries to the Liquidating Trust of Liquidating Trust Assets in exchange for interests in the Liquidating Trust. Accordingly, Holders of interests in the Liquidating Trust should be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of Liquidating Trust Assets (other than such Liquidating Trust Assets as are allocable to Disputed Claims).

While the following discussion assumes that the Liquidating Trust would be so treated for U.S. federal income tax purposes, no ruling will be requested from the IRS concerning the tax

status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust as a grantor trust. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Liquidating Trust and the Holders of Claims could vary from those discussed herein.

### 2.      General Tax Reporting by the Liquidating Trust and Holders of Interests in the Liquidating Trust

For all U.S. federal income tax purposes, all parties must treat the Liquidating Trust as a grantor trust of which the Holders of interests in the Liquidating Trust are the owners and grantors, and treat the Holders of interests in the Liquidating Trust as the direct owners of an undivided interest in the Liquidating Trust Assets (other than any assets allocable to Disputed Claims), consistent with their economic interests therein. The Liquidating Trustee will file tax returns for the Liquidating Trust treating the Liquidating Trust as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a).

Allocations of taxable income, gain, loss, deduction, and/or credit of the Liquidating Trust (other than such items allocable to any assets allocable to, or retained on account of, Disputed Claims, if such items are otherwise accounted for in a "disputed ownership fund") among the Holders of interests in the Liquidating Trust, as well as amounts realized by Holders on the Effective Date, will be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, and, if applicable, other than assets allocable to Disputed Claims) to the Holders of interests in the Liquidating Trust, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets for purposes of allocating taxable income and loss shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the IRC, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Liquidating Trust shall make a good faith valuation of the Liquidating Trust Assets. All parties to the Liquidating Trust (including, without limitation, the Debtors, the Liquidating Trustee, and Holders of interests in the Liquidating Trust) must consistently use such valuation for all U.S. federal income tax purposes. The Liquidating Trust shall also file (or cause to be filed) any other statements, returns or disclosures relating to the Liquidating Trust that are required by any Government Unit for taxing purposes. Taxable income or loss allocated to a Holder of interests in the Liquidating Trust will be treated as income or loss with respect to such Holder's undivided interest in the Liquidating Trust Assets, and not as income or loss with respect to its prior Allowed Claim. The character of any income and the character and ability to use any loss will depend on the particular situation of the Holders of interests in the Liquidating Trust.

The U.S. federal income tax obligations of a Holder with respect to its interest in the Liquidating Trust are not dependent on the Liquidating Trust distributing any Cash or other proceeds. Thus, a Holder may incur a U.S. federal income tax liability with respect to its allocable share of the Liquidating Trust's income even if the Liquidating Trust does not make a concurrent distribution to the Holder. In general, other than in respect of Cash retained on account of Disputed Claims and distributions resulting from undeliverable distributions (the subsequent distribution of which still relates to a Holder's Relevant Claim), a distribution of Cash by the Liquidating Trust will not be separately taxable to a Holder of interests in the Liquidating Trust since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the Liquidating Trust). Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of Cash originally retained by the Liquidating Trust on account of Disputed Claims.

The Liquidating Trustee will comply with all applicable governmental withholding requirements (*see* Article VI.E of the Plan). Thus, in the case of any Holders of interests in the Liquidating Trust that are not U.S. persons, the Liquidating Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate or is otherwise excluded from withholding). As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. Holders; accordingly, such Holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including owning an interest in the Liquidating Trust.

### 3.    *Tax Reporting for Assets Allocable to Disputed Claims*

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trust of an IRS private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee (i) may elect to treat any Liquidating Trust Assets allocable to, or retained on account of, Disputed Claims (*i.e.*, a Disputed Claim Reserve) as a "disputed ownership fund" governed by Treasury Regulations Section 1.468B-9, if applicable, and (ii) to the extent permitted by applicable law, will report consistently for state and local income tax purposes. Accordingly, if a "disputed ownership fund" election is made with respect to a Disputed Claim Reserve, such reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the Liquidating Trust Assets (including any gain recognized upon the disposition of such assets). All distributions from such reserves (which distributions will be net of the expenses, including taxes, relating to the retention or disposition of such assets) will be treated as received by Holders in respect of their Claims as if distributed by the Debtors. All parties (including, without limitation, the Debtors, the Liquidating Trustee, and the Holders of interests in the Liquidating Trust) will be required to report for tax purposes consistently with the foregoing. A Disputed Claim Reserve will be responsible for payment, out of the assets of the Disputed Claim Reserve, of any taxes imposed on the Disputed Claim Reserve or its assets. In the event, and to the extent, any Cash in the Disputed Claim Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the distribution of the assets in such reserve), assets of the Disputed Claim Reserve may be sold to pay such taxes.

E.     **Withholding on Distributions and Information Reporting**

All distributions to Holders of Relevant Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding.   Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%).   Backup withholding generally applies if the Holder (1) fails to furnish its social security number or other taxpayer identification number, (2) furnishes an incorrect taxpayer identification number, (3) fails properly to report interest or dividends, or (4) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding.   Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.   Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.   Holders of Relevant Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

In addition, a Holder of a Relevant Claim or a Holder of interests in the Liquidating Trust that is a not a U.S. person may be subject to up to 30% withholding, depending on, among other things, the particular type of income at issue and whether the type of income is subject to a lower treaty rate.   As to certain Claims, it is possible that withholding may be required with respect to Distributions by the Debtors even if no withholding would have been required if payment was made prior to the Chapter 11 Cases.   Moreover, withholding could apply on income of a non-U.S. person in respect of interests in the Liquidating Trust, and the Liquidating Trust could be required to make a payment to the IRS in satisfaction of such withholding, even where no distribution is made to such non-U.S. person.   A non-U.S. Holder may also be subject to other adverse consequences in connection with the implementation of the Plan.   As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. Holders.   Non-U.S. Holders are urged to consult their tax advisors regarding potential withholding on Distributions by the Debtors or payments from the Liquidating Trust.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.   Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the Holder's tax returns.

F.     **Importance of Obtaining Professional Advice**

**THE FOREGOING DISCUSSION OF CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION ONLY AND IS NOT TAX ADVICE.   HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE CONSUMMATION OF THE PLAN DESCRIBED HEREIN, AS WELL**

AS ANY OTHER TAX CONSEQUENCES, INCLUDING ANY TAX CONSEQUENCES ARISING UNDER STATE, LOCAL, OR NON-U.S. TAX LAWS.  NEITHER THE PROPONENTS OF THE PLAN NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON ARISING FROM OR RELATED TO THE U.S. FEDERAL, STATE, LOCAL, NON-U.S. OR ANY OTHER TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.

## ARTICLE X

## RECOMMENDATION

The Debtors and the Creditors' Committee believe that Confirmation and Consummation of the Plan are in the best interests of the Debtors, their Estates, and their creditors.  The Plan provides for an equitable distribution to Holders of Claims.  The Debtors and the Creditors' Committee believe that any alternative to Confirmation of the Plan, such as liquidation under chapter 7 of the Bankruptcy Code, could result in significant delay, litigation, and additional costs, as well as a reduction in the distributions to Holders of Claims in certain Classes. **Consequently, the Debtors and the Creditors' Committee urge all eligible Holders of Impaired Claims to vote to ACCEPT the Plan and to complete and submit their Ballots so that they will be RECEIVED by the Claims and Solicitation Agent on or before the Voting Deadline.**

Southern Foods Group, LLC (for itself and on behalf of all Debtors)

[DRAFT]
_____
Name: Gary Rahlfs
Title:   Senior Vice President & Chief Financial Officer